## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1] | Case No. 26-90103 (ARP) |
| Debtors. | (Joint Administration Requested)<br>(Emergency Hearing Requested) |

## DEBTORS' JOINT EMERGENCY MOTION
## FOR ENTRY OF ORDER (I) AUTHORIZING
## DEBTORS TO (A) PAY CERTAIN COMPENSATION AND
## BENEFITS OBLIGATIONS AND (B) MAINTAIN COMPENSATION
## AND BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

**Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on January 14, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on January 14, 2026, at 4:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "Judge Pérez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is proposed counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively, the "SO5 Digital Debtors"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are proposed counsel for the remaining Debtors (collectively, the "Global Debtors").

Saks Global Enterprises LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"),[2] respectfully represent as follows in support of this motion (the "Motion"):[3]

## RELIEF REQUESTED

1.     The Debtors seek entry of an order, substantially in the form attached hereto (the "Proposed Order") (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (b) granting related relief.

## JURISDICTION AND VENUE

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of*

---

[2]    For the avoidance of doubt, "Debtors" means, collectively, the Global Debtors and the SO5 Digital Debtors.  In 2021, the Global Debtors and the SO5 Digital Debtors entered into a series of agreements that resulted in the SO5 Digital Debtors effectively operating as a standalone company within the broader Saks corporate group.  Notwithstanding, certain operations remain consolidated within one or more of the Global Debtors.  Consequently, from time to time in the ordinary course of business, the Global Debtors make certain payments for the benefit of or allocable to the SO5 Digital Debtors for which the SO5 Digital Debtors remit reimbursement to the applicable Global Debtor.  To the extent the Global Debtors make any payments for the benefit of or allocable to the SO5 Digital Debtors, in accordance with the Approved Budget set forth in the Global Debtors' DIP Orders, the Global Debtors shall be entitled to assert an administrative priority claim against the applicable SO5 Digital Debtor(s); provided that all rights and defenses of all parties in interest shall be fully preserved with respect to any payments for the benefit of or allocable to the SO5 Digital Debtors (and whether or not such payments are for the benefit of or allocable to the SO5 Digital Debtors) after the earlier of (i) the second interim hearing on the SO5 Digital Debtors' motion for use of cash collateral or (ii) fourteen (14) days after the Petition Date, or such other date as may be agreed by the Global Debtors, the SO5 Digital Debtors, the SO5 Digital Debtors' prepetition agent, the DIP Agents, and the DIP Lenders (as defined in the Global Debtors' DIP Orders).

[3]    Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the *Declaration of Mark Weinsten in Support of Chapter 11 Petitions and First Day Pleadings*, the *Declaration of Andrew D.J. Hede in Support of SO5 Digital Debtors' Chapter 11 Petitions and First Day Pleadings* (together, the "First Day Declarations"), or the *Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, each filed concurrently herewith and incorporated by reference. The First Day Declarations describe in more detail the relationship between the Global Debtors and the SO5 Digital Debtors.

*Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), to the Court's entry of a final order in connection with this Motion.

3.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105(a), 362, 363(b), 507(a), and 541 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the *Procedures for Complex Cases for the Southern District of Texas*.

## BACKGROUND

5.      On January 13, 2026 (the "Petition Date") and January 14, 2026, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

7.      No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

8.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declarations.

## THE DEBTORS' WORKFORCE

9.      As of the Petition Date, the Debtors employ approximately 14,610 full-time employees and 2,220 part-time employees (collectively, the "Employees").    There are approximately 3,720 salaried and 13,110 hourly Employees.  The workforce is divided among the Debtors' headquarters located in New York, New York (the "Headquarters"), offices in Texas, distribution and fulfillment centers located in Pennsylvania, Nebraska, Texas, Michigan, New York, and Tennessee, and remote and home-based employees, some of whom are located outside of the United States.

10.     The Debtors also historically retained temporary Employees for specific short-term projects or roles and, in limited instances, independent contractors, such as freelance photographers, for specific events (collectively, the "Temporary Employees").  Most Temporary Employees are hired and compensated through various employment agencies (the "Staffing Agencies").   As of the Petition Date, the Debtors retain approximately 3,860 Temporary Employees.  The number of Temporary Employees fluctuates based on the Debtors' specific needs at any given time.

11.     In addition to the Employees and Temporary Employees, the Debtors contract with their merchandise vendors to place sales representatives in the Debtors' stores to assist the Debtors to sell branded merchandise (the "Independent Sales Representatives").  Historically, the Debtors do not typically pay the wages of the majority of the Independent Sales Representatives and, instead, such amounts are paid by the relevant merchandise vendors.  To the extent the Debtors do pay the wages of an Independent Sales Representative placed in their stores, the relevant merchandise vendor generally reimburses the Debtors for a portion of such wages.

12.     Approximately 170 of the Debtors' Employees are represented by six international and local unions (collectively, the "Unionized Employees" and, together with Employees,

Temporary Employees, and Independent Sales Representatives, the "Workforce").[4]  In connection therewith, the Debtors are party to seven collective bargaining agreements (collectively, the "CBAs") with the unions.

13.     The Debtors' Workforce performs a variety of functions critical to the Debtors' ordinary course operations and orderly administration of these Chapter 11 Cases.  The Workforce personnel are intimately familiar with the Debtors' businesses, processes, and systems, possess unique skills and experiences or have developed and maintain  essential relationships with certain key vendors.  Others provide services necessary to continue the Debtors' operations and maximize the value of the Debtors' estates.  These individuals cannot be easily replaced, if at all.  Without the continued, uninterrupted services of the Workforce, the Debtors' business operations would falter, materially impairing the administration of the Debtors' estates during these Chapter 11 Cases.

14.     Moreover, the vast majority of the Workforce relies exclusively on their compensation and benefits to pay their daily living expenses and to support their families.  These workers will be exposed to significant financial constraints and hardships if the Debtors are not permitted to continue paying their compensation and providing them with health and other benefits during these Chapter 11 Cases.  Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate due to the facts and circumstances of these Chapter 11 Cases.

---

[4]   The international and local unions include:  (a) the District Council for New York City and Vicinity, United Brotherhood of Carpenters and Joiners of America; (b) the New York Building and Construction Trades Council's Maintenance Organization; (c) the International Union of Operating Engineers; (d) Local 25, New York New Jersey Regional Joint Board, Workers United, affiliated with Service Employees International Union; (e) the Service, Production, Merchandising, Wholesale, Distribution, Clerical and Health Related Services Union, Local 210, affiliated with I.B.T.; and (f) Local 1102 Retail, Wholesale, and Department Store Union District Council and the United Food and Commercial Workers (collectively, the "Unions").

## COMPENSATION AND BENEFITS

15.     Effective January 1, 2026, the Debtors harmonized various components of their businesses, including their compensation and health and benefits structures.  Prior to January 1, 2026, Employees were employed through various Debtor entities, but, as of January 1, 2026, all but approximately 60 Employees are employed by Debtor Saks & Company LLC.  The remaining approximately 60 Employees are employed by Debtor Neiman Marcus Global Technology Services Private Ltd. ("NMG India").  Additionally, the Debtors further centralized their health and welfare benefits system to maximize and centralize benefit options for the Employees across healthcare providers.  Such harmonization will bring efficiency and synergy to the Debtors' operations.  Notwithstanding, certain health and benefit programs remain bifurcated between the Legacy Saks Employees and the Neiman Marcus Employees,[5] as discussed further herein.

16.     To minimize the personal hardship the Debtors' Workforce would likely suffer and potential Employee attrition that would likely follow if prepetition compensation and benefits obligations remained unpaid during these Chapter 11 Cases, the Debtors request authority, but not direction, to:  (a) pay and honor certain prepetition claims for, among other things, Compensation Obligations, fees on account of Payroll Withholding and Processing, and Health and Welfare Benefits and any other compensation or benefit programs that have historically been administered by the Debtors, as described herein (each as defined herein, and collectively, the "Compensation and Benefits," and the programs related thereto, the "Compensation and Benefits Programs," and the Debtors' obligations arising from the Compensation and Benefits Programs, the

---

[5]     In December 2024, Saks Fifth Avenue acquired the Neiman Marcus Group, which owned and controlled the Neiman Marcus and Bergdorf Goodman brands and related operations and employees.  "Legacy Saks Employees" refers to those legacy Employees historically under the Saks Global corporate entity group.  "Neiman Marcus Employees" refers to those Neiman Marcus and Bergdorf Goodman Employees acquired as part of the December 2024 acquisition or subsequently hired under the Neiman Marcus and Bergdorf Goodman corporate entity group.

"Compensation and Benefits Obligations") each as they become due and in the ordinary course of business, consistent with past practice; and (b) continue to honor obligations relating to or on account of the Compensation and Benefits Programs on a postpetition basis, as applicable, in each case, on a case-by-case basis and in the Debtors' discretion, as detailed herein and summarized in the chart below.  In addition, the Debtors also seek to pay all costs incidental to the Compensation and Benefits Programs.

