**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1] | Case No. 26-90103 (ARP) |
| | (Joint Administration Requested) |
| Debtors. | (Emergency Hearing Requested) |

**GLOBAL DEBTORS' MOTION FOR
INTERIM AND FINAL ORDERS (I) AUTHORIZING
DEBTORS TO (A) CONTINUE TO MAINTAIN THEIR
CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION
OBLIGATIONS RELATED THERETO, AND (C) CONTINUE TO PERFORM
<u>INTERCOMPANY TRANSACTIONS; AND (II) GRANTING RELATED RELIEF</u>**

---

**Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on January 14, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on January 14, 2026, at 4:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "Judge Pérez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "<u>Electronic Appearance</u>" link on Judge Pérez's homepage. Select the case name, complete the required fields and click "<u>Submit</u>" to complete your appearance.**

---

[1] A complete list of Saks Global Enterprises LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is proposed counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively the "<u>SO5 Digital Debtors</u>"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are proposed counsel for the remaining Debtors (collectively, the "<u>Global Debtors</u>").

The Global Debtors respectfully represent as follows in support of this motion (the "<u>Motion</u>"):[2]

## <u>RELIEF REQUESTED</u>

1. The Global Debtors seek entry of interim and final orders, substantially in the forms attached hereto (the "<u>Interim Order</u>" and the "<u>Final Order</u>," and, collectively, the "<u>Proposed Orders</u>"), (a) authorizing, but not directing, the Global Debtors to (i) continue to maintain their existing cash management system, as described herein and as illustrated on **Exhibit 1** annexed to the Interim Order and Final Order, (ii) maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, and (iii) continue Intercompany Transactions (as defined herein) and funding consistent with the Global Debtors' historical practices, subject to the terms described herein, (b) maintain existing business forms in the ordinary course of business, and (c) granting related relief.

2. Finally, the Global Debtors request that the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") schedule a final hearing to consider entry of the Final Order.

## <u>JURISDICTION AND VENUE</u>

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Global Debtors confirm their consent, pursuant to rule 7008 of the

---

[2]  Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the *Declaration of Mark Weinsten in Support of Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>"), filed concurrently herewith and incorporated herein by reference. The First Day Declaration describes in more detail the relationship between the Global Debtors and the SO5 Digital Debtors.

Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), to the Court's entry of a final order in connection with this Motion.

4.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory and legal predicates for the relief requested herein are sections 105, 345, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the *Procedures for Complex Cases for the Southern District of Texas*.

## BACKGROUND

6.      On January 13, 2026 (the "Petition Date") and January 14, 2026, the Debtors[3] filed voluntary petitions in these cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Debtors are operating their businesses and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

8.      No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

9.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

---

[3]     For the avoidance of doubt, "Debtors" means, collectively, the Global Debtors and the SO5 Digital Debtors.

## THE CASH MANAGEMENT SYSTEM

10.     In the ordinary course of business, the Global Debtors utilize and maintain an integrated, centralized cash management system (the "Cash Management System").  The Cash Management System consists of two largely separate systems that interact regularly in the ordinary course of business.  The two systems are divided by corporate group and entity: (a) the Saks Legacy Debtors[4] and (b) the Neiman Marcus Debtors.[5]  The Cash Management System is typical of multi-store retail operations and comparable to the centralized cash management systems used by other similarly sized retail companies to manage the cash of operating units in a cost-effective, efficient manner.[6]  The Global Debtors use the Cash Management System in the ordinary course

---

[4]     The "Saks Legacy Debtors" refers to Saks Global Holdings LLC; Saks Global Enterprises LLC; Saks Fifth Avenue Holdings Inc.; SFA Holdings Inc.; Saks Fifth Avenue HoldCo LLC; Saks Fifth Avenue HoldCo II LLC; 12 East 49th Street LLC; Saks & Company LLC; Black Caviar LLC; HBC US Propco Holdings LLC; HBC Garden City Leasehold LLC; HBS Leasehold LLC; LT Parent Propco LLC; Creative Design Studios, LLC; Street-Works Development LLC; HG Property Holdings LLC; LT Propco LLC; SW Westfield LLC; SWD Westfield I Urban Renewal LLC; SWD Westfield II Urban Renewal LLC; SWD Westfield III Urban Renewal LLC; SWD Westfield IV Urban Renewal LLC; SWD Westfield V Urban Renewal LLC; SWD Westfield VI Urban Renewal LLC; SWD Westfield VII Urban Renewal LLC; SWD Westfield VIII Urban Renewal LLC; SW Beverly Hills LLC; HBC Wilkes-Barre LLC; LT 424 LLC; HBC Woodbridge LLC; HBC Gaithersburg LLC; HBC Sterling Heights LLC; HBC Victor LLC; HBC Sterling LLC; York Factory LLC; YF Greenwich LLC; SaksWorks Bellevue LLC; SGUS LLC; Cafe Beverly SFA Trust; Cafe Beverly Hills SFA LLC; Saks Fifth Avenue LLC; Saks Fifth Avenue Real Property LLC; HBC Steele LLC; Saks Columbus Real Property LLC; Saks Direct, LLC; Saks Richmond Real Property LLC; Club Libby Lu, Inc.; Café SFA-Minneapolis, LLC; Fifth Floor Restaurant at SFA LLC; Sixth Floor Restaurant at SFA LLC; The Restaurant at Saks Fifth Avenue Corporation; Merchandise Credit, LLC; SCCA Store Holdings Real Property LLC; SCCA Leasehold LLC; Saks & Company Real Property LLC; Saks Fifth Avenue Puerto Rico, Inc.; Saks Global Investments Inc.; HBC Digital LLC; HBC Digital Holdings Inc.; Saks Partner Inc.; Saks.com Holdings LLC; Saks.com Midco Partner Inc.; Saks.com LLC; Saks Cloud Services LLC; Saks.com International Holdings LLC; Saks Manhattan (Blocker) Holdings L.P.; Saks (Cayman) Manhattan Blocker Inc.; Saks (EU) Manhattan Blocker Inc.; Nonsuch LLC; SW International Holdings LLC; The Wellery Holdings LLC; The Wellery LLC; The Wellery MSO LLC; GHBC Groupe Holdings, Inc.; GHBC Groupe, Inc.; GHBC Shared Services, Inc.; GHBC City, Inc.; and GGI Realty Services, Inc.

[5]     The "Neiman Marcus Legacy Debtors" refers to NMG Parent LLC; NMG Intermediate LLC; NMG Holding Company, Inc.; The Neiman Marcus Group LLC; NMG Term Loan PropCo LLC; NMGP, LLC; NMG Notes PropCo LLC; NMG Salon Holdings LLC; NMG California Salon LLC; NMG Salons LLC; NMG Florida Salon LLC; NMG Texas Salon LLC; Bergdorf Goodman LLC; Bergdorf Graphics, Inc.; NMG Interco LLC; NM Financial Services, Inc.; NMG Global Mobility, Inc.; Neiman Marcus Global Technology Services Private Limited; NM Bermuda, LLC; Neiman Marcus Bermuda L.P.; NEMA Beverage Parent Corporation; NEMA Beverage Holding Corporation; and NEMA Beverage Corporation.

[6]     The SO5 Digital Debtors maintain and operate their own cash management system and are seeking relief with respect therein pursuant to a separate motion.

of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Global Debtors' treasury department maintains daily oversight over the Cash Management System and maintains controls for entering, processing, and releasing funds, including in connection with any Intercompany Transaction (as defined below).  Given the economic and operational scale of the Global Debtors' businesses and related operations, any disruption to the Cash Management System will have an immediate and significant adverse effect on the Global Debtors' businesses and operations to the detriment of their estates and all stakeholders.

11.    A schematic illustrating the general flow of funds through the Cash Management System is attached to the Interim Order and the Final Order as **Exhibit 1** (the "Cash Flow Schematic").  The Cash Management System is comprised of approximate 227 bank accounts, each of which is identified on **Exhibit 2** attached to each of the Interim Order and the Final Order (collectively, the "Bank Accounts").[7]  The Bank Accounts reside at 11 different banks or financial institutions (collectively, the "Banks").  All of the Banks are financially stable institutions and are insured by the Federal Deposit Insurance Corporation ("FDIC").  The main components of the Cash Management System are described below.

**I.    The Bank Accounts and Flow of Funds.**

12.    As a major retail business, the Global Debtors depend on the efficient collection, transfer, and disbursement of funds.  The Cash Management System is tailored to meet the Global Debtors' operating needs—enabling the Global Debtors to control and monitor company funds, ensure cash availability and liquidity, comply with requirements of their financing arrangements, and reduce administrative expense by facilitating the movement of funds and the reporting of

---

[7]    Bank Accounts held by the Saks Legacy Debtors are referred to as the "Saks Legacy Accounts."  Bank Accounts held by the Neiman Marcus Debtors are referred to as the "Neiman Marcus Accounts."

accurate account balances.  It is, therefore, critical that the existing Cash Management System remain in place.

13.     The Global Debtors' cash management system includes hundreds of millions of dollars in cash collections and disbursements on a monthly basis.  Closing or changing the Global Debtors' existing Bank Accounts at this time would cause undue harm to the Global Debtors' business during a period where the need for efficiency is paramount.

