## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1] | Case No. 26-90103 (ARP) |
| Debtors. | (Joint Administration Requested)<br>(Emergency Hearing Requested) |

## GLOBAL DEBTORS' <u>EMERGENCY</u> MOTION
## FOR ENTRY OF INTERIM AND FINAL ORDERS
## (I) AUTHORIZING DEBTORS TO PAY CERTAIN
## PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS
## AND 503(b)(9) CLAIMANTS; (II) CONFIRMING ADMINISTRATIVE EXPENSE
## <u>PRIORITY OF OUTSTANDING ORDERS; AND (III) GRANTING RELATED RELIEF</u>

**Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on January 14, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on January 14, 2026, at 4:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "Judge Pérez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "<u>Electronic Appearance</u>" link on Judge Pérez's homepage. Select the case name, complete the required fields and click "<u>Submit</u>" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is proposed counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively, the "<u>SO5 Digital Debtors</u>"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are proposed counsel for the remaining Debtors (collectively, the "<u>Global Debtors</u>").

The Global Debtors respectfully represent as follows in support of this motion (the "Motion"):[2]

## RELIEF REQUESTED

1.      The Global Debtors seek entry of interim and final orders, substantially in the forms attached hereto (collectively, the "Proposed Orders"): (a) authorizing, but not directing, the Debtors to pay certain prepetition Trade Claims and 503(b)(9) Claims (each as defined below) in an amount not to exceed $126,000,000 pursuant to the Interim Order (the "Interim Order Cap") and, in the aggregate, inclusive of amounts paid pursuant to the Interim Order, an amount not to exceed $337,400,000 pursuant to the Final Order (the "Final Order Cap"); (b) confirming administrative expense priority for Outstanding Orders (as defined below); and (c) granting related relief.

2.      Finally, the Global Debtors request that the United States Bankruptcy Court for the Southern District of Texas (the "Court") schedule a final hearing to consider entry of the Final Order.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Global Debtors confirm their consent, pursuant to rule 7008 of the Federal

---

[2]   Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the *Declaration of Mark Weinsten in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") or the *Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, each filed concurrently herewith.  The First Day Declaration describes in more detail the relationship between the Global Debtors and the SO5 Digital Debtors.

Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), to the Court's entry of a final order in connection with this Motion.

4.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), 503(b), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas*.

## **BACKGROUND**

### **A.      General Background**

6.      On January 13, 2026 (the "Petition Date") and January 14, 2026, the Debtors[3] filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court. The Debtors are operating their businesses and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

8.      No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

9.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

---

[3]    For the avoidance of doubt, "Debtors" means, collectively, the Global Debtors and the SO5 Digital Debtors.

B.        **Trade Claims Overview**

10.        As described in greater detail in the First Day Declaration, the Debtors are a premier destination for luxury fashion, renowned for delivering a one-of-a-kind, highly curated shopping experience to their customers.  The Global Debtors' ability to generate income is dependent on the Global Debtors' sale and offering of a carefully curated assortment of third-party and private label merchandise and unique shopping experience.  In addition, at certain of their locations, the Global Debtors operate full-service restaurant and beverage businesses.  This curated model depends on longstanding partnerships with wholesale merchandise vendors, many of whom are irreplaceable, category-defining brands whose products cannot be substituted without irreparably altering the Global Debtors' value proposition and customer experience.  Non-merchandise vendors also provide products and services on favorable trade terms, and maintaining these trade terms is critical to the Global Debtors' ability to continue operations.  These non-merchandise vendors cannot be easily replaced or substituted by alternative vendors on similar terms.  In all, the company's vendor relationships are the backbone of the Global Debtors' business model and tantamount to the Global Debtors' successful operations.

11.        Further, in the ordinary course of their businesses, the Global Debtors regularly transact with foreign vendors that are critical to the Global Debtors' supply chain.  Because these foreign vendors and suppliers may not have any (or only a *de minimis* amount of) assets or operations in the United States that may subject them to the jurisdiction of the Court, the Global Debtors have no workable enforcement mechanisms against these parties.  As such, the Global Debtors believe that there is a significant risk that the these foreign vendors and suppliers may consider themselves beyond the jurisdiction of the Court, disregard the automatic stay, and engage in conduct that would disrupt the Global Debtors' operations.

