**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>SAKS GLOBAL ENTERPRISES LLC *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90103 (ARP)<br><br>(Joint Administration Requested)<br>(Emergency Hearing Requested) |

**DEBTORS' JOINT EMERGENCY MOTION FOR ENTRY OF
ORDER (I) AUTHORIZING DEBTORS TO PAY PREPETITION
CLAIMS OF CERTAIN (A) LIEN CLAIMANTS AND (B) CUSTOMS AND
REGULATORY CLAIMANTS; AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on January 14, 2026.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on January 14, 2026, at 4:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "Judge Pérez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is proposed counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively, the "SO5 Digital Debtors"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are proposed counsel for the remaining Debtors (collectively, the "Global Debtors").

Saks Global Enterprises LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"),[2] respectfully represent as follows in support of this motion (the "Motion"):[3]

## RELIEF REQUESTED

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "Proposed Order"), (a) authorizing, but not directing, the Debtors to pay certain prepetition amounts in the ordinary course owing on account of certain Customs and Regulatory Claimants and Lien Claimants (each as defined below) and (b) granting related relief.

## JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of

---

[2] For the avoidance of doubt, "Debtors" means, collectively, the Global Debtors and the SO5 Digital Debtors. In 2021, the Global Debtors and the SO5 Digital Debtors entered into a series of agreements that resulted in the SO5 Digital Debtors effectively operating as a standalone company within the broader Saks corporate group. Notwithstanding, certain operations remain consolidated within one or more of the Global Debtors. Consequently, from time to time in the ordinary course of business, the Global Debtors make certain payments for the benefit of or allocable to the SO5 Digital Debtors for which the SO5 Digital Debtors remit reimbursement to the applicable Global Debtor. To the extent the Global Debtors make any payments for the benefit of or allocable to the SO5 Digital Debtors, in accordance with the Approved Budget set forth in the Global Debtors' DIP Orders, the Global Debtors shall be entitled to assert an administrative priority claim against the applicable SO5 Digital Debtor(s); provided that all rights and defenses of all parties in interest shall be fully preserved with respect to any payments for the benefit of or allocable to the SO5 Digital Debtors (and whether or not such payments are for the benefit of or allocable to the SO5 Digital Debtors) after the earlier of (i) the second interim hearing on the SO5 Digital Debtors' motion for use of cash collateral or (ii) fourteen (14) days after the Petition Date, or such other date as may be agreed by the Global Debtors, the SO5 Digital Debtors, the SO5 Digital Debtors' prepetition agent, the DIP Agents, and the DIP Lenders (as defined in the Global Debtors' DIP Orders).

[3] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the *Declaration of Mark Weinsten in Support of Chapter 11 Petitions and First Day Pleadings*, the *Declaration of Andrew D.J. Hede in Support of SO5 Digital Debtors' Chapter 11 Petitions and First Day Pleadings* (together, the "First Day Declarations"), or the Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief, each filed concurrently herewith and incorporated by reference. The First Day Declarations describe in more detail the relationship between the Global Debtors and the SO5 Digital Debtors.

Texas, entered May 24, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the Court's entry of a final order in connection with this Motion.

3. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, Bankruptcy Rules 6003 and 6004, rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas*.

## BACKGROUND

5. On January 13, 2026 (the "Petition Date") and January 14, 2026, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Debtors are operating their businesses and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

7. No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

8. Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declarations.

**PRELIMINARY STATEMENT**

9. The Debtors are a premier destination for luxury fashion, delivering a one-of-a-kind and highly curated shopping experience for each of its customers. Since its inception over 100 years ago, the Debtors' in-store and online presence have featured broad selections of apparel, handbags, shoes, cosmetics, and precious and designer jewelry from premier luxury and fashion designers. The Debtors' businesses include a diverse collection of highly recognized, market-leading, and emerging retail brands, including: Saks Fifth Avenue, Neiman Marcus, Bergdorf Goodman, and Saks OFF 5TH. Across all brands, the Debtors have over 150 total retail store locations and operations spanning across the globe. To complement their store footprint, the Debtors operate a large luxury e-commerce platform. Additionally, the Debtors buy directly from vendors and sell directly to customers through multiple online platforms. The Debtors operate across intensely competitive industries, where they compete with various established companies.

