**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re:<br><br>SAKS GLOBAL ENTERPRISES LLC,<br>*et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26- 90103 (ARP)<br><br>(Joint Administration Requested) |

**DECLARATION OF MARK WEINSTEN IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Mark Weinsten, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.      I am the Chief Restructuring Officer ("CRO") of Saks Global Enterprises LLC ("SGE") and each of the other Global Debtors (collectively, "Saks Global").[2]

2.      I have served as CRO of the Global Debtors since January 1, 2026. I am a Managing Director with Berkeley Research Group LLC ("BRG") and have over 25 years of experience providing interim management services, including as Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and Chief Restructuring Officer, to distressed and transitioning companies. In those roles, I have implemented revenue enhancement, liquidity improvement, and

---

[1]      A complete list of each of the debtors in these chapter 11 cases (collectively, the "Debtors") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is proposed counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively the "SO5 Digital Debtors"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are proposed counsel for the remaining Debtors (collectively, the "Global Debtors").

[2]      The SO5 Digital Debtors, which have a separate capital structure from the Global Debtors, have appointed Andrew Hede to serve as their Chief Restructuring Officer.

cost-reduction programs. Prior positions of relevance include, Interim Chief Operating Officer of Neiman Marcus Group, Chief Restructuring Officer of Neiman Marcus Group during its 2020 Chapter 11 process, Interim Chief Financial Officer of Neiman Marcus Group and, most recently, Interim Chief Financial Officer of Saks Global.

3.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based upon my personal knowledge, information supplied to me by other members of the Debtors' management team and other professionals and advisors, my review of relevant documents, or my opinion based upon my experience and knowledge concerning the Debtors' operations and financial condition. I submit this Declaration to assist the United States Bankruptcy Court for the Southern District of Texas (the "Court") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed today (the "First Day Motions"). In addition to this Declaration, the Chief Restructuring Officer of the SO5 Digital Debtors has separately submitted the *Declaration of Andrew Hede in Support of SO5 Digital Debtors Chapter 11 Petitions and First Day Pleadings* (the "Hede Declaration") filed concurrently herewith, which specifically addresses certain issues pertaining to the SO5 Digital Debtors.

4.      I am over the age of 18, and if called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this Declaration.

5.      On January 13, 2026 (the "Petition Date") and January 14, 2026, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"). The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession.

## Preliminary Statement

6.       SGE is the parent company of three iconic American retailers, including Saks Fifth Avenue, which traces its founding back to 1867 and has operated its world-famous Manhattan flagship store for over 100 years. In 2013, Hudson's Bay Company ("HBC"), led by its Governor and Executive Chairman Richard Baker, acquired Saks Incorporated (owner, at the time, of Saks Fifth Avenue) to create a leading North American luxury retail conglomerate that included Saks Fifth Avenue, Lord & Taylor, and Hudson's Bay stores located in Canada. The merger was designed to increase growth potential both in the U.S. and Canada, generate efficiencies of scale, and add leverage across both companies' real estate portfolios.

7.       In 2024, Saks Global became the owner of Neiman Marcus and Bergdorf Goodman, each of which has its own storied history and deep roots as leaders in the fashion industry. The transaction combined Neiman Marcus, Bergdorf Goodman, Saks Fifth Avenue, and Saks OFF 5TH, with each continuing to serve customers under its own brand. This transaction was transformative for Saks Global and the luxury retail industry, creating an unparalleled multi-brand luxury portfolio. Through deep relationships with brand partners in the industry, cutting-edge personalization, and strategic technology partnerships, the combination of brands under Saks Global aimed to redefine the luxury shopping experience.

8.       Uniting these retailers under one umbrella has made the Debtors the largest multi-brand luxury retailer in the world, operating approximately 70 full-line luxury locations, additional off-price locations and five distinct e-commerce experiences. Through an improved e-commerce experience and well-located store fleet, Saks Global helps emerging and established brands reach their target customers. Such multi-channel retail platforms remain an important means by which

3

luxury brands connect with consumers as these brands are unlike traditional retail brands due to their focus on quality, controlled distribution, and long-term brand equity rather than volume-driven sales.

9. The Debtors, together with their non-Debtor affiliates (collectively, the "Company"), own or ground lease approximately 8.4 million square feet of U.S. real estate holdings and investments.

10. Despite the growth potential of Saks Global and synergies expected (and partially realized) from its recent acquisitions, the Company has been negatively impacted by sustained liquidity issues. Nonetheless, it is not a declining brick-and-mortar business. Fundamentally, the Debtors' sales are a function of two inputs: (i) the availability of luxury inventory through their sales channels; and (ii) luxury consumers' desire to shop. While there are strong indications that the Debtors' most lucrative customers are continuing to spend through their retail channels, the Debtors' liquidity constraints have increasingly made it difficult to acquire the inventory necessary to meet customer demand. In that respect, the constraints faced by the Company are not driven by declining demand; where product is available, performance has remained robust.

11. During the Debtors' fiscal year ending February 1, 2025—which included the Debtors' acquisition of Neiman Marcus and Bergdorf Goodman—consolidated total revenue declined by 13.6% year over year, largely driven by lower retail sales across all channels. Sales performance was also softer than expected in the second quarter of 2025. These headwinds led to an unsustainable level of aged trade payables and related reductions in the availability of goods for sale.

12. The Debtors sought to address these challenges by raising incremental financing in the summer of 2025. As discussed in more detail herein, in Summer 2025, the Global Debtors

secured $600 million (before fees and prepaid interest) in new money financing from existing bondholders and completed an exchange transaction (the "Exchange Transaction") that allowed the Global Debtors to capture approximately $115 million of discount in face value of their existing notes. The Debtors planned to use a significant portion of the net proceeds from the new money financing to pay aged payables and restore a normal flow of goods. The proceeds alone were insufficient to normalize aged payables or restore inventory flow to planned levels ahead of the 2025 holiday season. These efforts were complicated by the length of time that many vendor accounts payable had been stretched. Additionally, the Debtors were impacted by merchandising system integration issues which disrupted inventory receipts at Neiman Marcus and Bergdorf Goodman during a critical time leading up to peak holiday season. With this inventory disruption, and slower inventory receipts from vendors arising from aged payables, in the second half of 2025, the Debtors had over $550 million less in inventory receipts than the Company previously forecast in July. In addition to a reduction in top line, this reduced the Global Debtors' borrowing base under the ABL Facility, further constraining liquidity. Ultimately, the new money financing from the Exchange Transaction did not provide enough liquidity to fully normalize the Debtors' relationships with their trade partners heading into the critical 2025 holiday season. In addition, in December, borrowing base availability was further constrained under the ABL Facility when the minimum excess availability financial covenant threshold increased from $200 million to $500 million, in addition to over $50 million of discretionary reserves imposed under the ABL Facility over the course of 2025. Further, on December 4, 2025, the ABL Agent (defined below) sent notices to the Global Debtors triggering the ABL Agent's ability to exercise control over certain deposit accounts of the Global Debtors pursuant to the terms of certain deposit account control agreements. Compounding this with additional near-term obligations, including interest

payments due at the end of December 2025, the Debtors faced a perfect storm of liquidity challenges leading into January, historically a seasonal low point for sales and liquidity.

13.     To help address these challenges, in the months leading up to the Petition Date, the Debtors engaged restructuring professionals at Willkie Farr & Gallagher LLP ("WF&G") and PJT Partners L.P. ("PJT") to augment the professionals of BRG which had been previously retained to consider strategic alternatives. To further the Global Debtors' evaluation of strategic alternatives, the Global Debtors appointed (i) me as their Chief Restructuring Officer and (ii) independent managers Paul Aronzon and William Tracy (the "Independent Managers") to the board of managers of HBC GP LLC (the parent company of all Debtors) as well as to the governing body at each subsidiary Global Debtor that is not member-managed, and formed a special committee of the board comprised of the Independent Managers at the applicable entities (the "Special Committee"). In addition, the Board of Managers of HBC GP LLC approved the appointment of Scott Vogel to serve as an independent director of HBC GP LLC, each subsidiary Global Debtor that is not member-managed, and to the Special Committee, subject to the entry of the interim order approving the DIP Facilities (defined below).

14.     Further, the Company has announced that Geoffroy van Raemdonck, who previously served as Chief Executive Officer of Neiman Marcus Group prior to its acquisition in 2024, has been appointed Chief Executive Officer of Saks Global, effective immediately, to guide the Company through this pivotal period. Mr. van Raemdonck brings deep operating experience in luxury retail. Most recently, as Chief Executive Officer of Neiman Marcus Group, he led the company through its COVID-era restructuring and executed a mandate to rebuild vendor relationships and position the business for profitable growth.

15.     In addition, Mr. van Raemdonck will be joined by two senior leaders with whom

he worked as a unified team at Neiman Marcus Group and Bergdorf Goodman prior to the 2024 Saks acquisition: Lana Todorovich, who served as Chief Merchandising Officer at Neiman Marcus, and Darcy Penick, who served as President of Bergdorf Goodman. Further, Brandy Richardson will continue to serve as the Company's Chief Financial Officer and will be an integral, day-to-day member of the leadership team. Ms. Richardson previously worked with Mr. van Raemdonck, Ms. Todorovich and Ms. Penick at Neiman Marcus.

16.     In late 2025, the Debtors explored the possibility of consummating one or more potential value-maximizing transactions outside of chapter 11, including with key equity holders and third-party investors. These potential paths included sales of certain assets, financing alternatives with new and/or existing lenders, and holistic restructuring transactions. Although the Debtors were hopeful that they could identify a transaction or series of transactions that would enable them to obtain much-needed liquidity and consensually recapitalize their balance sheet outside of a chapter 11 process, they ultimately were not able to reach agreement on the terms of any transactions with these constituents. Accordingly, in mid-December 2025, the Global Debtors began engaging with their key creditor constituents and certain third-party investors on the terms of debtor-in-possession financing. An ad hoc group of the Global Debtors' noteholders (the "Ad Hoc Group"), which collectively own approximately 72% of the existing SPV Notes (as defined below) and approximately 50% of the existing 2O Notes (as defined below), engaged Paul, Weiss, Rifkind, Wharton & Garrison LLP, FTI Consulting, Inc. and Lazard Frères & Co, LLC to advise them in connection with negotiations with the Global Debtors. In addition, the Global Debtors' ABL Lenders (defined below) engaged Morgan, Lewis & Bockius LLP, Otterbourg P.C. and M3 Partners, LP in connection with these chapter 11 cases.

17.     These negotiations culminated in three debtor-in-possession financing facilities that will provide nearly $1.75 billion in new money to the Global Debtors both during the course of these cases and as part of an exit solution. *First*, the ABL Lenders have agreed to enter into a new debtor-in-possession ABL facility with commitments in an aggregate principal amount of $1.5 billion (the "ABL DIP Facility"), subject to a borrowing base formula and minimum excess availability financial covenants. The ABL DIP Facility provides materially improved terms through a reduction of the reserves and minimum excess availability covenant, as compared to the prepetition ABL Facility. These concessions will allow the Global Debtors to borrow approximately an incremental $240 million more than was available to them under the terms of the prepetition ABL Facility. The ABL DIP Facility also includes: (i) an interim roll-up of letters of credit and other non-revolving loan obligations under the prepetition ABL Facility; (ii) a creeping dollar-for-dollar roll-up of the outstanding revolving loans under the prepetition ABL Facility into the new ABL DIP Facility on an interim basis such that during the interim period, cash that is swept on a daily basis from the Global Debtors' accounts will first repay outstanding prepetition revolving loans under the ABL Facility, and new money advanced on a daily basis will be advanced as obligations under the ABL DIP Facility; and (iii) a full roll-up of any remaining obligations under the prepetition ABL Facility on a final basis.

18.     *Second*, the Ad Hoc Group, has agreed to backstop a new $2.6 billion delayed draw term loan debtor-in-possession financing facility (the "SGUS DIP Facility"),[3] which consists of (i) $1 billion of new money first out term loans available in three draws, (ii) up to $808 million in second out loans as a cashless roll-up of prepetition SPV Notes (as defined herein) and (iii) up to

---

[3]     The SGUS DIP Facility will be governed by that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement, by and among SGUS, the other Debtors guarantors thereto, the lenders party thereto, and U.S. Bank Trust Company, National Association, in its capacity as administrative agent and collateral agent (as it may be amended, the "SGUS DIP Credit Agreement").

