# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: <br><br> SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 26-90103 (ARP) <br><br> (Joint Administration Requested) |

### DECLARATION OF ANDREW D.J. HEDE IN SUPPORT OF
### SO5 DIGITAL DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Andrew D.J. Hede, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1. I am the Chief Restructuring Officer (CRO) of Saks OFF 5TH Holdings LLC, Saks OFF 5TH Midco Partner Inc., Saks OFF 5TH LLC and Luxury Outlets USA, LLC (collectively, the "SO5 Digital Debtors"). The SO5 Digital Debtors are affiliates of the other debtors and debtors in possession in these cases, which are collectively referred to herein as the "Global Debtors." The SO5 Digital Debtors and the Global Debtors are collectively referred to herein as the "Debtors."

2. I am authorized to submit this declaration on behalf of the SO5 Digital Debtors.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is proposed counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively, the "SO5 Digital Debtors"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are proposed counsel for the remaining Debtors (collectively, the "Global Debtors").

4932-0705-1912.1

3. I am the President of Business Transformation & Transactions at Accordion Partners, LLC ("Accordion") and the Head of Accordion's Turnaround & Restructuring Practice. I have over 30 years of financial and operational transformation and restructuring experience in both the United States and Australia. I specialize in advising companies, creditors, and equity sponsors in distressed and non-distressed situations, focusing on financial and operational reviews, liquidity management, performance improvement, business and asset divestment, business plan preparation and review, recapitalization strategies, and negotiation of reorganization plans. I have regularly served in an interim management capacity, including as Chief Executive Officer, President, Chief Restructuring Officer, and Chief Transformation Officer. My experience covers a broad range of sectors with extensive experience in consumer products and retail, real estate and construction, media and telecom, and transportation and distribution.

4. As discussed further herein, the SO5 Digital Debtors retained Accordion as financial advisor and me as CRO effective as of January 7, 2026.

5. I am generally familiar with the SO5 Digital Debtors' day-to-day operations, business and financial affairs. Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based upon my personal knowledge, information supplied to me by members of the SO5 Digital Debtors' management team, officers and employees of the Global Debtors and other professionals and advisors, my review of relevant documents, or my opinion based upon my experience and knowledge. I submit this Declaration to assist the United States Bankruptcy Court for the Southern District of Texas (the "Court") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the SO5 Digital Debtors' chapter 11 petitions and certain motions and applications filed today.

6. On the date hereof (the "Petition Date"), the SO5 Digital Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The SO5 Digital Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession.

**Preliminary Statement**

7. For additional background information regarding the Debtors and these Chapter 11 Cases, please see the *Declaration of Mark Weinsten in Support of Chapter 11 Petitions and First Day Pleadings* (the "Weinsten Declaration").

8. In order to enable the SO5 Digital Debtors to operate effectively postpetition and to avoid adverse effects with respect to these chapter 11 cases, the SO5 Digital Debtors have requested various types of relief in "first day" applications and motions (the "First Day Motions"). I am providing this Declaration to set forth the factual basis for the First Day Motions. The SO5 Digital Debtors also intend to rely on the facts set forth in the Weinsten Declaration in support of the First Day Motions. Further, the SO5 Digital Debtors are seeking certain relief in First Day Motions filed jointly with the Global Debtors.

9. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge and the knowledge I have acquired from members of the SO5 Digital Debtors' management team and other professionals and advisors including advisors to the Global Debtors, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the SO5 Digital Debtors' operations and financial condition. I am over the age of 18, and if called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this Declaration.

10. Part I of this Declaration provides background with respect to the SO5 Digital Debtors' history and operations, Part II provides an overview of the SO5 Digital Debtors' prepetition capital structure, Part III sets forth the relevant facts in support of the First Day Motions.

**Part I: Corporate History and Operations**

11. Saks Global Enterprises LLC and each of the other Global Debtors (collectively, "Saks Global") is the largest multi-brand luxury retailer in the world, comprised of Saks Fifth Avenue, Saks OFF 5TH, Neiman Marcus, Neiman Marcus Last Call, Bergdorf Goodman, and Horchow.

12. In 1992, due to growing consumer demand, Saks piloted its original off-price experience, an outlet store in Franklin Mills, Pennsylvania called "Saks Clearinghouse." After the model proved successful, Saks Global expanded the concept and launched Saks OFF 5TH in 1995. In 2013, Saks OFF 5TH launched SaksOFF5TH.com, offering a broad assortment across all categories. Today, Saks OFF 5TH is a leading destination for luxury off-price fashion in stores and online at SaksOFF5TH.com, the business offers an assortment of high-end designers at accessible prices.

