## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1] | ) | Case No. 26-90103 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## AMAZON'S (I) OBJECTION TO THE DEBTORS' DIP MOTION
## (II) RESERVATION OF RIGHTS WITH RESPECT TO THE CHAPTER 11 CASES

### [Related to Docket No. 49]

Amazon.com Services LLC and its affiliates (collectively, "*Amazon*") objects to the Global Debtors' DIP financing motion [Docket No. 49] (the "*DIP Motion*")[2] and reserves the right to amend or supplement this Objection and/or raise additional issues.

Amazon also reserves all of its rights under the Bankruptcy Code and applicable law, including, without limitation, to seek (i) the appointment of a trustee or an examiner, (ii) the conversion or dismissal of the chapter 11 case of Debtor Saks Fifth Avenue HoldCo II LLC ("*HoldCo II*," and together with its non-Debtor subsidiary, Saks Flagship Real Property LLC, and with its Debtor subsidiary, 12 East 49th Street LLC, the "*Flagship Entities*"),[3] (iii) to shorten or terminate Holdco II's exclusive period to file a plan, (iv) the appointment of an unsecured creditors' committee solely for Holdco II, and/or (v) any other applicable relief.

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is proposed counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively, the "*SO5 Digital Debtors*"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are proposed counsel for the remaining Debtors (collectively, the "*Global Debtors*").

[2]   Capitalized but undefined terms used herein shall have the meanings ascribed to them in the DIP Motion.

[3]   Attached as <u>Exhibit 1</u> hereto is a simplified corporate structure chart depicting the Flagship Entities in relation to the rest of the Saks corporate enterprise.

## PRELIMINARY STATEMENT

1.      In the months leading up to the Petition Date, the Debtors induced Amazon and other retail partners to extend credit and other accommodations by offering recourse to the purported "equity cushion" in the Debtors' iconic, Fifth Avenue flagship store (the "***Flagship Property***").  Having received the benefit of those accommodations—in Amazon's case, an after-the-fact consent to a liability management transaction that the Debtors improperly completed months earlier without first securing Amazon's required consent—the Debtors now seek to use that same "equity cushion" to secure approximately $2.6 billion of DIP financing under the SGUS DIP Facility from existing bondholders who voluntarily bargained for only limited recourse to the value of the Flagship Property prepetition (i.e., a guarantee claim capped at $200 million), again violating Amazon's consent right under the LLCA (as defined below).

2.      The new money component of the DIP financing serves no legitimate business objective of the Flagship Entities, which are real estate holding companies that Amazon believes have minimal cash expenses and positive cash flows, no need for a financing of this size (if at all), and possibly no need for chapter 11 relief in the first place.  Even more problematically, the DIP facility breaks new ground in the world of "roll ups" by transforming approximately $1.4 billion of *prepetition* debt of other Saks affiliates *on which the Flagship Entities are not obligated today* into postpetition, secured obligations of the Flagship Entities.

3.      Fundamentally, the DIP facility uses the value at the Flagship Entities to prop up the other Saks Debtors (the "***Non-Flagship Debtors***"), for the benefit of those *other* entities' creditors and at the expense of the Flagship Entities' creditors.  While Amazon does not object to the Non-Flagship Debtors' incurrence of DIP financing as a general matter, a financing package that burdens the Flagship Entities for no corresponding benefit and frustrates the legitimate expectations of the Flagship Entities' creditors is legally improper and should be rejected.

2

4.     Absent substantive consolidation, which Debtors are not seeking, the propriety and fairness of the proposed DIP facility must be assessed from the perspective of <u>each</u> individual entity—not "the Debtors" as a whole.  There are two specific entities that the Court should focus on when deciding whether to approve the proposed DIP facility:

- **Debtor HoldCo II.**  HoldCo II wholly owns Saks Flagship Real Property LLC ("***Flagship PropCo***"), the owner of the Flagship Property and the land underneath the Flagship Property.  Amazon is not aware of any material expenses at HoldCo II. In other words, HoldCo II does not need the DIP facility and no truly independent fiduciary assessing the benefits and burdens of the DIP facility solely from the perspective of HoldCo II would agree to undertake HoldCo II's obligations thereunder.

- **Non-Debtor Flagship PropCo.**  The only postpetition expense of Flagship PropCo, to Amazon's knowledge, is current interest on the CMBS Loan (as defined below), in the amount of approximately $4.7 million per month.  Flagship PropCo receives liquidity via ground rent payments in the monthly amount of $7.7 million from its Debtor affiliate, 12 East 49th Street LLC ("***12 East***"), which itself receives lease payments from Saks & Company LLC.  That rent covers Flagship's CMBS interest, which means Flagship PropCo is self-sustaining with no need for financing.[4]  Again, no truly independent fiduciary at Flagship PropCo would

---

[4]    To the extent the Debtors justify the Flagship Entities' incurrence of obligations under the proposed DIP facility based on the need for 12 East to avoid defaulting on its lease payments to Flagship PropCo, at most that justifies the Flagship Entities' incurrence of DIP obligations only in the amount necessary for 12 East to continue making the lease payments over the life of these chapter 11 cases (i.e., approximately $7.7 million per month).

3

undertake the obligations associated with the proposed DIP facility, to the extent any financing is needed at all.

5.      Given the obvious mismatch between the burdens and benefits of the DIP facility, assessed from the standpoint of HoldCo II, it is unsurprising (and necessary for the Debtors' proposal) that there is ***no independent fiduciary*** looking out for the interests of HoldCo II.  Instead, the decision to file HoldCo II for bankruptcy and incur DIP obligations was made by HoldCo II's member entities, rolling up to HBC GP LLC, whose directors owe conflicting duties to the Non-Flagship Debtors and prioritized the interests of those Debtors over the interests of HoldCo II.  Their decision to propose the DIP facility fails under the business judgment standard, much less the entire fairness standard that must apply here in light of the obvious conflicts.[5]

6.      Overall, there are significant issues to be addressed in these Chapter 11 Cases with respect to the Debtors' mismanagement, improper governance, and disregard of corporate separateness.  For now though, at least for purposes of the first-day hearing, the Court should (i) condition approval of the DIP facility on the elimination of any DIP claims or liens at HoldCo II; and (ii) not approve any cross collateralization of claims and liens at the Holdco, any roll-up beyond the $200 million secured notes guarantee at HoldCo II, any new-money financing at HoldCo II beyond what is actually needed to avoid immediate and irreparable harm, and any liens on chapter 5 causes of action.

