## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1] | Case No. 26-90103 (ARP) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 420** |

### GLOBAL DEBTORS' OBJECTION TO
### MOTION OF SIMON PROPERTY GROUP L.P. FOR
### ENTRY OF AN ORDER (A) DECLARING THE AUTOMATIC
### STAY DOES NOT APPLY, (B) IN THE ALTERNATIVE GRANTING
### RELIEF FROM THE AUTOMATIC STAY, AND (C) GRANTING RELATED RELIEF

The above-captioned Global Debtors as debtors and debtors in possession file this objection (the "Objection") to the *Motion of Simon Property Group L.P. for Entry of an Order (A) Declaring the Automatic Stay Does Not Apply, (B) In the Alternative Granting Relief from the Automatic Stay, and (C) Granting Related Relief* [Docket No. 420] (the "Lift Stay Motion"),[2] filed by Simon Property Group L.P. ("Simon"). In support of this Objection, the Global Debtors respectfully state as follows.[3]

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively, the "SO5 Digital Debtors"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are counsel for the remaining Debtors (collectively, the "Global Debtors").

[2]  Capitalized terms used, but not immediately defined herein shall have the meanings ascribed to them in the Lift Stay Motion or elsewhere in this Objection.

[3]  In support of this Objection, the Global Debtors rely on the *Declaration of Mark Weinsten in Support of Global Debtors' Objection to Motion of Simon Property Group L.P. for Entry of an Order (A) Declaring the Automatic Stay Does Not Apply, (B) In the Alternative Granting Relief from the Automatic Stay, and (C) Granting Related Relief* filed contemporaneously herewith.

## PRELIMINARY STATEMENT

1.      By the Lift Stay Motion, Simon seeks extraordinary relief to which it is not entitled. Simon seeks, in effect, to short circuit the Global Debtors' statutory right to deliberate and ultimately assume, assume and assign, or reject leases of nonresidential real property, which undoubtedly constitute important assets of these estates.  See 11 U.S.C. §§ 365 and 541.  And it seeks to do so even though the applicable cure periods had not yet run, the Global Debtors were operating pursuant to a well-established course of dealing, and there were no defaults to trigger a termination right.  As a result, because these Leases remain property of the estate and there is not cause to lift the automatic stay, the Global Debtors respectfully request the Court deny the relief sought by Simon in the Lift Stay Motion.  To the extent the Court concludes that further factual development is warranted—for example, on the parties' course of conduct and whether any amounts asserted were actually due and owing—the Global Debtors propose a targeted discovery period followed by an evidentiary hearing.

2.      The Global Debtors commenced these chapter 11 cases in order to (a) address their pressing liquidity challenges, (b) deleverage their balance sheets, and (c) refocus their operations to maximize long-term growth.  Achieving these goals will require the Global Debtors to effectively maximize the value of each estate asset, including their leases of nonresidential real property from Simon (the "Leases").  If the Global Debtors are successful, they will preserve thousands of jobs and maximize value for all stakeholders—including landlords like Simon who are poised to receive billions of dollars in future rent payments if they stand by the Global Debtors.

3.      Unfortunately, and notwithstanding a long standing relationship with the Global Debtors, Simon has decided that it can make more money on certain of the Leases by reletting

them at higher rates.[4]  That fact is the root of the instant dispute; not any genuine defect in performance by the Global Debtors.  By the Lift Stay Motion, Simon asks this Court to circumvent the Global Debtors' fundamental protections in chapter 11, and cause immediate harm to the Global Debtors' business by forcing a hasty and value-destructive withdrawal from two currently operating store locations at Woodbury Common Premium Outlets in New York and Stanford Shopping Center in California.  Simon also asks this Court to minimize the value of estate assets by precluding any possibility of selling these valuable leases.  Granting the relief Simon requests would require the Court to ignore underlying lease terms, infer departures from such lease terms by silence in a side letter (which by its terms represents an entire agreement as to the subject matter thereof), and to devalue sections 362, 365, and 541 of the Bankruptcy Code.  The Lift Stay Motion should be denied for three principal reasons.

