United States Bankruptcy Court
Southern District of Texas

**ENTERED**

February 20, 2026

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1] | Case No. 26-90103 (ARP) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 49, 206** |

### FINAL ORDER (I) AUTHORIZING THE GLOBAL DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "***DIP Motion***")[2] of the Global Debtors in the above-captioned chapter 11 cases (collectively, the "***Chapter 11 Cases***") pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as amended (the "***Bankruptcy Code***") and rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and rules 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules (the "***Local Rules***") for the United States Bankruptcy Court for the Southern District of Texas (this "***Court***") and the Procedures for Complex Cases in the

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Saks.  The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281.  Bradley Arant Boult Cummings LLP is proposed counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively, the "SO5 Digital Debtors").  Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are proposed counsel for the remaining Debtors (collectively, the "Global Debtors").

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in **Annex 1**, the DIP Motion or the DIP Documents, as applicable.

Southern District of Texas seeking entry of an interim order (the "**Interim Order**")[3] and a final order (this "**Final Order**" and together with the Interim Order, the "**DIP Orders**", and the period between entry of the Interim Order and this Final Order, the "**Interim Period**"), granting the relief provided herein, including among other things:

(i)    Authorization and approval for certain of the Global Debtors to obtain postpetition superpriority senior secured, asset-based debtor-in-possession financing and other financial accommodations (the "**ABL DIP Facility**"), consisting of a senior secured superpriority revolving credit facility in the aggregate principal amount of **$1,500,000,000** (excluding fees, premiums and other amounts payable-in-kind) (the "**ABL DIP Commitments**", and the loans made pursuant thereto, the "**ABL DIP Loans**"), pursuant to and in accordance with the terms and conditions set forth in that certain *Senior Secured, Super-Priority Debtor-in-Possession ABL Credit Agreement*, by and among Debtor Saks Global Enterprises LLC and the other Debtors identified as co-borrowers thereunder (collectively, the "**ABL DIP Borrower**"), the other Debtors identified as guarantors of the ABL DIP Obligations in the ABL DIP Documents (each an "**ABL DIP Guarantor**" and, together with the ABL DIP Borrower, the "**ABL DIP Loan Parties**"), the lenders party thereto (collectively, the "**ABL DIP Lenders**") and Bank of America, N.A., in its capacity as administrative agent and collateral agent (in such capacities, the "**ABL DIP Agent**" and, together with the ABL DIP Lenders, the "**ABL DIP Secured Parties**"), substantially in the form attached to the Interim Order as **Exhibit A** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "**ABL DIP Credit Agreement**"), allocated and made available to the ABL DIP Borrower as follows:

    (a) upon entry of the Interim Order, subject to the terms and conditions set forth in the ABL DIP Credit Agreement, the other ABL DIP Documents, and the Interim Order, the ABL DIP Commitments were made available to the ABL DIP Borrower to draw upon; and

    (b) (1) upon entry of the Interim Order, subject to the terms and conditions set forth in the ABL DIP Credit Agreement and other ABL DIP Documents, the repayment and refinancing of (x) the outstanding amount of all Prepetition ABL Secured Obligations, other than Prepetition ABL Revolving Loans, (y) all Prepetition ABL Secured Obligations related to Prepetition ABL Letters of Credit in the approximate amount of **$56,570,000**, and (z) the Prepetition ABL Revolving Loans via the Creeping Roll-Up (as defined below); and, (2) upon entry of this Final Order, subject to the terms and conditions set forth in the ABL DIP Credit Agreement and the other ABL DIP Documents, an extension of ABL DIP Loans to replace and

---

[3]   *Interim Order (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 206].

refinance any remaining outstanding Prepetition ABL Secured Obligations (all amounts so repaid and refinanced, the "***ABL Roll-Up DIP Loans***");

(ii)   Authorization and approval for certain of the Global Debtors to obtain up to **$2,559,128,755.07** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan financing and other financial accommodations (the "***SGUS DIP Facility***"), consisting of (a) **$1,000,000,000** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money "first-out" (first in right of payment) term loans (the "***SGUS First Out DIP Loans***"), (b) up to **$808,128,755.07** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of "second-out" term loans, which shall be immediately junior in right of payment to the SGUS First Out DIP Loans (the "***SGUS Second Out DIP Loans***"), which shall be used to replace and refinance, on a dollar-for-dollar, cashless basis, Prepetition SGUS Notes issued under the Prepetition SGUS Notes Indenture and held by certain SGUS DIP Lenders that are participating in the SGUS DIP Facility, and (c) up to **$751,000,000** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of "third-out" term loans, which shall be immediately junior in right of payment to the SGUS Second Out DIP Loans (the "***SGUS Third Out DIP Loans***" and, together with the SGUS First Out DIP Loans and the SGUS Second Out DIP Loans, the "***SGUS DIP Loans***"), which were used to fund Prepetition OpCo Second Out Notes Participations (as defined below), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Debtor-in-Possession Term Loan Credit Agreement*, by and among Debtor SGUS LLC (the "***SGUS DIP Borrower***"), the other Debtors identified as guarantors of the SGUS DIP Obligations in the SGUS DIP Documents (each, an "***SGUS DIP Guarantor***", and the SGUS DIP Guarantors, together with the SGUS DIP Borrower, the "***SGUS DIP Loan Parties***"), the lenders party thereto (collectively, the "***SGUS DIP Lenders***")[4] and U.S. Bank Trust Company, National Association, in its capacity as administrative agent and collateral agent (in such capacities, the "***SGUS DIP Agent***" and, together with the SGUS DIP Lenders, the "***SGUS DIP Secured Parties***"), substantially in the form attached to the Interim Order as <u>**Exhibit B**</u> (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "***SGUS DIP Credit Agreement***" and the funding commitments thereunder, the "***SGUS DIP Commitments***"), allocated and made available to the SGUS DIP Borrower as follows:

(a)   upon entry of the Interim Order, subject to the terms and conditions set forth in the SGUS DIP Credit Agreement, the other SGUS DIP Documents, and the Interim Order, (1) **$400,000,000** of SGUS First Out DIP Loans and (2) **$359,000,000** of SGUS Second Out DIP Loans to replace and refinance, on a dollar-for-dollar,

---

[4]   So long as the Fronting Lender is a holder of SGUS DIP Loans or a SGUS DIP Commitment, the Fronting Lender shall be included in the definitions of SGUS DIP Lenders and SGUS DIP Secured Parties (as applicable). For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Fronting Lender, by acting in such capacity, does not make any commitments, undertake any obligations.  or waive any rights, including whether to take or not take any action or to exercise or seek to exercise any rights or remedies, in each case solely in connection with any other claims or interests it may hold against any of the Global Debtors, and other than as set forth herein with respect to the SGUS DIP Facilities as set forth in the DIP Documents.

cashless basis, **$359,000,000** of Prepetition SGUS Notes, and (3) up to **$751,000,000** of SGUS Third Out DIP Loans to consummate Prepetition OpCo Second Out Notes Participations were in each case made available during the Interim Period to the SGUS DIP Borrower, which SGUS First Out DIP Loans were provided and funded, in whole or in part, through the Fronting Lender in accordance with the terms of the SGUS DIP Credit Agreement, and subsequently assigned to certain holders of the Prepetition SGUS Notes and/or their respective affiliates; and

(b) upon entry of this Final Order, subject to the terms and conditions set forth in the SGUS DIP Credit Agreement, the other SGUS DIP Documents, and this Final Order, (1) $**600,000,000** of SGUS First Out DIP Loans and (2) up to $**449,128,755.07** of SGUS Second Out DIP Loans to replace and refinance, on a dollar-for-dollar, cashless basis, up to $**449,128,755.07** of Prepetition SGUS Notes;

(iii)   Authorization and approval for certain of the Global Debtors to obtain up to $**1,752,465,541** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of postpetition superpriority senior secured, multi-draw, delayed draw debtor-in-possession term loan financing and other financial accommodations (the "***OpCo DIP Facility***"), consisting of (a) up to $**1,000,000,000** (excluding fees, premiums and other amounts payable-in-kind) in principal amount of new money term loans (the "***OpCo New Money DIP Loans***"), and (b) $**752,465,541** in principal amount of term loans to replace and refinance, on a dollar-for-dollar, cashless basis Prepetition FILO Loans under the Prepetition FILO Credit Agreement and Prepetition NPC Loans under the Prepetition NPC Credit Agreement (the "***OpCo Roll-Up DIP Loans***" and, together with the OpCo New Money DIP Loans, the "***OpCo DIP Loans***"), in each case pursuant to and in accordance with the terms and conditions set forth in that certain *Debtor-in-Possession Term Loan Credit Agreement*, by and among Debtor Saks Global Enterprises LLC (the "***OpCo DIP Borrower***"), the other Debtors identified as guarantors of the OpCo DIP Obligations in the OpCo DIP Documents (the "***OpCo DIP Guarantors***" and, together with the OpCo DIP Borrower, the "***OpCo DIP Loan Parties***"), the lenders party thereto (collectively, the "***OpCo DIP Lenders***"), and U.S. Bank Trust Company, National Association, in its capacity as administrative agent and collateral agent (in such capacities, the "***OpCo DIP Agent***" and, together with the OpCo DIP Lenders, the "***OpCo DIP Secured Parties***"), substantially in the form attached to the Interim Order as **Exhibit C** (as it may be amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time, the "***OpCo DIP Credit Agreement***" and the funding commitments thereunder, the "***OpCo DIP Commitments***"), allocated and made available to the OpCo DIP Borrower as follows:

(a)   upon entry of the Interim Order, subject to the terms and conditions set forth in the OpCo DIP Credit Agreement, the other OpCo DIP Documents, and the Interim Order, $**400,000,000** of OpCo New Money DIP Loans and $**793,051,617.32** of OpCo Roll-Up DIP Loans to replace and refinance, on a dollar-for-dollar, cashless basis, $**395,000,000** in principal amount of Prepetition FILO Loans under the Prepetition FILO Credit Agreement and $**23,656,111.11** of accrued interest on such Prepetition FILO Loans and $**357,465,541** in principal amount of Prepetition NPC Loans under the Prepetition NPC Credit Agreement and $**16,929,965.21** of accrued

4

interest on such Prepetition NPC Loans were made available during the Interim Period to the OpCo DIP Borrower;

(b) upon entry of the Interim Order, subject to the terms and conditions of an assignment and acceptance agreement, the issuance of a call option by SGUS DIP Borrower to the SGUS DIP Lenders for the outstanding portions of the Prepetition FILO Loans and Prepetition NPC Loans not rolled up in connection with such replacement and refinancing; and

(c) upon entry of this Final Order, subject to the terms and conditions set forth in the OpCo DIP Credit Agreement, the other OpCo DIP Documents, and this Final Order, **$600,000,000** of OpCo New Money DIP Loans shall be made available to the OpCo DIP Borrower;

(iv) Authorization for the Global Debtors to use the proceeds of the DIP Facilities in accordance with the terms of the DIP Orders and the DIP Documents, subject to the Approved Budget (as defined herein);

(v) Approval of and authorization for the Global Debtors to (a) enter into, execute, and perform under the DIP Documents and (b) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Documents and the DIP Orders (including any and all documents related to the fronting or seasoning of the SGUS DIP Loans by the Fronting Lender);

(vi) Subject to the Carve Out (as defined below), granting to each of the ABL Agent, the SGUS Agent, and the OpCo DIP Agent (each individually, a "***DIP Agent***", and collectively, the "***DIP Agents***"), for itself and on behalf of the applicable DIP Secured Parties, valid, enforceable, nonavoidable, automatically perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code), junior to the Carve Out, in and upon all of the DIP Collateral held by the DIP Loan Parties to secure the DIP Obligations as provided by and more fully defined in the DIP Documents, which liens shall be secured by the applicable DIP Collateral and have the priorities set forth in **Annex 3** and in accordance with the DIP Intercreditor Agreement and the Prepetition Intercreditor Agreements;

(vii) Subject to the Carve Out, granting to each DIP Agent, for itself and on behalf of the applicable DIP Secured Parties, allowed superpriority administrative expense claim status (junior to the Carve Out) for the applicable DIP Obligations in each of the Chapter 11 Cases of the applicable DIP Borrowers and each applicable Debtor Guarantor and any of their Successor Cases (as defined herein), pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the terms of the DIP Orders, which allowed superpriority administrative expense claims shall have the priorities set forth in **Annex 3** and in accordance with the DIP Intercreditor Agreement and the Prepetition Intercreditor Agreements;

(viii) Approving the application of the proceeds of all of the DIP Collateral in the manner and on the terms set forth in the DIP Orders, the DIP Documents, the DIP Intercreditor Agreement and the Prepetition Intercreditor Agreements;

(ix)    Authorizing the Global Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Commitment Fee, L/C Participation Fees, Issuing Bank Fees, the Upfront Fee, and the Administrative Agent Fees (as defined in the ABL DIP Documents) (the "***ABL DIP Premiums***"), the Backstop Premium, the Structuring Premium, and the Commitment Premium (as defined in the SGUS DIP Documents) (the "***SGUS DIP Premiums***") and the Backstop Premium, the Structuring Premium, and the Commitment Premium (as defined in the OpCo DIP Documents) (the "***OpCo DIP Premiums***" and, together with the ABL DIP Premiums and SGUS DIP Premiums, the "***DIP Premiums***"), and all other commitment fees, closing fees, exit fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, and the reasonable and documented fees and disbursements of the applicable DIP Agent's and the applicable DIP Lenders' (including the Fronting Lender's) attorneys, financial advisors, accountants, consultants, and other advisors, including the DIP Advisors and the ABL DIP Advisors, all to the extent provided in, and in accordance with, the applicable DIP Documents;

(x)    Authorizing the Global Debtors to use the Prepetition Collateral, including the Cash Collateral of the Prepetition Secured Parties under the Prepetition Documents, and providing adequate protection to the Prepetition Secured Parties for, among other things, any diminution in value of their respective interests in the Prepetition Collateral ("***Diminution in Value***");

(xi)    With respect to the DIP Collateral and the Prepetition Collateral, in each case, except to the extent of the Carve Out, authorizing the Global Debtors to waive (x) any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (y) the equitable doctrine of marshaling and other similar doctrines, and (z) the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xii)    Approving certain stipulation and releases by the Global Debtors with respect to the Prepetition Documents, the Prepetition Collateral, and the Prepetition Secured Obligations, as set forth herein;

(xiii)    Modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Final Order and waiving the 14-day stay provisions of Bankruptcy Rule 4001(a)(4);

(xiv)    Finding that the notice requirements of Bankruptcy Rule 6004(a) have been satisfied, waiving any applicable stay (including under Bankruptcy Rule 6004), and providing for immediate effectiveness of this Final Order;

(xv)    Reaffirming, as of the Interim Order Effective Date, the approval of the DIP Syndication Materials (as defined herein), substantially in the form attached to the Interim Order as **Exhibit D**; and

(xvi) Reaffirming, as of the Interim Order Effective Date, the approval of the engagement of and payment to Epiq Corporate Restructuring, LLC as DIP Financing Agent (as defined below) on the terms set forth herein.

Notice of the DIP Motion and the Final Hearing (as defined herein) ("***Notice***") having been served by the Debtors in accordance with Bankruptcy Rule 4001(c) on: (a) the U.S. Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Porter Hedges LLP, co-counsel to the SGUS DIP Lenders and the Ad Hoc Group; (d) Seward & Kissel LLP, as counsel to the SGUS DIP Agent and the OpCo DIP Agent; (e) Morgan Lewis and Bockius LLP, Otterbourg P.C., and Norton Rose Fulbright US LLP, co-counsel to the ABL DIP Agent and the Prepetition ABL Agent; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "***Notice Parties***"), and this Court finding that in light of the nature of the relief requested, no other or further notice is required.

This Court having considered the relief requested in the DIP Motion for the Interim Period, the First Day Declaration, the DIP Declarations, and the arguments of counsel made at the interim hearing (the "***Interim Hearing***") and the final hearing (the "***Final Hearing***") on the DIP Motion; the Interim Hearing and the Final Hearing having been held by this Court and concluded; this Court having entered the Interim Order on January 15, 2026; all objections and reservations of rights, if any, to the relief requested in the DIP Motion on a final basis having been withdrawn, resolved, or overruled by this Court; it appearing that approval of the relief requested in the DIP Motion on a final basis is fair and reasonable and in the best interests of the Global Debtors and their Estates; it appearing that the Global Debtors' entry into and performance under the DIP Documents and the other transactions contemplated by the DIP Orders is a sound and prudent

exercise of the Global Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[5]**

A.     <u>Disposition</u>.  The relief requested in the DIP Motion is **GRANTED** on a final basis in accordance with the terms of this Final Order.  Any objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.  This Final Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.     <u>Petition Date</u>.  On January 13, 2026 (the "***Petition Date***") and January 14, 2026 each of the Global Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

C.     <u>Debtors in Possession</u>.  The Debtors[6] continue to operate and manage their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On January 27, 2026, an official committee of unsecured creditors was appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code [Docket No. 480] (the "***Committee***").  No trustee or examiner has been appointed in the Chapter 11 Cases.

D.     <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, the DIP Motion, the DIP Orders, and the parties and property affected hereby pursuant to 28 U.S.C. §

---

[5]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[6]    For the avoidance of doubt, "Debtors" means, collectively, the Global Debtors and the SO5 Digital Debtors.

1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012. This Court's consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b). The Global Debtors confirm their consent to this Court's entry of a final order in connection with the DIP Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of the Chapter 11 Cases and the DIP Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and procedural bases for the relief sought in the DIP Motion and granted in this Final Order are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-1, 4002-1, and 9013-1.

E.     <u>Notice</u>. Upon the record presented to this Court at the Interim Hearing and the Final Hearing, and under the exigent circumstances set forth therein and in the DIP Motion, the First Day Declaration and the DIP Declarations, notice of the DIP Motion and the relief requested thereby and granted in this Final Order has been provided in accordance with Bankruptcy Rules 2002, 4001(b), and 4001(c)(1) and Local Rules 2002-1, 4001-1, 4002-1, and 9013-1, which notice was appropriate under the circumstances and sufficient for entry of this Final Order. No other or further notice of the DIP Motion is required for entry of this Final Order. The relief granted herein on a final basis is necessary to preserve the value of the Global Debtors and their Estates.

F.     <u>Global Debtors' Stipulations and Releases</u>. Subject to, and without prejudice to the rights of other parties in interest, including the Committee, as set forth in, paragraph 18 of this Final Order, and after consultation with their attorneys and financial advisors, and in exchange for and as a material inducement to the Prepetition Secured Parties (as defined below) to agree to

consent to access to the cash collateral, and subordination of the Prepetition Liens to the Carve Out and DIP Liens (each as defined below), the Global Debtors, on their behalf and on behalf of their Estates, under the Interim Order, as reaffirmed in this Final Order, admitted, stipulated, acknowledged, and agreed to the statements set forth in **Annex 2** hereto and the granting of the releases of the Prepetition Secured Parties set forth in paragraph 21 (collectively, the "***Global Debtors' Stipulations and Releases***"); *provided* that, notwithstanding anything to the contrary herein, the binding effect of the Global Debtors' Stipulations and Releases (and all other admissions, agreements, findings, and releases with respect to the Prepetition Secured Parties that are contained in this Final Order) on the Global Debtors' Estates shall be subject to Challenge and the Challenge Period, any party in interest with requisite standing bringing forth a timely Successful Challenge, and this Court fashioning an appropriate remedy following a party in interest bringing forth a timely Successful Challenge.

G. <u>No Control</u>.  None of the DIP Secured Parties or the Prepetition Secured Parties control (or have in the past controlled) any of the Global Debtors or their properties or operations, have authority to determine the manner in which any of the Global Debtors' operations are conducted or are control persons or insiders of any of the Global Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from any of the DIP Documents or the Prepetition Documents; *provided* that, notwithstanding anything to the contrary herein, the findings contained in this paragraph with respect to the Prepetition Secured Parties shall not limit the rights of parties in interest (including the Committee) with requisite standing to assert

claims against the Prepetition Secured Parties on behalf of the Global Debtors' Estates pursuant and subject to paragraph 18 of this Final Order.[7]

      H.    <u>Findings Regarding the DIP Facility</u>.

      (1)    *Request for DIP Financing*.  The Global Debtors have requested that the DIP Lenders extend loans, advances, and other financial accommodations, as applicable, and the DIP Lenders are only willing to do so as more particularly described, and subject to the terms and conditions set forth in the DIP Orders and the applicable DIP Documents.

      (2)    *Need for DIP Financing*.  As set forth in the DIP Declarations and the First Day Declaration, the Global Debtors do not have sufficient available sources of working capital to operate their business in the ordinary course without the DIP Facilities, or to fund the Chapter 11 Cases without access to the proceeds of the DIP Facilities, all on the terms set forth in the DIP Documents and the DIP Orders.  The Global Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and to otherwise fund their operations is essential to the viability of the Global Debtors and the Chapter 11 Cases.  The ability of the Global Debtors to obtain sufficient working capital and liquidity through the proposed DIP Facilities on the terms set forth in the DIP Documents and the DIP Orders is vital to the preservation and maximization of the value of the Global Debtors' business pending consummation of a restructuring transaction.  Accordingly, the Global Debtors have an immediate need to obtain funds from each of the DIP Facilities for the purposes and on the terms and subject to the limitations set forth herein and in the applicable DIP Documents, including the Approved Budget, in order to, among other things: (a) maintain business relationships, including with

---

[7]    Nothing in the DIP Orders vests or confers on any person (as defined in the Bankruptcy Code), including the Committee, standing or authority to pursue any claim or cause of action belonging to the Global Debtors or their Estates, including, without limitation, any Challenges.

wholesale merchandise vendors, and holders of valid and perfected security interests in the Consignment Inventory and Concession Merchandise (each as defined below); (b) permit the continued operation of their business; (c) pay the costs of administration of the Chapter 11 Cases and satisfy their other working capital and general corporate purposes; (d) minimize disruption of their business operations; and (e) manage and preserve the assets of the Global Debtors' Estates in order to maximize the value of such assets and the recoveries to creditors of the Estates.

(3)     *No Credit Available on More Favorable Terms*.   As stated in the DIP Declarations and the First Day Declaration, the Global Debtors are unable to procure financing or other financial accommodations on more favorable terms from sources other than from the DIP Lenders under the applicable DIP Documents and are unable to obtain satisfactory unsecured credit allowable under sections 364(a) or 364(b) and 503(b)(1) of the Bankruptcy Code as an administrative expense.   The Global Debtors also are unable to obtain secured credit for the purposes set forth in the DIP Documents on more favorable terms without the grant of liens on all or substantially all of the Global Debtors' assets pursuant to section 364(c) of the Bankruptcy Code and the terms of the DIP Orders.   In the Global Debtors' business judgment, the Global Debtors cannot procure the necessary financing on terms more favorable than the financing offered by the DIP Secured Parties pursuant to the applicable DIP Documents and the DIP Orders.

(4)     *Budget*.   Based upon the record presented to this Court by the Global Debtors, (a) the Global Debtors have prepared and delivered the Initial Budget, in the form attached to the Interim Order as **Exhibit F**, (b) the Initial Budget was prepared by the Global Debtors with the assistance of their professional advisors and management, and (c) the Initial Budget (as the same may be amended or extended solely as provided for herein) sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby.

The Initial Budget and any supplemental Approved Budget may be modified by the Global Debtors in accordance with the DIP Documents and this Final Order without further order of this Court. The Initial Budget has been thoroughly reviewed by the Global Debtors, their management, and their advisors, and the Global Debtors believe that the Initial Budget is reasonable under the circumstances. Each of the DIP Secured Parties are relying upon the Global Debtors' compliance with the Approved Budget, subject to such variances as permitted herein and in the applicable DIP Documents, in determining to enter into the applicable DIP Facility as provided for in the DIP Orders and the DIP Documents.

(5)    *Business Judgment and Good Faith Pursuant to Section 364(e).*  Based on the record before this Court, (a) the Global Debtors, the DIP Agents and the other DIP Secured Parties have negotiated at arm's length and in good faith regarding the terms of the DIP Orders, the DIP Credit Agreements, the other DIP Documents, and the DIP Facilities, (b) the terms of the DIP Credit Agreements, the other DIP Documents, the DIP Orders, and the DIP Facilities are fair and reasonable, reflect the Global Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration, (c) the interest, fees, costs, and expenses incurred by the Global Debtors in connection with the DIP Facilities, including, without limitation, the DIP Premiums, are fair, reasonable, and necessary, and (d) each of the DIP Facilities, the DIP Liens, the DIP Superpriority Claims, and the Prepetition OpCo Second Out Notes Participations (each as defined herein) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that either of the DIP Orders, or any provision thereof is vacated, reversed, or modified, on appeal or otherwise. Each of the DIP Secured Parties and the Prepetition Secured Parties has acted without negligence or violation of public policy or law in respect of all actions taken by them in connection with or related in any

way to negotiating, implementing, documenting, or obtaining requisite approvals of the Global Debtors' incurrence of the DIP Facilities and the use of Cash Collateral, including in respect of all of the terms of the DIP Orders, all documents related thereto, and all transactions contemplated by the foregoing.  Any credit extended under the terms of the DIP Orders shall be deemed to be extended in "good faith" (as that term is used in section 364(e) of the Bankruptcy Code) by the applicable DIP Secured Parties and their respective counsel, advisors, and consultants.

(6)   *Issuance of Roll-Up DIP Loans*.  As a condition to entry into each of the DIP Credit Agreements, the extension of credit under each of the DIP Facilities, and authorization to use the Cash Collateral of each of the Prepetition OpCo Secured Parties, the Global Debtors, each of the DIP Secured Parties, and each of the Prepetition OpCo Secured Parties has agreed that the Global Debtors shall repay, replace and/or refinance (a) as of the Interim Order Effective Date (i) the outstanding amount of all Prepetition ABL Secured Obligations, other than Prepetition ABL Revolving Loans outstanding immediately prior to the Petition Date, (ii) all Prepetition ABL Secured Obligations related to Prepetition ABL Letters of Credit, (iii) the gradual roll-up of all Prepetition ABL Revolving Loans into ABL DIP Obligations during the Interim Period by the ABL DIP Agent applying all ABL DIP Collateral proceeds received by the ABL DIP Agent during the Interim Period, first to the repayment of the Prepetition ABL Revolving Loans prior to the repayment of the ABL DIP Obligations in accordance with the terms of the ABL DIP Documents (the "***Creeping Roll-Up***"), (iv)  **$359,000,000** of the Prepetition SGUS Notes with the proceeds of **$359,000,000** of SGUS Second Out DIP Loans, and (v) **$395,000,000** in principal amount of the Prepetition FILO Loans and **$23,656,111.11** of accrued interest on such Prepetition FILO Loans with the proceeds of **$418,656,111.11** of OpCo Roll-Up DIP Loans (the "***Opco FILO Roll-Up DIP Loans***") and **$357,465,541** in principal amount of the Prepetition NPC Loans and

**$16,929,965.21** of accrued interest on such Prepetition NPC Loans with the proceeds of **$374,395,506.21** of OpCo Roll-Up DIP Loans (the "***Opco NPC Roll-Up DIP Loans***"), and (b) as of the entry of this Final Order, (i) any remaining outstanding Prepetition ABL Secured Obligations and (ii) up to **$449,128,755.07** of the Prepetition SGUS Notes with the proceeds of up to **$449,128,755.07** of SGUS Second Out DIP Loans, which in each case shall be exchanged, on a dollar-for-dollar and cashless basis, for the applicable Roll-Up DIP Loans in accordance with the applicable DIP Documents.   The issuance of the Roll-Up DIP Loans by the applicable DIP Borrowers reflects the Global Debtors' exercise of prudent business judgment consistent with their fiduciary duties.   Each of the Prepetition OpCo Secured Parties would not consent to the use of the Prepetition OpCo Collateral, including Cash Collateral or the subordination of the Prepetition OpCo Liens to the OpCo DIP Liens or the Carve Out, and each of the DIP Secured Parties would not be willing to provide the applicable DIP Facilities or extend credit to the Global Debtors thereunder without the repayment, replacement and/or refinancing of the (x) Prepetition ABL Loans through the issuance of the ABL Roll-Up DIP Loans, (y) Prepetition SGUS Notes through the issuance of the SGUS Second Out DIP Loans, and (z) Prepetition FILO Loans and Prepetition NPC Loans through the issuance of OpCo Roll-Up DIP Loans.   The issuance of the Roll-Up DIP Loans will benefit the Global Debtors and their Estates because it will enable the Global Debtors to obtain urgently needed financing critical to administering the Chapter 11 Cases and funding their operations, which financing would not otherwise be available.   Without limiting the rights of parties in interest (including the Committee) with requisite standing to assert claims against the Prepetition Secured Parties on behalf of the Global Debtors' Estates pursuant and subject to paragraph 18 of this Final Order, the issuance of the Roll-Up DIP Loans shall be final and irrevocable as to the Global Debtors.