17.     Subject to Court approval, the Debtors intend to continue their applicable prepetition Compensation and Benefits Programs in the ordinary course.  Out of an abundance of caution, the Debtors further request the right to modify, change, or discontinue any of their Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business during these Chapter 11 Cases and without the need for further approval by the Court, subject to applicable law.  For the avoidance of doubt, the Debtors do not, by this Motion, seek to pay outstanding prepetition amounts on account of the Compensation and Benefits in excess of the priority amount of $17,150 imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.[6]

18.     As set forth below, the Debtors seek authority but not direction, to pay, remit, or reimburse, as applicable, to the following aggregate prepetition amounts owed on account of the Compensation and Benefits:

| Relief Sought | Amount Requested |
|---|---|
| **Compensation Obligations** | **$50,271,600** |
| Saks & Company LLC Wages | $28,287,000 |
| NMG India Wages | $300,000 |
| Temporary Employee Costs and Fees (Including HBC India costs) | $6,956,000 |
| Commission Programs | $10,340,000 |
| Reimbursable and Job-Related Expenses | $3,470,600 |

---

[6]   Should the Debtors seek to pay amounts to any Workforce individual in excess of the $17,150 statutory cap, the Debtors shall seek relief pursuant to a separate motion.

| | |
|---|---:|
| Employee Recognition Programs | $54,000 |
| Non-Insider Severance Programs | $1,085,000 |
| **Payroll Withholding and Processing** | **$17,049,000** |
| Payroll Processors | $2,890,000 |
| Payroll Taxes and Employee Payroll Taxes | $14,021,000 |
| Deductions (Including Union Deductions) | $138,000 |
| **Health and Welfare Benefits** | **$72,895,350** |
| Legacy Health and Welfare Benefits | $19,039,200 |
| Current Health and Welfare Benefits | $8,956,900 |
| Health and Welfare Benefits Administrators | $374,550 |
| Paid Time Off and Leave Benefits | $15,138,400 |
| Retirement Benefits | $29,086,300 |
| COBRA | $300,000 |
| **Total:** | **$140,436,950** |

## I.   Compensation Obligations. [7]

### A.   Employee Wages.

#### 1.   Saks & Company LLC Employees.

19.     The Debtors incur obligations for their Employees for, among other things, wages, salaries, and overtime (the "Wages").  The Debtors pay Employees on a weekly or bi-weekly basis, one week in arrears.  Because Employees are paid in arrears, the Debtors may have accrued but not yet paid certain Wages as of the Petition Date.  Wages may also be due and owing as of the Petition Date due to, among other things, pay discrepancies that, upon reconciliation, may reveal that additional amounts are owed to certain Employees.

20.     As of the Petition Date, less than five of the Debtors' Employees work at non-Debtor, The Neiman Marcus Group Employees Federal Credit Union, a not-for-profit financial institution owned and operated by its members for the benefit of certain Employees

---

[7]   "Compensation Obligations" means, collectively, obligations on account of Wages, Temporary Employee Costs and Fees, Commission Programs, Reimbursable Expenses, the Credit Card Programs, the Cell Phone Programs, the Employee Recognition Programs, and the Severance Programs (each as defined herein).

(the "Neiman Credit Union").   The Debtors remit payroll to Employees of the Neiman Credit Union through their regular payroll system.

21.     In the twelve months prior to the Petition Date, the Debtors paid approximately $87,555,000 per month on account of Wages.  The Debtors estimate that, as of the Petition Date, there is approximately $28,287,000 in accrued and unpaid Wages obligations.  The Debtors request authority, but not direction, to pay all outstanding prepetition Wages and to continue to make all payments in the ordinary course of business on a postpetition basis and consistent with their prepetition practice.

### 2.     NMG India Employees.

22.     Approximately 60 of the Debtors' Employees are located at the Debtors' Indian entity, Debtor Neiman Marcus Global Technology Services Private Ltd.'s ("NMG India"). Pursuant to an intercompany services agreement by and between Debtor NMG Global Mobility, Inc. ("NMG Global Mobility") and Debtor NMG India (such agreement, the "Intercompany Services Agreement"), Employees at NMG India are responsible for performing various services for the benefit of the Debtors, including, but not limited to, certain information technology, data science, artificial intelligence, and machine learning services.  Additionally, the Debtors offer Health and Welfare Benefits (as defined herein) to the NMG India Employees.  In the twelve months prior to the Petition Date, the Debtors remitted approximately $300,000[8] per month to NMG India pursuant to the Intercompany Services Agreement, which NMG India then remits directly to the applicable Employees to satisfy such Employee-related payroll and Health and Welfare Benefits Obligations (as defined below).  The Debtors request authority, but not direction,

---

[8]     For the avoidance of doubt, the monthly intercompany payable to Debtor NMG India is in addition to the Wages amounts discussed above.

to pay all outstanding prepetition amounts incurred on account of the Intercompany Services Agreement and to continue to make all payments in the ordinary course of business on a postpetition basis and consistent with their prepetition practice.

**B.     Temporary Employee Costs and Fees.**

23.     The Debtors contract with various third-party service providers to efficiently manage and administer their Temporary Employees and temporary labor programs (collectively, the "Temporary Employment Administrators" and fees on account of the Temporary Employment Administrators and Staffing Agencies, collectively, the "Temporary Employee Costs and Fees"). The Temporary Employment Administrators do not provide Temporary Employees to the Debtors directly but, instead, complement the work of the Debtors' Staffing Agencies by, among other administrative tasks, coordinating limited access to the Debtors internal system, administering certain payroll and timekeeping processes, and managing Temporary Employee.  The Debtors rely upon the various software systems and tools utilized by the Temporary Employment Administrators to coordinate access to Temporary Employees in an efficient and organized manner.

24.     Under the Debtors' arrangements with the Temporary Employment Administrators, the Temporary Employment Administrators typically invoice the Debtors on a monthly basis for their services.  Likewise, in the ordinary course of business, the Staffing Agencies submit invoices to the Debtors on behalf of the Temporary Employees, which are subsequently paid in accordance with the Debtors' standard accounting practices and according to the terms of each Temporary Employee's contract.  The Debtors do not pay wages to, withhold taxes for, or provide benefits or paid time off to the Temporary Employees.

25.     Relatedly, Debtor Saks.com LLC, Debtor Saks Cloud Services LLC, and Debtor Saks & Company LLC are each party to non-exclusive support services agreements with non-

Debtor Hudson's Bay Services Private Limited ("HBC India" and, such agreements, the "HBC India Services Agreements"). Pursuant to the HBC India Services Agreement, HBC India provides defined support services related to information technology, analytics, human resources, finance, marketing, and logistics to support the Debtors' global operations. Each Debtor counterparty to the HBC India Services Agreements remits monthly fees and reimbursements to HBC India on account of such services. As of the Petition Date, the Debtors owe HBC India approximately $2,550,000 in connection with the HBC Services Agreements. Individuals employed by HBC India currently constitute Temporary Employees and are not directly employed by the Debtors. However, the Debtors expect to discontinue this arrangement in the near term and directly employ the individuals currently employed by HBC India.

26.    As of the Petition Date, the Debtors estimate that they owe approximately $1,585,000 in outstanding obligations due to the Staffing Agencies and approximately $2,821,000 to the Temporary Employment Administrators on account of their services, exclusive of costs due and owing to HBC India as of the Petition Date. The Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Temporary Employee Costs and Fees and amounts due and owing to HBC India and to continue to make all payments in the ordinary course of business on a postpetition basis and consistent with their prepetition practice.

    C.    **Commission Programs.**

27.    In addition to Employees receiving Wages, certain hourly-based Employees in sales and sales support roles are eligible to receive quota-based sales commissions based on each Employee's ability to meet or exceed certain predefined target performance metrics (including the Base Commission Programs and the Draw Commission Programs, each as defined below and, collectively, the "Commission Programs"). The Commission Programs motivate the Debtors' sales Employees to meet these defined sales targets, and the Commission Programs constitute part

of their ordinary course compensation on which these Employees depend.  Amounts earned pursuant to the Commissions Programs are paid as part of the Employees' regular payroll disbursements.

### 1.     Base Commission Programs.

28.     Eligible Employees in roles that require balancing selling with service and optics skills or in roles generally facing lower sales volatility, such as beauty advisors, beauty business managers, phone sellers, and certain jewelry associates, may participate in a "base plus commission" program that pays a steady hourly wage plus a predefined sales commission rate generally ranging between 3-5% (the "Base Commission Programs").  Commissions are based on the individual Employee's sales performance, including the sale price of any merchandise purchased or services provided that were effectuated by the Employee.  Some Base Commission Programs include seasonal base-rate reviews tied to a predefined target selling-cost metric.  Base Commission Programs do not include the Draw Commission sub-program, Million Dollar Book Program (as defined below), but may include role-specific bonuses and/or overrides.  Certain Base Commission Programs prescribe an initial commission rate that applies until a participating Employee reaches a defined cap on commission proceeds (the "Sales Plateau").  Generally, when an eligible Employee reaches his or her applicable Sales Plateau amount, that Employee's applicable commission rate may increase for future sales effectuated during the applicable commission period.  Certain Employees participating in the Base Commission Programs may be entitled to additional selling bonuses under the applicable Base Commission Programs.  For example, certain Employees in beauty advisor roles may be eligible for a $1,000 bonus upon achievement of $250,000 in "beauty sales" during the fiscal year.

2.      **Draw Commission Programs.**

29.      Eligible Employees in departments that emphasize high-ticket selling and clientele can participate in the Debtors' "draw vs. commission" program to compensate eligible Employees for sales achievements (the "Draw Commission Programs").   Under the Draw Commission Programs, qualifying Employees may receive a "draw," or an advance against future commissions, on a weekly basis.  Participating Employees' commission rates are set by the Debtors and vary by department.  Occasionally, participating Employees do not achieve sales sufficient to meet their "draw rate"; in such scenarios, the Debtors roll over any overage commission previously paid and generally offset such amounts against any future potential commissions earned.  Similarly, if the amount of commission payable to a participating Employee is higher than the commission "draw" received, the Debtors "true-up" or remit additional commission payments to such Employee during the next eligible pay period.