**A.     The Bank Accounts.**

14.     The Global Debtors' Cash Management System controls and operates the various Bank Accounts for each of the Saks Legacy Debtors and the Neiman Marcus Debtors.  The Bank Accounts, a list of which is annexed as **Exhibit 2** to the Interim Order and the Final Order, are held at the Banks, which include:[8]

- 1 Bank Account at Morgan Stanley;

- 29 Bank Accounts at Bank of America, N.A. ("Bank of America");

- 172 Bank Accounts at Wells Fargo, N.A. ("Wells Fargo");

- 13 Bank Accounts at J.P. Morgan Chase Bank, N.A. ("JP Morgan");

- 1 Bank Account at First Hawaiian;

- 6 Bank Accounts at U.S. Bank, N.A. ("US Bank");

- 4 Bank Accounts at Amegy Bank;

- 3 Bank Accounts at Regions Financial Corporation ("Regions Financial");

- 1 Bank Account at Truist Bank ("Truist");

---

[8]     **Exhibit 2** contains a complete list of the Global Debtors' Bank Accounts of which the Global Debtors are aware as of the Petition Date.  To the extent that any Bank Accounts have been inadvertently omitted from the list, the Global Debtors request that the Interim Order and the Final Order granting the relief sought herein apply to such Bank Accounts.

- 1 Bank Account at State Street Bank & Trust Company ("State Street Bank"); and

- 3 Bank Accounts at Citizens Bank.

**B.      Description of Funds Processing.**

15.      The bulk of the Global Debtors' cash on hand is comprised of proceeds from the Global Debtors' ongoing business operations and the Global Debtors' asset-based revolving credit facility (the "Legacy Revolving Credit Facility").[9]

16.      The Global Debtors request regular draws on the Legacy Revolving Credit Facility to fund daily operations and satisfy ordinary course obligations, as necessary.  When the Global Debtors draw down on the Legacy Revolving Credit Facility, such requested amounts are transferred directly into a master disbursement account, ending in 9155, at Bank of America (the "Legacy ABL Master Funding Account").  The Legacy ABL Master Funding Account is maintained by Debtor Saks Global Enterprises LLC.  Following receipt of funds into the Legacy ABL Master Funding Account, Debtor Saks Global Enterprises LLC remits funds across the following accounts: (a) two master operating accounts, ending in 2319 and 3386, at Wells Fargo (the "Saks Master Operating Accounts"), which are each maintained by and used to fund the operations of the Saks Legacy Debtors; and (b) one master disbursement account, ending in 3433, at Bank of America (the "Neiman Master Disbursement Account"), which is maintained by and used to fund the operations of the Neiman Marcus Debtors.

17.      The Global Debtors are in the midst of consolidating their Bank Accounts to further organize and streamline operations.  As set forth in greater detail below, in the ordinary course of business, the Global Debtors currently operate across various master operating accounts, master deposit accounts, payroll and taxing accounts, master store deposit accounts, and various store

---

[9]      Additional details regarding the Legacy Revolving Credit Facility are set forth in the First Day Declaration.

deposit sub-accounts.  The Global Debtors anticipate closing certain Bank Accounts throughout the course of these Chapter 11 Cases and further centralizing operations through the Global Debtors' Bank Accounts.  As of the Petition Date, cash generally flows through the Cash Management System as follows:

18.     **Saks Legacy Accounts:**  The Saks Legacy Debtors' Cash Management System is centralized around the Saks Master Operating Accounts.  The Saks Master Operating Account ending in 2319 is maintained by Debtor SFA Holdings Inc. and is utilized to fund the operations and disbursements related to the Saks Fifth Avenue and Saks OFF 5TH brick-and-mortar stores. In addition to receiving funding from the Legacy ABL Master Funding Account, the Saks Legacy Debtors utilize the Saks Master Operating Account ending in 2319 to remit certain vendor invoices related to the Saks Fifth Avenue and Saks OFF 5TH store operations and to pay certain amounts owed to certain domestic and foreign non-Global Debtor affiliates (collectively, the "Non-Global Debtor Affiliates"), including vendor invoices and payroll and other employee-related obligations for temporary workers, as described in more detail below.  At times, the Global Debtors may receive funds on account of proceeds of credit card transactions from third-party processors into the Saks Master Operating Account ending in 2319.  The Saks Master Operating Account ending in 3386 is maintained by Debtor Saks Global Enterprises LLC and is utilized to fund the operations and disbursements relating to the Saks Legacy Debtors' e-commerce operations.  As highlighted below, the Saks Legacy Debtors generally keep the Bank Account operations and transactions relating to their brick-and-mortar locations and e-commerce transactions separate.  Cash moves through the Saks Legacy Debtors' system as follows:

**Saks Fifth Avenue and Saks OFF 5TH Store-Related Receipts and Disbursements**:

*Receipts.*

- **Legacy ABL Master Funding Account:**  As set forth above, the Saks Legacy Debtors maintain the Legacy ABL Master Funding Account at Bank of America, through which the Saks Legacy Debtors receive funding distributions from the Legacy Revolving Credit Facility.  The Saks Legacy Debtors' ability to draw down on the Legacy Revolving Credit Facility is determined by the then-applicable borrowing base under the Legacy ABL Credit Agreement at the time of such draw request.  Requested amounts are transferred into the Legacy ABL Master Funding Account and, subsequently, to the Saks Master Operating Accounts.  Excess cash on hand is swept daily from certain of the Saks Legacy Debtors' relevant Bank Accounts and used to pay down the Legacy Revolving Credit Facility.

- **Saks Master Deposit Account:**  The Saks Legacy Debtors maintain one master deposit account, ending in 4224, at Wells Fargo (the "Saks Master Deposit Account") for all inflows and deposits made in connection with transactions related to the Saks Legacy Debtors and Saks OFF 5TH brick-and-mortar store locations.  The Saks Master Deposit Account generally receives certain deposits related to subtenant rent payments, corporate payments, and the proceeds of credit card transactions from third-party processors.  Amounts deposited into the Saks Master Store Deposit Account and the Saks Corporate Deposit Accounts (as defined below) are swept daily into the Saks Master Deposit Account.  Amounts from the Saks Master Deposit Account are subsequently remitted on a daily basis to pay down the Legacy Revolving Credit Facility.

- **Saks Legacy Store Deposit Account:**  The Saks Legacy Debtors maintain one master store deposit account, ending in 8793, at Wells Fargo (collectively, the "Saks Master Store Deposit Account") and 133 "sub-accounts" (collectively, the "Saks Store Sub-Accounts") held at Wells Fargo.  Store managers typically deposit cash and checks directly into the respective Saks Store Sub-Accounts multiple times per week.  Funds from the Saks Store Sub-Accounts are swept daily into the Saks Master Store Deposit Account, as reflected in the Cash Flow Schematic, in an amount equal to the Saks Legacy Debtors' estimated end-of-day cash balance.  As a result, the Saks Legacy Debtors historically leave nominal amounts, if anything, in the Saks Store Sub-Accounts.  Additionally, funds in the Saks Master Store Deposit Account are swept daily into the Saks Master Deposit Account ending in 4224.

- **Saks Corporate Deposit Accounts:**  The Saks Legacy Debtors maintain one corporate deposit account and one miscellaneous deposit account, ending in 5657 and 3817, respectively, located at Wells Fargo (collectively, the "Saks Corporate Deposit Accounts").  The Saks Legacy Debtors receive funds into the Saks Corporate Deposit Accounts in connection with their operation of the Saks Legacy Debtors and Saks OFF 5TH store locations, including, but not limited to, certain customer wires, vendor deposits and rebate payments, tenant allowances and rent

9

payments, and other miscellaneous payments.  The Saks Legacy Debtors also may deposit checks received in connection with such payments into the Saks Corporate Deposit Accounts.  Amounts from the Saks Corporate Deposit Accounts are swept daily into the Saks Master Deposit Account ending in 4224.

*Disbursements.*

- **Saks Sub-Disbursement Accounts:**  The Saks Legacy Debtors have five sub-disbursement accounts, ending in 3825, 1661, 2707, 2711, and 1157, each at Wells Fargo (collectively, the "Saks Sub-Disbursement Accounts").  The Saks Legacy Debtors remit funds from the Saks Master Operating Account ending in 2319 to the relevant Saks Sub-Disbursement Account to fund various daily operations, including to satisfy obligations related to accounts payable merchandise, imports, and expenses (checks and wire transfers), taxes (payment by checks), insurance premiums, store change orders, and customer refunds.  When disbursements need to be made, the Saks Sub-Disbursement Accounts draw down on amounts available in the Saks Master Operating Account ending in 2319.

- **Saks Foreign Disbursement Accounts:**  The Saks Legacy Debtors maintain two foreign disbursement accounts, ending in 6060 and 6061, each at Wells Fargo (the "Saks Foreign Disbursement Accounts").   Funds from the Saks Master Operating Account ending in 2319 are transferred to the Saks Foreign Disbursement Accounts to pay amounts related to imported merchandise purchased from outside of the United States.  When remitting such amounts, the Saks Legacy Debtors rely upon a third-party platform to convert the Saks Legacy Debtors' United States dollars to the applicable foreign currency.

- **Saks Standalone Miscellaneous Account:**  The Saks Legacy Debtors maintain one miscellaneous vendor account, ending in 0763, at Wells Fargo (the "Saks Standalone Miscellaneous Account").   The Saks Standalone Miscellaneous Account was previously maintained for the benefit of Debtor Saks Cloud Services LLC, but has since been repurposed and is now operated by Debtor Saks Global Enterprises LLC.  Funds from the Saks Master Operating Account ending in 3386 are transferred to the Saks Standalone Miscellaneous Account to fund the miscellaneous vendor expenses.

*Investments.*

- **Saks Pension Account:**  The Saks Legacy Debtors maintain one pension cash holding account (the "Saks Pension Account"), ending in 0028, at State Street Bank.  The Saks Legacy Debtors generally make monthly contributions into the Saks Pension Account with funds from the Saks Master Operating Account ending in 2319.