12.     The Global Debtors seek authority to pay prepetition claims of certain wholesale merchandise vendors and non-merchandise vendors and suppliers (collectively, the "Critical Vendors" and such claims, the "Trade Claims") and holders of claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code (such holders, the "503(b)(9) Claimants" and such claims, the "503(b)(9) Claims").   The Global Debtors also seek to confirm the administrative expense priority for products and merchandise ordered before the Petition Date in the ordinary course of business, including customized merchandise for which customers have already paid the Global Debtors, but which will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  The relief requested is necessary to avoid immediate and severe disruption to the Global Debtors' operations that would follow if these counterparties ceased or materially altered performance.  Many of the Global Debtors' merchandise vendors are one-of-a-kind luxury brands with limited production cycles and strict allocation practices.  Loss of supply or deterioration of terms from these sources would result in inventory gaps, missed fashion seasons, and loss of exclusivity that cannot be remediated during the pendency of these cases.  The resulting harm would cascade through merchandising, marketing, and customer engagement channels, undermining revenue, margin, and brand equity at a critical juncture.

13.     Moreover, the Global Debtors serve as a primary distribution channel and showcase for a significant number of these luxury brands, particularly haute and emerging designers whose commercial success is closely tied to the Global Debtors' platform and clientele. A breakdown in these relationships would not only deprive the Global Debtors of signature assortments that attract and retain high-value customers, but would also destabilize the vendors themselves—some of whom rely on the Global Debtors' doors and digital storefront as their principal route to market. If these brands falter or fail due to interruption of trade with the Global Debtors, the Global Debtors

would face a lasting contraction in the universe of offerings that differentiate their business, compounding the damage through reduced traffic, lower conversion, and diminished customer loyalty.  The targeted relief requested herein is therefore essential to preserve the Global Debtors' unique merchandising ecosystem, safeguard enterprise value, and position the estates for a successful reorganization.

14.     Prior to the Petition Date, the Global Debtors worked with their advisors and their pre- and post-petition lenders to evaluate their vendor base.  The Global Debtors submit that the relief requested in this Motion will allow the Global Debtors to preserve and maximize value by paying the prepetition claims of certain counterparties that are critical to the Global Debtors' business enterprise.  As described in further detail below, the obligations that the Global Debtors seek authority to pay are summarized in the following table:

| Category | Interim Amount Requested | Final Amount Requested |
|---|---|---|
| Critical Vendors | 120,000,000 | 300,000,000 |
| 503(b)(9) Claimants | 6,000,000 | 37,400,000 |

## CRITICAL VENDORS

### A.     Wholesale Merchandise Vendors

15.     The bulk of the Global Debtors' Critical Vendors are wholesale suppliers of the inventory and merchandise that the Global Debtors sell in their stores and through their websites (collectively, the "Wholesale Merchandise Vendors").[4]   As set forth above, the Global Debtors

---

[4]     Concurrently herewith, the Debtors have filed that certain *Debtors' Joint Emergency Motion for Entry of Order (I) Authorizing Debtors To Pay Prepetition Claims of Certain (A) Lien Claimants and (B) Customs and Regulatory Claimants; and (II) Granting Related Relief* (the "Lien Claimants Motion"), pursuant to which the Debtors seek authority to pay or honor (among others) Consignment Liens for Consigned Merchandise (each as defined in the Lien Claimants Motion).

operate in the highly competitive luxury fashion business, and the Wholesale Merchandise Vendors are specialized, name-brand designers.

16.     Given the unique nature of the merchandise sold in the Global Debtors' stores—with the vast majority of such products having strong, entrenched brand identities that render them irreplaceable—the merchandise and inventory purchased from the Wholesale Merchandise Vendors cannot be replaced or substituted by alternative vendors.  Furthermore, the Global Debtors' businesses are wholly reliant on the sale of their merchandise and inventory.  Failing to stock the Global Debtors' most in-demand items received from the Wholesale Merchandise Vendors would significantly harm the Global Debtors' businesses.