10. The Debtors' success in an intensely competitive industry is fueled by their partnerships with certain merchandise and services providers that ensure that the Debtors are able to deliver and sell the highest quality products for use and sale in their retail store locations and online platforms. Accordingly, it is imperative that the Debtors maintain an uninterrupted flow of inventory and other goods through their distribution networks and to their stores and customers, including the purchase, importation, storage, and shipment of inventory and merchandise. To accomplish this, the Debtors rely on a number of third-party warehousemen and distributors, various freight vendors, other shipping services providers, materialmen, and merchandise suppliers for the supply, shipping, receipt, storage, distribution, and delivery of the merchandise and products to their distribution centers and retail store locations.

11. Moreover, with respect to each of the Debtors' businesses, the Debtors obtain core merchandise and products from a limited number of highly specialized vendors and consignors that are irreplaceable, due to, among other things, demand created by branding and marketing. Customers choose to shop with the Debtors to obtain a distinct experience; in some instances, the Debtors are the exclusive distributor for highly sought after designers. If the Debtors fail to stock the products to which their customers have become accustomed, it is likely customers will instead seek out competitors to fulfill their shopping needs. Consequently, although the Debtors have evaluated several supplier options for the sourcing of their merchandise and products over the past several years, their unique merchandise and products cannot be sourced across multiple, redundant suppliers without difficulty and heightened costs. If the Debtors' critical goods and services providers refuse to continue doing business with the Debtors due to outstanding prepetition amounts, replacing them would cause significant delays in each Debtor's ability to deliver the necessary products to its stores and customers, which would not only jeopardize, but also cause irreparable, and potentially irreversible, damage to the Debtors' businesses, estates, and reorganization efforts.

12. Further, even if the Debtors were able to switch Shippers & Logistics Providers (as defined below) to alternative suppliers on such short notice (which, with respect to the Customs and Regulatory Claimants, Shippers & Logistics Providers, Consignors, and Third-Party Contractors discussed herein, they cannot), there would be significant disruptions in the Debtors' operations to the detriment of the Debtors' businesses and, ultimately, their stakeholders. Even a slight delay in the delivery of such products to market could negatively affect the Debtors' market share, causing irreparable harm to their businesses. The Debtors submit that the relief requested

5

through this Motion is necessary to the Debtors' ability to preserve and maximize the value of their estates.

## THE LIEN CLAIMANTS

13. In the ordinary course of business, the Debtors rely on various third parties to source and transport their merchandise and other goods throughout the Debtors' supply chain. The Debtors conduct their business through a complex logistics network that is dependent on services provided by certain common carriers, warehousemen, freight forwarders, consolidators, and third-party logistics providers (collectively, the "Shippers & Logistics Providers" and, such claims, the "Shippers & Logistics Providers Claims"). The Shippers & Logistics Providers are responsible for transporting the Debtors' merchandise and products from foreign countries to the United States and, once in the United States, transporting the merchandise and products to either the Debtors' distribution centers, the Debtors' storage facilities, the Debtors' stores, or directly to customers. In addition to transporting such inventory, the Debtors rely on third-party consolidators to manage certain shipment and packaging arrangements for distribution to the Debtors' stores, the Debtors' distribution centers and storage facilities, or directly to customers.

14. Finally, the Debtors also contract with certain Shippers & Logistics Providers to operate and manage distribution centers and storage facilities across the United States. As a result, the Shippers & Logistics Providers regularly possess certain of the Debtors' merchandise and products in the ordinary course of the Debtors' operations.