$751 million of third out DIP loans (the "<u>SGUS Third Out DIP Loans</u>") to be used by Debtor SGUS to purchase participation interests in the prepetition 2O Notes (as defined herein). The SGUS DIP Facility is paired with a commitment of $500 million in exit financing which will help ensure the Global Debtors have a solid path forward following their exit from these cases. All holders of SPV Notes will be permitted to participate in the SGUS DIP Facility on a final basis, and may roll-up certain of their SPV Notes following a final DIP hearing, in accordance with a declining schedule.

19.     *Third*, Debtor SGUS will use the proceeds of the SGUS DIP Facility to fund a $1.75 billion intercompany debtor-in-possession facility (the "<u>OpCo DIP Facility</u>," and together with the SGUS DIP Facility and the ABL DIP Facility, the "<u>DIP Facilities</u>") to Debtor SGE, as borrower, which will provide for (a) delayed draw term loans of up to $1 billion in principal amount from Debtor SGUS, in accordance with the terms of the OpCo DIP Facility, and (b) a cashless roll-up of up to approximately $395 million in principal amount of the FILO Onloan and $357 million in principal amount of the NPC Onloan (each defined below), which are prepetition intercompany loans among SGUS to SGE. A chart summarizing the DIP Facilities is below:

| SAKS GLOBAL DIP FACILITY SUMMARIES[4] | | | | | |
|---|---|---|---|---|---|
| DIP FACILITY | DESCRIPTION | NEW MONEY AMOUNT | INTERIM ROLL-UP AMOUNT | FINAL ROLL-UP AMOUNT[5] | PARTICIPATION |
| *ABL DIP Facility* | $1.5 billion revolving facility | Estimated $240 million incremental availability over prepetition ABL Facility | Dollar for dollar creeping roll-up of amounts loaned in the interim period<br><br>$56.6 million in letters of credit | $442.16 million in revolving loans<br><br>$56.6 million in letters of credit | |
| | | **First Out** | **Second Out** | | **Third Out** |
| *SGUS DIP Facility* | $2.6 billion term loan | Interim: $400 million<br><br>Final: $600 million<br><br><br>**Total: $1 billion** | *Roll-Up*:<br>Up to $359 million in SPV Notes | *Roll-Up*:<br>Up to $808 million in SPV Notes (inclusive of interim) | *Participation*:[6]<br>Up to $751 million in 2O Notes |
| **Intercompany DIP Facility** | | | | | |
| *OpCo DIP Facility* | $1.75 billion intercompany facility[7] | Interim: $400 million<br><br>Final: $600 million<br><br><br>**Total: $1 billion** | $395 million of prepetition FILO Onloan<br><br>$357 million of NPC Onloan<br><br>**Total: $752 million** | *Same as Interim* | |

20.    With these chapter 11 cases, and the funding provided by the DIP Facilities, including the exit commitment under the SGUS DIP Facility, the Global Debtors will have the tools they need to right-size their capital structure and provide enhanced liquidity, which in turn will best position the Global Debtors to maximize value for all partners and stakeholders and become a stronger and better partner to vendors going forward.

21.    In the meantime, Saks Global is operating in the ordinary course during the chapter 11 cases with the substantial new financing made available to it to honor go-forward commitments

---

[4]    Dollar amounts are approximate.

[5]    Includes the interim roll-up amounts.

[6]    During the interim period, SGUS will purchase up to $750,734,021.23 of participation interests in the 2O Notes held by the lenders under the SGUS DIP Facility through the issuance of an equal amount of SGUS Third Out DIP Loans, which shall be used to purchase the participations at face amount.

[7]    $1 billion new money received from the SGUS DIP Facility will be lent from Debtor SGUS to Debtor SGE through the OpCo DIP Facility.

to its brand partners and other vendors, and support the business operations of its three major brands, allowing it to meet evolving customer expectations into the future.

22.     Part I of this Declaration provides background with respect to the Company's corporate history and operations, Part II provides an overview of the Debtors' prepetition capital structure, Part III describes the circumstances leading to these chapter 11 cases and the Debtors' reorganization efforts, and Part IV sets forth the relevant facts in support of the First Day Motions.

## Part I: Corporate History and Operations

23.     As noted above, the Company is the largest multi-brand luxury retailer in the world, comprising Saks Fifth Avenue, Saks OFF 5TH, Neiman Marcus, Neiman Marcus Last Call, Bergdorf Goodman and Horchow. The Company's retail portfolio includes approximately 70 full-line luxury locations, additional off-price locations and five distinct e-commerce experiences.

  a.     **Retail Brands.**

    i.     *Saks Fifth Avenue and Saks OFF 5TH.*

24.     Saks Fifth Avenue ("Saks") is a leading destination for luxury fashion, driven by a mission to help customers express themselves through relevant and inspiring style. The first Saks store opened in Washington, D.C. in 1867 and, in 1902, the first New York City location opened in Herald Square. When customers moved uptown, so did Saks: on September 15, 1924, Saks Fifth Avenue was born, opening its flagship store on 50th Street and Fifth Avenue and becoming the first large retailer to operate in what was then primarily a residential district of Manhattan. Since then, Saks has established a coast-to-coast presence, currently operating 33 locations across North America. Saks also evolved to meet demand as luxury shoppers started to move online, establishing Saks.com in the year 2000 and reorienting its business around the e-commerce experience in the following years. The Saks Fifth Avenue experience combines an emphasis on e-

commerce with a strong connection to a network of extraordinary physical locations across the U.S., featuring an expertly curated assortment of fashion and highly personalized customer service.

25.     The Company has also proven to be a leader in off-price luxury. In 1992, due to growing consumer demand, Saks piloted its original off-price experience, an outlet store in Franklin Mills, Pennsylvania called "Saks Clearinghouse." After the model proved successful, the Company expanded the concept and launched Saks OFF 5TH in 1995. In 2013, Saks OFF 5TH launched SaksOFF5TH.com, offering a broad assortment of goods across all categories and operating as a true off price retailer buying merchandise from across the fashion and retail industry. Today, Saks OFF 5TH is an established destination for luxury off-price fashion. In 81 stores[8] across the U.S. and online at SaksOFF5TH.com, the business offers an assortment of high-end designers at accessible prices.

    ii.     *Saks OFF 5TH Digital.*

26.     In 2021, Saks OFF 5TH's e-commerce business ("SO5 Digital") entered into a series of agreements that resulted in the SO5 Digital Debtors effectively operating as a standalone company within the broader Saks corporate group. The SO5 Digital Debtors, which have their own capital structure and governance, are approximately 80% owned by Saks Global, with the remaining equity owned by funds affiliated with Insight Partners. Notwithstanding the separate capital structure, certain operations of the SO5 Digital Debtors remain consolidated within one or more of the Global Debtors. Consequently, from time to time in the ordinary course of business, the Global Debtors make certain payments for the benefit of, or allocable to, the SO5 Digital Debtors for which the SO5 Digital Debtors remit reimbursement to the applicable Global Debtor.

---

[8]     This includes four stores that are currently dark.

27.    As described in the Hede Declaration, in light of potential conflicts between the SO5 Digital Debtors and the Global Debtors (including with respect to potential intercompany claims), I have been informed that the SO5 Digital Debtors implemented revised governance and professional structures to ensure that their interests are independently represented in these chapter 11 cases. On December 31, 2025, the SO5 Digital Debtors appointed Gary Begeman as Independent Director to oversee their cases and ensure that decisions are made in the best interests of the SO5 Digital Debtors and their stakeholders. It is also my understanding that the SO5 Digital Debtors authorized Mr. Begeman to independently evaluate and address any matters in which the interests of the SO5 Digital Debtors may diverge from those of the Global Debtors. Further, the SO5 Digital Debtors separately retained Andrew Hede as their chief restructuring officer, with Mr. Hede reporting directly to the Independent Director. The SO5 Digital Debtors have also retained Accordion Partners, LLC (where Mr. Hede is the President, Business Transformation & Transactions) to act as financial advisor on matters where there may be conflicts among the Global Debtors and the SO5 Digital Debtors, or on matters where it may be more efficient to use their services as financial advisor. The SO5 Digital Debtors retained Bradley Arant Boult Cummings LLP as independent general bankruptcy counsel.

28.    The SO5 Digital Debtors filed chapter 11 petitions concurrently with the Global Debtors and are seeking to jointly administer their chapter 11 cases with the chapter 11 cases of the Global Debtors. However, certain of the relief requested in the First Day Motions shall apply only to the SO5 Digital Debtors, as further described below and in the Hede Declaration.

iii.    *Neiman Marcus.*

29.    Innovation has been at the forefront of Neiman Marcus since the opening of its first store in Dallas, Texas in 1907. The first Neiman Marcus store aimed to launch a concept featuring ready-to-wear fashion over custom-made creations, which were favored at the time. The founders'

unique vision brought new designers to a mass market and made Neiman Marcus a gateway to high fashion. Neiman Marcus is a pioneer in customer loyalty programs, and one of the first retailers to offer a gift card.  It embraced an integrated omnichannel selling model that defied conventional wisdom about "digital pure plays" vs. "brick and mortar" to set the standard for what exceptional service across both platforms could be.

30.     Today, Neiman Marcus is a leading luxury retailer serving customers across 36 stores well-placed in top markets across the country, via its integrated digital platforms, and through its network of highly trained selling associates, who offer both in store and remote selling services, as well as its five Neiman Marcus Last Call clearance locations.[9] Neiman Marcus has a highly loyal customer base and is known for its exceptional customer service and immersive luxury experiences, including large-scale exclusives and store-takeover events, the Neiman Marcus Awards, its beloved annual holiday Fantasy Gifts collections, and other seasonal campaigns.

iv.     *Bergdorf Goodman.*

31.     Bergdorf Goodman represents the global pinnacle of style, service and modern luxury. The store traces its roots back to a tailor's shop established in Manhattan in 1899 by Herman Bergdorf and later joined by his apprentice Edwin Goodman, who ultimately bought Bergdorf's interest in the business. By 1914, Goodman had become the first couturier in Manhattan to introduce ready-to-wear attire, making Bergdorf Goodman a destination for American and French fashion. In 1972, the Goodman family sold Bergdorf Goodman to what would become the Carter Hawley Hale Stores (which owned Neiman Marcus at the time), with the two brands being spun off into the Neiman Marcus Group in 1987.

---

[9]     Neiman Marcus also previously owned a minority ownership interest in Fashionphile Group, LLC an e-commerce company focused on pre-owned ultra-luxury handbags and accessories, which it sold in December 2025.

32.     Bergdorf Goodman's renowned location on Fifth Avenue and 58th Street, along with the Bergdorf Goodman Men's Store across the avenue, continue to embody the pinnacle of luxury shopping destinations for discerning customers around the world. On the e-commerce front, BG.com expands on Bergdorf Goodman's heritage, showcasing coveted collections for men and women in an unparalleled online shopping experience.

v.     *Horchow.*

33.     Horchow is a home furnishings retailer that has been dedicated to bringing customers unique, high-quality furniture, fine linens, and unique décor since 1973. Horchow was founded by Roger Horchow in 1973 as the first luxury mail-order catalog without a brick-and-mortar store, and was acquired by Neiman Marcus Group in 1988. Today, the Company conducts Horchow operations through its e-commerce platform, horchow.com.

**b.     Corporate History.**

34.     In 2013, HBC, then a publicly-traded company led by Richard Baker, acquired Saks Incorporated (the predecessor to Saks Global). The merger reflected the companies' focus on how the strategic interplay between the luxury retail industry and real estate would create substantial value. Following the acquisition, HBC and Saks Global were impacted by the macro-economic trends faced by other brick-and-mortar retailers, such as the shift to online commerce and the decline in foot traffic in physical stores. Due to the company's continued underperformance, HBC consummated a take-private transaction in March 2020, shortly before temporary store closures arising from the COVID-19 pandemic impacted the entire retail industry.