13. In 2021, Saks OFF 5TH's e-commerce business became a standalone company consisting of the SO5 Digital Debtors. Following the separation, the SAKS OFF 5TH brand remains the consumer-facing name for both the Saks OFF 5TH e-commerce business and Saks OFF 5TH stores. However, the SO5 Digital Debtors' e-commerce business and Saks OFF 5TH stores were established as separate operating entities and managed independently.

14. The SO5 Digital Debtors, which have their own capital structure and governance, are approximately 80% owned by Saks Global, with the remaining equity owned by outside investors, including funds affiliated with Insight Partners, a private equity fund.

15. The e-commerce business was separated from brick-and-mortar stores during the pandemic, at which time e-commerce was growing substantially, with the anticipation of continued high growth. The separation of the e-commerce business was intended to attract specialized talent focusing on technology, as well as new capital seeking out higher growth and returns.

16. The SO5 Digital Debtors made substantial investments in the infrastructure to operate an e-commerce business, and additionally incurred substantial expenses towards digital marketing, for example, which have not led to the anticipated return on investment.

17. Furthermore, the SO5 Digital Debtors had difficulty selling through inventory balances, which negatively affected working capital and thus liquidity. The liquidity strain resulted in the e-commerce business's inability to purchase new inventory to meet consumer demands, leading to additional revenue declines.

18. As discussed further herein, as the Debtors were considering strategic alternatives to address their financial obligations and operational issues, the SO5 Digital Debtors' lenders took actions that caused further liquidity constraints.

19. The SO5 Digital Debtors intend to conduct an orderly sale process to maximize value for stakeholders. Based on preliminary market feedback and the operational structure of the business, the SO5 Digital Debtors believe an inventory monetization strategy is most likely to optimize recoveries, though the SO5 Digital Debtors will consider any transaction that enhances value. Unless a superior alternative emerges, the SO5 Digital Debtors intend to move forward promptly with an orderly self-liquidation and wind-down of the SO5 Digital Debtors' businesses.

To be clear, the orderly self-liquidation of the SO5 Digital Debtors discussed herein relates ***solely*** to the e-commerce business (SaksOFF5TH.com) and ***not*** the brick-and-mortar Saks OFF 5TH stores.

20. Following the separation, Saks Global has supported the SO5 Digital Debtors through various measures including the transfer of employees to Saks Global, Saks Global buying media on behalf of the e-commerce business, the SO5 Digital Debtors purchasing merchandise from Saks Global, and certain loans to defer payment of the SO5 Digital Debtors' payables due to Saks Global.

21. The relationship between the SO5 Digital Debtors and the Global Debtors following the separation of the e-commerce business has therefore resulted in potential claims among the parties.

22. In light of potential conflicts between the SO5 Digital Debtors and the Global Debtors (including with respect to potential intercompany claims), the SO5 Digital Debtors implemented revised governance and professional structures to ensure that their interests are independently represented in these chapter 11 cases.

23. On December 31, 2025, the SO5 Digital Debtors appointed Gary D. Begeman as Independent Director to oversee their cases and ensure that decisions are made in the best interests of the SO5 Digital Debtors and their stakeholders. Following the appointment of Mr. Begeman, the managers appointed to the board by Insight Partners resigned their positions and Insight Partners waived certain governance rights.

24. The board of the SO5 Digital Debtors have also authorized Mr. Begeman to independently evaluate and address, among other things, any matters in which the interests of the SO5 Digital Debtors may diverge from those of the Global Debtors.

25. Further, as discussed above, the SO5 Digital Debtors separately retained me as their CRO. In that role, I report directly to the Independent Director. The SO5 Digital Debtors have also retained Accordion to act as financial advisor on matters where there may be conflicts between the SO5 Digital Debtors and the Global Debtors, or on matters where it may be more efficient to use their services as financial advisor.

26. The SO5 Digital Debtors also retained Bradley Arant Boult Cummings LLP as independent general bankruptcy counsel.

27. The SO5 Digital Debtors filed chapter 11 petitions concurrently with the Global Debtors and are seeking to jointly administer their chapter 11 cases with the chapter 11 cases of the Global Debtors.

## Part II: Prepetition Capital Structure

28. The SO5 Digital Debtors have approximately $20 million in prepetition funded debt obligations consisting of approximately $20 million in aggregate principal amount outstanding under a senior secured term loan facility (the "SO5 Term Loan"), owed by, and secured by substantially all of the assets of, certain of the SO5 Digital Debtors as described in more detail below.