7.      Amazon hopes the Debtors will resolve Amazon's concerns, but if not, then Amazon may be forced to (and reserves all rights to) seek more drastic remedies, including but not

---

[5]     To protect HoldCo II and its stakeholders, the Court should require HoldCo II to appoint independent directors and retain separate legal and financial advisors to determine what is—or is not—in the best interests of HoldCo II specifically.  That includes whether the proposed DIP facility, the chapter 11 filing, and the proposed reorganization the Debtors are pursuing are in the best interests of HoldCo II's estate.  Amazon believes that dismissal or conversion of the HoldCo II case may very well be in the best interests of its estate and creditors, as opposed to an excessive and burdensome DIP facility that HoldCo II does not need.

4

limited to (a) the appointment of an examiner or a trustee, (b) conversion or dismissal of HoldCo II's case, (c) the appointment of a separate unsecured creditors' committee for HoldCo II, and/or (d) the termination or shortening of HoldCo II's exclusive right to file and solicit a plan.

## RELEVANT BACKGROUND

I.   **Amazon's Preferred Equity Investment and Commercial Agreement**

8.      In December 2024, Amazon invested $475 million of preferred equity in Saks (through its ultimate parent company HBC GP LLC) in connection with the acquisition by Hudson's Bay Company (the owner of Saks) of Neiman Marcus. That equity investment is now presumptively worthless after Saks continuously failed to meet its budgets, burned through hundreds of millions of dollars in less than a year, and ran up additional hundreds of millions of dollars in unpaid invoices owed to its retail partners.

9.      Amazon's preferred equity investment was conditioned upon Saks entering into a commercial agreement with Amazon regarding the sale of Saks products on Amazon's website. Accordingly, Saks Global Holdings LLC ("**Saks Holdings**") and Amazon agreed to that certain Amazon Services Business Solutions Agreement and Program Policies, as modified by that certain Addendum, dated as of December 23, 2024 and that certain Second Addendum (the "**Second Addendum**"), dated as of October 3, 2025 (collectively, the "**Commercial Agreement**").

10.      Under the Commercial Agreement, Saks would sell products on Amazon's website. In return, Saks Holdings agreed to pay Amazon a referral fee for Saks-branded goods sold on Amazon's website and guaranteed at least $900 million over eight years in payments to Amazon (the "**Minimum Guarantee**").  Pursuant to the Commercial Agreement, Saks began selling goods on amazon.com, including launching "Saks at Amazon," a Saks-branded customer experience on amazon.com.

US-DOCS\166591200



11.     Prior to the full satisfaction of the Minimum Guarantee, Saks must pay Amazon cash true-ups annually to the extent that Amazon's referral fees under the Commercial Agreement fall below agreed annual minimums.  The Minimum Guarantee is subject to full acceleration upon the occurrence of certain events, including the failure of Saks to make an owed true-up payment, a material breach of the Commercial Agreement, or entry into a change of control transaction, liquidation, or dissolution.

12.     Pursuant to the Commercial Agreement, the following Saks subsidiaries, in addition to Saks, are liable for obligations under the Commercial Agreement (including the Minimum Guarantee):  HoldCo II (as a result of the Second Addendum), The Neiman Marcus Group LLC, SFA Holdings Inc., Saks.com LLC, Saks Global Enterprises LLC, Saks & Company LLC, Saks Fifth Avenue LLC, and Bergdorf Goodman LLC; *provided* that HoldCo II's aggregate obligations are capped at $475 million.

13.     HoldCo II's primary asset is full equity ownership of Flagship PropCo, which in turn holds Saks' flagship store property at 611 Fifth Avenue in New York, New York.  Flagship PropCo is also the obligor on a commercial mortgage-backed securities loan (the "***CMBS Loan***")

US-DOCS\166591200

with an outstanding balance of approximately $1.25 billion (plus approximately $30 million of a make-whole premium) and monthly interest payments in the approximate amount of $4.7 million.

14.    Upon information and belief, Flagship PropCo and HoldCo II do not need any financing—much less financing in the first 30 days of these Chapter 11 Cases—as (i) Flagship PropCo receives monthly ground rent payments from affiliate 12 East in the amount of $7.7 million, (ii) Flagship PropCo's monthly expenditures (i.e., the $4.7 million monthly CMBS interest) are covered by such monthly rent payments, and (iii) HoldCo II has minimal monthly expenditures, which are covered by its equity in Flagship PropCo.[6]  And even if Flagship PropCo stopped receiving monthly rent payments, then any financing at Flagship PropCo or HoldCo II should be limited to those minimal costs and the CMBS interest.

## II.    Saks' Summer 2025 LME

15.    In connection with its $475 million preferred equity investment, Amazon negotiated and became party to that *Fifth Amended and Restated Limited Liability Company Agreement of HBC GP LLC*, dated as of December 23, 2024 (as amended, supplemented, or otherwise modified from time to time, including by the *Sixth Amended and Restated Limited Liability Company Agreement of HBC GP LLC*, dated as of October 3, 2025, the "***LLCA***").  The LLCA provides Amazon with certain consent rights related to the Debtors' business and financing. In particular, section 4.05(b)(vi) of the LLCA limits the Debtors' ability to incur indebtedness,

---

[6]    An illustrative org chart depicting these intercompany arrangements is attached hereto as Exhibit 2.

including through the incurrence of guarantees, with respect to Flagship PropCo absent the consent of Amazon.[7]

16.     In August 2025, Saks purported to complete a liability management exercise (the "**Summer 2025 LME**") that raised $600 million in new-money financing from a majority of its then-existing bondholders in the form of asset-based notes issued by SGUS LLC, a wholly owned subsidiary of Saks Global (the "**LME Notes**").   The LME Notes were, among other things, guaranteed by HoldCo II up to $200 million.

17.     Even though the LLCA required Amazon's consent to that indebtedness, and even though Saks had requested Amazon's consent to that indebtedness and were engaged in ongoing discussions with Amazon, Saks executed the Summer 2025 LME <u>without</u> Amazon's consent. Notwithstanding Saks's disregard for the consent rights Amazon had bargained for just nine months before, Amazon engaged in settlement negotiations with Saks and the parties reached a settlement whereby, in exchange for Amazon's retroactive consent to the LME transaction, Saks, among other things, provided Amazon with a guarantee from HoldCo II of the Debtors' obligations under the Commercial Agreement, up to an aggregate amount of $475 million.

18.     An illustrative organizational chart depicting HoldCo II's indebtedness and guarantees as of the Petition Date after giving effect to the Summer 2025 LME, to the best of Amazon's knowledge, is attached hereto as <u>Exhibit 3</u>, and summarized as follows (in general order of priority, ignoring the proposed DIP facility):

---

[7]     Section 4.05(b)(vi) of the LLCA prohibits, without Amazon's "prior written approval" "any sale, Transfer or other disposition of, the granting of any pledge, lien or other encumbrance with respect to, the incurrence or guarantee of Indebtedness in respect of, or the entry into any transaction with similar effect to any of the foregoing with respect to, (a) the Saks Flagship, (b) prior to the date upon which SFA Holdings Inc. ceases to be the direct legal and beneficial owner of 100% of the outstanding Equity Securities of Saks Fifth Avenue HoldCo LLC (the "**Saks Flagship Transfer Date**"): HoldCo II or any of its direct or indirect Subsidiaries (or Equity Securities thereof), or (c) on and following the Saks Flagship Transfer Date: any Person (or Equity Securities thereof) that directly or indirectly holds the equity of the Person that owns or holds the Saks Flagship or the ground or operating lease with respect to the Saks Flagship," except for certain inapplicable exceptions.