4.      *First*, the Letter Agreement allows Simon to invoke a termination right on ten days' notice only where (a) there is a default under the Letter Agreement or (b) the Global Debtors failed to ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████.  Thus, the operative question is whether the Global Debtors failed to ████████████████████████████████████████.  Because many of the asserted charges had not fully matured under the leases' provisions—and because the Global Debtors were well within any relevant cure period, and were operating in accordance with decades' long practice between the parties, at the time the termination notices were issued—Simon's notice was invalid and of no effect.

---

[4]    Linda Moss, Landlord Simon Property Expects to Hike Rents at Former Saks Off 5th Stores, https://www.costar.com/article/1292787101/landlord-simon-property-expects-to-hike-rents-at-former-saks-off-5th-stores.

5.      **Second**, by the Global Debtors own records, they have paid all amounts due and owing under the Leases and will pay any amounts subject to inquiry or dispute upon the conclusion of reconciliation.  The Global Debtors are working assiduously to parse the vague ledgers Simon provided without backup, and the Global Debtors intend to timely pay amounts that are outstanding but not yet due.  For clarity, the Leases generally provide for base rent, which is a fixed monthly amount, which may change according to a set schedule ("Base Rent"), and additional rent, which generally includes variable charges like common area maintenance, real estate taxes, and utility charges (collectively "Additional Rent").  See Weinsten Decl. ¶¶ 7-8.  To the extent any Base Rent was outstanding as of January 7, 2026, the Global Debtors paid such amounts within days—and well within any applicable cure period.   Instead, the dispute here centers primarily on the Additional Rent that Simon asserted to be due, without substantiation, in a stark departure from prior practice.  Because Additional Rent is generally a variable charge, the Global Debtors ordinarily receive statements from Simon and work to substantiate and reconcile such amounts asserted.  See Weinsten Decl. ¶ 8.  These amounts subject to reconciliation cannot form the basis of a failure to perform any underlying lease so as to give rise to the Termination Right.

6.      **Third**, Simon alternatively asks the Court to lift the automatic stay.  However, Simon cannot meet its significant burden under section 362(d)(1), particularly with respect to the balancing of harms.  Granting Simon's requested relief would cause a disordered frenzy to immediately remove significant quantities of merchandise from currently operational stores, relocate or terminate dozens of employees, and address significant customer confusion that would be triggered by a rushed closing of stores.  See Weinsten Decl. ¶ 13.  Conversely, Simon's only hardship is continuing to operate under lease agreements it signed.

7.      Additionally, the Global Debtors are aware that Simon has discussed terms of the Letter Agreement on an earnings call and to the press,[5] which violates the confidentiality of the Letter Agreement.  The Global Debtors expressly reserve all rights and waive none with respect to Simon's unauthorized disclosure, including with respect to whether Simon has come to this Court with unclean hands as a result of its conduct with respect to this disclosure.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas (the "Court"), dated May 24, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Global Debtors confirm their consent to entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory and legal predicates for the relief sought herein are sections 105(a), 362, and 541 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 4001-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the *Procedures for Complex Cases for the Southern District of Texas.*

---

[5]     Linda Moss, Landlord Simon Property Expects to Hike Rents at Former Saks Off 5th Stores.

## BACKGROUND

### I.     General

11.     On January 13, 2026 (the "Petition Date") and January 14, 2026, the Global Debtors[6] filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Global Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

12.     On January 27, 2026, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [Docket No. 480].  On January 29, 2026, the U.S. Trustee filed a notice amending the composition of the Committee.  [Docket No. 522].

13.     No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

### II.    The Global Debtors' Relationship with Simon

14.     For approximately five decades, the Global Debtors have leased properties from Simon and have enjoyed a constructive business relationship.  Indeed, Simon leases over 75 locations to the Global Debtors, and the Global Debtors are important anchor tenants in over 40 Simon shopping centers.[7]  Simon "rel[ies] upon anchor tenants to attract customers."[8]

15.     Consistent with this longstanding relationship, the Global Debtors, when raising capital in connection with the Neiman Marcus acquisition, looked to Simon as an investor.  ▮

---

6    For the avoidance of doubt, "Debtors" means, collectively, the Global Debtors and the SO5 Digital Debtors.
7    Simon Property Group, Inc., Form 10-K (Feb. 21, 2025).
8    *Id.*

█████████████████████████████████████████████

████████████████████████ the Global Debtors and Simon entered into the Letter

Agreement.