(7)     *Consummation of the Prepetition OpCo Second Out Notes Participations*.
As a condition to entry into the SGUS DIP Credit Agreement and the OpCo DIP Credit Agreement, the extension of credit under the SGUS DIP Facility and the OpCo DIP Facility, and authorization to use the Cash Collateral of the Prepetition OpCo Secured Parties, the SGUS DIP Borrower and certain of the SGUS DIP Lenders agreed that, upon entry of the Interim Order, the SGUS DIP Borrower shall purchase up to **$751,000,000** of participation interests in the Prepetition OpCo Second Out Notes held by such SGUS DIP Lenders, in each case through the issuance of an equal amount of SGUS Third Out DIP Loans, which SGUS Third Out DIP Loans were used to purchase such participations at a price equal to 100% of the face amount of the Prepetition OpCo Second Out Notes in accordance with the applicable SGUS DIP Documents and the DIP Orders (the "***Prepetition OpCo Second Out Notes Participations***").  The use of SGUS Third Out DIP Loans to consummate the Prepetition OpCo Second Out Notes Participations reflects the Global Debtors' exercise of sound business judgment consistent with their fiduciary duties.  Each of the Prepetition OpCo Secured Parties would not consent to the use of the Prepetition OpCo Collateral, including Cash Collateral or the subordination of its Prepetition OpCo Liens to the DIP Liens or the Carve Out, and each of the DIP Secured Parties would not be willing to provide the applicable DIP Facilities or extend credit to the Global Debtors thereunder without the use of SGUS DIP Loans to consummate the Prepetition OpCo Second Out Notes Participations.  The consummation of the Prepetition OpCo Second Out Notes Participations in the amount of up to **$751,000,000** upon entry of the Interim Order benefited the Global Debtors and their Estates because it enabled the Global Debtors to obtain urgently needed financing critical to administering the Chapter 11 Cases and funding their operations, which financing would not otherwise be available.  Without limiting the rights of parties in interest (including the Committee) with requisite standing to assert claims

against the Prepetition Secured Parties on behalf of the Global Debtors' Estates pursuant and subject to paragraph 18 of this Final Order, the consummation of the Prepetition OpCo Second Out Notes Participations is final and irrevocable as to the Global Debtors upon entry of the Interim Order. As of the consummation of the Prepetition OpCo Second Out Notes Participations, (a) prior to the elevation of the participation interests, the holders of the Prepetition OpCo Second Out Notes subject to such transaction shall continue to hold and control the beneficial interests in such Prepetition OpCo Second Out Notes, including all rights to control the voting of such Prepetition OpCo Second Out Notes, and (b) the Prepetition OpCo Second Out Notes subject to such transaction shall continue to constitute valid, enforceable and allowed claims under section 502 of the Bankruptcy Code against the Prepetition OpCo Note Parties; *provided*, that the rights of the Committee to object to or otherwise challenge the voting of the Prepetition OpCo Second Out Notes subject to the Prepetition OpCo Second Out Notes Participation, solely in connection with confirmation of a chapter 11 plan, are expressly reserved and shall not be prejudiced by this Final Order.

(8)     *Adequate Protection*.  Each of the Prepetition Secured Parties is entitled, as of the Interim Order Effective Date, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, to the extent of any Diminution in Value thereof as set forth herein.

(9)     *Sections 506(c) and 552(b), and Marshaling*.  In light of the DIP Secured Parties' and the Prepetition Secured Parties' undertakings as set forth herein, as a condition to obtaining financing under the DIP Facility and the use of Cash Collateral, and as a material inducement to the DIP Secured Parties' agreement to provide the DIP Facility and the Prepetition

Secured Parties' consent to the use of Cash Collateral, (A) upon the entry of this Final Order, each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code *provided* that, any waiver by the Global Debtors or the Estates of their rights under section 506(c) of the Bankruptcy Code shall be subject to paragraph 19(a) herein, and (B) each of the DIP Secured Parties upon the entry of the Interim Order was entitled to (as reaffirmed herein), and each of the Prepetition Secured Parties upon the entry of this Final Order is entitled to, a waiver of (i) the "equities of the case" exception under section 552(b) of the Bankruptcy Code and (ii) subject to paragraph 20 herein, the equitable doctrine of "marshaling" or any other similar doctrine, with respect to any of the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations, as applicable, in each case, except to the extent of the Carve Out.

(10)     *No Responsible Person.*   The Global Debtors stipulate that in making the decision to finance the Global Debtors' continued business operations through the DIP Facilities and use of Cash Collateral, in administering any loans, in approving the Initial Budget, or in taking any actions permitted by the DIP Orders, the DIP Documents, or the Prepetition Documents, none of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, as applicable, shall be deemed to be in control of the operations of the Global Debtors or to be acting as a "responsible person," "owner or operator," or part of any "control group" with respect to any of the Global Debtors or the management of the Global Debtors or owe any fiduciary duty to the Global Debtors, their respective creditors, shareholders, or Estates; *provided* that, notwithstanding anything to the contrary herein, the findings contained in this paragraph with respect to the Prepetition Secured Parties shall not limit the rights of parties in interest (including the Committee) with requisite

standing to assert claims against the Prepetition Secured Parties on behalf of the Global Debtors' Estates pursuant and subject to paragraph 18 of this Final Order.

(11)    *Good Cause*.  Good and sufficient cause has been shown for the entry of the DIP Orders, and for authorizing the Global Debtors to obtain financing pursuant to each of the DIP Facilities.  The relief requested in the DIP Motion is necessary, essential, and appropriate, and is in the best interest of and will benefit the Global Debtors and their Estates, as its implementation will, among other things, provide the Global Debtors with the necessary liquidity to: (a) minimize disruption to the Global Debtors' efforts for the continued operations of their business; (b) preserve and maximize the value of the Global Debtors' Estates; and (c) avoid immediate and irreparable harm to the Global Debtors, their business, employees, and assets.

(12)    *No Obligation to Monitor*.  No DIP Secured Party shall have any obligation or responsibility to monitor any Global Debtor's use of any DIP Facility and each DIP Lender and each DIP Agent may rely upon each Global Debtor's representations that the extensions of credit under each DIP Facility requested at any time and the use thereof are in accordance with the requirements of the DIP Orders, the DIP Documents, and Bankruptcy Rule 4001(c)(2).

(13)    *Good Faith*.  Each of the DIP Secured Parties have acted in good faith regarding the DIP Facilities and the DIP Loan Parties' use of the DIP Collateral, including Cash Collateral, to fund the Chapter 11 Cases, the Global Debtors' Estates and the continued operation of the Global Debtors' businesses in connection with the terms of this Final Order, and each of the DIP Agents and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that either of the DIP Orders or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

(14)    *Immediate Entry.*  Good and sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and, to the extent applicable, 6004(h).  Absent the immediate grant by this Court of the relief set forth in this Final Order, including the authorization to incur the incremental DIP Loans, each Global Debtor's Estate will be immediately and irreparably harmed.  Consummation of each of the DIP Facilities and the Debtors' continued performance thereunder in accordance with the terms of the DIP Orders, the Approved Budget, and the DIP Documents is in the best interests of the Global Debtors' Estates and is consistent with the Global Debtors' exercise of their fiduciary duties.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before this Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**I.    Authorization and Terms of Financing.**

1.    <u>DIP Motion Granted on Final Basis</u>.  The relief sought in the DIP Motion is granted on a final basis as provided herein, and the financing described herein is authorized and approved on a final basis, subject to the terms and conditions set forth in each of the DIP Documents, the Approved Budget (subject to the Carve Out and the Permitted Variances as defined herein), and the DIP Orders.  All objections to this Final Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.  The DIP Lenders consent to entry of this Final Order.  To the extent there exists any conflict among the terms and conditions of the Interim Order and this Final Order, the terms and conditions of this Final Order shall govern and control.  This Final Order shall become effective immediately upon its entry.

2.     <u>Authorization to Borrow, Guaranty, and Use Loan Proceeds</u>.

(a)     The DIP Facilities are hereby approved as set forth herein on a final basis. The Global Debtors are hereby expressly authorized and empowered on a final basis to immediately (i) borrow, or guarantee, as applicable, and obtain, on a joint and several basis, aggregate principal amount of ABL DIP Loans up to the ABL DIP Commitments, subject to the terms and conditions of the ABL DIP Credit Agreement and the other ABL DIP Documents, (ii) borrow, or guarantee, as applicable, and obtain, on a joint and several basis, aggregate principal amount of SGUS DIP Loans in an amount equal to (A) **$1,000,000,000** for funding the OpCo DIP Loans and (B) up to **$751,000,000** to consummate Prepetition OpCo Second Out Notes Participations, in each case as required under and in accordance with the applicable DIP Documents, (iii) borrow, or guarantee, as applicable, and obtain, on a joint and several basis, aggregate principal amount of OpCo DIP Loans in an amount equal to **$1,000,000,000**, (iv) incur, on a joint and several basis, all other obligations owing to the applicable DIP Agent and DIP Lenders on the terms and subject to the conditions and limitations set forth in the applicable DIP Documents and the DIP Orders, and (v) cause each of the DIP Guarantors to guarantee the applicable DIP Obligations, in each case in accordance with the terms of the applicable DIP Documents and the DIP Orders; *provided* that the DIP Secured Parties shall not be required to extend DIP Loans or other extensions of credit under the applicable DIP Facility to the extent that the applicable conditions for making such DIP Loans or other extensions of credit under such DIP Credit Agreement have not been satisfied or waived in accordance with the applicable DIP Documents; *provided*, *further*, that for the avoidance of doubt, only the SGUS DIP Loan Parties shall be obligated upon the SGUS DIP Obligations, and only the OpCo DIP Loan Parties shall be obligated upon the OpCo DIP Obligations.

(b)        Subject to the provisions and limitations contained in paragraph 18 of this Final Order, (i) immediately upon the entry of the Interim Order, the Global Debtors were deemed, automatically and without any further action, to incur  (A)  $**359,000,000** in SGUS Second Out DIP Loans incurred to replace and refinance $**359,000,000** in outstanding Prepetition SGUS Notes, (B) $**418,656,111.11** in OpCo FILO Roll-Up DIP Loans incurred to replace and refinance $**395,000,000** in principal amount of outstanding Prepetition FILO Loans and $**23,656,111.11** of accrued interest thereon and $**374,395,506.21** in OpCo NPC Roll-Up DIP Loans incurred to replace and refinance $**357,465,541** in Prepetition NPC Loans and $**16,929,965.21** of accrued interest thereon, and (C) $**499,085,844.61** in ABL Roll-Up DIP Loans to replace and refinance (1) the outstanding amount of all Prepetition ABL Secured Obligations, other than the Prepetition ABL Revolving Loans, (2) all Prepetition ABL Secured Obligations related to the Prepetition ABL Letters of Credit, and (3) the Prepetition ABL Revolving Loans via the Creeping Roll-Up, and (ii) immediately upon the entry of this Final Order, the Global Debtors are deemed, automatically and without any further action, to incur on a final basis up to $449,128,755.07 in additional SGUS Second Out DIP Loans incurred to replace and refinance up to $449,128,755.07 in outstanding Prepetition SGUS Notes, in each case of clauses (i) and (ii), on a cashless basis (and with respect to the Creeping Roll-Up, application of the Prepetition ABL Collateral proceeds to pay down the Prepetition ABL Secured Obligations), consistent with and as set forth in the DIP Orders and the DIP Documents, as applicable.   The Prepetition SGUS Notes, Prepetition FILO Secured Obligations and Prepetition NPC Secured Obligations deemed replaced and refinanced under this paragraph 2(b) were, and hereby are, on a final basis, (A) with respect to the foregoing clause (i), deemed indefeasibly replaced as of the Interim Order Effective Date and with respect to the foregoing clause (ii), deemed indefeasibly replaced as of the date of entry of this Final Order and

the (x) SGUS Second Out DIP Loans issued to replace and refinance the Prepetition SGUS Notes were, and hereby are, on a final basis, deemed exchanged therefor by each DIP Lender in accordance with the terms of the SGUS DIP Documents and (y) OpCo Roll-Up DIP Loans issued to replace and refinance the Prepetition FILO Secured Obligations and Prepetition NPC Secured Obligations were deemed exchanged therefor by each DIP Lender in accordance with the terms of the OpCo DIP Documents and (B) authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lenders to fund the DIP Facilities and not as adequate protection for, or otherwise on account of, any of the Prepetition Secured Obligations.  Each Global Debtor, DIP Secured Party and Prepetition Secured Party were, and hereby are, on a final basis, authorized to take any actions as may be necessary or advisable to effectuate the issuance of the ABL Roll-Up DIP Loans, SGUS Second Out DIP Loans, and OpCo Roll-Up DIP Loans.

(c)     Immediately upon the entry of the Interim Order, but subject to the provisions and limitations contained within the assignment and acceptance agreement, the SGUS DIP Borrower was, and hereby is on a final basis, deemed to have issued a call option to certain of the SGUS DIP Lenders for the outstanding portions of the Prepetition FILO Loans and Prepetition NPC Loans not rolled up in connection with the replacement and refinancing of such obligations; *provided* that the rights of the Committee to object to or otherwise challenge the voting of such Prepetition FILO Loans and Prepetition NPC Loans, solely in connection with confirmation of a chapter 11 plan, are expressly reserved and shall not be prejudiced by this Final Order.

(d)     All Prepetition ABL Secured Obligations in respect of Cash Management Services (as defined in the Prepetition ABL Credit Agreement) issued or provided by any of the

Prepetition ABL Secured Parties shall constitute ABL DIP Obligations, and (ii) all Prepetition ABL Letters of Credit issued or provided by the Prepetition ABL Agent were, and hereby are on a final basis, automatically deemed issued under the ABL DIP Credit Agreement, and all Prepetition ABL Secured Obligations in respect thereof shall constitute ABL DIP Obligations.

(e)     In accordance with the terms of the DIP Orders and the DIP Documents, the proceeds of borrowings issued under the DIP Facilities and of Cash Collateral shall be used solely for purposes permitted under the applicable DIP Documents and the DIP Orders, and in accordance with the Approved Budget, subject to the Carve Out and the Permitted Variances (as defined below) as set forth in the DIP Orders and the DIP Documents.  All proceeds of the SGUS DIP Facility following the entry of this Final Order shall be deposited in the DIP Escrow Account and shall only be disbursed in accordance with the terms and conditions of the SGUS DIP Documents, the Approved Budget and the DIP Orders to fund draws under the OpCo DIP Facility.  All proceeds of the OpCo DIP Facility shall be deposited in the OpCo DIP Proceeds Account and shall be used in accordance with the DIP Documents, the Approved Budget, and the DIP Orders, and shall be subject to a first priority lien and security interest in favor of the OpCo DIP Agent.  All amounts (except for the SGUS New Money DIP Loans disbursed pursuant to the Interim Order) shall be drawn from the DIP Facilities pursuant to the Funding Mechanics.

(f)     To the extent any proceeds of the ABL DIP Facility or the OpCo DIP Facility are necessary to be transferred to, or otherwise used to make payments on behalf of, or expended for the benefit of any TopCo Debtors to fund such TopCo Debtors' ongoing administrative expenses, provided that such amounts shall not include amounts utilized by non-Topco Debtors to fund such non-Topco Debtors' administrative or other expenses, (i) such TopCo Debtors shall be guarantors, on a joint and several basis, of the ABL Facility or the OpCo DIP

Facility (as applicable), in a principal amount equal to the aggregate amount of proceeds of the ABL DIP Facility or the OpCo DIP Facility (as applicable) used by, or for the benefit of, such TopCo Debtors, and (ii)(x) the claims of each applicable DIP Lender against such TopCo Debtors for any such transfers, payments, or expenditures shall be DIP Superpriority Claims in favor of the applicable DIP Agent, and (y) shall be secured by DIP Liens on all DIP Collateral Assets of such entities, including a first priority lien on all property (including any proceeds thereof) of such TopCo Debtors (provided such DIP liens shall be subject to the Carve Out); *provided* that any payments made to the ABL DIP Lenders or the OpCo DIP Lenders by the TopCo Debtors pursuant to the DIP Orders shall be paid (A) *first*, from unencumbered property of such TopCo Debtors and (B) *second*, from encumbered property of such TopCo Debtors; *provided, further,* that (a) the equity interests owned by HBC IV LP shall not be treated as property of that TopCo Debtor for purposes of the DIP Orders and (b)(i) the Global Debtors shall use commercially reasonable efforts to provide GLAS USA LLC, in its capacity as administrative agent in connection with the TopCo Debt facility (the "***TopCo Agent***"), with five (5) Business Days' notice prior to any proposed transfer of any proceeds of the ABL DIP Facility or the OpCo DIP Facility to any TopCo Debtors or any proposed use by any TopCo Debtors or any payments on behalf of or expenditures for the benefit of any TopCo Debtors of any proceeds of the ABL DIP Facility or the OpCo DIP Facility, and (ii) the right of any holder of a valid prepetition lien on property of a TopCo Debtor, including the TopCo Agent to object to such proposed priming and/or seek adequate protection at an expedited hearing before the Court shall be reserved.  For the avoidance of doubt, any such payments to the TopCo Debtors shall only be made with the prior written consent of the SGUS DIP Lenders in their sole discretion (which consent may be conveyed by email from the DIP Lender Advisors to lead counsel to the Global Debtors and be conditioned on the DIP Liens

securing such payment being on a priming basis to any existing liens or claims against the TopCo Debtors).

(g)　Notwithstanding anything to the contrary in the Interim Order or this Final Order, to the extent the Prepetition Secured Obligations that are exchanged for Roll-Up DIP Loans or are participated in exchange for SGUS Third Out DIP Loans are subject to a successful Challenge, then this Court may fashion an appropriate remedy solely with respect to such Prepetition Secured Obligations, Roll-Up DIP Loans or SGUS Third Out DIP Loans (as applicable).

3.　<u>Financing Documents</u>.

(a)　*Authorization*.　As of the Interim Order Effective Date (and as reaffirmed herein), the Global Debtors were, and hereby are on a final basis, expressly authorized and empowered to immediately execute, deliver, enter into, and, as applicable, perform all of their obligations under each of the DIP Documents.　As of the Interim Order Effective Date (and as reaffirmed herein), the Global Debtors were, and hereby are on a final basis, authorized to incur and perform the DIP Obligations and borrow money pursuant to the applicable DIP Credit Agreements, which shall be used for all purposes permitted hereunder and under such DIP Documents, in accordance with the Approved Budget, subject to the Permitted Variances.　As of the Interim Order Effective Date (and as reaffirmed herein), in furtherance of the foregoing and without further approval of this Court, the Global Debtors were, and hereby are on a final basis, authorized and empowered themselves, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified on a final basis solely to the extent necessary, to: (a) enter into, execute, deliver, perform, and comply with all of the terms, conditions, and covenants of the DIP Documents, including, without limitation, the DIP Credit Agreements, any fee letters with

any of the DIP Secured Parties, and all security, guaranty, and pledge agreements; (b) execute and deliver all certificates, reports, statements, and other agreements, instruments and documents required or contemplated by the DIP Documents (including, without limitation, documents required for the Global Debtors' performance of their obligations under the DIP Documents and the creation and perfection of liens granted or contemplated therein); and (c) pay all obligations incurred under the DIP Documents in accordance herewith (whether principal, interest, fees, costs, expenses, indemnities, or other amounts described in the DIP Documents as such amounts become earned, due, and payable and without need to obtain further Court approval, including, without limitation, the Prepetition OpCo Second Out Notes Participations, the DIP Premiums, any other commitment fees or exit fees, administrative agent's fees, and the fees and disbursements of or incurred by (to the extent provided in the DIP Documents) each of the DIP Agents' and DIP Lenders' (including the Fronting Lender's) attorneys, financial advisors, accountants, consultants, and other advisors, including the DIP Advisors and the ABL DIP Advisors, whether or not such fees arose before, on, or after the Petition Date, to the extent provided under the applicable DIP Documents), and perform all other undertakings and acts required or contemplated by, the applicable DIP Documents.

(b)     *Approval of Financing Documents.*   The DIP Documents (and all certificates, reports, statements, and other agreements and documents) constitute valid and binding obligations of the applicable Debtors enforceable in accordance with their terms and are approved on a final basis to the extent necessary to implement the terms and provisions of the DIP Orders. Based on the record presented to this Court by the Global Debtors, the DIP Facilities and the DIP Documents are found to be in compliance with the Prepetition Documents and the Prepetition Intercreditor Agreements.

(c)      *Amendment of DIP Documents*.  The Global Debtors and the DIP Secured Parties are in each case hereby authorized on a final basis to approve and implement, in accordance with the terms of the applicable DIP Documents, any amendment, restatement, amendment and restatement, supplement, modification, extension or waiver (each, an "***Amendment***") of such DIP Documents; *provided*, *however*, that in the case of any material Amendment to any of the DIP Documents that is adverse to the interests of the Global Debtors or their Estates, (i) the Global Debtors shall provide notice of such material Amendment (which may be provided through electronic email) to counsel to the Committee, the U.S. Trustee, and the DIP Agent for the DIP Facilities not subject to such Amendment, and (ii) each of the Committee, the U.S. Trustee, and the DIP Agent for the DIP Facilities not subject to such Amendment (acting in accordance with the consent provisions under the applicable DIP Facility) shall have five (5) days from the date of such notice to object in writing to such Amendment.  If each of the Committee, the U.S. Trustee, and the DIP Agent for the DIP Facilities not subject to such Amendment (acting in accordance with the consent provisions under the applicable DIP Facility) indicate that it has no objection to the Amendment (or if no objections are timely received), the Global Debtors may proceed to execute the Amendment, which shall become effective immediately upon execution; *provided* that notwithstanding any failure to object to such Amendment, the rights of each of the other DIP Secured Parties whose DIP Facilities are not subject to such Amendment are fully preserved under the applicable DIP Documents.  If any of the Committee, the U.S. Trustee, or any DIP Secured Party timely objects to such Amendment, approval of this Court (which may be sought on an expedited basis) will be necessary to effectuate the Amendment.  The foregoing requirements shall not apply to any amendment, modification, extension, update or approval of any Approved Budget, and shall not limit any covenants or provisions of any of the DIP Documents that restrict or limit

Amendments to the DIP Documents of any other DIP Facility.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material Amendment on an expedited basis.

(d)  *Application of DIP Facility Proceeds*.  The advances under each DIP Facility shall be used solely in a manner consistent with the terms and conditions of each of the DIP Documents and the DIP Orders and in accordance with and as may be limited by the Approved Budget (subject to the Carve Out and the Permitted Variances), solely as follows, (i) in the case of the SGUS DIP Facility, to (A) effect the issuance of the SGUS DIP Loans, the proceeds of which shall be used to fund the OpCo DIP Facility, (B) consummate the replacement and refinancing of the Prepetition SGUS Notes with SGUS Second Out DIP Loans as set forth herein, and (C) consummate Prepetition OpCo Second Out Notes Participations, (ii) consummate the replacement and refinancing of Prepetition FILO Loans and Prepetition NPC Loans with OpCo Roll-Up DIP Loans, and (iii) in the case of the OpCo DIP Facility and the ABL DIP Facility, (A) for the OpCo DIP Loan Parties' and the ABL DIP Loan Parties' working capital and other general corporate needs, (B) for the payment of professional fees, costs and expenses in connection with the DIP Credit Agreements (as applicable) and the Chapter 11 Cases, (C) for the payment of fees, costs, and expenses of the administration of the Chapter 11 Cases, (D) for the payment of other prepetition obligations approved by this Court, (E) for the payment of adequate protection payments as authorized herein, (F) for the payment of agency fees and fees, costs, and expenses of the DIP Agents and the DIP Lenders, and each of the DIP Agents' and DIP Lenders' (including the Fronting Lender's) attorneys, financial advisors, accountants, consultants, and other advisors, including the DIP Advisors and the ABL DIP Advisors, owed under the DIP Documents and in connection with the DIP Credit Agreements (as applicable) and the Chapter 11 Cases, (G) to

facilitate the Creeping Roll-Up, and (H) for the payment of obligations arising from or related to the Carve Out.  For the avoidance of doubt, no proceeds of the DIP Facilities may be used for any purpose not set forth in the Approved Budget without the consent of the Applicable Required DIP Lenders.

(e)    *Conditions Precedent; DIP Commitments*.  Notwithstanding anything to the contrary herein or in any DIP Documents, none of the DIP Agents or the DIP Lenders shall (i) have any obligation to make any loan or advance under any DIP Credit Agreement unless the conditions precedent to such loan or extension of credit under the applicable DIP Credit Agreement have been satisfied in full or waived in accordance with such DIP Credit Agreement.  Notwithstanding anything to the contrary herein or in any DIP Document, none of (x) the ABL DIP Agent or the ABL DIP Lenders shall be required to lend in excess of the Line Cap (as defined in the ABL DIP Credit Agreement), subject to the terms and conditions contained in the ABL DIP Documents, (y) the SGUS DIP Agent or the SGUS DIP Lenders shall be required to lend in excess of the SGUS DIP Commitments, and (z) the OpCo DIP Agent or the OpCo DIP Lenders shall be required to lend in excess of the OpCo DIP Commitments.

(f)    *Budget Compliance and Reporting*.

(i)    The Initial Budget shall be the Approved Budget until the next Updated Budget (as defined below) is delivered on the Updated Budget Delivery Date (as defined below) and such Updated Budget has been accepted (or deemed accepted) in accordance with Section 3(f)(ii).  The Global Debtors shall deliver to (w) the DIP Agents (in accordance with the notice provisions in the applicable DIP Documents), for further distribution to the applicable DIP Lenders, (x) the ABL DIP Advisors, and (y) the DIP Lender Advisors (limited to lead counsel and financial advisors), and (z) the Committee's advisors (collectively, the "**Budget Notice Parties**"),

not later than 12:00 p.m. on every fourth Friday occurring after the Petition Date (each, an "***Updated Budget Delivery Date***"), commencing with the Friday of the fourth full calendar week occurring after the Petition Date (i.e., February 6, 2026), a supplement to the Initial Budget or the previously Approved Budget for the rolling 13-week period commencing on the Saturday immediately preceding the applicable Updated Budget Delivery Date (each, an "***Updated Budget***").

(ii)     Each such Updated Budget shall be in form and substance acceptable to the Required SGUS DIP Lenders.  Upon such acceptance (and at no time prior thereto), such Updated Budget shall constitute the "Approved Budget," *provided*, that to the extent any Updated Budget is not objected to by the Required SGUS DIP Lenders in writing to the Global Debtors (which written objection may be conveyed by email from the lead counsel or financial advisor to the SGUS DIP Lenders to the lead counsel or financial advisor to the Global Debtors) within five (5) Business Days of delivery thereof by the Global Debtors in accordance with paragraph 3(f)(i), such Updated Budget shall automatically be deemed accepted and become the Approved Budget, *provided, further*, that, in the event that the Required SGUS DIP Lenders timely object to such Updated Budget, the Required SGUS DIP Lenders shall negotiate in good faith with the Global Debtors on the terms of an Approved Budget and if the Required SGUS DIP Lenders and the Global Debtors have not thereafter agreed on such terms, such disagreement shall result in an Event of Default (solely with respect to the SGUS DIP Facility and the OpCo DIP Facility) only upon expiration of the 13 week period covered by the existing Approved Budget; and such existing Approved Budget shall remain the "Approved Budget" (including for purposes of determining any Permitted Variances (as defined below)) until the earlier of the expiration of the

period covered by such existing Approved Budget and the date the Required SGUS DIP Lenders have accepted an Updated Budget in accordance with this paragraph.

(iii)    No later than 12:00 p.m. (Eastern time) on each Budget Variance Test Date, the Global Debtors shall deliver a Budget Variance Report to the Budget Notice Parties. As used herein, (x) "*Budget Variance Report*" means, for any Budget Variance Test Period, a weekly variance report prepared by the Debtors' management, comparing for such Budget Variance Test Period the actual receipts, disbursements and net cash flow against the forecasted receipts and disbursements under the Approved Budget, on an aggregate basis and with the same level of detail set forth in the Approved Budget, together with detailed written explanations for all material variances for any given testing period; *provided* that, to the extent the applicable Budget Variance Test Period is covered by more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in calculating the comparisons for purposes of the Budget Variance Report; (y) "*Budget Variance Test Date*" means the Friday of every week (commencing with the Friday of the third full calendar week occurring after the Petition Date (i.e., February 6, 2026)) or, to the extent such Friday is not a Business Day, the next Business Day thereafter; and (z) the "*Budget Variance Test Period*" shall mean, with respect to any Budget Variance Test Date, the four-week period ending on the last Business Day of the week immediately preceding the applicable Budget Variance Test Date; *provided* that the (1) initial Budget Variance Test Period shall include the period beginning on the Petition Date through end of the otherwise applicable full calendar two-week period (*i.e.*, through January 30, 2026) (the "*Initial Budget Variance Test Period*") and (2) the second Budget Variance Test Period shall include the period beginning on the Petition Date through end of the otherwise applicable full calendar three-week period (*i.e.*, through February 6, 2026) (the "*Second Budget Variance Test Period*").

(iv)      For each Budget Variance Test Period, the Global Debtors shall not permit (A) actual aggregate cash receipts as reported in the Budget Variance Report by the Global Debtors for such Budget Variance Test Period to be less than (1) forecasted cash receipts as set forth in the Approved Budget for such Budget Variance Test Period minus (2) the product of (x) for the Initial Budget Variance Test Period, 20%, for the Second Budget Variance Test Period, 17.5%, and for each Budget Variance Test Period thereafter, 15% and (y) forecasted cash receipts as set forth in the Approved Budget for such Budget Variance Test Period, (B) actual aggregate cash disbursements as reported by the Global Debtors for such Budget Variance Test Period (including disbursements in respect of vendor payments, but excluding disbursements in respect of professional fees for any advisor in connection with the Chapter 11 Cases) to exceed (1) forecasted aggregate cash disbursements as set forth in the Approved Budget for such Budget Variance Test Period *plus* (2) the product of (x) for the Initial Budget Variance Test Period, 15%, for the Second Budget Variance Test Period, 12.5%, and for each Budget Variance Test Period thereafter, 10% and (y) forecasted aggregate cash disbursements as set forth in the Approved Budget for such Budget Variance Test Period, and (C) actual net cash flow (i.e., aggregate cash receipts minus aggregate cash disbursements (including disbursements in respect of vendor payments, but excluding disbursements in respect of professional fees for any advisor in connection with the Chapter 11 Cases)) as reported by the Global Debtors to be less than (1) the absolute value of forecasted aggregate cash receipts minus the absolute value of aggregate cash disbursements (including disbursements in respect of vendor payments, but excluding disbursements in respect of professional fees for any advisor in connection with the Chapter 11 Cases) minus (2) the product of (x) for the Initial Budget Variance Test Period, 15%, for the Second Budget Variance Test Period, 12.5%, and for each Budget Variance Test Period thereafter,

10% and (y) the absolute value of forecasted aggregate cash receipts plus the absolute value of aggregate cash disbursements (including disbursements in respect of vendor payments, but excluding disbursements in respect of professional fees for any advisor in connection with the Chapter 11 Cases) (the variances set forth in this clause (iv), the "***Permitted Variances***").