30.      The Draw Commission Programs include a sub-program that provides qualifying Employees with incremental bonuses and enhanced commission upon achievement of higher sales volume thresholds within a given fiscal year, starting at $1,000,000 (the "Million Dollar Book Program").  Sales volume thresholds reset at the beginning of each fiscal year, and standard commission rates apply until an eligible Employee hits the requisite sales volume threshold under the Million Dollar Book Program.  The Debtors calculate incremental bonuses under the Million Dollar Book Program at the end of each fiscal month.  For each milestone achieved during the relevant fiscal month, a corresponding incremental bonus under the Million Dollar Book Program will be paid out on the fourth paycheck of the following fiscal month.

31.      Approximately 6,020 Employees are eligible to participate in the Commission Programs.  As of the Petition Date, the Debtors estimate that they owe approximately $10,340,000 on account of accrued amounts due under the Commission Programs.  The Debtors are seeking

authority, but not direction, to pay all prepetition amounts due and owing under the Commission Programs and to maintain the Commission Programs in the ordinary course of business on a postpetition basis and consistent with past practices.

      **D.**     **Reimbursable and Job-Related Expenses.**

          **1.**     **Reimbursable Expenses.**

32.     The Debtors, in the ordinary course of business, reimburse Employees for a variety of reasonable approved business-related expenses incurred within the scope of their employment (the "Reimbursable Expenses).  The Debtors expect that Employees will continue to incur necessary Reimbursable Expenses in connection with the Debtors' business operations. Employees may incur and pay for such Reimbursable Expenses by using personal funds or credit cards, but, after submission and approval of expense reimbursement reports, are subsequently reimbursed by the Debtors through their payroll processor, WorkDay, Inc. ("WorkDay").  Eligible Employees generally utilize Navan, Inc. ("Navan") when making business travel arrangements and submit travel expense reports for reimbursement through Oracle iExpense software, administered by Oracle E-Business Suite ("Oracle").

33.     The Debtors pay, on average, approximately $75,000 per month on account of Reimbursable Expenses.  As of the Petition Date, the Debtors estimate that they owe approximately $38,500 on account of accrued amounts due on account of Reimbursable Expenses, including amounts owed to Navan and Oracle for use of their services.  Nonetheless, the Debtors seek authority, but not direction, to remit amounts due and owing on account of Reimbursable Expenses as of the Petition Date and to continue remitting amounts due and owing on account of Reimbursable Expenses in the ordinary course of business on a postpetition basis and consistent with past practices.

2. **Credit Card Programs.**

34.     In the ordinary course of business, the Debtors maintain four credit card programs with: (a) American Express Travel Related Services Company, Inc. ("Amex" and, such program, the "Amex Credit Card Program"); (b) JPMorgan Chase Bank, N.A. ("JPMorgan" and, such program, the "JPMorgan Credit Card Program"); (c) Silicon Valley Bank, a division of First-Citizens Bank & Trust Company ("Silicon Valley Bank" and, such program, the "Silicon Valley Credit Card Program"); and (d) Bank of America, N.A. and Bank of America Europe, DAC (collectively, "Bank of America" and, together with Amex, JPMorgan, and Silicon Valley Bank, the "Credit Card Providers" and, such program, the "Bank of America Credit Card Program," and, together with the Amex Credit Card Program, the JPMorgan Credit Card Program, and the Silicon Valley Credit Card Program, the "Credit Card Programs").   The Credit Card Programs are governed by the terms of those certain credit card agreements entered into between the Debtors and the Credit Card Providers (each individually a "Credit Card Agreement," and, collectively, the "Credit Card Agreements").

35.     Under the Credit Card Programs, the Debtors provide certain eligible Employees with access to credit cards on an as-needed basis to use primarily for corporate charges and travel expenses.  The Debtors are historically invoiced monthly by the applicable credit card provider. As of the Petition Date, the Debtors have approximately 310 credit cards under the Amex Credit Card Program, approximately 760 credit cards under the JPMorgan Credit Card Program, approximately 56 credit cards under the Silicon Valley Credit Card Program, and approximately 593 credit cards under the Bank of America Credit Card Program.

36.     On average, the Debtors accrue approximately $3,200,000 in the aggregate per month in charges pursuant to the Credit Card Programs.  As of the Petition Date, the Debtors believe they owe approximately $3,200,000 on account of accrued, but unpaid expenses under the

15

Credit Card Programs, comprised of approximately $726,000 under the Amex Credit Card Program, approximately $1,400,000 under the JPMorgan Credit Card Program, approximately $95,000 under the Silicon Valley Credit Card Program, and approximately $1,000,000 under the Bank of America Credit Card Program.  Although the Debtors do not believe that Employees may be held personally liable for any unpaid amounts on account of the Credit Card Programs, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any outstanding Credit Card Programs amounts owed as of the Petition Date and to continue the Credit Card Programs on a postpetition basis in the ordinary course of business consistent with past practices.

### 3. Cell Phone Program.

37.    The Debtors have historically paid for cellular service for certain Employees based on the requirements of their job functions (the "Cell Phone Program").  As part of the Cell Phone Program, the Debtors provide portable devices, such as smartphones and tablets, to their Employees and pay for the accounts associated with such portable devices through various cellular service providers such as AT&T and Verizon, among others (collectively, the "Cellular Service Providers").  Additionally, the Debtors may provide stipends to certain Employees who use their own mobile devices, rather than Debtor-owned devices.  As of the Petition Date, the Debtors estimate that they provide cell phones or similar devices to approximately 5,200 Employees.  As of the Petition Date, the Debtors believe they owe approximately $211,100 on account of accrued, but unpaid expenses under the Cell Phone Program.  The Debtors seek authority, but not direction, to pay any outstanding Cell Phone Program amounts owed as of the Petition Date and to continue the Cell Phone Program on a postpetition basis in the ordinary course of business consistent with past practices.

4.      **Employee Discounts.**

38.      In the ordinary course of business, the Debtors offer their Employees and such Employees' eligible dependents a discount (the "Employee Discount") on items purchased from the Debtors either in person or online.   Employees are eligible for a 20-40% discount applied toward their total purchase on qualifying merchandise.   The Employee Discounts improve Employee morale and retention and ensure that the Debtors secure their Employees as customers. Accordingly, the Debtors seek authority to continue offering and honoring the Employee Discounts in the ordinary course of business on a postpetition basis.

E.      **Employee Recognition Programs.**

39.      The Debtors maintain various recognition programs to boost and maintain morale, high performance, and engagement across their Workforce (the "Employee Recognition Programs").   As of the Petition Date, the Debtors offer thirteen Employee Recognition Programs. Such Employee Recognition Programs include, but are not limited to, synergy acceleration programs, warehouse and in-store role-specific recognition awards for high performance, recognition awards for exemplary customer care, and events hosted by the Debtors to honor top sellers across the Workforce, among other programs.   The Debtors historically fund specific department budgets with amounts ranging from approximately $2,000 to $36,000 for use under the Employee Recognition Programs.   Rewards under each relevant Employee Recognition Program vary, with some programs awarding recipients gift cards to the Debtors' stores.   The Employee Recognition Programs are designed to promote positive performance and maintain morale throughout the Workforce by recognizing exemplary performance across various departments.

40.      The Debtors maintain the majority of the Employee Recognition Programs through the Reward Gateway BX platform ("Reward Gateway" and such platform, the "BX Platform").

17

As compensation under certain Employee Recognition Programs, the Debtors may award an eligible Employee "points" through the BX Platform. Employees may also earn points on their work anniversary with the Debtors. Employees may cash in their points for various rewards offered across the BX Platform, including third-party gift cards and select merchandise.

41. The Debtors remit processing and use fees to Reward Gateway on a monthly basis in order to maintain access to the BX Platform. In 2025, the Debtors remitted approximately $150,000 to Reward Gateway on account of its services. As of the Petition Date, the Debtors estimate that approximately $54,000 remains outstanding on account of fees due and owing to Reward Gateway for use of the BX Platform services. Accordingly, the Debtors seek authority, but not direction, to pay any unpaid obligations due and owing under the Employee Recognition Programs and to Reward Gateway for use of the BX Platform service, each in a manner consistent with historical practices, and to continue to honor amounts accruing under the existing Employee Recognition Programs in the ordinary course of business during these Chapter 11 Cases.

**F.      Historical Employee Awards Programs.**

42. The Debtors historically provided certain other retentive- and incentive-based award programs for their Employees. For the avoidance of doubt, the Debtors are not seeking any relief pursuant to this Motion with respect to any award programs not referenced or described herein. To the extent the Debtors seek to make any payments on account of said historical award programs, or seek to implement new award programs, the Debtors will file a separate motion seeking such relief.

**G.      Non-Insider Severance Programs.**

**1.      Non-Unionized Employee Severance Practices.**

43. In the ordinary course of business, the Debtors maintain discretionary severance policies for the benefit of eligible non-Unionized Employees that may be involuntarily terminated

(collectively, the "Employee Severance Practices").  The Employee Severance Practices include the following:

- **Non-Insider Legacy Saks Employee Severance Practices**:  Historically, at the Debtors' sole discretion, the Debtors may offer severance to eligible Employees who do not have separate severance rights under an employment contract or CBA.  Payment is based on such Employee's job level, job type, and tenure with the Debtors.  Severance is historically paid out in periodic installments consistent with the Debtors' normal payroll practices or otherwise in accordance with state law, as applicable.  The Debtors may also offer a lump-sum payment at termination equal to the employer share of the Employee's healthcare premiums.  In order to receive severance, the Employee must sign a separation and release agreement.  Severance payments are remitted following execution of such agreement in line with the term set forth in the agreement.