### *Real Estate.*

- **Flagship Rent Accounts:** The Saks Legacy Debtors maintain two accounts, ending in 6722 and 6699, at Wells Fargo, which remit funds on a monthly basis to cover portions of the Global Debtors' rent obligations in connection with the Saks Fifth Avenue flagship store located in New York City.

### *DIP Accounts.*

- **DIP Accounts:** The Saks Legacy Debtors maintain three accounts, two ending in 6253 and 6334, respectively, at Bank of America, and one ending in 5431, at US Bank, through which funds from the contemplated DIP financing will flow (collectively, the "<u>DIP Accounts</u>"). Funds from the DIP Accounts will flow into the applicable Bank Accounts for the purpose of funding operational expenses during the pendency of these Chapter 11 Cases. Upon request, the Global Debtors will provide additional information regarding the DIP Accounts to the Office of the United States Trustee. The Global Debtors' ability to draw funds from the applicable DIP Account will be subject to the Global Debtors' DIP Orders and the DIP Documents in all respects.

### *Non-Active Accounts.*

- The Saks Legacy Debtors maintain certain non-active Bank Accounts at Wells Fargo (ending in 2726, 9320, 9312, and 6281), Bank of America (ending in 0904), and Amegy (ending in 7084) (collectively, the "<u>Saks Non-Active Accounts</u>"). The Bank Account ending in 2726 is maintained by Debtor SFA Holdings Inc. The Bank Accounts ending 9320 and 9312 are maintained by Debtor Saks Fifth Avenue HoldCo II LLC. The Bank Account ending 6281 is maintained by Debtor SCCA Store Holdings Real Property LLC. The Bank Account ending 0904 is maintained by Debtor LT Propco LLC and holds approximately $63,000. The remaining Saks Non-Active Accounts hold zero funds and are not used by the Global Debtors for any operations. The Saks Non-Active Accounts are reflected on **<u>Exhibits 1</u>** and **<u>2</u>** annexed to the Interim Order and Final Order.

## <u>Saks.com E-Commerce-Related Receipts and Disbursements</u>:

### *Receipts*

- **Saks.com Corporate Deposit Accounts:** The Saks Legacy Debtors maintain one Saks.com corporate deposit account and one miscellaneous deposit account, ending in 3402 and 3436, respectively, located at Wells Fargo (collectively, the "<u>Saks.com Corporate Deposit Accounts</u>"). The Saks Legacy Debtors receive funds into the Saks.com Corporate Deposit Accounts from outside sources relating to operations for the Saks Legacy Debtors' e-commerce businesses, including, but not limited to, customer wires, vendor deposits and rebate payments, license payments, and other miscellaneous payments. Amounts from the Saks.com Corporate Deposit Accounts are swept daily to pay down the Legacy Revolving Credit Facility.

*Disbursements*

- **Saks Global Disbursement Accounts:** The Saks Legacy Debtors have six disbursement accounts, ending in 3451, 3469, 1185, 3444, 9071, and 6292, each at Wells Fargo (the "<u>Saks Global Disbursement Accounts</u>"). The Saks Legacy Debtors remit funds from the Saks Master Operating Account ending in 3386 to the relevant Saks Global Disbursement Account to fund various daily operations, including payroll obligations, tax disbursements, and expense and merchandise payments remitted via check or automatic clearing house ("<u>ACH</u>") transfer. When disbursements need to be made, the Saks Global Disbursement Accounts draw down on amounts available in the Saks Master Operating Account ending in 3386.

19. <u>**Neiman Marcus Accounts**</u>: The Neiman Marcus Debtors' Cash Management System is centralized around the Neiman Master Disbursement Account and the Neiman Marcus Debtors' master operating account, ending in 3309, at JP Morgan (the "<u>Neiman Master Operating Account</u>"). The Neiman Master Disbursement Account and the Neiman Master Operating Account are each maintained by The Neiman Marcus Group LLC. Cash generally moves through the Neiman Marcus Debtors' system as follows:

*Receipts.*

- **Neiman Master Store Deposit Accounts:** The Neiman Marcus Debtors maintain nine master store deposit accounts (collectively, the "<u>Neiman Master Store Deposit Accounts</u>") and 42 "sub-accounts" (collectively, the "<u>Neiman Store Sub-Accounts</u>") held at JP Morgan, Bank of America, Wells Fargo, First Hawaiian,[10] US Bank, Amegy Bank, Regions Financial, Citizens Bank, and Truist. Store managers typically deposit cash and checks directly into the respective Neiman Store Sub-Accounts multiple times per week and funds are subsequently swept into the applicable Neiman Master Store Deposit Accounts, as reflected in the Cash Flow Schematic. The Neiman Marcus Debtors historically leave nominal amounts in the Neiman Store Sub-Accounts. Additionally, funds in the Neiman Master Store Deposit Accounts are either swept manually twice a week into the Neiman Master Operating Account or swept directly to pay down the Legacy Revolving Credit Facility, as reflected in the Cash Flow Schematic.

- **Credit Card Collections:** Credit card sales at the Neiman Marcus Debtors' brick-and-mortar locations and e-commerce transactions are processed through third-

---

[10]  The Neiman Master Store Deposit Accounts at Hawaiian Bank, ending in 1156, and Truist Bank, ending in 8556, sweep directly into the Neiman Master Operating Account and do not have Neiman Store Sub-Accounts.

party processors and the proceeds are deposited, net of fees, chargebacks, and returns, directly into the Neiman Master Operating Account.

*Disbursements.*

- **Neiman Master Sub-Disbursement Accounts:**  The Neiman Marcus Debtors have nine disbursement "sub-accounts" (collectively, the "Neiman Disbursement Sub-Accounts"), held at Bank of America, that receive funds from the Neiman Master Disbursement Account.  The Neiman Disbursement Sub-Accounts remit payments that fund various daily operations, including to satisfy obligations related to accounts payable imports and expenses, accounts payable merchandise (via check), customer refunds, sales taxes and payroll, postage, and licenses.  When distributions need to be made, funds are manually remitted by the Neiman Marcus Debtors from the Neiman Master Disbursement Account to the relevant Neiman Master Sub-Disbursement Account.

- **Neiman Business Account:**  The Neiman Marcus Debtors maintain an account through NMG Interco LLC, ending in 9208, at Bank of America (the "Neiman Business Account").  Funds from the Neiman Master Disbursement Account are transferred to the Neiman Business Account to pay for various business and liquor license-related expense.

- **Wire Disbursement Account:**  The Neiman Marcus Debtors maintain one wire disbursement account, ending in 7773, at Wells Fargo (the "Wire Disbursement Account").  Funds from the Neiman Master Disbursement Account are transferred to the Wire Disbursement Account as needed to fund merchandise payables.

- **Neiman Foreign Operating Account:**  The Neiman Marcus Debtors maintain one foreign operating account, ending in 7185, at JP Morgan (the "Neiman Foreign Operating Account").  Funds from the Neiman Master Disbursement Account are transferred to the Neiman Foreign Operating Account to pay funds related to the Global Debtors' global capabilities center operations, which are based in India through Debtor Neiman Marcus Global Technology Services Private Limited.

- **Neiman Gift Card Operating Account:**  The Neiman Marcus Debtors maintain one gift card-specific operating account, ending in 6019, at JP Morgan (the "Neiman Gift Card Operating Account").  Funds from the Neiman Master Disbursement Account are transferred to the Neiman Gift Card Operating Account to cover legal and tax-related expenses related to the Neiman Marcus Debtors' gift card program.

*Investments.*

- **Sompo Collateral Account:**  The Neiman Marcus Debtors maintain one interest-bearing collateral account, ending in 3088, at Morgan Stanley (the "Sompo Collateral Account").  The Sompo Collateral Account was opened in connection with entry into various surety agreements by the Neiman Marcus Debtors, all of

which are managed by Endurance Assurance Corporation (Sompo).  The Sompo Collateral Account is maintained to secure the Neiman Marcus Debtors' obligations under such surety agreements and to protect the holders' interest in the relevant collateral in the event that the Neiman Marcus Debtors default under any surety agreement.

20.    **Global Debtor Mercury Aggregator LP's Bank Account:**    Global Debtor Mercury Aggregator LP maintains one Bank Account, ending in 8186, at Bank of America (the "Mercury Aggregator Account").  Global Debtor Mercury Aggregator LP has no business operations.  The Mercury Aggregator Account is maintained solely for the purpose of paying any amounts owed under the HoldCo Credit Agreement.[11]  Any such amounts would be remitted from the Saks Master Operating Account to the Mercury Aggregator Account and, subsequently, to the relevant third party.