17.     Moreover, the Global Debtors rely heavily on the Wholesale Merchandise Vendors to deliver not only current orders, but also future supply.  Failure to pay the Wholesale Merchandise Vendors at this juncture would jeopardize the Global Debtors' abilities to stock their shelves with spring inventory and, in turn, maintain operations in the ordinary course.  Many of the Wholesale Merchandise Vendors have already begun shipping inventory for the spring season, and the Global Debtors' inability to pay these vendors would jeopardize their spring sales to the detriment of their businesses and their estates.  Further, the Global Debtors could lose entire relationships, including exclusive rights to future seasons' design lines and nonexclusive rights to other highly sought-after designers.  Given that the Global Debtors' inventory is carefully curated to suit the Global Debtors' clientele, in most cases, there are no true replacements available if a relationship with a Wholesale Merchandise Vendor falters.  Even if alternative producers were to exist, the attempt to procure merchandise and inventory from replacement vendors would be unduly burdensome at such a crucial time and would likely result in significant revenue loss.  Accordingly, it is essential to the success of the Global Debtors' restructuring efforts that they be

able to maintain the level of service and the supply of brand-name goods that customers have come to expect from the Saks Fifth Avenue, Neiman Marcus, and Bergdorf Goodman experience. If the Global Debtors' services and offerings fail to meet customers' expectations, these customers may move on to the Global Debtors' competitors to the detriment of the Debtors' estates.

**B.      Non-Merchandise Vendors**

18.      The Global Debtors also rely on Non-Merchandise Vendors (the "Non-Merchandise Vendors") to operate their business in the ordinary course, including, but not limited to, vendors that provide goods and services critical to the maintenance of the Global Debtors' stores and brand and vendors that provide marketing-related services, such as advertising on key customer-facing platforms to identify and generate new customers. Essential goods and services provided by such vendors include online operations, website development, maintenance and management, general supplies and packaging materials, employee onboarding and management programs, regulated direct mail and digital marketing campaigns, customer relationship management capabilities, brand creative services, and the Global Debtors' omnichannel initiatives, among other critical services that support the Global Debtors' operational needs across all platforms. In many instances, the Non-Merchandise Vendors are the only vendors able to produce or deliver the volume, quality, or type of services or products sufficient to meet the Global Debtors' operational needs.

19.      If the Non-Merchandise Vendors ceased doing business with the Global Debtors on account of unpaid prepetition amounts, the process of finding suitable replacement vendors would be time consuming and could significantly delay the delivery of the Global Debtors' product to their stores and customers. Without these Non-Merchandise Vendors, the Global Debtors cannot sustain the highest quality retail and website operations that they have worked for years to achieve, would be unable to continue serving their customers, and would likely lose significant

revenue.  Accordingly, the Global Debtors seek authority to satisfy the prepetition claims of certain Non-Merchandise Vendors, subject to the Interim Order Cap and the Final Order Cap.

## CUSTOMARY TRADE TERMS

20.     In return for paying Critical Vendors, the Global Debtors seek authorization to condition payment of the Trade Claims, either in full or in part, on each vendor's agreement to continue to provide favorable trade terms in line with historical practices and other terms covered by existing agreements and other programs for the postpetition delivery of goods and services as well as continue supplying the Global Debtors with essential merchandise, products, and services for the duration of these Chapter 11 Cases (collectively, the "Customary Trade Terms").

21.     To ensure that the Critical Vendors continue to deal with the Global Debtors on the Customary Trade Terms, the Global Debtors propose that a letter agreement (a "Trade Agreement"),[5] substantially in the form attached to the Interim Order and the Final Order as **Exhibit 1**, be sent to the Critical Vendors for execution, together with a copy of the Interim Order (or the Final Order, if such order has been entered) granting this Motion.