15. Certain manufacturers ship merchandise and other goods to the Debtors either "delivery duty paid" ("DDP") or "free on board" ("FOB"). Under DDP, or "domestic," arrangements, which represent most of the Debtors' shipping arrangements, the vendor pays to ship goods to a U.S.-based location, and title to the merchandise and goods does not pass to the

6

Debtors until it arrives at the U.S.-based location. Under a FOB, or "import," arrangement, the Debtors pay freight forwarders to transport merchandise and goods from abroad to a U.S.-based facility, and title passes to the Debtors when merchandise and goods are loaded for shipment to the United States. Once the merchandise and goods reach the United States port, the Debtors rely on Shippers & Logistics Providers to transport them to stores, distribution centers, or storage facilities. Under either arrangement, if any fees and expenses owed to the Shippers & Logistics Providers are not satisfied, these parties may refuse to deliver or release the Debtors' merchandise and products, thereby preventing the Debtors from delivering their merchandise and products to their stores and customers.

16.  In addition to Shippers & Logistics Providers, the Debtors routinely transact business with a number of third-party contractors, including mechanics, technicians, repairmen, security guards, and janitorial staff in connection with their brick-and-mortar stores, distribution facilities, corporate offices, and other facilities (the "Third-Party Contractors"). Such Third-Party Contractors perform a number of services for the Debtors that are integral to the Debtors' ongoing business operations, including the installation and repair of certain equipment in the Debtors' stores and distribution centers, maintenance and improvement of the Debtors' real property and facilities, and other repair, renovation, or construction of the facilities and property therein. The Third-Party Contractors may be able to assert statutory, common law, or possessory liens, such as mechanic's liens, materialmen's liens, or other liens, against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered (such claims, the "Third-Party Contractor Claims"). Further, the Third-Party Contractors may cease providing services to the Debtors if they are not paid timely. The Debtors would suffer immediate harm if the Third-Party

Contractors refused to fulfill ongoing obligations to the Debtors—including critical maintenance, repair, installation, security, sanitation, and other services.

17. Finally, the Debtors are also party to a number of agreements under which third-party consignors of goods supply merchandise and products for sale in the Debtors' stores and across their e-commerce websites (such agreements, the "Consignment Agreements" and, such third-party consignors, the "Consignors"). These Consignment Agreements permit the Debtors to access and stock merchandise for sale to customers without carrying excessive inventory, offering the Debtors the flexibility to pay for and purchase only the goods that they can ultimately sell to customers. Pursuant to the terms of the Consignment Agreements, the Consignors may be authorized to take and perfect liens on the merchandise and goods supplied to the Debtors under such agreements (to the extent so authorized and properly perfected, the "Consignment Liens"). The Debtors' failure to pay or honor the Consignment Liens could result in the Consignors' refusal to continue to supply merchandise under the Consignment Agreements, undermining the Debtors' ability to stock their stores and fulfill their customers' needs. Accordingly, continued performance under the Consignment Agreements is necessary and critical to the continued success of the Debtors' businesses.

18. Under certain non-bankruptcy laws, Shippers and Logistics Providers, Third-Party Contractors, and Consignors (collectively, the "Lien Claimants") may be able to assert liens on certain property of the Debtors in connection with prepetition obligations (collectively, "Lien Claims"). While the Consignors may already have valid liens on certain merchandise sold by the Debtors, the Shippers and Logistics Providers and the Third-Party Contractors may be able to assert incidental possessory liens on the merchandise, goods, and/or supplies in their possession that secure the charges or expenses incurred by logistics providers in connection with the

transportation or storage of goods, and by contractors in connection with the maintenance and repair of a company's properties.  Furthermore, in certain circumstances, the Shippers and Logistics Providers and the Third-Party Contractors parties may be entitled to sell any goods in their possession to third parties to enforce the possessory liens and secure payment of the charges or expenses incurred in connection with any lien charges, including shipping and storage charges.  Even a minor interruption to the Debtors' supply chain could undermine the Debtors' ability to stock their stores and fulfill their customers' needs and adversely impact relationships with such parties.  Additionally, an interruption to the maintenance, installation and/or repair of the Debtors' equipment in their stores could render the space unsafe for public use; forced store closures (even for minor periods of time) will inevitably negatively impact the Debtors' relationship with their customers and their ability to fulfill customers' needs.