35.     As the retail industry navigated the COVID-19 pandemic and its aftermath, between 2020 and 2024, HBC and Saks Global were reorganized under the same ownership, with HBC, Saks and Saks OFF 5TH physical locations financed as a single credit group. During this time period, the Saks e-commerce business, like the SO5 Digital Debtors, effectively operated as

a standalone company within the broader Saks corporate group, and was financed as a separate credit group during this period. The Saks.com business platform and operations were reintegrated into the Saks Global credit group beginning in December 2024. During this time, unforeseen challenges in the Canadian market impacted HBC's ability to invest in the Saks stores. This negatively impacted inventory receipts at both Saks and Saks.com. As described in further detail below, in late 2024, Saks Global acquired Neiman Marcus Group and the combined companies established a separate capital structure from HBC. The combination of the companies created a $7 billion portfolio of well-located retail real estate assets in top-tier luxury shopping destinations. In early 2025, amid inflation, rising interest rates, tariff-related uncertainty that disrupted liquidity discussions with potential lenders, and the lingering decline in foot traffic driven by post-COVID shifts in downtown occupancy and reduced in-person work near flagship stores, HBC filed proceedings in Canada under the Companies' Creditors Arrangement Act and ultimately commenced liquidation in 2025.

      c.      **Neiman Marcus Acquisition.**

36. On December 23, 2024, Saks Global consummated the acquisition of Neiman Marcus Group, for a total enterprise value of $2.7 billion (the "Acquisition"). Subsequent to the Acquisition, the retail operations of the Neiman Marcus, Bergdorf Goodman and Last Call businesses were consolidated into Saks Global. In conjunction with the Acquisition, Saks Global raised capital from the issuance of new equity and debt, including $275 million in seller financing, a new $1.8 billion asset-based revolving credit facility and new senior secured notes in an aggregate principal amount of $2.2 billion. New equity investors at the time of the Acquisition included Amazon, Authentic Brands Group and Salesforce. The proceeds of the new debt and equity issuances were used to finance the Acquisition, repay existing indebtedness of Saks Global and the Neiman Marcus Group, and pay costs associated with the Acquisition.

      **d.**    **Real Estate Portfolio.**

37.     The Company utilizes both owned and leased properties in its operations. The Company owns or controls ground leases, either entirely or with joint venture partners, on 39 retail properties located throughout the United States comprising more than 5.5 million square feet of gross leasable area. The owned and ground leased real estate portfolio is concentrated in top metropolitan regions with high population density and higher than average household income, and includes the Saks Fifth Avenue New York City flagship, which is recognized as one of the world's premier luxury department stores.

38.     The Company is partners in a real estate joint venture (the "HBS JV") with Simon Property Group Inc. and other third-party investors. The HBS JV holds 31 properties in the United States, and Saks Global currently owns approximately 62.4% of the equity interests in the HBS JV. Each property is held in a separate special purpose entity which operates as landlord. Each of the properties contributed by the Company to the HBS JV has been leased back to the Company pursuant to portfolio operating leases, with an initial term of 20 years with five six-year extension options. Certain of the fee and leasehold interests owned by the HBS JV secure a real estate loan in an aggregate outstanding principal amount of approximately $428.1 million (the "HBS CMBS Loan"), which has been securitized. The real estate loans and the rest of the Debtors' capital structure is described in further detail below.

39.     The Saks Fifth Avenue flagship building and land is owned by non-Debtor affiliate Saks Flagship Real Property LLC and is subject to a $1.25 billion mortgage loan which has been securitized. The Saks Fifth Avenue flagship building has been ground leased by 12 East 49th Street LLC, as tenant.

40.     As part of its restructuring, the Company is evaluating its operational footprint to ensure it is well-positioned to invest in areas that present the greatest opportunities for sustainable,

long-term growth for its luxury retail brands and partners. By strategically optimizing its footprint and sharpening its focus on luxury retail, the Global Debtors will be well-positioned to uphold their iconic legacy. On the Petition Date, the Global Debtors are seeking to reject certain leases related to "dark stores," locations that the Company has not operated out of for some time. These rejections will have no impact on employees or day-to-day operations.

41.    A summary of the Debtors' owned real estate portfolio is as follows: [10]

| Asset Type | Ownership | Number of Properties | Non-Recourse Debt [1] | Saks Ownership % |
|---|---|---|---|---|
| Saks Fifth Avenue Flagship Store | Wholly Owned / Ground Lease | 1 | $    (1,250) | 100% |
| Saks Fifth Avenue Stores | HBS JV | 11 | (137) | 62% |
| Saks Fifth Avenue Stores | Wholly Owned / Ground Lease | 7 | - | 100% |
| Neiman Marcus Stores | Wholly Owned / Ground Lease | 20 | - | 100% |
| **Total Operating Properties** | | **39** | **(1,387)** | **93%** |
| Development Properties | HBS JV | 20 | (291) | 62% |
| Development Properties | Wholly Owned / Ground Lease | 5 | - | 100% |
| **Total Development Properties** | | **25** | **(291)** | **73%** |
| **Total Saks Global** | | **64** | **$    (1,678)** | **90%** |

1. HBS JV non-recourse debt balances reflect 100% of the outstanding CMBS principal as of January 1, 2026

42.    In total, including both owned and leased properties, the Company operates (a) 33 Saks Fifth Avenue stores, with an aggregate total property size of approximately 4,362,303 square feet, (b) 81 Saks Off 5TH stores, with an aggregate total property size of approximately 2,394,818 square feet, (c) 36 Neiman Marcus stores, with an aggregate total property size of approximately 5,240,913 square feet, (d) two Bergdorf Goodman stores, both of which are located in Manhattan at 58th Street and Fifth Avenue, and (e) 5 Last Call stores in three states that range from

[10]    The Company's real estate operations also include Streetworks Development, a property development firm that creates multi-use environments.

approximately 15,000 to 45,000 square feet each in size. In addition, the Company utilizes various distribution, support and office facilities to support store and online operations.

        **e.**      **Axonic Pledge.**

43.      In 2021, an affiliate of Axonic Coinvest II, LP ("Axonic") purchased certain HBS CMBS Loan bonds issued by Hudson's Bay Simon JV Trust 2015 HBS. In connection with this purchase, an affiliate of Axonic and certain Global Debtors entered into several agreements, which have since been amended, including (i) Holdco II and SGE each having entered into an Amended and Restated Conditional Bond Purchase Agreement, made on March 18, 2021 (as amended from time to time, collectively, the "CBUPAs") with AXONIC Credit Opportunities Master Fund, LP (predecessor in interest to Axonic); (ii) various Global Debtors, including Holdco II, having entered into an Amended and Restated Investment Structuring Agreement, dated as of March 18, 2021 (as amended from time to time, the "2024 A&R ISA") with Axonic Capital LLC; (iii) various Global Debtors, including Holdco II, having entered into an Amended and Restated Guaranty, dated as of March 18, 2021 (as amended, the "2024 Holdco II Guaranty"); and (iv) Holdco II having entered into the Amended and Restated Pledge Agreement, as of March 18, 2021, whereby Holdco II pledged the equity of 12 East 49th Street LLC to secure the guarantees made by Holdco II under the 2024 A&R Holdco II Guaranty.

44.      The CBPAs provided Axonic with the ability to require SGE or Holdco II to purchase certain bonds (which are more fully described in the CBPAs) at specified times and for specified prices (the "Put"). The Put originally became exercisable on March 14, 2024, but has been extended several times to October 31, 2025. Axonic received at least $5.5 million in exchange for such extensions. Even prior to October 31, 2025, the Global Debtors have been in discussions with Axonic regarding a further one-year extension of the Put. In connection with these negotiations, the Global Debtors paid Axonic $12 million. On December 15, 2025, Axonic agreed

19

to forbear from exercising the Put until January 31, 2026, provided (i) the Global Debtors paid an additional $13 million that was part of the extension agreement that was then being negotiated, (ii) the parties continued to negotiate in good faith, (iii) none of the parties to the Put or Investment Structuring Agreements, or their affiliates, had filed for bankruptcy, and (iv) there was no default under the HBS CMBS Loan. Thereafter, the Debtors paid Axonic the additional $13 million and continued to engage in good faith negotiations regarding the terms of extending the Put for one year.

45.     Even so, despite the continued good faith negotiations, and presumably as a result of rumors that the Debtors would be filing for bankruptcy, on January 7, 2026, Axonic sent a notice to certain of the Debtors, including Holdco II, purporting to exercise its rights under the Put. Axonic's notice asserted a right to elect to sell one of the series of bonds, with a purported settlement date of January 9, 2026. The Debtors responded to Axonic, asserting that the purported exercise of the Put was in breach of the forbearance agreement and therefore invalid. Nonetheless, Axonic refused to withdraw the purported exercise of the Put, notwithstanding its agreement to forbear.  It is the Debtors' position that the Put was not properly exercised and is null and void and that Axonic is stayed from exercising the Put and taking any action in connection therewith. Absent a consensual resolution to the foregoing, the Debtors will bring an adversary proceeding seeking, among other things, a declaratory judgment that the Put notice is invalid and a determination that Axonic breached the forbearance agreement by purporting to exercise the Put, and damages in connection with the foregoing.

f.      **Commercial and Joint Venture Arrangements.**

i.      *Authentic Brands.*

46.     The Company is also party to a joint venture with Authentic Brands, the owner of more than 50 global brands such as Reebok, Champion and Nautica.[11] The Company and Authentic Brands each own 50% of the equity of the joint venture, Authentic Luxury Group LLC ("ALG"), which collects royalties from sales of products and services using the Saks Fifth Avenue, Saks OFF 5TH, Neiman Marcus and Bergdorf Goodman brands (excluding the use of those brands in connection with the operation of retail stores in the United States and Canada, as well as the Saks, Neiman Marcus and Bergdorf Goodman e-commerce businesses globally) as well as several brands under the control of Authentic Brands. The Global Debtors also agreed to certain purchase commitments for wholesale purchases of products from Authentic Brands' third-party licensees of certain brands under Authentic Brands' control and ALG's sublicensees of Saks Global's brands. If there is a shortfall in the annual purchase commitment, Saks Global may cure the shortfall by making a cash payment equal to 10% of the shortfall.

47.     Certain agreements state that, upon certain triggers, including the bankruptcy filing of certain of the Global Debtors, Authentic Brands' preferred equity in Saks Global Investor L.P. will be exchangeable for newly-issued equity in ALG (which would dilute the Company's existing equity in ALG). The Company's equity in ALG is not pledged as collateral under the Debtors' indebtedness.

---

[11]     In connection with the transaction underlying the joint venture, the Global Debtors transferred intellectual property related to Saks, Saks Fifth Avenue, Saks OFF 5TH, Neiman Marcus and Bergdorf Goodman brands to certain subsidiaries that are not guarantors on the Debtors' funded debt. ALG licenses these brands from these non-Debtor subsidiaries. Neither these entities, nor the entities comprising the joint venture described in this paragraph, are Debtors.

ii.     *Amazon.*

48.     Certain Global Debtors are party to a prepetition commercial agreement with Amazon to maintain a new "Saks on Amazon" virtual storefront, which launched in April 2025. The partnership combines Saks' luxury fashion expertise with Amazon's expertise in delivering a technology-driven, highly convenient shopping experience to a broader audience. As part of this arrangement, SGE is required to pay referral fees to Amazon, and, in certain circumstances, SGE must make true-up payments to Amazon for any shortfalls in such referral fees based on certain annual minimum amounts up to an aggregate of $900 million over eight years.

**g.     Merchandising and Revenue Generation.**

49.     Saks Global generates revenue mainly from sales of luxury merchandise through its stores and e-commerce operations, primarily through (i) sales of owned merchandise purchased at wholesale prices across an assortment of brand partners, (ii) sales of consigned merchandise, (iii) a percentage of revenue from in-store concessions from brands that sell their inventory through Saks Global's "shop in shop" model, and (iv) a percentage of revenue from merchandise sold through Saks Global's e-commerce platforms and shipped directly from its brand partners. Consignment and concessions have remained comparatively robust in recent periods, demonstrating that where inventory is available, customer traffic remains healthy. The core constraint has been owned inventory flow driven by declining liquidity and vendor credit considerations.

50.     The foundation of Saks Global's retail business model is supported by its ability to efficiently acquire and retain customers. Once customers have made a purchase, they demonstrate a propensity to purchase more over time. Saks Global focuses on driving higher customer lifetime values by providing not only a compelling product assortment, but also by providing a differentiated shopping experience and elevated level of service. Saks Global also has proprietary

credit card programs through which credit is extended to customers and Saks Global receives payments based on sales transacted on those credit cards.