29. Shortly before filing, the SO5 Digital Debtors repaid and terminated a senior secured asset-based revolving credit facility (the "SO5 ABL Facility") that was secured by certain assets of the SO5 Digital Debtors. As a result, the SO5 Term Loan is the only remaining funded debt obligation of the SO5 Digital Debtors.

   i. *SO5 Term Loan.*

30. The SO5 Term Loan was issued pursuant to that certain Term Loan Credit Agreement, dated as of August 6, 2021 (as amended, amended and restated, supplemented, or

7

otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "SO5 Term Credit Agreement"), among Saks OFF 5TH LLC, a Delaware limited liability company ("SO5"), as borrower, Saks OFF 5TH Holdings LLC, a Delaware limited liability company ("SO5 Holdings"), as Holdings, the other guarantors party thereto, the lenders party thereto from time to time (the "SO5 Term Lenders"), and Callodine Commercial Finance, LLC, as administrative agent and collateral agent (in such capacities, the "SO5 Term Agent").

31. The SO5 Term Loan matures on August 6, 2026. SO5 Holdings and Luxury Outlets USA, LLC, guarantee the SO5 Term Loan (collectively with SO5, the "SO5 Obligors").

32. Subject to the terms of the SO5 Intercreditor Agreement (as defined herein), the SO5 Obligors' liabilities under the SO5 Term Loan were secured by a second priority lien on all Collateral (as defined in the SO5 Intercreditor Agreement), other than with respect to the "Second Lien Exclusive Collateral" (as defined in the SO5 Intercreditor Agreement) comprised of certain equipment, fixtures and the second lien priority account, which do not constitute collateral securing the SO5 ABL Facility (as defined herein). As discussed herein, upon the repayment and termination of the SO5 ABL Facility, the SO5 Term Lenders hold the first lien on substantially all assets of the SO5 Obligors.

33. On January 7, 2026, the SO5 Term Agent issued a Notice of Default, Reservation of Rights, and Implementation of Default Interest (the "Notice of Default"). The Notice of Default generally alleges that the SO5 Digital Debtors had defaulted by failing to maintain availability under the SO5 ABL Facility (as defined herein).

   *ii. SO5 ABL Facility.*

34. The SO5 Digital Debtors also had a revolving credit facility (the "SO5 ABL Facility") in an amount up to $85 million (with borrowing capacity subject to borrowing base

availability) pursuant to that certain Credit Agreement, dated as of August 6, 2021 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "SO5 ABL Credit Agreement"), among SO5, as borrower, SO5 Holdings, as holdings, the other guarantors party thereto, the lenders party thereto from time to time (the "SO5 ABL Lenders"), and Citibank, N.A., as administrative agent and collateral agent (collectively, the "SO5 ABL Agent").

35. On December 19, 2025, the SO5 ABL Agent placed a block on the SO5 Digital Debtors' availability under the facility and all amounts received by the SO5 Digital Debtors with respect to the collateral securing the SO5 ABL Facility and cash on hand were applied to repay the then outstanding principal balance of the facility. As a result, approximately $7 million in principal was repaid.

36. On January 6, 2026, the SO5 Digital Debtors repaid all remaining amounts outstanding under the SO5 ABL Facility totaling approximately $339,000 in an effort to reduce further costs associated with the SO5 ABL Facility.

## Part IV: Facts in Support of First Day Motions

37. The Debtors have requested a variety of relief in various First Day Motions. Through my review of various materials and information, discussions with members of the SO5 Digital Debtors' and the Global Debtors' management, and discussions with the SO5 Digital Debtors' and Global Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the SO5 Digital Debtors in the First Day Motions, including those described below, and (b) the immediate and irreparable harm to which the SO5 Digital Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.

38. I believe that the relief sought in the First Day Motions is critical to a smooth transition into Chapter 11 to minimize the adverse effects of the chapter 11 cases on the SO5 Digital Debtors' business and creditors. Collectively, the First Day Motions maximize value for all of the estates and stakeholders by reducing unnecessary disruption and minimizing any negative impact of the chapter 11 cases on the Debtors' businesses and operations.

39. The Debtors have filed several purely administrative or procedural First Day Motions that are common in many large chapter 11 cases and are appropriate in the circumstances before the Court. Similarly, the Debtors have requested operational relief in the First Day Motions that will enable the SO5 Digital Debtors, consistent with the terms of the proposed interim order authorizing use of cash collateral, to satisfy certain obligations necessary to maintain operations, all as more particularly described in the First Day Motions.

40. I am familiar with the contents and substance of each First Day Motion. I believe that the relief sought in each First Day Motion to which the SO5 Digital Debtors have joined: (a) is necessary to enable the SO5 Digital Debtors to operate in chapter 11 with minimal disruption or loss of value; and (b) best serves the interests of the SO5 Digital Debtors' stakeholders. For the reasons identified below and in each First Day Motion to which the SO5 Digital Debtors have joined, I believe that the relief requested in each of the First Day Motions is narrowly tailored to avoid immediate and irreparable harm and is appropriate under the circumstances and should be granted by the Court.

     i. *The SO5 Digital Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing SO5 Digital Debtors' Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (V) Granting Related Relief* (the "<u>SO5 Digital Cash Collateral Motion</u>").