- Flagship PropCo is an obligor on the CMBS Loan (secured by the Flagship Property) in the aggregate amount of approximately $1.25 billion.

- Residual equity value from Flagship PropCo flows up to HoldCo II.

- HoldCo II, in turn, is a secured obligor on $200 million of the LME Notes.

- HoldCo II is an obligor pursuant to that certain Amended and Restated Pledge Agreement, dated as of March 18, 2021 by and between HoldCo II and Axonic Credit Opportunities Master Fund, LP, which secured obligations of certain Saks entities in the purported amount of up to $118 million.

- HoldCo II is an obligor on its $475 million guarantee to Amazon under the Commercial Agreement.

- HoldCo II is a guarantor on various trade claims at other Saks entities, approximating $180 million to the best of Amazon's knowledge, which claims are contractually junior to Amazon's $475 million guarantee.

**III.**   **Saks' Breach and Proposed Rejection of Commercial Agreement**

19.    On December 24, 2025, Amazon sent written notice to Saks that it had materially breached the Commercial Agreement by failing to perform core obligations thereunder, including obligations that Saks agreed to complete by December 23, 2025.  On January 14, 2026, the Debtors filed the *Debtors' Joint First Omnibus Motion for Entry of Order, Pursuant to Sections 105(a), 365(a), and 554 of the Bankruptcy Code, Authorizing Debtors to (I) Reject Certain (A) Unexpired Leases of Nonresidential Real Property and (B) Executory Contracts, Effective as of the Petition Date; and (II) Abandon Personal Property* [Docket No. 32] seeking to reject the Commercial Agreement.[8]

---

[8]    Amazon has submitted a proof of claim in the amount of $475 million against HoldCo II for amounts owed by HoldCo II under the Commercial Agreement, contingent on the Court's authorization of the Debtors' requested rejection of the Commercial Agreement. Pursuant to 11 U.S.C. § 502(a), Amazon's claim is deemed allowed unless a party in interest objects to such claim. No party has objected.

## IV.     The Chapter 11 Cases and Proposed DIP Facility

20.     On January 14, 2026, the Debtors initiated these Chapter 11 Cases and filed the DIP Motion, requesting approval of three DIP facilities: a $1.5 billion ABL DIP Facility, a $2.6 billion SGUS DIP Facility, and a $1.75 billion intercompany OpCo DIP Facility.

21.     Of those DIP facilities, at this time, Amazon objects solely to the SGUS DIP Facility.  The SGUS DIP Facility provides for (i) $1.0 billion of new-money DIP term loan commitments *(with $400 million to be approved upon entry of the interim DIP order)*, (ii) a rollup of approximately $808 million of prepetition SPV Notes *($359 million to be approved upon entry of the interim DIP order)*, and (iii) an additional $751 million to effectively roll up prepetition 2O Notes *(all $751 million to be approved upon entry of the interim DIP order)*.

22.     Thus, the SGUS DIP Facility would result in HoldCo II *incurring $2.4 billion in additional obligations* (the $2.6 billion of the DIP Facility, less the $200 million of SPV notes already guaranteed by HoldCo II), even though HoldCo II does not need a DIP facility.  Of that $2.4 billion in incremental liability, *approximately $1.31 billion would be approved under the Debtors' proposed interim DIP order.*  The following table depicts the current and additional liability that would be imposed at HoldCo, on an interim and final basis:

| Type of Debt | Prepetition | Interim | Final |
|---|---|---|---|
| New Money SGUS DIP | $0 | $400 million new money | Additional $600mm, so $1 billion total |
| SGUS DIP Roll-Up (Incl. 2O Participation) | $0 | $1.11 billion rollup | Additional $449mm, so $1.56 billion total |
| CMBS Loan | $1.25 billion | $1.25 billion | $1.25 billion |
| CMBS Makewhole | ~$30 million | ~$30 million | ~$30 million |
| SPV Notes Guarantee | $200 million | $0 (due to rollup) | $0 (due to rollup) |
| Axonic Claim | $118 million | $118 million | $118 million |
| **Total Ahead of Amazon** | **$1.6 billion** | **$2.9 billion** | **$3.9 billion** |

10

## V.      Governance at HoldCo II

23.      HoldCo II is wholly owned by Debtor Saks Fifth Avenue HoldCo LLC.  HoldCo II is a member-managed limited liability company, meaning that decisions regarding HoldCo II's governance roll up to the management of Saks Fifth Avenue HoldCo LLC.  There are no independent directors and no independent advisors or other fiduciaries at HoldCo II.  The result is that, when, as here, there is a conflict of interest between HoldCo II and the Non-Flagship Debtors, fiduciaries of the Non-Flagship Debtors are still the ultimate decision-makers for HoldCo II with no independent guardrails protecting HoldCo II's creditors.

## ARGUMENT

## I.      The Debtors Lack Authorization to Enter Into the DIP Facility.

24.      As a threshold matter, the Debtors lack the requisite corporate authority to enter into the DIP facility because Amazon does not consent thereto, as required by the LLCA.  Section 4.05(b)(vi) of the LLCA prohibits—without Amazon's "prior written approval"—"any sale, Transfer or other disposition of, the granting of any pledge, lien or other encumbrance with respect to, *the incurrence or guarantee of Indebtedness* in respect of, or the entry into any transaction with similar effect to any of the foregoing with respect to (a) *the Saks Flagship*, (b) prior to the date upon which SFA Holdings Inc. ceases to be the direct legal and beneficial owner of 100% of the outstanding Equity Securities of Saks Fifth Avenue HoldCo LLC (the "*Saks Flagship Transfer Date*"): *HoldCo II or any of its direct or indirect Subsidiaries* (or Equity Securities thereof), or (c) on and following the Saks Flagship Transfer Date: any Person (or Equity Securities thereof) that directly or indirectly holds the equity of the Person that owns or holds the Saks Flagship or the ground or operating lease with respect to the Saks Flagship" (emphases added), with certain inapplicable exceptions.