██ ██ ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████

## III.    Ordinary Course of Dealing

17.    The Leases generally provide for two categories of rent.  The first is "Base Rent," a fixed monthly amount generally payable on a set schedule.  <u>See</u> Weinstein Decl., ¶ 7.  In the ordinary course, the Global Debtors remitted Base Rent payments in accordance with the terms of each Lease.

18.    But the present dispute is focused on the second category of rent, (the "<u>Additional Rent</u>"), which generally includes variable charges such as real estate taxes, common-area maintenance ("<u>CAM</u>"), percentage rent, utility payments, and insurance.  <u>See</u> Weinstein Decl. ¶ 8. The Leases impose documentation and timing conditions that govern when Additional Rent becomes due.  For example, under the Woodbury Lease, taxes are payable only upon landlord's presentation of the actual tax bill together with a calculation report showing the tenant's allocable share, and must be paid at least ten days before landlord's tax remittance deadline.  Woodbury Lease, Section 8.3(b).  Percentage rent is due on or before the twentieth day of the month following the applicable sales period.  Woodbury Lease, Section 4.1.  The Stanford Lease follows a comparable structure, with its own documentation requirements and timing windows.  Stanford Lease, Section 3(e); Stanford Second Amendment to Lease, Section 3.

19.     The parties' decades-long practice for Additional Rent operated roughly as follows: Simon would assert charges—sometimes via ledger entries, sometimes via payment demands or other correspondence.  Weinsten Decl., ¶ 8.  The Global Debtors would review the asserted amounts against their own books and records and the applicable lease requirements.  Id.  Where the Global Debtors required backup to verify a charge—such as tax bills, calculation reports, CAM determinations, or insurance invoices—they requested it from Simon.  Id.  This back-and-forth was routine and ongoing across the portfolio of properties that Global Debtors leased from Simon. Id., ¶ 9.  Once a charge was substantiated and any discrepancies resolved, payment followed on the next scheduled rent-roll cycle.  The parties operated this way for years without incident. Id., ¶ 8.

20.     In January 2026, Simon departed from this practice.  On January 8, the Global Debtors received, via courier delivery, purported default and termination notices asserting that the Global Debtors owed amounts[9] under the leases, which notices were also received on January 9 via United Parcel Service.  Id., ¶ 11.  Yet, as of that date, invoices and supporting documentation for many of the Additional Rent items Simon cited had not yet been delivered; the Global Debtors had open requests for missing tax bills and calculation reports at multiple properties; and reconciliation of recent CAM year-end determinations was ongoing.  Weinsten Decl., ¶ 12.  Simon has not offered an explanation for this departure from the prior course of dealing, nor did it indicate *ex ante* that it would deviate in this way.

---

[9]     Simon's notices asserted approximately $7 million in claimed charges.  The vast majority of these amounts consisted of Additional Rent charges (taxes, CAM, percentage rent, and insurance).  To the extent any Base Rent was included, the Global Debtors paid all such amounts within days of receiving the notices—and well within any applicable cure period.

## ARGUMENT

21.    Simon's Lift Stay Motion should be denied for three reasons.  First, Simon misreads the Letter Agreement, which does not give Simon an immediate right to terminate.  Section 5's Termination Right arises only upon a "failure to perform" obligations "contained within" the Leases—and the Leases define when obligations mature and what cure rights apply.  Because many or all of the asserted charges had not matured and all cure periods remained open, no failure to perform existed.  Second, Simon has not carried its evidentiary burden to show that Global Debtors failed to perform.  Its notices lump together ledger entries across dozens of properties without proving that any specific charge was due, documented, and uncured.  Third, Simon has not shown cause to lift the automatic stay.  Granting relief would interfere with the Global Debtors' reorganization, strip valuable assets from the estates, and cause immediate operational harm— while Simon's only grievance is being held to the leases it signed.