(v)     The failure by the Global Debtors to satisfy the terms of this paragraph 3(f) shall give rise to an Event of Default solely with respect to the SGUS DIP Facility and the OpCo DIP Facility, and the terms of this paragraph may be waived or otherwise modified with the written consent of the Required SGUS DIP Lenders (which written objection may be conveyed by email from the lead counsel or financial advisor to the SGUS DIP Lenders to the lead counsel or financial advisor to the Debtors).

(vi)     The Global Debtors shall promptly deliver to the Committee a copy of any business plan or similar financial plan that is provided to the DIP Lenders, including any initial, preliminary, draft, updated, revised, amended, supplemented, or final version thereof, in each case contemporaneously with delivery to the DIP Lenders.

4.     <u>Payments and Application of Payments</u>.  The Global Debtors are authorized on a final basis to make all payments (including any mandatory prepayments) and transfers of the Estates' property to the DIP Secured Parties as provided, permitted, or required under the DIP Documents and the DIP Orders, which payments, proceeds, and other amounts shall be applied to the applicable DIP Obligations in accordance with the DIP Documents (including the DIP Intercreditor Agreement).  As of the Interim Order Effective Date (and as reaffirmed herein), the DIP Documents constitute legal, valid, binding, and non-avoidable obligations of the Global Debtors, enforceable in accordance with the terms of the DIP Orders and the other DIP Documents, against each Global Debtor, their Estates and any successors thereto, including, without limitation,

any Trustee or in any case under chapter 7 of the Bankruptcy Code upon the conversion or dismissal of any of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "***Successor Cases***").  No obligation, payment, transfer, or grant of collateral or security hereunder or under any of the DIP Documents to the DIP Agents and/or the DIP Lenders (including any DIP Superpriority Claims or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law, section 724(a) of the Bankruptcy Code, or any other provision with respect to Avoidance Actions under the Bankruptcy Code or applicable federal, state or foreign law equivalents), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason, subject only to the DIP Intercreditor Agreement and the DIP Orders.  Without limiting the generality of the foregoing, the Global Debtors are authorized on a final basis, without further order of this Court, to (i) pay all principal, interest, fees, premiums, and indemnities when due, under the DIP Documents and (ii) pay or reimburse the DIP Secured Parties, in accordance with the DIP Documents for all present and future costs and expenses, including, without limitation, all reasonable and documented pre- and post-Petition Date professional fees, financial advisor fees, legal fees, consultant fees and other advisor fees and expenses paid or incurred by the DIP Agents and DIP Lenders (including the Fronting Lender), including of the DIP Advisors and the ABL DIP

Advisors, as provided in the applicable DIP Documents and the DIP Orders regardless of whether such amounts are in the Approved Budget. None of such fees and expenses payable pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by this Court. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.

5.    <u>Interest and Fees</u>. The rates of interest to be charged for the DIP Loans shall be the rates set forth in the applicable DIP Credit Agreements and shall be calculated in the manner and payable at the times set forth therein. The fees charged under the DIP Facilities shall be those set forth in the applicable DIP Credit Agreements and shall be unconditionally earned and payable in the amounts and at the times set forth in such DIP Credit Agreement. As of the Interim Order Effective Date (and as reaffirmed herein), the Global Debtors were, and hereby are on a final basis, authorized and directed to pay, in accordance with the DIP Orders, the principal, interest, fees, payments, expenses, and other amounts described above and in the DIP Documents, including, without limitation, the DIP Premiums, as such amounts become due and without need to obtain further Court approval, and the applicable Debtors shall be jointly and severally obligated to pay all such amounts, and satisfy all such obligations, which in each case shall constitute DIP Obligations hereunder and under the applicable DIP Documents.

6.    <u>DIP Obligations</u>. The DIP Documents and the DIP Orders shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable against each of the DIP Loan Parties to the extent provided by the applicable DIP Documents, along with their Estates, and any successors thereto, including, without limitation, against any Trustee or any other Estate representative elected or appointed in the Chapter 11 Cases or any Successor Case or in any other proceedings related to any of the foregoing. Upon the Interim Order Effective Date

(and as reaffirmed herein), the DIP Obligations include all loans, notes, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Global Debtors to any of the DIP Agents or the other DIP Secured Parties, in each case, under the applicable DIP Documents or the DIP Orders or secured by the applicable DIP Liens, including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, indemnities, and other amounts (including any reasonable and documented attorneys', accountants', investment bankers', financial advisors', and other fees, costs, and expenses, including of the DIP Advisors and the ABL DIP Advisors, that are chargeable or reimbursable under the DIP Documents and/or the DIP Orders) owing under the DIP Documents.

7.    _Use of Cash Collateral_.  As of the Interim Order Effective Date (and as reaffirmed herein), the Global Debtors were, and hereby are on a final basis, authorized, to use all Cash Collateral of the Prepetition Secured Parties and the DIP Secured Parties, solely for the purposes and subject to the restrictions set forth in the DIP Orders (subject to the Carve Out) and in accordance with the Approved Budget (subject to the Permitted Variances), from the Interim Order Effective Date through and including the DIP Termination Date (as defined below).  Nothing in the DIP Orders shall authorize the Disposition of any assets of the Global Debtors or their Estates outside the ordinary course of business, or any Global Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except pursuant to the Approved Budget (subject to the Permitted Variances) as permitted in the DIP Orders (including with respect to the Carve Out), the DIP Facilities, and the DIP Documents.

8.    _Access to Records_.  The Global Debtors shall provide (a) the ABL DIP Advisors, and the DIP Lender Advisors with all reporting and other information provided to the Prepetition Agents under the Prepetition Documents and (b) each DIP Agent, the ABL DIP Advisors and the

DIP Lender Advisors with all reporting and other information provided to the other DIP Agents under the applicable DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Documents, upon reasonable notice to Debtors' lead counsel (email being sufficient), the Global Debtors shall permit representatives, agents, and employees of the DIP Agents, the ABL DIP Advisors and the DIP Lender Advisors to have reasonable access to (i) inspect the Global Debtors' assets, and (ii) all information (including historical information and the Global Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Global Debtors and other company advisors (during normal business hours), and the DIP Agents, the ABL DIP Advisors and the DIP Lender Advisors shall be provided with access to all information they shall reasonably request, excluding any information that (x) constitutes trade secrets or proprietary information, (y) in respect of which disclosure to any DIP Agent, any DIP Lender, or any Prepetition Secured Party (or their respective representatives or contractors) is prohibited by applicable law, court order or regulation or any contractual obligation or (z) is subject to attorney-client or similar privilege or constitutes attorney work product; *provided* that, in the event that any Debtor does not provide any document or information in reliance on the foregoing clauses (y) or (z), the Global Debtors shall provide notice to the applicable DIP Agent, DIP Advisor, ABL DIP Advisor or DIP Lender Advisor, as applicable, that such documents or information is being withheld and the Global Debtors shall use commercially reasonable efforts to communicate the applicable documents or information in a way that would not violate the applicable obligation or risk waiver of such privilege.

II.  **Collateralization and Superpriority Administrative Claim Status.**

9.  <u>Collateralization</u>.

(a)  *DIP Lien Grant.*  To secure the prompt payment and performance of the applicable DIP Obligations of the Global Debtors to the applicable DIP Secured Parties of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, and subject and subordinate to the Carve Out, and for the benefit of itself and the applicable DIP Lenders, and without the necessity of the execution by the Global Debtors (or recordation or other filing) of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar instruments or documents, or the possession or control by the applicable DIP Agent or any other DIP Secured Party of, or over, any DIP Collateral, (i) the ABL DIP Agent was granted pursuant to the Interim Order, which grant is hereby reaffirmed on a final basis, valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***ABL DIP Liens***") in and upon the ABL DIP Collateral held by the ABL DIP Loan Parties (ii) the SGUS DIP Agent was granted pursuant to the Interim Order, which grant is hereby reaffirmed on a final basis, valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***SGUS DIP Liens***") in and upon the SGUS DIP Collateral held by the SGUS DIP Borrower and/or the SGUS DIP Guarantors, and (iii) the OpCo DIP Agent was granted pursuant to the Interim Order, which grant is hereby reaffirmed on a final basis, valid, binding, enforceable, continuing, non-avoidable, and automatically and properly perfected security interests and liens (such security interests and liens collectively, the "***OpCo DIP Liens***") in and upon the OpCo DIP Collateral held by the OpCo DIP Borrower and/or the OpCo DIP Guarantors, subject in the case of the ABL DIP Liens and the OpCo DIP Liens to the DIP Intercreditor Agreement.  Any provision of any lease (except for

nonresidential real property leases) or other license, contract or other agreement that requires (i) the consent or approval of one or more parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any interest in any such lease, license, contract, or other agreement, or the proceeds thereof, or other collateral related thereto, is deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens (as defined below) on such interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreements or the DIP Orders, subject to applicable law.

(b)     *DIP Lien Priority*.  The DIP Liens securing each DIP Facility shall be, in all cases, subject to the Carve Out and have the priority set forth in **Annex 3**.  Other than as set forth herein (including with respect to the Carve Out) or permitted under the DIP Documents, including the DIP Intercreditor Agreement, the DIP Liens (i) shall not be made subject to or pari passu with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and (ii) shall be valid and enforceable (A) against any Trustee, (B) upon the conversion or dismissal of any of the Chapter 11 Cases to any Successor Case, (C) notwithstanding any abstention by this Court, and/or (D) upon the dismissal or conversion of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the Estate pursuant to section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP Liens.

(c)     *Post-Petition Lien Perfection*.  The DIP Orders shall be sufficient and conclusive evidence of the priority, perfection, enforceability, and validity of the DIP Liens,

Adequate Protection Liens and any other post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral held by the DIP Loan Parties, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of the Global Debtors (a "*Perfection Act*").   Notwithstanding the foregoing, if any DIP Agent or Prepetition Agent elects for any reason to file, record, or otherwise effectuate any Perfection Act, such DIP Agent (acting at the direction of the Applicable Required DIP Lenders) or Prepetition Agent, as applicable, in each case in its sole discretion, is authorized on a final basis to perform such Perfection Act, and the Global Debtors are authorized to perform such Perfection Acts to the extent necessary or required by such DIP Agent (acting at the direction of the Applicable Required DIP Lenders) or Prepetition Agent, as applicable, which act or acts shall be deemed to have been accomplished as of the Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized and directed to accept, file, and/or record any document in regard to such act in accordance with applicable law.   Any DIP Agent (acting at the direction of the Applicable Required DIP Lenders) or Prepetition Agent may, in each case in its sole discretion, choose to file, record, or present a certified copy of either of the DIP Orders (as applicable) in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized and directed to accept, file, and/or record such certified copy of the DIP Orders in accordance with applicable law.   Should any DIP Agent or Prepetition Agent so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or

perfection of the DIP Liens or the Adequate Protection Liens, as applicable, granted herein by virtue of the entry of the Interim Order, as reaffirmed in this Final Order.

(d)       All proceeds of the OpCo New Money DIP Loans shall be funded by the OpCo DIP Agent into the OpCo DIP Proceeds Account, and shall be held in such account until disbursed in accordance with the DIP Documents and the Approved Budget (as defined herein). Notwithstanding anything to the contrary herein or in the DIP Documents or the Prepetition Intercreditor Agreements, the OpCo DIP Proceeds Account and the cash on deposit therein, and any other cash proceeds of the OpCo New Money DIP Loans (a) shall not constitute Prepetition ABL Priority Collateral nor ABL Priority Collateral but shall constitute Notes / Term Priority Collateral (in each case as defined in the DIP Intercreditor Agreement), (b) shall not be swept or foreclosed on by any ABL DIP Secured Party, whether pursuant to any "cash dominion" or similar arrangements or following an Event of Default under any DIP Facility, and (c) upon the occurrence and during the continuance of an Event of Default under the OpCo DIP Facility and following the expiration of the Remedies Notice Period, may be swept, foreclosed upon or otherwise collected by the SGUS DIP Agent acting at the direction of the SGUS DIP Lenders (which direction may be provided by email by the DIP Lender Advisors to counsel to the SGUS DIP Agent).

(e)       All proceeds of the ABL DIP Loans shall be funded by the ABL DIP Agent into the DIP ABL Excess Funding Account, and shall be held in such account until disbursed in accordance with the DIP Documents and the Approved Budget (as defined herein). Notwithstanding anything to the contrary herein or in the DIP Documents or the Prepetition Intercreditor Agreements, the DIP ABL Excess Funding Account and the cash on deposit therein, and any other cash proceeds of the ABL DIP Loans (a) shall not constitute Prepetition Notes / Term Priority Collateral nor Notes / Term Priority Collateral but shall constitute ABL Priority

Collateral (in each case as defined in the DIP Intercreditor Agreement), (b) shall not be swept or foreclosed on by any Notes / Term Secured Party, whether pursuant to any "cash dominion" or similar arrangements or following an Event of Default under any DIP Facility, and (c) upon the occurrence and during the continuance of an Event of Default under the ABL DIP Facility and following the expiration of the Remedies Notice Period, may be swept, foreclosed upon or otherwise collected by the ABL DIP Agent acting at the direction of the ABL DIP Lenders (which direction may be provided by email by the ABL DIP Advisors to counsel to the ABL DIP Agent).

10.     <u>Superpriority Administrative Expense</u>.

(a)     For the applicable DIP Obligations, whether now existing or hereafter arising pursuant to the DIP Orders, the DIP Documents, or otherwise, subject and subordinate to the Carve Out as provided herein and pursuant to the DIP Documents and, in the case of DIP Superpriority Claims against the OpCo DIP Loan Parties and the ABL DIP Loan Parties, including pursuant to the DIP Intercreditor Agreement, each DIP Agent, for the benefit of itself and the DIP Secured Parties for which such DIP Agent serves as agent, is granted on a final basis an allowed superpriority administrative expense claim against each of the Global Debtors' Estates to the extent that such Debtors are DIP Loan Parties under the DIP Facility under which such DIP Agent serves as agent (without the need to file any proof of claim) pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of any of such Debtors, whether now in existence or hereafter incurred by any of such Debtors, of every kind or nature, including any and all unsecured claims, administrative expenses, adequate protection claims, priority claims or any other claims of the kind specified in, or ordered pursuant to, the Bankruptcy Code, including without limitation, *inter alia*, sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507, 546(c), 552(b), 726,

1113, or 1114 of the Bankruptcy Code (the "**DIP Superpriority Claims**"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Global Debtors and all proceeds thereof to the extent provided in the DIP Documents or the DIP Orders, including, without limitation, all applicable DIP Collateral, subject and subordinate to the payment of the Carve Out as provided for herein and pursuant to the DIP Documents and, in the case of DIP Superpriority Claims against the OpCo DIP Loan Parties and the ABL DIP Loan Parties, pursuant to the DIP Intercreditor Agreement.

(b)      Each DIP Superpriority Claim against each Debtor shall be junior in right of payment to the Carve Out and have the priorities set forth in **Annex 3** and in the DIP Documents, including the DIP Intercreditor Agreement.   No Debtor may incur any financing with liens or claims senior or *pari passu* to the DIP Superpriority Claims against such Debtor (other than pursuant to the DIP Intercreditor Agreement), without the consent of the applicable DIP Lenders holding DIP Superpriority Claims against such Global Debtor.

(c)      Notwithstanding anything to the contrary in the DIP Orders, (i) the SGUS DIP Secured Parties shall not have recourse in respect of the DIP Superpriority Claims or the SGUS DIP Liens under the SGUS DIP Facility against any asset of any OpCo DIP Loan Parties or ABL DIP Loan Parties, (ii) the OpCo DIP Secured Parties and the ABL DIP Secured Parties shall not have recourse in respect of the DIP Superpriority Claims or the OpCo DIP Liens under the OpCo DIP Facility or the DIP Superpriority Claims or the ABL DIP Liens under the ABL DIP Facility against any asset of any SGUS DIP Loan Party, and (iii) with respect to the DIP

Superpriority Claims against the OpCo DIP Loan Parties and the ABL DIP Loan Parties, the DIP Superpriority Claims shall be subject to the priorities set forth in the DIP Intercreditor Agreement. For the avoidance of doubt, the DIP Superpriority Claims under each DIP Facility shall be subject to the priorities set forth in **Annex 3**.

(d)     With respect to rights preserved under section 506(c) of the Bankruptcy Code, with the exception of the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or *pari passu* with the DIP Superpriority Claims or the DIP Obligations or with any other claims of the DIP Secured Parties arising hereunder or under the DIP Documents.

## III.    Adequate Protection

11.    <u>Adequate Protection for the Prepetition Secured Parties</u>.   Until the Prepetition Secured Obligations are Paid in Full, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral, including in the amount of any Prepetition Secured Obligations subsequently reinstated after the refinancing and replacement thereof pursuant to paragraph 2(b) because such refinancing or replacement is rescinded or required to be returned or repaid pursuant to paragraph 18 or otherwise.  As adequate protection, the Prepetition Secured Parties are hereby granted the following (the "***Adequate Protection Obligations***"):

(a)     <u>Adequate Protection Liens</u>.

(i)      *OpCo Adequate Protection Liens*.  As security for the payment of the Adequate Protection Obligations, each of the Prepetition OpCo Agents, for the benefit of the applicable Prepetition OpCo Secured Parties, is hereby granted on a final basis (effective and perfected upon the Petition Date and without the necessity of the execution by the Global Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on the OpCo DIP Collateral as set forth in **Annex 3** (the "***OpCo Adequate Protection Liens***"), which security interests and liens shall be subject and subordinate to the Carve Out and the OpCo DIP Liens and the applicable Adequate Protection Liens and have the priorities set forth in **Annex 3**.

(ii)      *SGUS Adequate Protection Liens*.  As security for the payment of the Adequate Protection Obligations, the Prepetition SGUS Agent, for the benefit of the Prepetition SGUS Notes Secured Parties, is hereby granted on a final basis (effective and perfected upon the Petition Date and without the necessity of the execution by the Global Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and lien on the SGUS DIP Collateral as set forth in **Annex 3** (the "***SGUS Adequate Protection Liens***" and, together with the OpCo Adequate Protection Liens, the "***Adequate Protection Liens***"), which security interests and liens shall be subject and subordinate to the Carve Out and the SGUS DIP Liens and have the priorities set forth in **Annex 3**.

(iii)      The Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Global Debtors and their Estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date except to the extent set forth in **Annex 3**.  The Adequate Protection

Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Secured Parties and not in substitution therefor.

(b)    <u>Adequate Protection Claims</u>.

(i)    *<u>OpCo Adequate Protection Claims</u>*.  Each of the Prepetition OpCo Agents, for the benefit of the applicable Prepetition OpCo Secured Parties, is hereby granted on a final basis an allowed superpriority administrative expense claim against each OpCo DIP Loan Party on a joint and several basis, solely to the extent of any Diminution in Value, which shall (A) have recourse to and be payable from all prepetition and postpetition property of the OpCo DIP Loan Parties, and (B) have priority over all other administrative claims in the Chapter 11 Cases of the OpCo DIP Loan Parties, including all claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carve Out, the DIP Superpriority Claims, and the DIP Intercreditor Agreement, and (C) have the priorities set forth in **<u>Annex 3</u>** (the "***OpCo Adequate Protection Claims***").

(ii)    *<u>SGUS Adequate Protection Claims</u>*.  The Prepetition SGUS Notes Agent, for the benefit of the Prepetition SGUS Secured Parties, is hereby granted on a final basis an allowed administrative superpriority expense claim against each SGUS DIP Loan Party on a joint and several basis, solely to the extent of any Diminution in Value, which shall (i) have recourse to and be payable from all prepetition and postpetition property of the SGUS DIP Loan Parties, and (ii) have priority over all other administrative claims in the Chapter 11 Cases of the OpCo DIP Loan Parties, including all claims of the kind specified under sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carve Out and the DIP Superpriority Claims with the priorities set forth in **<u>Annex 3</u>** (the "***SGUS Adequate Protection Claims***" and together with the OpCo Adequate Protection Claims, the "***Adequate Protection Claims***").

(c) <u>Adequate Protection Fees and Expenses</u>.  As further adequate protection, the Global Debtors were, pursuant to the Interim Order, and are hereby authorized on a final basis to make current cash payments of (i) all prepetition and postpetition accrued and unpaid fees and expenses for the DIP Lender Advisors and, until the Prepetition ABL Secured Obligations are Paid in Full, the Prepetition ABL Secured Party Advisors and (ii) the amount of principal due as Prepetition ABL Secured Obligations under the Prepetition ABL Documents to the extent not rolled up into ABL Roll-Up DIP Loans, and (iii) the reasonable and documented prepetition and postpetition accrued and unpaid fees and expenses of Citibank, N.A., as Prepetition SGUS Notes Agent, Reed Smith LLP, as primary counsel to the Prepetition SGUS Notes Agent, and Emmet, Martin & Marvin LLP, as prepetition counsel to the Prepetition SGUS Notes Agent; *provided* that, in the case of clause (iii), (x) the Prepetition SGUS Notes Agent shall be entitled to seek an indemnity, including a joint and several indemnity, and security from the Prepetition SGUS Noteholders acceptable to the Prepetition SGUS Notes Agent prior to taking any action or inaction at the direction of the Prepetition SGUS Noteholders, and (y) the rights of parties in interest to seek to recharacterize as payments of principal of the Prepetition SGUS Notes any payments made as adequate protection to the Prepetition SGUS Notes Agent are reserved. None of the fees and expenses payable pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by this Court; *provided* that such fees and expenses shall be payable in compliance with paragraph 22(b) (the "***Adequate Protection Fees and Expenses***"). No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.

(d) <u>Adequate Protection Information Rights</u>.  The Global Debtors shall provide to the Prepetition ABL Agent (for the benefit of the Prepetition ABL Secured Parties) and the DIP

Lender Advisors, for the benefit of the Ad Hoc Group, at the same time as such reporting is provided to the DIP Secured Parties all reporting required to be provided to the DIP Secured Parties under the DIP Documents.  Upon any or all DIP Obligations being Paid in Full, the Prepetition ABL Agent (for the benefit of the Prepetition ABL Secured Parties) and the Ad Hoc Group shall continue to be entitled hereby to satisfaction of such reporting rights unless and until the applicable Prepetition Secured Obligations of the applicable Prepetition Secured Party are also Paid in Full.

**IV.    Carve Out.**

12.    <u>Carve Out</u>.

(a)    The DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, and the Prepetition Liens shall be subject and subordinate in all respects to the Carve Out.

(b)    As used in this Final Order, the "***Carve Out***" means the sum of (i) all fees required to be paid to the Clerk of this Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, and all fees and expenses for services provided under section 156(c) of title 28 of the United States Code (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including (x) the Investigation Budget and (y) any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Global Debtors or the Committee (such fees in clause (y), the "***Transaction Fees***"))[8] (the "***Allowed Professional Fees***") incurred by persons or firms retained

---

[8]    For the avoidance of doubt, the ABL DIP Agent may, in its reasonable determination, establish a reserve against the Borrowing Base (as defined in the ABL DIP Credit Agreement) in respect of the portion of any earned or unearned Transaction Fees provided for in any approved retention application but have not been not funded into

by the Global Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code, less any prepetition retainers held by such professionals (the "**Debtor Professionals**") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first Business Day following delivery by any of the DIP Agents (at the direction of the Applicable Required DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $15,000,000 incurred after the first Business Day following delivery by any of the DIP Agents of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Trigger Carve Out Trigger Notice Cap**").  As used in this Final Order, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by any of the DIP Agents (acting at the direction of the Applicable Required DIP Lenders) to the Global Debtors, their lead restructuring counsel, each other DIP Agent, the DIP Advisors, the ABL DIP Advisors, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of any of the DIP Obligations under any of the DIP Facilities, stating that the Post-Trigger Carve Out Trigger Notice Cap has been invoked.

(c)     The Global Debtors shall establish and fund a segregated account maintained by the Global Debtors in trust (the "**Funded Reserve Account**"), not subject to the control of the SGUS DIP Agent or the ABL DIP Agent, for purposes of funding the Carve Out. The Funded Reserve Account will be funded on an 80%/20% split, calculated by the Global

---

the Funded Reserve Account and for which the ABL DIP Lenders are responsible to cover under the Carve Out (i.e., 20% of such fees).

Debtors using reasonable best efforts, from proceeds of (i) the SGUS DIP Facility comprising 80% of any such funding, and (ii) the ABL DIP Facility comprising 20% of any such funding, in accordance with the respective terms of the ABL DIP Facility and SGUS DIP Facility. Notwithstanding anything to the contrary, (i) under no circumstances (which, for the avoidance of doubt, includes, but is not limited to, an Event of Default or a termination of either or both of the ABL DIP Facility and the SGUS DIP Facility) shall the Global Debtors be prohibited in any way from accessing or drawing upon the SGUS DIP Facility or the ABL DIP Facility, provided that any amounts are drawn on an 80%/20% basis from each facility as set forth above, for the purpose of funding the Funded Reserve Account. Following the Interim Order Effective Date (and as reaffirmed herein), the Global Debtors will draw from the SGUS DIP Facility and the ABL DIP Facility on an 80%/20% basis, as set forth above, an amount equal to (i) the aggregate amount of Allowed Professional Fees projected to accrue in the Approved Budget from the Petition Date through the date that this Final Order is entered by this Court, plus (ii) the Post-Trigger Carve Out Trigger Notice Cap (the "***Initial Funded Reserve Amount***"). Commencing on the first Business Day following entry of this Final Order, and on the Monday of each week thereafter up until a Carve Out Trigger Notice has been issued in accordance with the terms of this Final Order, the Global Debtors shall fund into the Funded Reserve Account by drawing from the SGUS DIP Facility and the ABL DIP Facility, on an 80%/20% basis as set forth above, an amount equal to the aggregate amount of Allowed Professional Fees projected to accrue for the following week in the Approved Budget (the "***Weekly Funded Reserve Amount***"). Each Professional Person shall deliver to the Global Debtors on the Wednesday of each week a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding week (each such statement, a "***Fee Statement***"), and to the extent the amount of Allowed Professional Fees

accrued and claimed in a Fee Statement exceeds the Initial Funded Reserve Amount or the Weekly Funded Reserve Amount for the applicable period, and such fees and expenses have otherwise not been paid by the Global Debtors, the Global Debtors shall, within one (1) Business Day, fund additional amounts into the Funded Reserve Account equal to the difference between, as applicable, the Initial Funded Reserve Amount or the Weekly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "***Top Off Amount***").  At any time, if the Global Debtors in good faith believe a Transaction Fee has been earned by a Professional Person and is then due and payable, and such Transaction Fee is set forth in the applicable Professional Person's retention application approved pursuant to an order of this Court, the Global Debtors shall deposit in the Funded Reserve Account the amount of such fee.  The Funded Reserve Account shall be maintained, and the funds therein (the "***Funded Reserve Amount***") shall be held in trust, for the benefit of Professional Persons.  Any and all amounts in the Funded Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in any Prepetition Documents or DIP Documents, and no Prepetition Secured Party nor any DIP Secured Party shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in any loan documents.  Notwithstanding the foregoing, any and all payments to Professional Persons allowed by this Court (excluding Transaction Fees) shall be paid first from the Funded Reserve Account.

(d)     On the day on which a Carve Out Trigger Notice is delivered in accordance with paragraph 12(b) of this Final Order, with a copy to counsel to the Committee, (the "***Termination Declaration Date"),*** the Carve Out Trigger Notice shall constitute a demand to the Global Debtors to draw down on the SGUS DIP Facility and the ABL DIP Facility, on a 80%/20% basis as set forth above to fund a reserve in an amount equal to the then unpaid amounts of the

Allowed Professional Fees that are in excess of the Funded Reserve Amount and not covered by a prior Fee Statement issued by such Professional Person; *provided*, that in the event that a Termination Declaration Date occurs, Professional Persons shall have two (2) Business Days to deliver a Final Fee Statement to the Global Debtors to reflect Allowed Professional Fees of such Professional Person not covered by any prior Fee Statements issued by such Professional Person in respect of Allowed Professional Fees accrued through the Termination Declaration Date. The Global Debtors shall deposit and hold such amounts in the Funded Reserve Account in trust to pay such then-unpaid Allowed Professional Fees (the "***Pre-Trigger Carve Out Trigger Notice Reserve***") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Global Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Global Debtor, including Cash Collateral, after funding the Pre-Trigger Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Trigger Carve Out Trigger Notice Cap to the extent not already funded as set forth above. The Global Debtors shall deposit and hold such amounts in a segregated account at an institution mutually acceptable to the ABL DIP Agent and SGUS DIP Agent (at the direction of the Applicable Required DIP Lenders) in trust to pay such Allowed Professional Fees benefiting from the Post-Trigger Carve Out Trigger Notice Cap (the "***Post-Trigger Carve Out Trigger Notice Reserve***" and, together with the Pre-Trigger Carve Out Trigger Notice Reserve, the "***Carve Out Reserves***") prior to any and all other claims.