- **Non-Insider Neiman Marcus Employee Severance Practices**:  Historically, at the Debtors' sole discretion, the Debtors may offer severance to eligible Employees with the title of "Director" or below through a salary continuation for a set number of weeks calculated based on job level and tenure with the Debtors.  Severance is typically remitted in periodic installments consistent with the Debtors' normal payroll practices or otherwise in accordance with state law, as applicable.  In order to receive severance, all eligible Employees must sign a separation and release agreement.  Severance payments are remitted following execution of such agreement in line with the term set forth in the agreement.

### 2.  Unionized Employee Severance Practices.

44.     Unionized Employees are eligible to receive severance in accordance with the terms of the CBAs (the "Union Employee Severance Practices" and, together with the Employee Severance Practices, the "Severance Programs" and obligations on account thereof, the "Severance Obligations").  Generally, the Debtors provide Unionized Employees with a certain number of weeks of base pay tied to completed years of service.  Unionized Employees must execute a separation and release agreement with the Debtors in order to receive any severance payment.

45.     At this time, the Debtors are seeking authority, but not direction, to pay only prepetition Severance Obligations that constitute priority treatment under Bankruptcy Code section 507(a).  Further, the Debtors seek authority, but not direction, to honor Severance Obligations on a postpetition basis solely as required by applicable law.  For the avoidance of

doubt, the Debtors are not seeking to pay any Severance Obligations to any of the Debtors' "insiders" as such term is defined under section 101(31) of the Bankruptcy Code.

## II.    Payroll Withholding and Processing.

### A.    Payroll Processing Fees.

46.    The Debtors process payroll for all Employees located in the United States through WorkDay and distribute checks and direct deposits to Employees through Automatic Data Processing, Inc. ("ADP" and, together with WorkDay, the "Payroll Processors").  The Payroll Processors provide services and administer payroll, which includes calculating and processing gross-to-net payroll, issuing payroll payments to the appropriate funds transfer networks, assisting with time-keeping services, generating pay statements, and coordinating the payment of any Deductions or other applicable withholdings.  The Payroll Processors debit the Debtors' respective bank accounts on a periodic basis in accordance with the applicable payroll period to satisfy all specific payroll and associated Withholding Obligations and Union Deductions (each as defined herein).  The ongoing services of the Payroll Processors are imperative to the smooth functioning of the Debtors' operations and payroll processing.  The Debtors pay WorkDay approximately $458,000 per month and ADP approximately $127,000 per month for their services (the "Payroll Processing Fees").  The Debtors remit all fees owed to WorkDay and ADP as part of the Debtors' relevant payroll cycle.  The Debtors estimate that, as of the Petition Date, the amount of accrued but unpaid obligations owed on account of the Payroll Processing Fees is approximately $2,890,000.

### B.    Deduction, Payroll Tax and Withholding Obligations.

47.    In the ordinary course of business and during each applicable payroll period, the Debtors routinely deduct amounts from Employees' paychecks for retirement programs, benefit

plans, flexible spending accounts, insurance programs, garnishments, and other similar programs (the "Deductions") and forward such amounts to various third-party recipients.

48.     In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authority.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (the "Payroll Taxes," and, collectively with Employee Payroll Taxes, the Payroll Processing Fees, and the Union Deductions (defined below), the "Payroll Withholding and Processing Obligations").  The Debtors' Payroll Withholding and Processing Obligations are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.  The Debtors generally remit such Payroll Withholding and Processing Obligations to the relevant authorities through the Payroll Processors.

### C.     Union Deductions.

49.     In the ordinary course of business, the Debtors withhold from the Unionized Employees' paychecks certain amounts for the payment of dues and, as applicable, initiation fees to the Union (together, the "Union Dues").  The Union Dues are remitted to the Union on a monthly basis.  The Union Dues are paid as part of the Debtors' payroll and amount to approximately $8,000 per month.

50.     In accordance with the Unionized Employees' applicable CBA, Unionized Employees may elect to contribute to the relevant Union's political / "voter education" committees.  On a monthly basis, the Debtors may deduct specified amounts from each

21

contributing Unionized Employee's payroll and remit such amounts to the relevant Union (the "Unpaid Union Committee Contributions" and, together with unpaid Union Dues, the "Union Deductions").  By this Motion, the Debtors seek authority, but not direction, to remit any Union Deductions in a manner consistent with historical practices and to continue to honor the Union Deductions in the ordinary course of business during these Chapter 11 Cases.

51.    In the twelve months prior to the Petition Date, the Debtors' average monthly Payroll Withholding and Processing Obligations was approximately $45,429,000.   As of the Petition Date, the Debtors estimate that they have accrued Payroll Withholding and Processing Obligations equal to approximately $14,021,000.  The Debtors seek authority, but not direction, to pay any unpaid prepetition Payroll Withholding and Processing Obligations in the ordinary course of business on a postpetition basis and consistent with past practices and to continue to honor the Payroll Withholding and Processing Obligations in the ordinary course of business during these Chapter 11 Cases.

**III.    Employee Benefits Programs.**

    **A.    Health and Welfare Benefits**

        **1.    Overview and January 2026 Harmonization.**

52.    In the ordinary course of business, the Debtors provide eligible Employees the opportunity to participate in a number of insurance and benefit programs, including, but not limited to, medical care, dental coverage, vision coverage, health savings accounts, coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), flexible spending accounts, life and disability insurance, and other benefit programs provided to Employees in the ordinary course of business (collectively, and as listed in detail in paragraphs 53-83 below, the "Health and Welfare Benefits" and the Debtors' obligations arising therefrom, the "Health and Welfare Benefits Obligations").

53.     As noted above, the Debtors recently undertook an initiative to harmonize their offered Health and Welfare Benefits to promote greater efficiency and synergies across their corporate enterprise.  Such harmonization commenced on January 1, 2026 with various health and welfare policies or programs either transferring to new providers or otherwise consolidating (those policies in effect prior to January 1, 2026, the "Legacy Health and Welfare Benefits", and those policies in effect as of January 1, 2026 and go forward, the "Current Health and Welfare Benefits"). The Debtors believe that prepetition amounts outstanding on account of any Current Health and Welfare Benefits are $8,956,900.

54.     Further, despite the January 1, 2026 transition, many of the Legacy Health and Welfare Benefits have outstanding costs due and owing on account of services provided or certain "tail" periods under the applicable policies.  In the twelve months prior to the Petition Date, the Debtors paid approximately $12,320,000 per month on account of the Legacy Health and Welfare Benefits.  As of the Petition Date, the Debtors estimate there is approximately $19,039,200 on account of the Legacy Health and Welfare Benefits, as set forth in the following chart:

| Legacy Health and Welfare Benefits[9] | | |
|---|---|---|
| **Program** | **Provider(s)** | **Prepetition Amount(s)** |
| *Medical Plans* | | |
| Legacy Saks Employee Medical Plan | Cigna Health and Life Insurance Company ("Cigna"); Geisinger Health System; Hawaii Medical Service Association ("HSMA") | $5,315,300 |
| Neiman Marcus Employee Medical Plan | Aetna Life Insurance Company; Blue Cross Blue Shield Association; Cigna; Dean Health Plan Inc./Prevea360 Health Plan; Geisinger Health System; Health Net, LLC; UPMC Health Plan; UnitedHealthcare Services, Inc.; Kaiser Permanente; Aon Exchange | $12,492,500 |

---

[9]     Unless otherwise indicated, a specific benefit or program applies to both the Legacy Saks Employees and the Neiman Marcus Employees.

| *Dental Plans* | | |
|---|---|---|
| Legacy Saks Employee Dental Plans | Cigna | $170,000 |
| Neiman Marcus Employee Dental Plans | Aetna; Delta Dental Plans Association; MetLife Life Insurance; Cigna; UnitedHealthcare | $414,700 |
| *Vision Plans* | | |
| Legacy Saks Employee Vision Plans | VSP Vision Care Inc. | $24,800 |
| Neiman Marcus Employee Vision Plans | VSP Vision Insurance; EyeMed Vision Care LLC; UnitedHealthCare; MetLife Insurance | $49,500 |
| *Flexible Spending Accounts* | | |
| Legacy Saks Employee Flexible Spending Accounts | WEX Health Inc. | $46,800 in unremitted Employee contributions |
| Neiman Marcus Employee Flexible Spending Accounts | Inspira Financial Trust, LLC | |
| *Health Savings Accounts* | | |
| Health Savings Accounts | Cigna; Aon Exchange (managed by HSA Bank and Optum, Inc.) | $0 in unremitted Employee contributions |
| | | $0 in unremitted Debtor contributions |
| *Basic Life and Disability Insurance* | | |
| Life and Accidental Death and Dismemberment Insurance | MetLife, Inc.; Reliance Matrix | $282,700 |
| Supplemental Voluntary Life and Accidental Death and Dismemberment Insurance | MetLife, Inc. | $0 |
| Short-Term and Long-Term Disability Coverage | Reliance Matrix | $210,900 |
| *Other Health and Welfare Benefits* | | |
| Miscellaneous Benefits | | $32,000 |
| **Total:** | | $19,039,200 |