21.    The Bank Accounts generally fall into one of a number of categories, each of which is briefly described in the following table:

| Saks Legacy Debtors' Bank Accounts – Saks Fifth Avenue and Saks OFF 5TH Stores | |
| --- | --- |
| **Account** | **Account Description** |
| **Saks Master Operating Account**<br>*Wells Fargo Account ending in 2319* | The Saks Master Operating Account is funded directly by certain credit card revenue from business operations and by the Legacy ABL Master Funding Account. Amounts are remitted from the Saks Master Operating Account to pay certain third-party invoices and intercompany disbursements. |
| **Saks Master Deposit Account**<br>*Wells Fargo Account ending in 4224* | The Saks Master Deposit Account is funded directly by third party credit card payments, rent payments, and related corporate transactions and by the Saks Legacy Store Deposit Account and the Corporate Deposit Accounts. Amounts are remitted from the Saks Master Deposit Account directly to pay down the Legacy Revolving Credit Facility. |

[11]    As set forth in further detail in the First Day Declaration, the "HoldCo Credit Agreement" refers to that certain *Credit Agreement*, dated as of December 23, 2024 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date), by and among Debtor Mercury Aggregator L.P., as borrower, Debtor Mercury Aggregator Holdco LLC, a Delaware limited liability company, as holdings, Debtor HBSFA Holdings Ltd., a Canadian limited company, as Canadian holdings, the other guarantors party thereto, the lenders party thereto from time to time, and GLAS USA LLC, as administrative agent.

| Saks Legacy Debtors' Bank Accounts – <u>Saks Fifth Avenue and Saks OFF 5TH Stores</u> ||
|---|---|
| **Account** | **Account Description** |
| <u>**Store Legacy Store Deposit Accounts**</u><br><br>**Saks Master Store Deposit Account**<br>*Wells Fargo Account ending in 8793* | The Saks Legacy Debtors operate one Saks Master Store Deposit Account. Cash is swept daily from the Saks Store Sub-Accounts to the Saks Master Store Deposit Account and, subsequently, to the Saks Master Deposit Account. |
| **Saks Store Sub-Accounts**<br>*See Exhibit 2* | The 132 Saks Store Sub-Accounts are funded by in-store cash and check purchases. Store managers deposit cash into the relevant Saks Store Sub-Account multiple times per week and/or daily. The funds in these accounts are typically swept into the Saks Master Store Deposit Account on a daily basis. |
| <u>**Saks Corporate Deposit Accounts**</u><br>*Wells Fargo Account ending in 5657*<br>*Wells Fargo Account ending in 3817* | The Saks Corporate Deposit Accounts are funded by certain customer wires, vendor deposits and rebate payments, tenant allowances and rent payments, and other miscellaneous payments. Amounts from the Saks Corporate Deposit Accounts are swept daily into the Saks Master Deposit Account. |
| <u>**Saks Sub-Disbursement Accounts**</u> | The Saks Sub-Disbursement Accounts are each funded by the Saks Master Operating Account. |
| **Saks Miscellaneous Disbursement Account**<br>*Wells Fargo Account ending in 3825* | The Saks Miscellaneous Disbursement Account is used to make disbursements on account of the Saks Legacy Debtors' accounts payable and various corporate transactions. |
| **SaksWorks Account**<br>*Wells Fargo Account ending in 2707* | The SaksWorks Account is used to disburse payments in connection with operations at Debtor SaksWorks Bellevue LLC. |
| **Saks Accounts Payable Checks Account**<br>*Wells Fargo Account ending in 1157* | The Saks Accounts Payable Checks Account is used to make disbursements via check on account of various expenses owed by the Saks Legacy Debtors. |
| **Saks Store Change Account**<br>*Wells Fargo Account ending in 2711* | The Saks Store Change Account is used to make disbursements in connection with various store change orders for the Global Debtors. |
| <u>**Other Accounts**</u><br>**Saks Pension Account**<br>*State Street Bank Account ending in 0028* | The Saks Pension Account holds funds in connection with the Saks Legacy Debtors' pension policies. |
| **Saks Foreign Disbursement Accounts**<br>*Wells Fargo Account ending in 6060*<br>*Wells Fargo Account ending in 6061* | The Saks Foreign Disbursement Accounts remit funds related to imported merchandise purchased from outside of the United States. |
| **Saks Flagship Rent Accounts**<br>*Wells Fargo Account ending in 6699*<br>*Wells Fargo Account ending in 6722* | The Saks Flagship Rent Accounts receive funding from the Saks Master Operating Account and remit such funds on a monthly basis on account of the Global |

| Saks Legacy Debtors' Bank Accounts – **Saks Fifth Avenue and Saks OFF 5TH Stores** | |
|---|---|
| **Account** | **Account Description** |
| | Debtors' rent obligations in connection with the Saks flagship store located in New York City. |

| Saks Legacy Debtors' Bank Accounts – **Saks.com E-Commerce** | |
|---|---|
| **Account** | **Account Description** |
| **Saks Master Operating Account**<br>*Wells Fargo Account ending in 3386* | The Saks Master Operating Account is funded directly by the Legacy ABL Master Funding Account. Amounts are remitted from the Saks Master Operating Account to pay certain third-party invoices and intercompany disbursements. |
| **Saks.com Corporate Deposit Accounts**<br>*Wells Fargo Account ending in 3402*<br>*Wells Fargo Account ending in 3436* | The Saks.com Corporate Deposit Accounts are funded from outside sources on account of operations for the Saks Legacy Debtors' e-commerce businesses. Amounts are swept daily to pay off the Legacy Revolving Credit Facility. |
| **Saks Global Disbursement Accounts**<br>**Saks Global Payroll Account**<br>*Wells Fargo Account ending in 3451* | The Saks Global Payroll Account is used to make disbursements on account of certain employee payroll direct deposit and check deposits for the Global Debtors. |
| **Saks Global Taxes Account**<br>*Wells Fargo Account ending in 3469* | The Saks Global Taxes Account is used to make tax-related disbursements on account of store-related goods and services taxes, operating taxes, real estate taxes, and business license taxes. |
| **Saks Global Merchandise Accounts**<br>*Wells Fargo Account ending in 1185*<br>*Wells Fargo Account ending in 3444* | The Saks Global Merchandise Accounts are used to make disbursements via check or ACH payment, as relevant, on account of certain merchandise payments from the Global Debtors' brand partners. |
| **Saks Global Expense Accounts**<br>*Wells Fargo Account ending in 9071*<br>*Wells Fargo Account ending in 6292* | The Saks Global Expense Accounts are used to make certain disbursements via check or ACH payment, as relevant, on account of employee reimbursement, customer refunds, and corporate-related expenses for the Global Debtors. |

| Neiman Legacy Debtors' Bank Accounts | |
| --- | --- |
| **Account** | **Account Description** |
| **Neiman Master Operating Account**<br>*JP Morgan Account ending in 3309* | The Neiman Master Operating Account is funded directly by credit card revenue from business operations, by the Neiman Master Store Deposit Accounts.  The Neiman Master Operating Account remits funds directly to paydown the Legacy Revolving Credit Facility. |
| <u>**Store Depository Accounts**</u><br>**Neiman Master Store Deposit Accounts**<br>*JP Morgan 8734         Amegy 4745*<br>*BOA 2079            Regions 2868*<br>*Wells Fargo 0316      Citizens 8740*<br>*First Hawaiian 1156    Truist 8556*<br>*US Bank 4725* | The Neiman Marcus Debtors operate nine Neiman Master Store Deposit Accounts.   Cash is swept periodically from the Neiman Store Sub-Accounts in the relevant Neiman Master Store Deposit Account.  The Neiman Master Store Deposit Accounts at Hawaiian Bank and Truist, ending in 1156 and 8556, respectively, sweep directly into the Neiman Master Operating Account and do not have Neiman Store Sub-Accounts. |
| **Neiman Store Sub-Accounts**<br>*See Exhibit 2* | The 42 Neiman Store Sub-Accounts are funded by in-store cash and check purchases.  Store managers deposit cash into the respective Neiman Store Sub-Account multiple times per week.  The funds in these accounts are typically swept into the Neiman Master Store Deposit Account twice a week and, thus, maintain low balances. |
| <u>**Disbursement Accounts**</u><br>**Neiman Master Disbursement Account**<br>*BOA Account ending in 3433* | The Neiman Master Disbursement Account is funded by the Legacy ABL Master Funding Account and subsequently remitted to nine Neiman Disbursement Sub-Accounts to fund certain operating expenses of the Neiman Marcus Debtors. |
| **Accounts Payable Account**<br>*BOA Account ending in 9445* | The Accounts Payable Account is used to make disbursements due to the Neiman Marcus Debtors' various vendors. |
| ***ACH Benefits Account***<br>*BOA Account ending in 3271* | The ACH Benefits Account is used to make ACH payments to fund the Neiman Marcus Debtors' benefits-related obligations. |
| ***International Payment Account***<br>*BOA Account ending in 3420* | The International Payment Account is used to make international electronic disbursements to foreign suppliers and vendors and to reconcile hedging agreements. |
| ***Liquor Account***<br>*BOA Account ending in 1189* | The Liquor Account is used to make disbursements for the Neiman Marcus Debtors' purchases of beer, liquor, and wine to sell in the Neiman Marcus Debtors' restaurants and dining establishments. |
| ***Merchandise Payable Account***<br>*BOA Account ending in 3431* | The Merchandise Payable Account is used to purchase merchandise from the Neiman Marcus Debtors' brand partners. |

| | |
|---|---|
| **Payroll Account**<br>*BOA Account ending in 3458* | The Payroll Account is used to make disbursements on account of employee payroll direct deposit and check deposits for the Neiman Marcus Debtors. |
| **Postage Account**<br>*BOA Account ending in 8009* | The Postage Account disburses funds to satisfy operating expenses related to Neiman Marcus Debtors' postage and e-commerce sales. |
| **Refund Account**<br>*BOA Account ending in 3415* | The Refund Account is used to make disbursements related to the refund of merchandise. |
| **Sales Taxes Account**<br>*BOA Account ending in 3247* | The State Taxes Account is used to make disbursements on account of the Neiman Marcus Debtors' state sales and property taxes. |
| **Other Accounts**<br>**Neiman Business Account**<br>*BOA Account ending in 9208* | The Neiman Business Account receives funds from the Neiman Master Disbursement Account to pay for the Neiman Marcus Debtors' business and liquor license-related payments. |
| **Wire Disbursement Account**<br>*Wells Fargo Account ending in 7773* | The Wire Disbursement Account receives funds from the Neiman Master Disbursement Account on a periodic basis to disburse funds via ACH or wire transfer on account of all merchandise payables owed to merchandising vendors. |
| **Neiman Foreign Operating Account**<br>*JP Morgan Account ending in 7185* | The Neiman Foreign Operating Account receives funds from the Neiman Master Disbursement Account to pay disbursements associated with Debtor Neiman Marcus Global Technology Services Private Limited, which is based in India. Such disbursements relate to the Neiman Marcus Debtors' global capabilities center operations and certain employees based in India. |
| **Neiman Gift Card Operating Account**<br>*JP Morgan Account ending in 6019* | The Neiman Gift Card Operating Account receives funds from the Neiman Master Disbursement Account to cover legal and tax-related expenses related to the Neiman Marcus Debtors' gift card program. |
| **Sompo Collateral Account**<br>*Morgan Stanley Account ending in 3088* | The Sompo Collateral Account is maintained to secure the Neiman Marcus Debtors' obligations under various surety agreements and to protect the holders' interest in the relevant collateral in the event that the Neiman Marcus Debtors default under such sureties. |

| Standalone Bank Accounts | |
|---|---|
| **Account** | **Account Description** |
| **Mercury Aggregator Account**<br>*BOA Account ending in 8186* | Funds from the Saks Master Operating Account ending in 2319 are transferred to the Mercury Aggregator Account to pay any amounts owed under the HoldCo Credit Agreement. |

| Saks Standalone Miscellaneous Account<br>*Wells Fargo Account ending in 0763* | Funds from the Saks Master Operating Account ending in 3386 are transferred to the Saks Standalone Miscellaneous Account to fund miscellaneous vendor expenses. |
| --- | --- |