22.     The Global Debtors propose that each Trade Agreement include, without limitation:

(a)     the amount of the relevant Critical Vendor's estimated Trade Claim, accounting for any setoffs, other credits, and discounts thereto; provided, however, such amount shall be used only for the purposes of determining such Critical Vendor's claim under the Interim Order or Final Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of this Court;

(b)     the Customary Trade Terms applicable to such Critical Vendor, or such other terms as the Critical Vendor and the Global Debtors may agree on that are at least as favorable or better than those in effect at

---

[5]     The Global Debtors' entry into a Trade Agreement shall not change the nature, validity, amount, or priority of the underlying Trade Claims and shall not constitute an assumption or rejection of any executory contract or unexpired lease between a Global Debtor and Critical Vendor.

any time in the twelve months prior to the Petition Date, and the Critical Vendor's agreement to provide goods and/or services to the Global Debtors pursuant to such terms during the pendency of the Global Debtors' bankruptcy cases, unless the Global Debtors fail to make timely payments under the agreed-upon terms; and

(c)     the Critical Vendor's agreement not to file or otherwise assert against any or all of the Global Debtors, their estates, or any other person or entity or any of their respective assets or property (real or personal) any lien (a "<u>Lien</u>") or claim for reclamation (a "<u>Reclamation Claim</u>"), regardless of the statute or other legal authority upon which such Lien or Reclamation Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Global Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien or Reclamation Claim, the Critical Vendor shall take whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim.

23.     The Global Debtors seek only the authority to enter into Trade Agreements when the Global Debtors determine that payment of such Trade Claims in the ordinary course is necessary and that such agreements are advisable.  The Global Debtors also hereby seek authority to make payments in the ordinary course on account of the Trade Claims, even in the absence of a Trade Agreement, if the Global Debtors determine, in their business judgment, that failure to pay such Trade Claims in the ordinary course is likely to result in irreparable harm to the Global Debtors' business operations and that they are not reasonably likely to be able to achieve a Trade Agreement with the relevant Critical Vendor.[6]

24.     In the event that a Critical Vendor refuses to supply goods and services to the Global Debtors on Customary Trade Terms (or such other terms as are agreed to by the parties) following receipt of payment on its Trade Claim, or fails to comply with any Trade Agreement entered into between such Critical Vendor and the Global Debtors, then the Global Debtors hereby

---

[6]     Nothing in this Motion should be construed as a waiver by any of the Global Debtors of their rights to contest any claim of a Critical Vendor under applicable law.

seek authority, in their discretion and without further order of the Court, to: (a) declare that any Trade Agreement between the Global Debtors and such Critical Vendor is terminated; (b) declare that payments made to such Critical Vendor on account of its Trade Claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of this Court or action by any person or entity; and/or (c) recover any payment made to such Critical Vendor on account of its Trade Claim to the extent that such payments exceeded the postpetition claims of such Critical Vendor without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.

25.      In sum, if a Trade Agreement is terminated or a Critical Vendor refuses to supply goods or services to the Global Debtors on Customary Trade Terms (or such other terms as have been agreed to by the parties) following receipt of payment on its Trade Claim, the Global Debtors seek authority to return the parties to the positions they held immediately prior to the entry of the Interim Order approving this Motion with respect to all prepetition claims of such Critical Vendor. In addition, the Global Debtors reserve the right to seek damages or other appropriate remedies against any breaching Critical Vendor.

26.      The Global Debtors further propose that any Trade Agreement terminated as a result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated in the Global Debtors' discretion if:

> (a)      the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five business days following the Global Debtors' notification to the Critical Vendor of such a default; or
>
> (b)      the Global Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor.

27.      Some of the Critical Vendors also may have obtained Liens on the Global Debtors' (or other parties') assets, based upon Trade Claims held by such vendors.  As a further condition

to receiving payment on a Trade Claim, a Critical Vendor must agree to take whatever action is necessary to remove any such Lien.