19. Such Shippers & Logistics Providers' possession (and retention) of the Debtors' products would severely disrupt the Debtors' operations and affect the Debtors' ability to fulfill orders and, in turn, efficiently administer these Chapter 11 Cases.  Likewise, the value of the Debtors' product in the Shippers & Logistics Providers' possession is likely to exceed the amounts owed to such Shippers & Logistics Providers.  As a result, the cost of such disruption to the Debtors' estates would likely be greater than any applicable lien charges or payments owed to the Shippers & Logistics Providers.  Additionally, non-payment of Third-Party Contractors could lead to shortages of skilled labor, labor disputes, work stoppages, and disputes with contractors or subcontractors.  Finally, failure to honor liens held by the Consigners in any merchandise or goods supplied under the Consignment Agreements could lead to the Consignors refusing to supply further merchandise, or otherwise damaging the Debtors' relationships with key suppliers.  Any of these contingencies would affect the Debtors' anticipated costs and disrupt their businesses.

20. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $10.9 million to the Shippers & Logistics Providers, approximately $11.1 million to the Third-Party Contractors, and approximately $91.5 million to Consignors pursuant to the terms of the Consignment Agreements. Accordingly, the Debtors seek authority, but not direction, to pay, on a case-by-case basis, the Lien Claims where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods and the delay associated with such actions.

## CUSTOMS AND REGULATORY CLAIMANTS

21. In the ordinary course of their business, the Debtors import certain products and merchandise from single-source providers located in foreign countries. Timely receipt or transmittal, as applicable, of imported products and merchandise is critical to the Debtors' business. Any disruption or delay could adversely affect the Debtors' operations and affect the Debtors' ability to efficiently administer these Chapter 11 Cases.

22. In connection with the importation of products and merchandise, the Debtors may be required to pay various charges (the "Customs and Regulatory Claims" and holders of such claims, the "Customs and Regulatory Claimants"), including customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding, and other similar obligations. Absent such payments, the Customs and Regulatory Claimants may interfere with the transportation of the Debtors' products and merchandise.

23. If the flow of the Debtors' products and merchandise were to be interrupted, the Debtors may be deprived of the inventory necessary to fill the shelves and displays in their stores or fulfill online orders, thereby reducing profits. The ultimate value of such sales is worth far more

to the Debtors than the aggregate amount of incurred, but unpaid, Customs and Regulatory Claims. Accordingly, the Debtors seek authority to pay any and all necessary and appropriate Customs and Regulatory Claims incurred on account of prepetition transactions.

24. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $120,000 to the Customs and Regulatory Claimants. For the foregoing reasons, the Debtors submit that payment of the Customs and Regulatory Claims is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest. Accordingly, the Debtors seek authority, but not direction, to pay, on a case-by-case basis, the Customs and Regulatory Claims where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs to the estates.

## BASIS FOR RELIEF REQUESTED

**A.     The Court Should Grant the Requested Relief Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.**

25. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate. See, e.g., In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("Cases cited by [the] Debtors that refer to necessity of payment to preserve going concern value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); see also In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

26. Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so. See Ionosphere Clubs, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where such action supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty to protect and preserve the estate can "only be fulfilled by the preplan satisfaction of a prepetition claim." CoServ, 273 B.R. at 497; see also In re Mirant Corp., 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (permitting a debtor to pay prepetition lien claims to prevent the debtor's businesses from being seriously damaged).