      **h.**    **Employees.**

     51.    As of the Petition Date, the Debtors employed approximately 14,610 full-time employees and 2,220 part-time employees. Each of the Debtors' business units employs a mix of full-time and part-time employees. The Debtors also hire seasonal in-store associates during peak seasons (such as the holiday shopping season), which provides the Debtors with greater workforce flexibility and allows the Debtors to address busier periods. The Debtors have a small number of unionized employees and are party to seven (7) collective bargaining agreements.

<u>**Part II: Prepetition Capital Structure**</u>

     52.    As of the Petition Date, the Global Debtors have approximately $3.4 billion in prepetition funded debt obligations, consisting of the following:[12]

       a.    approximately $275 million[13] in aggregate principal amount outstanding under a senior secured term loan facility arising from seller financing in connection with the Acquisition (the " <u>TopCo Debt</u>");

       b.    approximately $442.16 million in aggregate principal amount of loans, not including the face amount of issued and undrawn letters of credit, outstanding under a senior secured asset-based revolving credit facility (the "ABL Facility");

       c.    approximately $762.5 million in aggregate principal amount outstanding of SPV Notes (as defined below), issued in June and August 2025, the proceeds of which were lent to SGE in the form of intercompany loans;

---

[12]   This summary describes the debt obligations of the Debtors, and does not reference debt obligations of non-Debtor affiliates, including the CMBS loan associated with the flagship property (totaling approximately $1.25 billion) and the CMBS loan associated with the HBS JV (totaling approximately $428.1 million as of January 1, 2026).

[13]   The TopCo Debt is approximately $310 million, inclusive of paid-in-kind interest. As described below, the obligors under the TopCo Debt are certain parent entities of Holdings and SGE. Holdings and SGE and their subsidiaries are not obligors under the TopCo Debt.

d.  approximately $1.4 billion in aggregate principal amount outstanding of 2O Notes (as defined below), issued in connection with the Exchange Transaction;

e.  approximately $440.8 million in aggregate principal amount outstanding of 3O Notes (as defined below) issued in connection with the Exchange Transaction; and

f.  approximately $51.2 million in aggregate principal amount outstanding of Old Notes (as defined below) (together with the 3O Notes and the 2O Notes, the "Opco Notes").

53.  The following table summarizes the Global Debtors' outstanding borrowings, which are described in further detail below:

| Facility | Maturity Date | Outstanding Principal Amount (Approximate) |
|---|---|---|
| TopCo Debt | February 3, 2026 | $275 million[14] |
| ABL Facility | December 23, 2029 | $442.16 million[15] |
| SPV Notes | December 15, 2029 | $762.5 million |
| 2O Notes | December 15, 2029 | $1.4 billion |
| 3O Notes | December 15, 2029 | $440.8 million |
| Old Notes | December 15, 2029 | $51.2 million |
| Total: | | $3.4 billion |

54.  A corporate structure chart is attached hereto, which sets forth the legal entities obligated on the debt facilities.

a.  **TopCo Debt.**

55.  In connection with the consummation of the Acquisition, then-holders of equity interests in Neiman Marcus Group, as lenders, agreed to permit the Debtors to defer payment of a portion of the purchase price, ultimately providing term loans in the original principal amount of $275 million (which amount is subject to adjustment in connection with certain purchase price adjustments relating to the Acquisition) to Debtor Mercury Aggregator L.P. ("Mercury") for the

---

[14]  Inclusive of paid-in-kind interest, the TopCo Debt is approximately $310 million.

[15]  This amount does not include $56.6 million in face amount of issued but undrawn letters of credit.

purpose of financing the deferred payment. The term loan is governed by that certain Credit Agreement, dated as of December 23, 2024 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "TopCo Credit Agreement"), by and among Mercury, as borrower, Debtor Mercury Aggregator Holdco LLC, a Delaware limited liability company ("Mercury Holdings"), as holdings, Debtor HBSFA Holdings Ltd., a Canadian limited company ("Mercury Holdings Canada"), as Canadian holdings, the other guarantors party thereto, the lenders party thereto from time to time (the "TopCo Lenders"), and GLAS USA LLC, as administrative agent (the "TopCo Agent").

56.    The TopCo Debt matures on February 3, 2026. Mercury Holdings, Mercury Holdings Canada, and Debtor HBC GP IV LLC, a Bermuda exempted limited liability company ("HBC GP IV"), guarantee the TopCo Debt. The TopCo Debt is secured by substantially all personal property of Mercury, Mercury Holdings, Mercury Holdings Canada and HBC GP IV, including pledges of the equity interests owned by these entities.

57.    Pursuant to the Springing Guaranty, dated as of December 23, 2024 (the "Springing Guaranty"), made by Lisa and Richard Baker Enterprises, LLC, a Delaware limited liability company ("LARBE"), in favor of the TopCo Agent, LARBE agreed to guarantee the TopCo Debt on a non-recourse contingent basis. The obligations of LARBE under the Springing Guaranty are limited to an aggregate amount not to exceed $100 million.

**b.    ABL Facility.**

58.    SGE, as borrower, Saks Global Holdings LLC ("Holdings"), as Holdings, the other guarantors party thereto (the "Opco Subsidiary Guarantors"),[16] the lenders party thereto from time

---

[16] "**Opco Subsidiary Guarantors**" include the following, all of which are Debtors: Saks Fifth Avenue Holdings Inc., a Delaware corporation; SFA Holdings Inc., a Tennessee corporation; Saks & Company LLC, a Delaware limited liability company; Saks Fifth Avenue LLC, a Massachusetts limited liability company; Saks Direct, LLC, a Delaware limited liability company; Merchandise Credit, LLC, a Virginia limited liability company; SCCA

to time (the "ABL Lenders"), and Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "ABL Agent"), are party to that certain ABL Credit Agreement, dated as of December 23, 2024 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "ABL Credit Agreement"). The ABL Credit Agreement provides for the ABL Facility with prepetition commitments in an aggregate principal amount of $1.8 billion (with borrowing capacity subject to borrowing base availability). Holdings and the Opco Subsidiary Guarantors guarantee the ABL Facility. The ABL Facility matures on December 23, 2029.[17]

---

Store Holdings Real Property LLC, a Delaware limited liability company; Saks Richmond Real Property LLC, a Delaware limited liability company; Saks Fifth Avenue Real Property LLC, Delaware limited liability company; Saks Columbus Real Property LLC, Delaware limited liability company; Saks & Company Real Property LLC, a Delaware limited liability company; HBC Gaithersburg LLC, a Delaware limited liability company; HBC Sterling LLC; a Delaware limited liability company; HBC Woodbridge LLC, a Delaware limited liability company; HBC Victor LLC, a Delaware limited liability company; HBC Steele LLC, a Delaware limited liability company; Saks.com LLC, a Delaware limited liability company; Saks.com Holdings LLC, a Delaware limited liability company; Saks.com Midco Partner Inc., a Delaware corporation; Saks Cloud Services LLC, a Delaware limited liability company; LT Parent Propco LLC, a Delaware limited liability company; LT Propco LLC, a Delaware limited liability company; HBC Digital LLC, a Delaware limited liability company; HBC Digital Holdings Inc., a Delaware corporation; Saks Partner Inc., a Delaware corporation; NMG Parent, LLC, a Delaware limited liability company; NMG Intermediate, LLC, a Delaware limited liability company; NMG Holding Company, Inc., a Delaware corporation; The Neiman Marcus Group LLC, a Delaware limited liability company; Bergdorf Goodman LLC, a Delaware limited liability company; Bergdorf Graphics, Inc., a New York corporation; NEMA Beverage Corporation, a Texas corporation; NEMA Beverage Holding Corporation, a Texas corporation; NEMA Beverage Parent Corporation, a Texas corporation; NM Financial Services, Inc., a Delaware corporation; NMG Interco LLC, a Delaware limited liability company; NMGP, LLC, a Virginia limited liability company; NM Bermuda, LLC, a Delaware limited liability company; NMG California Salon LLC, a California limited liability company; NMG Florida Salon LLC, a Florida limited liability company; NMG Global Mobility, Inc., a Delaware corporation; NMG Notes PropCo LLC, a Delaware limited liability company; NMG Salon Holdings LLC, a Delaware limited liability company; NMG Salons LLC, a Delaware limited liability company; NMG Term Loan PropCo LLC, a Delaware limited liability company; NMG Texas Salon LLC, a Texas limited liability company; Saks (EU) Manhattan Blocker Inc., a Delaware corporation; Saks (Cayman) Manhattan Blocker Inc., a Delaware corporation; Saks Manhattan (Blocker) Holdings L.P.; a Delaware limited partnership; HBC US Propco Holdings LLC, a Delaware limited liability company; and HBS Leasehold LLC, a Delaware limited liability company.

[17] Provided that if the maturity date would otherwise occur after the date that is ninety-one (91) days prior to the scheduled maturity date set forth in (i) the Opco Notes or any refinancing thereof, (ii) the NPC Onloan or any refinancing thereof, (iii) the SPV Notes or any refinancing thereof, (iv) the FILO Onloan or any refinancing thereof or (v) the documentation governing any Material Indebtedness (as defined in the ABL Credit Agreement) (the "Specified Maturity Date"), the maturity date shall automatically spring forward to the date that is ninety-one (91) days prior to the scheduled Specified Maturity Date.

59.     Subject to the terms of the ABL / Notes Intercreditor Agreement (as defined herein), SGE's obligations under the ABL Facility are secured by (a) a first priority lien on all ABL Priority Collateral (as defined in the ABL / Notes Intercreditor Agreement) (the "<u>ABL Priority Collateral</u>"), and (b) a second priority lien on all Notes / Term Priority Collateral (as defined in the ABL / Notes Intercreditor Agreement) (the "<u>Notes / Term Priority Collateral</u>"). In addition, subject to the terms of the ABL / FILO Intercreditor Agreement (as defined herein), SGE's obligations under the ABL Facility are secured (x) on a senior basis to the FILO Onloan on ABL Priority Collateral and (y) on a junior basis to the FILO Onloan on Notes / Term Priority Collateral with respect to an aggregate principal amount of the FILO Onloan not to exceed $300 million. As of the Petition Date, approximately $442.16 million of principal remains outstanding under the ABL Facility, in addition to approximately $56.6 million in face amount of letters of credit outstanding.

c.      **SPV Notes.**

60.     SGUS, a Delaware limited liability company and wholly-owned subsidiary of SGE, as issuer, Citibank N.A., as trustee and collateral agent (in such capacities, the "<u>SPV Trustee</u>") for the benefit of the "Holders" (as defined in the SPV Indenture) (the "<u>SPV Noteholders</u>") and Holdco II are party to that certain Asset Based Indenture, dated as of June 27, 2025 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "<u>SPV Indenture</u>"). On June 27, 2025, SGUS authorized the issuance of $300.0 million aggregate principal amount of 11.00% senior secured asset based notes due 2029 (the "<u>Initial SPV Notes</u>"). In connection with the Exchange Transaction, on August 8, 2025, SGUS authorized the issuance of an additional $462.5 million aggregate principal amount of 11.000% senior secured asset based notes due 2029 (the "<u>Additional SPV Notes</u>" and, together with the Initial SPV Notes, the "<u>SPV Notes</u>"). In addition, in connection with the Exchange Transaction, Holdco II entered into a supplemental indenture to

the SPV Indenture on August 8, 2025, pursuant to which Holdco II, fully, unconditionally and irrevocably guaranteed the SPV Notes up to a maximum guaranteed amount of $200 million. As of the Petition Date, approximately $762.5 million of principal remains outstanding under the SPV Notes. The SPV Notes mature on December 15, 2029.

        **d.**        **Opco Notes: 2O Notes, 3O Notes and Old Notes.**

61.      SGE, as issuer (as successor in interest to SFA Issuer LLC), Holdings, the Opco Subsidiary Guarantors, and Citibank, N.A., as trustee (in such capacity, the "Old Trustee") and as collateral agent (in such capacity, the "Notes / Term Collateral Agent") for the benefit of the "Holders" (as defined in the Old Indenture) (the "Old Noteholders") are party to that certain Indenture, dated as of December 16, 2024 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "Old Indenture"). On December 23, 2024, SGE assumed $2.2 billion aggregate principal amount of notes (the "Old Notes") issued under the Old Indenture and the Old Notes were guaranteed by Holdings and the Opco Subsidiary Guarantors.