41. Pursuant to the SO5 Digital Cash Collateral Motion, the SO5 Digital Debtors seek entry of an interim order and final order: (a) authorizing the SO5 Digital Debtors' use of cash collateral; (b) granting adequate protection to the SO5 Term Lenders to the extent of any diminution in value of their interests in the prepetition collateral; (c) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the cash collateral order; and (d) granting related relief.

42. The SO5 Digital Debtors require immediate use of cash collateral to operate their businesses, preserve value, and avoid irreparable harm to their estates. Without the use of cash collateral, I believe that the SO5 Digital Debtors would be unable to continue their ordinary course operations while pursuing a strategic transaction or orderly liquidation of their assets, which would result in an immediate liquidation and significantly impair recoveries for creditors. Authorizing the use of cash collateral therefore enables the SO5 Digital Debtors to maximize the value of their estates by continuing to operate as a going concern. I believe that the terms and conditions of the proposed order authorizing the use of Cash Collateral and the Approved Budget (as defined therein) permit the SO5 Digital Debtors to continue their ordinary course operations while pursuing a strategic transaction or orderly liquidation of their assets. In connection with the foregoing, as part of the consensual use of Cash Collateral and with the consent of the SO5 Term Lenders, I have engaged, and will continue to engage, in discussions with nationally recognized liquidation firms and, in accordance with the milestones agreed to with the SO5 Term Lenders, anticipate seeking approval of engagement of one such firm within the first two weeks of these chapter 11 cases. If a viable alternative path presents itself, I anticipate the SO5 Digital Debtors will pursue a dual track process.

43. Authorization to use Cash Collateral during the interim period will ensure the SO5 Digital Debtors have sufficient cash to adequately protect the SO5 Term Lenders and other parties in interest during these chapter 11 cases. In consideration for the consensual use of Cash Collateral, the SO5 Digital Debtors have agreed to provide the SO5 Term Lenders with adequate protection as set forth in the SO5 Digital Cash Collateral Motion and the accompanying interim order.

44. Accordingly, I believe that SO5 Digital Cash Collateral Motion should be approved.

> ii. *Motion for Interim and Final Orders (i) Authorizing SO5 Digital Debtors to (a) Continue to Maintain their Cash Management System, (b) Honor Certain Prepetition Obligations Related Thereto, and (c) Continue to Perform Intercompany Transactions; (ii) Waiving Certain Operating Guidelines; (iii) Suspending Time to Comply with Section 345(b) of the Bankruptcy Code; and (iv) Granting Related Relief (the "<u>SO5 Digital Cash Management Motion</u>").*

45. Pursuant to the SO5 Digital Cash Management Motion, the SO5 Digital Debtors seek entry of interim and final orders, substantially in the forms attached thereto, (i) authorizing, but not directing, the SO5 Digital Debtors to (a) continue to maintain their existing cash management system, including bank accounts and business forms, (b) continue approved Intercompany Transactions among and between the SO5 Digital Debtors and the Global Debtors, as authorized by the SO5 Digital Debtors' cash collateral budget, (ii) waiving certain operating guidelines; and (iii) suspending the time to comply with section 345(b) of the Bankruptcy Code on an interim basis, to the extent applicable suspending the time to comply with section 345(b) of the Bankruptcy Code.

46. In the ordinary course of business, the SO5 Digital Debtors utilize and maintain a cash management system that includes, among other things, operating, collection, and

disbursement accounts (collectively, the "Cash Management System").  The Cash Management System is integral to the operation and administration of the SO5 Digital Debtors' businesses.  The Cash Management System allows the SO5 Digital Debtors to efficiently collect, transfer, and disburse funds generated through the SO5 Digital Debtors' operations and to accurately record such collections, transfers, and disbursements as they are made.

47. Because of the disruption that would result if the SO5 Digital Debtors were forced to close their existing bank accounts, I believe it is critical that the existing Cash Management System remain in place. I believe that the relief requested in the Cash Management Motion is in the best interests of the SO5 Digital Debtors' estates, their creditors, and all other parties in interest, and will enable the SO5 Digital Debtors to continue to operate their business in chapter 11. Accordingly, it is my opinion that the SO5 Digital Cash Management Motion should be approved.

[*Signature on Following Page*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  January 14, 2026               */s/ Andrew D.J. Hede*