25.     The proposed DIP facility constitutes "Indebtedness" for which Amazon's consent is required, and Amazon does not consent.  Amazon put the Debtors on written notice prior to the chapter 11 filing that it does not and would not consent to such a DIP facility.  *See* Exhibit 4 (letter from Amazon to Saks).  Saks, however, seeks to impose the DIP obligations at HoldCo II and Flagship PropCo over Amazon's contractual, bargained-for consent right.  HoldCo II thus lacks the corporate authority to incur the proposed claims and liens under the DIP facility, and Amazon reserves all rights to seek any and all claims on account of any breach of the LLCA.

## II.     The Propriety and Fairness of the Proposed DIP Facility Must Be Assessed From the Standpoint of HoldCo II.

26.     A separate bankruptcy estate is created for *each debtor*, and the Court must analyze each debtor on an individualized basis to ensure the financing respects corporate separateness and benefits *that debtor.  See In re Tribune Co.*, 464 B.R. 126, 182 (Bankr. D. Del. 2011) (holding that "*entity separateness is fundamental,*" and denying confirmation because, among other things, the requirements of section 1129 must be satisfied by each debtor under a plan) (emphasis added); *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518-19 (2d Cir. 1988) ("[C]reditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan. Such lenders… do not anticipate having the creditors of a less sound debtor compete for the borrower's assets."); *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 699 (Bankr. S.D. Tex. 2009) ("The proposed use of cash collateral from one estate to pay the claims of another estate—in effect, borrowing from Peter to pay Paul—is not allowed under the applicable law.").  Failure to maintain corporate separateness would cause an improper "de facto consolidation" of the estates.  *See In re Dynaco Corp.*, 158 B.R. 552, 553-54 (Bankr. D.N.H. 1993).

27.     Here, the Debtors have not even attempted to establish the basis to substantively consolidate the Debtors' estates, nor have the Debtors requested substantive consolidation. Indeed, the order of joint administration explicitly states that the joint administration is for "procedural purposes only" and "nothing … is intended or shall be deemed or otherwise construed as directing or otherwise effecting a substantive consolidation of the Debtors' estates." And the Debtors' cash management motion (paragraph 24) explains that the Debtors "maintain records of the Intercompany Transactions in the ordinary course of business that are sufficient to ascertain, trace, and account for such Intercompany Transactions." Thus, when considering whether to approve the Debtors' proposed DIP facility over Amazon's objection, the Court must look at whether the DIP facility should be approved *at HoldCo II* based on the facts and circumstances solely *at HoldCo II*—not other Debtors.

### III.    HoldCo II Does Not Need Any New-Money DIP Financing, Much Less Interim DIP Financing On An Emergency Basis To Avoid Immediate & Irreparable Harm.

28.     A debtor may obtain secured postpetition financing under § 364(c) of the Bankruptcy Code only upon a showing that (i) it is unable to obtain unsecured financing; (ii) the proposed financing is necessary to preserve the assets of the estate; and (iii) the financing is fair, reasonable, and adequate under the circumstances. *See In re Crouse Group, Inc.*, 71 B.R. 544, 549 (E.D. Pa. 1987) (emphasis added). Additionally, for DIP financing to be approved on an emergency basis in the first 21 days of the debtor's case, the debtor must show that such financing is necessary "*to avoid immediate and irreparable harm*." Fed. R. Bankr. Proc. 6003(a)(2) (emphasis added).

29.     HoldCo II bears the burden of proving that postpetition financing is necessary to preserve the assets of *the HoldCo II estate* and is fair, reasonable, and adequate under the circumstances *of HoldCo II*. *See Crouse Group*, 71 B.R. at 549. Likewise, in requesting the

approval of such financing during the first 21 days of a case, HoldCo II bears the burden of showing that immediate and irreparable harm will ensue *at HoldCo II* if such relief is not granted. *See* Fed. R. Bankr. P. 6003(a)(2).

30.     Here, the Debtors have failed to show that HoldCo II needs the proposed DIP financing to preserve its assets, that the proposed DIP financing is fair and reasonable, or that, to the extent any DIP financing is necessary at HoldCo II, such financing is needed on an emergency basis to avoid immediate and irreparable harm.  To the contrary, Flagship PropCo and HoldCo II do not need financing—much less financing in the first 30 days of these Chapter 11 Cases—as (i) Flagship PropCo receives monthly ground rent payments from affiliate 12 East in the amount of $7.7 million, (ii) Flagship PropCo's monthly expenditures (i.e., the $4.7 million monthly CMBS interest) are covered by such monthly rent payments, and (iii) HoldCo II has minimal monthly expenditures, which are covered by its equity in Flagship.  Even if Flagship stopped receiving monthly rent payments because Saks & Company LLC defaulted on its own lease payments, the $4.7 million monthly CMBS interest would be covered by a significantly smaller DIP facility—not the proposed $2.6 billion SGUS DIP Facility.

31.     Put simply, HoldCo does not need new-money DIP financing and should not incur new-money DIP obligations.  And it is clear that no "immediate and irreparable harm" will result at HoldCo II if the DIP facility is not approved at HoldCo II on an emergency interim basis.  It is not apparent that anything negative, much less anything immediate and irreparable, will happen to HoldCo II in the next 30 days absent the DIP.  The Court should therefore deny any such interim financing at HoldCo II and provide the parties an opportunity to negotiate the appropriate amount and terms of such financing and/or build the factual record necessary to litigate whether such financing is necessary at all.  Further, any new-money DIP claims at HoldCo II must be limited to

US-DOCS\166591200

new-money DIP financing that HoldCo II actually receives.  There is no legal basis or business justification for HoldCo II to incur $1.0 billion in new-money DIP claims when none (or nearly none) of that new money is being provided to HoldCo II.

### IV.    The Proposed *Cross-Debtor* Cross-Collateralization "Roll Up" Is Impermissible.

32.    Second, it is axiomatic that the maximum amount of prepetition obligations that a debtor can "roll up" into DIP financing is the total amount of prepetition obligations on which that debtor is liable.  Yet, by the DIP Motion, HoldCo II seeks authority to "roll up" (whether through the rollup of SPV Notes or the participation rights with respect to the 2O Notes) approximately *$1.6 billion* of prepetition obligations (approximately $1.11 billion on an interim basis) despite being obligated *on only $200 million of such obligations today.*  That is not merely a "roll up," nor is it merely "cross-collateralization" in which a debtor secures prepetition debt with new collateral that did not previously secure the debt.  Typical roll-ups and cross-collateralization—which are already viewed with skepticism by bankruptcy courts given the potential harm they may inflict on unsecured creditors—do not result in a debtor *obligating* itself for the first time, postpetition, on *prepetition* debts on which it was not previously obligated.