## I.    The Letter Agreement Does Not Give Simon an Immediate Termination Right



23.     Simon argues that ███████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████

24.     Simon is wrong. ████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

25.     Importantly, the ████████████████████████████████████
████████████████████████████████████████████ That is because the Leases themselves
supply that definition. ██████████████████████████████████████████
█████████████████████████████████████████████████████████████████
███████████████████ incorporates the Leases wholesale—including their provisions governing
when obligations mature and what notice and cure rights apply.

26.     This distinction is critical here because the amounts Simon asserted in its notices
were owing appear to consist primarily of Additional Rent—taxes, common-area maintenance,
percentage rent, and insurance—not fixed Base Rent.  Unlike Base Rent, which is a fixed monthly
sum payable on a set schedule, Additional Rent under the Leases is subject to documentation
requirements and timing conditions that govern when any amount becomes "due."

27.     Moreover, even where an Additional Rent item has matured, the Leases require notice and afford cure periods before any nonpayment ripens into a defaulted obligation.  Those cure periods vary in length depending on the specific lease and type of payment, but in no case is the cure period shorter than five calendar days (which was the time between receipt of the notices of default and the Petition Date).  Thus, even assuming (without conceding) that there were amounts due and payable when the Global Debtors received notice from Simon, ███████████ ████████████████████████████████████████

28.     Simon has ignored that the Letter Agreement simply did not alter ███████████ █████████████████████████████████████████ Only once Simon is *permitted* to invoke its Termination Right ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████     However, that Termination Right, by its terms, was never triggered, and Simon therefore has no right to terminate the leases.

29.     In situations similar to the instant dispute, courts have consistently held that a debtor-tenant who files for bankruptcy within a cure period retains their property right in the lease and that an attempt to terminate prior to the expiration of the cure period would violate the automatic stay.  See, e.g., In re Liljeberg Enters., Inc., 304 F.3d 410, 437 (5th Cir. 2002) (holding that termination would not violate the stay only where no further affirmative acts were required to effectuate termination); accord In re C.W. Mining Co., 422 B.R. 746 (B.A.P. 10th Cir. 2010) (noting that a termination can only be automatic where it is complete and not subject to reversal through cure payments).  Further, as a matter of Indiana law,[10] where a contract provides a cure

---

period upon notice, termination cannot be effective prior to the expiration of a cure period.  City of Jeffersonville v. Env't Mgmt. Corp., 954 N.E. 2d 1000, 1008 (Ind. Ct. App. 2011).

30.     Simon puts undue weight on case law that is unhelpful to its argument because it is applicable only where a contract provided an absolute automatic termination right.  See, e.g., Moody v. Amoco Oil Co., 734 F.2d 1200, 1212-1213 (7th Cir. 1984) (addressing a situation without a cure right); In re Margulis, 323 B.R. 130, 136 (Bankr. S.D.N.Y. 2005) (addressing a situation where the debtor's cure period had already expired); In re Prado, 340 B.R. 574, 582 (Bankr. S.D. Tex. 2006) (addressing statutory redemption periods and whether the automatic stay indefinitely tolls them when section 108(b) provides a time limit); Shockbeton Indus., Inc. v. Schokbeton Prods. Corp., 466 F.2d 171, 175-76 (5th Cir. 1972) (pre-Code case finding that where a referee attempted to enter an order after the conclusion of a cure period providing for a *nunc pro tunc* extension of the cure period, that such an extension was invalid).

31.     Simon argues that "Unlike the contracts at issue in *C.W. Mining* and *Tudor Motor Lodge*, there are no ██████████████████████████████" Lift Stay Motion, ¶ 30.  This misses the point.  Simon only had a right to exercise the Termination Right where the Global Debtors had failed ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Therefore, any supposed lack of ██████████████████████████████████████ is not relevant.  The cure rights derive from the underlying leases ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

████████████████████████████████   As a major real estate investment trust

represented by able counsel, Simon's failure to do so is meaningful.