(e)    All funds in the Pre-Trigger Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth in paragraph 12(b) of this Final Order (the "***Pre-Trigger Carve Out Amounts***") until Paid in Full, and then, to the extent the Pre-Trigger Carve Out Trigger Notice Reserve has not been

reduced to zero, to pay the ABL DIP Agent and SGUS DIP Agent on a *pro rata* basis (based on funded amounts with respect to the Carve Out) for the benefit of the ABL DIP Lenders and SGUS DIP Lenders, until the ABL DIP Obligations and SGUS DIP Obligations have been Paid in Full, and the ABL DIP Facility and the SGUS DIP Facility have been terminated, in which case any such excess shall be paid to the other secured parties in accordance with their rights and priorities. All funds in the Post-Trigger Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth in paragraph 12(b) of this Final Order (the "***Post-Trigger Carve Out Amounts***") until Paid in Full, and then, to the extent the Post-Trigger Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the ABL DIP Agent and SGUS DIP Agent on a *pro rata* basis (based on funded amounts with respect to the Carve Out) for the benefit of the ABL DIP Lenders and SGUS DIP Lenders, until the ABL DIP Obligations and SGUS DIP Obligations have been Paid in Full, and the ABL DIP Facility and the SGUS DIP Facility have been terminated, in which case any such excess shall be returned to the DIP Borrowers for distribution in accordance with any other party's rights under the Bankruptcy Code.  Notwithstanding anything to the contrary, if either of the Carve Out Reserves are not funded in full in the amounts set forth herein, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Trigger Carve Out Amounts and Post-Trigger Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the ABL DIP Agent, the SGUS DIP Agent or any other secured parties, as applicable. Notwithstanding anything to the contrary, following delivery of a Carve Out Trigger Notice, neither the ABL DIP Agent nor the SGUS DIP Agent shall sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Global Debtors until the Carve Out Reserves have been fully

funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the ABL DIP Agent and SGUS DIP Agent on a *pro rata* basis (based on funded amounts with respect to the Carve Out) for application in accordance with the ABL DIP Facility and SGUS DIP Facility until the ABL DIP Obligations and SGUS DIP Obligations have been Paid in Full, and the ABL DIP Facility and the SGUS DIP Facility have been terminated, in which case any such excess shall be returned to the DIP Borrowers for distribution in accordance with any other party's rights under the Bankruptcy Code.  Further, notwithstanding anything to the contrary, (i) disbursements by the Global Debtors from the Carve Out Reserves shall not constitute ABL DIP Loans or SGUS DIP Loans or increase or reduce the ABL DIP Obligations or SGUS DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Trigger Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Global Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary, the Carve Out shall be senior to DIP Liens, DIP Obligations, Adequate Protection Liens, Adequate Protection Claims, Prepetition Liens, and Prepetition Secured Obligations.

(f)    Payment of Allowed Professional Fees Prior to, on or After the Carve Out Trigger Date.  Following the delivery of a Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to,

and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Documents, the Bankruptcy Code and applicable law.

(g)     Continued Funding of the Carve Out.  The Carve Out shall be senior to all claims and liens over all assets of the Global Debtors; *provided* that, upon the funding of the Funded Reserve Amount in full in accordance with the terms of this Final Order, the subordination of the liens of the DIP Agents, DIP Lenders, DIP Secured Parties and the Prepetition Secured Parties in respect of Allowed Professional Fees covered by the Carve Out shall be limited to the funds deposited into the Funded Reserve Account for such Allowed Professional Fees; *provided* that such limitation is subject to additional contributions to the Funded Reserve Account such that it contains sufficient funds so as to fully fund the Carve Out.

(h)     No Direct Obligations to Pay Allowed Professional Fees. None of the DIP Agents, the DIP Lenders, any other DIP Secured Party or any Prepetition Secured Party shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code regardless of whether such fee or expense has been allowed by this Court or is included in the Carve Out.  Nothing in the DIP Orders or otherwise shall be construed to obligate any of the DIP Agents, the DIP Lenders, any other DIP Secured Party or any Prepetition Secured Party, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

13.     Excluded Professional Fees.  Notwithstanding anything to the contrary in the DIP Orders, no proceeds of any DIP Facility, the Carve Out, or any Cash Collateral may be used by

any Debtor (or any subsidiary or affiliate thereof) or any other party in interest, including the Committee, any other statutory or non-statutory committee or any Trustee or any Representative of the foregoing, to: (a) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner or raise any defenses to the debt or collateral position of any of the DIP Agents, the DIP Lenders, any other DIP Secured Party, or the Prepetition Secured Parties, whether by (i) challenging the validity, extent, amount, perfection, priority or enforceability of the obligations under any DIP Facility, any DIP Documents, any of the Prepetition Secured Obligations or any of the Prepetition Documents, (ii) challenging the validity, extent, perfection, priority, or enforceability of any mortgage, security interest, or lien with respect thereto, or any other rights or interests or replacement liens with respect to any DIP Facility, any DIP Documents, any of the Prepetition Secured Obligations or any of the Prepetition Documents, (iii) seeking to subordinate or recharacterize the obligations under any DIP Facility or any of the Prepetition Secured Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, or (iv) asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any DIP Agent, DIP Lender, any other DIP Secured Party, or any Prepetition Secured Party or any of their respective Representatives; (b) prevent, hinder or otherwise delay any DIP Agent's, DIP Lender's, any other DIP Secured Party's, or Prepetition Secured Party's assertion, enforcement, or realization on any of the DIP Collateral or the Prepetition Collateral in accordance with the DIP Documents or the Prepetition Documents, as applicable; (c) seek to modify the rights granted to any DIP Agent, DIP Lender, any other DIP Secured Party, or Prepetition Secured Party under any DIP Document or Prepetition Document, as applicable, in each case without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective

sole discretion; or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court (which order may be the Interim Order or this Final Order) and (ii) permitted by the DIP Documents; *provided* that during the Challenge Period (as defined below), an aggregate amount of $350,000 (the "***Investigation Budget***") of the DIP Loans and/or the Prepetition Collateral, including Cash Collateral, and the proceeds thereof, may be used by the Committee to investigate, prepare, initiate, litigate, or prosecute, an objection to, or otherwise challenge, (x) the claims and liens of the Prepetition Secured Parties against the Global Debtors, and (y) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties.

**V.     Right to Credit Bid.**

14.     <u>Right to Credit Bid</u>.

(a)     Subject to the terms of the DIP Documents and the Prepetition Documents, as applicable, each of the Prepetition Agents and each of the DIP Agents (acting at the direction of the Applicable Required DIP Lenders) shall have the unqualified right to credit bid (either directly or through one or more acquisition vehicles), on a dollar-for-dollar basis up to the full amount of the applicable DIP Obligations and Prepetition Secured Obligations (in accordance with the DIP Documents, the DIP Intercreditor Agreement and the Prepetition Intercreditor Agreements), including any accrued interest, fees and expenses, and the DIP Premiums, as applicable, in any sale (including any deposit in connection with such sale) of all or any portion of the applicable DIP Collateral or Prepetition Collateral, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan, including chapter 11 plans subject to confirmation under section 1129(b) of the Bankruptcy Code, and any sale or Disposition by a chapter 7 trustee for any of the Global Debtors, including under sections 363 or 725 of the Bankruptcy Code or otherwise, and such DIP Secured Parties and

Prepetition Secured Parties shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code or otherwise; *provided* that nothing in this paragraph shall prejudice the rights of the Committee under paragraph 18 of this Final Order (including the right to object to the credit bidding of the Prepetition Secured Obligations "for cause" or to seek a finding from this Court to the same effect prior to the expiration of the Challenge Deadline).

(b)    In any transaction involving a credit bid of all or any portion of each of the SGUS DIP Obligations and the OpCo DIP Obligations, each of the SGUS DIP Agent and the OpCo DIP Agent (or their respective designees) (in each case acting at the direction of the Applicable Required DIP Lenders) shall be permitted to form one or more acquisition vehicles in which the SGUS DIP Lenders own the equity interests and/or debt instruments issued by such entity and to cause such entity to jointly credit bid any or all of the SGUS DIP Obligations and the OpCo DIP Obligations for any or all of the SGUS DIP Collateral and the OpCo DIP Collateral.

## VI.    Default; Rights and Remedies; Relief from Stay.

15.    <u>Events of Default</u>.  (a) The failure of the Global Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Final Order; or (b)(i) with respect to the ABL DIP Facility, the occurrence of any Event of Default as defined in and under the ABL DIP Credit Agreement (unless waived in accordance with the terms thereof), (ii) with respect to the SGUS DIP Facility, the occurrence of any Event of Default as defined in and under the SGUS DIP Credit Agreement (unless waived in accordance with the terms thereof), or (iii) with respect to the OpCo DIP Facility, the occurrence of any Event of Default as defined in and under the OpCo DIP Credit Agreement (unless waived in accordance with the terms thereof), shall constitute an "***Event of Default***" under this Final Order with respect to the applicable DIP

Facility, unless extended or otherwise waived in accordance with the terms of the applicable DIP Credit Agreement.

16.    <u>Rights and Remedies Upon Event of Default</u>.

(a)    Subject to the terms of the DIP Documents and the terms of this Final Order, without requiring further order from this Court and without the need for filing any motion for relief from the automatic stay or any other pleading, immediately upon the date of delivery of a written notice (with a copy filed with this Court) (a "***Default Notice***," and the date of delivery of such Default Notice, the "***DIP Termination Date***") by any DIP Agent (acting at the direction of the Applicable Required DIP Lenders) to lead counsel to the Global Debtors, the U.S. Trustee, each other DIP Agent, lead counsel to the Committee, the DIP Lender Advisors and the ABL DIP Advisors (collectively, the "***Remedies Notice Parties***") of the occurrence of the Maturity Date (as defined in the applicable DIP Credit Agreement) or an Event of Default, the automatic stay shall terminate solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the applicable DIP Agent (acting at the direction of the Applicable Required DIP Lenders, in their sole discretion): (i) the Global Debtors' authority to use Cash Collateral of the applicable DIP Secured Parties may be terminated, reduced or restricted (subject only to the Carve Out and except as set forth in this paragraph 16); (ii) the applicable DIP Obligations shall (subject only to the Carve Out) be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Global Debtors; (iii) the termination, reduction, or restriction of any further DIP Commitments under the applicable DIP Facility to the extent any such DIP Commitments remain outstanding; (iv) subject to the funding of the Carve Out in accordance with the terms of this Final Order, the applicable DIP Facility shall be terminated with

respect to any future liability or obligation of the applicable DIP Agent and DIP Lenders, but, for the avoidance of doubt, without affecting any of the applicable DIP Liens, DIP Superpriority Claims or DIP Obligations, and, in the case of the OpCo DIP Facility, the Global Debtors shall be prohibited from withdrawing, utilizing, or transferring funds from the OpCo DIP Proceeds Account or taking any action in furtherance thereof, and in the case of the SGUS DIP Facility, the Global Debtors shall be prohibited from withdrawing, utilizing, or transferring funds from the DIP Escrow Account or taking any action in furtherance thereof (and in each case, the Global Debtors waive any right to make such attempt to withdraw, utilize, or transfer such funds or taking any action in furtherance thereof); (v) the delivery of a Carve Out Trigger Notice; (vi) subject to the terms of the DIP Documents, to take possession of the DIP Collateral and without liability for trespass to the applicable DIP Loan Party to enter any premises where the DIP Collateral may be located for the purpose of taking possession of, removing or selling the DIP Collateral and, generally, to exercise any and all rights afforded to a secured party under applicable law, or (vii) the exercise of any other right or remedy with respect to the DIP Collateral or the DIP Liens permitted under the DIP Documents or applicable law or the Prepetition Collateral or the Prepetition Liens permitted under the Prepetition Documents or applicable law, including withdrawing, utilizing, or transferring funds on deposit in the OpCo DIP Proceeds Account and applying such amounts to replace the OpCo DIP Facility or by withdrawing, utilizing, or transferring funds on deposit in the DIP Escrow Account, or taking any action in furtherance thereof and applying such amounts to replace the SGUS DIP Facility (and in each case, the Global Debtors waive any right to make such attempt to withdraw, utilize, or transfer such funds, or take any action in furtherance thereof); *provided* that prior to the exercise of any right or remedy under clauses (vi) and (vii) above, the applicable DIP Agent shall be entitled to file a motion with the

Court seeking emergency relief from the automatic stay (the "***Stay Relief Motion***") on at least five (5) Business Days' notice to the Global Debtors, the U.S. Trustee, and counsel to the Committee (the "***Remedies Notice Period***").  Following the DIP Termination Date and during the Remedies Notice Period, the Global Debtors or any party in interest may seek an emergency hearing before this Court to be held during the Remedies Notice Period, and must provide prompt notice of such hearing to each DIP Agent, the DIP Advisors and the ABL DIP Advisors and by filing a notice of such hearing with the Court, solely to contest whether an Event of Default has occurred and is continuing or to obtain authority for the non-consensual use of Cash Collateral. At the hearing on the Stay Relief Motion or any relief sought by the Global Debtors and/or any party in interest, the Court may fashion an appropriate remedy.  In the event that a party challenges a DIP Agent's assertion that an Event of Default has occurred or has occurred and is continuing and this Court is unavailable for a hearing during the Remedies Notice Period, the automatic stay shall remain in effect until this Court has an opportunity to rule on such challenge; *provided*, *however*, notwithstanding anything to the contrary in the DIP Orders, that during the Remedies Notice Period, the Global Debtors shall only be permitted to use Cash Collateral to (i) make payroll and fund critical expenses necessary to preserve the DIP Collateral, in each case in accordance with the terms of the Approved Budget and this Final Order and (ii) to fund the Carve Out.  Notwithstanding the foregoing, the DIP Lenders shall not be obligated to provide any DIP Loans or advances at any time an Event of Default has occurred and is continuing, including during the Remedies Notice Period, or after the Maturity Date. Notwithstanding anything to the contrary herein, the DIP Secured Parties may only enter upon a leased premises upon an Event of Default in accordance with paragraph 16(d) of this Final Order.

(b)　　Notwithstanding the occurrence of the Maturity Date, an Event of Default, and/or the termination of any of the DIP Commitments, all of the rights, remedies, benefits, and protections provided to the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties, as applicable, under the DIP Documents, the Prepetition Documents and the DIP Orders shall survive. The rights and remedies of the DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties may have under the applicable DIP Documents or otherwise and may be exercised in whole or in part in any order.  With respect to the exercise of such rights and remedies, the fourteen-day stay provisions of Bankruptcy Rules 6004(h) and 4001(a)(4) are hereby waived.

(c)　　In addition, if an Event of Default has occurred and is continuing and after the expiration of the Remedies Notice Period, subject to the terms of the DIP Documents and this Final Order and subject to further order of this Court approving such Sales Process (as defined below), the DIP Agents (acting at the direction of the Applicable Required DIP Lenders) may direct the Global Debtors to commence a process for a sale of all or any material portion of the DIP Collateral (the "***Sales Process***") in accordance with, and subject to, the terms and conditions of the DIP Documents.

(d)　　Subject to this Final Order and unless otherwise ordered by this Court, upon the earlier of (i) the expiration of the Remedies Notice Period or (ii) this Court's ruling that an Event of Default has occurred and is continuing, if any, subject to the DIP Intercreditor Agreement and the Prepetition Intercreditor Agreements and terms and conditions set forth in paragraph 16 of this Final Order, the DIP Secured Parties, and any professional retained by any of the DIP Secured Parties, will have the right to access and utilize (i) at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and (ii) any warehouse, distribution centers,

stores, or other locations, in each case to the extent reasonably necessary or appropriate in order to sell, lease or otherwise dispose of any of the DIP Collateral, including pursuant to any Sales Process and in all cases subject to existing license agreements.  Notwithstanding the foregoing or anything in the DIP Orders, the DIP Credit Agreements, or the DIP Documents, the DIP Secured Parties and Prepetition Secured Parties, as applicable, may only enter upon a leased premises of the Debtors after an Event of Default in accordance with (1) a separate written agreement among the DIP Secured Parties or the Prepetition Secured Parties, as applicable, and the applicable landlord for the leased premises, (2) pre-existing rights of the DIP Secured Parties or Prepetition Secured Parties under applicable non-bankruptcy law, (3) written consent of the applicable landlord for the leased premises, or (4) entry of an order by this Court approving such access to the leased premises after notice and an opportunity to be heard for the applicable landlord for the leased premises.

(e)     Notwithstanding anything to the contrary herein or in the DIP Documents, upon the occurrence and during the continuance of an Event of Default, the Required SGUS DIP Lenders shall have the exclusive right to "step-in" and instruct the OpCo DIP Agent and the OpCo DIP Lenders to take or refrain from taking any actions, including with respect to voting, amendments, waivers, the exercise of remedies and other discretionary actions under the DIP Orders and the DIP Documents, in accordance with and as otherwise may be provided for under the DIP Documents, and none of the Debtors, the OpCo DIP Agent or the OpCo DIP Lenders shall take any action to interfere with such rights; provided that the exercise of any applicable remedies under this agreement shall be on the earlier of (i) the expiration of the Remedies Notice Period or (ii) a successful and timely objection by any party and this Court's ruling that an Event of Default has occurred and is continuing.

17.    <u>Relief from Stay</u>.  Subject to paragraph 16 and upon the expiration of the Remedies Notice Period, for the purpose of exercising rights, options, and remedies set forth in this Article VI, unless otherwise ordered by this Court, each DIP Agent (acting at the direction of the Applicable Required DIP Lenders), on behalf of the DIP Secured Parties, shall be automatically relieved from the effect of any stay under section 362 of the Bankruptcy Code, any other restriction on the enforcement of their liens upon and security interests in the DIP Collateral or any other rights granted to them, or any of them, solely to the extent necessary to exercise their rights and remedies pursuant to the terms and conditions of the DIP Documents and this Final Order.

## VII.    Challenges to the Prepetition Secured Obligations

18.    <u>Effect of Stipulations on Third Parties</u>.

(a)    The Global Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order (including the incurrence of the Roll-Up DIP Loans pursuant to the terms and conditions of this Final Order) shall be irrevocably binding upon the Global Debtors and their Estates and any and all of the Global Debtors' successors-in-interest and assigns in all circumstances and for all purposes upon the Interim Order Effective Date, and the Global Debtors and their Estates are deemed to have irrevocably waived and relinquished all Challenges as of the Petition Date; *provided* that, notwithstanding anything to the contrary herein, the binding effect of the Global Debtors' Stipulations and Releases (and all other admissions, agreements, findings, and releases with respect to the Prepetition Secured Parties that are contained in this Final Order) on the Global Debtors' Estates shall be subject to Challenge and the Challenge Period, any party in interest bringing forth a timely Successful Challenge, and this Court fashioning an appropriate remedy following a party in interest bringing forth a timely Successful Challenge.

(b)        Upon the expiration of the Challenge Period, the Global Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order shall also be binding upon the Global Debtors' Estates, all creditors and other parties in interest and all of their respective successors and assigns, including the Committee and any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, or any Trustee, in each case in all circumstances and for all purposes, unless and solely to the extent that (i) during the Challenge Period, the Committee or any other party in interest with proper standing granted by an order of the Court, prior to the expiration of the Challenge Period, and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to commence such proceeding, (ii) has timely and properly filed an appropriate proceeding or contested matter as required under the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this Final Order, including this paragraph 18) challenging any of the Global Debtors' Stipulations and Releases or other admissions, agreements, and releases contained in this Final Order with respect to the Prepetition Secured Obligations, the Prepetition Liens, the Prepetition Documents, or otherwise asserting or prosecuting any Avoidance Action or any other claim, counterclaim, cause of action, objection, contest, defense or other challenge relating to the Global Debtors' Stipulations and Releases   (each such proceeding or contested matter, a "*Challenge*"), and (iii) this Court enters a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely and properly filed Challenge (a "***Successful Challenge***"); *provided*, *however*, that, (x) any pleadings filed in a proceeding asserting any Challenge shall set forth with specificity the basis for such Challenge, and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released,

and barred and (y) if the Chapter 11 Cases are converted to chapter 7, or a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Period, any such estate representative or trustee shall receive the full benefit of any remaining time before the expiration of the Challenge Period.  This Court may fashion any appropriate remedy upon a Successful Challenge.

(c)      If no Challenge is timely and properly filed by a party in interest with the requisite standing and authority as contemplated herein prior to the expiration of the Challenge Period or to the extent that this Court does not rule in favor of the plaintiff in any such Challenge proceeding or if such Challenge is withdrawn, then, without further order of this Court:  (i) the Global Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order shall be binding and preclusive on all parties in interest, including the Global Debtors, the Global Debtors' Estates, the Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Trustee, or other successors and assigns of the Global Debtors and the Global Debtors' Estates, and on any other person or entity; (ii) the Prepetition Secured Obligations shall constitute allowed claims, not subject to counterclaim, claim, subordination, recoupment, demands, offset, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Chapter 11 Cases and any Successor Cases, including, without limitation, any subsequent chapter 7 case; (iii) the Prepetition Liens on the Prepetition Collateral held by the Prepetition Secured Parties shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected, security interests and liens and with the priority specified in the Global Debtors' Stipulations and Releases or in this Final Order, not subject to counterclaim, recharacterization, subordination, avoidance or other defense; (iv) the Prepetition Secured Obligations, the Prepetition Liens on the Prepetition Collateral held

by the Prepetition Secured Parties, and the Prepetition Secured Parties (and their respective Representatives) shall not be subject to any other or further Challenge or other proceeding by the Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any Trustee, or any successors and assigns of the Global Debtors and the Global Debtors' Estates, or by any other person or entity, and all such parties shall be enjoined from seeking to exercise the rights of the Global Debtors or the Global Debtors' Estates, including, without limitation, any successor thereto (including, without limitation, any Estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period); and (v) any and all Challenges by any party (including the Committee, any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Trustee, or other successors and assigns of the Global Debtors and the Global Debtors' Estates, and any other person or entity) and any right to bring a Challenge shall be deemed forever waived, released, and barred; *provided*, *however*, in each case under clauses (i) through (v) above except to the extent that such Global Debtors' Stipulations and Releases and any other admissions, agreements, and releases contained in this Final Order were subject to a Successful Challenge.

(d)     If any Challenge is timely and properly filed prior to the expiration of the Challenge Period (as defined below) by the Committee, any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any Trustee or any other person or entity, in each case, with requisite standing and authority, then upon the expiration of the Challenge Period, (i) any claim or action that is not brought shall forever be barred, and (ii) the Global Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order shall be binding and preclusive on the Committee, any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, any Trustee, and any other person or entity, as

applicable, except as to any such stipulations, admissions, agreements, and releases that were subject to a Successful Challenge.

(e)    Nothing in the DIP Orders vests or confers on any person, including the Committee or any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, any Trustee, or any other party in interest, standing or authority to pursue any claim or cause of action belonging to the Global Debtors or their Estates, including, without limitation, Challenges with respect to the Global Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order, and the Roll-Up DIP Loans, which shall be final and irrevocable as to the Global Debtors but shall not limit the rights of parties in interest (including the Committee) with requisite standing to assert claims against the Prepetition Secured Parties on behalf of the Global Debtors' Estates pursuant and subject to paragraph 18 of this Final Order, and (i) to the extent required by applicable law, a separate order of this Court conferring such standing on the Committee or other person shall be a prerequisite for the prosecution of a Challenge by the Committee or such other person and (ii) all rights to seek such standing or to object or to oppose such standing or any Challenge in any manner are expressly reserved.

(f)    The "*Challenge Period*" shall mean earliest to occur of (i) for any party in interest other than the Committee, no later than March 16, 2026, and (ii) for the Committee, no later than April 15, 2026; *provided*, *however*, that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period ending on the later of March 16, 2026 and forty-five (45) days after the date of such conversion or appointment, as applicable, in each case solely with respect to any such trustee; *provided*, *further*, that (A) if, prior to the expiration of the Challenge Period, the Committee (1) files a motion seeking standing to bring a Challenge, which

attaches one or more draft complaints that detail the alleged Challenges for which the Committee seeks standing to assert, and (2) seeks an expedited hearing before the Court brought on no more than seven (7) calendar days' notice to all parties in interest, the expiration of the Challenge Period shall be tolled solely for the Committee solely with respect to the Challenges identified in such complaints until 11:59 p.m. (prevailing Central Time) on the date that is two business days after such standing motion is adjudicated by the Court, and (B) to the extent not previously heard, any such standing motion or related Challenge shall be heard simultaneously with the confirmation hearing on any chapter 11 plan proposed by the Debtors. The Challenge Period may be extended in writing prior to the expiration of the Challenge Period (which writing may be in the form of email by counsel) from time to time in the sole discretion of (A) the Prepetition ABL Agent (at the direction of the Prepetition ABL Lenders) with respect to any Challenge to the Prepetition ABL Liens, the Prepetition ABL Secured Obligations, or the Prepetition ABL Secured Parties; (B) the SGUS DIP Agent (at the direction of the Applicable Required DIP Lenders) with respect to any Challenge to the Prepetition FILO Liens, the Prepetition FILO Secured Obligations, the Prepetition FILO Secured Parties, the Prepetition NPC Liens, the Prepetition NPC Secured Obligations, the Prepetition NPC Secured Parties, the Prepetition SGUS Notes Liens, the Prepetition SGUS Notes Secured Obligations, or the Prepetition SGUS Notes Secured Parties; and (C) the Prepetition OpCo Notes Agent (at the direction of the applicable Prepetition OpCo Notes Secured Parties) with respect to any Challenge to the Prepetition OpCo Notes Liens, the Prepetition OpCo Notes Secured Obligations, the Prepetition OpCo Notes Secured Parties, the Prepetition Initial Notes Liens, the Prepetition Initial Notes Secured Obligations, or the Prepetition Initial Notes Secured Parties.

(g)    For the avoidance of doubt, notwithstanding anything to the contrary in the DIP Orders, upon the entry of the Interim Order, (i) the Challenge Period was automatically

deemed to have lapsed as to the Global Debtors with respect to the Global Debtors' Stipulations and Releases, (ii) such stipulations, admissions, agreements, and other releases shall be binding upon the Global Debtors, and (iii) any Challenges by the Global Debtors with respect to the Prepetition Secured Parties relating to the Global Debtors' Stipulations and Releases (including on account of the portion of the Roll-Up DIP Loans approved pursuant to the terms of the DIP Orders) were deemed forever waived, released, and barred.

(h)     Any successor to the Global Debtors (including, without limitation, any Trustee appointed or elected for any of the Global Debtors' Estates or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) shall be bound by the terms of the DIP Orders to the same extent as the Global Debtors, including with respect to the Global Debtors' Stipulations and Releases; *provided* that, notwithstanding anything to the contrary herein, the binding effect of the Global Debtors' Stipulations and Releases and all other admissions, agreements, and releases contained in this Final Order on the Global Debtors' Estates shall be subject to the Challenge Period, any party in interest bringing forth a timely Successful Challenge, and this Court fashioning an appropriate remedy following a party in interest bringing forth a timely Successful Challenge.

## VIII.  Debtors' Waivers and Releases.

19.     <u>Section 506(c) Claims; 552(b) Equities of the Case; Vendor Carve-Out</u>.

(a)     Without affecting, modifying or limiting the scope or priority of the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases or any Successor Cases at any time shall be charged against or recovered from any of (i) the DIP Secured Parties, their respective claims, or the DIP Collateral or (ii) the Prepetition Secured Parties, their respective claims, or the Prepetition Collateral, in each case pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without

the prior written consent of the applicable DIP Agent (acting at the direction of the Applicable Required DIP Lenders) or the applicable Prepetition Agent (at the direction of the applicable Prepetition Secured Parties), as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by any DIP Agent, DIP Secured Party, Prepetition Agent or Prepetition Secured Party; *provided* that (i) solely to the extent that valid administrative expense claims based on rent owed by the Global Debtors under leases for nonresidential real property which accrued and remains unpaid for period commencing on the Petition Date and ending on January 31, 2026 ("***Stub Rent Claims***") are unpaid, the holders of such Stub Rent Claims and the Committee shall each have the right to seek standing on behalf of the Global Debtors' Estates and the ability to seek to assert a surcharge, by motion, against any and all of the DIP Collateral or Prepetition Collateral (but excluding DIP Collateral or Prepetition Collateral to the extent securing the ABL DIP Obligations, the ABL DIP Liens, the Prepetition ABL Secured Obligations, and the Prepetition ABL Liens) under section 506(c) of the Bankruptcy Code solely for the amount of unpaid Stub Rent Claims and (ii) solely to the extent that valid administrative expense claims based on merchandise delivered by vendors to the Global Debtors on or after the Petition Date ("***Postpetition Vendor Claims***") are unpaid, the holders of such claims and the Committee shall each have the right to seek standing on behalf of the Global Debtors' Estates and the ability to seek to assert a surcharge, by motion, against any and all of the DIP Collateral or Prepetition Collateral (but excluding DIP Collateral or Prepetition Collateral to the extent securing the ABL DIP Obligations, the ABL DIP Liens, the Prepetition ABL Secured Obligations, and the Prepetition ABL Liens) under section 506(c) of the Bankruptcy Code solely for the amount of unpaid Postpetition Vendor Claims; *provided*, *further*, that (A) notwithstanding anything in the DIP Orders to the contrary, the proceeds of surcharge claims obtained pursuant to the immediately prior

proviso shall be used to satisfy Stub Rent Claims and Postpetition Vendor Claims, as applicable; and (B) that nothing herein shall prejudice or limit the rights of the DIP Secured Parties, the Prepetition Secured Parties, or any other party in interest to oppose any motion seeking standing or to assert a surcharge pursuant to this paragraph.

(b)       Each of the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, to the extent applicable, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the DIP Secured Parties or the Prepetition Secured Parties, with respect to proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral, as applicable.

(c)       _Timing of Payment of Stub Rent_.  Subject to any agreements between the Global Debtors and any individual landlord, and provided that there has not been an occurrence and continuance of any Event of Default, the Global Debtors shall pay any unpaid Stub Rent Claims to the applicable landlords within 10 Business Days after entry of this Final Order.