55.     As of January 1, 2026, the Current Health and Welfare Benefits are the operative

benefit programs.  A summary chart is as follows and additional detail is set forth below:

| **Current Health and Welfare Benefits** | | |
|---|---|---|
| **Program** | **Provider(s)** | **Prepetition Amount(s)** |
| *Medical Plans* | | |
| Medical Plan | Cigna; Geisinger Health System; HSMA; Kaiser Permanente | $7,445,400 |

| *Dental Plans* | | |
|---|---|---|
| Dental Plans | Cigna | $596,700 |
| *Vision Plans* | | |
| Vision Plans | VSP Vision Care Inc. | $93,000 |
| *Flexible Spending Accounts* | | |
| Flexible Spending Accounts | HealthEquity | $110,000 in unremitted Employee contributions |
| *Health Savings Accounts* | | |
| Health Savings Accounts | HealthEquity | $104,500 in unremitted Employee contributions |
| | | $0 in unremitted Debtor contributions |
| *Basic Life and Disability Insurance* | | |
| Group Life and Accidental Death and Dismemberment Insurance | Reliance Matrix | $99,800 |
| Supplemental Voluntary Life and Accidental Death and Dismemberment Insurance | Reliance Matrix | $11,500 |
| Short-Term and Long-Term Disability Coverage | Matrix Absence Management Inc. | $194,800 |
| *Other Health and Welfare Benefits* | | |
| Miscellaneous Benefits | | $301,200 |
| **Total:** | | $8,956,900 |

56.     As of the Petition Date, the Debtors estimate there is approximately $27,996,100 outstanding on account of the Health and Welfare Benefits.  To ensure uninterrupted coverage to their Employees, the Debtors seek authorization to pay any prepetition amounts outstanding on account of the Legacy Health and Welfare Benefits and the Current Health and Welfare Benefits and to continue administering the Legacy Health and Welfare Benefits and the Current Health and Welfare Benefits, as applicable, in the ordinary course of business on a postpetition basis.

### 2.      Health and Welfare Benefits Administrators.

57.     As of the Petition Date, in the ordinary course of business, the Debtors engage Empyrean Benefit Solutions Inc. ("Empyrean") to assist with structuring and managing their

Health and Welfare Benefits.  In exchange for its services, Empyrean may earn commissions from the Health and Welfare Benefits plans.  The Debtors believe that failing to maintain its relationship with Empyrean on a go-forward basis would have an adverse effect on the Employees and the Debtors' ability to maintain and manage each Health and Welfare Benefit set forth herein.  As of the Petition Date, the Debtors owe Empyrean approximately $110,000 on account of its services.

58.     Prior to January 1, 2026, in addition to Empyrean, the Debtors utilized WorkDay, WEX Health Inc. ("WEX"), and Alight Solutions LLC ("Alight" and with WorkDay, WEX, and Empyrean, collectively, the "Health and Welfare Benefits Administrators") to assist with such services.  The Debtors believe it is important to remit such accrued and outstanding amounts to WorkDay, WEX, and Alight to ensure that the Employees' services are not interrupted upon commencement of these Chapter 11 Cases and the Debtors' transition to Empyrean.  This is especially important because the Debtors utilize WorkDay and WEX in connection with other aspects of the businesses, including as payroll processor and administrator of the Debtors' flexible spending plans, respectively.  As of the Petition Date, the Debtors owe Alight approximately $222,750 and owe WEX approximately $41,800 on account of each's services.[10]  The Debtors request authorization, but not direction, to remit amounts due and owing to the Health and Welfare Benefits Administrators on account of prepetition services and continue to honor any postpetition obligations in the ordinary course of business consistent with past practices.

### 3.     Current Medical and Prescription Benefits.

59.     As of January 1, 2026, the Debtors offer all eligible Employees and their dependents the option to select between four medical plans administered through Cigna Open Access Plus ("Cigna" and, such medical plans, the "Cigna Medical Plans").  The Cigna Medical

---

[10]     Amounts due and owing to WorkDay as of the Petition Date are discussed in paragraph 46.

Plans are self-insured.  Additionally, the Debtors offer six zip code-dependent medical coverage options for Employees in those applicable jurisdictions:  (a) one HMSA PPO Plan administered by HSMA; (b) three HMO plans administered by Kaiser Permanente (the "Kaiser HMO Plans"); and (c) two HMO plans administered through the Geisinger Health System (the "Geisinger HMO Plans" and, together with the Cigna Medical Plans, the HMSA PPO Plan, and the Kaiser HMO Plans, the "Current Medical Plans").  The Current Medical Plans provide coverage for, among other medical costs, outpatient and inpatient services, preventative care, and prescription drug services by Optum Rx ("Optum").

### 4.  Current Dental Plans.

60.     The Debtors offer eligible Employees and their dependents the option to select between two dental plans (the "Current Dental Plans") administered through Cigna:  (a) the Base Plan and (b) the Buy-Up Plan.  The Current Dental Plans are self-insured and fully funded through Employee Deductions.  Accordingly, the Debtors do not believe any prepetition amounts are outstanding on account of the Current Dental Plans.

### 5.  Current Vision Plans.

61.     The Debtors offer eligible Employees and their dependents the option to select between two vision plans administered through VSP Vision Care Inc.:  (a) the Base Plan and (b) the Buy-Up Plan (the "Current Vision Plans").  The Current Vision Plans are fully funded through Employee Deductions.  Accordingly, the Debtors do not believe any prepetition amounts are outstanding on account of the Current Vision Plans.

### 6.  Current Flexible Spending Accounts.

62.     As of January 1, 2026, eligible Employees may elect to participate in the Debtors' tax-advantaged flexible spending account plans administered by HealthEquity, Inc. ("HealthEquity").  The Debtors offer three plans administered by HealthEquity:  (a) the Health

Care FSA, (b) the Limited Purpose FSA, and (c) the Dependent Care FSA (collectively, the "Current FSA Plans").  Employees are entitled to enroll in one of the three HealthEquity plans depending on which Current Medical Plan the Employee is enrolled.

63.     Following each pay period, Employee payroll contributions to the Current FSA Plans (the "Current Employee FSA Contributions") are remitted to, and held by, HealthEquity on behalf of each participating Employee.  When an Employee seeks to use any elected flexible spending account amounts, HealthEquity reviews the request to ensure that it meets the flexible spending account requirements before funding the claim.  Eligible Employees enrolled in one of the Current FSA Plans may contribute up to $3,400 in Current Employee FSA Contributions per year under the Health Care FSA and the Limited Purpose FSA and up to $7,500 ($3,750 if married and filing separate tax returns) in Current Employee FSA Contributions per year under the Dependent Care FSA.

### 7.     Current Health Savings Accounts.

64.     As of January 1, 2026, depending on the Current Medical Plan in which an eligible Employee is enrolled, an Employee may also elect to participate in the Debtors' tax-advantaged health savings account plan (collectively, the "Current HSA Plans" and, such participants, the "Current HSA Plan Employees"), managed by HealthEquity.  In 2026, employer contributions are generally funded as an initial contribution on the following scale:  (a) the Debtors contribute $250 per year to all Current HSA Plan Employees enrolled in the Employee-only medical plan; and (b) the Debtors contribute $500 per year to all Current HSA Plan Employees enrolled under the Employee plus spouse, children, or family medical plans (collectively, the "Current Debtor HSA Contributions").   Generally, the Debtors' and each Current HSA Plan Employee's contributions may not exceed $4,400 for the Employee-only medical plan ($5,400 if age 55 or

older) and $8,750 for the Employee plus spouse/domestic partner and Employee plus child(ren) or family medical plan ($9,750 if age 55 or older) (the "Current Employee HSA Contributions").

### 8.    Current Basic Life and Disability Insurance.

65.    As of January 1, 2026, the Debtors provide all eligible Employees with group life and accidental death and dismemberment insurance (the "Current Life/AD&D Insurance") through Reliance Matrix, which is offered to all eligible Employees at no cost.  Further, the Debtors offer salary continuation for short-term disability coverage (the "Current Short-Term Disability Coverage") and long-term disability coverage (the "Current Long-Term Disability Coverage" and, together with the Current Short-Term Disability Coverage, the "Current Disability Coverage Policies") through Matrix Absence Management Inc. ("Matrix Absence").

### 9.    COBRA Benefits.

66.    Pursuant to COBRA, certain of the Debtors' former Employees (the "COBRA Participants") may continue insurance coverage under certain Health & Welfare Benefits (the "COBRA Benefits").  COBRA Participants are entitled by law to receive COBRA Benefits for up to 18 months, and in certain instances up to 36 months, after termination of their employment.  As of the Petition Date, the Debtors estimate that approximately $300,000 remains outstanding on account of the COBRA Benefits.  The Debtors seek authority to pay any prepetition and postpetition obligations relating to COBRA in the ordinary course of business and consistent with past practices.

### B.    Paid and Unpaid Leave.

67.    The Debtors maintain several paid leave benefit programs for their Employees, providing paid leave for paid time off ("PTO"), holidays, and other personal leaves of absence (collectively, the "Paid Leave").  These forms of compensation are, in certain cases, required by statute, and, in all cases, customary and necessary.  These policies enable the Debtors to retain

qualified Employees to operate their businesses. Failure to provide these benefits could contravene applicable law, harm Employee morale, and encourage the premature departure of Employees. The Debtors, therefore, request authority, but not direction, to continue these benefits programs in the ordinary course of business during these Chapter 11 Cases.