## II.      Intercompany Transactions.[1]

22.      In the ordinary course of business, the Global Debtors engage in routine arm's-length business relationships among and between each other and their Non-Global Debtor Affiliates (the "Intercompany Transactions").  The Intercompany Transactions arise primarily on account of operating expenses and debt service payments, as well as interest, fees, taxes, and other expenses.  At times, one Global Debtor entity may be invoiced for, and pay amounts on behalf of, another Global Debtor, SO5 Digital Debtor, or non-Global Debtor Affiliate, or vice-versa.  Likewise, one Global Debtor entity may make a payment on account of another Global Debtor, SO5 Digital Debtor, or non-Global Debtor Affiliate and will subsequently be reimbursed.  These Intercompany Transactions result in intercompany receivables and payables (the "Intercompany Claims").

23.      As set forth above, the bulk of the Global Debtors' cash on hand is comprised of proceeds from the Global Debtors' ongoing business operations and the Legacy Revolving Credit Facility.  The Global Debtors request periodic draws on the Legacy Revolving Credit Facility to fund daily operations and satisfy their outstanding obligations.  The amount that the Global Debtors are able to draw down from the Legacy Revolving Credit Facility is determined by reference to the then-applicable borrowing base under the Legacy ABL Credit Agreement.  The requested amounts are transferred directly into the Legacy ABL Master Funding Account, which is maintained by Debtor SFA Holdings Inc., and subsequently transferred to the Saks Master

---

[1]      Any reference to Intercompany Transactions herein applies only to transactions by and among the Debtors and their direct and indirect subsidiaries.

Operating Accounts, which are maintained by Debtors SFA Holdings Inc. and Saks Global Enterprises LLC, respectively, and the Neiman Master Operating Account, which is maintained by Debtor The Neiman Marcus Group LLC. Stated differently, the Global Debtors rely upon such Intercompany Transactions to maintain operations in the ordinary course of business. The Global Debtors use any excess cash on hand across the Bank Accounts maintained by the Global Debtors to pay down the Legacy Revolving Credit Facility.

24.     The Global Debtors generally account for and record all Intercompany Transactions and Intercompany Claims in their respective books and records, the results of which are concurrently recorded on the Global Debtors' balance sheets and periodically reconciled. The Global Debtors maintain records of the Intercompany Transactions in the ordinary course of business that are sufficient to ascertain, trace, and account for such Intercompany Transactions.

25.     If the Intercompany Transactions were discontinued, the Cash Management System and related administrative controls, as well as the Global Debtors' broader business operations, would be severely disrupted to the detriment of the Global Debtors, their estates, and their creditors. Accordingly, the Global Debtors seek authority, but not direction, to continue the Intercompany Transactions, in the ordinary course of business and consistent with prior practice, and request, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, that postpetition Intercompany Claims resulting from ordinary course Intercompany Transactions be accorded administrative priority, subject and junior to any claims, including all adequate protection claims, granted in connection with the DIP Order, the DIP Documents, and the use of cash collateral. The Global Debtors' Intercompany Transactions include the following:

**A.      Saks Flagship Rent Payments.**

26.     Non-Global Debtor Affiliate Saks Flagship Real Property LLC ("Flagship") owns the Global Debtors' flagship property located at 12 East 49th Street in New York City. Pursuant

to that certain Operating Lease, by and between Debtor Saks & Company LLC and Debtor 12 East 49th Street LLC, dated as of December 3, 2014 (as amended, modified, or supplemented from time to time, the "Operating Lease"), Debtor Saks & Company LLC, directly or through Debtor SFA Holdings Inc., remits from the Saks Master Operating Account ending in 2319 to the Saks Flagship Rent Account ending in 6722 monthly operating rent payments to Debtor 12 E. 49th Street LLC. In turn, pursuant to that certain Ground Lease, by and between Debtor 12 East 49th Street LLC and Flagship, dated as of December 3, 2014 (as amended, modified, or supplemented from time to time, the "Ground Lease"), Debtor 12 E. 49th Street LLC, directly or through Debtor SFA Holdings Inc., remits from the Saks Flagship Rent Account ending in 6722 to a non-Debtor Bank Account ending in 6709 monthly rent payments to Flagship.[2]   Any and all excess funds after payment of the applicable rent under the Operating Lease and the Ground Lease, respectively, are either dividended or loaned to the Global Debtors.  Rent under each lease is generally due on the last business day of the month.

> **B.      Saks OFF 5TH Sharing Arrangement.**

27.      The Global Debtors and the SO5 Digital Debtors are party to a sharing arrangement in connection with fundings required for the management, employment, and daily operations of the SO5 Digital Debtors (the "SO5 Sharing Arrangement").  Pursuant to the SO5 Sharing Arrangement, the SO5 Digital Debtors are entitled to purchase at least 10 percent of their annual budgeted receipts in sell-off merchandise from certain of the Saks Legacy Debtors.  The pricing of such sell-off merchandise is calculated based on pricing tables and determined by the Global Debtors.  Additionally, under the SO5 Sharing Arrangement, Debtor Saks Global Enterprises LLC

---

[2]      Flagship Real utilizes the rent payments received from 12 East 49th Street to pay, among other things, debt service under that certain *Loan Agreement*, by and between Flagship and the lenders party thereto from time to time, dated as of December 3, 2014, (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date).

is responsible for remitting certain costs associated with the employment of individuals through SO5 Digital Debtor Saks OFF 5TH Holdings LLC, including, but not limited to, funding any salaries, benefits, payroll taxes, and severance payments owed to such individuals.[3]  Under the SO5 Sharing Arrangement, SO5 Digital Debtor Saks OFF 5TH Holdings LLC subsequently reimburses Global Debtor Saks Global Enterprises LLC on 120-day terms following receipt of an invoice from Global Debtor Saks Global Enterprises LLC.  SO5 Digital Debtor Saks OFF 5TH Holdings LLC remits amounts due and owing to Global Debtor Saks Global Enterprises LLC to the Saks Master Deposit Account ending in 4224.

     **C.**      **HBS JV Structure.**

     28.     As set forth in the First Day Declaration, the Global Debtors are partners in a real estate joint venture (the "HBS JV") with Simon Property Group Inc. and other third-party investors in the United States.  The HBS JV holds 31 properties in the United States, and the Global Debtors currently own  approximately 62.4% of the equity interests in the HBS JV.  Each property is held in a separate special purpose entity which operates as landlord.  Each of the properties contributed by the Global Debtors to the HBS JV have been leased back to the Global Debtors pursuant to portfolio operating leases.  Certain of the fee and leasehold interests owned by the HBS JV secure that certain *Loan Agreement*, by and between Non-Global Debtor Affiliates and the lenders party thereto from time to time, dated as of July 22, 2025 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Portfolio CMBS Loan Agreement").

---

[3]    As set forth in further detail in the *Debtors' Joint Emergency Motion for Entry of Order (I) Authorizing Debtors to (A) Pay Certain Compensation and Benefits Obligations and (B) Maintain Compensation and Benefits Programs and (II) Granting Related Relief* (the "Wages Motion"), prior to January 1, 2026, the Debtors employed employees across various Debtor entities.  As of January 1, 2026, all employees are employed through either Global Debtor Saks & Company LLC or Global Debtor Neiman Marcus Global Technology Services Private Ltd.

29.     In connection with the HBS JV arrangement, Non-Global Debtor Affiliates HBC Simon LLC, HBS Global Properties LLC, and Saks Dadeland Leasehold LLC collectively maintain five bank accounts at Wells Fargo.[4]  Non-Debtor Saks Dadeland Leasehold LLC's bank accounts receive rent payments from each of the properties in the HBS JV structure and, subsequently, remit such amounts to pay down the interest and principal accruing under the Portfolio CMBS Loan Agreement.  When the Global Debtors are responsible for payment of the rent obligations of any properties in the structure, the Global Debtors remit funds from the Saks Master Operating Account to non-Debtor's Saks Dadeland Leasehold LLC account ending in 0626; from there, the funds are automatically swept overnight to non-Debtor's Saks Dadeland Leasehold LLC account ending in 0634 and remitted to cover such obligations.  The Global Debtors remit all cash distributions and non-financed portions of rent obligations related to the properties in the HBS JV structure from a bank account maintained by non-Debtor HBC-Simon LLC.  Such account is funded by the Saks Master Operating Account ending 2319.