## VENDOR SELECTION PROCESS

28.     With the assistance of their advisors, the Global Debtors' senior management team has spent considerable time reviewing and analyzing the Global Debtors' books and records, consulting with employees responsible for operations and purchasing, and analyzing applicable laws, regulations, and historical practice to identify those vendors that are actually essential to the continued and uninterrupted operation of the Global Debtors' business—the loss of which would materially impair the going-concern viability of the Global Debtors' business, and, ultimately, their ability to continue operating in the ordinary course of business, to the detriment of the Global Debtors, their vendors, and all of their stakeholders.  Specifically, as part of this process, the Global Debtors considered a variety of factors in examining each of their vendor relationships, including:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Global Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Global Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Global Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Global Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Global Debtors, to refuse to ship inventory or to provide critical services on a postpetition basis;

- whether the Global Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

29.     In addition to these factors, the Global Debtors and their advisors examined the status of each vendor relationship, the vendor's familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be otherwise satisfied as part of the chapter 11 process.

30.     Based on the foregoing considerations, the Global Debtors identified the Critical Vendors whose cessation of services or provision of goods could cripple, in short order, the Global Debtors' business and, therefore, result in irreparable harm.  The Global Debtors believe that the Critical Vendors will refuse to supply goods or services to the Global Debtors postpetition, unless some or all of their prepetition claims are paid, and that immediate replacement of the Critical Vendors would be impracticable or, in some cases, impossible.  Without authority to pay the Critical Vendors, the Global Debtors could be forced to suspend or curtail certain operations immediately.

## 503(b)(9) CLAIMANTS

31.     The Global Debtors may have received certain goods or materials from the 503(b)(9) Claimants within the twenty days before the Petition Date.  Under section 503(b)(9) of the Bankruptcy Code, the value of such goods or materials would be accorded administrative priority.  A significant number of the 503(b)(9) Claimants are also Critical Vendors.  The Global Debtors' relationships with these vendors are not governed by long-term contracts.  Rather, the Global Debtors obtain goods from such claimants on an order-by-order basis.  Additionally, the Global Debtors have tight timelines with their vendors, with some invoices being due and payable on delivery.  As a result, a 503(b)(9) Claimant may refuse to supply new orders if the Global Debtors do not pay the 503(b)(9) Claims.  Such refusal would negatively affect the Global Debtors'

estates because the Global Debtors' business is dependent on the steady flow of merchandise and products through their logistics network.

32.     Accordingly, the Global Debtors request the authority, but not the direction, to pay undisputed 503(b)(9) Claims as they come due subject to the Interim Order Cap and the Final Order Cap.  As of the Petition Date, the Global Debtors estimate that the 503(b)(9) Claims total approximately $37,400,000 in the aggregate, approximately $6,000,000 of which will come due within twenty-one days following the Petition Date.

## OUTSTANDING ORDERS

33.     Before the Petition Date and in the ordinary course of business, the Global Debtors may have Outstanding Orders for products and merchandise that will not be delivered until after the Petition Date.  To avoid becoming general unsecured creditors of the Global Debtors' estates with respect to such products and merchandise, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to the Outstanding Orders, unless the Global Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Global Debtors' business operations, and given that products and merchandise delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Global Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Global Debtors arising from the acceptance of products and merchandise subject to Outstanding Orders and (b) authorizing the Global Debtors to satisfy such obligations in the ordinary course of business.

## BASIS FOR RELIEF REQUESTED

**A.     The Court Should Grant the Requested Relief Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.**

34.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate. See, e.g., In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("Cases cited by [the] Debtors that refer to necessity of payment to preserve going concern value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); see also Czyewski v. Jevic Holding Corp., 580 U.S. 451, 468 (2017) (noting that courts "have approved . . . 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices."); In re Scotia Dev., LLC, No. 07-20027-RSS, 2007 WL 2788840, at *2 (Bankr. S.D. Tex. Sept. 21, 2007) (outlining factors for when a critical vendor payment is necessary) (citation omitted); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").   In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

35.     Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so.  See Ionosphere, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where such action is supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty to protect and preserve the estate can "only be fulfilled by the preplan satisfaction of a prepetition claim." In re CoServ, L.L.C., 273 B.R. at 497.

36.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Under section 105(a), courts may authorize payments of prepetition obligations when essential to the continued operation of a debtor's businesses.  See CoServ, 273 B.R. at 497; Ionosphere, 98 B.R. at 175.  Specifically, the Court may use its equitable power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  Ionosphere, 98 B.R. at 176.