27. In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may authorize payments of prepetition obligations when essential to the continued operation of a debtor's businesses. CoServ, 273 B.R. at 497; Ionosphere, 98 B.R. at 175. Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). Ionosphere, 98 B.R. at 176.

28. Indeed, the courts in the Fifth Circuit have recognized the "necessity of payment" doctrine. See, e.g., In re Scotia Dev., LLC, No. 07-20027-RSS, 2007 WL 2788840, at *1 (Bankr. S.D. Tex. Sep. 21, 2007) (acknowledging the existence of the doctrine of necessity); CoServ, 273 B.R. at 497. The CoServ court held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. Id. ("These are simply

examples of claims that may require satisfaction for the debtor in possession to perform its fiduciary obligations. In such instances, it is only logical that the bankruptcy court be able to use section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); Ionosphere, 98 B.R. at 175 ("The ability of a Bankruptcy Court to authorize the payment of a prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").

29. Allowing the Debtors to pay Lien Claims and Customs and Regulatory Claims pursuant to sections 363(b) and 105(a) of the Bankruptcy Code is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code: preserving going-concern value and maximizing the value of property available to satisfy creditors. See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship, 526 U.S. 434, 453 (1999) (citation omitted).

**B.  Payment of Certain Lien Claims Now Will Not Adversely Affect Creditor Recoveries in These Chapter 11 Cases.**

30. Certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim. Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[4] 11 U.S.C. § 362(b)(3). As a result, the Debtors anticipate that certain Shippers & Logistics Providers, Third-Party Contractors, and Consignors may assert or perfect liens, refuse to turn over merchandise, goods or supplies in their possession,

---

[4] See 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection.").

or stop performing their ongoing obligations. Even absent a valid lien, to the extent that certain Shippers & Logistics Providers and Third-Party Contractors have possession of the Debtors' inventory, mere possession or retention would disrupt the Debtors' operations.

31. Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Shippers & Logistics Providers, Third-Party Contractors, and Consignors may be entitled to adequate protection of a valid possessory lien to the extent that the Debtors use or sell the estate property against which a Shippers & Logistics Providers Claim, Third-Party Contractor Claim, Consignors Claim is asserted. Given that the value of such property will generally far exceed the value of the related Shippers & Logistics Providers Claim, creditors will not be harmed—and, in fact, will be benefited—by the satisfaction of certain amounts owed to the Shippers & Logistics Providers, Third-Party Contractors, or Consignors, as applicable. In some instances—for example, if a Shipper & Logistics Provider or Third-Party Contractor is permitted a lien—where the amounts owed to a Shipper & Logistics Provider or Third-Party Contractor, as applicable, are less than the value of the merchandise or goods that could be held as collateral to secure the Shipper & Logistics Provider Claim or Third-Party Contractor Claim, such parties may be fully secured creditors of the Debtors' estates. In such instances, payment now only provides such parties with what they might be entitled to receive, only without any interest costs that might otherwise accrue during these Chapter 11 Cases. Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy and the ultimate delivery and sale of inventory to customers.

## EMERGENCY CONSIDERATION

32. Pursuant to Local Rule 9013-1, the Debtors request emergency consideration of this Motion under Bankruptcy Rule 6003. Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief "is

necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001). For the reasons discussed above and in the First Day Declarations, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief "is needed to avoid immediate and irreparable harm" as contemplated by Bankruptcy Rule 6003, and, as a result, the Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

33. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth throughout this Motion, any delay in paying Lien Claims and Customs and Regulatory Claims would be detrimental to the Debtors, their creditors, and estates, as the Debtors' ability to manage and run their business operations without any unexpected or inopportune interruption requires, in part, that they continue to receive the goods and services provided by the Shippers & Logistics Providers, Third-Party Contractors, and Consignors. For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Order.

34. To implement the foregoing immediately, the Debtors also respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent they are applicable to the Proposed Order.