62.      In connection with the Exchange Transaction, SGE, as issuer, the Opco Subsidiary Guarantors, and Citibank, N.A., as trustee (in such capacity, the "2O / 3O Trustee") and as Notes / Term Collateral Agent for the benefit of the "Holders" (as defined in the 2O / 3O Indenture) (the "2O / 3O Noteholders") are party to that certain Indenture, dated as of August 8, 2025 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "2O / 3O Indenture"). Under the 2O / 3O Indenture, SGE issued (i) $1,439,252,628 in aggregate principal amount of second out notes (the "2O Notes") and (ii) $440,763,140 in aggregate principal amount of third out notes (the "3O Notes").

63.      Subject to the terms of the Equal Priority Intercreditor Agreement (as defined herein), SGE's obligations under the Opco Notes are secured on a pari passu basis with its obligations under the NPC Onloan. In addition, subject to the terms of the ABL / Notes

Intercreditor Agreement, SGE's obligations under the Opco Notes are secured by (a) a first priority lien on all Notes / Term Priority Collateral and (b) a second priority lien on all ABL Priority Collateral. The Opco Notes mature on December 15, 2029. Subject to the terms of the PAA (as defined herein), (a) the Opco Notes rank junior in payment priority to the FILO Onloan and the NPC Onloan, (b) the 2O Notes rank senior in payment priority to the 3O Notes and the Old Notes, (c) the 3O Notes rank junior in payment priority to the 2O Notes and senior in payment priority to the Old Notes and (d) the Old Notes are fourth out, and rank junior in payment priority to the 2O Notes and the 3O Notes.

        e.        **Intercompany On-Loans.**

                i.        *FILO On-Loan.*

64.     Following the issuance of the SPV Notes by SGUS, SGUS lent an aggregate original principal amount of $400 million as an intercompany on-loan (the "<u>FILO Onloan</u>") to SGE under that certain Term Loan Credit Agreement, dated as of June 27, 2025 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "<u>FILO Credit Agreement</u>") among SGE, as borrower, the Opco Subsidiary Guarantors, the lenders party thereto from time to time (the "<u>FILO Lenders</u>"), and SGUS, as administrative agent.

65.     Subject to the terms of the ABL / Notes Intercreditor Agreement, SGE's obligations under the FILO Credit Agreement are secured by (a) a first priority lien on all ABL Priority Collateral and (b) a second priority lien on all Notes / Term Priority Collateral (in each case, other than the assets of Holdings). In addition, subject to the terms of the ABL / FILO Intercreditor Agreement, SGE's obligations under the FILO Credit Agreement are secured (x) on a junior basis to the ABL Facility on ABL Priority Collateral and (y) on a senior basis to the ABL Facility on Notes / Term Priority Collateral with respect to an aggregate principal amount of the FILO Onloan

not to exceed $300 million, and thereafter on a junior basis to the ABL Facility on Notes / Term Priority Collateral. Subject to the terms of the PAA (as defined herein), the FILO Onloan (a) ranks senior in payment priority to the NPC Onloan for so long as the outstanding aggregate principal amount of the FILO Onloan exceeds $300.0 million (in an amount up to such excess), and thereafter ranks equal in payment priority to the NPC Onloan and (b) ranks senior in payment priority to the Opco Notes.

ii.     *NPC On-Loan.*

66.     In addition, following the issuance of the SPV Notes by SGUS, SGUS lent an additional aggregate original principal amount of approximately $362.5 million in proceeds as an intercompany on-loan (the "NPC Onloan") to SGE under that certain Term Loan Credit Agreement, dated as of August 8, 2025 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "NPC Credit Agreement"), among SGE, as borrower, the Opco Subsidiary Guarantors, the lenders party thereto from time to time (the "NPC Lenders"), SGUS, as administrative agent (the "NPC Agent"), and the Notes / Term Collateral Agent.

67.     Subject to the terms of the Equal Priority Intercreditor Agreement, SGE's obligations under the NPC Onloan are secured on a pari passu basis with its obligations under the Opco Notes. In addition, subject to the terms of the ABL / Notes Intercreditor Agreement, SGE's obligations under the NPC Credit Agreement are secured by (a) a first priority lien on all ABL Priority Collateral and (b) a second priority lien on all Notes / Term Priority Collateral. Subject to the terms of the PAA (as defined herein), the NPC Onloan (a) ranks junior in payment priority to the FILO Onloan for so long as the outstanding aggregate principal amount of the FILO Onloan exceeds $300 million (in an amount up to such excess), and thereafter ranks equal in payment priority to the FILO Onloan and (b) ranks senior in payment priority to the Opco Notes.

f.      **Intercreditor Agreements.**

68.      <u>ABL / Notes Intercreditor Agreement</u>. The ABL Agent, the Notes / Term Collateral Agent, Holdings, SGE and the Opco Subsidiary Guarantors entered into that certain Second Amended and Restated Intercreditor Agreement, dated as of August 8, 2025 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "<u>ABL / Notes Intercreditor Agreement</u>"). The ABL / Notes Intercreditor Agreement sets forth the agreement among the ABL Agent, in its capacity as collateral agent under the ABL Facility and FILO Onloan, and the Notes / Term Collateral Agent, in its capacity as collateral agent under the Opco Notes and the NPC Onloan, with respect to the priority of liens in the collateral securing the ABL Facility and the FILO Onloan, on the one hand, and the Opco Notes and the NPC Onloan, on the other hand, and the respective rights and remedies of the various lenders, among other things.

69.      <u>The Equal Priority Intercreditor Agreement</u>. SGE, Holdings, the Opco Subsidiary Guarantors, the NPC Agent, the Notes / Term Collateral Agent, the Old Trustee, and the 2O / 3O Trustee entered into that certain Equal Priority Intercreditor Agreement, dated as of August 8, 2025 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "<u>Equal Priority Intercreditor Agreement</u>"). The Equal Priority Intercreditor Agreement sets forth the agreement among the NPC Agent, as Initial First Out Administrative Agent (as defined therein) for the Initial First Out Secured Parties (as defined therein), the Notes / Term Collateral Agent, as the Initial Notes Collateral Agent (as defined therein) for the Initial Notes Secured Parties (as defined therein), the Old Trustee, as the Initial Fourth Out Trustee (as defined therein) for the Initial Fourth Out Secured Parties (as defined therein), and the 2O / 3O Trustee, as Initial Second Out/Third Out Trustee (as defined therein) for the Initial Second Out/Third Out Secured Parties (as defined therein), with respect to the priority of liens in the

31

collateral securing the NPC Onloan and the Opco Notes, and the respective rights and remedies of the various creditors, among other things.

70.   <u>Collateral Agency Agreement and Intercreditor Agreement</u>. The ABL Agent and the FILO Agent entered into that certain Collateral Agency Agreement and Intercreditor Agreement, dated as of June 27, 2025 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "<u>ABL / FILO Intercreditor Agreement</u>"). The ABL / FILO Intercreditor Agreement sets forth the agreement between the ABL Agent and the FILO Agent with respect to the appointment of the ABL Agent as the collateral agent for the FILO Onloan, the priority of liens in the collateral securing the ABL Facility and the FILO Onloan, and the respective rights and remedies of the various lenders.

71.   <u>Payment Administration Agreement</u>. SGE, Holdings, the Opco Subsidiary Guarantors, the FILO Agent, the NPC Agent, the SPV Trustee, the Notes / Term Collateral Agent, the 2O / 3O Agent and the Old Agent entered into that certain Payment Administration Agreement, dated as of August 8, 2025 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "<u>PAA</u>"). The PAA sets forth the agreement among the FILO Agent, as the Initial First Out Administrative Agent (as defined therein) for the Initial First Out Secured Parties (as defined therein), the NPC Agent, as the Initial Additional First Out Administrative Agent (as defined therein) for the Initial Additional First Out Secured Parties (as defined therein), the SPV Trustee, as the SPV Notes Collateral Agent (as defined therein) for the SPV Noteholders (as defined therein), the Notes / Term Collateral Agent, as Initial Notes Collateral Agent (as defined therein) for the Initial Notes Secured Parties (as defined therein), the 2O / 3O Trustee, as the Initial Second Out/Third Out Trustee (as defined therein) for the Initial Second Out/Third Out Secured Parties (as defined therein) and the Old Agent, as the Initial Fourth

Out Trustee (as defined therein) for the Initial Fourth Out Secured Parties (as defined therein) with respect to the priority of payment among the FILO Onloan, the NPC Onloan, the Opco Notes and certain indemnification obligations in favor of the SPV Debt, and the respective rights and remedies of the various creditors, among other things.

        **g.**       **LC Facility Obligations.**

72.      SGE and Evolution Credit Partners ("Evolution") are party to that certain Uncommitted Master Continuing Agreement for Letters of Credit, dated as of October 7, 2025 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "LC Facility Agreement") solely in connection with backstopping certain workers' compensation insurance obligations. The LC Facility Agreement provides for an uncommitted facility under which Evolution may arrange for the issuance of standby letters of credit by third-party issuing banks to support SGE. Letters of credit in an undrawn face amount of $32,741,098.40 have been issued under the LC Facility Agreement as of the Petition Date. The LC Facility Agreement terminates on October 7, 2028.

        **h.**       **Saks OFF 5TH Term Loan.**

73.      In addition, certain of the SO5 Digital Debtors have a $20 million term loan ("SO5 Term Loan") issued pursuant to that certain Term Loan Credit Agreement, dated as of August 6, 2021 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "SO5 Term Credit Agreement"), among Saks OFF 5TH LLC, a Delaware limited liability company ("SO5"), as borrower, Saks OFF 5TH Holdings LLC, a Delaware limited liability company ("SO5 Holdings"), as holdings, the other guarantors party thereto, the lenders party thereto from time to time (the "SO5 Term Lenders"), and Callodine Commercial Finance, LLC, as administrative agent and collateral agent (in such capacities, the "SO5 Term Agent").

74.     The SO5 Term Loan matures on August 6, 2026. SO5 Holdings and Luxury Outlets USA, LLC, a Delaware limited liability company, guarantee the SO5 Term Loan.

75.     Prior to the Petition Date, SO5 Digital also had a revolving credit facility (the "<u>SO5 ABL Facility</u>") in an amount up to $125 million pursuant to that certain Credit Agreement, dated as of August 6, 2021 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "<u>SO5 ABL Credit Agreement</u>"), among SO5, as borrower, SO5 Holdings, as holdings, the other guarantors party thereto, the lenders party thereto from time to time (the "<u>SO5 ABL Lenders</u>"), and Citibank, N.A., as administrative agent and collateral agent (collectively, the "<u>SO5 ABL Agent</u>").

76.     On December 19, 2025, the SO5 ABL Agent placed a new discretionary reserve of $7.9 million on the SO5 Digital Debtors' availability under the facility. On January 6, 2026, the SO5 Digital Debtors wired a final payoff totaling $339,240.16, consisting of accrued interest, fees and other obligations. As of the Petition Date, the SO5 ABL Facility has been paid in full and terminated, and the SO5 Digital Debtors have no continuing obligations thereunder.

### **Part III: Circumstances Leading to Chapter 11 and Reorganization Efforts**

77.     As described above, the Company used $2.2 billion in Old Notes, drawings under the ABL Facility, seller financing in the form of the TopCo Debt and a $1.544 billion equity contribution to purchase Neiman Marcus and pay down debt owed by both companies in connection with the Acquisition. Following the Acquisition, the Company faced immediate liquidity challenges and the capital structure became unsustainable. Although the Debtors expect to realize $600 million of total run-rate synergies over the five years post-Acquisition, their immediate-term liquidity position remained severely constrained which made it difficult for the Company to pay vendors on time. The inability to timely pay vendors exacerbated the payables balance and further strained relations with brand partners. In turn, vendors were less willing to

34

ship goods to the Company, leaving the Company unable to build an adequate amount of seasonal inventory leading into Spring of 2025. As described above, the Company also suffered a reduced borrowing base and corresponding reduced availability under its ABL Facility as a result of declining inventory and increased discretionary reserves imposed under the ABL Facility.