33.    Viewed in the most Debtor-favorable light, HoldCo II's request to do so is tantamount to a request to incur priming DIP financing to pay off prepetition funded debt of an affiliate, on which HoldCo II is not liable, simply because the providers of a DIP facility (that HoldCo II does not need) insist upon it.  If that justification is sufficient, it is difficult to envision any terms in a DIP facility, no matter how offensive to principles of corporate separateness or harmful to a particular debtor's estate and non-DIP lender creditors, that could not similarly be justified by generalized claims of "necessity."  Courts evaluating *less* overreaching DIP financing terms have nevertheless rejected "necessity" as a basis to do violence to the Bankruptcy Code and its priority scheme. *See Matter of Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1496 (11th Cir. 1992)

("Rehabilitation is certainly the primary purpose of Chapter 11.  This end, however, does not justify the use of any means.  Cross-collateralization is directly inconsistent with the priority scheme of the Bankruptcy Code."); *Dynaco*, 158 B.R. at 553-54 (Bankr. D.N.H. 1993) ("The Court will not be held hostage to that threat of closing down the business as a device to force premature approval of a complex financing arrangement of the nature presented in this case.").

34.     Amazon is aware of no reported cases featuring a debtor becoming obligated on an affiliate's prepetition debt postpetition so that its affiliates can procure DIP financing.  Rather, decisions illustrating courts' longstanding skepticism even of "ordinary" cross-collateralization make clear that such terms should not be approved.  The Eleventh Circuit, in *Saybrook*, concluded that there was no authorization in section 364 or elsewhere in the Bankruptcy Code to permit cross-collateralization *using prepetition and postpetition assets of a single debtor*—a less egregious form of cross-collateralization than using a different debtor's assets.  *See Matter of Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1494-96 (11th Cir. 1992).  The *Saybrook* court reasoned that if cross-collateralization "were initiated by the bankrupt while insolvent and shortly before filing a petition, the arrangement 'would have constituted a voidable preference.' … The fundamental nature of this practice is not changed by the fact that it is sanctioned by the bankruptcy court."  *Id.* at 1496 (quoting *In re Texlon Corp.*, 596 F.2d 1092, 1097 (2d Cir. 1979)).  Here, if HoldCo II is insolvent (or rendered insolvent by the DIP financing), then its agreement to incur the prepetition obligation of its affiliates would similarly be avoidable: it would unquestionably be a fraudulent transfer, as HoldCo II would be incurring obligations for no corresponding benefit.

35.     *Tenney Village* is also instructive.  There, the debtor's two primary assets were (i) a 1,000-acre ski resort (the "**Ski Resort**") and (ii) a development of condominium units adjoining the ski resort (the "**Condo Assets**").  *In re Tenney Village Co., Inc.*, 104 B.R. 562, 563 (Bankr.

D.N.H. 1989).  The bank was owed approximately $16.5 million and had a prepetition lien solely covering the Condo Assets—it did not have any lien on the Ski Resort, which was otherwise encumbered by another lender's lien.  Under the bank's proposed DIP facility, the bank would have provided the debtor with $1 million in new money to improve the Condo Assets and the Ski Resort and would have received a security interest on the Ski Resort—not just for the $1 million but for the bank's entire prepetition debt.  *Id.* at 569.  The court denied the proposed financing after finding that the benefit to the bankruptcy estate was outweighed by the burdens of cross-collateralization because, among other things, "only one party will benefit from the proposed reorganization—the bank."  *Id.* at 570.  As in *Saybrook*, in *Tenney*, there was only one debtor and the court still refused to cross-collateralize the lender's claims against different assets at that debtor, when the bank did not have a lien on the Ski Resort prior to the bankruptcy case.

36.     To cross-collateralize ***across debtor entities*** would be even more egregious and have the effect of substantively consolidating the estates of debtors who are obligated on the full amount of the prepetition SPV Notes and the prepetition 2O Notes with a debtor who is obligated on only $200 million of those obligations.  In this respect, the proposed DIP Facility violates the bedrock principles that "respecting entity separateness is a fundamental ground rule," "substantive consolidation … should be rare and … one of last resort," and "while substantive consolidation may be used defensively to remedy the identified harms caused by entangled affairs, it may not be used offensively … to disadvantage tactically a group of creditors in the plan process or to alter creditor rights."  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).  Rather, "substantive consolidation should be used only after it has been determined that all creditors will benefit"— which is not true here, as Amazon and other creditors at HoldCo II would be significantly harmed,

17

for the reasons described herein.  *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 519 (2d Cir. 1988).

37.     Absent a showing that substantive consolidation of HoldCo II with the Non-Flagship Debtors is appropriate—a burden that the Debtors cannot carry—the proposed cross-Debtor cross-collateralization contemplated by the DIP facility cannot be approved.  To the extent the Debtors assert that such relief is justified by the need to avoid an immediate liquidation of the Saks enterprise, that basis is insufficient, particularly where (as here) it may be the case that an immediate liquidation of HoldCo II's assets would be more beneficial to its creditors.  *See Dynaco*, 158 B.R. at 554 (limiting initial relief to the use of cash collateral and adjourning the relief requested with respect to DIP financing because "creditors should have some opportunity to evaluate the alternative of liquidation before the secured claimant is given extensive rights in the post-petition assets of the debtor that may improve its position in such a liquidation").

## V.     The Court Should Not Defer To The Debtors' Business Judgment Because There Are No Unconflicted Decision-Makers for HoldCo II.

38.     The fact that HoldCo II is requesting approval of a DIP facility that would saddle it with billions of dollars of obligation for no material benefit makes evident that conflicts exist between the Flagship Entities and the Non-Flagship Debtors, the latter of which will benefit materially from the DIP facility.  There are no independent or unique directors at HoldCo II.  HoldCo II is member managed, with decision making for HoldCo II ultimately being the responsibility of the HBC GP LLC board (the ultimate Saks parent), which oversees all the Debtors.  HoldCo II needs its own fiduciaries to determine whether the proposed DIP facility is in the best interests of HoldCo II, irrespective of its effect on the Non-Flagship Debtors.  HoldCo II's current decision-makers are unable to adequately make such an evaluation because of their responsibility to other entities that benefit from the DIP facility.

18

39.     Due to these obvious conflicts, deference to HoldCo II's business judgment should not apply, and the Debtors must demonstrate that the transaction meets the "entire fairness" standard with respect to HoldCo II. *In re Tops Holding II Corp.*, 646 B.R. 617, 698 (Bankr. S.D.N.Y. 2022) ("where the directors' loyalty has been called into question, the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction'" (collecting cases)).

40.     They cannot make that showing here.  For the reasons discussed above, the DIP facility uniquely harms HoldCo II and would fail to pass muster even under the more relaxed business judgment standard, much less the entire fairness standard, as there is no justification for incurring $2.6 billion of DIP obligations.  An unconflicted fiduciary would not, in good faith, have approved the proposed DIP facility.  At bottom, the DIP facility is so harmful to HoldCo II that dismissal or conversion may very well be better for HoldCo II and its creditors, including Amazon, than taking on the obligations of a DIP facility it does not need.