32.     In any event, ████████████████████████████████████████

████████   termination would not be allowed because it is inconsistent with Simon's course of

dealing with the Global Debtors.  As described above, the parties operated for years under a

consistent practice:  Simon would assert Additional Rent charges, the Global Debtors would

review and request backup as needed, and payment followed once charges were substantiated.  In

January 2026, however, Simon unilaterally decided to depart from this settled practice, issuing

default and termination notices prior to or while that very process was underway.  This seems to

have been an effort to manufacture a "default" shortly before the filing of the Global Debtors'

bankruptcy cases, catching them by surprise while they were acting according to the parties'

longstanding practice.  Indiana law does not countenance such an about-face.  <u>T-3 Martinsville,</u>

<u>LLC v. US Holding, LLC</u>, 911 N.E.2d 100, 114 (Ind. Ct. App. 2009) ("When a party deviates from

strict performance called for by the contract, the former cannot suddenly declare the deviation a

breach.") (cleaned up); <u>Johnson v. Scandia Assocs., Inc.</u>, 717 N.E.2d 24, 30-31 (Ind. 1999)

("Contracts and covenants implied in fact arise from the course of dealing between the parties and

may be evidenced by acts done in the course of performance or by ordinary practices in the trade.").

33.     Simon cannot seek to terminate the Global Debtors' Leases for actions it has

permitted for years.  A party that consistently accepts non-conforming performance may not later

declare a forfeiture without first giving the other party (i) *specific* notice of its intent to insist on

strict compliance and (ii) a reasonable time to cure.  <u>McBride v. Griffith</u>, 134 Ind. App. 12, 16

(1962) ("[A]n indulgent vendor, who consistently fails to require of the vendee compliance with

the contractual provisions existing between himself and the vendee, thereby waives the provisions

of the contract . . . and casts upon him the duty to give definite and specific notice to the buyer that he will be indulgent no longer . . . ."); <u>Nelson v. Butcher</u>, 170 Ind. App. 101, 106 (1976) ("[a] vendor may waive strict compliance with the provisions of the contract by accepting overdue or irregular payments, and having so done, equity requires the vendor give specific notice of his intent that he will no longer be indulgent and that he will insist on his right of forfeiture unless the default is paid within a reasonable and specified time."); <u>Nassau Trust Co. v. Montrose Concrete Prods. Corp.</u>, 436 N.E.2d 1265, 1270 (N.Y. 1982) ("A waiver . . . can, to the extent that it is executory, be withdrawn, provided the party whose performance has been waived is given notice of withdrawal and a reasonable time after notice within which to perform."). Simon's failure to take these necessary steps renders its purported terminations invalid.

34. At bottom, Simon is asking for something it failed to bargain for *ex ante* and which departs from the parties' decades-long course of dealing—leases with no right of cure. Because the Global Debtors were well within the cure periods provided for by the underlying leases, Simon is mistaken that it had any right to issue the termination notices received on January 8 and 9, 2026. Instead, Simon needed to wait for the Global Debtors to fail to exercise their right of cure prior to terminating on ten days' notice (rather than whatever potentially more onerous termination steps Simon would have had to take under the operative lease). For this reason, whether the Global Debtors owed any amounts or not, this Court should reject Simon's argument that the leases were terminated prepetition. Instead, the leases remain active parts of the Global Debtors' estates.

## II.   Simon Has Not Proven Any Amounts Were Due

35. Even setting aside the legal defects in Simon's theory, Simon has not carried its evidentiary burden. As the party claiming that Global Debtors failed to perform, Simon bears the burden of proof. <u>See</u> <u>Sapp v. Flagstar Bank, FSB</u>, 12 N.E. 3d 913, 927 (Ind. Ct. App. 2014) (holding that the party asserting a breach bears the burden of proof by a preponderance of the

evidence). That means Simon must show, for each lease it relies on: (a) what the lease requires for the category of Additional Rent at issue, (b) when the required documentation was presented, (c) when the payment window closed, and (d) whether any cure period had run. Simon has not done so. Its notices lump together ledger entries across dozens of properties without supplying the underlying charges, the dates when invoices and backup were presented, or whether any cure period had expired.