20.       _Marshaling_.  In no event shall (a) any DIP Secured Party with respect to any of the DIP Collateral or (b) any Prepetition Secured Party with respect to any of the DIP Collateral, be subject to the equitable doctrine of "marshaling" or any other similar doctrine, as applicable, and the proceeds of the DIP Collateral and the Prepetition Collateral shall be received and applied pursuant to this Final Order, including **Annex 3**, and the DIP Documents, including the DIP Intercreditor Agreement, and the Prepetition Documents, including the Prepetition Intercreditor Agreements, notwithstanding any other agreement or provision to the contrary; _provided_ that prior to the date that is 150 days after the DIP Termination Date, the DIP Secured Parties shall first obtain recoveries from DIP Collateral other than the proceeds of (x) the assets of Saks Fifth Avenue

Holdco II LLC and its subsidiaries and (y) any property or assets of the DIP Loan Parties as of the commencement of these Chapter 11 Cases that did not constitute valid, duly perfected Prepetition Collateral at such time (but excluding from this clause (y) any proceeds of duly perfected Prepetition Collateral and any property or assets of the DIP Loan Parties acquired after the commencement of these Chapter 11 Cases that are of a type that would have constituted duly perfected Prepetition Collateral) (collectively, clauses (x) and (y), the "*Specified Assets*") before obtaining recoveries from the Specified Assets; *provided*, *further*, that (i) from and after the date that is 150 days after the DIP Termination Date, the DIP Secured Parties shall be permitted to recover from the Specified Assets subject to the use of commercially reasonable efforts to first recover from DIP Collateral other than Specified Assets (and, with respect to Specified Assets, shall use commercially reasonable efforts to first obtain recoveries from the assets described in clause (y) before the assets described in clause (x)); (ii) ten (10) days prior to the DIP Secured Parties satisfying the DIP Obligations from the proceeds of any Specified Asset, the applicable DIP Secured Parties shall file a notice with the Court disclosing that the DIP Secured Parties will apply proceeds of Specified Assets to the DIP Obligations upon the expiration of such 10 day period (the "*Notice Period*"), (iii) the rights of all parties in interest to challenge during the Notice Period whether such commercially reasonable efforts have been made and to seek relief in connection therewith are fully preserved, and (iv) after the expiration of the Notice Period, the rights of any party in interest under this paragraph 20 that did not bring a timely challenge during such period are forever waived and barred.

21.     Release of the DIP Secured Parties and Prepetition Secured Parties.

(a)     Subject to and effective upon entry of the Interim Order (as reaffirmed herein), and in consideration of and as a condition to each DIP Agent and each DIP Lender making

the DIP Facilities available under the DIP Credit Agreements and providing other credit and financial accommodations to the Global Debtors pursuant to the provisions of the DIP Orders and the DIP Documents (including the Carve Out provisions) and the Prepetition OpCo Secured Parties consenting to the priming of the Prepetition OpCo Liens by the OpCo DIP Liens and the Carve Out and permitting the use of the Prepetition OpCo Collateral, including Cash Collateral, pursuant to the provisions of the DIP Orders, each DIP Loan Party, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present, and future subsidiaries and assigns (collectively, the "**_Releasors_**"), to the maximum extent permitted by applicable law, hereby absolutely, unconditionally and irrevocably and forever releases, acquits, absolves, and discharges (i) each DIP Secured Party (solely in their capacity as such), (ii) each Prepetition Secured Party (solely in their capacity as such and subject to paragraph 18 of this Final Order), (iii) the Ad Hoc Group and each member thereof (solely in their capacity as such), and (iv) with respect to each of the foregoing (solely in their capacities as such), each of their respective Representatives (solely in their capacities as such) (the persons and entities described in these clauses (i) through (iv), each a "**_Released Party_**") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, demands, liabilities, responsibilities, disputes, remedies, causes of action (including causes of action in the nature of "lender liability"), Avoidance Actions, suits, judgments, costs, debts, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, bonds, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, recoupment, demands, controversies, other rights of disgorgement or recovery, and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Global Debtors, their

Estates, or such entities' successors or assigns, whether individually or collectively) that exist on the date of this Final Order, at law or in equity, by statute or common law, in contract, or in tort, including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, (C) any and all offsets, defenses, claims, counterclaims, set-off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement or recovery, and (D) any defense, right of counterclaim, right of set-off, or deduction on the payment of the Prepetition Secured Obligations, the DIP Facility, or the DIP Obligations (as applicable), in each case that any Releasor may now or hereafter own, hold, have, or claim to have against the Released Parties, or any of them for, upon, or by reason of any nature, cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date of this Final Order, arising out of, relating to, or in connection with, any of the DIP Obligations, the DIP Loan Parties, the Prepetition Secured Obligations, the DIP Liens, the Prepetition Liens, any sale process or transaction, the payment of any fees and expenses, including the DIP Advisors and the ABL DIP Advisors, the DIP Documents, the Prepetition Documents, other financial accommodations under the DIP Documents, the Prepetition Documents, or the negotiations concerning the same, or the Chapter 11 Cases (individually, a "***Released Claim***" and collectively, the "***Released Claims***"), but excluding (i) claims or liabilities that a court of competent jurisdiction

determines results from the gross negligence or willful misconduct of a Released Party and (ii) claims or obligations arising on or after the date of this Final Order, including claims against or obligations of the DIP Lenders under the DIP Facilities.  For the avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Global Debtors of their obligations under the DIP Documents and the DIP Secured Parties and the Global Debtors reserve all rights in respect of any breaches of the DIP Documents by any DIP Secured Parties or the Global Debtors, as applicable.

(b)    As of the Interim Order Effective Date, the releases granted solely to the DIP Secured Parties and their associated Representatives and Released Parties in this paragraph 21 are final and binding and are not subject to a Challenge pursuant and subject to paragraph 18 of this Final Order or otherwise.  Notwithstanding the immediately preceding sentence, the releases contained in this paragraph 21 with respect to the Prepetition Secured Parties shall not limit the rights of parties in interest (including the Committee) with requisite standing to assert claims against the Prepetition Secured Parties on behalf of the Global Debtors' Estates pursuant and subject to paragraph 18 of this Final Order.

(c)    Each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each Released Party that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Released Party on the basis of any Released Claim or other claim or cause of action that has been released and discharged by any Releasor pursuant to clause (a) above.  If any Releasor violates the foregoing covenant, such Releasor and the Global Debtors each agree to pay, on a joint and several basis, in addition to such other damages as any Released Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Released Party as a result of such violation.

**IX.    Other Rights and Obligations.**

22.    <u>Payment of Fees and Expenses</u>.

(a)    The Global Debtors are authorized on a final basis to and shall pay all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of each DIP Agent and each other DIP Secured Party, including the fees and expenses of the DIP Advisors, the Fronting Lender Advisors and the ABL DIP Advisors, in connection with each DIP Facility, including in connection with (i) the discussion, negotiation, preparation, execution and delivery of any DIP Documents and the funding of the DIP Loans, (ii) the administration of the DIP Facilities and any amendment, modification or waiver of any provision of any DIP Document, (iii) the interpretation, enforcement or protection of any of the rights and remedies of the DIP Secured Parties under the DIP Documents, and (iv) the Chapter 11 Cases, in each case as provided in the applicable DIP Documents.  No attorney or advisor to any of the Ad Hoc Group, the DIP Agents, the Fronting Lender, or the other DIP Secured Parties, including the fees and expenses of the DIP Advisors and the ABL DIP Advisors, shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Global Debtors to the DIP Agents, the other DIP Secured Parties, the DIP Advisors or the ABL DIP Advisors in connection with any of the DIP Facilities are hereby approved in full on a final basis.

(b)    Any time that any of the DIP Advisors, the ABL DIP Advisors, the Fronting Lender Advisors, the DIP Lender Advisors or counsel to the Prepetition SGUS Notes Agent seeks payment of any fees and expenses, including Adequate Protection Fees and Expenses, from the Global Debtors, such professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege,

any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine or other privilege) by electronic mail to the U.S. Trustee, counsel to the Committee and the DIP Lender Advisors contemporaneously with the delivery of such fee and expense statements to the Global Debtors' primary restructuring counsel. The Global Debtors, the Committee, the SGUS DIP Lenders or the U.S. Trustee may dispute the payment of any portion of such invoiced fees and expenses (the "***Disputed Invoiced Fees***") by notifying the submitting party in writing, within ten (10) days of the receipt of such fee and expense statement or invoice (the "***Review Period***"), setting forth the specific objections to the Disputed Invoiced Fees.  If such objection cannot be consensually resolved, the objecting party may file with this Court a motion or other pleading to resolve such dispute prior to the expiration of the Review Period (which such deadline may be extended by the applicable submitting party in writing), with at least ten (10) days' prior written notice to the submitting party of any hearing on such motion or other pleading.  The Global Debtors shall promptly pay at the expiration of the applicable Review Period in full in cash all such invoiced fees and expenses other than the Disputed Invoiced Fees, and this Court shall have jurisdiction to determine the Disputed Invoiced Fees if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Global Debtors shall pay on the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Secured Parties, including the DIP Advisors, the Fronting Lender Advisors, and the ABL DIP Advisors, and the Ad Hoc Group, including the DIP Lender Advisors, incurred on or prior to such date without the need for any professional engaged by the DIP Secured Parties and the Ad Hoc Group to first deliver a copy of its invoice as provided for herein (other than to the Global Debtors).  No attorney or advisor to any of the DIP Secured Parties

or the Ad Hoc Group shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Global Debtors to any of the DIP Secured Parties or the Ad Hoc Group in connection with the applicable Prepetition Secured Obligations, the DIP Facility, the Chapter 11 Cases or otherwise are hereby approved in full.

23.     <u>Exercise of Remedies Under Prepetition FILO Credit Agreement and Prepetition NPC Credit Agreement</u>.

(a)     To the extent that the Prepetition SGUS Noteholders have the right under the terms any of the Prepetition FILO Credit Agreement or the Prepetition NPC Credit Agreement to "step-in" and instruct the Prepetition FILO Secured Parties or the Prepetition NPC Secured Parties to take any actions, including voting, amendments, waivers or other discretionary actions, based upon (i) the effect of the automatic stay with respect to the prepetition claims of the Prepetition FILO Secured Parties and the Prepetition NPC Secured Parties and (ii) the DIP Liens encumbering all property and assets of Debtor SGUS LLC, including its rights and interests in the Prepetition FILO Loans and the Prepetition NPC Loans, on a first priority priming basis, until the SGUS DIP Obligations are Paid in Full, the SGUS DIP Agent, acting at the direction of the SGUS DIP Lenders, shall have the sole right to "step-in" and instruct the Prepetition FILO Secured Parties and the Prepetition NPC Secured Parties, and it shall constitute a violation of the automatic stay to the extent any Prepetition SGUS Noteholder or the Prepetition SGUS Notes Agent seeks to exercise any such rights or any similar rights under any of the Prepetition FILO Documents or the Prepetition NPC Documents.

24.     <u>Approval of DIP Syndication Materials</u>.

(a)     The syndication procedures to participate in the SGUS First Out DIP Loans and SGUS Second Out DIP Loans (the "**DIP Syndication**") are set forth in the Notice and the

Subscription Forms to the eligible holders of Prepetition SGUS Notes attached to the Interim Order substantially in the form of **Exhibit D** (the "**DIP Syndication Materials**") were approved pursuant to the Interim Order (and as reaffirmed herein). As of the Interim Order Effective Date (and as reaffirmed herein), the Global Debtors were authorized to commence and conduct the DIP Syndication in accordance with the terms and conditions of the DIP Syndication Materials and the DIP Orders.

(b)     As of the Interim Order Effective Date (and as reaffirmed herein), the Debtors were authorized to distribute the DIP Syndication Materials to each Eligible Holder (as defined in the DIP Syndication Materials). Each Eligible Holder intending to participate in the DIP Syndication must affirmatively make a binding election to exercise such rights to participate (the "**Subscription Rights**") on or prior to the Early Tender Time or the Expiration Time, as applicable (each as defined in the DIP Syndication Materials) and must otherwise timely satisfy each of the terms and conditions set forth in the DIP Syndication Materials, and shall be deemed to have relinquished and waived all rights to participate in the DIP Syndication to the extent such Eligible Holder fails to timely satisfy each of the terms and conditions set forth in the DIP Syndication Materials.

(c)     Debtor SGUS LLC, with the prior written consent of the Required SGUS DIP Lenders (which consent may be conveyed by email from the DIP Lender Advisors to lead counsel to the Global Debtors), was, pursuant to the Interim Order, and is hereby authorized on a final basis to effect Amendments to the DIP Syndication Materials or adopt any additional detailed procedures or forms, consistent with the provisions of the DIP Syndication Materials and the DIP Orders, to effectuate the DIP Syndication. The Global Debtors are authorized on a final basis, but not directed, to make changes to the DIP Syndication Materials without further notice, hearing or

order of this Court, including formatting changes, changes to correct typographical and grammatical errors and conforming changes with respect to the DIP Documents and other related materials.

(d)     For the avoidance of doubt, all questions concerning the timeliness, viability, form, and eligibility of any exercise to participate in the DIP Syndication shall be determined by the Global Debtors with the consent of the SGUS DIP Lenders (which consent may be conveyed by email from the DIP Lender Advisors to lead counsel to the Global Debtors) in accordance with the DIP Syndication Materials.  Pursuant to the DIP Syndication Materials, Debtor SGUS LLC, with the consent of the Required SGUS DIP Lenders (which consent may be conveyed by email from the DIP Lender Advisors to lead counsel to the Global Debtors), was, pursuant to the Interim Order, and is hereby authorized on a final basis, but not directed, to waive any defect or irregularity, to permit a defect or irregularity to be corrected within such time frames as they may determine, or to reject any Eligible Holder's participation in the DIP Syndication.

25.     <u>DIP Syndication Failure to Fund Penalty</u>.  Any Prepetition SGUS Noteholder who exercises Subscription Rights to participate in the DIP Syndication and refuses and fails to fund the SGUS First Out DIP Loans per their obligations thereunder shall have any SGUS Second Out DIP Loans they receive on account of such exercise of Subscription Rights subordinated in both lien and payment priority to all tranches of the SGUS DIP Facility and any remaining Prepetition SGUS Notes.

26.     <u>Payment of DIP Financing Agent</u>.

(a)     Prior to the Petition Date, the Global Debtors provided Epiq Corporate Restructuring LLC ("**_Epiq_**") a retainer in the amount of $40,000. Epiq will apply these funds in accordance with the Engagement Letter.  As of the Interim Order Effective Date (and as reaffirmed

herein), the Global Debtors were authorized to compensate Epiq for their services as DIP Financing Agent under sections 105(a) and 363(b) of the Bankruptcy Code effective as of the Petition Date, under the terms of the engagement agreement attached to the Interim Order as **Exhibit E** (the "***Engagement Agreement***"), as modified by the DIP Orders.

(b)     As of the Interim Order Effective Date (and as reaffirmed herein), Epiq was authorized and directed to perform the services as described in the DIP Motion, the Engagement Agreement, and the DIP Orders.  If a conflict exists, this Final Order controls.

(c)     As of the Interim Order Effective Date (and as reaffirmed herein), Epiq was authorized to take such other actions as necessary to provide the Services set forth in the DIP Motion and the Engagement Agreement.

(d)     Epiq may hold its retainer for services authorized pursuant to the DIP Orders during the Chapter 11 Cases as security of payment of Epiq's final invoice for services rendered and expenses incurred under the DIP Orders.

(e)     All amounts due to Epiq will be treated as section 503(b) administrative expenses.  Epiq may apply its retainer in accordance with the Engagement Letter and the terms of this Final Order.  The Global Debtors shall indemnify Epiq and each other Indemnified Person, as that term is defined in the Engagement Agreement (collectively, the "***Indemnified Persons***"), under the terms of the Engagement Agreement, as modified pursuant to and limited by the DIP Orders.

(f)     The Indemnified Persons shall not be entitled to indemnification, contribution or reimbursement pursuant to the Engagement Agreement for services other than the services provided under the Engagement Agreement, unless such services and the indemnification, contribution or reimbursement therefor are approved by this Court.

(g)     Notwithstanding anything to the contrary in the Engagement Agreement, the Global Debtors shall have no obligation to indemnify the Indemnified Persons, or provide contribution or reimbursement to the Indemnified Persons, for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from an Indemnified Person's gross negligence, willful misconduct or fraud; (ii) for a contractual dispute in which the Global Debtors allege the breach of an Indemnified Person's contractual obligations if this Court determines that indemnification, contribution or reimbursement would not be permissible pursuant to applicable law; or (iii) settled before a judicial determination under (i) or (ii), but determined by this Court, after notice and a hearing, to be a claim or expense for which an Indemnified Person should not receive indemnity, contribution or reimbursement under the terms of the Engagement Agreement as modified by the DIP Orders.

(h)     Notwithstanding anything to the contrary in the Engagement Agreement, for services rendered pursuant to the DIP Orders, the limitation of liability contained in paragraph 8 of the Engagement Agreement shall have no force or effect during the Chapter 11 Cases.

(i)     If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in the Chapter 11 Cases (that order having become a final order no longer subject to appeal), or (ii) the entry of an order closing the Chapter 11 Case, an Indemnified Person believes that it is entitled to the payment of any amounts by the Global Debtors on account of the Global Debtors' indemnification, contribution or reimbursement obligations under the Engagement Agreement (as modified by the DIP Orders), including the advancement of defense costs, the Indemnified Person or Epiq must file an application therefor in this Court, and the Global Debtors may not pay any such amounts to such Indemnified Person before the entry of an order by this Court approving the payment.  This paragraph is intended only to specify the period of time under which this Court

shall have jurisdiction over any request for fees and expenses by Epiq for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Global Debtors' obligation to indemnify the Indemnified Persons.  All parties in interest shall retain the right to object to any demand by any Indemnified Person for indemnification, contribution or reimbursement.

(j)      The Global Debtors and Epiq are authorized on a final basis to take all actions necessary to effectuate the relief granted pursuant to the DIP Orders in accordance with the DIP Motion.

(k)      In the event of any inconsistency between the Engagement Agreement, the DIP Motion and the DIP Orders concerning the terms of Epiq's engagement, the DIP Orders shall govern.

27.    <u>Consignment Inventory</u>.

(a)      Subject to the terms (including any consent rights of the DIP Secured Parties) of the DIP Orders and the DIP Documents, the Global Debtors are hereby authorized to enter into consignment agreements (including any Trade Agreements, to the extent related to consignment merchandise) or arrangements (such agreements or arrangements, the "***Postpetition Consignment Agreements***") and to issue orders for consignment merchandise with all such contracts and orders being deemed to be in the ordinary course of business, without further order of this Court.  The Postpetition Consignment Agreements are hereby authorized and approved and shall constitute valid and binding obligations of the applicable Global Debtors, enforceable against the Global Debtors and their Estates and the counterparties thereto in accordance with their terms.  The following shall be subject and subordinate in all respects to amounts owed by the Global Debtors under the Postpetition Consignment Agreements on account of Postpetition Consigned

Merchandise (as defined below): the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, all other administrative claims of the Global Debtors' Estates, the Adequate Protection Obligations, the Adequate Protection Liens, the Prepetition Secured Obligations, and the Prepetition Liens (but excluding the ABL DIP Obligations, the ABL DIP Liens, the Prepetition ABL Secured Obligations, and the Prepetition ABL Liens (and, in each case, the Adequate Protection Obligations and Adequate Protection Liens related thereto)).

(b)        With respect to any merchandise (i) consigned and delivered to the Global Debtors on or after the Petition Date and prior to the effective date of a chapter 11 plan, or (ii)(A) consigned and delivered to the Global Debtors prior to the Petition Date and (B) in the Global Debtors' possession and not sold as of the Petition Date (excluding any proceeds of consignment merchandise to which the Global Debtors are entitled to receive and retain under any Postpetition Consignment Agreements) (the "***Postpetition Consigned Merchandise***"), the vendor (the "***Postpetition Consignor***") (x) shall either (1) state (or have stated) on its invoice, memo, or similar document that the merchandise identified therein is being provided to the Global Debtors "on consignment" or "on memo", or (2) ship (or have shipped) such merchandise pursuant to an existing or hereafter entered into consignment agreement or arrangement (including a Postpetition Consignment Agreement) between the vendor and the Global Debtors, and (y) be authorized but not required to file UCC financing statements to perfect its rights with respect to such merchandise; *provided* that, each Postpetition Consignor's interest in the applicable Postpetition Consigned Merchandise shall be deemed valid and perfected, with first priority, as against all other parties in interest (including the Global Debtors, their Estates, and the DIP Secured Parties) without the need for any such filing; *provided, further*, that the Prepetition ABL Agent and the ABL DIP Lenders shall not be liable or responsible with respect to the application of the proceeds of Postpetition

Consigned Merchandise against the Prepetition ABL Secured Obligations or the ABL DIP Obligations to the extent such application occurred from and after the Petition Date in accordance with the DIP Orders.

(c)     Notwithstanding anything in the DIP Orders to the contrary, (i) the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations, and the Prepetition Liens (A) shall attach to and encumber Postpetition Consigned Merchandise, but shall be junior and subordinate to the applicable Postpetition Consignor's interests in such Postpetition Consigned Merchandise, and (B) shall attach to and encumber any proceeds of the Postpetition Consigned Merchandise to which the Global Debtors are entitled to receive and retain under the Postpetition Consignment Agreements or applicable law, and (ii) the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, all other administrative claims of the Global Debtors' Estates, the Prepetition Secured Obligations, and the Prepetition Liens (but excluding the ABL DIP Obligations, the ABL DIP Liens, the Prepetition ABL Secured Obligations, and the Prepetition ABL Liens (and, in each case, the Adequate Protection Obligations and Adequate Protection Liens related thereto)) shall be subject and subordinate in all respects to the payment of amounts owed by the Global Debtors to Postpetition Consignors on account of such Postpetition Consigned Merchandise.

(d)     Notwithstanding anything in the DIP Orders to the contrary, the Global Debtors may pay in their discretion any consignor (a "***Prepetition Consignor***") on account of merchandise consigned and delivered to the Global Debtors prior to the Petition Date and sold prior to the Petition Date (the "***Prepetition Consignment Sale Claims***"), consistent with the terms of the *Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Certain (A) Lien*

*Claimants and (B) Customs and Regulatory Claimants, and (II) Granting Related Relief*, dated January 14, 2026 [Docket No. 152], and the DIP Credit Agreements.

(e)       Notwithstanding anything in the DIP Orders to the contrary, (i) in no event shall the DIP Agents, any DIP Lender, or any of the Representatives of any of the foregoing parties, be liable on account of any Postpetition Consigned Merchandise or proceeds thereof and the Postpetition Consignors' sole recourse shall be to the Global Debtors' Estates, and (ii) in no event shall the Prepetition ABL Agent and the ABL DIP Lenders be liable or responsible with respect to the application of the proceeds of Postpetition Consigned Merchandise against the Prepetition ABL Secured Obligations or the ABL DIP Obligations to the extent such application occurred from and after the Petition Date in accordance with the DIP Orders.

(f)       The provisions of this paragraph 27 are entered on a final basis and shall be binding on the Global Debtors and their Estates, each Prepetition Consignor and Postpetition Consignor, any assignee or successor, any Trustee, and the DIP Agents.

(g)       Notwithstanding anything in the DIP Orders to the contrary, nothing contained herein shall constitute or be deemed to constitute an assumption or an assumption and assignment of any agreement between any Debtor and any consignor pursuant to section 365 of the Bankruptcy Code.

(h)       Notwithstanding anything in the DIP Orders to the contrary, but subject to the rights of all parties in interest under paragraph 18 hereof (provided that, solely for purposes of this paragraph 27(h), the "***Challenge Period***" shall mean no later than April 15, 2026), (i) the rights of all parties with respect to any Prepetition Consignment Sale Claims (including any rights of setoff with respect thereto) are hereby fully reserved, and (ii) to the extent that any party held, as of the Petition Date, a valid, duly perfected, first priority lien or interest in any merchandise giving

rise to a Prepetition Consignment Sale Claim, nothing in this Order shall be deemed to prejudice, impair, subordinate, or prime such lien or interest.

28.    <u>Concession Merchandise</u>.

(a)    Subject to the terms (including any consent rights of the DIP Secured Parties) of the DIP Orders and the DIP Documents, the Global Debtors are hereby authorized to enter into concession agreements (including any Trade Agreements, to the extent related to concession merchandise) or arrangements (such agreements or arrangements, the "***Postpetition Concession Agreements***") with respect to concession merchandise with all such contracts and orders being deemed to be in the ordinary course of business, without further order of this Court.  The Postpetition Concession Agreements are hereby authorized and approved and shall constitute valid and binding obligations of the applicable Global Debtors, enforceable against the Global Debtors and their Estates and the counterparties thereto in accordance with their terms.  The following shall be subject and subordinate in all respects to amounts owed by the Global Debtors under the Postpetition Concession Agreements on account of Postpetition Concession Merchandise (as defined below): the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, all other administrative claims of the Global Debtors' Estates, the Adequate Protection Obligations, the Adequate Protection Liens, the Prepetition Secured Obligations, and the Prepetition Liens (but excluding the ABL DIP Obligations, the ABL DIP Liens, the Prepetition ABL Secured Obligations, and the Prepetition ABL Liens (and, in each case, the Adequate Protection Obligations and Adequate Protection Liens related thereto)).

(b)    Notwithstanding anything in the DIP Orders to the contrary, (i) all concession merchandise maintained at premises operated by the Global Debtors (A) delivered on or after the Petition Date and prior to the effective date of a chapter 11 plan or (B)(1) delivered

prior to the Petition Date, and (2) maintained at premises operated by the Global Debtors and not sold as of the Petition Date (excluding any proceeds of concession merchandise to which the Global Debtors are entitled to receive and retain under any Postpetition Concession Agreements), together with any other tangible or intangible property owned by concession vendors and maintained at premises operated by the Global Debtors on or after the Petition Date (collectively, the "*Postpetition Concession Merchandise*," and the vendor with respect thereto, the "*Postpetition Concession Vendor*") shall remain the property of the applicable Postpetition Concession Vendor and shall not constitute property of the Global Debtors' Estates, and the DIP Obligations, the DIP Superiority Claims, the DIP Liens, the Prepetition Secured Obligations, and the Prepetition Liens (x) shall not attach to or encumber any Postpetition Concession Merchandise but (y) shall attach to and encumber any proceeds of the Postpetition Concession Merchandise to which the Global Debtors are entitled to receive and retain under the Postpetition Concession Agreements or applicable law; and (ii) the DIP Obligations, the DIP Superiority Claims, the DIP Liens, the Prepetition Secured Obligations, and the Prepetition Liens (but excluding the ABL DIP Obligations, the ABL DIP Liens, the Prepetition ABL Secured Obligations, and the Prepetition ABL Liens (and, in each case, the Adequate Protection Obligations and Adequate Protection Liens related thereto)) shall be subject and subordinate in all respects to the payment of amounts owed by the Global Debtors to Postpetition Concession Vendors on account of Postpetition Concession Merchandise.   The Postpetition Concession Vendors shall be authorized but not required to file UCC financing statements with respect to the Postpetition Concession Merchandise; *provided* that, each Postpetition Concession Vendor's ownership interest in the applicable Postpetition Concession Merchandise shall be deemed valid as against all other parties in interest (including the Global Debtors, their Estates, and the DIP Secured Parties)

without the need for any such filing; *provided, further*, that the Prepetition ABL Agent and the ABL DIP Lenders shall not be liable or responsible with respect to the application of the proceeds of Postpetition Concession Merchandise against the Prepetition ABL Secured Obligations or the ABL DIP Obligations to the extent such application occurred from and after the Petition Date in accordance with the DIP Orders.

(c)     Notwithstanding anything in the DIP Orders to the contrary, (i) in no event shall the DIP Agents, any DIP Lender, or any of the Representatives of any of the foregoing, be liable on account of any Postpetition Concession Merchandise or proceeds thereof and the Postpetition Concession Vendor's sole recourse shall be to the Global Debtors' Estates, and (ii) in no event shall the Prepetition ABL Agent and the ABL DIP Lenders be liable or responsible with respect to the application of the proceeds of Postpetition Concession Merchandise against the Prepetition ABL Secured Obligations or the ABL DIP Obligations to the extent such application occurred from and after the Petition Date in accordance with the DIP Orders.

(d)     The provisions of this paragraph 28 are entered on a final basis and shall be binding on the Global Debtors and their Estates, any assignee or successor, each prepetition concession vendor and Postpetition Concession Vendor, any Trustee, and the DIP Agents.

(e)     Notwithstanding anything in the DIP Orders to the contrary, nothing contained herein shall constitute or be deemed to constitute an assumption or an assumption and assignment of any agreement between any Debtor and any concession vendor pursuant to section 365 of the Bankruptcy Code.

(f)     Notwithstanding anything in the DIP Orders to the contrary, but subject to the rights of all parties in interest under paragraph 18 hereof (provided that, solely for purposes of this paragraph 28(f), the "***Challenge Period***" shall mean no later than April 15, 2026), (i) the rights

of all parties with respect to the proceeds of any concession merchandise sold prior to the Petition

Date (including any rights of setoff with respect thereto) are hereby fully reserved, (ii) to the extent

that any party held, as of the Petition Date, a valid, duly perfected, first priority lien or interest in

any such proceeds, nothing in this Order shall be deemed to prejudice, impair, subordinate, or

prime such lien or interest.

      29.    <u>No Modification or Stay of This Final Order</u>.

      (a)    Based upon the record presented to this Court by the Global Debtors,

notwithstanding (i) any stay, modification, amendment, supplement, vacatur, revocation, or

reversal of the DIP Orders, the DIP Documents or any term hereunder or thereunder or (ii) the

dismissal or conversion of one or more of the Chapter 11 Cases, each DIP Agent and each DIP

Lender shall retain and be entitled to all of the rights, remedies, privileges, and benefits in favor of

the DIP Agents and the DIP Lenders pursuant to section 364(e) of the Bankruptcy Code, the DIP

Orders, and the applicable DIP Documents as of the date any event referred to in clauses (i) or (ii)

shall have occurred.

      (b)    Unless and until all DIP Obligations are Paid in Full, and all DIP

Commitments are terminated, the Global Debtors irrevocably waive the right to seek and shall be

prohibited from seeking or consenting to, directly or indirectly, (i) except as permitted under the

DIP Documents or, if not provided for therein, with the prior written consent of each DIP Agent

(at the direction of the Applicable Required DIP Lenders), as applicable (and no such consent shall

be implied by any action or inaction of any DIP Agent): (A) any reversal, modification, stay,

vacatur, or amendment of the DIP Orders or any provision thereof, (B) a priority claim for any

administrative expense, priority claim, secured claim, unsecured claim, or any other claims against

any of the Global Debtors (now existing or hereafter arising of any kind or nature whatsoever,

including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases, pari passu with or senior to the DIP Liens or the DIP Superpriority Claims, or (C) any order, other than the DIP Orders, allowing the use of Cash Collateral constituting or resulting from DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out and subject to the DIP Intercreditor Agreement), any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens; or (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Final Order.  The Global Debtors irrevocably waive any right to seek any Amendment of the DIP Orders without the prior written consent, as provided in the foregoing, of each DIP Agent (at the direction of the Applicable Required DIP Lenders) and no such consent shall be implied by any other action, inaction, or acquiescence of any DIP Agent or DIP Lender.