68.      <u>Paid Time Off</u>.   The PTO policies for each Debtor vary.   Temporary Employees generally are not eligible to accrue PTO, unless required by local law or regulation.   The PTO policies are generally described below:

- **Saks Employees' PTO Policies**:   Eligible Employees are generally entitled to an unlimited, flexible PTO policy.   There is generally no minimum increment to take PTO, but Employees may only request a maximum of two consecutive weeks of PTO at a time. If any PTO request exceeds two consecutive weeks, Employees generally must apply for a personal unpaid leave of absence.   Certain eligible Employees receive an allotted amount of PTO days based on years of service and full-time or part-time status, available on an accrual basis as determined by each applicable Debtor entity.

- **NMG Employees' PTO Policies**:   Hourly Employees that are eligible to receive overtime payments accrue PTO based on length of service with the Debtors pursuant to the following increments:  (a) eligible Employees who have completed 0-1 year of service receive up to one week of PTO; (b) eligible Employees who have completed 5-15 years of service receive up to three weeks of PTO; (c) eligible Employees who have completed at least 15 years of service receive up to four weeks of PTO.   Certain salaried Employees are eligible to participate in a flexible PTO program (the "<u>NMG WOW Program</u>"), under which eligible Employees are expected to take three weeks of PTO each year.   Participation in the NMG WOW Program is contingent upon the eligible Employee exhibiting satisfactory job performance, meeting performance priorities, and obtaining approval from their respective manager prior to taking PTO.

- **Unionized Employees**:   Full-time and part-time Unionized Employees begin accruing PTO after a certain period of service pursuant to the terms of the relevant Unionized Employee's CBA.   The relevant CBA either adopts the PTO policy offered by the Debtors or is based on length of service arrangements.   Unionized Employees must request their PTO days in accordance with the terms of the CBA.

69.      Eligible Employees are permitted to apply their PTO to take vacation, sick days, and personal days.  Eligible Employees are generally not permitted to carry over unused portions of PTO each year and/or to receive cash payouts for unused PTO, unless required by state law.

70.     <u>Holidays</u>.  In addition, in 2025, the Debtors generally offered Employees up to six or seven paid holidays, while Unionized Employees received eight paid holidays throughout the year (collectively, the "<u>Holidays</u>").  Generally, eligible Employees and Unionized Employees are not required to work on designated Holidays, however Unionized Employees working in the Debtors' stores and logistics centers are typically required to work on Holidays with limited exceptions.  Employees that are scheduled to work on a Holiday are generally granted a different day off, which must be taken within 60 calendar days of the actual designated Holiday.  In accordance with the terms of the CBAs, full-time Unionized Employees scheduled to work on a Holiday may qualify for compensation at a specified Holiday rate.

71.     <u>Other Leaves of Absence</u>.  The Debtors also permit eligible Employees to take certain other paid and unpaid leaves of absence for personal reasons.  Based on an Employee's location, the Debtors offer certain paid and unpaid leaves, including: (a) certain paid parental leave following the birth, adoption, or foster care placement of a child, including paid break times for nursing mothers; (b) time to be used by Employees for personal absences; (c) certain military leaves of absence; (d) emergency bereavement and compassionate leave; and (e) leave for jury duty and witness duty, among other leaves of absence.  Unionized Employees receive other forms of paid and unpaid leaves of absence in accordance with the terms of the CBAs.  The Debtors rely on Reliance Standard Life Insurance Company ("<u>Reliance Matrix</u>") and Matrix Absence Management, Inc. for reviewing, approving, processing, and tracking leave requests related to the U.S. Family and Medical Leave Act.  In the twelve months prior to the Petition Date, the Debtors paid Reliance Matrix approximately $1,750,000 and Matrix Absence approximately $1,170,000 for their services.  As of the Petition Date, the Debtors estimate that they owe Reliance Matrix approximately $107,000 on behalf of its services and owe Matrix Absence approximately

$219,000 on behalf of its services.  The Debtors seek authority, but not direction, to remit such amounts to Reliance Matrix and Matrix Absence in a manner consistent with historical practices and to continue to honor such amounts in the ordinary course of business during these Chapter 11 Cases.

### C.   Workers' Compensation

72.   The Debtors maintain workers' compensation insurance that provides coverage for their Employees for employee-related injuries, disability, or death, as prescribed by state and federal workers' compensation laws and other statutes, at no cost to Employees (the "Workers' Compensation Policies").  The Workers' Compensation Policies are maintained through Safety National Casualty Corporation ("Safety National") and Liberty Mutual Insurance Company ("Liberty Mutual").  Under the Workers' Compensation Policies, the Debtors are responsible for workers' compensation claims up to $500,000 under such policy maintained by Safety National and up to $750,000 under such policy maintained by Liberty Mutual.  If a workers' compensation claim exceeds $500,000 under the policy maintained by Safety National, Safety National provides all excess insurance coverage up to the policy limit.  If a workers' compensation claim exceeds $750,000 under the policy maintained by Liberty Mutual, Liberty Mutual provides all excess insurance coverage up to the policy limit.  The annual premium for the Workers' Compensation Policies equals approximately $1,507,365 for the 2024-2025 policy period, which the Debtors have paid in full.  Under the Workers' Compensation Policies, the Debtors historically pay monthly premiums based on an annual estimated projected payroll, which is audited and reconciled annually.

73.   The Debtors also maintain a Texas opt-out, non-subscription workers' compensation plan for Employees working in the state of Texas (the "Texas Opt-Out Program" and, together with the Workers' Compensation Policies, the "Workers' Compensation Program")

through Zurich American Insurance Company ("Zurich"), provided by PartnerSource and administered by ESIS Inc.  Similarly, certain claims for Texas-based Employees under the policy maintained by Safety National are administered by Broadspire Services, Inc. ("Broadspire" and, together with Safety National, Liberty Mutual, Zurich, and ESIS Inc., the "Workers' Compensation Administrators").  As of the Petition Date, the Debtors believe they owe approximately $99,000 in administrative fees to the Workers' Compensation Administrators on account of their services.

74.     To ensure that the Debtors comply with state law requirements, it is necessary to obtain authority to continue to maintain the Workers' Compensation Program in the ordinary course of business.  Accordingly, the Debtors seek authority, but not direction, to pay any prepetition amounts related thereto, including, without limitation, any payments for future workers' compensation claims, premiums, deductibles, and fees owed for administrative costs, and other amounts required in connection with the Workers' Compensation Program as such amounts become due in the ordinary course of business.  As of the Petition Date, the Debtors estimate that they owe approximately $14,713,400 on account of the Workers' Compensation Program.

D.     **Employee Retirement Benefits.**

1.     **401(k) Plan**

75.     The Debtors maintain and administer a 401(k) savings plan, a qualified defined contribution plan pursuant to section 401(k) of the Internal Revenue Code, for all eligible Employees and Unionized Employees (the "401(k) Plan").  Approximately 13,250 Employees actively participate in the 401(k) Plan.  Prior to January 1, 2026, Bank of America Merrill Lynch ("Bank of America"), Voya Financial, Inc. ("Voya"), and Fidelity Investments ("Fidelity") acted as record keepers to the 401(k) Plans.  As of January 1, 2026, Bank of America acts as the record keeper to the 401(k) Plan for all Employees.

76.     The Debtors contribute to Employees' 401(k) Plans on a discretionary basis that is determined annually.  Each pay period, the Debtors match 100% on the first 1% of eligible compensation and 50% on the next 5% of eligible compensation, up to a maximum of 6% (the "401(k) Employer Contributions").  The 401(k) Employer Contributions are remitted each pay period.  Over the past twelve months, the 401(k) monthly contributions totaled approximately $104,200,000, equal to approximately $76,200,00 of withholdings made from participating Employees' paychecks and approximately $28,000,000 of 401(k) Employer Contributions.  As of the Petition Date, the Debtors believe they owe approximately $5,940,000 on account of prepetition 401(k) Employer Contributions.

## 2.     Qualified Pension Plans.

77.     Certain of the Debtors maintain two qualified defined benefit pension plans (the "Qualified Pension Plans") under the Internal Revenue Code and the Employee Retirement Income Security Act (ERISA) for certain current and former employees.  The Qualified Pension Plans provide current and future pension benefits to approximately 8,158 participants, 1,297 of whom are current Employees, 3,575 of whom are no longer employed by the Debtors and vested in their benefits, and 3,286 of whom are retirees receiving payments (collectively, the "Pension Recipients").  Pension Recipients are generally eligible to begin receiving monthly payments at retirement, usually 65 years of age, but certain eligible Employees may elect a lesser benefit at age 55 with 15 years of credited service.

78.     Funds used to make distributions to Pension Recipients are held in a pension trust fund and are not intermingled with the Debtors' operating cash.  As of January 2026, the projected Qualified Pension Plan obligation is approximately $465,000,000.  The Pension Recipients receive approximately $5,800,000 in the aggregate on a monthly basis under the Pension Plan from the pension trust fund.  Payments to recipients are not drawn from the Debtors' cash on hand.  The

Debtors, however, make quarterly contributions of approximately $4,100,000 million to the pension trust fund.  The Debtors' next contribution, in the amount of approximately $393,000, is due January 15, 2026.

79.     In addition, the Debtors pay approximately $5,400,000 in annual premiums to the Pension Benefit Guaranty Corporation (the "PBGC") from a pension trust fund.  Payments are not drawn from the Debtors' cash on hand.  As of the Petition Date, the Debtors estimate that they owe approximately $5,940,000 on account of PBGC premiums (the "Unpaid PBGC Premiums").  By this motion, the Debtors request authorization, but not direction, to continue the Qualified Pension Plans on a postpetition basis, to remit the Unpaid PBGC Premiums, and to honor any other prepetition obligations related therewith in the ordinary course of business.