## III.    Bank Fees.

30.     In the ordinary course of business, the Global Debtors incur periodic service charges and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees").  During the past twelve months, the Global Debtors paid on average approximately $140,000 in Bank Fees each month.  The Global Debtors seek authority, but not direction, to pay any outstanding Bank Fees, including any prepetition Bank Fees for prepetition transactions that are charged postpetition, and to continue paying the Bank Fees in the ordinary course on a postpetition basis, consistent with historical practices.

---

[4]     As of the Petition Date, one bank account maintained by non-Debtor HBC-Simon LLC, ending in 4747, and one bank account maintained by non-Debtor HBS Global Properties LLC, ending in 7896, are both non-active.

**IV.      Merchant Services Obligations.**

31.      In the ordinary course of business, the Global Debtors pay certain fees, charges, refunds, chargebacks, reserves, and other amounts due and owing to various credit card processors (collectively, the "Merchant Services Obligations") pursuant to certain merchant processing agreements (each, a "Merchant Processing Agreement") with certain of the Cash Management Banks.  The credit card processor collects customer payments, deducts the Merchant Services Obligations, including processing fees, offsets related to refunds and chargebacks, and reserve account amounts, from the customer payment amounts and then remits the remaining amounts to the Global Debtors on the cadence set forth in the applicable Merchant Processing Agreement. Certain credit card processors may implement reserves under the Merchant Processing Agreements to protect against any chargeback exposure.

**V.      Credit Card Programs.**

32.      Additionally, and as set forth in greater detail in the Wages Motion, the Global Debtors maintain Credit Card Programs (as defined in the Wages Motion), which are governed by the terms of those certain credit card agreements entered into between the Global Debtors and the Credit Card Providers (each individually a "Credit Card Agreement," and, collectively, the "Credit Card Agreements").

33.      The Cash Management Services provided by the Banks for their applicable Credit Card Program is secured under the Legacy Revolving Credit Facility and the ABL DIP Facility as Cash Management Obligations.

34.      The Credit Card Programs are an essential component of the Global Debtors' businesses and allow their employees to make certain ordinary course and approved business-related purchases.  The Global Debtors seek authority, but not direction, to pay any prepetition outstanding Credit Card Program amounts owed and to continue the Credit Card Programs on a

24

postpetition basis in the ordinary course of business consistent with past practices.  The Global

Debtors further seek authority for each of the Banks, as applicable, to (a) continue holding any

cash collateral in its possession to cover its exposure under its applicable Credit Card Agreement

in accordance with the terms thereof and (b) without further authorization or order from the Court,

but upon notice to the Global Debtors, apply any cash collateral it is holding to any outstanding

credit card exposure under its applicable Credit Card Agreement in the ordinary course of business

in accordance with its applicable Credit Card Agreement.

## VI.   Business Forms.

35.     As part of the Cash Management System, the Global Debtors utilize various pre-

printed business forms, including checks, letterhead, correspondence forms, invoices, and other

business forms (collectively, the "Business Forms"), in the ordinary course of business.  To

minimize expenses, the Global Debtors seek authority to continue to use all Business Forms in

substantially the form used immediately prior to the Petition Date, without reference to the Global

Debtors' status as debtors in possession.  Given the expansive scope of the Global Debtors'

business operations, requiring the Global Debtors to change their existing Business Forms would

impose needless administrative expense on the Global Debtors' estates and significant disruption

to their business operations.

## VII.   Compliance with U.S. Trustee Guidelines and Bankruptcy Code.

36.     Pursuant to the *Region 7 Guidelines for Debtors-in-Possession* established by the

Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee," and,

such guidelines, the "U.S. Trustee Guidelines"), the U.S. Trustee generally requires chapter 11

debtors to, among other things, deposit all estate funds into an account with an authorized

depository (an "Authorized Depository") that agrees to comply with the requirements of the U.S.

Trustee's office.  Further, section 345(a) of the Bankruptcy Code governs a debtor's cash deposits

during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  Section 345(b) of the Bankruptcy Code requires a debtor's bank to post a bond, unless a debtor's funds are "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States."  11 U.S.C. § 345(b).

37.     The majority of the Global Debtors' financial transactions—including, but not limited to, payroll,[5] tax payments, and the majority of vendor payments—route through Bank Accounts located at Wells Fargo, JP Morgan, and Bank of America, each of which is an Authorized Depository.  The Global Debtors' Bank Accounts at Morgan Stanley, First Hawaiian, and State Street Bank (collectively, the "Non-UDA Banks") are not Authorized Depositories; however, all such Banks are well capitalized, financially stable, and reputable institutions and are necessary to maintain the Cash Management System.  All of the Global Debtors' Bank Accounts, including those at the Non-UDA Banks, are insured by the FDIC.

38.     The Neiman Marcus Debtors' Bank Account at Morgan Stanley is maintained to secure the Neiman Marcus Debtors' obligations under their surety agreements and to protect the sureties' interest in the relevant collateral in the event that the Neiman Marcus Debtors default under any surety agreement.  As a result, the Sompo Collateral Account was established at the request of certain counterparties and holds restricted cash that serves as collateral for certain sureties.  The Global Debtors do not regularly access these funds.  As of the Petition Date, the Sompo Collateral Account held approximately $3.36 million.  Likewise, the Saks Legacy Debtors' Bank Account at State Street Bank maintains the Saks Pension Account.  Such Bank Account holds funds in trust for certain of the Global Debtors' current and former employees pursuant to

---

[5]     Payroll is paid through the Saks Global Payroll Account at Wells Fargo and the Payroll Account at Bank of America, as applicable, each of which are Authorized Depositories.

the relevant pension plan.  As of the Petition Date, the Saks Pension Account held approximately $65,353,473.  Finally, the Neiman Marcus Bank Account at First Hawaiian is one of the Neiman Store Sub-Accounts, holding customer cash and checks that are deposited with the Neiman Marcus Debtors on a daily basis and in the ordinary course of their business.  The First Hawaiian Bank Account is swept on a periodic basis, with more frequent sweeps occurring during the holiday season.  The Neiman Marcus Debtors manually sweep such account directly into the Neiman Master Operating Account at regular intervals to maintain a balance below $150,000.  As a result, the Neiman Marcus Debtors do not typically hold large amounts of cash in the Neiman Store Sub-Account at First Hawaiian at any one time.

39.     The Global Debtors' Banks, including the Non-UDA Banks, are well positioned to continue performing depository and cash management functions during these Chapter 11 Cases and are integral to the Global Debtors' Cash Management System.  Requiring the Global Debtors to transfer any of their applicable Bank Accounts to an Authorized Depository would place a needless and excessive administrative burden on the Global Debtors and impose significant, value-destructive costs to the Global Debtors' estates.  To the extent that any of the Bank Accounts cease to comply with, or do not comply with, the requirements of section 345(b) of the Bankruptcy Code during these Chapter 11 Cases, the Global Debtors request that the Court grant the Global Debtors a forty-five day suspension, without prejudice to the Global Debtors' right to seek an additional suspension after the entry of the Interim Order, to either (a) bring the applicable Bank Accounts into compliance with section 345(b) of the Bankruptcy Code or (b) seek appropriate relief from the Court.

## BASIS FOR RELIEF REQUESTED

**I.     Continued Use and Maintenance of the Cash Management System Is Warranted.**

40.     The Global Debtors maintain the Cash Management System in the ordinary course of their business operations, which allows them to efficiently administer their cash and financial affairs.  Maintenance of the Cash Management System is important for preserving and enhancing the value of the Global Debtors' businesses and for administering these Chapter 11 Cases.

41.     As described herein, any disruption to the Cash Management System would have an immediate adverse impact on the Global Debtors' businesses and would impair the Global Debtors' ability to successfully administer these Chapter 11 Cases.  Continued maintenance of the Cash Management System is necessary to, among other things, ensure that the Global Debtors may (a) honor obligations that accrued or any payments that were made or issued prepetition, but that remain outstanding as of the Petition Date (to the extent authorized by the Court), and (b) avoid any unnecessary interruption of their Cash Management System, including the flow of funds among and between the Global Debtors.  It would be time-consuming, difficult, and costly for the Global Debtors to establish an entirely new system of accounts and a new cash management system, and particularly impractical given that the Global Debtors anticipate moving through these Chapter 11 Cases as expeditiously as possible.  The attendant delays from revising cash management procedures, redirecting receipts, and implementing new payment protocols would create unnecessary pressure on the Global Debtors at this critical juncture.

42.     Allowing the Global Debtors to utilize and maintain the Cash Management System is consistent with section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business, without notice or a hearing." 11 U.S.C. § 363(c)(1).  Section 363(c)(1) is intended to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business.  See,

e.g., In re HLC Props., Inc., 55 B.R. 685, 686 (Bankr. N.D. Tex. 1985) (finding "no need to further burden the docket or the staff of the Court with a superfluous order" when a transaction is in the ordinary course of business); In re Lavigne, 114 F.3d 379, 384 (2d Cir. 1997); In re Crystal Apparel, Inc., 207 B.R. 406, 409 (S.D.N.Y. 1997).  Included within the purview of section 363(c) is a debtor's ability to continue the routine transactions necessitated by its cash management system.  See In re Amdura Corp., 75 F.3d 1447, 1453 (10th Cir. 1996).  Courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992), aff'd in relevant part, 997 F.2d 1039, 1061 (3d Cir. 1993); see also In re Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (maintaining an existing cash management system allows a debtor "to administer more effectively and efficiently its financial operations and assets").