37.     Indeed, courts in the Fifth Circuit have recognized the "necessity of payment" doctrine.  See, e.g., In re Scotia Dev., LLC, No. 07-20027-RSS, 2007 WL 2788840, at *1 (Bankr. S.D. Tex. Sep. 21, 2007) (acknowledging the existence of the doctrine of necessity); CoServ, 273 B.R. at 497.   The CoServ court held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  Id. ("These are simply examples of claims that may require satisfaction for the debtor in possession to perform its fiduciary obligations.  In such instances, it is only logical that the bankruptcy court be able to use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); see also Ionosphere, 98 B.R. at 175 ("The ability of a Bankruptcy Court to authorize the payment of a prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").

38.     Allowing the Global Debtors to pay Trade Claims and 503(b)(9) Claims pursuant to sections 363(b) and 105(a) of the Bankruptcy Code is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code:

preserving going-concern value and maximizing the value of property available to satisfy creditors. See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship, 526 U.S. 434, 453 (1999) (citations omitted).

39.     The Global Debtors depend on the supply of good and merchandise and the provision of services by the Critical Vendors to sustain their operations.  Ensuring that these Critical Vendors continue to supply such goods and services to the Global Debtors is, therefore, vital to the success of these Chapter 11 Cases and the ability of the Global Debtors to continue operating in the ordinary course of business during these Chapter 11 Cases.  Further, as set forth above, certain Critical Vendors located in foreign countries likely would be able to immediately pursue remedies against the Global Debtors and seek to collect prepetition amounts owed to them. As a result, there is significant risk that such foreign Critical Vendors could seek to reclaim vital goods and equipment already in the Global Debtors' possession or shut down the Global Debtors' access to essential goods needed to maximize profit, which would significantly disrupt the Global Debtors' operations.  A slight disruption to the products and services provided by the Critical Vendors could leave the Global Debtors unable to meet their obligations and disrupt their important relationship with their customers.  Any resulting harm to the Global Debtors' estates, in turn, far outweighs the costs associated with paying a portion of the Global Debtors' prepetition obligations to the Critical Vendors.  The Global Debtors believe that the relief sought in this Motion will not burden the Debtors and, instead, will help to maximize the value of their estates.

**B.      The Court Should Authorize the Payment of Claims Entitled to Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code.**

40.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within twenty days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such

debtor's business."  Consequently, payment of such claims now only provides such parties with what they will be entitled to ultimately receive in these cases.  The timing of such payments lies squarely within the Court's discretion.  See, e.g., In re ATP Oil & Gas Corp., No. 12-36187, 2014 Bankr. LEXIS 1050, at *28 (Bankr. S.D. Tex. March 18, 2014) ("The timing of payment of administrative expense is within the Court's discretion.") (citation omitted); In re Glob. Home Prods., LLC, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("The timing of the payment of that administrative expense claim is left to the discretion of the Court."). The payment of certain 503(b)(9) Claims, in the Global Debtors' discretion, may allow the Global Debtors to maximize the value of their estates by allowing the Global Debtors to satisfy such claims, where doing so would have a net benefit to their estates in terms of increased inventory, favorable credit terms, or other benefits to the estates.

**C.      The Court Should Confirm that the Outstanding Orders are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized.**

41.      Pursuant to 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estates postpetition.  See 11 U.S.C. § 503(b)(1)(A) (providing that the "actual, necessary costs and expenses of preserving the estate" are administrative expenses); see also In re John Clay & Co., 43 B.R. 797, 809-12 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative expense priority).  Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they would have received if the relief requested herein were not granted, and will not prejudice any other party in interest.

42.     Absent such relief, however, the Global Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority status.  The disruption to the continuous and timely flow of inventory to the Global Debtors would force the Global Debtors to potentially halt operations and production, damage the Global Debtors' business reputation, erode the Global Debtors' customer base and ultimately lead to a loss of revenue, all to the detriment of the Global Debtors and their creditors.  As such, the Global Debtors submit that the Court should confirm the administrative expense status of the Outstanding Orders and authorize the Global Debtors to pay the Outstanding Orders in the ordinary course.