## RESERVATION OF RIGHTS

35. Nothing in the Proposed Order or this Motion (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors, their estates, or any other party in interest with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors, their estates, or any other party in interest with respect to any and all claims or causes of action; or (d) shall be construed as a promise to pay a claim.

36. Nothing in the Proposed Order or this Motion shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of any Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

37. Nothing in the Proposed Order or this Motion shall create, nor is intended to create, any rights in favor of or enhance the priority or status of any claim held by any party.

## NOTICE

38. Notice of this Motion has been or will be provided to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the United States Attorney's Office for the Southern District of Texas; (c) those creditors holding the thirty largest unsecured claims against the Debtors' estates; (d) counsel to the DIP Agents; (e) counsel to the DIP Lenders; (f) counsel to the SO5 Digital Debtors' term loan lender; (g) the Internal Revenue Service; and (h) the Banks.

In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

[*Remainder of This Page Intentionally Left Blank*]

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order granting the relief requested herein and such other and further relief as is just and proper.

Houston, Texas
Dated: January 14, 2026

*/s/ Kelli Stephenson Norfleet*
**HAYNES AND BOONE, LLP**
Kelli Stephenson Norfleet (TX Bar No. 24070678)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney P. Lyda (TX Bar No. 24013330)
David Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone:  (713) 547 2000
Facsimile:   (713) 547 2600
Email:        kelli.norfleet@haynesboone.com
              kenric.kattner@haynesboone.com
              arsalan.muhammad@haynesboone.com
              kourtney.lyda@haynesboone.com
              david.trausch@haynesboone.com

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (*pro hac vice* pending)
Robin Spigel (*pro hac vice* pending)
Allyson B. Smith (*pro hac vice* pending)
Betsy L. Feldman (*pro hac vice* pending)
Jessica D. Graber (*pro hac vice* pending)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Facsimile:   (212) 728-8111
Email:        dsinclair@willkie.com
              rspigel@willkie.com
              absmith@willkie.com
              bfeldman@willkie.com
              jgraber@willkie.com

-and-

Jennifer J. Hardy (TX Bar No. 24096068)
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Facsimile:   (713) 510-1799
Email:        jhardy2@willkie.com

-and-

Ryan Blaine Bennett (*pro hac vice* pending)
300 North LaSalle Drive
Chicago, IL 60654
Telephone:  (312) 728-9123
Facsimile:   (312) 728-9199
Email:        rbennett@willkie.com

*Proposed Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

*Proposed Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

        */s/ Jarrod B. Martin*
        **BRADLEY ARANT BOULT CUMMINGS LLP**
        Jarrod B. Martin (TX Bar No. 24070221)
        Michael K. Riordan (TX Bar No. 24070502)
        600 Travis Street, Suite 5600
        Houston, TX 77002
        Telephone: (713) 576-0300
        Facsimile: (713) 547-0301
        Email:    jbmartin@bradley.com
                    mriordan@bradley.com

-and-

James Bailey (TX Bar No. 24108289)
1819 Fifth Avenue N.
Birmingham, AL 35203
Telephone: (205) 521-8000
Facsimile: (205) 488-6913
Email:    jbailey@bradley.com

*Proposed Counsel to the SO5 Digital Debtors and SO5 Digital Debtors in Possession*

**Certificate of Accuracy**

In accordance with Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency with respect to the Global Debtors are true and accurate to the best of my knowledge.

/s/ *Kelli Stephenson Norfleet*
Kelli Stephenson Norfleet

**Certificate of Accuracy**

In accordance with Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency with respect to the SO5 Digital Debtors are true and accurate to the best of my knowledge.

/s/ *Jarrod B. Martin*
Jarrod B. Martin

**Certificate of Service**

I certify that on the date hereof, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' claims agent.

/s/ *Kelli Stephenson Norfleet*
Kelli Stephenson Norfleet