78.     In February of 2025, the Company began considering strategies to address these challenges. In addition to implementing changes to the business model, including extending payment terms, and continuing to execute on identified synergy opportunities, the Company recognized that a new money financing solution was required to provide it the flexibility necessary to catch up on vendor payments, obtain runway to continue recognizing synergies from the Acquisition, and address a June 30 interest payment date on the Old Notes. The Company targeted closing a new financing in early to mid-May to address these liquidity needs. Ultimately, the financing timing led to incremental delays in paying vendors and therefore incremental stretching of accounts payable.

79.     On April 28, 2025, the Company announced that they had secured commitments for a new money financing facility from SLR Credit Solutions ("SLR") in the form of a $300 million FILO loan for SGE and a $50 million secured term loan for certain subsidiaries. However, the SLR financing could not be executed on the terms of the commitments previously obtained from SLR.

80.     In late June 2025, the Global Debtors secured commitments for $600 million (before associated fees and payment of accrued interest) in SPV Notes from a majority of their existing bondholders to be funded in two parts, beginning with the issuance of $300 million in SPV Notes in June. The transaction required the $400 million FILO Onloan described above, with $300 million in intercompany term loans funded by SGUS to SGE upon closing of the initial

sale of SPV Notes in June 2025, and an additional $100 million subsequently available to draw upon as a delayed draw term loan facility.

81.     Subsequently, in August 2025, the Debtors completed an exchange offer and new money financing transaction in which (i) holders of approximately 98% of the aggregate principal amount of the Old Notes tendered their notes in exchange for $162.5 million in SPV Notes, (ii) the Debtors received $300 million in additional gross proceeds from the sale of additional SPV Notes to existing holders, and (iii) the proceeds of the SPV Notes were on-lent to SGE in the form of (a) the $362.5 million NPC Onloan and (b) $100 million of additional delayed draw term loans under the FILO Onloan.

82.     In addition to accessing new capital, the transaction allowed the Global Debtors to capture approximately $115 million of discount in principal amount of Old Notes upon issuance of the SPV Notes and cancellation of the tendered Old Notes. Despite the closing of the Exchange Transaction, the Company was only able to use $244 million of proceeds for catch-up payments to vendors as the remaining proceeds were needed for working capital purposes as the Debtors continued to expend funds to integrate Neiman Marcus, while they faced a significant second quarter EBITDA loss driven by lower receipts.

83.     Following the closing of the Exchange Transaction, the Debtors engaged with vendors in order to reduce past due amounts and to facilitate the purchase of inventory entering into the 2025 holiday season. Concurrently, the Global Debtors were affected by one-time merchandising system integration issues which disrupted inventory receipts at Neiman Marcus and Bergdorf Goodman when sales and inventory were already at a seasonal low point. This resulted in a significant reduction in the Global Debtors' borrowing base, negatively impacting liquidity. With less liquidity to continue paying brand partners and other vendors according to agreed-upon

terms, the benefits of the $244 million vendor paydown were negated. These liquidity issues and the continued backlog of past due trade payables caused the Debtors to lose out on opportunities for "chase" inventory—in-season replenishment of in-demand items—and the downward trend in the Debtors' business and liquidity continued.

84.     The Debtors' business is seasonal, and the second quarter is typically the smallest of the year from a profit standpoint. With interest payments of $130 million paid in June, the merchandise integration issues in August that disrupted shipments, and soft second quarter results, liquidity was stretched in a way that did not allow the Debtors to restore inventory receipts to normalized levels. At the end of the second fiscal quarter, inventory was 9% below last year's levels on a combined basis.

85.     Prior to the Petition Date, the increasing payment delays damaged trust with the Company's brand partners and the Company continued to hit credit caps with vendors who were unwilling or unable to increase their credit exposure to the Debtors. The Company was paying faster than agreed terms to stay below credit caps—giving the Company limited flexibility in managing inventory flow.

86.     These factors resulted in a loss of approximately over $550 million of inventory receipts in the second half of 2025 compared to the Company's July forecast, and consequently a materially lower borrowing base under the ABL Facility, which is calculated largely based on inventory value. Compounding these issues, the Global Debtors' minimum excess availability covenant under the ABL Facility stepped up from $200 million to $375 million on December 1, 2025 and up to $500 million on December 16, 2025, greatly reducing the Debtors' ability to borrow under that facility. The Global Debtors also faced interest payments on the FILO Loan, NPC

Onloan, SPV Notes and OpCo Notes totaling about $126 million at the end of December 2025 which they were unable to pay.

87.     Despite the constraints on the business due to tight liquidity, and current estimates that the Global Debtors' year-to-date EBITDA through December 2025 will be a loss, the business shows multiple positive indicators, which the Global Debtors can take advantage of with sufficient liquidity. Importantly, Company data indicates that when stores have inventory, the inventory sells. Significant capital expenditures or investment in marketing dollars are not required to redirect the Company's business trend. The Company has achieved substantial synergies with the integration of Neiman Marcus faster than expected. The initial target for run-rate synergies expected to be realized by the end of fiscal 2025 was approximately $150 million. As of the Company's results for the quarter ended August 2, 2025, the Company has identified and is executing on approximately $300 million in run-rate synergies, nearly double the expectations outlined at transaction close for year one. Since August, the Company has been operating from one unified merchandising platform which allows its teams to buy and sell inventory across Saks Fifth Avenue and Neiman Marcus to optimize inventory buys and allows allocation of inventory across all of its luxury retail brands. This unlocks significant margin potential by allowing the Company to maximize its working capital efficiency. Sellers at all three of the luxury banners will benefit, with the ability, with vendor permission, to offer customers merchandise from across the entire network in the future.

88.     The Debtors believe they represent a significant majority of the multi-brand luxury volume in the United States and are the largest global partner for nine of the top ten luxury brands. The Company's full-line real estate properties are true luxury showcases with retail environments that offer a differentiated high touch experience that cater to the luxury customer. While overall

comparable store sales were down, comparable sales at Saks Fifth Avenue stores and Saks.com improved in November 2025, reflecting improved inventory flows in the channels. Additionally, concession or leased sales of merchandise have outperformed expectations in all months of the Company's 2025 fiscal year, demonstrating strong traffic and resilience in the business where timely flow of inventory is available. This indicates that the Company's challenges are tied to inventory availability and vendor confidence, not underlying demand for luxury goods. The concession business, has recorded positive comparable sales each month, with results ranging up 2 to 18% year over year. Customers of Saks, Neiman Marcus and Bergdorf Goodman are highly loyal, with retention rates for customers spending at least $10,000 annually exceeding 90%. The Company's top 3% of customers, who spend more than $10,000 annually, generate approximately 40% of the Company's annual gross merchandise value. However, the Global Debtors need debt relief and substantial additional funding to take advantage of these positive indicators.

89.     Prior to the Petition Date, the Global Debtors pursued alternative liquidity solutions from both third parties and existing stakeholders, and implemented liquidity-enhancing steps and other expense reduction actions, including delaying or halting vendor payments, while engaging with stakeholders on terms of a comprehensive restructuring and debtor-in-possession financing. After intense negotiations, the Global Debtors determined that the best path forward was to pursue the SGUS DIP Facility offered by the Ad Hoc Group, which will provide $1 billion in new money during the course of these cases, as well as a commitment to provide an additional $500 million upon exit from bankruptcy. This vital liquidity boost, along with the benefits of the chapter 11 process, will give the Company critical debt relief and cash for its operations, allowing the Debtors to emerge from bankruptcy with a stronger financial foundation so that the Company can

reestablish its credibility and relationships with key brand partners and other important business partners, to play a central role in shaping the luxury retail industry well into the future.

## Part IV: Facts in Support of First Day Motions

90.     The Debtors have requested a variety of relief in various First Day Motions.[18] As a result of my first-hand experience, and through my review of various materials and information, discussions with members of the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below, and (b) the immediate and irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.

91.     I believe that the relief sought in the First Day Motions is critical to a smooth transition into Chapter 11 to minimize the adverse effects of the chapter 11 cases on the Debtors' business and on their employees and creditors. Collectively, the First Day Motions maximize value for the Debtors' estates and stakeholders by reducing unnecessary disruption and minimizing any negative impact of the chapter 11 cases on the Debtors' businesses and operations.

92.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, and as described more fully in each First Day Motion, the Debtors, in consultation with their professionals, carefully tailored the relief

---

[18]     Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Motions.

requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm.

93.     I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders. For the reasons identified below and in each First Day Motion, I believe that the relief requested in each of the First Day Motions is narrowly tailored to avoid immediate and irreparable harm and is appropriate under the circumstances and should be granted by the Court.

94.     As described below and in the First Day Motions, certain relief requested applies to all of the Debtors, and certain First Day Motions request distinct relief with respect to the Global Debtors and the SO5 Digital Debtors. The Hede Declaration provides additional support for the relief requested solely with respect to the SO5 Digital Debtors.

     **a.**    **Administrative and Procedural Motions.**

          **i.**    ***Debtors' Joint Emergency Motion for Entry of Order (I) Authorizing the Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").***

95.     Through the Joint Administration Motion, the Debtors seek the joint administration of these chapter 11 cases (the "Chapter 11 Cases") for procedural purposes only, given the integrated nature of the Debtors' operations.  Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors.  I understand that joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative hearings, notices, applications, and orders.  I understand that no prejudice will befall

any party by the joint administration of the Debtors' cases, as the relief sought is solely procedural and is not intended to affect substantive rights. Based on the foregoing, I believe that it would be far more efficient for the administration of these Chapter 11 Cases if the Court were to authorize their joint administration.

      ii.    ***Debtors' Joint Emergency Motion for Entry of Order (I) Authorizing Debtors to Redact Certain Personally Identifiable Information; (II) Authorizing Electronic Noticing Procedures for Parties in Interest and Approving the Form and Manner of Notifying Creditors of the Commencement of these Chapter 11 Cases; (III) Authorizing Debtors to File a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors; and (IV) Granting Related Relief (the "Redaction Motion").***

96.    Through the Redaction Motion, the Debtors request authority to (a) redact certain personally identifiable information from their Creditor Matrix, Equity Holders List, Schedules and Statements, Top 30 List, and other documents filed in these Chapter 11 Cases, (b) provide parties in interest with electronic notice, as well as the approval of the form and manner of notifying creditors of the commencement of these Chapter 11 Cases, and (c) file a consolidated Creditor Matrix and Top 30 List in lieu of submitting separate mailing matrices and creditor lists for each Debtor.

97.    Bankruptcy Rule 1007(a)(1) requires a debtor to file "a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H[.]" Fed. R. Bankr. P. 1007(a)(1). Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors should be authorized to file one consolidated Creditor Matrix for all Debtors. Furthermore, the redaction of certain personally identifiable information of individuals is necessary due to the privacy and safety concerns that would arise if such information were disclosed in the Debtors' Court filings and to help the Debtors comply with applicable privacy laws. Additionally, the redaction of the

individual customer information is appropriate under section 107(b)(1) of the Bankruptcy Code because the Debtors' ability to maintain existing customer relationships is critical to the Debtors' ability to continue operating in the ordinary course and to maximize the value of the business. Approving the form and manner of the notice of commencement is necessary to avoid confusion among creditors as well as to prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous consolidated Creditor Matrix.

98.     Finally, I believe that the Court should authorize the Debtors to provide parties in interest with electronic notice.  I understand that providing electronic service of any and all notices, documents, and pleadings filed in these Chapter 11 Cases, which are required to be served on the parties in interest, by email will reduce the cost and administrative burdens associated with providing traditional service, reduce delay in providing notice, and provide the Debtors' estate with significant cost savings.  I also understand that the Debtors communicate with their parties in interest primarily by email in the ordinary course of business.  As such, the parties in interest will expect to receive notice from the Debtors electronically, and electronic notice will provide an efficient and effective means of service.  In the event the Debtors do not have an email address for a party in interest, the Debtors will proceed with mailing a printed copy in lieu of email.

iii.     ***Debtors' Joint Emergency Motion for Entry of an Order (I) Establishing Notice and Hearing Procedures for Transfers of Equity Interests in Debtors and Declarations of Worthlessness with Respect to Equity Interests in Saks Global Holdings LLC; (II) Establishing Record Date for Notice and Sell-Down Procedures for Transferring Claims Against the Debtors; and (III) Granting Related Relief (the "NOL Motion").***

99.     Through the NOL Motion, the Debtors seek, among other things, to establish notice and hearing procedures that must be satisfied before certain transfers of equity interests in the Debtors, or declarations of worthlessness with respect to the equity interests in certain Debtors,

are deemed effective.  I believe that these procedures are necessary to protect the potential value

of the Debtors' federal and state tax attributes, including, but not limited to, significant net

operating loss carryforwards, tax credits, disallowed interest deduction carryforwards, and certain

other tax attributes (collectively, the "Tax Attributes") for use during the pendency of these

Chapter 11 Cases.