**VI.     The DIP Facility Should Be Denied—But If It Is Approved, It Must Be Revised.**

41.     ***First,* any DIP claims at HoldCo II must be limited to *new money* that is needed by HoldCo II during the interim period to avoid immediate and irreparable harm to HoldCo II and that are actually advanced to and used by HoldCo II for its own actual operational needs during the interim period**.  In addition, the interim financing should not cover any estate professional fees (as they would not be paid in the interim period), and, to the extent the DIP financing is intended to cover professional fees after the interim period, those fees must be ratably and fairly allocated among HoldCo II and the Non-Flagship Debtors, but the proposed DIP budget does not currently provide for any such allocation.

42.     ***Second,* if any roll-up at HoldCo II is approved on an interim basis (which it should not be), it should be subject to full reconsideration at the final hearing and subject to**

**the challenge period in any event.**   Interim relief should be limited to only what is necessary to allow other interests in the estate to "get organized" for "an appropriate hearing." *Dynaco*, 158 B.R. at 554.  Amazon contests the necessity of the proposed roll-up, and rolling up significant secured debt at Non-Flagship Debtors ahead of HoldCo II's existing creditors on the first day of the Chapter 11 cases, without an opportunity for discovery, deprives HoldCo II's creditors of the opportunity to fairly and equitably litigate the merits of the proposed financing, including the proposed roll-up.  The roll-up, to the extent approved at all, should therefore remain subject to reconsideration in full at the final hearing for Amazon, an official committee of unsecured creditors, and all other parties of interest who did not receive adequate notice of the Debtors' first-day hearing—which is being held just 5.5 hours after the DIP Motion was filed.

43.    The roll-up (including the consummation of the Prepetition OpCo Second Out Notes Participations) should also be subject to the challenge period—if the prepetition notes were not properly perfected, for example, then they cannot and should not be rolled up (including through consummation of the Prepetition OpCo Second Out Notes Participations).   For example, paragraph I(7) of the proposed interim order says that "the consummation of the Prepetition OpCo Second Out Notes Participations shall be final and irrevocable as to the Debtors upon entry of this Interim Order."  That must be subject to challenge.

44.    ***Third*, the DIP Lenders must be required to "marshal away" from HoldCo II to recover from their other collateral first.**  A DIP facility must be, among other things, "fair, reasonable, and adequate under the circumstances." *See In re Crouse Group, Inc.*, 71 B.R. 544, 549 (E.D. Pa. 1987).  To permit the DIP Lenders to recover from HoldCo II first is particularly unfair in this situation as it would enable the DIP Lenders to recover the vast majority of their claims from HoldCo II, in order to preserve the maximum amount of collateral value at the Debtors

obligated on their (non-rolled up) prepetition claims, while leaving Amazon and other HoldCo II creditors with a significantly reduced recovery (or no recovery at all). Moreover, equitable marshalling here aligns with the principles of corporate separateness by ensuring that the creditors of the estates that benefit the most from the proposed DIP financing (*i.e.*, the Debtors other than HoldCo II) also bear the cost of that financing. *See In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1387 (5th Cir. 1986) ("[U]nencumbered assets of a debtor's estate will not be used to benefit one class of creditors at the expense of another class."). To the extent the currently proposed DIP financing seeks to waive the Debtors' right to later seek marshalling, the proposed DIP financing is particularly insidious, as the equitable doctrine of marshalling exists to "prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *See Meyer v. United States*, 375 U.S. 233, 237 (1963); *see also In re The Colad Grp. Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("While the debtor may seek authority to waive its own rights, it cannot waive the marshalling rights of parties who have not consented.").

45.      ***Fourth***, **the Debtors must reserve the right to surcharge encumbered collateral under § 506(c) of the Bankruptcy Code and argue that the "equities of the case" exception to secured creditors' liens on post-petition proceeds under §552(b) of the Bankruptcy Code applies.** It is well established that bankruptcy cases should not be run solely for the benefit of secured creditors at the expense of all other creditors. *See In re Laffite's Harbor Dev. I, LP*, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) ("While certain favorable terms may be permitted [in DIP financing] as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of

the postpetition lender"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) (finding that proposed financing should not be approved "where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate" and that "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). To the extent the DIP financing sought here waives the Debtors' rights against the DIP Lenders under §§ 506(c), 552(b), or any other provision of the Bankruptcy Code, the court should deny such waiver to avoid converting the Chapter 11 cases from one run on behalf of all Saks' stakeholders into one run purely for the benefit of the DIP Lenders.

46.     **Fifth, the DIP order should not grant any liens (DIP liens or adequate protection liens) or any claims on any chapter 5 causes of action or any other cause of action that was not subject to a properly perfected prepetition lien, or the proceeds of any such causes of actions or any applicable insurance policy, including, without limitation, the Debtors' D&O insurance policy.**  Such claims and proceeds should remain available for unsecured creditors.

47.     *Sixth,* **the DIP order should provide HoldCo II with adequate protection claims and liens against the other Debtors, as the DIP facility is being incurred by HoldCo II for the other Debtors' benefit.**  *See e.g., Babcock & Wilcox*, 250 F.3d at 957, 59 (5th Cir. 2001) (discussing DIP financing protections designed to maintain the separateness of debtors, including language that would provide debtors with priority claims against other debtors); *see also In re Delta Airlines, Inc.*, Case No. 05-17923 (PCB), [Docket No. 652], ¶ 41 (Bankr. S.D.N.Y.

October 6, 2005) (similar language).   Specifically, in line with *Babcock* and *Delta*, Amazon

requests language similar to the following:

> Without limiting the joint and several liability of each of the Debtors
> for the DIP Obligations, the Debtors shall use their reasonable best
> efforts to ensure that Debtors that receive the benefit of funds
> advanced under Postpetition Credit Facilities or the services
> contemplated thereunder or hereunder repay their share thereof on a
> dollar for dollar basis. To the extent a Debtor (i) incurs any of the
> DIP Obligations (including as a result of intercompany balances
> incurred after the Petition Date to the extent such balances arise from
> the incurrence of DIP Obligations) or (ii) receives a postpetition
> intercompany loan or transfer (including as a result of the Debtors'
> cash management system or otherwise) (each a "***Beneficiary
> Debtor***"), and such DIP Obligations were repaid or such postpetition
> intercompany loan or transfer is made (including from cash
> collateral) (each an "***Advance***") by any other Debtor that is an
> obligor under the Postpetition Credit Facilities (an "***Adequately
> Protected Debtor***"), the Adequately Protected Debtor shall have
> (a) an allowed claim under sections 364(c)(1) and 507(b) of the
> Bankruptcy Code against the Beneficiary Debtor for the amount of
> such Advance, having priority over any and all administrative
> expenses of the kind specified in sections 503(b) and 507(b) of the
> Bankruptcy Code, which claim shall bear interest at a rate agreed
> between the Debtors from time to time for the period accruing from
> and after the date such claim arises until repayment thereof
> (collectively, the "***Junior Reimbursement Claim***") and (b) a lien on
> all Postpetition Collateral under section 364(c)(3) of the Bankruptcy
> Code securing such Junior Reimbursement Claim (a "***Junior
> Lien***").