36.     The Global Debtors, for their part, dispute that any amounts were due and owing as of the termination notices. Many charges had not yet been invoiced with the required documentation; others were still within their payment windows; others were subject to open backup requests or ongoing reconciliation. Additionally, the Global Debtors had remitted payment on all Base Rent on time or prior to the expiration of any cure period. The Global Debtors made substantial payments on January 9, 2026, which Simon acknowledged. Where amounts remain in dispute, the Global Debtors are reconciling them as the parties have done for decades—and the Global Debtors cannot pay unverified or disputed charges consistent with their fiduciary duties.

## III.   Cause Does Not Exist to Lift the Automatic Stay

37.     In the alternative, Simon asks the Court to provide it stay relief to pursue state law remedies. The Court should decline the invitation. Stay relief requires a fact-intensive, case-by-case determination of whether such relief should be granted. In re Mosher, 578 B.R. 765, 772 (Bankr. S.D. Tex. 2017). The automatic stay is a fundamental debtor protection. See In re Fowler, 259 B.R. 856, 858. (Bankr. S.D. Tex. 2001) It is also a fundamental creditor protection that "protects creditors by preventing particular creditors from acting unilaterally in self-interest[.]" Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1204 (3d Cir. 1991). Accordingly, a party seeking stay relief bears a significant burden to show why both debtor and creditor interests must yield to one creditor's parochial request.

38.     Here, Simon argues that the Global Debtors have at most a holdover tenancy. However, and as discussed above, the fact that the Global Debtors had not exhausted the cure periods of the underlying leases—and that, even if they had, Simon has not proven any delinquency on the Global Debtors' part—conferred upon the Global Debtors a leasehold interest, which is property of the estate.  See 11 U.S.C. § 541; In re Farb Invs. Ints. Ltd., 155 B.R. 442, 445 (Bankr. S.D. Tex. 1993) (stating that leasehold interests are property of the estate.).[11]

39.     Courts considering whether cause exist often consider "interference with the bankruptcy, good or bad faith of the debtor, injury to the debtor and other creditors if the stay is modified, injury to the movant if the stay is not modified, and the proportionality of the harms from modifying or continuing the stay." In re Mosher, 578 B.R. at 772 (quoting In re Bovino, 496 B.R. 492, 502 (Bankr. N.D. Ill. 2013)) (internal citations omitted).

40.     ***Interference with the Bankruptcy***:  Stay relief of the kind Simon seeks is likely to be materially disruptive to the Global Debtors and these chapter 11 cases.  The Global Debtors are working to reorganize around their valuable assets to ensure a viable go-forward Saks.  Here, one Lease, the Stanford Lease, represents a highly profitable location which generates millions of dollars annually for the estates.  Weinsten Decl., ¶ 13.  Loss of a trophy property like this would adversely impact revenue, cause significant customer confusion, and harm goodwill at a time when

---

[11]     A debtors' possessory interests in a lease are sufficient for application of the automatic stay.  See, e.g., PHI Health, LLC v. WFAS, Inc., No. 7:20-CV-00196, 2021 WL 4150875, at *8 (S.D. Tex. June 1, 2021) ("The automatic bankruptcy stay is "extremely broad" and extends even to items in which the debtor has a solely possessory interest." (quoting In re Burns, 503 B.R. 666, 673 (Bankr. S.D. Miss. 2013) (collecting cases)); In re Wilson, 610 B.R. 255, 275 (Bankr. N.D. Tex. 2019) ("A debtor's possessory interest in real property, including a leasehold interest, constitutes property of the debtor's bankruptcy estate subject to the protections of the automatic stay.") Moreover, contrary to Simon's assertions, neither sections 541(b)(2) nor section 362(b)(10) operate to exclude from the protection of the automatic stay leases that have expired by means other than expiration of the lease term.  In re Ind. Hotel Equities, LLC, 586 B.R. 870, 878 (Bankr. E.D. Mich. 2018); accord 3 Collier on Bankruptcy ¶ 362.05 ("[T]his exception is limited to leases under which the stated term expires, not to leases terminated for other reasons."); Robinson v. Chicago Housing Auth., 54 F.3d 316, 318 (7th Cir. 1995) (observing that leases may expire or terminate for a number of reasons, and that the section 362(b)(10) stay exception applies only when leases expire "in a particular way," when "the stated term of the lease has run")