30.     <u>Real Property Leases</u>.  Notwithstanding anything to the contrary in the DIP Orders, the DIP Credit Agreements, or the DIP Documents, all of the liens granted pursuant to the DIP Orders shall not include or attach to: (a) any of the Global Debtors' real property leases (but shall include all proceeds of such leases) and no liens granted pursuant to the DIP Orders shall attach to the Global Debtors' real property leaseholds; (b) any insurance or proceeds therefrom for damage to a landlord's property; and (c) any security deposits (in possession of the landlord) or the Global Debtors' interests, if any, in any pre-paid rent, unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents.  For the avoidance of doubt, the liens granted pursuant to the DIP Orders shall not interfere with any rights held by a landlord under such policies to any such insurance proceeds for damage to such landlord's property.

31.     <u>Power to Waive Rights; Duties to Third Parties; No Waiver by Failure to Seek Relief</u>.  Each DIP Secured Party and Prepetition Secured Party shall have the right, in its respective

sole discretion, to waive any of the terms, rights, and remedies provided or acknowledged in the DIP Orders, or the applicable DIP Documents or Prepetition Documents ("***Lender Rights***") with respect to such party, and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s). Any waiver by any such party of any Lender Rights shall apply solely to such party and to the Lender Rights so waived and shall not be or constitute a continuing waiver, except that any waiver by (a) a DIP Agent, on behalf of the applicable DIP Secured Parties, shall bind such DIP Lenders in accordance with the applicable DIP Documents and (b) a Prepetition Agent, on behalf of the applicable Prepetition Secured Parties, shall bind such Prepetition Secured Parties in accordance with the applicable Prepetition Documents. Any delay in or failure by any DIP Secured Party or Prepetition Secured Party to seek relief or otherwise exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, nor cause or enable any other party to rely upon or in any way assert a defense based upon such delay or failure. No delay on the part of any party in the exercise of any Lender Right or remedy under the DIP Orders shall preclude any other or further exercise of any such Lender Right or remedy or the exercise of any other Lender Right or remedy. None of the rights or remedies of any party under the DIP Orders shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing, and signed by the party against whom such amendment, modification, suspension, or waiver is sought. No consents required hereunder, any DIP Document, or any Prepetition Document from any of the DIP Secured Parties or Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties, respectively.

32.    <u>Modification of the Automatic Stay</u>.  The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified solely as necessary to effectuate all of the terms and provisions of the DIP Orders and the DIP Documents, including, without limitation, the incurrence of obligations, the authorization to make payments, the granting of liens and the perfection of liens.

33.    <u>Binding Effect</u>.

(a)    The provisions of the DIP Orders, the DIP Documents, the DIP Superpriority Claims, the DIP Liens, the DIP Obligations, and any and all rights, remedies, privileges, protections, liens, priorities, and benefits, in favor of the DIP Agents, the DIP Lenders, any other DIP Secured Party, and/or any Prepetition Secured Party, respectively, provided or acknowledged in the DIP Orders, and any actions taken pursuant thereto, shall be effective immediately upon entry of the DIP Orders (as applicable) pursuant to Bankruptcy Rule 6004(h), shall continue in full force and effect, shall survive entry of any other order, and shall not be modified, impaired, or discharged by the entry of any order (i) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, (ii) converting any of the Chapter 11 Cases to a chapter 7 case, (iii) dismissing any of the Chapter 11 Cases or any Successor Cases, (iv) withdrawing of the reference of any of the Chapter 11 Cases or any Successor Cases, (v) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases or Successor Cases in this Court, (vi) terminating the joint administration of the Chapter 11 Cases, or (vii) approving the sale of any DIP Collateral or Prepetition Collateral, including pursuant to section 363(b) of the Bankruptcy Code, or by any other act or omission.  The terms and provisions of the DIP Orders shall continue in the Chapter 11 Cases, in any Successor Cases, or following the dismissal of the Chapter 11 Cases or any Successor Cases, notwithstanding the entry of any such order, and such

protections, rights, remedies, liens, priorities, privileges, and benefits, shall continue in full force and effect in these proceedings and after any dismissal thereof, and shall maintain their respective priorities as provided by the DIP Orders and the DIP Documents, and to the maximum extent permitted by law, until all of the DIP Obligations have been Paid in Full.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code (and pursuant to section 1141(d)(4) of the Bankruptcy Code, the Global Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations), unless the DIP Obligations have been Paid in Full on or before the effective date of such plan of reorganization or the DIP Agents (at the direction of the Applicable Required DIP Lenders) have otherwise agreed in writing.

(b)    Any order dismissing one or more of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) each DIP Agent's, DIP Lender's, and any other DIP Secured Party's respective liens on, and security interests in, the applicable DIP Collateral and the Adequate Protection Liens, the Adequate Protection Obligations and the other administrative claims granted pursuant to the DIP Orders shall continue in full force and effect (in each case, subject to the Carve Out) notwithstanding such dismissal and shall maintain their priorities as provided in the DIP Orders until the DIP Obligations and Adequate Protection Obligations have been Paid in Full (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Obligations, and the other administrative claims granted pursuant to the DIP Orders, shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, to the maximum extent permissible under

applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claims, the DIP Liens and the claims, liens, and security interests referred to in the foregoing clause (i), as applicable.

(c)     The provisions of the DIP Orders shall be binding upon and inure to the benefit of the Global Debtors, their Estates, the Committee, all other creditors of any of the Global Debtors, and all other parties in interest in the Chapter 11 Cases, and in each case their respective successors and assigns, including any Trustee in the Chapter 11 Cases or any Successor Cases or otherwise in respect of any Debtors or any property of the Estate of any of the Global Debtors, and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, and their respective successors and assigns.  Such binding effect is an integral part of the DIP Orders. No lien or interest avoided and preserved for the benefit of any Debtor's Estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Adequate Protection Liens.

34.     <u>Indemnification</u>.  Each of (a) the DIP Secured Parties and their Representatives and (b) the Prepetition Secured Parties and their Representatives, respectively, have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, respectively, any challenges or objections to the DIP Facilities or the use of Cash Collateral, the DIP Documents, the Prepetition OpCo Second Out Notes Participations, the issuance of the Roll-Up DIP Loans, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, as of the Interim Order Effective Date

(and as reaffirmed herein), each of the Prepetition Secured Parties and the DIP Secured Parties were, and hereby are on a final basis, indemnified as provided in the applicable Prepetition Documents and DIP Documents, as applicable, in connection with the actions referenced in the immediately preceding sentence. The Global Debtors agree that no exception or defense in contract, law, or equity exists as of the Interim Order Effective Date to any obligation set forth, as the case may be, in the DIP Orders, the DIP Documents, the Prepetition Documents, or in connection with the Prepetition OpCo Second Out Notes Participations or the issuance of the Roll-Up DIP Loans, to indemnify and/or hold harmless the DIP Agents, any other DIP Secured Party, the Prepetition Agents, or any other Prepetition Secured Party, as the case may be, and any such defenses are hereby waived; *provided* that, notwithstanding anything to the contrary herein, the binding effect of the indemnification rights contained in this paragraph with respect to the Prepetition Secured Parties shall be subject to Challenge and the Challenge Period, any party in interest bringing forth a timely Successful Challenge, and this Court fashioning an appropriate remedy following a party in interest bringing forth a timely Successful Challenge.

35.     <u>Limits on Lender Liability</u>.

(a)     Nothing in the DIP Orders, any of the DIP Documents, any of the Prepetition Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or Prepetition Secured Parties of any liability for any claims arising from any activities by the Global Debtors or their affiliates in the operation of their business or in connection with the Global Debtors' or their affiliates' restructuring efforts or the administration of the Chapter 11 Cases or any Successor Cases.

(b)     In determining to make any loan under the DIP Documents or the Prepetition Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to the DIP Orders, the DIP Documents, or the Prepetition Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Global Debtors or their affiliates, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Global Debtors or their affiliates (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

(c)     Furthermore, nothing in the DIP Orders, in the DIP Documents or in the Prepetition Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, any other DIP Secured Party, or any Prepetition Secured Party of any liability for any claims arising from the prepetition or post-petition activities of any of the Global Debtors or their affiliates or any fiduciary duties owed to the Global Debtors, their affiliates, or the Global Debtors' or their affiliates' respective creditors, shareholders, or Estates.  Nothing in the DIP Orders or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Global Debtors or their affiliates, and the DIP Secured Parties and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, (v) any payments to any vendors,

contractors or service providers to any Debtor or any subsidiary or affiliate thereof, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Global Debtors.

(d)     Notwithstanding anything to the contrary herein, the findings contained in this paragraph with respect to the Prepetition Secured Parties shall not limit the rights of parties in interest (including the Committee) with requisite standing to assert claims against the Prepetition Secured Parties on behalf of the Global Debtors' Estates pursuant and subject to paragraph 18 of this Final Order.

36.     <u>Proofs of Claim</u>.

(a)     Notwithstanding anything to the contrary contained in any prior or subsequent order of this Court, including, without limitation, any order establishing a bar date or deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code in any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, none of the DIP Agents, the DIP Lenders, the Prepetition Agents or the other Prepetition Secured Parties shall be required to file proofs of claim or requests for payment of administrative expenses in any of the Chapter 11 Cases or any Successor Cases with respect to, as applicable, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Obligations, the Prepetition Liens, the Adequate Protection Claims, the Adequate Protection Liens or any other claims or liens granted hereunder or created by the DIP Orders, the DIP Documents or the Prepetition Documents.  As of the Interim Order Effective Date (as reaffirmed herein), each of the DIP Secured Parties and the Prepetition Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if they filed a proof of claim in the full amount of the applicable DIP Obligations and Prepetition Secured

Obligations.  All of the DIP Obligations and the remaining Prepetition Secured Obligations shall be and shall remain due and payable in accordance with the applicable DIP Documents and Prepetition Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents, the Prepetition Documents or any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect any DIP Agent's, DIP Lender's, any other DIP Secured Party's, or Prepetition Secured Party's rights, remedies, powers, or privileges under any of the DIP Documents, the Prepetition Documents, the DIP Orders, or applicable law.   Each (i) DIP Agent, for the benefit of the applicable DIP Lenders, and (ii) Prepetition Agent, for the benefit of the applicable Prepetition Secured Parties, is authorized (but not directed), in its sole and absolute discretion, but in no event is required, to file (and amend and/or supplement, as it sees fit) proofs of claim in each of the Chapter 11 Cases on behalf of the applicable DIP Secured Parties in respect of the applicable DIP Obligations or the applicable Prepetition Secured Parties in respect of the applicable Prepetition Secured Obligations.  Any proofs of claim so filed shall be deemed to be in addition to, and not in lieu of, any other proof of claim that may be filed by any DIP Agent, DIP Lender, or Prepetition Secured Party.

(b)      In order to facilitate the processing of claims, to ease the burden upon this Court and to reduce any unnecessary expense to the Global Debtors' Estates, each DIP Agent and Prepetition Agent is authorized (but not directed), in its sole discretion, to file in the Global Debtors' lead Chapter 11 Case *In re Saks Global Enterprises LLC*, Case No. 26-90103 (ARP), a master proof of claim on behalf of the applicable DIP Secured Parties or Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable DIP Documents or

Prepetition Documents and hereunder (as applicable) (each, a "**_Master Proof of Claim_**") against each of the applicable Debtors.  Upon the filing of any such Master Proof of Claim, the DIP Agent or the Prepetition Agent filing such Master Proof of Claim shall be deemed to have filed a proof of claim in the amount set forth therein in respect of its claims of any type or nature whatsoever with respect to the applicable DIP Documents or Prepetition Documents, and the claims of each applicable DIP Secured Party or Prepetition Secured Party (and each of its successors and assigns), asserted or described in such Master Proof of Claim shall be treated as if a separate proof of claim had been filed in each of the Chapter 11 Cases of the Global Debtors identified as having liability in such Master Proof of Claim.  The Master Proofs of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by the applicable Debtors to the DIP Secured Parties or the Prepetition Secured Parties, as applicable.  Any Master Proof of Claim so filed by any DIP Agent or Prepetition Agent shall be deemed to be in addition to and not in lieu of any other Master Proof of Claim that may be filed by any other DIP Secured Party or Prepetition Secured Party.

37.    <u>Waiver of Bankruptcy Rule 6004(a) and 6004(h)</u>.  The notice requirements of Bankruptcy Rule 6004(a) and the 14-day stay of Bankruptcy Rule 6004(h) are hereby waived.

38.    <u>Insurance</u>.  Until the DIP Obligations and Prepetition Secured Obligations have been Paid in Full, at all times the Global Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and otherwise in accordance with the DIP Documents.  To the fullest extent provided by applicable law, each DIP Agent and Prepetition Agent shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Global Debtors to the extent that such policy in

any way relates to the DIP Collateral securing the obligations under the credit facility for which such DIP Agent or Prepetition Agent, as applicable, serves as agent provided that, the rights or liens granted hereunder shall not interfere with any rights held by a landlord to insurance proceeds for damages to a landlord's property.

39.  <u>Cash Management</u>.  Until such time as all DIP Obligations and Prepetition Secured Obligations are Paid in Full, unless otherwise agreed to by each DIP Agent (acting at the direction of the Applicable Required DIP Lenders) and Prepetition Agent, the Global Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by the DIP Orders and any Cash Management Order.  The Global Debtors shall not open any new deposit or securities account that is not subject to the liens and security interests of the applicable DIP Agents, for the benefit of the applicable DIP Lenders (in which case they shall be subject to the lien priorities and other provisions set forth in the DIP Orders and the DIP Intercreditor Agreement), and no bank account pledged in favor of any DIP Agent or Prepetition Agent will be closed during the Chapter 11 Cases without the prior written consent of the applicable DIP Agent (acting at the direction of the Applicable Required DIP Lenders), and nothing in the DIP Orders will alter or impair any security interest or perfection thereof that existed as of the Petition Date or that arises after the Petition Date. Until the DIP Obligations and Prepetition Secured Obligations are Paid in Full, the Global Debtors shall (a) maintain accurate records of all transfers (including intercompany transactions) within their cash management system so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, and (b) provide reasonable access to such records to each DIP Agent, the other DIP Secured Parties, the DIP Advisors, and the ABL DIP Advisors.

40.     <u>Intercreditor Provisions</u>.   Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition Documents (including, for the avoidance of doubt, the Prepetition Intercreditor Agreements) shall remain in full force and effect; *provided*, that to the extent there exists any conflict among the terms and conditions of the Prepetition Documents and this Final Order, the terms and conditions of this Final Order shall govern and control.

41.     <u>Final Order Controls</u>.   In the event of a conflict between (a) the terms and provisions of the DIP Documents or the Interim Order and (b) the terms and provisions of this Final Order, then in each case the terms and provisions of this Final Order shall govern.   Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Global Debtors pursuant to the authority granted therein shall be subject to the DIP Orders, including compliance with the Approved Budget and all other terms and conditions of this Final Order, and (ii) to the extent there is any inconsistency between the terms of such other order and this Final Order, this Final Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

42.     <u>No Third-Party Rights</u>.   Except as explicitly provided for herein, the DIP Orders do not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

43.     <u>Payments Free and Clear</u>.   Any and all payments or proceeds remitted to or for the benefit of any of the DIP Secured Parties pursuant to the provisions of the DIP Orders, any subsequent order of this Court, or the DIP Documents, shall, subject to the terms of this paragraph, be irrevocable, received free and clear of any claims, charges, assessments, or other liabilities, including, without limitation, any such claims or charges arising out of or based on, directly or

indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Global Debtors, and in the case of payments made or proceeds remitted after the delivery of a Carve Out Trigger Notice, subject to the Carve Out in all respects; *provided* that nothing in this paragraph shall prejudice the rights of parties in interest (including the Committee) with requisite standing to assert claims against the Prepetition Secured Parties on behalf of the Global Debtors' Estates pursuant and subject to paragraph 18 of this Final Order solely with respect to the Roll-Up DIP Loans and SGUS Third Out DIP Loans.

44.     <u>Joint and Several Liability</u>.  Nothing in the DIP Orders shall be construed to constitute a substantive consolidation of any of the Global Debtors' Estates or any subset thereof, it being understood, however, that the applicable Debtors shall be jointly and severally liable for the obligations hereunder and the DIP Obligations in accordance with the terms of this Final Order and of the DIP Documents, including the DIP Intercreditor Agreement.

45.     <u>Necessary Action</u>.  The Global Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Final Order.

46.     <u>Intercompany Claims</u>.  For the avoidance of doubt, any claim against a DIP Loan Party held by a Global Debtor, and any Lien securing any such claim held by a Global Debtor, shall be junior and subordinate to the DIP Superpriority Claims, DIP Liens, Adequate Protection Claims, Adequate Protection Liens, and the Carve Out.

47.     <u>Treatment of DIP Obligations</u>.  On the Maturity Date of each DIP Facility, the applicable DIP Borrower shall pay the then unpaid and outstanding amount of the applicable DIP

Obligations pursuant to the provisions of the applicable DIP Documents or as otherwise provided in an Acceptable Plan.

48.    <u>Preservation of Rights Granted Under this Final Order</u>.  Notwithstanding anything herein to the contrary, and subject to the DIP Intercreditor Agreement, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) any DIP Agent's, DIP Secured Party's or Prepetition Secured Party's rights to seek any other or supplemental relief in respect of the Global Debtors (including, the right to seek additional or different adequate protection); (b) the rights of any of the Prepetition Secured Parties to seek the payment by the Global Debtors of post-petition interest or fees pursuant to section 506(b) of the Bankruptcy Code; (c) any of the rights of any of the DIP Agents, the other DIP Secured Parties and/or the Prepetition Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of or relief from the automatic stay imposed by section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) seek an injunction, (iv) oppose any request for use of Cash Collateral or any request for the use of proceeds of any DIP Facility (other than as permitted under this Final Order and the DIP Documents), (v) object to any sale of assets, including any DIP Collateral or Prepetition Collateral, (vi) object to the granting of any interest in the DIP Collateral or Prepetition Collateral (other than as contemplated herein or permitted under the DIP Documents), (vii) object to any application for either or both allowance and payment of compensation of Professional Persons or other parties seeking compensation or reimbursement from the Estates, or (viii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (d) any other

rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agents, the other DIP Secured Parties or the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Global Debtors', the Committee's, or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Final Order.  Other than as expressly set forth in this Final Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties and the Prepetition Secured Parties are preserved.

49.    <u>Chubb Matters</u>. For the avoidance of doubt, (i) neither the Interim Order, this Final Order, nor the DIP Documents shall authorize the Global Debtors to grant liens on and/or security interests in (x) any property received and/or held by ACE American Insurance Company and/or any of its U.S.-based affiliates (collectively, together with each of their successors, and solely in their roles as insurers or third party administrators, "***Chubb***") in accordance with the terms of any insurance policy, or any related agreements or (y) any insurance policy issued by Chubb; (ii) neither the Interim Order, this Final Order, nor the DIP Documents grants the Global Debtors any right to use any property (or the proceeds thereof) held by Chubb as collateral to secure obligations under any insurance policies and any related agreements; (iii) the Adequate Protection Liens shall only attach to the proceeds of any insurance policy issued by Chubb to the extent such proceeds are payable to the Global Debtors (as opposed to a third party claimant) pursuant to the terms of any such applicable insurance policy or any related agreement; *provided*, *however*, that the Global Debtors shall pursue any such claim for insurance proceeds or request in accordance with the terms of the applicable insurance policy or any related agreements; *provided*, *further* that Chubb shall not have any duty to effectuate or turnover such property or payment of any such

insurance proceeds directly to the DIP Agents or any other third party; and (iv) nothing, including the DIP Documents, the Interim Order, and/or this Final Order, including subsection (iii) of this Final Order,  and/or any other order of this Court, alters or modifies the terms and conditions of any insurance policies or any related agreements issued by Chubb; *provided*, *further* that nothing set forth in this paragraph shall operate as a waiver of the rights, defenses, or privileges of the Global Debtors, DIP Secured Parties, and the Prepetition Secured Parties from challenging or otherwise objecting to the validity, priority, or extent of the collateral, liens, and/or security interests of Chubb or any claims relating thereto, and any and all such rights shall be fully reserved.

50.     <u>Replacement Agent</u>.  Notwithstanding the resignation or replacement of any collateral agent or administrative agent, including any DIP Agent or Prepetition Agent, or the appointment of a new DIP Agent or Prepetition Agent, the DIP Liens on the DIP Collateral, the Prepetition Liens on the Prepetition Collateral and the Adequate Protection Liens shall remain continuously and properly perfected, notwithstanding the transfer of control, possession, or title of any Prepetition Collateral or DIP Collateral to a new collateral or administrative agent.

51.     <u>Texas Taxing Authorities</u>.  Notwithstanding any other provisions in this Final Order or any final orders pertaining to the use of cash collateral in these Chapter 11 Cases, any statutory liens on account of ad valorem taxes held by the Texas Taxing Authorities[9] (the "***Tax Liens***") shall retain their pre- and postpetition lien priority as provided by applicable nonbankruptcy law and will not be primed by nor made subordinate to any liens granted to any

---

[9]   Bexar County, Cypress-Fairbanks Independent School District, Dallas County, Fort Bend County, Harris County Emergency Service District #9, Harris County Improvement District #1, City of Houston, Houston City College, Houston Independent School District, Lone Star College System, San Marcos CISD, Tarrant County, City of Grapevine, Grapevine-Colleyville Independent School, City of Garland, Garland Independent School District, City of Katy, Katy Management District #1, Fort Bend Independent School District, Fort Bend County Levee Improvement District #2, Clear Creek Independent School District, Harris County Municipal Utility District #358, Harris County Water Control Improvement District #155, Spring Branch Independent School District, City of Houston, and Hays County.

party hereby, to the extent the Tax Liens are valid, senior, perfected, enforceable and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved. Furthermore, as adequate protection for the asserted secured ad valorem taxes of the Texas Taxing Authorities applicable to the Store Closure Assets located in Texas (the "***Tax Claims***"), the Global Debtors shall set aside the amount of $375,121.27 (the "***Texas Tax Reserve***"); *provided that*, in the event additional Closing Stores are included at a later date and are within the Texas Taxing Authorities' jurisdictions, the Global Debtors will supplement the Texas Tax Reserve to account for the ad valorem tax liability incident to such Store Closure Assets or any other asset within the Texas Taxing Authorities' jurisdiction that secures the Tax Claims. The Tax Liens of the Texas Taxing Authorities shall attach to the Texas Tax Reserve to the same extent and with the same priority as such liens attached to the Global Debtors' assets securing the Tax Liens. The funds in the Texas Tax Reserve shall be on the order of adequate protection and shall constitute neither the allowance of the Tax Claims nor a cap or floor on the amounts the Texas Taxing Authorities may be entitled to receive. The funds from the Texas Tax Reserve may be distributed only upon agreement between the Texas Taxing Authorities, the Applicable Required DIP Lenders, and the Global Debtors upon notice to the Committee with an opportunity to object, or by subsequent order of the Court, duly noticed to the Texas Taxing Authorities. Notwithstanding any order that may be entered converting these Chapter 11 Cases to cases under chapter 7, the funds in the Texas Tax Reserve will continue to be held for the benefit of the Texas Taxing Authorities and the Tax Liens shall remain attached to the funds in the Texas Tax Reserve in their relative priority until the Tax Claims are paid in full.  Any payment made to the Texas Tax Authorities from sources other than the Texas Tax Reserve shall reduce the Texas Tax Reserve dollar for dollar.

52.     <u>Payments Held in Trust</u>.  Except as expressly permitted in this Final Order or the other DIP Documents, and subject to the Carve Out, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral prior to all DIP Obligations being Paid in Full, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agents and the DIP Secured Parties and shall immediately turn over the proceeds to the DIP Agents, or as otherwise instructed by this Court, for application in accordance with this Final Order and the other DIP Documents.

53.     <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

54.  <u>Retention of Jurisdiction</u>.  This Court retains exclusive jurisdiction to resolve any disputes arising from or related to the interpretation or enforcement of this Final Order.

Houston, Texas

Signed: February 20, 2026

Alfredo R Pérez
United States Bankruptcy Judge

## Annex 1

## Definitions

"***ABL DIP Advisors***" means each of (a) Otterbourg P.C., Morgan, Lewis & Bockius LLP, and Norton Rose Fulbright US LLP as counsel to the ABL DIP Agent, (b) M3 Advisory Partners, LP, as financial advisor to the ABL DIP Agent, (c) Great American, as Inventory Valuation Consultant to the ABL DIP Agent, and (d) any other financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the ABL DIP Agent (in accordance with the ABL DIP Documents).  It being understood that any such notice required to be delivered to the ABL DIP Advisors shall be satisfied through the delivery of such notice to either Otterbourg P.C. or Morgan, Lewis & Bockius LLP.

"***ABL DIP Collateral***" means all DIP Collateral Assets held by any ABL DIP Loan Party.

"***ABL DIP Documents***" means (a) the ABL DIP Credit Agreement and (b) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents and instruments executed and/or delivered with or to, or filed by, the ABL DIP Agent and/or the ABL DIP Lender in connection with or related thereto (collectively, as amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time).

"***ABL DIP Obligations***" means (a) the "*Secured Obligations*" as defined in the ABL DIP Credit Agreement, and (b) all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Global Debtors under the ABL DIP Facility), and all other fees, indemnity obligations, reimbursement obligations, and any other obligations under or in connection with the ABL DIP Documents and the DIP Orders, whether due or to become due, absolute or contingent.

"***Acceptable Plan***" means a chapter 11 plan of reorganization or liquidation for any of the Global Debtors or their Estates that provides for (a) the termination of all DIP Commitments, (b) all DIP Obligations and Prepetition Secured Obligations to be Paid in Full on or prior to the effective date thereof, and (c) treatment otherwise consented to by the applicable DIP Agent (acting at the direction of the Applicable Required DIP Lenders) and the applicable Prepetition Agent (acting at the direction of the requisite Prepetition Secured Parties) in each case in their sole discretion.

"***Ad Hoc Group***" means the ad hoc group of certain Prepetition Secured Parties represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Porter Hedges LLP

"***Applicable Required DIP Lenders***" means (a) with respect to the ABL DIP Agent or the ABL DIP Facility, the Required ABL DIP Lenders, (b) with respect to the SGUS DIP Agent or the SGUS DIP Facility, the Required SGUS DIP Lenders, and (c) with respect to the OpCo DIP Agent or the OpCo DIP Facility, the "Required Lenders" (as defined in the OpCo DIP Credit Agreement), as directed by the Required SGUS DIP Lenders.

"**_Approved Budget_**" means the Initial Budget or, if an Updated Budget has been approved (including, for the avoidance of doubt, if an Updated Budget has been deemed approved) by the Required SGUS DIP Lenders in accordance with Section 3(f) of this Final Order, such Updated Budget.

"**_Avoidance Actions_**" means any claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code).

"**_Business Day_**" shall mean any day that is not a Saturday, Sunday or other day on which banking institutions in New York City are authorized or required by law to be closed.

"**_Cash Collateral_**" means "cash collateral" (as defined in section 363(a) of the Bankruptcy Code) that is, as applicable, (a) the property of the DIP Loan Parties or is the traceable proceeds of DIP Collateral, in each case in which one or more of the DIP Secured Parties have an interest, or (b) the property of the Prepetition Secured Parties or is the traceable proceeds of Prepetition Collateral, in each case in which one or more of the Prepetition Secured Parties have an interest.

"**_Cash Management Motion_**" means (a) the _Global Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Maintain Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions; and (II) Granting Related Relief_ and (b) any other motion of the Global Debtors seeking interim or final approval of the Global Debtors' cash management system.

"**_Cash Management Orders_**" means the interim and final orders approving any Cash Management Motion, which orders shall be in form and substance acceptable to the DIP Agents (acting at the Applicable Required DIP Lenders).

"**_Closing Date_**" means, with respect to any DIP Facility, the date on which the conditions precedent to the closing of the DIP Facility have been satisfied or waived in accordance with the applicable DIP Documents and the effectiveness of the applicable DIP Documents and the DIP Facility has occurred.

"**_DIP ABL Excess Funding Account_**" means the "_DIP ABL Excess Funding Account_" as defined in the ABL DIP Credit Agreement.

"**_DIP Agent Advisors_**" means Seward & Kissel LLP and any other local or special counsel or other professionals retained by the SGUS DIP Agent.  It being understood that any notice required to be delivered to the DIP Agent Advisors shall be satisfied by delivery of such notice to either Seward & Kissel LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP.

"**_DIP Advisors_**" means the DIP Agent Advisors and the DIP Lender Advisors.

"**_DIP Borrowers_**" means the ABL DIP Borrower, the SGUS DIP Borrower and the OpCo DIP Borrower.

"**_DIP Collateral_**" means the ABL DIP Collateral, the SGUS DIP Collateral and the OpCo DIP Collateral.

2

"**DIP Collateral Assets**" means all property and rights and interests in property of the Global Debtors or their Estates of any kind or nature whatsoever, whether tangible or intangible, in existence as of the Petition Date as well as thereafter created or acquired, and wherever located, including, without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), vehicles, aircraft, goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), tax credits, rights to the payment of money (including tax refunds, interconnection deposit refunds, equipment refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all other claims including commercial tort claims; (c) all proceeds of leased real property; (d) if not otherwise described above, all of the property or rights in property identified as Collateral (as defined in any of the DIP Credit Agreements); (e) proceeds of Avoidance Actions, *provided* that the Avoidance Actions are not DIP Collateral Assets; (f) the proceeds of any exercise of the Global Debtors' rights under sections 506(c) and 550 of the Bankruptcy Code; (g) the proceeds of any actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral Assets; (h) all proceeds from the sale, assignment, or other Disposition of any commercial real estate leases and the Global Debtors' right to select, identify, and designate which commercial leases may be assumed or assumed and assigned under section 365 of the Bankruptcy Code; (i) any security deposits refunded to the Global Debtors after application by a landlord of non-residential real property; (j) all intercompany claims held by any Debtor against one or more of its affiliates and the entitlement of such Debtor thereunder to receive payment on such claims, including all collateral for such claims, subject to the terms set forth in this Final Order, (k) all equity interests held by any Global Debtor; and (l) except as provided above, all other personal property of the Global Debtors and their Estates of every kind and nature; <u>provided</u>, that the proceeds of Avoidance Actions shall be applied subject to paragraph 20 of this Final Order.