### 3.     Supplemental Nonqualified Retirement Plans.

80.     The Debtors offer a variety of supplemental nonqualified plans that are not subject to ERISA standards or protections and provide a tax-deferred income to participants (collectively, the "Supplemental Retirement Plans" and, together with the 401(k) Plan and the Qualified Pension Plans, the "Retirement Benefits").  As of the Petition Date, the Debtors estimate that they owe approximately $17,200,000 in the aggregate on account of the Supplemental Retirement Plans. The amount that the Debtors pay to recipients each month varies depending on, among other things, the date of retirement of the recipients.  Approximately $114,810 will be due and owing in January 2026 on account of the Supplemental Retirement Plans.  The Debtors seek authority, but not direction, to pay prepetition and postpetition amounts outstanding as they come due in the ordinary course of business, and to continue these programs in the ordinary course of business on a postpetition basis.  The Supplemental Retirement Plans include:

- **DC SERP:**  The Debtors provide Employees above the compensation limit set for ERISA qualified plans to participate in a defined contribution retirement plan (the "DC SERP"). Approximately two current Employees participate in the DC SERP, and no retired

employees are receiving benefits under the DC SERP. To be eligible, participants must have been employed by the Debtors for at least one year with a base salary of 80% of the IRS Compensation Limit on the first of August of the previous year. The Debtors typically contribute 8% of base salary and performance bonus above the IRS compensation limit ("DC SERP Contributions"). All DC SERP Contributions are vested at five years of participation or age 65, death, disability, or change in control. Payments under the DC SERP are made in equal installments on an annual basis for three years after retirement or a later date elected by the recipient.

- **Saks DB SERP:** Additionally, the Debtors maintain a defined benefit supplemental retirement plan for certain associates who earn base salaries over a certain threshold amount (the "Saks DB SERP"). The Saks DB SERP has been frozen since 2006, except that accruals for certain participants continued until March 2009. Participants become eligible to receive monthly payments upon retirement from the Debtors. Normal retirement age is 65, although a lesser benefit may be triggered at age 55 with ten years of service. While there are no current Employees participating in the Saks DB SERP, approximately 48 retired employees are currently receiving benefits.

- **Neiman Marcus Post-Retirement Welfare Plan:** The Debtors also maintain a post-retirement welfare benefits program to provide medical benefits to eligible retirees (the "NMG Post-Retirement Welfare Plan"). The NMG Post-Retirement Welfare Plan currently has approximately 203 participants, approximately 89 of which are presently receiving benefits under the plan. Eligibility is generally limited to certain legacy cohorts hired before March 1, 1989. Beginning January 1, 2018, participating retired employees aged 65 or older moved from traditional coverage to individual coverage via a Willis Towers Watson Private Exchange, which is generally paired with a retiree health reimbursement arrangement ("HRA"), while retired employees under 65 years of age continue on the traditional group coverage. The Debtors generally credit a participating retired employee's HRA when such retired employee reaches the age of 65, contributing between $0 and $3,000 annually based on the retired employee's date of hire and retirement date. For participants under the age of 65, the program is generally unfunded and the Debtors may allocate the cost of benefits and premiums for that cohort in its discretion.

### E.   Miscellaneous Employee Benefit and Welfare Programs.

81.   In addition to the above-mentioned benefit programs, the Debtors historically maintain various other benefit programs, including emotional well-being and therapeutic services, various wellness programs, pet insurance coverage, tuition assistance and/or reimbursement, adoption and family planning resources, legal and financial resources, and identity theft protection services, among other benefits (collectively, the "Miscellaneous Employee Benefit and Welfare

Programs"). As of the Petition Date, the Debtors estimate that they owe approximately $333,200 on account of the Miscellaneous Employee Benefit and Welfare Programs.

82.    The Miscellaneous Employee Benefit and Welfare Programs are an important part of the total benefits package offered by the Debtors to their Employees. The Debtors believe that the Miscellaneous Employee Benefit and Welfare Programs are important to maintain Employee morale and assist in the retention of the Debtors' workforce. The Debtors believe that failing to honor expected benefits under such Miscellaneous Employee Benefit and Welfare Programs, as well as the Debtors' main Health and Welfare Benefits, would have an adverse effect on the Employees.

83.    The Debtors therefore seek authority, but not direction, to pay unpaid prepetition amounts owed on account of the Miscellaneous Employee Benefit and Welfare Programs and to continue paying amounts that come due on a postpetition basis in the ordinary course of business and consistent with past practice.

## BASIS FOR RELIEF REQUESTED

I.    **Payment of the Compensation and Benefits Obligations Is a Sound Exercise of the Debtors' Business Judgment and Is Appropriate Under Sections 363 and 105(a) of the Bankruptcy Code.**

84.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b)(1), courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business upon the debtor showing that sound business reasons support the proposed use of property. See, e.g., In re BNP Petroleum Corp., 642 F. App'x 429, 434–35 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation and citation

omitted); In re Cont'l Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); see also In re Crutcher Res. Corp., 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); In re Terrace Gardens Park P'ship, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted).  When applying the "business judgment" standard, courts show great deference to the debtor's decision making.  See Richmond Leasing Co. v. Cap. Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985).  Thus, if a transaction satisfies the business judgment rule, it should be approved under section 363(b)(1) of the Bankruptcy Code.

85.     In addition to being justified under section 363(b)(1) of the Bankruptcy Code, payment of the Compensation and Benefits Obligations is warranted under the doctrine of necessity.  Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), bankruptcy courts may "authorize the payment of prepetition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization."  See In re Just for Feet, Inc., 242 B.R. 821, 824 (Bankr. D. Del. 1999).

86.     Courts generally acknowledge that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating

business's going-concern value.  See, e.g., In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); In re Scotia Dev., LLC, No. 07-20027-RSS, 2007 WL 2788840, at *1 (Bankr. S.D. Tex. Sep. 21, 2007) (acknowledging the existence of the doctrine of necessity); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); see also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (granting authority to pay prepetition claims of certain vendors and finding that such payment was "essential to the survival of the debtor during the chapter 11 reorganization"). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

87.     It is a sound exercise of the Debtors' business judgment to pay the Compensation Obligations and Payroll Withholding and Processing Obligations and, to the extent requested herein, the Health and Welfare Benefits Obligations because doing so will help the Debtors avoid the potential for value-destructive interruption to their business operations during these Chapter 11 Cases.  For the reasons discussed herein, payment of the Compensation and Benefits Obligations enhances value for the benefit of all interested parties.  The Debtors' ability to continue operations and maximize value depends, in large part, on the retention, motivation, and productivity of their Workforce, whose efforts will be critical to the success of these Chapter 11 Cases.  Most of the Debtors' Workforce rely exclusively on the Compensation and Benefits Obligations to satisfy their daily living expenses.  If amounts owed are not received or benefits are delayed, the Workforce may be exposed to significant financial hardship; in some cases,

individuals will be unable to meet their basic needs, which may make continuing to work for the Debtors impossible.  If the Debtors are unable to satisfy their various compensation and benefits obligations, the Workforce will suffer at a time when their support is critical to the Debtors. Therefore, to provide certainty to the Debtors' Workforce, maintain morale and productivity, limit turnover, and minimize any adverse effect of the commencement of these Chapter 11 Cases, it is necessary to continue providing ordinary course compensation and benefits to such individuals. Moreover, for the avoidance of doubt, no member of the Workforce will receive payment under this Motion in excess of the statutory cap of $17,150 on account of any existing Compensation and Benefits Programs outstanding as of the Petition Date.  Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to pay and continue the Compensation Obligations and the Prepetition Withholding and Processing Obligations and, as applicable, the Health and Welfare Benefits Obligations in the ordinary course of business and consistent with past practice.

## II.     Payment of Certain of the Compensation and Benefits Obligations Are Required as Priority Claims.

88.     The Debtors believe that the majority of the Compensation and Benefits Obligations constitute priority claims under sections 507(a)(4), (a)(5), and (a)(8) of the Bankruptcy Code, which must be satisfied before any general unsecured claims against the Debtors' estates. See 11 U.S.C. §§ 507(a)(4), 507(a)(5), 507(a)(8), 726.  Specifically, under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status up to $17,150 per individual.  See 11 U.S.C. § 507(a)(4)(A).

89.     Under section 507(a)(5) of the Bankruptcy Code, employees' claims for contributions to certain employee benefit plans are also afforded priority unsecured status up to

$17,150 per employee covered by such plan, less any amount paid under section 507(a)(4). <u>See</u> 11 U.S.C. § 507(a)(5)(A). The same holds true for the payment of payroll taxes, as the relevant taxing authorities generally would hold priority claims under section 507(a)(8) of the Bankruptcy Code for such obligations and their payment will not prejudice other creditors of the Debtors. <u>See</u> 11 U.S.C. § 507(a)(8).

90. The Debtors believe that no member of the Workforce is owed accrued and unpaid Wages in excess of the cap, and no amounts are accrued and owing under any benefits plan in excess of the cap. Thus, the Compensation Obligations and the Payroll Withholding and Processing Obligations and, as applicable, the Health and Welfare Benefits Obligations are priority claims that, in any event, must be paid in full under the Bankruptcy Code. As a result, payment of such Compensation and Benefits Obligations merely expedites the treatment afforded to such claims and is consistent with the priority scheme set forth in the Bankruptcy Code. Accordingly, the Debtors request entry of the Order authorizing the Debtors to pay the Compensation Obligations subject to the $17,150 per individual cap, and authorizing the Debtors to pay the Compensation Obligations and, as applicable, the Health and Welfare Benefits Obligations and continue paying Workforce obligations in the ordinary course throughout these Chapter 11 Cases.