43.     The Court may also exercise its equitable powers to grant the relief requested herein.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); see also In re Trevino, 615 B.R. 108, 143 (Bankr. S.D. Tex. 2020) (emphasizing that section 105(a) grants courts authority to grant injunctive relief and other equitable remedies to ensure the orderly conduct of reorganization proceedings); In re Wilborn, 401 B.R. 872, 896 (Bankr. S.D. Tex. 2009) (same); CoServ, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (noting that section 105 of the Bankruptcy Code provides the authority for a debtor in possession to pay prepetition claims).

44.     To minimize the disruption caused by the filing of these Chapter 11 Cases and maximize the value of the Global Debtors' estates, the Global Debtors request authority to continue

to utilize the Cash Management System during the pendency of these Chapter 11 Cases.  The Global Debtors have each used their respective Cash Management System for many years.  Parties in interest will not be harmed by the Global Debtors' continued maintenance of the Cash Management System, including the Bank Accounts, because the Global Debtors will implement appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.  Specifically, with the assistance of their professionals and consistent with prior practice, the Global Debtors will continue to maintain detailed records of all transfers of cash, if any, and record all transactions on applicable accounts. Therefore, the Global Debtors should be permitted to maintain their cash and transfer funds among the Bank Accounts, if needed, in accordance with the Cash Management System.

## II.    The Court Should Authorize the Global Debtors to Maintain the Bank Accounts.

45.    The U.S. Trustee Guidelines require that the debtor in possession open new bank accounts and close all existing accounts.  This requirement was designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against the inadvertent payment of prepetition claims and payments.  The U.S. Trustee Guidelines also require opening a separate operating account and a special tax payment account into which all funds that may be collected and/or payable during the pendency of a debtor's case will be deposited.  This requirement is meant to provide cash collateral for, and ensure payment of, certain priority tax claims such as federal and state payroll taxes and sales taxes.

46.    To avoid disruption to the Global Debtors' operations, the Global Debtors request that they be permitted to continue to maintain the existing Bank Accounts.  Allowing the Global Debtors to maintain the Bank Accounts will assist the Global Debtors in accomplishing a smooth transition to operations under chapter 11.  Moreover, through their internal controls, the Global Debtors can distinguish between prepetition and postpetition obligations and payments without

30

closing the Bank Accounts and opening new ones. Therefore, the goals of the U.S. Trustee Guidelines can be satisfied, and the Global Debtors' creditors can be protected, without closing the Bank Accounts.

47.    Although the Global Debtors are requesting a waiver of the requirement that they close all Bank Accounts, the Global Debtors may determine, in their business judgment, that opening new bank accounts and/or closing existing Bank Accounts is in the best interests of the estates. Nothing contained herein should prevent the Global Debtors from opening any additional bank accounts, or closing any existing Bank Accounts, as they may deem necessary and appropriate. Any new bank account opened by the Global Debtors will be established at an institution that is a party to a Uniform Depository Agreement with the U.S. Trustee, at one of the Global Debtors' existing Banks, or is willing to immediately execute a Uniform Depository Agreement.

48.    As part of the requested relief, the Global Debtors also seek a waiver of the requirement to establish specific bank accounts for tax payments. The Global Debtors' tax obligations can be paid out of the Bank Accounts, and the U.S. Trustee can adequately monitor the flow of funds into, among, and out of the accounts, through the Global Debtors' required reporting. Moreover, the creation of a new debtor-in-possession account designated solely for tax obligations would be unnecessary and inefficient.

## III.    The Court Should Authorize the Global Debtors to Pay Prepetition Amounts Related to Bank Fees.

49.    In connection with the Cash Management System, the Global Debtors request authorization to continue to pay, honor, or deduct from the appropriate account certain Bank Fees. Payment of the Bank Fees will minimize disruption to the Global Debtors' operations and is therefore in the best interests of their estates. Absent payment of the Bank Fees, the Banks might

assert setoff rights against the funds in the Bank Accounts, freeze the Bank Accounts, and/or refuse to provide banking services to the Global Debtors.  Accordingly, the Global Debtors should be permitted, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, to pay and/or reimburse the Banks in the ordinary course of business for any Bank Fees arising prior to or after the Petition Date.

**IV.    The Global Debtors Should Be Authorized to Use Existing Check Stock and Related Business Forms.**

50.     To avoid material disruption of the Cash Management System and minimize expenses to their estates, the Global Debtors request authority to continue using their existing prepetition Business Forms without reference to their status as debtors in possession or any other alteration.  As discussed above, the Global Debtors utilize various Business Forms in the ordinary course of their business.  However, the Global Debtors make the majority of their cash payments via wires or other electronic transfers rather than via check.  Furthermore, most—if not all—parties doing business with the Global Debtors undoubtedly will be aware of the Global Debtors' status as debtors in possession.  As a result, changing Business Forms would be an unnecessary additional expense and unduly burdensome.  A failure to permit the Global Debtors to maintain and utilize their existing check stock and related Business Forms as set forth herein would:  (a) disrupt the ordinary financial affairs and business operations of the Global Debtors; (b) delay the administration of the Global Debtors' estates; (c) compromise the Global Debtors' internal controls and accounting system; and (d) require the estates to unnecessarily spend money to create new Business Forms.  Accordingly, the requested relief is warranted under the circumstances.

**V.    The Court Should Authorize the Banks to Continue to Service and Administer the Global Debtors' Bank Accounts.**

51.     In connection with the foregoing, the Global Debtors respectfully request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts as

accounts of the Global Debtors, as debtors in possession, without interruption and in the ordinary course of business.  In this regard, the Banks should be authorized (a) to receive, process, honor, and pay all checks and transfers issued by the Global Debtors in accordance with this Motion, without regard to whether any checks or transfers were issued before or after the Petition Date; (b) to provide that the Banks may rely on the representations of the Global Debtors with respect to whether any check or transfer issued or made by the Global Debtors before the Petition Date should be honored pursuant to this Motion (such Banks having no liability to any party for relying on such representations by the Global Debtors provided for herein); and (c) to authorize the Global Debtors to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with this Motion are dishonored or rejected by the Banks.

52.     The Global Debtors respectfully request that the Court authorize the Banks to receive, process, honor, and pay any and all checks, ACH payments and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, whether such checks, drafts, wires, or ACH payments are dated prior to or subsequent to the Petition Date consistent with any order of the Court and governing law; provided, however, that any check, advise, draft, or other notification that the Global Debtors advised the Banks to have drawn, issued, or otherwise presented prior to the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

53.     The Global Debtors also request that, to the extent the Banks honor a prepetition check or other item drawn on any account that is the subject of this Motion either (a) at the direction of the Global Debtors; (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored; or (c) as the result of an innocent mistake despite the

above-described protective measures, such Bank will not be deemed to be liable to the Global

Debtors, their estates, or any other party on account of such prepetition check or other item honored

postpetition.

54.     Both as part of this Motion and in other motions that have been concurrently filed,

the Global Debtors are requesting authority, but not direction, to pay certain prepetition

obligations.  With respect to some of these obligations, the Global Debtors may have issued checks

prior to the Petition Date that have yet to clear the banking system.  In other instances, the Global

Debtors will create the relevant check once the Court enters an order permitting the Global Debtors

to do so.  The Global Debtors intend to inform the Banks which checks should be so honored.

Therefore, the Global Debtors request that the Banks be authorized to rely on the representations

of the Global Debtors with respect to whether any check or other payment order drawn or issued

by the Global Debtors prior to the Petition Date should be honored.   The Global Debtors

respectfully submit that such relief is reasonable and appropriate because the Banks are not in a

position to independently verify or audit whether a particular item may be paid in accordance with

a court order or otherwise.

**VI.     A Suspension of Time to Comply with the Requirements of Section 345(b) of the
Bankruptcy Code Is Warranted.**

55.     Pursuant to section 345(b) of the Bankruptcy Code, any deposit or other investment

made by a debtor, except those insured or guaranteed by the United States or by a department,

agency, or instrumentality of the United States or backed by the full faith and credit of the United

States, must be secured by a bond in favor of the United States that is secured by the undertaking

of a corporate surety approved by the U.S. Trustee or by the deposit of securities of the kind

specified in 31 U.S.C. § 9303.  See 11 U.S.C. § 345(b).  Section 345(b) provides further, however,

that a bankruptcy court may allow the use of alternatives to these approved investment guidelines "for cause." Id.; see also In re Serv. Merch. Co., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

56.     In Service Merchandise, the court identified the following factors for determining whether cause exists to suspend the requirements of Bankruptcy Code section 345(b):

(a)     the sophistication of the debtor's business;

(b)     the size of the debtor's business operations;

(c)     the amount of investments involved;

(d)     the bank ratings of the financial institutions where the debtor's funds are held;

(e)     the complexity of the case;

(f)     the safeguards in place within the debtor's own business for insuring the safety of the funds;

(g)     the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(h)     the benefit to the debtor of current practices;

(i)     the harm, if any, to the estate; and

(j)     the reasonableness of the debtor's request for relief from the section 345(b) requirements in light of the overall circumstances of the case.

Service Merchandise, 240 B.R. at 896.  Examining these factors, the Service Merchandise court concluded that "cause" existed in that case because the debtors were "large, sophisticated [companies] with a complex cash management system," with the ability to shift money as needed to insure the safety of their funds. Id.  Moreover, the benefits to the debtor of suspending the section 345(b) requirements far outweighed any potential harm to the estate, and the failure to suspend the requirements "would needlessly handcuff this debtor's reorganization efforts." Id. at 896–97.