## EMERGENCY CONSIDERATION

43.     Pursuant to Local Rule 9013-1, the Global Debtors request emergency consideration of this Motion under Bankruptcy Rule 6003.  Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief "is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).  For the reasons discussed above and in the First Day Declaration, an immediate and orderly transition into chapter 11 is critical to the viability of the Global Debtors' operations.  Failure to receive the requested relief in this Motion during the first twenty-one days of these chapter 11 cases would severely disrupt the Global Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Global Debtors to operate their business in the ordinary course,

preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders.  The Global Debtors have demonstrated that the requested relief "is needed to avoid immediate and irreparable harm" as contemplated by Bankruptcy Rule 6003, and, as a result, the Global Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

44.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, any delay in paying Trade Claims and 503(b)(9) Claims would be detrimental to the Global Debtors, their creditors, and estates, as the Global Debtors' ability to manage and run their business operations without any unexpected or inopportune interruption requires, in part, that they continue to receive the goods and services provided by their vendor base.  For this reason and those set forth above, the Global Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders.

45.     To implement the foregoing immediately, the Global Debtors also respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent they are applicable to the Proposed Orders.

## RESERVATION OF RIGHTS

46.     Nothing in the Proposed Orders or this Motion (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Global Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Global Debtors, their estates, or any

other party in interest with respect to the validity, priority, or amount of any claim against the Global Debtors and their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Global Debtors, their estates, or any other party in interest with respect to any and all claims or causes of action; or (d) shall be construed as a promise to pay a claim.

47.     Nothing in the Proposed Orders or this Motion shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of any Global Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

48.     Nothing in the Proposed Orders or this Motion shall create, nor is intended to create, any rights in favor of or enhance the priority or status of any claim held by any party.

## NOTICE

49.     Notice of this Motion has been or will be provided to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the United States Attorney's Office for the Southern District of Texas; (c) those creditors holding the thirty largest unsecured claims against the Debtors' estates; (d) counsel to the DIP Agents; (e) counsel to the DIP Lenders; (f) the Internal Revenue Service; and (g) the Banks.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.  No previous motion for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Global Debtors respectfully request that the Court enter the Proposed Order granting the relief requested herein and such other and further relief as is just and proper.

Houston, Texas
Dated: January 14, 2026

/s/ Kelli Stephenson Norfleet
**HAYNES AND BOONE, LLP**
Kelli Stephenson Norfleet (TX Bar No. 24070678)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney P. Lyda (TX Bar No. 24013330)
David Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone: (713) 547 2000
Facsimile: (713) 547 2600
Email:       kelli.norfleet@haynesboone.com
             kenric.kattner@haynesboone.com
             arsalan.muhammad@haynesboone.com
             kourtney.lyda@haynesboone.com
             david.trausch@haynesboone.com

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (*pro hac vice* pending)
Robin Spigel (*pro hac vice* pending)
Allyson B. Smith (*pro hac vice* pending)
Betsy L. Feldman (*pro hac vice* pending)
Jessica D. Graber (*pro hac vice* pending)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email:       dsinclair@willkie.com
             rspigel@willkie.com
             absmith@willkie.com
             bfeldman@willkie.com
             jgraber@willkie.com

-and-

Jennifer J. Hardy (TX Bar No. 24096068)
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1766
Facsimile: (713) 510-1799
Email:       jhardy@willkie.com

-and-

Ryan Blaine Bennett (*pro hac vice* pending)
300 North LaSalle Drive
Chicago, IL 60654
Telephone: (312) 728-9123
Facsimile: (312) 728-9199
Email:       rbennett@willkie.com

*Proposed Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

*Proposed Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

## **Certificate of Accuracy**

In accordance with Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency with respect to the Global Debtors are true and accurate to the best of my knowledge.

/s/ Kelli Stephenson Norfleet
Kelli Stephenson Norfleet

## **Certificate of Service**

I certify that on the date hereof, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' claims agent.

/s/ Kelli Stephenson Norfleet
Kelli Stephenson Norfleet