100.    Specifically, the NOL Motion seeks authority to impose restrictions on, and

procedures related to, the trading of any equity interests in the Debtors and any claim of a

Worthless Securities Deduction with respect to equity interests in Saks Global Holdings LLC,

which could result in an "ownership change" as defined under Section 382 occurring before the

effective date of a chapter 11 plan or any applicable bankruptcy court order.  As a general matter,

an "ownership change" could severely limit or eliminate the Debtors ability to use the Tax

Attributes to offset future taxable income.  Thus, I believe that the proposed restrictions and

procedures are necessary to protect the Debtors' ability to preserve the Tax Attributes during the

pendency of these Chapter 11 Cases.  I also believe that the termination or limitation of the Tax

Attributes that might result if such restrictions and procedures are not imposed would be materially

detrimental to all parties in interest.

    iv.    ***Debtors' Joint Emergency Ex Parte Application for Entry of Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent (the "Stretto Retention Application").***

101.    Through the Stretto Retention Application, the Debtors filed an application to

employ Stretto as the claims, noticing, and solicitation agent for these Chapter 11 Cases.  I believe

that the retention of Stretto is critical because of the large number of creditors identified in these

cases.

102.    I understand that Stretto is a data-processing firm with extensive experience in

noticing, claims processing, solicitation, and other administrative tasks in chapter 11 cases.  The

Debtors obtained and reviewed engagement proposals from other Court-approved claims and noticing agents to ensure selection through a competitive process. I believe that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise. Given the need for the services described above and Stretto's expertise in providing such services, I believe that retaining Stretto will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their chapter 11 efforts.

> v.     ***Debtors' Joint Emergency Motion for Entry of Order (I) Extending Time to File Schedules and Statements and 2015.3 Reports; (II) Modifying the Requirements of Local Rule 2015-3; and (III) Granting Related Relief (the "Schedules and Statements and 2015.3 Reports Extension Motion").***

103.    Pursuant to the Schedules and Statements and 2015.3 Reports Extension Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their Schedules and Statements and 2015.3 Reports by an additional 45 days, through and including March 13, 2026, without prejudice to the Debtors' ability to seek further extensions of such deadlines, and (b) modifying the requirements of Rule 2015-3 of the Local Rules.

104.    Given the size and complexity of the Debtors' businesses and financial affairs, as well as their interests in a number of non-Debtor subsidiaries, the Debtors will have to compile information from books, records, and documents relating to thousands of creditors, assets, leases, customer contracts, vendor agreements, and various other contracts from each Debtor entity, as well as from certain non-Debtor entities, in order to prepare their Schedules and Statements and 2015.3 Reports. Such will require a significant expenditure of time and effort on the part of the Debtors, their employees, and professional advisors. Additionally, because the Debtors' various business segments maintain voluminous books, records, and complex accounting systems across various legal entities located in numerous jurisdictions, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements and 2015.3

Reports. I believe that the extensions requested in the Schedules and Statements and 2015.3 Extension Motion will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements and 2015.3 Reports, which, in turn, will promote the efficient administration of these Chapter 11 Cases. Accordingly, I believe the relief requested in the Schedules and Statements Extension Motion is warranted under the circumstances.

vi. ***Debtors' Joint Emergency Motion for Entry of Order (I) Restating and Enforcing Protections of 11 U.S.C §§ 362, 365, 525, and 541(C); (II) Approving the Related Form and Manner of Notice; and (III) Granting Related Relief (the "Automatic Stay Motion").***

105. Pursuant to the Automatic Stay Motion, the Debtors seek entry of an order (a) confirming, restating, and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of sections 362, 365, 525, and 541(c) of the Bankruptcy Code, and (b) approving the form and manner of notice related thereto. The Debtors further seek authority, but not direction, to translate the Automatic Stay Motion, the Proposed Order, and/or the Notice into other languages to better inform creditors, governmental units, and other interested parties of the relief requested in the Automatic Stay Motion.

106. The Debtors' business operations are conducted worldwide with significant assets moving through international commerce at any given time. The Debtors have regular dealings with foreign customers and contract counterparties in various ports and jurisdictions that may not be familiar with the restrictions of the Bankruptcy Code. Many of these foreign customers and contract counterparties do not transact business on a regular basis with companies that have filed for chapter 11 and, therefore, may lack meaningful, if any, contact with the United States and may be unfamiliar with the chapter 11 process, the scope of a debtor in possession's authority to conduct its business, or the importance and implications of the worldwide automatic stay. Certain of the Debtors' non-U.S. creditors may attempt to seize assets located outside of the United States or take

46

other actions that violate the automatic stay, including attempting to terminate certain unexpired leases or executory contracts pursuant to *ipso facto* provisions in contravention of section 365 of the Bankruptcy Code, to the detriment of the Debtors, their estates, and other creditors.  The relief requested will protect the Debtors against improper actions that non-U.S. parties in interest may take and assuage such parties in interest of any concerns during the pendency of these chapter 11 cases.

    **b.**    **Operational Motions**

        i.    ***Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief (the "DIP Motion").***

107.     Pursuant to the DIP Motion, the Global Debtors are seeking authority to enter into the DIP Facilities, use cash claimed as collateral, and grant adequate protection to prepetition secured parties, among other relief.  I have also submitted that certain *Declaration of Mark Weinstein in Support of Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief* ("Weinstein DIP Declaration") which provides additional factual basis for entry into the DIP Facilities.

108.     For the reasons set forth herein and in the Weinstein DIP Declaration, I believe that the DIP Motion should be approved.

        ii.    ***Global Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Maintain their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions; and (II) Granting Related Relief (the "Cash Management Motion").***

109.    The Cash Management Motion seeks interim and final Court orders (a) authorizing, but not directing, the Global Debtors to (i) continue to maintain their existing cash management system, (ii) maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, and (iii) continue intercompany transactions and funding consistent with the Global Debtors' historical practices, subject to the terms described therein, and (b) maintain existing business forms in the ordinary course of business.

110.    The Cash Management System is typical of multi-store retail operations and comparable to the centralized cash management systems used by other similarly sized retail companies to manage the cash flow of operating retail operations in a cost-effective, efficient manner.  The Global Debtors use their Cash Management System to collect, transfer, and disburse funds generated through the Global Debtors' operations and to accurately record such collections, transfers, and disbursements as they are made to facilitate monitoring, forecasting, and reporting.

111.    I understand that section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee's office.  The majority of the Global Debtors' Bank Accounts are held at authorized depositories and, therefore, comply with section 345(b) of the Bankruptcy Code.  While certain of the Global Debtors' Bank Accounts are not held at authorized depositories, such Banks are nonetheless FDIC insured and are well-capitalized, financially stable, and reputable institutions.  I believe that such financial institutions are well-positioned to perform the depository and cash management functions during these Chapter 11 Cases and, to the extent that the requirements of section 345 of the Bankruptcy Code are inconsistent, or otherwise conflict, with the Global Debtors' Cash Management System, I believe that a forty-five day (or such longer period as the

Global Debtors may request) suspension of time to address any questions that the U.S. Trustee may have regarding the Cash Management System and the Global Debtors' compliance with section 345(b) of the Bankruptcy Code is appropriate.

112.    Moreover, in the ordinary course of business, the Global Debtors engage in routine arm's-length business relationships between each other and other Non-Global Debtor Affiliates (the "Intercompany Transactions").  The Intercompany Transactions arise primarily on account of operating expenses and debt service payments, as well as interest, fees, taxes, and other expenses. The Intercompany Transactions result in intercompany receivables and payables (the "Intercompany Claims"), which are generally satisfied in cash.  As further described in the Cash Management Motion, the Global Debtors rely upon the Intercompany Transactions to maintain operations in the ordinary course of business.  The Global Debtors generally account for and record all Intercompany Transactions and Intercompany Claims in their respective books and records, the results of which are concurrently recorded on the Global Debtors' balance sheets and periodically reconciled.  The Global Debtors maintain strict records of the Intercompany Transactions and can ascertain, trace, and account for all Intercompany Transactions.

113.    Because of the nature and operational scale of the Global Debtors' business, I believe that any disruption to the Cash Management System would have an immediate and significant adverse effect on the Global Debtors' business and operations to the detriment of their estates and stakeholders.  As such, I believe that allowing the Global Debtors to maintain their Cash Management System, continue Intercompany Transactions, pay the prepetition Bank Fees, and continue to use their customary business forms, as well as suspending certain requirements under section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines, is essential to the

Global Debtors' continuation of ordinary course operations and in the best interests of the Global Debtors' estates, creditors, and other parties in interest.

        iii.    ***Debtors' Joint Emergency Motion for Entry of Order (I) Authorizing Debtors to (A) Pay Certain Compensation and Benefits Obligations and (B) Maintain Compensation and Benefits Programs and (II) Granting Related Relief (the "Wages Motion").***

114.    The Debtors filed a motion seeking authority to, among other things, (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

115.    The Debtors employ approximately 16,830 Employees, including approximately 14,610 full-time employees and approximately 2,220 part-time employees.  The Debtors also retain approximately 3,860 Temporary Employees, who are employed through Staffing Agencies or directly by the Debtors, and contract with their merchandise vendors to place Independent Sales Representatives in their stores to assist with selling the vendors' branded merchandise.  In many instances, the Debtors' Workforce includes personnel who are intimately familiar with the Debtors' business, processes, and systems, who possesses unique skills and experience, or who have developed relationships with vendors that are essential to the Debtors' businesses.  These individuals are not easily replaced.  At the same time, much of the Debtors' Workforce relies exclusively on their compensation and benefits to pay their daily living expenses and to support their families and will be materially harmed and exposed to significant financial hardship if the Debtors are not permitted to continue paying their compensation, providing employee benefits, and maintaining certain employee programs during these Chapter 11 Cases.

116.    The Debtors are seeking authority to pay and honor certain prepetition claims related to Compensation and Benefits Obligations, including, among other things, wages, salaries,

other compensation, expense reimbursement, payroll obligations and withholding of federal and state taxes (including garnishments, Employees' share of insurance premiums, taxes, and other amounts withheld), payroll processing, severance policies, health and wellness benefits (including vision and dental coverage), insurance programs, workers' compensation programs, short and long-term disability coverage, retirement savings plans and pension plans, time-off policies, and certain other benefits that the Debtors have historically provided in the ordinary course. The Compensation and Benefits Obligations are further described in the Wages Motion.

117.    I believe that the requested authority to continue to pay the Compensation and Benefits Obligations and to maintain the Debtors' current employee benefits programs is critical to ensure that the Debtors can retain personnel knowledgeable about the Debtors' business, the Debtors' employees continue to provide quality services to the Debtors at a time when they are needed most, and the Debtors remain competitive with comparable employers.

iv.    ***Debtors' Joint Emergency Motion for Order (I) Approving Debtors' Proposed Adequate Assurance of Future Payment for Utility Services; (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services; (III) Establishing Procedures for Resolving Objections by Utility Companies and Determining Additional Adequate Assurance of Payment; and (IV) Authorizing Certain Fee Payments for Services Performed; and (V) Granting Related Relief (the "Utility Motion").***

118.    Through the Utility Motion, the Debtors request that the Court (a) prohibit the Utility Companies from altering, refusing, or discontinuing Utility Services on account of the commencement of these Chapter 11 Cases and/or any outstanding prepetition invoices, (b) deem the Debtors' Utility Companies adequately assured of future payment, based on the Debtors' establishment of a segregated account in the amount of $2.9 million, which equals approximately one half of the Debtors' estimated monthly cost of the Utility Services subsequent to the Petition Date, and (c) establish procedures for resolving objections by Utility Companies.