## CONCLUSION

48.      For the foregoing reasons, the Court should deny the Debtors' proposed SGUS DIP

Facility insofar that it results in DIP claims and liens at HoldCo II because HoldCo II either does

not need DIP financing or, if needed, should procure smaller, more reasonable DIP financing.  At

the very least, the Court should not approve such claims and liens at HoldCo II on an emergency

basis and should wait until the final DIP hearing to consider their approval, permitting the parties

an opportunity to negotiate a resolution and/or prepare for litigation with a full evidentiary record

on these issues.  To the extent the Court nonetheless is inclined to approve such DIP claims and liens at HoldCo II on an interim basis, then the DIP facility must be revised as set forth herein.

49.    More generally, Amazon has grave concerns with significant issues in these cases, particularly with respect to the Debtors' mismanagement and their attempts to ignore Amazon's consent right under the LLCA, ignore the corporate separateness of the Flagship Entities (at the expense of their creditors), and effectively substantively consolidate them with the Non-Flagship Debtors (for the benefit of their creditors).  The Court should not sanction such maneuvers. Amazon reserves all rights to pursue further objections and relief under the Bankruptcy Code and applicable law.

*[Remainder of this page has been intentionally left blank]*

Respectfully submitted,

Date: January 14, 2026

*/s/ Caroline A. Reckler*
Caroline A. Reckler (IL Bar No. 6275746)
Jonathan Gordon (IL Bar No. 6329732)
Timothy "Beau" Parker (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: caroline.reckler@lw.com
          jonathan.gordon@lw.com
          beau.parker@lw.com

-and-

Christopher Harris (NY Bar No. 2914265)
Andrew Sorkin (NY Bar No. 4597944)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: christopher.harris@lw.com
          andrew.sorking@lw.com

-and-

Michael J. Reiss (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (424) 653-5500
Facsimile: (424) 653-5501
Email: Michael.reiss@lw.com

*Counsel to Amazon*

25

**Exhibit 1**

**Simplified Org Chart Showing Flagship Entities**



**Exhibit 2**

**Flagship Entities' Intercompany Arrangements**



US-DOCS\166591200

**Exhibit 3**

**Partial Org Chart With Indebtedness and Flow of Funds**



1. Blue boxes are liable for:
   a. Secured Debt
      i. ABL – up to $1,800M (currently drawn: $1,200M)
      ii. Exchange Notes – $1,880M
      iii. Old Notes – $51.2M
      iv. FILO Onloan – $400M (except Saks Global Holdings LLC)
      v. NPC Onloan – $362.5M (except Saks Global Holdings LLC)
   b. Unsecured Debt
      i. Trade payables (amount subject to diligence)
      ii. Other unsecured corporate debt (amount subject to diligence)
2. Blue + Pink boxes are liable for:
   a. Secured Debt – same as above
   b. Unsecured Debt
      i. Amazon Commercial Agreement (full amount)
      ii. Trade payables (amount subject to diligence)
      iii. Other unsecured corporate debt (amount subject to diligence)
3. Purple + Pink box is liable for:
   a. Secured Debt
      i. SPV Note Guaranty – $200M
      ii. Axonic Guaranty – $118M
   b. Unsecured Debt
      i. Amazon Commercial Agreement – $475M
      ii. Vendor Guarantees – $180M
      iii. Other debt at Holdco II (existence/amount subject to diligence)
4. Turquoise box liable for:
   a. CMBS – $1,250M + make-whole
   b. Other debt at flagship (existence/amount subject to diligence)

28

US-DOCS\166591200

**<u>Exhibit 4</u>**

**Letter from Amazon to Saks**

1271 Avenue of the Americas
New York, New York  10020-1401
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

**LATHAM&WATKINS** LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

January 9, 2026

**VIA ELECTRONIC MAIL**

Gregory B. Astrachan
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019

Re:      **Saks Chapter 11 Filing: DIP Financing Issues, Diligence, & Litigation Hold**

Greg:

As you know, we represent Amazon.com Services LLC and Amazon Payments, Inc. (together with their affiliates, "***Amazon***").[1] **We request that you immediately share this letter with Paul Aronzon, William Tracy, and Saks' Chief Restructuring Officer and confirm via e-mail that you have done so.**

We understand that Saks Global and certain of its direct and indirect subsidiaries (the "***Company***") are contemplating filing for chapter 11 bankruptcy on or around January 11, 2026. We further understand that Saks, in connection with such a filing, is pursuing debtor-in-possession (DIP) financing from a variety of financing sources that would, among other things, (i) impose new claims and liens at, among others, Saks Fifth Avenue HoldCo II LLC ("***HoldCo II***") and Saks Flagship Real Property LLC ("***Flagship***"), which claims and liens would be senior to Amazon's claims at HoldCo II; (ii) "roll up" significant amounts of existing debt into such DIP facility, including debt that is not currently secured by HoldCo II's and Flagship's assets and on which HoldCo II and Flagship are not currently obligated; (iii) waive any obligation that the DIP lenders have to marshal away from HoldCo II and Flagship before seeking a recovery from those entities; and (iv) pay a significant amount of prepetition claims owed to vendors, even though those vendors have enforceable contracts and either have claims at HoldCo II contractually subordinate to Amazon or have no claims at HoldCo II or Flagship whatsoever.

---

[1]   Amazon is party to that (i) certain Amazon Services Business Solutions Agreement, as modified by the Addendum effective December 23, 2024 and the Second Addendum effective October 3, 2025 (collectively, the "***Commercial Agreement***"), by and between Amazon and Saks Global Holdings LLC ("***Saks Global***", and together with its affiliates, "***Saks***") and (ii) certain Sixth Amended and Restated Limited Liability Agreement of HBC GP LLC, dated as of October 3, 2025 (the "***LLC Agreement***").  Amazon provided notice to Saks Global on December 24, 2025 that Saks is in material breach of the Commercial Agreement.