the Global Debtors most need to maintain lucrative locations and manage customer sentiment. Id. Additionally, while the location at the Woodbury Lease is closing, the Global Debtors can monetize the Woodbury Lease by repurposing it, subletting it, or assigning it. Id. Granting Simon's Lift Stay Motion would harm both company revenue and consumer trust, and would substantially impair the Global Debtors' ability to successfully prosecute these chapter 11 cases.

41. **_The Good or Bad Faith of the Debtor_**: No party has alleged that the Global Debtors have conducted themselves in bad faith. This factor is not applicable to this dispute.

42. **_Injury to the Debtor_**: The Global Debtors are working around the clock to reduce their debt load, rationalize their store footprint, and monetize their leasehold assets. As discussed in the "Interference with the Bankruptcy" analysis, the Global Debtors would be severely harmed if the Court grants Simon's requested stay relief. They will lose the Stanford Lease, which generates a high degree of revenue for the Global Debtors. Id. Moreover, granting Simon's Lift Stay Motion would harm consumer relationships as a result of the closure of this important location, deprive the estates of the ability to monetize the Woodbury Lease, and deprive the Global Debtors of their bargained-for rights under the Leases. Id.

43. **_Injury to Simon_**: Conversely, Simon is unlikely to face real hardship. Simon argues that it will be harmed by the inability to pursue more lucrative tenants. But that is the baseline reality of the deal they struck with the Global Debtors.

44. **_Balancing of Harms_**: When weighing the balance of harms, the Court has, on the one hand, a retail chapter 11 debtor facing immediate eviction from important, valuable locations and, on the other hand, a real estate investment trust who now believes it can charge a new tenant higher rent. In truth, the only harm Simon is being forced to bear is abiding by the cure periods in its own leases, while the Global Debtors would face a cascade of harms were the stay to be lifted.

45.     Because the Global Debtors would face severe harms while Simon is merely being asked to uphold its end of the bargain, these chapter 11 cases would be meaningfully disrupted, and because good faith is not at issue, there is no cause shown to lift the automatic stay.

## IV.     Simon's Own Breach of the Letter Agreement

46.     Simon asks the Court for two forms of equitable relief: (a) a declaratory judgment or (b) relief from the automatic stay.  It seeks this relief on the basis of a flawed reading of the Letter Agreement.  However, as a party to the Letter Agreement, Simon is bound to keep it and its terms confidential.  Simon is aware of its confidentiality obligation.  The Global Debtors understand that confidentiality of the Letter Agreement is of high importance to Simon, particularly because the Global Debtors have not been permitted to share the Letter Agreement with their lenders, even if subject to a protective order.  It is hard to square this use of confidentiality as a shield when Simon's leadership has separately described key terms of the Letter Agreement publicly.[12]  The Global Debtors expressly reserve all rights with respect to their damages from unauthorized disclosure of this kind.  Courts have denied stay relief on the basis of a party's unclean hands in seeking relief.  See In re Leeds, 589 B.R 186, 202 (Bankr. D. Nev. 2018) (denying stay relief where movant had unclean hands due to fiduciary duty breach).  The Global Debtors believe Simon's apparent effort to manufacture a termination under the Letter Agreement by ignoring applicable cure periods and departing dramatically from the parties' course of conduct—coupled with Simon's own willingness to breach confidentiality—suggests that Simon is using the Letter Agreement as leverage to gain an advantage to which it is not entitled.  For that reason alone, Simon's request for declaratory relief or to lift the stay should be denied.

---

[12]     Linda Moss, Landlord Simon Property Expects to Hike Rents at Former Saks Off 5th Stores.

## ALTERNATIVE RELIEF:  PROPOSED CASE SCHEDULE

47.     As explained above, the Court should deny the Lift Stay Motion because Simon's claims fail under the clear contractual language, because Simon has not met its evidentiary burden, because there is not cause to lift the automatic stay, and because Simon has unclean hands.  If, however, the Court decides not to deny the Lift Stay Motion outright, the Global Debtors respectfully request that it establish a schedule for targeted fact-finding before ruling on the merits.