"**DIP Commitments**" means each of the ABL DIP Commitments, the SGUS DIP Commitments and the OpCo DIP Commitments.

"**DIP Credit Agreements**" means each of the ABL DIP Credit Agreement, the SGUS DIP Credit Agreement and the OpCo DIP Credit Agreement.

"**DIP Documents**" means each of the ABL DIP Documents, the SGUS DIP Documents, the OpCo DIP Documents, and the DIP Intercreditor Agreement.

"**DIP Escrow Account**" means the "*DIP Escrow Account*" in the SGUS DIP Credit Agreement.

"**DIP Facilities**" means the ABL DIP Facility, the SGUS DIP Facility and the OpCo DIP Facility.

"***DIP Guarantors***" means the ABL DIP Guarantors, the SGUS DIP Guarantors and the OpCo DIP Guarantors.

"***DIP Intercreditor Agreement***" means that certain Intercreditor Agreement, dated as of January 15, 2026, among the ABL DIP Agent, the OpCo DIP Agent, Saks Global Holdings LLC, Saks Global Enterprises LLC and the other parties from time to time party thereto (as amended, supplemented, restated, extended, renewed, amended and restated or otherwise modified from time to time).

"***DIP Lender Advisors***" means (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as lead counsel to the Ad Hoc Group, and Porter Hedges LLP, as co-counsel to the SGUS DIP Lenders and the Ad Hoc Group, (b) FTI Consulting, Inc., as financial advisor to the SGUS DIP Lenders and the Ad Hoc Group, (c) Lazard Frères & Co. LLC, as investment banker to the SGUS DIP Lenders and the Ad Hoc Group, (d) Hilco Global Professional Services, LLC, as real property advisor to the SGUS DIP Lenders and the Ad Hoc Group, (e) Kekst and Company, Incorporated, as communications advisor to the SGUS DIP Lenders and the Ad Hoc Group, and (f) any other local or special counsel or other professionals retained by the SGUS DIP Lenders and the Ad Hoc Group.  It being understood that any such notice required to be delivered to the DIP Lender Advisors shall be satisfied through the delivery of such notice to Paul, Weiss, Rifkind, Wharton & Garrison LLP.

"***DIP Lenders***" means the ABL DIP Lenders, the SGUS DIP Lenders and the OpCo DIP Lenders.

"***DIP Liens***" means the ABL DIP Liens, the SGUS DIP Liens and the OpCo DIP Liens.

"***DIP Loan Parties***" means the ABL DIP Loan Parties, the SGUS DIP Loan Parties and the OpCo DIP Loan Parties.  Except and solely to the extent set forth in paragraph 2(f) of the DIP Orders, the TopCo Debtors shall not be DIP Loan Parties and shall not use, receive, or benefit from Cash Collateral (as defined above) of the other Debtors, proceeds of DIP Collateral (as defined above), or proceeds of the DIP Facility.

"***DIP Loans***" means each of the ABL DIP Loans, the SGUS DIP Loans and the OpCo DIP Loans.

"***DIP Obligations***" means the ABL DIP Obligations, the SGUS DIP Obligations and the OpCo DIP Obligations.

"***DIP Secured Parties***" means the ABL DIP Secured Parties, the SGUS DIP Secured Parties and the OpCo DIP Secured Parties.

"***Disposition***" means the sale, transfer, conveyance, license, lease or other disposition (including any sale and leaseback transaction) of any property by any person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.  "***Dispose***", "***Disposed***" and "***Disposal***" have correlative meanings.

"***Estate***" means, with respect to a Global Debtor, its bankruptcy estate (as defined under section 541 of the Bankruptcy Code), and "***Estates***" means the bankruptcy estates (as defined under section 541 of the Bankruptcy Code) of each Global Debtor.

"***Fronting Lender***" means Barclays Bank PLC, as fronting lender of the SGUS First Out DIP Loans.

"***Fronting Lender Advisors***" means Dentons US LLP any other local or special counsel or other professionals retained by the Fronting Lender.

"***Funding Mechanics***" means the agreed upon mechanism by which the Global Debtors and their subsidiaries are able to draw on the DIP Facilities, as approved by each of the Required SGUS DIP Lenders and the Required ABL DIP Lenders on or prior to the Interim Order Effective Date.

"***Initial Budget***" means the 13-week consolidated weekly operating budget of the Global Debtors and their subsidiaries setting forth, among other things, projected disbursements, liquidity and net cash flow for the period described therein prepared by the DIP Borrowers' management and advisors and approved by each of the Required SGUS DIP Lenders and the Required ABL DIP Lenders on or prior to the Interim Order Effective Date and attached to the Interim Order as **Exhibit F**.

"***Interim Order Effective Date***" means January 15, 2026.

"***Notes / Term Adequate Protection Liens***" means the OpCo Adequate Protection Liens granted to the Prepetition NPC Agent, the Prepetition OpCo Notes Agent and Prepetition Initial Notes Agent, the proceeds of which shall be subject to the payment priorities set forth in the Prepetition Payment Administration Agreement.

"***OpCo DIP Collateral***" means all DIP Collateral Assets held by any OpCo DIP Loan Party.

"***OpCo DIP Documents***" means (a) the OpCo DIP Credit Agreement and (b) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents and instruments executed and/or delivered with or to, or filed by, the OpCo DIP Agent and/or the OpCo DIP Lender in connection with or related thereto (collectively, as amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time).

"***OpCo DIP Obligations***" means (a) the "*Obligations*" as defined in the OpCo DIP Credit Agreement, and (b) all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Global Debtors under the OpCo DIP Facility), and all other fees, indemnity obligations, reimbursement obligations, and any other obligations under or in connection with the OpCo DIP Documents and the DIP Orders, whether due or to become due, absolute or contingent.

"***OpCo DIP Proceeds Account***" means the "*DIP Proceeds Account*" (as defined in the OpCo DIP Credit Agreement).

"***Paid in Full***" means (a) the indefeasible payment in full in cash of the obligations (including principal, accrued and unpaid interest and fees, reimbursable expenses and indemnities, other than contingent indemnification obligations for which no claim has been asserted or threatened) and all other amounts due and owing by the DIP Loan Parties or any other obligors thereunder (with such payment being without prejudice to any terms or provisions contained in such credit facility that survive such discharge by their terms) under the applicable credit facility and this Final Order, (b) the termination of all commitments to make loans or extend other financial accommodations under such facility, (c) the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of all letters of credit, in each case, in accordance with the terms of the applicable facility, and (d) in the case of the Prepetition Secured Obligations, no Challenge has been timely and properly asserted in accordance with this Final Order (including any Challenge against the applicable Prepetition Secured Parties or their Representatives), or if such a Challenge is timely and properly commenced, upon the disposition of such Challenge pursuant to a final, non-appealable order of a court of competent jurisdiction in favor of such Prepetition Secured Parties and Representatives and consistent with the Global Debtors' Stipulations and Releases; *provided*, that Paid in Full shall also include a credit bid or other voluntary release of the full amount of (x) with respect to any reference to Paid in Full in relation to a DIP Facility, all applicable DIP Obligations, and (y) with respect to any reference to Paid in Full in relation to any Prepetition Secured Obligations, all applicable Prepetition Secured Obligations (including, in the case of each of the preceding clauses (x) and (y), principal, accrued and unpaid interest and fees, reimbursable expenses and indemnities, other than contingent indemnification obligations for which no claim has been asserted or threatened) owing by the Global Debtors and any other DIP Loan Party in connection with consummation of a sale of any or all of the DIP Collateral.

"***Permitted Prior Liens***" means any valid and non-avoidable senior lien in existence and perfected immediately prior to the Petition Date or any valid and non-avoidable lien in existence immediately prior to the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. For the avoidance of doubt, Permitted Prior Liens shall not include any Prepetition Liens or any DIP Liens.

"***Petition Date***" means the date on which the Global Debtors file chapter 11 petitions with this Court.

"***Prepetition ABL / FILO Intercreditor Agreement***" means that certain Collateral Agency Agreement and Intercreditor Agreement, dated as of June 27, 2025, among Bank of America, N.A., as administrative agent and collateral agent and SGUS LLC, as Subordinated Agent (as defined therein) (as amended, supplemented, restated, extended, renewed, amended and restated or otherwise modified from time to time).

"***Prepetition ABL / FILO Liens***" means the Prepetition ABL Liens and the Prepetition FILO Liens, the proceeds of which shall be subject to the payment priorities set forth in the Prepetition ABL / FILO Intercreditor Agreement.

"***Prepetition ABL / Notes Intercreditor Agreement***" means that certain Second Amended and Restated Intercreditor Agreement, dated as of August 8, 2025, by and among Bank of America,

N.A., as the Initial ABL Agent (as defined therein), Citibank N.A., as the Initial Notes / Term Agent (as defined therein) under the Secured Notes Collateral Agreement (as defined therein), Saks Global Holdings LLC, Saks Global Enterprises LLC and the other parties from time to time party thereto (as amended, supplemented, restated, extended, renewed, amended and restated or otherwise modified from time to time).

"***Prepetition ABL Agent***" means Bank of America, N.A., solely in its capacity as administrative agent and collateral agent under the Prepetition ABL Credit Agreement, and any successor thereto.

"***Prepetition ABL Borrower***" means, collectively, Saks Global Enterprises LLC, solely in its capacity as borrower under the Prepetition ABL Credit Agreement, together with the Borrower Parties (as defined in the Prepetition ABL Credit Agreement).

"***Prepetition ABL Collateral***" means (a) the "*Collateral*" (as defined in the Prepetition ABL Documents) and (b) all other assets and property that secure the Prepetition ABL Secured Obligations.

"***Prepetition ABL Credit Agreement***" means that certain *Credit Agreement*, dated as of December 23, 2024 by and among the Prepetition ABL Borrower, the Prepetition ABL Agent, and the Prepetition ABL Lenders (as amended by that certain *Amendment No. 1*, dated as of June 27, 2025, as further amended by that certain *Consent and Amendment No. 2*, dated as of July 23, 2025, as further amended by that certain *Amendment No. 3 to ABL Credit Agreement*, dated as of September 8, 2025, and as may be further amended, restated, amended and restated, supplemented, extended, renewed, refinanced or otherwise modified from time to time).

"***Prepetition ABL Documents***" means (a) the Prepetition ABL Credit Agreement, (b) the Prepetition ABL Security Documents, and (c) each of the other "*Loan Documents*" (as defined in the Prepetition ABL Credit Agreement).

"***Prepetition ABL Guarantors***" means, collectively, "*Guarantors*" (as defined in the Prepetition ABL Credit Agreement).

"***Prepetition ABL Lenders***" means, the "*Lenders*" (as defined in the Prepetition ABL Credit Agreement).

"***Prepetition ABL Letters of Credit***" means, the "*Letters of Credit*" (as defined in the Prepetition ABL Credit Agreement).

"***Prepetition ABL Liens***" means each of the liens and security interests granted by the Prepetition ABL Loan Parties in the Prepetition ABL Collateral pursuant to the Prepetition ABL Security Documents to secure the Prepetition ABL Secured Obligations.

"***Prepetition ABL Loan Parties***" means (a) the Prepetition ABL Borrower, (b) the Prepetition ABL Guarantors, and (c) each other "*Loan Party*" (as defined in the Prepetition ABL Credit Agreement).

"**Prepetition ABL Loans**" means (a) the "*Loans*" as defined in the Prepetition ABL Credit Agreement and (b) and all other loans and other financial accommodations provided by the Prepetition ABL Lenders to the Prepetition ABL Loan Parties pursuant to the Prepetition ABL Documents.

"**Prepetition ABL Priority Collateral**" means "*ABL Priority Collateral*" as defined in the Prepetition ABL / Notes Intercreditor Agreement.

"**Prepetition ABL Revolving Loans**" means the "*Revolving Loans*" (as defined in the Prepetition ABL Documents).

"**Prepetition ABL Secured Obligations**" means the "*Obligations*" (as defined in the Prepetition ABL Documents).

"**Prepetition ABL Secured Parties**" means (a) the Prepetition ABL Agent, (b) the Prepetition ABL Lenders, and (c) each of the other "*Secured Parties*" (as defined in the Prepetition ABL Documents).

"**Prepetition ABL Secured Party Advisors**" means (a) Otterbourg P.C., Morgan, Lewis & Bockius LLP, and Norton Rose Fulbright US LLP each as counsel to the ABL DIP Agent and (b) M3 Advisory Partners, LP, as financial advisor to the ABL DIP Agent.

"**Prepetition ABL Security Documents**" means (a) the "*Security Documents*" (as defined in the Prepetition ABL Credit Agreement) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Prepetition ABL Agent has been granted a security interest in and continuing liens on the Prepetition ABL Collateral.

"**Prepetition Agents**" means, collectively, the Prepetition SGUS Notes Agent and the Prepetition OpCo Agents.

"**Prepetition Collateral**" means, collectively, the Prepetition SGUS Notes Collateral, the Prepetition ABL Collateral, and the Prepetition OpCo Collateral.

"**Prepetition Documents**" means, collectively, Prepetition SGUS Notes Documents, the Prepetition ABL Documents, the Prepetition OpCo Documents, and the Prepetition Intercreditor Agreements.

"**Prepetition FILO Agent**" means, as applicable, SGUS LLC, solely in its capacity as administrative agent under the Prepetition FILO Credit Agreement and Bank of America, N.A., solely in its capacity as collateral agent under the Prepetition FILO Security Documents and any successor thereto.

"**Prepetition FILO Borrower**" means Saks Global Enterprises LLC, solely in its capacity as borrower under the Prepetition FILO Credit Agreement.

"**Prepetition FILO Collateral**" means (a) the "*Collateral*" (as defined in the Prepetition FILO Documents) and (b) all other assets and property that secure the Prepetition FILO Secured Obligations.

"**Prepetition FILO Credit Agreement**" means that certain *Term Loan Credit Agreement*, dated as of June 27, 2025 by and among the Prepetition FILO Borrower, the Prepetition FILO Agent, and the Prepetition FILO Lenders (as amended, restated, amended and restated, supplemented, extended, renewed, refinanced or otherwise modified from time to time).

"**Prepetition FILO Documents**" means (a) the Prepetition FILO Credit Agreement, (b) the Prepetition FILO Security Documents, and (c) each of the other "Loan Documents" (as defined in the Prepetition FILO Credit Agreement).

"**Prepetition FILO Guarantors**" means, collectively, "*Guarantors*" (as defined in the Prepetition FILO Credit Agreement).

"**Prepetition FILO Lenders**" means, the "*Lenders*" (as defined in the Prepetition FILO Credit Agreement).

"**Prepetition FILO Liens**" means each of the liens and security interests granted by the Prepetition FILO Loan Parties in the Prepetition FILO Collateral pursuant to the Prepetition FILO Security Documents to secure the Prepetition FILO Secured Obligations.

"**Prepetition FILO Loan Parties**" means (a) the Prepetition FILO Borrower, (b) the Prepetition FILO Guarantors, and (c) each other "Loan Party" (as defined in the Prepetition FILO Credit Agreement).

"**Prepetition FILO Loans**" means (a) the "*Loans*" as defined in the Prepetition FILO Credit Agreement and (b) and all other loans and other financial accommodations provided by the Prepetition FILO Lenders to the Prepetition FILO Loan Parties pursuant to the Prepetition FILO Documents.

"**Prepetition FILO Secured Obligations**" means the "*Obligations*" (as defined in the Prepetition FILO Documents).

"**Prepetition FILO Secured Parties**" means (a) the Prepetition FILO Agent, (b) the Prepetition FILO Lenders, and (c) each of the other "*Secured Parties*" (as defined in the Prepetition FILO Documents).

"**Prepetition FILO Security Documents**" means (a) the "*Security Documents*" (as defined in the Prepetition FILO Credit Agreement) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Prepetition FILO Agent has been granted a security interest in and continuing liens on the Prepetition FILO Collateral.

"**Prepetition Initial Noteholders**" means, collectively, "*Holders*" (as defined in the Prepetition Initial Notes Indenture).

"**Prepetition Initial Notes**" means the Global Debtors' 11.000% Senior Secured Notes due 2029, issued pursuant to the Prepetition Initial Notes Indenture.

"**Prepetition Initial Notes Agent**" means Citibank, N.A., solely in its capacity as trustee and collateral agent under the Prepetition Initial Notes Indenture, and any successor thereto.

"**_Prepetition Initial Notes Collateral_**" means (a) the "*Collateral*" (as defined in the Prepetition Initial Notes Documents) and (b) all other assets and property that secure the Prepetition Initial Notes Secured Obligations.

"**_Prepetition Initial Notes Documents_**" means (a) the Prepetition Initial Notes Indenture, (b) the Prepetition Initial Notes Security Documents, and (c) each of the other "*Notes Documents*" (as defined in the Prepetition Initial Notes Indenture).

"**_Prepetition Initial Notes Guarantors_**" means, collectively, "*Guarantors*" (as defined in the Prepetition Initial Notes Indenture).

"**_Prepetition Initial Notes Indenture_**" means that certain *Indenture*, dated as of December 16, 2024 by and among the Prepetition Initial Notes Issuer (as successor in interest to SFA Issuer LLC), the Prepetition Initial Notes Guarantors from time to time party thereto, the Prepetition Initial Notes Agent (as modified by that certain *First Supplemental Indenture* dated as of December 23, 2024, that certain *Second Supplemental Indenture* dated as of February 21, 2025, that certain *Third Supplemental Indenture* dated as of May 16, 2025, that certain *Fourth Supplemental Indenture* dated as of August 1, 2025, that certain *Fifth Supplemental Indenture* dated as of August 8, 2025, that certain Sixth Supplemental Indenture dated as of November 26, 2025 and as may be further amended, restated, amended and restated, supplemented, extended, renewed, refinanced or otherwise modified from time to time).

"**_Prepetition Initial Notes Issuer_**" means Saks Global Enterprises LLC, solely in its capacity as issuer under the Prepetition Initial Notes Indenture.

"**_Prepetition Initial Notes Liens_**" means each of the liens and security interests granted by the Prepetition Initial Notes Parties in the Prepetition Initial Notes Collateral pursuant to the Prepetition Initial Notes Security Documents to secure the Prepetition Initial Notes Secured Obligations.

"**_Prepetition Initial Notes Parties_**" means (a) the Prepetition Initial Notes Issuer, (b) the Prepetition Initial Notes Guarantors, and (c) each other "*Grantor*" (as defined in the Prepetition Initial Notes Indenture).

"**_Prepetition Initial Notes Secured Obligations_**" means the "*Obligations*" (as defined in the Prepetition Initial Notes Documents).

"**_Prepetition Initial Notes Secured Parties_**" means (a) the Prepetition Initial Notes Agent, (b) the Prepetition Initial Noteholders, and (c) each of the other "*Secured Parties*" (as defined in the Prepetition Initial Notes Documents).

"**_Prepetition Initial Notes Security Documents_**" means (a) the "*Collateral Documents*" (as defined in the Prepetition Initial Notes Indenture) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Prepetition Initial Notes Agent has been granted a security interest in and continuing liens on the Prepetition Initial Notes Collateral.

"**Prepetition Intercreditor Agreements**" means, collectively, the Prepetition ABL / Notes Intercreditor Agreement, the Prepetition ABL / FILO Intercreditor Agreement, the Prepetition Pari Notes Intercreditor Agreement and the Prepetition Payment Administration Agreement.

"**Prepetition Liens**" means, collectively, the Prepetition OpCo Liens and the Prepetition SGUS Notes Liens.

"**Prepetition Notes / Term Priority Collateral**" means "*Notes / Term Priority Collateral*" as defined in the Prepetition ABL / Notes Intercreditor Agreement.

"**Prepetition NPC Agents**" means, collectively, SGUS LLC, solely in its capacity as administrative agent under the Prepetition NPC Credit Agreement, and any successor thereto, and Citibank, N.A., solely in its capacity as collateral agent under the Prepetition NPC Credit Agreement, and any successor thereto.

"**Prepetition NPC Borrower**" means Saks Global Enterprises LLC, solely in its capacity as borrower under the Prepetition NPC Credit Agreement.

"**Prepetition NPC Collateral**" means (a) the "*Collateral*" (as defined in the Prepetition NPC Documents) and (b) all other assets and property that secure the Prepetition NPC Secured Obligations.

"**Prepetition NPC Credit Agreement**" means that certain *Term Loan Credit Agreement*, dated as of August 8, 2025 by and among the Prepetition NPC Borrower, the Prepetition NPC Agents, and the Prepetition NPC Lenders (as amended, restated, amended and restated, supplemented, extended, renewed, refinanced or otherwise modified from time to time).

"**Prepetition NPC Documents**" means (a) the Prepetition NPC Credit Agreement, (b) the Prepetition NPC Security Documents, and (c) each of the other "Loan Documents" (as defined in the Prepetition NPC Credit Agreement).

"**Prepetition NPC Guarantors**" means, collectively, "*Guarantors*" (as defined in the Prepetition NPC Credit Agreement).

"**Prepetition NPC Lenders**" means, the "*Lenders*" (as defined in the Prepetition NPC Credit Agreement).

"**Prepetition NPC Liens**" means each of the liens and security interests granted by the Prepetition NPC Loan Parties in the Prepetition NPC Collateral pursuant to the Prepetition NPC Security Documents to secure the Prepetition NPC Secured Obligations.

"**Prepetition NPC Loan Parties**" means (a) the Prepetition NPC Borrower, (b) the Prepetition NPC Guarantors, and (c) each other "Loan Party" (as defined in the Prepetition NPC Credit Agreement).

"**Prepetition NPC Loans**" means (a) the "*Loans*" as defined in the Prepetition NPC Credit Agreement and (b) and all other loans and other financial accommodations provided by the

Prepetition NPC Lenders to the Prepetition NPC Loan Parties pursuant to the Prepetition NPC Documents.

"***Prepetition NPC Secured Obligations***" means the "*Obligations*" (as defined in the Prepetition NPC Documents).

"***Prepetition NPC Secured Parties***" means (a) the Prepetition NPC Agents, (b) the Prepetition NPC Lenders, and (c) each of the other "*Secured Parties*" (as defined in the Prepetition NPC Documents).

"***Prepetition NPC Security Documents***" means (a) the "*Security Documents*" (as defined in the Prepetition NPC Credit Agreement) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Prepetition NPC Agents have been granted a security interest in and continuing liens on the Prepetition NPC Collateral.

"***Prepetition OpCo Agents***" means, collectively, the Prepetition OpCo Notes Agent, the Prepetition ABL Agent, the Prepetition Initial Notes Agent, the Prepetition FILO Agents, and the Prepetition NPC Agents.

"***Prepetition OpCo Borrowers***" means, collectively, the Prepetition OpCo Notes Issuer, the Prepetition ABL Borrower, the Prepetition Initial Notes Issuer, the Prepetition FILO Borrower, and the Prepetition NPC Borrower.

"***Prepetition OpCo Collateral***" means, collectively, the Prepetition OpCo Notes Collateral, the Prepetition ABL Collateral, the Prepetition Initial Notes Collateral, the Prepetition FILO Collateral, and the Prepetition NPC Collateral.

"***Prepetition OpCo Documents***" means, collectively, the Prepetition OpCo Notes Documents, the Prepetition ABL Documents, the Prepetition Initial Notes Documents, the Prepetition FILO Documents, and the Prepetition NPC Documents.

"***Prepetition OpCo Liens***" means, collectively, the Prepetition OpCo Notes Liens, the Prepetition ABL Liens, the Prepetition Initial Notes Liens, the Prepetition FILO Liens, and the Prepetition NPC Liens.

"***Prepetition OpCo Loan Parties***" means, collectively, the Prepetition OpCo Notes Parties, the Prepetition ABL Loan Parties, the Prepetition Initial Notes Parties, the Prepetition FILO Loan Parties, and the Prepetition NPC Loan Parties.

"***Prepetition OpCo Noteholders***" means, collectively, the Prepetition OpCo Second Out Noteholders and the Prepetition OpCo Third Out Noteholders.

"***Prepetition OpCo Notes***" means, together collectively, the Prepetition OpCo Second Out Notes, and the Prepetition OpCo Third Out Notes.

"***Prepetition OpCo Notes Agent***" means Citibank, N.A., solely in its capacity as trustee and collateral agent under the Prepetition OpCo Notes Indenture, and any successor thereto.

"***Prepetition OpCo Notes Collateral***" means (a) the "*Collateral*" (as defined in the Prepetition OpCo Notes Documents) and (b) all other assets and property that secure the Prepetition OpCo Notes Secured Obligations.

"***Prepetition OpCo Notes Documents***" means (a) the Prepetition OpCo Notes Indenture, (b) the Prepetition OpCo Notes Security Documents, and (c) each of the other "*Notes Documents*" (as defined in the Prepetition OpCo Notes Indenture).

"***Prepetition OpCo Notes Guarantors***" means, collectively, "*Guarantors*" (as defined in the Prepetition OpCo Notes Indenture).

"***Prepetition OpCo Notes Indenture***" means that certain *Indenture*, dated as of August 8, 2025 by and among the Prepetition OpCo Notes Issuer, the Prepetition OpCo Notes Guarantors from time to time party thereto and the Prepetition OpCo Notes Agent (modified by that certain *First Supplemental Indenture* dated as of August 20, 2025, that certain *Second Supplemental Indenture*, dated as of November 26, 2025 and as amended, restated, amended and restated, supplemented, extended, renewed, refinanced or otherwise modified from time to time).

"***Prepetition OpCo Notes Issuer***" means Saks Global Enterprises LLC, solely in its capacity as issuer under the Prepetition OpCo Notes Indenture.

"***Prepetition OpCo Notes Liens***" means each of the liens and security interests granted by the Prepetition OpCo Notes Parties in the Prepetition OpCo Notes Collateral pursuant to the Prepetition OpCo Notes Security Documents to secure the Prepetition OpCo Notes Secured Obligations.

"***Prepetition OpCo Notes Parties***" means (a) the Prepetition OpCo Notes Issuer, (b) the Prepetition OpCo Notes Guarantors, and (c) each other "*Grantor*" (as defined in the Prepetition OpCo Notes Indenture).

"***Prepetition OpCo Notes Secured Obligations***" means the "*Notes Obligations*" (as defined in the Prepetition OpCo Notes Documents).

"***Prepetition OpCo Notes Secured Parties***" means (a) the Prepetition OpCo Notes Agent, (b) the Prepetition OpCo Noteholders, and (c) each of the other "*Secured Parties*" (as defined in the Prepetition OpCo Notes Documents).

"***Prepetition OpCo Notes Security Documents***" means (a) the "*Collateral Documents*" (as defined in the Prepetition OpCo Notes Indenture) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Prepetition OpCo Notes Agent has been granted a security interest in and continuing liens on the Prepetition OpCo Notes Collateral.

"***Prepetition OpCo Second Out Noteholders***" means, collectively, the "*Holders*" as defined in the Prepetition OpCo Notes Indenture, of the Prepetition OpCo Second Out Notes.

"***Prepetition OpCo Second Out Notes***" means the Global Debtors' 11.000% Senior Secured Second Out Notes due 2029, issued pursuant to the Prepetition OpCo Notes Indenture.

13

"**Prepetition OpCo Secured Parties**" means, collectively, the Prepetition OpCo Notes Secured Parties, the Prepetition ABL Secured Parties, the Prepetition Initial Notes Secured Parties, the Prepetition FILO Secured Parties, and the Prepetition NPC Secured Parties.

"**Prepetition OpCo Third Out Noteholders**" means, collectively, the "*Holders*" as defined in the Prepetition OpCo Notes Indenture, of the Prepetition OpCo Third Out Notes.

"**Prepetition OpCo Third Out Notes**" means the Global Debtors' 11.000% Senior Secured Third Out Notes due 2029, issued pursuant to the Prepetition OpCo Notes Indenture.

"**Prepetition Pari Notes Intercreditor Agreement**" means that certain Equal Priority Intercreditor Agreement, dated as of August 8, 2025, by and among Saks Global Holdings LLC, the Saks Global Enterprises LLC, Citibank, N.A. in its capacity as collateral agent and the other parties thereto (as amended, supplemented, restated, extended, renewed, amended and restated or otherwise modified from time to time).

"**Prepetition Pari Passu Liens**" means the Prepetition NPC Liens, the Prepetition OpCo Notes Liens and the Prepetition Initial Notes Liens, the proceeds of which shall be subject to the payment priorities set forth in the Prepetition Payment Administration Agreement.

"**Prepetition Payment Administration Agreement**" means that certain Payment Administration Agreement, dated as of August 8, 2025, by and among, Saks Global Holdings LLC, Saks Global Enterprises LLC, the other grantors party thereto, SGUS LLC as the Initial First Out Administrative Agent (as defined therein) and the Initial Additional First Out Administrative Agent (as defined therein), Citibank, N.A. as the SPV Notes Collateral Agent (as defined therein), the Initial Second Out/Third Out Trustee (as defined therein), and the Initial Fourth Out Trustee (as defined therein), and each Additional Agent (as defined therein) from time to time party thereto (as amended, supplemented, restated, extended, renewed, amended and restated or otherwise modified from time to time).

"**Prepetition Secured Obligations**" means, collectively, the Prepetition OpCo Notes Secured Obligations, the Prepetition Initial Notes Secured Obligations, the Prepetition FILO Secured Obligations, the Prepetition NPC Secured Obligations and the Prepetition SGUS Notes Secured Obligations, and the Prepetition ABL Secured Obligations.