### III. Funds Related to the Payroll Withholding and Processing Obligations May Be Held in Trust and Are Not Property of the Estates.

91. Payroll Taxes withheld from an Employee's wages and any other Payroll Withholding and Processing Obligations are collected or withheld by the Debtors and may be held in trust for the benefit of the applicable taxing authority. As a result, Payroll Taxes and other Payroll Withholding and Processing Obligations are not property of the Debtors' estates under section 541 of the Bankruptcy Code and those funds, therefore, are not available for the satisfaction of creditors' claims. <u>See</u>, <u>e.g.</u>, <u>Begier v. IRS</u>, 496 U.S. 53 (1990) (withheld taxes are property held

by the debtor in trust for another and, as such, not property of the debtor's estate); <u>In re Equalnet</u> <u>Commc'ns</u>, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing <u>In re Al</u> <u>Copeland Enter., Inc.</u>, 991 F.2d 233 (5th Cir. 1993)).  Instead, the Debtors may be obligated to remit these funds to the applicable taxing authority.

92.     Many federal, state, and local statutes also impose personal liability on officers and directors of companies for the failure to remit certain Payroll Taxes and other Payroll Withholding and Processing Obligations.  To the extent that the relevant Payroll Taxes and other Payroll Withholding and Processing Obligations remain unpaid by the Debtors, the Debtors' directors, officers, and executives may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases.  Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Debtors and their directors, officers, and executives from devoting their full attention to the Debtors' businesses and the orderly administration of these Chapter 11 Cases.  The Debtors believe that these distractions would materially undermine their ability to operate in the ordinary course of business and to administer these Chapter 11 Cases, with resulting detriment to any parties-in-interest.

93.     For these reasons, the Debtors submit that the relief requested in this Motion is essential, appropriate, and in the best interests of their estates, creditors, and any parties-in-interest, and, therefore, should be granted.

**IV.    The Debtors Do Not Seek to Make Payments in Connection with Compensation Obligations Outside the Scope of Section 502(b)(7) or that are Subject to Section 503(c).**

94.     By this Motion, the Debtors seek authority to continue the Commission Programs, Employee Recognition Programs, and Severance Programs in the ordinary course and honor, in the Debtors' sole discretion, obligations on account of such programs that arise after the Petition

Date exclusively for non-insider Employees.  For the avoidance of doubt, the Debtors do not seek authority to pay such amounts to "insiders" during these Chapter 11 Cases.

95.     Given the uncertainty attendant to companies operating in chapter 11 and out of an abundance of caution, the Debtors request authority, in their sole discretion, to continue the Severance Programs with respect to non-insider Employees terminated postpetition in the ordinary course of business, if any, in an effort to provide additional comfort to such Employees.  For the avoidance of doubt, the Debtors are not requesting authority to, and will not make, any payments to insiders that are subject to section 503(c) of the Bankruptcy Code.

96.     The Compensation Obligations do not implicate section 503(c)(3) of the Bankruptcy Code because they do not include insiders and payments made pursuant to the Compensation Obligations are within the ordinary course of the Debtors' businesses. See 11 U.S.C. § 503(c)(3) (prohibiting certain payments "outside the ordinary course of business").  The Court may grant the relief requested if it finds that a non-insider severance program satisfies the requirements of section 363(b) of the Bankruptcy Code.  See In re Equalnet Commc'ns, 258 B.R. at 370 ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense.  Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").  None of the Employees that would be paid on account of the Commission Programs or Severance Programs are "insiders" of the Debtors for purposes of section 503(c) of the Bankruptcy Code because none of the Employees: (a) participate in the management of the Debtors; (b) have decision-making authority with respect to the policies of the Debtors; (c) report directly to the Debtors' board of directors; (d) were appointed by the Debtors' board of directors; (e) qualify as an "insider" under Rule 16a-1(f) of the Securities Exchange Act;

(g) undertake budget control over the Debtors' business operations; (h) are compensated in the form of equity of the Debtors; and (i) are relatives of any insider of the Debtors.  Accordingly, the Debtors submit that the Compensation Obligations do not implicate section 503(c) of the Bankruptcy Code.

97.    For the reasons stated herein, discretion to continue the Compensation Obligations—similar to all of the relief sought through this Motion—is critical and necessary to assuage Employee concerns and motivate them to achieve the Debtors' chapter 11 objectives. Accordingly, the requested relief should be approved.

## V.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

98.    Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).  Section 362 of the Bankruptcy Code, however, permits a debtor or other parties-in-interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

99.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims under the Workers' Compensation Policies in the appropriate judicial or administrative forum during these Chapter 11 Cases.  The Debtors believe that cause exists to modify the automatic stay because staying an Employee's workers' compensation claim could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees.  As discussed above, such departures would cause a severe disruption in the Debtors' businesses to the detriment of all stakeholders.

Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the workers' compensation claims, if any, to proceed.

100.     Pursuant to this Motion, the Debtors do not seek a waiver, termination, or modification of the automatic stay with respect to any other claims.

## VI.     Processing of Checks and Electronic Funds Transfers Should Be Authorized.

101.     Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing and the consensual use of cash collateral. Under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests that are unrelated to authorized payments will be honored inadvertently.  The Debtors request that the Court authorize all applicable financial institutions, upon request of the Debtors, to receive, process, honor, and pay any and all checks, direct debit, wire transfer, ACH, or other payment requests in respect of the relief requested herein.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

102.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

103.     To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## EMERGENCY CONSIDERATION

104.     Pursuant to Local Rule 9013-1, the Debtors request emergency consideration of this Motion under Bankruptcy Rule 6003.  Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief "is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).   For the reasons discussed above and in the First Day Declarations, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief "is needed to avoid immediate and irreparable harm" as contemplated by Bankruptcy Rule 6003, and, as a result, the Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

## RESERVATION OF RIGHTS

105.     Nothing in the Proposed Order or this Motion (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors. their estates, or any other party in

interest with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors, their estates, or any other party in interest with respect to any and all claims or causes of action; or (d) shall be construed as a promise to pay a claim.

106.    Nothing in the Proposed Order or this Motion shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of any Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date,

107.    Nothing in the Proposed Order or this Motion shall create, nor is intended to create, any rights in favor of or enhance the priority or status of any claim held by any party.

## NOTICE

108.    Notice of this Motion has been or will be provided to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the United States Attorney's Office for the Southern District of Texas; (c) those creditors holding the thirty largest unsecured claims against the Debtors' estates; (d) counsel to the DIP Agents; (e) counsel to the DIP Lenders; (f) the Unions; (g) counsel to the SO5 Digital Debtor' term loan lender; (h) the Internal Revenue Service; and (i) the Banks.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.  No previous motion for the relief sought herein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors request that the Court enter the Proposed Order granting the

relief requested herein and such other and further relief as is just and proper.

Houston, Texas
Dated: January 14, 2026

/s/ Kelli Stephenson Norfleet

**HAYNES AND BOONE, LLP**
Kelli Stephenson Norfleet (TX Bar No. 24070678)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney P. Lyda (TX Bar No. 24013330)
David Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone:  (713) 547 2000
Facsimile:  (713) 547 2600
Email:        kelli.norfleet@haynesboone.com
                  kenric.kattner@haynesboone.com
                  arsalan.muhammad@haynesboone.com
                  kourtney.lyda@haynesboone.com
                  david.trausch@haynesboone.com

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (*pro hac vice* pending)
Robin Spigel (*pro hac vice* pending)
Allyson B. Smith (*pro hac vice* pending)
Betsy L. Feldman (*pro hac vice* pending)
Jessica G. Graber (*pro hac vice* pending)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Email:        dsinclair@willkie.com
                  rspigel@willkie.com
                  absmith@willkie.com
                  bfeldman@willkie.com
                  jgraber@willkie.com

-and-

Jennifer J. Hardy (TX Bar No. 24096068)
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Facsimile:  (713) 510-1799
Email:        jhardy2@willkie.com

-and-

Ryan Blaine Bennett (*pro hac vice* pending)
300 North LaSalle Drive
Chicago, IL 60654
Telephone:  (312) 728-9123
Facsimile:  (312) 728-9199
Email:        rbennett@willkie.com

*Proposed Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

*Proposed Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

/s/ Jarrod B. Martin

**BRADLEY ARANT BOULT
CUMMINGS LLP**
Jarrod B. Martin (TX Bar No. 24070221)
Michael K. Riordan (TX Bar No. 24070502)
600 Travis Street, Suite 5600
Houston, TX 77002
Telephone:  (713) 576- 0300
Facsimile:  (713) 547-0301
Email:        jbmartin@bradley.com
                  mriordan@bradley.com

-and-

James Bailey (TX Bar No. 24108289)
1819 Fifth Avenue N.
Birmingham, AL 35203
Telephone: (205) 521-8000
Facsimile: (205) 488-6913
Email: jbailey@bradley.com

*Proposed Counsel to the SO5 Digital Debtors and
SO5 Digital Debtors in Possession*

**Certificate of Accuracy**

     In accordance with Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency with respect to the Global Debtors are true and accurate to the best of my knowledge.


/s/ Kelli Stephenson Norfleet     
Kelli Stephenson Norfleet

**Certificate of Accuracy**

     In accordance with Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency with respect to the SO5 Digital Debtors are true and accurate to the best of my knowledge.


/s/ Jarrod B. Martin
Jarrod B. Martin

**Certificate of Service**

     I certify that on the date hereof, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' claims agent.


/s/ Kelli Stephenson Norfleet     
Kelli Stephenson Norfleet