57.     As in Service Merchandise, the Global Debtors operate a sophisticated enterprise with a complex Cash Management System—inclusive of complex systems within their Cash

Management System—that provides the Global Debtors with the ability to transfer funds rapidly to ensure their safety.  In light of the <u>Service Merchandise</u> factors and the safety of the institutions that the Global Debtors propose to utilize as a continuation of their prepetition practices, the Global Debtors believe that sufficient cause exists to allow deviation from the investment guidelines set forth in section 345(b) of the Bankruptcy Code.  Satisfaction of those requirements would impose needless costs on the Global Debtors' estates and the process of satisfying those requirements would lead to inefficiencies in the management of the Global Debtors' business.

58.     Given the global scope of the Global Debtors' operations and cash management requirements, it will prove difficult to consolidate all cash activities to the narrow group of financial institutions approved in the U.S. Trustee Guidelines.  Furthermore, any effort to reconfigure the Global Debtors' entire Cash Management System could have significant tax or regulatory impacts in numerous jurisdictions and will require extensive time and resources of the Global Debtors' estates, to the detriment of all creditors.  The Global Debtors' estates and creditors, however, will not be harmed by the Global Debtors' maintenance of the status quo as modified by the relief requested herein because of the relatively safe and prudent practices already utilized by the Global Debtors.

59.     Moreover, the Global Debtors submit that they are in substantial compliance with section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines with respect to the Global Debtors' Bank Accounts at all Banks other than the Non-UDA Banks.  Pursuant to the U.S. Trustee Guidelines, the U.S. Trustee generally requires chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee's office.  Aside from the Bank Accounts held at the Non-UDA Banks, all other Bank Accounts are held at Authorized Depositories and are FDIC insured up to

$250,000 (including the Bank Accounts at the Non-UDA Banks) on an aggregate basis and, therefore, comply with section 345(b) of the Bankruptcy Code.  As set forth in further detail above, while the Bank Accounts at the Non-UDA Banks are not held at Authorized Depositories, such Banks are nonetheless FDIC insured and are well-capitalized, financially stable, and reputable institutions.  Such financial institutions are well-positioned to perform the depository and cash management functions during these Chapter 11 Cases.  Consequently, the Global Debtors believe that they can maintain the Bank Accounts at the Non-UDA Banks pending entry of the Final Order without jeopardizing any parties in interest.

60.     As a result, to the extent that the requirements of section 345 of the Bankruptcy Code are inconsistent, or otherwise conflict, with the Global Debtors' Cash Management System or any action taken by the Global Debtors in accordance with an order of this Court, the Global Debtors respectfully request a forty-five day (or such longer period as the Global Debtors may request) suspension of time to address any questions that the U.S. Trustee may have regarding the Cash Management System and the Global Debtors' compliance with section 345(b) of the Bankruptcy Code to allow the Global Debtors to continue their existing cash management practices.  The Global Debtors will work in good faith with the U.S. Trustee to address any concerns regarding the continued use of the Global Debtors' Bank Accounts on a postpetition basis and, should the U.S. Trustee have concerns regarding the Bank Accounts, make such arrangements as are acceptable to the U.S. Trustee (without prejudice to the Global Debtors' right to request further suspensions of time by motion in this Court).

## VII.    Cause Exists to Permit Continued Use of Intercompany Transactions.

61.     As described above, the Global Debtors enter into certain Intercompany Transactions in the ordinary course of business that are essential to the operations of the Global Debtors' businesses.  If the Intercompany Transactions were to be discontinued, the Global

Debtors' operations, Cash Management System, and related administrative controls would be disrupted, causing irreparable harm to the Global Debtors.

62.     The continuation of the Intercompany Transactions in the ordinary course of business and in a manner consistent with past practice will not prejudice the Global Debtors' estates or their creditors.  Among other things, the Intercompany Transactions are part of the normal course of operation of the Global Debtors' businesses, which allows the Global Debtors' enterprise to function more effectively and efficiently as a whole, thereby benefitting all of the Global Debtors' stakeholders.  Further, the Global Debtors maintain strict records of transfers of cash and can ascertain, trace, and account for all such Intercompany Transactions.  Accordingly, the Global Debtors believe that the continuation of the Intercompany Transactions in the ordinary course and in a manner consistent with past practice, in all cases subject and junior to any claims, including all adequate protection claims, granted in connection with the DIP Order, the DIP Documents, and the use of cash collateral, is in the best interest of the Global Debtors' estates and creditors.

63.     Because the Global Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among similar enterprises, the Global Debtors believe that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, therefore, do not require the Court's approval.  Yet, precisely because of their routine nature, the continuation of such transactions is integral to the Global Debtors' ability to operate their businesses.  Accordingly, out of an abundance of caution, the Global Debtors are seeking express authority to engage in Intercompany Transactions postpetition in the ordinary course and in a manner consistent with past practice, subject and junior to any claims, including all adequate protection claims, granted in connection with the DIP Order,

the DIP Documents, and the use of cash collateral.  The continued performance of the ordinary course Intercompany Transactions are integral to ensuring the Global Debtors' ability to operate their businesses.

64.    To ensure that each individual Global Debtor will not fund, at the expense of its own creditors, the operations of another Global Debtor, the Global Debtors respectfully request that, pursuant to 503(b)(1), 507(b), and 364(a) of the Bankruptcy Code, all Intercompany Claims be granted administrative expense status, in all cases subject and junior to any claims, including all adequate protection claims, granted in connection with the DIP Order, the DIP Documents, and the use of cash collateral.  If all Intercompany Claims against the Global Debtors are accorded administrative expense priority status, each entity will continue to bear the ultimate payment responsibility for such ordinary course transactions.  For the avoidance of doubt, all postpetition Intercompany Transactions shall be subject to the DIP Orders and the DIP Documents.

## EMERGENCY CONSIDERATION

65.    Pursuant to Local Rule 9013-1, the Global Debtors request emergency consideration of this Motion under Bankruptcy Rule 6003.  Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief "is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).  For the reasons discussed above and in the First Day Declaration, an immediate and orderly transition into chapter 11 is critical to the viability of the Global Debtors' operations.  The requested relief is necessary for the Global

Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Global Debtors have demonstrated that the requested relief "is needed to avoid immediate and irreparable harm" as contemplated by Bankruptcy Rule 6003, and, as a result, the Global Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

66.    The Global Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Global Debtors seek in this Motion is necessary for the Global Debtors to operate their business without interruption and to preserve the value of their estates. Accordingly, the Global Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

67.    To implement the foregoing immediately, the Global Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## RESERVATION OF RIGHTS

68.    Nothing in the Proposed Order or this Motion (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Global Debtors, their estates, or any other party in interest; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Global Debtors, their estates, or any other party in interest with respect to the validity, priority, or amount of any claim against the Global Debtors and their estates; (c) shall impair, prejudice, waive, or

otherwise affect the rights of the Global Debtors, their estates, or any other party in interest with respect to any and all claims or causes of action; or (d) shall be construed as a promise to pay a claim.

## <u>NOTICE</u>

69.     Notice of this Motion has been or will be provided to:  (a) the U.S. Trustee; (b) the United States Attorney's Office for the Southern District of Texas; (c) those creditors holding the thirty (30) largest unsecured claims against the Global Debtors' estates; (d) counsel to the DIP Agents; (e) counsel to the DIP Lenders; (f) the Internal Revenue Service; and (g) the Banks.  In light of the nature of the relief requested herein, the Global Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Global Debtors request that the Court enter the Proposed Orders, granting the relief requested herein and such other and further relief as is just and proper.

Houston, Texas
Dated: January 14, 2026

*/s/ Kelli Stephenson Norfleet*

| | |
|---|---|
| **HAYNES AND BOONE, LLP** | **WILLKIE FARR & GALLAGHER LLP** |
| Kelli Stephenson Norfleet (TX Bar No. 24070678) | Debra M. Sinclair (*pro hac vice* pending) |
| Kenric D. Kattner (TX Bar No. 11108400) | Robin Spigel (*pro hac vice* pending) |
| Arsalan Muhammad (TX Bar No. 24074771) | Allyson B. Smith (*pro hac vice* pending) |
| Kourtney P. Lyda (TX Bar No. 24013330) | Betsy L. Feldman (*pro hac vice* pending) |
| David Trausch (TX Bar No. 24113513) | Jessica D. Graber (*pro hac vice* pending) |
| 1221 McKinney Street, Suite 4000 | 787 Seventh Avenue |
| Houston, TX 77010 | New York, NY 10019 |
| Telephone:  (713) 547 2000 | Telephone:  (212) 728-8000 |
| Facsimile:  (713) 547 2600 | Facsimile:  (212) 728-8111 |
| Email:      kelli.norfleet@haynesboone.com | Email:      dsinclair@willkie.com |
|                kenric.kattner@haynesboone.com |                rspigel@willkie.com |
|                arsalan.muhammad@haynesboone.com |                absmith@willkie.com |
|                kourtney.lyda@haynesboone.com |                bfeldman@willkie.com |
|                david.trausch@haynesboone.com |                jgraber@willkie.com |

-and-

Jennifer J. Hardy (TX Bar No. 24096068)
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Facsimile:  (713) 510-1799
Email:      jhardy2@willkie.com

-and-

Ryan Blaine Bennett (*pro hac vice* pending)
300 North LaSalle Drive
Chicago, IL 60654
Telephone:  (312) 728-9123
Facsimile:  (312) 728-9199
Email:      rbennett@willkie.com

*Proposed Co-Counsel to the Global Debtors*          *Proposed Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*                          *and Global Debtors in Possession*

## Certificate of Accuracy

In accordance with Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency are true and accurate to the best of my knowledge.

/s/ Kelli Stephenson Norfleet
Kelli Stephenson Norfleet

## Certificate of Service

I certify that on the date hereof, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' claims agent.

/s/ Kelli Stephenson Norfleet
Kelli Stephenson Norfleet