51

119.     Maintaining uninterrupted Utility Services is essential to the Debtors' ongoing business operations and, in turn, the overall success of these Chapter 11 Cases.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, causing immediate and irreparable harm.  Accordingly, it is essential that the Utility Services, including payments to the Administrators that administer and support the Debtors' maintenance of Utility Services, continue uninterrupted during these Chapter 11 Cases. I believe that the relief requested in the Utility Motion is in the best interest of the Debtors and their estates, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtors' estates.

     v.     ***Debtors' Joint Emergency Motion for Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief (the "Taxes Motion").***

120.     The Debtors filed the Taxes Motion seeking authority to continue to negotiate, remit, and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business and consistent with past practices that are payable or become payable during these Chapter 11 Cases, including any obligations arising on account of an Audit and/or Assessment, without regard to whether such obligations accrued or arose before, on, or after the Petition Date.  Failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations.  Further, the Debtors' failure to pay the prepetition Taxes and Fees as they come due may ultimately increase the Debtors' tax liability and result in personal liability for the Debtors' directors and officers, which would distract from the Debtors' restructuring efforts.

121.     The relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to

operate their businesses in chapter 11 without disruption.  Accordingly, I believe that the Taxes

Motion should be approved.

> vi.   ***Debtors' Joint Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Maintain and Administer Their (A) Existing Customer Programs and (B) Charitable Donation Programs; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief (the "Customer Programs Motion").***

122.    The Customer Programs Motion seeks the Debtors' authority to fulfill and honor

(through payment, credit, setoff, or otherwise) the Customer Programs as they deem appropriate

in their business judgment and continue, renew, replace, terminate, and implement Customer

Programs and any other customer practices as they deem appropriate, without further application

to the Court.  The Debtors' Customer Programs include, without limitation, the (a) Refund and

Exchange Program, (b) Gift Card Programs, (c) Credit Card Programs, (d) Loyalty Programs,

(e) Special Order and Will Call Programs, (f) Sales Commission Program, (g) Charitable Donation

Program, and (h) other Promotional Programs.

123.    The Customer Programs maximize the value of the Debtors' customer relationships

by promoting customer satisfaction, creating goodwill for the Debtors' businesses, and enhancing

the value of their brands.  The Debtors operate in a highly competitive global marketplace, and, in

the absence of certain Customer Programs, the Debtors' customers could turn to competitors for

their various retail shopping needs.  The Debtors' failure to either honor their prepetition Customer

Obligations or to continue the Customer Programs in the ordinary course during these Chapter 11

Cases will put the Debtors at a significant competitive disadvantage.  The Debtors seek authority

to continue the Customer Programs in the ordinary course of business and to pay claims arising

out of the Customer Programs to avoid any harm or disruption to their business.  I believe that the

continuation of the Customer Programs is critical to the Debtors' ongoing operations in these

Chapter 11 Cases and is necessary to maximize the value of the Debtors' business for the benefit of all stakeholders.

> vii. ***Debtors' Joint Emergency Motion for Entry of Order (I) Authorizing Debtors to Continue their Insurance Programs, Including their Insurance Premium Finance Program, Surety Coverage, and Letters of Credit Entered into Prepetition and to Pay all Obligations in Respect thereof; (II) Authorizing Banks and Other Financial Institutions to Honor and Process Checks and Transfers Related thereto; and (III) Granting Related Relief (the "Insurance Motion").***

124.     Pursuant to the Insurance Motion, the Debtors seek authority to (a) maintain insurance coverage under the Debtors' Insurance Policies, including surety coverage and letters of credit, and satisfy any obligations related thereto, (b) renew, amend, supplement, modify, extend, purchase, and/or enter into new insurance policies, in each case, in the ordinary course of business, (c) continue honoring and paying obligations arising under the Premium Financing Agreements, and (d) satisfy payment of prepetition obligations on account of and continue to pay amounts due and owing to the insurance brokers.  The continuation and renewal of the Debtors' insurance coverage is essential to preserving the value of the Debtors' business, properties, and assets. Moreover, I understand that, in many instances, insurance coverage is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Accordingly, I believe the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, will avoid immediate and irreparable harm, and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

> viii. ***Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors and 503(b)(9) Claimants; (II) Confirming Administrative Expense Priority of Outstanding Orders; and (III) Granting Related Relief (the "Critical Vendors Motion")***.

125.    The Global Debtors' business success is partially fueled by their partnerships with certain critical vendors and goods and services providers that ensure that the Global Debtors are able to deliver and sell the highest quality products and provide their customers with the highly curated shopping experience that defines their brand.  Specifically, the Global Debtors' ability to generate income is dependent on the Global Debtors' sale and offering of a carefully curated assortment of third-party and private label merchandise and unique shopping experience.   In addition, at certain of their locations, the Global Debtors operate full-service restaurant and beverage businesses.  This curated model depends on longstanding partnerships with wholesale merchandise vendors, many of whom are irreplaceable, category-defining brands whose products cannot be substituted without irreparably altering the Global Debtors' value proposition and customer experience.  The Global Debtors also rely on a number of non-merchandise vendors who provide products and services on favorable trade terms.  Maintaining these trade terms is critical to the Global Debtors' ability to continue operations.

126.    These highly specialized Critical Vendors are irreplaceable, due to, among other things, demand created by branding and marketing.  If the Global Debtors fail to stock the products that their customers have grown accustomed to seeing in their stores and across their e-commerce websites, the effects would extend far beyond simply not offering those particular products.  If consumers become aware that the Global Debtors do not stock a particular item, they will simply not come to the Global Debtors' stores or visit their websites, where they may have purchased additional items beyond the one product that they initially came to purchase.  Further, a breakdown in the Global Debtors' relationships with these Critical Vendors would also destabilize the vendors themselves—some of whom rely on the Global Debtors' doors and digital storefront as their principal route to market.  I believe that if the Global Debtors' critical goods and services providers

refuse to continue doing business with the Global Debtors on account of outstanding prepetition amounts, replacing them would significantly and irreparably harm the Global Debtor's ability to deliver the necessary products to its stores and online platforms.  The targeted relief sought in the Critical Vendors Motion is therefore essential to preserve the Global Debtors' unique merchandising ecosystem, safeguard enterprise value, and position the estates for a successful reorganization.

127.    Additionally, before the Petition Date and in the ordinary course of business, the Global Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Global Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transfer such goods (or may recall shipments) with respect to such Outstanding Orders, unless the Global Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Global Debtors' business operations, I believe that it is necessary that the Global Debtors satisfy such obligations in the ordinary course of business.

128.    The Global Debtors may have also received certain goods or materials from certain vendors within the twenty days before the Petition Date.  I understand that under section 503(b)(9) of the Bankruptcy Code, the value of such goods or materials would be accorded administrative priority.  The Global Debtors' relationships with these vendors are not governed by long-term contracts and the Global Debtors rather obtain goods from such vendors on an order-by-order basis.  Additionally, the Global Debtors have tight timelines with their vendors, with some invoices being due and payable on delivery.  As a result, a 503(b)(9) Claimant may refuse to supply new orders if the Global Debtors do not pay the 503(b)(9) Claims as and when they come due.  Such

refusal would negatively affect the Global Debtors' estates because the Global Debtors' business is dependent on the steady flow of merchandise and products through their logistics network.

129.    I believe that the requested authority to pay the Critical Vendors Claims and 503(b)(9) Claims, in accordance with the cap set forth in the proposed Interim Order, is in the best interests of the Global Debtors and their estates and will enable the Global Debtors to continue to operate their business in chapter 11 without disruption.  The relief requested in the Critical Vendors Motion is also necessary to preserve and maximize value by paying the prepetition claims of certain counterparties that are critical to the Global Debtors' business enterprises.  Absent the relief requested in the Critical Vendors Motion, I believe that the Global Debtors and their estates would suffer immediate and irreparable harm due to significant disruptions to their ordinary course business operations.

ix.    ***Debtors' Joint Emergency Motion for Entry of Order (I) Authorizing Debtors to Pay Prepetition Claims of Certain (A) Lien Claimants and (B) Customs and Regulatory Claimants; and (II) Granting Related Relief (the "Lien Claimants Motion").***

130.    The Debtors' businesses and supply chain depend on partnerships with certain goods and services providers that ensure that the Debtors are able to deliver and sell merchandise and products for sale in their retail store locations and online platforms.   Under certain non-bankruptcy laws, these goods and services providers may be able to assert liens on certain property of the Debtors in connection with prepetition obligations (collectively, "Lien Claims"). Specifically, the Debtors rely on a number of third-party common carriers, warehousemen, freight forwarders, consolidators, third party logistics providers, materialmen, and contractors for the receipt, distribution, and delivery of their merchandise and products.  These critical third-party contractors and services providers support nearly every aspect of the Debtors' business, including by: packing and shipping the Debtors' products to their store locations and customers, managing

the Debtors' distribution centers and storage facilities, and maintaining the Debtors' stores and real property facilities.  I understand that these parties may be able to assert statutory or possessory liens on certain property of the Debtors if the Debtors fail to pay for certain goods and services delivered in connection with prepetition obligations.

131.    Further, the Debtors are party to a number of agreements under which third-party consignors of goods supply merchandise and products for sale in the Debtors' stores and across their e-commerce websites.  These Consignment Agreements permit the Debtors to access and stock merchandise for sale to customers without carrying excessive inventory and allow the Debtors to stock products their customers expect to see in their stores and on their online platforms. Pursuant to the terms of the Consignment Agreements, the Consignors may be authorized to take and perfect liens on the merchandise and goods supplied to the Debtors under such agreements.

132.    Finally, the Debtors import certain products and merchandise from single-source providers located in foreign countries in the ordinary course of business.  In connection with the importation of products and merchandise, the Debtors may be required to pay various charges, including customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding, and other similar obligations.  The Debtors' failure to make payments on account of such Customs and Regulatory Claims may interfere with the transportation and importation of the Debtors' products and merchandise.  Through the Lien Claimants Motion, the Debtors seek authorization, but not direction, to honor and pay Lien Claims and Customs and Regulatory Claims.

133.    I believe that the Debtors' failure to honor and satisfy their Lien Claims and Customs and Regulatory Claims could interrupt the Debtors' supply chain and the maintenance of the Debtors' stores and real property facilities.  I believe that the requested authority to pay

prepetition Lien Claims, and Customs and Regulatory Claims is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  The relief requested in the Lien Claimants Motion is also necessary to preserve and maximize value by paying the prepetition claims of goods and services providers that are critical to the Debtors' business enterprise.  Absent the relief requested in the Lien Claimants Motion, I believe that the Debtors and their estates would suffer immediate and irreparable harm due to significant disruptions to their business operations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: January 14, 2026

*/s/ Mark Weinsten*_____
Name: Mark Weinsten
Title:   Chief Restructuring Officer

## CORPORATE ORGANIZATIONAL CHART



Saks Global
Corporate Structure Chart
As of January 11, 2026

1. General Partner has a nominal interest (less than .01%). Saks & Company owns 74 shares of Peruvian Corporation and 80% membership interests in Casa Tua Cucina (Miami) Associates, LLC.
2. HBC Digital Holdings Inc. holds 1,475,000,000.00 Class B Common Units, Saks Partner Inc. holds 20,000,000.00 Class B Common Units, Saks & Company LLC holds 137,822,874.93 Class A Units and 7,000,000.00 Class B Units, Saks Manhattan (Blocker) Holdings L.P. holds 237,854,919.89 Class A Units, Saks (EU) Manhattan Blocker Inc. holds 978,224.43 Class A Units and Saks (Cayman) Manhattan Blocker Inc. holds 123,343,980.75 Class A Units of Saks.com Holdings LLC.
3. Saks & Company LLC and Saks OFF 5TH Partner Inc. hold 781,358,000 Class B Common Units and 8,642,000 Class B Common Units of Saks OFF 5TH Holdings LLC, respectively. 200,000,000 Class A Preferred Units of Saks OFF 5TH Holdings LLC are held by third parties. Saks & Company LLC holds the sole outstanding Class RS Preferred Unit of Saks OFF 5TH Holdings LLC.
4. Café Beverly SFA Trust is a Grantor trust with Saks & Company LLC as Grantor and beneficiary
5. HBC Convene Friends & Family L.P. holds a 96.12% interest.
6. See HBC – US JV Structure Chart.
7. ABG Intermediate 2 Holdings LLC holds 50% of Authentic Luxury Group, LLC.
8. HBC Digital LLC is the General Partner of Saks Manhattan (Blocker) Holdings L.P.

Global Debtors
SOS Digital Debtors

**Saks TopCo**
**Corporate Structure Chart**
As of December 1, 2025