**LATHAM&WATKINS**LLP

This strategy, if pursued by Saks, would violate Amazon's consent rights under the LLC Agreement[2] and would inflict significant harm upon Amazon and other creditors at HoldCo II, for the sole purpose of advantaging other groups of creditors at other entities. Please note that, for the avoidance of doubt, Amazon does not consent to any financing that encumbers HoldCo II or Flagship. In addition, such a strategy is impermissible under the Bankruptcy Code and is not an exercise of sound business judgment by, or in the best interests of, HoldCo II or Flagship. **Saks cannot use the assets and value of Flagship and HoldCo II to fund other Saks entities for the benefit of those other Saks entities' creditors, at the expense of creditors of Flagship and HoldCo II, including Amazon. Given Saks' past financial and operational performance and present uncertainties, a liquidation of Flagship may very well be in the best interests of the creditors of Flagship and HoldCo II.**

If such a DIP facility is nonetheless pursued, be advised that Amazon will be forced to pursue all available legal remedies, which may include, without limitation, (i) objecting to court approval of the DIP financing, (ii) objecting to any related first-day relief that would diminish Flagship's value or violate the Bankruptcy Code's repayment priority scheme, (iii) seeking the appointment of an examiner or trustee, (iv) seeking conversion or dismissal of HoldCo II's case, (v) seeking the appointment of a separate unsecured creditors' committee specific to HoldCo II, and/or (vi) seeking the termination of HoldCo II's exclusive right to file and solicit a chapter 11 plan. Moreover, Amazon reserves its rights to pursue all claims arising from the Company's and its management's misconduct related to the LLC Agreement, in addition to claims arising from the Board and management's conduct in the last year that has led to the degradation of significant value and left the Company in such a precarious financial position. Amazon has also learned that certain third parties may be investigating and consider pursuing fraud claims against the Company and its officers and directors. If such allegations are substantiated, Amazon will pursue all available remedies against all applicable parties.

**Accordingly, the Company and its advisors are hereby notified that the Company and its outside financial, legal and other advisors are required to preserve all communications and documents in any way related to the foregoing, including, without limitation, documents, emails, text messages and other communications and exchanges through messaging applications.** Nothing that is relevant to the foregoing (and any potential related litigation) or the financial condition of the Company, including specifically HoldCo II and Flagship, should be discarded, altered or removed from the files (electronic or otherwise) of the Company without first consulting with us. General corporate policies and all automatic mechanisms for retiring or purging documents—including electronic documents—must be reversed and turned off,

---

[2]   LLC Agreement § 4.05(b)(vi) (prohibiting, without Amazon's "prior written approval" "any sale, Transfer or other disposition of, the granting of any pledge, lien or other encumbrance with respect to, the incurrence or guarantee of Indebtedness in respect of, or the entry into any transaction with similar effect to any of the foregoing with respect to, (a) the Saks Flagship, (b) prior to the date upon which SFA Holdings Inc. ceases to be the direct legal and beneficial owner of 100% of the outstanding Equity Securities of Saks Fifth Avenue HoldCo LLC (the "**Saks Flagship Transfer Date**"): HoldCo II or any of its direct or indirect Subsidiaries (or Equity Securities thereof), or (c) on and following the Saks Flagship Transfer Date: any Person (or Equity Securities thereof) that directly or indirectly holds the equity of the Person that owns or holds the Saks Flagship or the ground or operating lease with respect to the Saks Flagship," except for certain inapplicable exceptions.

LATHAM&WATKINS LLP

respectively, with respect to the aforementioned documents.  With respect to any individuals approving, negotiating, providing advice with respect to, or otherwise involved in the foregoing matters who communicated via personal devices (including via SMS, iMessage, WhatsApp or similar applications), you must instruct those persons to retain all such messages and communications relevant to the issues discussed herein.  If you have any questions as to whether a document should be preserved, you should retain it.  Failure to take these steps could result in discovery and case-related penalties against the Company and any other potential defendants, including adverse evidentiary inferences and litigation sanctions.

If HoldCo II requires financing to fund HoldCo II expenses in a chapter 11 case, then Amazon would be willing to consider providing alternative DIP financing to HoldCo II, subject to mutually agreeable documentation.  As noted below, we have repeatedly asked for information regarding HoldCo II's expenses for purposes of sizing such DIP financing. This alternative financing proposal would be more reasonably calibrated to HoldCo II's financing needs, while permitting the remaining Saks entities to still obtain DIP financing from their own creditors or from third parties on terms that are tailored to their own situation.

While we appreciate the calls and information that have been provided to Amazon and its advisors to date, we continue to request, but have not received, critical information.  Between December 23 and January 5, Evercore requested additional clarifications related to the business plan shared by Saks' advisors on December 19, but no information has been provided.  Most recently, on January 5, Evercore again requested a 13-week cash flow for SFA Holdings Inc., Saks Fifth Avenue HoldCo, Saks Fifth Avenue Holdco II, Saks Flagship Real Property, 12 East 49th Street, and Saks & Company and was told by Mr. Lamb of BRG (the Company's financial advisor) that they "do not have these items off the shelf at the moment" and "will follow up as appropriate at the right time."  Four days have passed since this request was made.  It defies logic that at this juncture the Company doesn't have this information available in light of the Company's imminent bankruptcy filing.  We expect that you will promptly share this information.  The "right time" is right now.

Amazon requests a response by **no later than Saturday, January 10, 2026** that includes: (i) the information requested in the preceding paragraph, as well as the information requested in <u>Exhibit A</u>, in accordance with Amazon's information rights under the Commercial Agreement and the LLC Agreement, (ii) the terms of any and all other proposed DIP financings that are currently being negotiated and all materials provided to such potential DIP lenders, and (iii) the proposed budget and expected 13-week cash flow associated with such proposal(s).

We look forward to continued dialogue between Amazon and Saks regarding Saks' capital structure and liquidity concerns.  **We also request and expect that at your earliest convenience, as a matter of professional courtesy, you will inform us of what dates and times you have reserved with the Bankruptcy Court for a first-day hearing as we understand that you have already reserved such dates and times.**

LATHAM&WATKINS LLP

      Nothing in this letter waives or limits any rights or remedies available to Amazon under the Commercial Agreement or the LLC Agreement or at law or in equity, all of which are expressly reserved.

                    Sincerely,

                    */s/ Caroline A. Reckler*

                    Caroline A. Reckler
                    of LATHAM & WATKINS LLP

cc:      bertucci@amazon.com
           crcasey@amazon.com
           mbrandt@willkie.com
           tprakash@willkie.com
           andrew.elken@lw.com
           christopher.harris@lw.com
           jason.hegt@lw.com
           michael.reiss@lw.com
           andrew.sorkin@lw.com
           jonathan.gordon@lw.com
           arosenberg@paulweiss.com
           spak@paulweiss.com
           mweinsten@thinkbrg.com

January 9, 2026
Page 5

LATHAM&WATKINS LLP

## **EXHIBIT A**

### **Requested Information**

[Intentionally Omitted]