48.     Specifically, if the contract language does not resolve Simon's claims, it will be necessary to examine the parties' course of conduct to determine whether Simon's termination was an unjustified departure from the parties' prior dealings.  Moreover, determining whether there has been a default under the Leases would require a lease-by-lease analysis of Additional Rent items across dozens of properties.  This is not a dispute about fixed Base Rent.  It is a dispute about taxes, CAM reconciliations, percentage rent, and insurance—charges that, over the course of the parties' decades-long relationship, were routinely subject to documentation requests, back-and-forth, and reconciliation before payment.  To determine whether any obligation in the Leases had matured and remained uncured as of January 8, 2026, the Court would need to examine, for each lease Simon relies on:  the governing lease terms for the category of Additional Rent at issue; the dates on which required documentation was presented; when any payment window closed; and whether any cure period had run.

49.     Simon has not made this showing.  Its notices aggregate ledger entries across the portfolio without supplying the underlying leases, the presentation dates for invoices and backup, or the cure-period status for any specific charge.  Before the Lift Stay Motion can be granted, the Global Debtors should have the opportunity to test Simon's assertions through discovery.

50.     As a result, if the Court declines to reject Simon's motion at the threshold, the Global Debtors respectfully request that the Court enter the following schedule to allow for the necessary discovery and a full hearing on the merits:

- **<u>Discovery Period</u>**: 60 days from entry of a scheduling order.

- **<u>Supplemental Briefing</u>**: Due two weeks after the close of discovery.

- **<u>Evidentiary Hearing</u>**: At the court's convenience following the submission of supplemental briefs.

51.     This focused schedule would allow the Court to resolve the disputed factual questions efficiently while preserving the Global Debtors' rights and the integrity of these chapter 11 cases.

<u>**CONCLUSION**</u>

52.     Simon has sought extraordinary relief that it is not entitled to. For that reason, the Lift Stay Motion should be denied. First, because the Letter Agreement did not displace the cure provisions of the underlying leases, the Global Debtors have valid leasehold interests and their rights under the leases are property of the estate. Second, the Global Debtors do not even believe that the amounts Simon asserts are owed. Third, the balancing of harms weighs strongly in the Global Debtors' favor and the stay should not be lifted.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Global Debtors request that the Court deny the relief sought by Simon in the Lift Stay Motion and, in the alternative, enter an order providing for a discovery schedule as set forth herein.

Houston, Texas
Dated: February 16, 2026

/s/ Kelli Stephenson Norfleet
**HAYNES AND BOONE, LLP**
Kelli Stephenson Norfleet (TX Bar No. 24070678)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney P. Lyda (TX Bar No. 24013330)
David Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone:  (713) 547 2000
Facsimile:  (713) 547 2600
Email:      kelli.norfleet@haynesboone.com
            kenric.kattner@haynesboone.com
            arsalan.muhammad@haynesboone.com
            kourtney.lyda@haynesboone.com
            david.trausch@haynesboone.com

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Robin Spigel (admitted *pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
Betsy L. Feldman (admitted *pro hac vice*)
Jessica D. Graber (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Email:      dsinclair@willkie.com
            rspigel@willkie.com
            absmith@willkie.com
            bfeldman@willkie.com
            jgraber@willkie.com

-and-

Jennifer J. Hardy (TX Bar No. 24096068)
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Facsimile:  (713) 510-1799
Email:      jhardy2@willkie.com

-and-

Ryan Blaine Bennett (admitted *pro hac vice*)
300 North LaSalle Drive
Chicago, IL 60654
Telephone:  (312) 728-9123
Facsimile:  (312) 728-9199
Email:      rbennett@willkie.com

*Proposed Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

*Proposed Co-Counsel to the Global Debtors*
*and Debtors in Possession*

### **Certificate of Service**

I certify that on the date hereof, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' claims agent.

/s/ *Kelli Stephenson Norfleet*
Kelli Stephenson Norfleet