"**Prepetition Secured Parties**" means, collectively, the Prepetition OpCo Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition SGUS Notes Secured Parties.

"**Prepetition SGUS Noteholders**" means, collectively, the "*Holders*" as defined in the Prepetition SGUS Notes Indenture, of the Prepetition SGUS Notes.

"**Prepetition SGUS Notes**" means SGUS LLC's 11.000% Senior Secured Notes due 2029, issued pursuant to the Prepetition SGUS Notes Indenture.

"**Prepetition SGUS Notes Agent**" means Citibank, N.A., in its capacity as trustee and collateral agent under the Prepetition SGUS Notes Indenture, together with its successors and permitted assigns in such capacity.

"**Prepetition SGUS Notes Collateral**" means (a) the "*Collateral*" (as defined in the Prepetition SGUS Notes Documents) and (b) all other assets and property that secure the Prepetition SGUS Notes Secured Obligations.

"**Prepetition SGUS Notes Documents**" means (a) the Prepetition SGUS Notes Indenture, (b) the Prepetition SGUS Notes Security Documents, and (c) each of the other "*Notes Documents*" (as defined in the Prepetition SGUS Notes Indenture).

"**Prepetition SGUS Notes Guarantor**" means Saks Fifth Avenue HoldCo II LLC.

"**Prepetition SGUS Notes Indenture**" means that certain *Indenture* dated as of June 27, 2025, between SGUS LLC as Issuer, the Prepetition SGUS Notes Guarantor party thereto, and the Prepetition SGUS Notes Agent (as amended by that certain *First Supplemental Indenture* dated as of July 29, 2025, and that certain *Second Supplemental Indenture* dated as of August 8, 2025, and as may be further amended, supplemented, restated, extended, renewed, amended and restated or otherwise modified from time to time).

"**Prepetition SGUS Notes Issuer**" means SGUS LLC, solely in its capacity as issuer under the Prepetition SGUS Notes Indenture.

"**Prepetition SGUS Notes Liens**" means each of the liens and security interests granted by the Prepetition SGUS Notes Parties in the Prepetition SGUS Notes Collateral pursuant to the Prepetition SGUS Notes Security Documents to secure the Prepetition SGUS Notes Secured Obligations.

"**Prepetition SGUS Notes Parties**" means (a) the Prepetition SGUS Notes Issuer, (b) the Prepetition SGUS Notes Guarantor, and (c) each other "*Grantor*" (as defined in the Prepetition SGUS Notes Indenture).

"**Prepetition SGUS Notes Secured Obligations**" means the "*Notes Obligations*" (as defined in the Prepetition SGUS Notes Documents).

"**Prepetition SGUS Notes Secured Parties**" means (a) the Prepetition SGUS Notes Agent, (b) the Prepetition SGUS Noteholders, and (c) each of the other "*Secured Parties*" (as defined in the Prepetition SGUS Notes Documents).

"**Prepetition SGUS Notes Security Documents**" means (a) the "*Collateral Documents*" (as defined in the Prepetition SGUS Notes Indenture) and (b) any other security documents, mortgages, and ancillary agreements pursuant to which the Prepetition SGUS Notes Agent has been granted a security interest in and continuing liens on the Prepetition SGUS Notes Collateral.

"**Representative**" means, as to any Person, its current and former affiliates, and its and each such entity's current and former directors, officers, managers, participants and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect parents, subsidiaries and divisions, and its and each of such entity's current and former officers, members, managers, directors, controlling persons, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, attorneys, accountants, investment bankers, independent contractors,

15

representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, legal advisors, consultants, and partners (including both general and limited partners).

"***Required ABL DIP Lenders***" means the "*Required Lenders*" as defined in the ABL DIP Credit Agreement.

"***Required SGUS DIP Lenders***" means the "*Required Lenders*" as defined in the SGUS DIP Credit Agreement.

"***Roll-Up DIP Loans***" means the ABL Roll-Up DIP Loans, the SGUS Second Out DIP Loans and the OpCo Roll-Up DIP Loans.

"***SGUS DIP Collateral***" means all DIP Collateral Assets held by any SGUS DIP Loan Party.

"***SGUS DIP Documents***" means (a) the SGUS DIP Credit Agreement and (b) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents and instruments executed and/or delivered with or to, or filed by, the SGUS DIP Agent and/or the SGUS DIP Lenders in connection with or related thereto (collectively, as amended, restated, amended and restated, modified, supplemented, extended, waived or replaced from time to time).

"***SGUS DIP Obligations***" means (a) the "*Obligations*" as defined in the SGUS DIP Credit Agreement, and (b) all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Global Debtors under the SGUS DIP Facility), and all other fees, indemnity obligations, reimbursement obligations, and any other obligations under or in connection with the SGUS DIP Documents and the DIP Orders, whether due or to become due, absolute or contingent.

"***TopCo Debtors***" means Mercury Aggregator Holdco LLC; Mercury Aggregator LP; HBSFA Holdings Ltd.; HBC GP IV LLC; HBC IV LP; HBC GP LLC; HBC Management Class A LP; HBC Management Class B LP; HBC I LP; SGI Initial Partner L.P.; Saks Global Investor L.P.

"***Trustee***" means any chapter 7 or chapter 11 trustee appointed or elected for any of the Global Debtors and/or any examiner or other estate representative or other fiduciary appointed or elected in the Chapter 11 Cases or any Successor Case, and any other person acting or seeking to act on behalf of the Global Debtors' Estates in the Chapter 11 Cases or any Successor Case.

"***U.S. Trustee***" means Office of the United States Trustee for the Southern District of Texas.

**Annex 2**

**The Global Debtors' Stipulations and Releases**

Without prejudice to the rights of all parties in interest other than the Global Debtors, but subject to the limitations contained in paragraph 18 of this Final Order, and after consultation with their attorneys and financial advisors, the Global Debtors admit, stipulate, acknowledge and agree that:

**Stipulations as to Prepetition SGUS Notes Secured Parties**.

1.      Prepetition SGUS Notes Indenture.  Prior to the commencement of the Chapter 11 Cases, the Prepetition SGUS Notes Issuer became indebted to the Prepetition SGUS Noteholders pursuant to the Prepetition SGUS Notes Documents.  Pursuant to the Prepetition SGUS Notes Documents, the Prepetition SGUS Notes Guarantor unconditionally and irrevocably guaranteed, on a joint and several basis, as a primary obligor and not merely as a surety, the Prepetition SGUS Notes Secured Obligations up to a maximum guaranteed amount of $200,000,000 to the Prepetition SGUS Notes Agent for the benefit of the Prepetition SGUS Noteholders.

2.      Prepetition SGUS Notes Secured Obligations.  As of the Petition Date, the Prepetition SGUS Notes Issuer was justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Prepetition SGUS Noteholders, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $762,465,541, and the Prepetition SGUS Notes Guarantor was justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Prepetition SGUS Noteholders, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not more than $200,000,000, in each case on account of the Prepetition SGUS Notes Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and

other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Prepetition SGUS Notes Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Prepetition SGUS Notes Documents, and all commitments of the Prepetition SGUS Noteholders to purchase Prepetition SGUS Notes or make other financial accommodations were terminated on the Petition Date.

3.      <u>Validity and Priority of Prepetition SGUS Notes Secured Obligations</u>.  (a) The Prepetition SGUS Notes Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition SGUS Notes Parties and such Prepetition SGUS Notes Secured Obligations are enforceable in accordance with the terms of the Prepetition SGUS Notes Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition SGUS Notes Secured Obligations exist, and no portion of the Prepetition SGUS Notes Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Global Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Prepetition SGUS Notes Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Prepetition SGUS Notes Documents or the Prepetition SGUS Notes Secured Obligations; and (d) the Global Debtors waive, discharge, and release any

2

right to challenge any of the Prepetition SGUS Notes Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

4.      <u>Validity, Priority and Perfection of Prepetition SGUS Notes Liens</u>.  As more fully set forth in the Prepetition SGUS Notes Indenture, prior to the Petition Date, the Prepetition SGUS Notes Parties became parties to the Prepetition SGUS Notes Documents pursuant to which the Prepetition SGUS Notes Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Prepetition SGUS Notes Collateral in favor of the Prepetition SGUS Notes Agent.  The Global Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition SGUS Notes Liens on the Prepetition SGUS Notes Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition SGUS Noteholders for fair consideration and reasonably equivalent value; (b) the Prepetition SGUS Notes Liens were senior in priority over any and all other liens on the Prepetition SGUS Notes Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition SGUS Notes Documents, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition SGUS Notes Liens.

5.      <u>No Challenges/Claims as to Prepetition SGUS Notes Secured Parties</u>.  No claims or causes of action exist that are held by the Global Debtors or their Estates against, or with respect to, any Prepetition SGUS Notes Secured Party or any of their respective Representatives.  The Global Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition SGUS Notes Secured Parties or any of their respective Representatives (in each

3

case in such respective capacity) with respect to the Prepetition SGUS Notes Documents, the Prepetition SGUS Notes Secured Obligations, or the Prepetition SGUS Notes Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

**Stipulations as to Prepetition OpCo Notes Secured Parties**.

6.     <u>Prepetition OpCo Notes Indenture</u>.  Prior to the commencement of the Chapter 11 Cases, the Prepetition OpCo Notes Issuer became indebted to the Prepetition OpCo Noteholders pursuant to the Prepetition OpCo Notes Documents.  Pursuant to the Prepetition OpCo Notes Documents, each of the Prepetition OpCo Notes Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Prepetition OpCo Notes Secured Obligations to the Prepetition OpCo Notes Agent for the benefit of the Prepetition OpCo Noteholders.

7.     <u>Prepetition OpCo Notes Secured Obligations</u>.   As of the Petition Date, the Prepetition OpCo Notes Issuer and the other Prepetition OpCo Notes Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Prepetition OpCo Noteholders, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $1,880,015,768 on account of the Prepetition OpCo Notes Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable

agreements or applicable law.   The Prepetition OpCo Notes Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Prepetition OpCo Notes Documents, and all commitments of the Prepetition OpCo Noteholders to purchase Prepetition OpCo Notes or make other financial accommodations were terminated on the Petition Date.

8.    <u>Validity and Priority of Prepetition OpCo Notes Secured Obligations</u>.   (a) The Prepetition OpCo Notes Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition OpCo Notes Parties and such Prepetition OpCo Notes Secured Obligations are enforceable in accordance with the terms of the Prepetition OpCo Notes Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition OpCo Notes Secured Obligations exist, and no portion of the Prepetition OpCo Notes Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Global Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Prepetition OpCo Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Prepetition OpCo Notes Documents or the Prepetition OpCo Notes Secured Obligations; and (d) the Global Debtors waive, discharge, and release any right to challenge any of the Prepetition OpCo Notes Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

9.      <u>Validity, Priority and Perfection of Prepetition OpCo Notes Liens</u>.  As more fully set forth in the Prepetition OpCo Notes Indenture, prior to the Petition Date, the Prepetition OpCo Notes Parties became parties to the Prepetition OpCo Notes Documents pursuant to which the Prepetition OpCo Notes Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Prepetition OpCo Notes Collateral in favor of the Prepetition OpCo Notes Agent.  The Global Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition OpCo Notes Liens on the Prepetition OpCo Notes Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition OpCo Noteholders for fair consideration and reasonably equivalent value; (b) the Prepetition OpCo Notes Liens were senior in priority over any and all other liens on the Prepetition OpCo Notes Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition OpCo Notes Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition OpCo Notes Liens.

10.      <u>No Challenges/Claims as to Prepetition OpCo Notes Secured Parties</u>.  No claims or causes of action exist that are held by the Global Debtors or their Estates against, or with respect to, any Prepetition OpCo Notes Secured Party or any of their respective Representatives.  The Global Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition OpCo Notes Secured Parties or any of their respective Representatives (in each case in such respective capacity) with respect to the Prepetition OpCo Notes Documents, the

Prepetition OpCo Notes Secured Obligations, or the Prepetition OpCo Notes Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

**Stipulations as to Prepetition ABL Secured Parties**.

11.     <u>Prepetition ABL Credit Agreement</u>.  Prior to the commencement of the Chapter 11 Cases, the Prepetition ABL Borrower became indebted to the Prepetition ABL Lenders pursuant to the Prepetition ABL Documents.  Pursuant to the Prepetition ABL Documents, each of the Prepetition ABL Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Prepetition ABL Secured Obligations to the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders.

12.     <u>Prepetition ABL Secured Obligations</u>.  As of the Petition Date, the Prepetition ABL Borrower and the other Prepetition ABL Loan Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Prepetition ABL Lenders, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $499,085,844.61 on account of the Prepetition ABL Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Prepetition ABL Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the

Prepetition ABL Documents, and all commitments of the Prepetition ABL Lenders to extend credit thereunder or make other financial accommodations were terminated on the Petition Date.

13.    <u>Validity and Priority of Prepetition ABL Secured Obligations</u>.  (a) The Prepetition ABL Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition ABL Loan Parties and such Prepetition ABL Secured Obligations are enforceable in accordance with the terms of the Prepetition ABL Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Secured Obligations exist, and no portion of the Prepetition ABL Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Global Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Prepetition ABL Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Prepetition ABL Documents or the Prepetition ABL Secured Obligations; and (d) the Global Debtors waive, discharge, and release any right to challenge any of the Prepetition ABL Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

14.    <u>Validity, Priority and Perfection of Prepetition ABL Liens</u>.  As more fully set forth in the Prepetition ABL Credit Agreement, prior to the Petition Date, the Prepetition ABL Loan Parties became parties to the Prepetition ABL Documents pursuant to which the Prepetition ABL Secured Obligations were fully secured by legal, valid, perfected, binding, enforceable, and

nonavoidable liens and security interests in the Prepetition ABL Collateral in favor of the Prepetition ABL Agent.  The Global Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition ABL Liens on the Prepetition ABL Collateral fully secured the Prepetition ABL Secured Obligations and were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Lenders for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition ABL Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition ABL Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition ABL Liens.

15.    <u>No Challenges/Claims as to Prepetition ABL Lenders</u>.  No claims or causes of action exist that are held by the Global Debtors or their Estates against, or with respect to, any Prepetition ABL Secured Party or any of their respective Representatives.  The Global Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition ABL Lenders or any of their respective Representatives (in each case in such respective capacity) with respect to the Prepetition ABL Documents, the Prepetition ABL Secured Obligations, or the Prepetition ABL Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

**Stipulations as to Prepetition Initial Notes Secured Parties**.

16.     <u>Prepetition Initial Notes Indenture</u>.  Prior to the commencement of the Chapter 11 Cases, the Prepetition Initial Notes Issuer became indebted to the Prepetition Initial Noteholders pursuant to the Prepetition Initial Notes Documents.  Pursuant to the Prepetition Initial Notes Documents, each of the Prepetition Initial Notes Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Prepetition Initial Notes Secured Obligations to the Prepetition Initial Notes Agent for the benefit of the Prepetition Initial Noteholders.

17.     <u>Prepetition Initial Notes Secured Obligations</u>.  As of the Petition Date, the Prepetition Initial Notes Issuer and the other Prepetition Initial Notes Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Prepetition Initial Noteholders, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $51,166,000.00 on account of the Prepetition Initial Notes Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Prepetition Initial Notes Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Prepetition Initial Notes Documents, and all commitments of the Prepetition Initial Noteholders to purchase Prepetition Initial Notes or make other financial accommodations were terminated on the Petition Date.

18.     <u>Validity and Priority of Prepetition Initial Notes Secured Obligations</u>.  (a) The Prepetition Initial Notes Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Initial Notes Parties and such Prepetition Initial Notes Secured Obligations are enforceable in accordance with the terms of the Prepetition Initial Notes Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Initial Notes Secured Obligations exist, and no portion of the Prepetition Initial Notes Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Global Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Prepetition Initial Notes Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Prepetition Initial Notes Documents or the Prepetition Initial Notes Secured Obligations; and (d) the Global Debtors waive, discharge, and release any right to challenge any of the Prepetition Initial Notes Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

19.     <u>Validity, Priority and Perfection of Prepetition Initial Notes Liens</u>.  As more fully set forth in the Prepetition Initial Notes Indenture, prior to the Petition Date, the Prepetition Initial Notes Parties became parties to the Prepetition Initial Notes Documents pursuant to which the Prepetition Initial Notes Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Prepetition Initial Notes Collateral

in favor of the Prepetition Initial Notes Agent.  The Global Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Initial Notes Liens on the Prepetition Initial Notes Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Initial Noteholders for fair consideration and reasonably equivalent value; (b) the Prepetition Initial Notes Liens were senior in priority over any and all other liens on the Prepetition Initial Notes Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition Initial Notes Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Initial Notes Liens.

20.    <u>No Challenges/Claims as to Prepetition Initial Noteholders</u>.  No claims or causes of action exist that are held by the Global Debtors or their Estates against, or with respect to, any Prepetition Initial Notes Secured Party or any of their respective Representatives.  The Global Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition Initial Noteholders or any of their respective Representatives (in each case in such respective capacity) with respect to the Prepetition Initial Notes Documents, the Prepetition Initial Notes Secured Obligations, or the Prepetition Initial Notes Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

**Stipulations as to Prepetition FILO Secured Parties**.

21.    Prepetition FILO Credit Agreement.  Prior to the commencement of the Chapter 11 Cases, the Prepetition FILO Borrower became indebted to the Prepetition FILO Lenders pursuant to the Prepetition FILO Documents.  Pursuant to the Prepetition FILO Documents, each of the Prepetition FILO Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the Prepetition FILO Secured Obligations to the Prepetition FILO Agent for the benefit of the Prepetition FILO Lenders.

22.    Prepetition FILO Secured Obligations.  As of the Petition Date, the Prepetition FILO Borrower and the other Prepetition FILO Secured Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Prepetition FILO Lenders, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $400,000,000 on account of the Prepetition FILO Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Prepetition FILO Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Prepetition FILO Documents, and all commitments of the Prepetition FILO Lenders to extend credit thereunder or make other financial accommodations were terminated on the Petition Date.

23.    Validity and Priority of Prepetition FILO Secured Obligations.  (a) The Prepetition FILO Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition FILO Secured Parties and such Prepetition FILO Secured Obligations are enforceable

in accordance with the terms of the Prepetition FILO Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition FILO Secured Obligations exist, and no portion of the Prepetition FILO Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Global Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Prepetition FILO Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Prepetition FILO Documents or the Prepetition FILO Secured Obligations; and (d) the Global Debtors waive, discharge, and release any right to challenge any of the Prepetition FILO Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

24.     Validity, Priority and Perfection of Prepetition FILO Liens.  As more fully set forth in the Prepetition FILO Credit Agreement, prior to the Petition Date, the Prepetition FILO Secured Parties became parties to the Prepetition FILO Documents pursuant to which the Prepetition FILO Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Prepetition FILO Collateral in favor of the Prepetition FILO Agent.  The Global Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition FILO Liens on the Prepetition FILO Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition FILO Lenders for fair consideration and reasonably equivalent value; (b) the Prepetition FILO

14

Liens were senior in priority over any and all other liens on the Prepetition FILO Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition FILO Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition FILO Liens.

25.     <u>No Challenges/Claims as to Prepetition FILO Lenders</u>.  No claims or causes of action exist that are held by the Global Debtors or their Estates against, or with respect to, any Prepetition FILO Secured Party or any of their respective Representatives.  The Global Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition FILO Lenders or any of their respective Representatives (in each case in such respective capacity) with respect to the Prepetition FILO Documents, the Prepetition FILO Secured Obligations, or the Prepetition FILO Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

**Stipulations as to Prepetition NPC Secured Parties**.

26.     <u>Prepetition NPC Credit Agreement</u>.  Prior to the commencement of the Chapter 11 Cases, the Prepetition NPC Borrower became indebted to the Prepetition NPC Lenders pursuant to the Prepetition NPC Documents.  Pursuant to the Prepetition NPC Documents, each of the Prepetition NPC Guarantors unconditionally and irrevocably guaranteed, on a joint and several

15

basis, each as a primary obligor and not merely as a surety, the Prepetition NPC Secured Obligations to the Prepetition NPC Agent for the benefit of the Prepetition NPC Lenders.

27.     <u>Prepetition NPC Secured Obligations</u>.  As of the Petition Date, the Prepetition NPC Borrower and the other Prepetition NPC Secured Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Prepetition NPC Lenders, without defense, counterclaim, or offset of any kind, in an aggregate principal amount of not less than $362,465,541 on account of the Prepetition NPC Secured Obligations, plus accrued and unpaid interest, fees, expenses (including advisors' fees and expenses, in each case, that are chargeable or reimbursable under the applicable agreements), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law.  The Prepetition NPC Secured Obligations were automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Cases in accordance with the terms of the Prepetition NPC Documents, and all commitments of the Prepetition NPC Lenders to extend credit thereunder or make other financial accommodations were terminated on the Petition Date.

28.     <u>Validity and Priority of Prepetition NPC Secured Obligations</u>.  (a) The Prepetition NPC Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition NPC Secured Parties and such Prepetition NPC Secured Obligations are enforceable in accordance with the terms of the Prepetition NPC Documents; (b) no offsets, recoupments, demands, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition NPC Secured Obligations exist, and no portion of the Prepetition NPC Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the

16

Bankruptcy Code or applicable non-bankruptcy law; (c) the Global Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including Avoidance Actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, or actions for recovery or disgorgement, against any of the Prepetition NPC Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, employees or other Representatives arising out of, based upon or related to the Prepetition NPC Documents or the Prepetition NPC Secured Obligations; and (d) the Global Debtors waive, discharge, and release any right to challenge any of the Prepetition NPC Secured Obligations, and the priority of the applicable Debtors' obligations thereunder.

29.     <u>Validity, Priority and Perfection of Prepetition NPC Liens</u>.  As more fully set forth in the Prepetition NPC Credit Agreement, prior to the Petition Date, the Prepetition NPC Secured Parties became parties to the Prepetition NPC Documents pursuant to which the Prepetition NPC Secured Obligations were secured by legal, valid, perfected, binding, enforceable, and nonavoidable liens and security interests in the Prepetition NPC Collateral in favor of the Prepetition NPC Agent.  The Global Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition NPC Liens on the Prepetition NPC Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition NPC Lenders for fair consideration and reasonably equivalent value; (b) the Prepetition NPC Liens were senior in priority over any and all other liens on the Prepetition NPC Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition NPC Documents, including pursuant to the Prepetition Intercreditor Agreements, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected

subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition NPC Liens.

30.     <u>No Challenges/Claims as to Prepetition NPC Lenders</u>.  No claims or causes of action exist that are held by the Global Debtors or their Estates against, or with respect to, any Prepetition NPC Secured Party or any of their respective Representatives.  The Global Debtors and their Estates have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition NPC Lenders or any of their respective Representatives (in each case in such respective capacity) with respect to the Prepetition NPC Documents, the Prepetition NPC Secured Obligations, or the Prepetition NPC Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, Avoidance Action, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

**Stipulations as to All Prepetition Secured Parties**

31.     <u>Cash Collateral</u>.  Any and all of the cash of the Prepetition OpCo Loan Parties, including the Prepetition OpCo Loan Parties' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Prepetition OpCo Loan Parties, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition OpCo Collateral or deposited into the Global Debtors' banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing, wherever located, is the Prepetition OpCo Secured Parties' Cash Collateral within the meaning of section 363(a) of the Bankruptcy Code.

32.    <u>Bank Accounts</u>.  The Global Debtors acknowledge and agree that, as of the Petition Date, none of the Global Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to the Cash Management Order.

**Annex 3 – Adequate Protection and DIP Lien Priorities**

| Priority | ABL DIP Collateral / OpCo DIP Collateral | | | | | |
|---|---|---|---|---|---|---|
| | **Prepetition ABL Priority Collateral** | **Prepetition Notes / Term Priority Collateral** | **Encumbered Property Constituting ABL Priority Collateral (as defined in the DIP Intercreditor Agreement)** | **Encumbered Property Constituting Term Priority Collateral (as defined in the DIP Intercreditor Agreement)** | **Unencumbered Property Constituting ABL Priority Collateral (as defined in the DIP Intercreditor Agreement)** | **Unencumbered Property Constituting Term Priority Collateral (as defined in the DIP Intercreditor Agreement)** |
| **1st** | Carve Out | Carve Out | Carve Out | Carve Out | Carve Out | Carve Out |
| **2nd** | Permitted Prior Liens | Permitted Prior Liens | Permitted Prior Liens | Permitted Prior Liens | ABL DIP Liens | OpCo DIP Liens |
| **3rd** | ABL DIP Liens | OpCo DIP Liens | ABL DIP Liens | OpCo DIP Liens | ABL Adequate Protection Liens | Notes/ Term Adequate Protection Liens |
| **4th** | ABL Adequate Protection Liens | Notes / Term Adequate Protection Liens | ABL Adequate Protection Liens | Notes / Term Adequate Protection Liens | OpCo DIP Liens | ABL DIP Liens |
| **5th** | Prepetition ABL / FILO Liens | Prepetition Pari Passu Liens | OpCo DIP Liens | ABL DIP Liens | Notes / Term Adequate Protection Liens | ABL Adequate Protection Liens |
| **6th** | OpCo DIP Liens | ABL DIP Liens | Notes / Term Adequate Protection Liens | ABL Adequate Protection Liens | | |
| **7th** | Notes / Term Adequate Protection Liens | ABL Adequate Protection Liens | | | | |
| **8th** | Prepetition Pari Passu Liens | Prepetition ABL / FILO Liens | | | | |

For the avoidance of doubt, the proceeds of the liens and security interests set forth herein are subject to the payment priorities, application of proceeds and payment turnover provisions set forth in the DIP Intercreditor Agreement and the Prepetition Intercreditor Agreements, and:

(I)     For purposes of the Prepetition ABL / Notes Intercreditor Agreement: (a) the Debtors' rights under section 506(c) of the Bankruptcy Code; (b) the proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; and (c) the proceeds of leases of Real Property, in each of the foregoing clauses (a) through (c) are, and shall be treated as, ABL Priority Collateral under the Prepetition ABL / Notes Intercreditor Agreement.  The DIP Collateral shall be included as Collateral under the Prepetition ABL / Notes Intercreditor Agreement and all DIP Collateral (other than as set forth in clauses (a) through (c) above) that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date: (i) that is of a type that would be ABL Priority Collateral and the proceeds and products thereof is, and shall be treated as, ABL Priority Collateral for the purposes of the Prepetition ABL / Notes Intercreditor Agreement and the DIP Orders, and (ii) that is of a type that would be Notes / Term Priority Collateral and the proceeds and products thereof is, and shall be treated as, Notes / Term Priority Collateral for the purposes of the Prepetition ABL / Notes Intercreditor Agreement and the DIP Orders.  For the avoidance of doubt, (x) other than as provided in clauses (a) through (c) above, all property or assets of the Debtors that are not of a type that would be ABL Priority Collateral are, and shall be treated as, Notes / Term Priority Collateral and (y) the DIP Intercreditor Agreement shall control with respect to

the rights of the ABL DIP Secured Parties and the OpCo DIP Secured Parties as to the DIP Collateral (including with respect to Specified Collateral (as defined in the DIP Intercreditor Agreement)).

(II)    For the purposes of the Prepetition ABL / Notes Intercreditor Agreement: (a) the claims (as such term is defined in section 101(5) of the Bankruptcy Code) in respect of the DIP ABL Obligations and OpCo FILO Roll-Up Loans are "ABL Claims" under and as defined therein and (b) the claims (as such term is defined in section 101(5) of the Bankruptcy Code) in respect of the OpCo NPC Roll-Up Loans are "Term Loan Claims" under and as defined therein.

(III)    For purposes of the Prepetition ABL / FILO Intercreditor Agreement: (a) the claims (as such term is defined in section 101(5) of the Bankruptcy Code) in respect of the DIP ABL Obligations are "ABL Obligations" under and as defined therein and (b) the claims (as such term is defined in section 101(5) of the Bankruptcy Code) in respect of the OpCo FILO Roll-Up Loans are "Subordinated Obligations" under and as defined therein.

(IV)    For purposes of the Prepetition Pari Notes Intercreditor Agreement, (a) the claims (as such term is defined in section 101(5) of the Bankruptcy Code) in respect of the OpCo NPC Roll-Up Loans are "Initial First Out Obligations" under and as defined therein, (b) the OpCo DIP Credit Agreement (with respect to the OpCo NPC Roll-Up Loans) is the "Initial First Out Credit Agreement" under and as defined therein and (c) the OpCo DIP Agent is the "Initial First Out Administrative Agent" under and as defined therein.

(V)    For purposes of the Prepetition Payment Administration Agreement: (a)(i) the claims (as such term is defined in section 101(5) of the Bankruptcy Code) in respect of the OpCo FILO Roll-Up Loans are "Initial First Out Obligations" under and

as defined therein, (ii) the OpCo DIP Credit Agreement (with respect to the OpCo FILO Roll-Up Loans) is the "Initial First Out Credit Agreement" under and as defined therein and (iii) the OpCo DIP Agent is the "Initial First Out Administrative Agent" under and as defined therein and (b)(i) the claims (as such term is defined in section 101(5) of the Bankruptcy Code) in respect of the OpCo NPC Roll-Up Loans are "Initial Additional First Out Obligations" under and as defined therein, (b) the OpCo DIP Credit Agreement (with respect to the OpCo NPC Roll-Up Loans) is the "Initial Additional First Out Credit Agreement" under and as defined therein and (c) the OpCo DIP Agent is the "Initial Additional First Out Administrative Agent" under and as defined therein.

| Priority | SGUS DIP Collateral | | |
| --- | --- | --- | --- |
| | **Prepetition SGUS Collateral** | **Encumbered Property** | **Unencumbered Property** |
| **1st** | Carve Out | Carve Out | Carve Out |
| **2nd** | Permitted Prior Liens | Permitted Prior Liens | SGUS DIP Liens |
| **3rd** | SGUS DIP Liens | SGUS DIP Liens | SGUS Adequate Protection Liens |
| **4th** | SGUS Adequate Protection Liens | SGUS Adequate Protection Liens | |
| **5th** | Prepetition SGUS Liens | | |