**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1] | Case No. 26-90103 (ARP) |
| Debtors. | (Jointly Administered) |

**JOINT CHAPTER 11 PLAN OF SAKS**
**GLOBAL ENTERPRISES LLC AND ITS GLOBAL DEBTOR AFFILIATES**

**HAYNES AND BOONE, LLP**
Kelli Stephenson Norfleet (TX Bar No. 24070678)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney P. Lyda (TX Bar No. 24013330)
David Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone:     (713) 547 2000
Facsimile:     (713) 547 2600
Email:     kelli.norfleet@haynesboone.com
     kenric.kattner@haynesboone.com
     arsalan.muhammad@haynesboone.com
     kourtney.lyda@haynesboone.com
     david.trausch@haynesboone.com

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Robin Spigel (admitted *pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
Betsy L. Feldman (admitted *pro hac vice*)
Jessica D. Graber (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:     (212) 728-8000
Facsimile:     (212) 728-8111
Email:     dsinclair@willkie.com
     rspigel@willkie.com
     absmith@willkie.com
     bfeldman@willkie.com
     jgraber@willkie.com

-and-

Jennifer J. Hardy (TX Bar No. 24096068)
600 Travis Street
Houston, TX 77002
Telephone:     (713) 510-1766
Facsimile:     (713) 510-1799
Email:     jhardy2@willkie.com

-and-

Ryan Blaine Bennett (admitted *pro hac vice*)
300 North LaSalle Drive
Chicago, IL 60654
Telephone:     (312) 728-9123
Facsimile:     (312) 728-9199
Email:     rbennett@willkie.com

*Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

*Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

Dated: April 5, 2026

---

[1]     A complete list of each of the debtors in these chapter 11 cases (collectively, the "Debtors") may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Saks.   The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281.   Bradley Arant Boult Cummings LLP is counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively the "SO5 Digital Debtors").   Haynes and Boone, LLP and Willkie Farr & Gallagher LLP, respectively, are co-counsel for the Global Debtors.

**TABLE OF CONTENTS**

**ARTICLE I. DEFINITIONS AND INTERPRETATION**.......................................................**2**

    A.    Definitions. ................................................................................................... 2
    B.    Interpretation; Application of Definitions and Rules of Construction. ......................... 31
    C.    Appendices and Plan Documents. ..................................................................... 31
    D.    Definitive Document Consent Rights. ................................................................ 32
    E.    Nature of the Restructuring Transactions ........................................................... 32

**ARTICLE II. CERTAIN INTERCREDITOR AND INTER-DEBTOR ISSUES** ...............**32**

    2.1.    Settlement of Certain Intercreditor and Inter-Global Debtor Issues............................. 32
    2.2.    Formation of Global Debtor Groups for Convenience Purposes. ................................ 32

**ARTICLE III. DIP ABL FACILITY CLAIMS,   DIP OPCO CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,  PROFESSIONAL FEE CLAIMS, U.S. TRUSTEE FEES, AND PRIORITY TAX CLAIMS**............................................................**32**

    3.1.    DIP ABL Facility Claims. ............................................................................... 33
    3.2.    DIP OpCo Claims. ......................................................................................... 33
    3.3.    Administrative Expense Claims. ....................................................................... 34
    3.4.    Professional Fee Claims. ................................................................................. 35
    3.5.    Priority Tax Claims. ....................................................................................... 36
    3.6.    U.S. Trustee Fees and Related Reporting Obligations. ........................................... 37

**ARTICLE IV. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** ................**37**

    4.1.    Classification of Claims and Equity Interests....................................................... 37
    4.2.    Separate Classification of Other Secured Claims. ................................................. 39

**ARTICLE V. TREATMENT OF CLAIMS AND EQUITY INTERESTS**.........................**39**

    A.    Treatment of Claims and Equity Interests........................................................... 39
    5.1.    Class 1 – Priority Non-Tax Claims.................................................................... 40
    5.2.    Class 2 – Other Secured Claims. ...................................................................... 40
    5.3.    Class 3-A – First Out DIP Term Loan Facility Claims. .......................................... 41
    5.4.    Class 3-B – Second Out DIP Term Loan Facility Claims. ....................................... 41
    5.5.    Class 3-C – Third Out DIP Term Loan Facility Claims........................................... 41
    5.6.    Class 4-A – Prepetition SGUS Notes Claims. ...................................................... 42
    5.7.    Class 4-B – Prepetition FILO and NPC Claims.................................................... 42
    5.8.    Class 4-C – Prepetition OpCo Second Out Notes Claims. ....................................... 43
    5.9.    Class 4-D – OpCo General Unsecured Claims...................................................... 43
    5.10.    Class 5-A – HoldCo II SGUS Notes Guarantee Claims........................................... 44
    5.11.    Class 5-B – HoldCo II General Unsecured Claims................................................. 44
    5.12.    Class 6-A – Prepetition TopCo Facility Claims..................................................... 45
    5.13.    Class 6-B – TopCo General Unsecured Claims..................................................... 45
    5.14.    Class 7 – Intercompany Claims........................................................................ 45

5.15.   Class 8 – Subordinated Claims..................................................................................... 46
5.16.   Class 9 – Existing TopCo Equity Interests................................................................. 46
5.17.   Class 10 – Existing Intercompany Equity Interests.................................................... 46
B.   Class Acceptance Requirement. ................................................................................... 46
C.   Tabulation of Votes on a Non-Consolidated Basis...................................................... 47
D.   Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code........................... 47
E.   Voting Classes; Deemed Acceptance or Rejection by Non-Voting Classes................. 47
F.   Vacant and Abstaining Classes. ................................................................................... 47
G.   Controversy Concerning Impairment........................................................................... 48
H.   Special Provision Governing Unimpaired Claims........................................................ 48

**ARTICLE VI. MEANS FOR IMPLEMENTATION OF THIS PLAN............................... 48**

6.1.   Non-Substantive Consolidation................................................................................... 48
6.2.   Plan Administrator. ...................................................................................................... 48
6.3.   Restructuring Transactions. ......................................................................................... 50
6.4.   Continued Corporate Existence in Certain Debtors; Vesting of Assets........................ 51
6.5.   Indemnification Provisions in Organizational Documents. .......................................... 52
6.6.   Sources for Cash Distributions under this Plan. ........................................................... 52
6.7.   Exit ABL Facility......................................................................................................... 52
6.8.   New Exit Facilities. ...................................................................................................... 53
6.9.   Litigation Trust. ........................................................................................................... 56
6.10.   Reorganized Global Debtors' Ownership. ................................................................... 59
6.11.   Exemption from Registration Requirements. ............................................................... 60
6.12.   Organizational Documents........................................................................................... 61
6.13.   Exemption from Certain Transfer Taxes and Recording Fees. ..................................... 61
6.14.   Other Tax Matters........................................................................................................ 62
6.15.   Cancellation of Existing Securities and Agreements. .................................................. 62
6.16.   Boards. ......................................................................................................................... 63
6.17.   Directors and Officers Insurance Policies.................................................................... 64
6.18.   New Capital Commitment Claims and DIP Term Loan Documents Indemnification
       Obligations. .................................................................................................................. 64
6.19.   Corporate Action.......................................................................................................... 65
6.20.   Comprehensive Settlement of Claims and Controversies; Termination of Subordination
       Rights. .......................................................................................................................... 65
6.21.   Additional Transactions Authorized Under this Plan.................................................... 66
6.22.   Insurance Policies......................................................................................................... 66

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ..................................... 67**

7.1.   Distributions. ............................................................................................................... 67
7.2.   No Postpetition Interest on Claims............................................................................... 67
7.3.   Date of Distributions. ................................................................................................... 67
7.4.   Distribution Record Date.............................................................................................. 67
7.5.   Disbursing Agent. ........................................................................................................ 68
7.6.   Delivery of Distribution................................................................................................ 69
7.7.   Unclaimed Property...................................................................................................... 69

7.8.    Satisfaction of Claims.................................................................................. 70
7.9.    Manner of Payment Under Plan. .................................................................. 70
7.10.   De Minimis Cash Distributions.................................................................... 70
7.11.   Distributions on Account of Allowed Claims Only. ....................................... 70
7.12.   Fractional Shares........................................................................................ 70
7.13.   No Distribution in Excess of Amount of Allowed Claims. ............................. 70
7.14.   Foreign Currency Exchange Rate. ............................................................... 71
7.15.   Withholding and Reporting Requirements..................................................... 71
7.16.   Claims Payable by Third Parties. ................................................................ 71

**ARTICLE VIII. PROCEDURES FOR RESOLVING CLAIMS ..................................... 72**

8.1.    Allowance of Claims................................................................................... 72
8.2.    Claims Administration Responsibilities........................................................ 72
8.3.    Estimation of Claims.................................................................................. 73
8.4.    Disputed Claims Process. ........................................................................... 73
8.5.    Adjustment to Claims or Equity Interests without Objection. ........................ 74
8.6.    No Distributions Pending Allowance. .......................................................... 74
8.7.    Distributions After Allowance. ................................................................... 74
8.8.    Claim for Reimbursement or Contribution.................................................... 74

**ARTICLE IX. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................... 74**

9.1.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ..... 74
9.2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..... 76
9.3.    Claims Based on Rejection of Executory Contracts and Unexpired Leases. ..... 77
9.4.    Contracts and Leases Entered into After the Petition Date............................. 78
9.5.    Modifications, Amendments, Supplements, or Other Agreements................... 78
9.6.    Non-Occurrence of Effective Date. ............................................................. 78
9.7.    Reservation of Rights. ................................................................................ 78
9.8.    Employee Compensation and Benefits. ........................................................ 79

**ARTICLE X. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN.................................................................................................................. 80**

10.1.   Conditions Precedent to Confirmation.......................................................... 80
10.2.   Conditions Precedent to the Effective Date................................................... 80
10.3.   Satisfaction and Waiver of Conditions Precedent.......................................... 83
10.4.   Effect of Failure of Conditions.................................................................... 83
10.5.   Binding Effect............................................................................................ 83
10.6.   Substantial Consummation. ........................................................................ 84

**ARTICLE XI. RELEASE, INJUNCTION, AND RELATED PROVISIONS..................... 84**

11.1.   Discharge of Claims and Termination of Certain Equity Interests; Compromise and
        Settlement of Claims, Certain Equity Interests, and Controversies................. 84
11.2.   [Releases by the Global Debtors.]................................................................ 85
11.3.   [Third-Party Release.] ................................................................................ 87

11.4.   [Exculpation.] .......................................................................................................... 89

11.5.   Discharge of Claims and Termination of Equity Interests........................................ 90

11.6.   Injunction................................................................................................................... 91

11.7.   Setoffs and Recoupment. ........................................................................................... 92

11.8.   Waiver of Statutory Limitations on Releases. ........................................................... 92

11.9.   Protection Against Discriminatory Treatment........................................................... 93

11.10. Release of Liens.......................................................................................................... 93

**ARTICLE XII. RETENTION OF JURISDICTION**.................................................................. **94**

**ARTICLE XIII. MISCELLANEOUS PROVISIONS**................................................................. **96**

13.1.   Dissolution of Creditors' Committee.......................................................................... 96

13.2.   Termination of Professional Persons. ........................................................................ 96

13.3.   Modifications and Amendments.................................................................................. 96

13.4.   Revocation or Withdrawal of this Plan. ..................................................................... 97

13.5.   Allocation of Distributions under this Plan Between Principal and Interest. ................. 97

13.6.   Severability................................................................................................................. 98

13.7.   Governing Law. .......................................................................................................... 98

13.8.   Section 1125(e) of the Bankruptcy Code. .................................................................. 98

13.9.   Inconsistency. ............................................................................................................. 98

13.10. Time............................................................................................................................. 99

13.11. Reference to Monetary Figures. ................................................................................. 99

13.12. Exhibits. ...................................................................................................................... 99

13.13. Reservation of Rights. ................................................................................................ 99

13.14. Successors and Assigns. ............................................................................................. 99

13.15. Notices. ....................................................................................................................... 99

13.16. Filing of Additional Documents................................................................................ 101

13.17. Closing of Chapter 11 Cases..................................................................................... 101

13.18. Tax Matters............................................................................................................... 101

## JOINT CHAPTER 11 PLAN OF
## SAKS GLOBAL ENTERPRISES LLC AND ITS GLOBAL DEBTOR AFFILIATES[2]

Saks Global Enterprises LLC and its Global Debtor affiliates propose this joint chapter 11 plan of reorganization (as amended, supplemented, or otherwise modified from time to time, this "Plan") for the resolution of the outstanding Claims against, and Equity Interests in, the Global Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I of this Plan.

Although proposed jointly for administrative purposes, this Plan resolves the outstanding Claims against, and Equity Interests in, each Global Debtor pursuant to the Bankruptcy Code on an individual basis. Each Global Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code on a joint basis. The classification of Claims and Equity Interests set forth in Article IV of this Plan applies with respect to each Global Debtor on an individual basis as set forth herein. This Plan does not contemplate the substantive consolidation of any of the Global Debtors.

Reference is made to the Disclosure Statement for discussion of the Global Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan.

**ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS PLAN (INCLUDING WITHOUT LIMITATION, UNDER ARTICLE VI HEREOF) IN FULL.**

**THE ISSUANCE OF ANY SECURITIES REFERRED TO IN THIS PLAN SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF ANY INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF APPLICABLE LAW IN ANY JURISDICTION. NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY SECURITIES REFERRED TO IN THIS PLAN (OTHER THAN SECURITIES ISSUED PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE IN A DEEMED PUBLIC OFFERING) IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.**

---

[2]   [**NTD**:  For the avoidance of doubt, all terms of this Plan remain subject to negotiation, material revision, and the consent rights set forth in the Restructuring Support Agreement (as defined herein).]

1

## ARTICLE I.
## DEFINITIONS AND INTERPRETATION

### A.     *Definitions.*

As used in this Plan, capitalized terms have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

1.1.     "*Ad Hoc Group*" means the ad hoc group of holders of DIP Facility Claims and Prepetition Secured Claims represented by the Ad Hoc Group Advisors.

1.2.     "*Ad Hoc Group Advisors*" means, collectively, the advisors retained by the Ad Hoc Group, including (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as co-counsel to the Ad Hoc Group, (b) Porter Hedges LLP, as co-counsel to the Ad Hoc Group, (c) FTI Consulting, as financial advisor to the Ad Hoc Group, (d) Lazard Frères & Co. LLC, as investment banker to the Ad Hoc Group, (e) Hilco Global, as valuation consultant to the Ad Hoc Group, (f) Kekst CNC, as public relations advisor to the Ad Hoc Group, (g) Morgan Lewis & Bockius LLP, as labor counsel to the Ad Hoc Group, and (h) such other professionals that may be retained by or on behalf of the Ad Hoc Group, solely in the case referred to in this clause (h), upon written notice to the Global Debtors.

1.3.     "*Additional SGUS Notes*" means those certain 11.000% senior secured asset based notes due 2029 in the aggregate principal amount of $462.5 million, the issuance of which was authorized by SGUS on August 8, 2025.

1.4.     "*Administrative Bar Date*" means the applicable deadline by which all requests for Administrative Expense Claims must be Filed and served on the Global Debtors, which shall be the first Business Day that is or follows the date that is thirty (30) days after the Effective Date; <u>provided</u> that Filing a request for payment of Administrative Expense Claims is not required where this Plan, the Bankruptcy Code, or a Final Order expressly excuses the obligation to make such Filing.

1.5.     "*Administrative Expense Claim*" means a Claim (other than any DIP Facility Claim) for costs and expenses of administration of the Chapter 11 Cases Allowed under sections 503(b), 507(a)(2), 507(b), or, if applicable, 1114(e)(2) of the Bankruptcy Code, including, but not limited to:  (a) any actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Global Debtors (including, but not limited to, wages, salaries, commissions for services, and payments for inventories, leased equipment, and premises); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, solely to the extent incurred on or before the Effective Date; (c) all U.S. Trustee Fees; (d) any Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code; and (e) any Claims that have been designated "Administrative Expense Claims" by Final Order of the Bankruptcy Court.

1.6.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

2

1.7. "*Allowed*" means, with respect to a Claim or Equity Interest under this Plan, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim or Proof of Equity Interest Filed by the Bar Date or a request for payment of an Administrative Expense Claim Filed by the Administrative Bar Date, as applicable (or for which Claim or Equity Interest a Proof of Claim or Proof of Equity Interest is not required to be Filed under this Plan, the Bankruptcy Code, the Bar Date Order, or a Final Order, including the Final DIP Order); (b) a Claim that is scheduled by the Global Debtors as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim or Proof of Equity Interest, as applicable, has been timely Filed; (c) a Claim allowed in any stipulation that is approved by the Bankruptcy Court by a Final Order; (d) a Claim allowed pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (e) a Claim allowed pursuant to this Plan or a Final Order, including the Final DIP Order; provided that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by this Plan, the Confirmation Order, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim or Proof of Equity Interest is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Global Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Unless expressly waived by this Plan, the Allowed amount of Claims or Equity Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Global Debtor or Reorganized Global Debtor, as applicable. For the avoidance of doubt, a Proof of Claim or Proof of Equity Interest Filed after the Bar Date or a request for payment of an Administrative Expense Claim Filed after the Administrative Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

1.8. "*Assumed Contracts / Leases*" means, collectively, those Executory Contracts and Unexpired Leases that shall be assumed by the Reorganized Global Debtors, as set forth in the Assumed Contracts / Leases List.

1.9. "*Assumed Contracts / Leases List*" means the list or lists of Assumed Contracts / Leases included in the Plan Supplement which provide for proposed Cure Costs, as applicable, as may be amended or supplemented up to and including the Effective Date.

1.10. "*Ballot*" means the form distributed by the Global Debtors or the Claims Agent to Holders of Impaired Claims entitled to vote on this Plan on which the acceptance or rejection of this Plan is to be indicated, in accordance with the Solicitation Procedures.

1.11. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

3

1.12.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

1.13.    "*Bankruptcy Rules*" means, collectively, (a) the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, (b) the Local Rules, and (c) any chambers rules of the Bankruptcy Court.

1.14.    "*Bar Date*" means the applicable date established by the Bar Date Order by which respective Proofs of Claim and Proofs of Equity Interest must be Filed.

1.15.    "*Bar Date Order*" means the *Order (A) Establishing Deadlines for the Filing of Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Approving the Form and Manner of Filing Proofs of Claim, (III) Approving the Form and Manner of Notice Thereof, Including Section 503(b)(9) Requests, and (IV) Granting Related Relief* [Docket No. 1158].

1.16.    "*Boards*" means, collectively, the applicable boards of directors or other governing bodies of the Global Debtors or Reorganized Global Debtors, as applicable.

1.17.    "*Business Day*" means any day other than a Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or a day on which commercial banks are authorized to close under the Laws of, or are in fact closed for general business in, the state of New York.

1.18.    "*Cash*" means cash and cash equivalents, including bank deposits, checks, and the equivalents thereof, in the legal tender of the United States of America.

1.19.    "*Causes of Action*" means without limitation, any action, Claim, damage, remedy, judgment, cause of action, controversy, demand, right, action, suit, right of setoff, cross claim, counterclaim, recoupment, any Claim arising from any contract or for breach of duty imposed by law or in equity, contribution, reimbursement, suit, class action, third-party claim, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, direct or indirect, choate or inchoate, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, disputed or undisputed, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, the term "Causes of Action" includes: (a) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (b) any right to object to or otherwise contest Claims or Equity Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the

4

Bankruptcy Code; and (e) claims pursuant to section 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state Law.

1.20.     "*Chapter 11 Cases*" means:  (a) when used with reference to a particular Global Debtor, the case pending for that Global Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all of the Global Debtors, the jointly administered chapter 11 cases pending for the Global Debtors in the Bankruptcy Court.

1.21.     "*Claim*" means any claim as defined in section 101(5) of the Bankruptcy Code against any Global Debtor or property of any Global Debtor, including any Claim arising after the Petition Date.

1.22.     "*Claims Agent*" means Stretto, Inc. in its capacity as noticing, claims, and solicitation agent for the Global Debtors.

1.23.     "*Claims Objection Deadline*" means the deadline for objecting to a Claim asserted against a Global Debtor, which shall be on the date that is the later of (a) 180 days after the Effective Date, or in the case of an Administrative Expense Claim, ninety (90) days after the Effective Date, and (b) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court for objecting to such Claims.

1.24.     "*Claims Register*" means the official register of Claims maintained by the Clerk or the Claims Agent.

1.25.     "*Class*" means a class of Claims or Equity Interests established under Article IV of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.26.     "*ClearPar*" means ClearPar by S&P Global.

1.27.     "*Clerk*" means the clerk of the Bankruptcy Court.

1.28.     "*Closing Date Commitment Premium*" has the meaning set forth in the New Capital Commitment Letter.

1.29.     "*Collateral*" means, at any time, any assets and any property of the Global Debtors or Reorganized Global Debtors, as applicable, wherever located, whether real, personal or mixed, or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim.

1.30.     "*Combined Hearing*" means a hearing to be held by the Bankruptcy Court regarding Confirmation of this Plan (as may be amended pursuant to Section 13.3 of this Plan) and final approval of the adequacy of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

1.31.     "*Commitment Cash Premium*" has the meaning set forth in the New Capital Commitment Letter.

5

1.32. "*Commitment Increases*" has the meaning set forth in the New Capital Commitment Letter.

1.33. "*Conditional Disclosure Statement Approval Hearing*" means a hearing held by the Bankruptcy Court on April 24, 2026 to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code.

1.34. "*Conditional Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, the Solicitation Materials, and the Solicitation Procedures [Docket No. [●]].

1.35. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

1.36. "*Confirmation Date*" means the date on which the Clerk enters the Confirmation Order on the docket of the Bankruptcy Court, within the meaning of Bankruptcy Rules 5003 and 9021.

1.37. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as may be amended, modified, or supplemented from time to time.

1.38. "*Consenting DIP Term Loan Lenders*" means, collectively, as of the relevant time, those DIP Term Loan Lenders that are party to the Restructuring Support Agreement.

1.39. "*Creditors' Committee*" means the statutory committee of unsecured creditors, appointed in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, as identified in the *US Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 480], and the *US Trustee's Notice (Amended) of Appointment of Committee of Unsecured Creditors* [Docket No. 522], Filed by the U.S. Trustee on January 27, 2026 and January 29, 2026, respectively, as the same may be further reconstituted from time to time.

1.40. "*Cure Cost*" means (a) all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease), and (b) to the extent required to be cured by the Bankruptcy Code, other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that, in each case, is to be assumed by the Global Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

1.41. "*Cure Dispute*" has the meaning set forth in Section 9.2 of this Plan.

1.42. "*D&O Liability Insurance Policies*" means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related

6

thereto) issued at any time to or providing coverage to any of the Global Debtors for current or former directors', managers', employees', and/or officers' liability.

1.43.     "*Debtors*" means, collectively, the Global Debtors and the SO5 Digital Debtors.

1.44.     "*Definitive Document Consent Rights*" means the documentation principles set forth in <u>Section I.D.</u> hereof.

1.45.     "*Definitive Documents*" has the meaning set forth in the Restructuring Support Agreement.

1.46.     "*DIP ABL Advisors*" means, collectively, (a) Otterbourg P.C., as co-counsel to the DIP ABL Lenders, (b) Morgan Lewis & Bockius LLP, as co-counsel to the DIP ABL Lenders, and (c) M-III Partners, LP, as investment banker to the DIP ABL Lenders.

1.47.     "*DIP ABL Agent*" means Bank of America, N.A., in its capacity as administrative agent and collateral agent for the lenders under the DIP ABL Credit Agreement, together with its successors and permitted assigns.

1.48.     "*DIP ABL Claim(s)*" means any Claim arising on account of the DIP ABL Credit Facility.

1.49.     "*DIP ABL Credit Agreement*" means that certain Senior Secured Super-Priority DIP ABL Credit Agreement, dated as of January 15, 2026 by and among Holdings, Saks as borrower, the co-borrowers party thereto, the guarantors party thereto, the lenders party thereto, Bank of America, N.A., as administrative agent, collateral agent, and swingline lender, as amended, restated, amended or restated, supplemented, extended, renewed, or otherwise modified, refinanced, or replaced from time to time.

1.50.     "*DIP ABL Credit Facility*" means the debtor-in-possession asset-based financing facility on the terms and conditions set forth in the DIP ABL Credit Agreement.

1.51.     "*DIP ABL Documents*" means the DIP ABL Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

1.52.     "*DIP ABL Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the DIP ABL Documents.

1.53.     "*DIP ABL Loans*" means, collectively, the senior secured superpriority revolving credit facility arising under or pursuant to the DIP ABL Credit Agreement.

1.54.     "*DIP Agents*" means, collectively, the administrative and collateral agents for the DIP Lenders with respect to the DIP Facilities, which shall be (a) the DIP ABL Agent,

(b) the DIP OpCo Agent, (c) the DIP Term Loan Agent, and (d) in each case, their successors and permitted assigns.

1.55. "*DIP Budget*" means the "Approved Budget" under the Final DIP Order.

1.56. "*DIP Conversion*" means the conversion, on the Effective Date, of DIP Term Loan Claims into Take Back Term Loans, Take Back Preferred Units, or New Saks Common Stock in accordance with (a) the terms of this Plan, (b) the Restructuring Support Agreement, (c) the New Capital Commitment Letter, (d) the DIP Documents, as applicable, and (e) any additional terms and conditions set forth in the applicable Definitive Documents as may be agreed among the Global Debtors and the Required Consenting DIP Term Loan Lenders.

1.57. "*DIP Credit Agreements*" means, collectively, the DIP ABL Credit Agreement, the DIP OpCo Credit Agreement, and the DIP Term Loan Credit Agreement.

1.58. "*DIP Credit Documents*" means, collectively, the DIP ABL Documents, the DIP OpCo Loan Documents, and the DIP Term Loan Documents.

1.59. "*DIP Documents*" means, collectively, the DIP Motion, the DIP Orders, the DIP Credit Agreements, the DIP Credit Documents, and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

1.60. "*DIP Facilities*" means, collectively, the DIP OpCo Credit Facility, the DIP Term Loan Credit Facility, and the DIP ABL Credit Facility.

1.61. "*DIP Facility Claims*" means, collectively, all Claims of the DIP Agents and/or the DIP Lenders related to, arising under, or in connection with the Final DIP Order and the DIP Documents, including, without limitation, Claims for all principal amounts outstanding, interest, fees, reasonable and documented expenses (including the reasonable and documented expenses of counsel as set forth in the DIP Credit Documents), costs and other charges of the DIP Agent and the DIP Lenders in respect of the obligations of the Global Debtors arising under the DIP Documents, including, for the avoidance of doubt and as applicable, the DIP ABL Claims, the DIP OpCo Claims, and the DIP Term Loan Claims.

1.62. "*DIP Lenders*" means, collectively, and as of the relevant time, the DIP ABL Lenders, the DIP OpCo Lenders, and the DIP Term Loan Lenders.

1.63. "*DIP Lender Litigation Trust Allocation*" means the percentage or portion of Litigation Trust Proceeds (after the payment of expenses of the Litigation Trust) allocable to Holders of DIP Term Loan Claims pursuant to the Litigation Trust Agreement, which shall be equal to 100% of the net Litigation Trust Proceeds.

1.64. "*DIP Loans*" means, collectively, the DIP ABL Loans, the DIP OpCo Loans, and the DIP Term Loans.

8

1.65.     "*DIP Motion*" means the *Global Debtors Emergency Motion for Entry of Interim And Final Orders (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 49].

1.66.     "*DIP OpCo Agent*" means U.S. Bank Trust Company, National Association, together with its successors and permitted assigns.

1.67.     "*DIP OpCo Claims*" means, collectively, all Claims arising on account of the DIP OpCo Loans.

1.68.     "*DIP OpCo Claims Distribution*" has the meaning set forth in Section 3.2 of this Plan.

1.69.     "*DIP OpCo Credit Agreement*" means that certain Superpriority Senior Secured Term Loan Debtor-in-Possession OpCo Credit Agreement, dated as of January 15, 2026, by and among Holdings, Saks as borrower, the lenders party thereto, and U.S. Bank Trust Company, National Association, in its capacity as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, extended, renewed, or otherwise modified from time to time.

1.70.     "*DIP OpCo Credit Facility*" means the intercompany debtor-in-possession facility provided pursuant to the DIP OpCo Credit Agreement.

1.71.     "*DIP OpCo Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the DIP OpCo Loan Documents.

1.72.     "*DIP OpCo Loan Documents*" means, collectively, the DIP OpCo Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection with the DIP OpCo Credit Facility, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

1.73.     "*DIP OpCo Loans*" means, collectively, the superpriority senior secured, multi-draw, delayed draw term loans arising under or pursuant to the DIP OpCo Credit Agreement.

1.74.     "*DIP Orders*" means, as applicable, the Global Debtors' Interim DIP Order, the Final DIP Order, or any other Final Order approving, among other things, the terms of the DIP Facilities and the DIP Credit Documents.

1.75.     "*DIP Term Loan Agent*" means U.S. Bank Trust Company, National Association, together with its successors and permitted assigns.

1.76.    "*DIP Term Loan Claims*" means, collectively, the First Out DIP Term Loan Facility Claims, the Second Out DIP Term Loan Facility Claims, and the Third Out DIP Term Loan Facility Claims.

1.77.    "*DIP Term Loan Credit Agreement*" means that certain Debtor-in-Possession Term Loan Credit Agreement, dated as of January 15, 2026, by and among SGUS as borrower, the Lenders party thereto from time-to time, and U.S. Bank Trust Company, National Association, in its capacity as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, extended, renewed, or otherwise modified from time to time.

1.78.    "*DIP Term Loan Credit Facility*" means the delayed draw term loan debtor-in-possession financing facility provided pursuant to the DIP Term Loan Credit Agreement.

1.79.    "*DIP Term Loan Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the DIP Term Loan Documents.

1.80.    "*DIP Term Loan Documents*" means, collectively, the DIP Term Loan Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection with the DIP Term Loan Credit Facility, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

1.81.    "*DIP Term Loans*" means, collectively, the First Out DIP Term Loans, the Second Out DIP Term Loans, and the Third Out DIP Term Loans.

1.82.    "*Disallowed*" means a finding or conclusion of Law of the Bankruptcy Court in a Final Order, or provision in the Confirmation Order, disallowing a Claim or Equity Interest.  A Proof of Claim or Equity Interest Filed after the Bar Date or a request for payment of an Administrative Expense Claim Filed after the Administrative Bar Date, as applicable, shall be automatically deemed Disallowed and expunged from the Claims Register as of the Effective Date without any further action, order, or approval of the Bankruptcy Court, unless a Final Order has deemed such late-Filed Claim timely.  "Disallow" and "Disallowing" shall have correlative meanings.

1.83.    "*Disbursing Agent*" means the Plan Administrator, if appointed subject to the consents set forth in this Plan, or else the Reorganized Global Debtors; provided that with respect to any distributions made from the Litigation Trust in accordance with this Plan and the Litigation Trust Agreement, the "Disbursing Agent" shall be the Litigation Trustee.

1.84.    "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. [●]], including all exhibits and schedules annexed thereto or referred to therein (in each case, as it or they may be amended, modified, or supplemented from time to time).

1.85.    "*Disputed*" means, as to a Claim or an Equity Interest, a Claim or an Equity Interest:  (a) that is not Allowed; (b) that is not Disallowed under this Plan, the Bankruptcy

10

Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or Proof of Equity Interest, as applicable.

1.86. "*Distribution Record Date*" means the date for purposes of determining which Holders of Allowed Claims are eligible to receive distributions under this Plan, which date shall be the Confirmation Date, or such other date as shall be agreed by the Global Debtors and the Required Consenting DIP Term Loan Lenders; provided, further that the Distribution Record Date shall not apply to any securities of the Global Debtors deposited with DTC or ClearPar, as applicable, the Holders of which shall receive a distribution in accordance with the customary procedures of DTC or ClearPar, as applicable; provided, further that the Distribution Record Date shall not apply to any of the DIP Facility Claims.

1.87. "*DTC*" means The Depository Trust Company.

1.88. "*Effective Date*" means the date specified by the Global Debtors in a notice Filed with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 10.2 of this Plan have been satisfied or waived in accordance with Section 10.3 of this Plan, and no stay of the Confirmation Order is in effect. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

1.89. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.90. "*Equal Priority Intercreditor Agreement*" means that certain Equal Priority Intercreditor Agreement, dated as of August 8, 2025, by and among Saks, Holdings, SGUS, in its capacity as administrative agent for the Initial First Out Secured Parties (as defined therein), Citibank, N.A. in its capacity as collateral agent under the Prepetition NPC Credit Agreement, the Prepetition OpCo Notes Trustee, and the Prepetition Initial Notes Trustee, as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date.

1.91. "*Equity Interest*" means, collectively, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, and any other equity, ownership, membership, profit interests, or phantom equity of or in any Global Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, or other equity, ownership, membership, or profits interests of any Global Debtor (in each case whether or not arising under or in connection with any employment agreement).

1.92. "*Estate*" means, as to each Global Debtor, the estate created in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.93. "*Excess Liquidity Reduction*" has the meaning set forth in the New Capital Commitment Letter.

11

1.94.    "*Excluded Parties*" means [●], and additional parties, if any, that will be set forth in the Schedule of Excluded Parties.

1.95.    "*Exculpated Parties*"[3] means, collectively, (a) each of the Global Debtors, (b) each member of the Special Restructuring Committee, solely in their capacity as such, and (c) the Creditors' Committee and each of its members, solely in their capacities as such; provided that no Excluded Party shall be an Exculpated Party.

1.96.    "*Exculpation*" means the exculpation provision set forth in Section 11.4 of this Plan.

1.97.    "*Executory Contract*" means a contract to which one or more of the Global Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof.

1.98.    "*Existing Intercompany Equity Interests*" means, collectively, any Equity Interest in a Global Debtor or a subsidiary of a Global Debtor that is owned or held by another Global Debtor existing immediately prior to the Effective Date.

1.99.    "*Existing TopCo Equity Interests*" means, collectively, any Equity Interest of the TopCo Global Debtors existing immediately prior to the Effective Date.

1.100.    "*Exit ABL Credit Agreement*" means the loan agreement memorializing the Exit ABL Facility, the material terms of which shall be included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Global Debtors, the Exit ABL Credit Agreement Agent, and the Exit ABL Facility Lenders.

1.101.    "*Exit ABL Credit Agreement Agent*" means the administrative agent under the Exit ABL Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the Exit ABL Credit Agreement.

1.102.    "*Exit ABL Facility*" means an exit asset based loan facility in the principal amount of $[1.5 billion].

1.103.    "*Exit ABL Facility Documents*" means, collectively, the Exit ABL Credit Agreement and any other agreements or documents related to or executed in connection with the Exit ABL Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

1.104.    "*Exit ABL Facility Lenders*" means the lenders party to the Exit ABL Facility Documents.

---

[3]    [**NTD**:   The definition of "Exculpated Parties" remains subject to the outcome of the Special Restructuring Committee Independent Investigation.]

1.105.   "*Exit ABL Parties*" means the Exit ABL Facility Lenders and the Exit ABL Credit Agreement Agent.

1.106.   "*Expense Reimbursement*" has the meaning set forth in the New Capital Commitment Letter.

1.107.   "*File*," "*Filed*," or "*Filing*" means, as applicable, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or the Claims Agent (as applicable).

1.108.   "*Final DIP Order*" means the *Final Order (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 917], as may be amended from time to time.

1.109.   "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

1.110.   "*First Out DIP PIK Loans*" has the meaning set forth in the DIP Term Loan Credit Agreement.

1.111.   "*First Out DIP Term Loan Facility Claims*" means, collectively, any Claims against a Global Debtor arising under, derived from, based on, or related to the First Out DIP Term Loans.

1.112.   "*First Out DIP Term Loans*" means, collectively, the "First Out Term Loans" under and as defined in the DIP Term Loan Credit Agreement.

1.113.   "*Flagship CMBS Settlement*" has the meaning set forth in the Restructuring Support Agreement.

1.114.   "*General Unsecured Claim*" means any Unsecured Claim, including, without limitation, any Claim arising from the rejection of Executory Contracts and Unexpired Leases and any Claim arising from any litigation or other court, administrative or regulatory

13

proceeding, including damages or judgments entered against, or settlement amounts owing by, a Global Debtor in connection therewith other than (a) an Administrative Expense Claim, (b) a Priority Non-Tax Claim, (c) a Priority Tax Claim, (d) a Professional Fee Claim, (e) an Intercompany Claim, or (f) a Subordinated Claim. For the avoidance of doubt, a "General Unsecured Claim" excludes any Equity Interests or Secured Claims.

1.115. "*Global Debtor Release*" has the meaning set forth in Section 11.2 of this Plan.

1.116. "*Global Debtor Releasing Party*" means any Releasing Party that is a Global Debtor.

1.117. "*Global Debtors*" means, collectively, the Debtors that are not SO5 Digital Debtors.

1.118. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.119. "*HoldCo II*" means Saks Fifth Avenue HoldCo II LLC.

1.120. "*HoldCo II General Unsecured Claim(s)*" means, collectively, any General Unsecured Claims against HoldCo II in Class 5-B.

1.121. "*HoldCo II SGUS Notes Guarantee*" means that certain Guarantee to the Prepetition SGUS Notes provided by HoldCo II pursuant to that certain Second Supplemental Indenture, by and among SGUS LLC, as issuer, HoldCo II and Citibank, N.A., as trustee and collateral agent, dated as of August 8, 2025, as amended, restated, supplemented, waived, or otherwise modified as of the date hereof.

1.122. "*HoldCo II SGUS Notes Guarantee Claims*" means, collectively, any Claims arising under or pursuant to the HoldCo II SGUS Notes Guarantee.

1.123. "*Holder*" means any Entity or Person holding a Claim against or an Equity Interest in any Global Debtor, as applicable.

1.124. "*Holdings*" means Saks Global Holdings LLC.

1.125. "*Impaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests, as applicable, that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.126. "*Incremental New Money Debt Facility*" means the senior secured first lien term loan facility consisting of term loans in an aggregate principal amount up to $500 million (subject to (a) any Commitment Increases or in-kind increases described in the New Capital Commitment Letter, (b) any reductions on account of the Excess Liquidity Reduction on the terms set forth in the New Capital Commitment Letter, or (c) such other increases or reductions as may be agreed between the New Capital Commitment Parties and the Global Debtors in connection with any New Capital Syndication).

14

1.127. "*Incremental New Money Preferred Equity Facility*" means the facility pursuant to which the Incremental New Money Preferred Units are issued on the terms set forth in the New Capital Commitment Letter.

1.128. "*Incremental New Money Preferred Equity Facility Documents*" means collectively, the Incremental New Money Preferred Equity Facility Share Purchase Agreement and any other agreements or documents related to or executed in connection with the Incremental New Money Preferred Equity Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

1.129. "*Incremental New Money Preferred Equity Facility Parties*" means the Consenting DIP Term Loan Lenders that become party from time to time to the Incremental New Money Preferred Equity Facility Share Purchase Agreement, together with their successors and permitted assigns.

1.130. "*Incremental New Money Preferred Equity Facility Share Purchase Agreement*" means the share purchase agreement memorializing the Incremental New Money Preferred Equity Facility, the material terms of which shall be consistent with the New Capital Commitment Letter and included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Global Debtors and the Incremental New Money Preferred Equity Facility Parties.

1.131. "*Incremental New Money Preferred Units*" means the redeemable preferred units of Holdings, with an aggregate initial liquidation preference equal to $500 million, *minus* any reduction on account of the amount of any Excess Liquidity Reduction, subject to any in-kind increases as described in this Plan and the New Capital Commitment Letter. The Incremental New Money Preferred Units with respect to distribution, redemption and repurchase rights and rights upon the Reorganized Global Debtors or its subsidiaries' liquidation, winding up or dissolution, will rank senior to the common equity and all other equity interests of the Reorganized Global Debtors, including the Take Back Preferred Units.

1.132. "*Incremental New Money Term Loans*" means the senior secured first lien term loans issued under the Incremental New Money Debt Facility.

1.133. "*Independent Managers*" means, collectively, (a) the independent members of the board of managers of HBC GP LLC and (b) the independent members of the governing body of each subsidiary Global Debtor that is not member-managed.

1.134. "*Initial SGUS Notes*" means $300 million aggregate principal amount of senior secured asset based notes due 2029, issued on June 27, 2025.

1.135. "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

1.136. "*Intercompany Claim*" means any Claim, Cause of Action, or remedy held by or asserted against a Global Debtor by another Global Debtor, other than the Prepetition FILO and Prepetition NPC Claims.

15

1.137.     "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on January 15, 2026 [Docket No. 206].

1.138.     "*Key Employee Compensation Motion*" means the *Global Debtors' Motion for Entry of an Order (I) Authorizing and Approving Global Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Compensation Program and (II) Granting Related Relief* [Docket No. 1773].

1.139.     "*Key Employee Compensation Order*" means any order entered by the Bankruptcy Court granting the Key Employee Compensation Motion.

1.140.     "*Key Employees*" means, collectively, those employees subject to the Post-Emergence Incentive Program, which shall be set forth on a list to be contained in the Plan Supplement.

1.141.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

1.142.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.143.     ["*Litigation Trust*" means the trust, of which the Litigation Trustee shall serve as trustee, to be established on the Effective Date pursuant to this Plan and the Litigation Trust Agreement.][4]

1.144.     "*Litigation Trust Agreement*" means that certain agreement entered into no later than the Effective Date, which shall be in form and substance reasonably acceptable to the Global Debtors, the Required Consenting DIP Term Loan Lenders setting forth, among other things, the terms and conditions for the establishment of the Litigation Trust and the appointment of the Litigation Trustee.

1.145.     "*Litigation Trust Assets*" means, collectively, the Litigation Trust Escrow Account (if applicable) and the Litigation Trust Retained Causes of Action and any proceeds thereof. For the avoidance of doubt, Litigation Trust Assets shall not include the Professional Fee Escrow Account (and any amounts therein).

1.146.     "*Litigation Trust Escrow Account*" means, if applicable, an account funded on terms acceptable to the Required Consenting DIP Term Loan Lenders and paid to the

---

[4]     [**NTD**:  All provisions related to Litigation Trust remain under review and subject to material revision.]

Litigation Trust with Cash no later than the Effective Date in an amount equal to the Litigation Trust Escrow Amount (if applicable).

1.147. "*Litigation Trust Escrow Amount*" means, if applicable, $[●] that may, at the sole election of the Required Consenting DIP Term Loan Lenders, be funded on terms acceptable to the Global Debtors and the Required Consenting DIP Term Loan Lenders.

1.148. "*Litigation Trust Proceeds*" means, if applicable, all dividends, rents, royalties, income, proceeds, and other receipts of, from, or attributable to the Litigation Trust Assets (if any) after payment of expenses of the Litigation Trust, which such Litigation Trust Proceeds shall be distributed in accordance with the DIP Lender Litigation Trust Allocation as set forth in the Litigation Trust Agreement.

1.149. "*Litigation Trust Retained Causes of Action*" means, collectively, those Causes of Action of any Global Debtor that shall vest in the Litigation Trust on the Effective Date, which shall be set forth in the Schedule of Retained Causes of Action.

1.150. "*Litigation Trustee*" means the Person or Entity (or successor thereto) who or which, on and after the Effective Date, shall have the rights, powers and duties as set forth in this Plan and the Litigation Trust Agreement.

1.151. "*Litigation Trustee Duties*" has the meaning set forth in <u>Section 6.9(b)(i)</u> of this Plan.

1.152. "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas, including the Procedures for Complex Cases in the Southern District of Texas.

1.153. "*Management Incentive Plan*" means a management incentive plan for the Reorganized Global Debtors on the terms set forth in the Plan Supplement.

1.154. "*Majority Commitment Parties*" has the meaning set forth in the New Capital Commitment Letter.

1.155. "*New Board*" means the initial board of directors or similar governing body of each of the Reorganized Global Debtors.

1.156. "*New Capital Commitment Claims*" means, collectively, any Claim by a New Capital Commitment Party pursuant to the New Capital Commitment Letter, including but not limited to the Closing Date Commitment Premium, the Commitment Cash Premium, the Expense Reimbursement, and the indemnity obligations contained in the New Capital Commitment Letter. For the avoidance of doubt, the New Capital Commitment Claims shall constitute Allowed Administrative Expense Claims, which, for the avoidance of doubt, shall be senior in priority to all other Administrative Expense Claims (other than the DIP Facility Claims).

1.157. "*New Capital Commitment Letter*" means that certain *$500,000,000.00 Incremental New Money Facilities Commitment Letter* entered into by and among Saks,

the New Capital Commitment Parties, and the other parties thereto, dated April 1, 2026, as such agreement may be amended, supplemented, amended and restated, or otherwise modified from time to time.

1.158.   "*New Capital Commitment Parties*" means, collectively, the Consenting DIP Term Loan Lenders that become party from time to time to the New Capital Commitment Letter, together with their successors and permitted assigns.

1.159.   "*New Capital Syndication*" means the syndication process pursuant to which the Global Debtors will seek to obtain commitments from third-party capital providers to syndicate some or all of the New Exit Facilities, which process will be in a form reasonably acceptable to the New Capital Commitment Parties.

1.160.   "*New Capital Syndication Documents*" means, collectively, any and all agreements, documents, and instruments delivered or entered into in connection with the New Capital Syndication, subject to the consents and conditions precedent set forth in the Restructuring Support Agreement.

1.161.   "*New Exit Debt Facilities Credit Agreement*" means the loan agreement memorializing the New Exit Debt Facilities, the material terms of which shall be included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Global Debtors, the Exit Debt Term Loan Agent, and the New Exit Debt Term Lenders.

1.162.   "*New Exit Debt Facilities*" means, collectively, the Take Back Debt Facility and the Incremental New Money Debt Facility.

1.163.   "*New Exit Debt Facilities Documents*" means, collectively, the New Exit Debt Facilities Credit Agreement and any other agreements or documents related to or executed in connection with the New Exit Debt Facilities, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

1.164.   "*New Exit Debt Term Lenders*" means the lenders party to the New Exit Debt Facilities Documents.

1.165.   "*New Exit Debt Term Loan Agent*" means the administrative agent under the New Exit Debt Facilities Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New Exit Debt Facilities Credit Agreement.

1.166.   "*New Exit Facilities*" means, collectively, the New Exit Debt Facilities and the Preferred Equity Facilities.

1.167.   "*New Exit Facilities Documents*" means, collectively, the agreements, documents, and instruments delivered or entered into in connection with the New Exit Facilities, including, without limitation, the New Capital Commitment Letter, the New Capital Syndication Documents, the New Exit Debt Facilities Documents, and the Preferred Equity Facilities Documents, and any credit agreement, term sheet, backstop agreement, guarantee agreement, pledge and collateral agreement, intercreditor agreement, and other ancillary and

18

security documents provided therein or related thereto, subject in all respects to the consents and conditions precedent set forth in the Restructuring Support Agreement.

1.168. "*New Exit Term Loans*" means the indebtedness issued pursuant to the New Exit Debt Facilities, and shall include, collectively, the Take Back Term Loans and the Incremental New Money Term Loans.

1.169. "*New Exit Term Loan Secured Parties*" means, collectively, the New Exit Debt Term Lenders and the New Exit Debt Term Loan Agent.

1.170. "*New Organizational Documents*" means, collectively, the new Organizational Documents of the Reorganized Global Debtors, to be entered into on the Effective Date, including certificates of incorporation, limited liability company agreements, stockholders or shareholders agreements, operating agreements, equity subscription or purchase agreements, charters or bylaws.

1.171. "*New Saks*" means either (a) Holdings or (b) a new corporation or limited liability company that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Global Debtors in the Chapter 11 Cases or issue the New Saks Common Stock to be distributed pursuant to this Plan.

1.172. "*New Saks Common Stock*" means the common Equity Interests of New Saks authorized under the New Organizational Documents of the Reorganized Global Debtors and issued and/or distributed on the Effective Date in accordance with this Plan, subject to dilution by the Management Incentive Plan and the New Exit Facilities.

1.173. "*Non-Global Debtor Releasing Party*" means any Releasing Party that is not a Global Debtor.

1.174. "*Notes / Term Collateral Agent*" means Citibank, N.A., in its capacity as collateral agent under the Prepetition Initial Notes Indenture, together with its successors and permitted assigns.

1.175. "*OpCo General Unsecured Claim(s)*" means, collectively, any General Unsecured Claims against the OpCo Global Debtors other than HoldCo II.

1.176. "*OpCo Global Debtor(s)*" means any Global Debtor other than any TopCo Global Debtor and HoldCo II.

1.177. "*Organizational Documents*" means, collectively, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as bylaws or a partnership agreement, or an operating, limited liability company, or members agreement).

19

1.178.   "*Other Secured Claim*" means any Secured Claim against a Global Debtor other than a DIP Facility Claim, Prepetition SGUS Notes Claim, Prepetition OpCo Second Out Notes Claim, Prepetition OpCo Third Out Notes Claim, and Prepetition Initial Notes Claims.

1.179.   "*PAA*" means that certain Payment Administration Agreement, dated as of August 8, 2025 by and among Saks, Holdings, the Opco Subsidiary Guarantors (as defined therein), the Prepetition FILO Agent, the Prepetition NPC Agent, the Prepetition SGUS Notes Trustee, the Notes / Term Collateral Agent, the Prepetition OpCo Notes Trustee, and the Old Agent (as defined therein), as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date.

1.180.   "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

1.181.   "*Petition Date*" means, as applicable, January 13, 2026 or January 14, 2026, the date on which each Global Debtor commenced its Chapter 11 Case.

1.182.   "*Plan*" means this joint chapter 11 plan proposed by the Global Debtors, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Restructuring Support Agreement, and the terms hereof.  If this Plan is withdrawn as the Plan for a particular Global Debtor, the defined term "Plan" shall not include the plan of reorganization or liquidation for such Global Debtor in its Chapter 11 Case where the context otherwise requires.

1.183.   "*Plan Administrator*" means the person or Entity which may be selected by the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders, to implement, administer, and enforce the Plan, consistent with Section 6.2 of this Plan (to the extent a Plan Administrator is appointed).  All costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in performance of the Plan Administrator's duties, shall be paid from the Plan Administrator Escrow, subject to and in accordance with the Plan Administrator Budget.

1.184.   "*Plan Administrator Agreement*" means, if applicable, that certain agreement entered into no later than the Effective Date, setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan.

1.185.   "*Plan Administrator Budget*" means, if applicable, a budget, in form and substance mutually acceptable to the Global Debtors and the Required Consenting DIP Term Loan Lenders, for the reasonable activities and expenses to be incurred in administering and enforcing the Plan, in accordance with the Plan Administrator Agreement and Section 6.2 of this Plan.

1.186.   "*Plan Administrator Escrow*" means, if applicable, an account funded on terms reasonably acceptable to the Required Consenting DIP Term Loan Lenders and paid into an account controlled by the Plan Administrator with Cash no later than the Effective Date in an amount sufficient to fund the Plan Administrator Budget.

20

1.187.      "*Plan Documents*" means, collectively, those documents necessary to effectuate this Plan following entry of the Confirmation Order, which shall be contained in the Plan Supplement and shall be subject to revision and modification prior to the Effective Date.

1.188.      "*Plan Supplement*" means any compilation of documents and forms of documents (including term sheets), agreements, schedules, and exhibits to this Plan, which may be amended from time to time, including (a) the New Organizational Documents, (b) the Schedule of Retained Causes of Action, (c) the Schedule of Excluded Parties, (d) the Restructuring Steps Plan, (e) the Assumed Contracts / Leases List, (f) the Exit ABL Facility Documents, (g) the New Exit Facilities Documents, (h) to the extent known, the identity of the members of the New Board and the nature and compensation for any director who is an Insider, (i) the Management Incentive Plan, (j) the Post-Emergence Incentive Program, (k) the Litigation Trust Agreement, (l) to the extent known, and if appointed, the identity(ies) of the Plan Administrator; (m) the Plan Administrator Agreement (if any); and (n) any and all other documents necessary to effectuate the Restructuring Transactions or that are contemplated by this Plan, which shall be Filed by the Global Debtors prior to the Combined Hearing, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, and shall be in all respects in form and substance acceptable to the Required Consenting DIP Term Loan Lenders.

1.189.      "*Post-Emergence Bonuses*" means the bonuses to be paid by the Reorganized Global Debtors to the Key Employees pursuant to the Post-Emergence Incentive Program in an aggregate amount not to exceed $[6.5 million] approved in the Key Employee Compensation Order.

1.190.      "*Post-Emergence Incentive Program*" means the incentive program that provides for payment of the Post-Emergence Bonuses to the Key Employees, which will be filed as part of the Plan Supplement.

1.191.      "*Preferred Equity Facilities*" means, together, the Take Back Preferred Equity Facility and the Incremental New Money Preferred Equity Facility.

1.192.      "*Preferred Equity Facilities Documents*" means, collectively, the Incremental New Money Preferred Equity Facility Documents and the Take Back Preferred Equity Facility Documents.

1.193.      "*Preferred Equity Facilities Parties*" means, collectively, the Take Back Preferred Equity Facility Parties and the Incremental New Money Preferred Equity Facility Parties.

1.194.      "*Preferred Equity Units*" means, collectively, the Incremental New Money Preferred Units and the Take Back Preferred Units.

1.195.      "*Prepetition FILO Agent*" means, collectively, SGUS as administrative agent, and Bank of America, N.A., as collateral agent, under the Prepetition FILO Credit Agreement, together with their successors and permitted assigns in such capacity.

21

1.196.    "*Prepetition FILO and NPC Claims*" means, collectively, the Prepetition FILO Claims and Prepetition NPC Claims.

1.197.    "*Prepetition FILO Claim(s)*" means any Claim against a Global Debtor arising under, derived from, related to, or based on the Prepetition FILO Credit Agreement.

1.198.    "*Prepetition FILO Credit Agreement*" means that certain Term Loan Credit Agreement, dated as of June 27, 2025 by and among Saks as borrower, the Opco Subsidiary Guarantors (as defined therein), the lenders party thereto from time to time, and SGUS, as administrative agent, as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date.

1.199.    "*Prepetition FILO Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the Prepetition FILO Credit Agreement.

1.200.    "*Prepetition Initial Notes*" means, collectively, the secured notes issued under the Prepetition Initial Notes Indenture.

1.201.    "*Prepetition Initial Notes Claim(s)*" means any Claim on account of the Prepetition Initial Notes arising under or pursuant to the Prepetition Initial Notes Indenture. For the avoidance of doubt, such Claims shall constitute OpCo General Unsecured Claims.

1.202.    "*Prepetition Initial Notes Indenture*" means that certain Indenture, dated as of December 16, 2024, by and among Saks, as issuer (as successor in interest to SFA Issuer LLC), Holdings, the Opco Subsidiary Guarantors (as defined therein) and Citibank, N.A. as trustee and as collateral agent, as amended, restated, supplemented, waived, or otherwise modified prior to the Petition Date.

1.203.    "*Prepetition Initial Notes Trustee*" means Citibank, N.A., in its capacity as trustee under the Prepetition Initial Notes Indenture, together with its successors and permitted assigns.

1.204.    "*Prepetition NPC Agent*" means, collectively, SGUS LLC, as administrative agent, and Citibank, N.A. as collateral agent, under the Prepetition NPC Credit Agreement, together with their successors and permitted assigns in such capacity.

1.205.    "*Prepetition NPC Claim(s)*" means any Claim against a Global Debtor arising under, derived from, related to, or based on the Prepetition NPC Credit Agreement.

1.206.    "*Prepetition NPC Credit Agreement*" means that certain Term Loan Credit Agreement, dated as of August 8, 2025 by and among Saks, as borrower, the Opco Subsidiary Guarantors (as defined therein), the lenders party thereto from time to time, SGUS, as administrative agent, and Citibank, N.A., as collateral agent, as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date.

1.207.    "*Prepetition NPC Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the Prepetition NPC Credit Agreement.

1.208.    "*Prepetition OpCo Notes*" means, collectively, the Prepetition OpCo Second Out Notes and the Prepetition OpCo Third Out Notes.

1.209.    "*Prepetition OpCo Notes Claim(s)*" means, to the extent not converted into a DIP Facility Claim, any Claim against a Global Debtor arising under, derived from, related to, or based on the Prepetition OpCo Notes.

1.210.    "*Prepetition OpCo Notes Indenture*" means that certain Indenture, dated as of August 8, 2025, by and among Saks, as issuer, Holdings, the Opco Subsidiary Guarantors (as defined therein), and Citibank, N.A. as trustee and as Notes / Term Collateral Agent, as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date.

1.211.    "*Prepetition OpCo Notes Trustee*" means Citibank, N.A., in its capacity as trustee under the Prepetition OpCo Notes Indenture, together with its successors and permitted assigns.

1.212.    "*Prepetition OpCo Second Out Notes*" means, collectively, those certain second out notes issued under the Prepetition OpCo Notes Indenture.

1.213.    "*Prepetition OpCo Second Out Notes Claims*" means, collectively, any Claims on account of the Prepetition OpCo Second Out Notes arising under or pursuant to the Prepetition OpCo Notes Indenture.

1.214.    "*Prepetition OpCo Second Out Noteholders*" means, collectively, the holders of certain Prepetition OpCo Second Out Notes under the Prepetition OpCo Notes Indenture.

1.215.    "*Prepetition OpCo Third Out Notes*" means, collectively, those certain third out notes issued under the Prepetition OpCo Notes Indenture.

1.216.    "*Prepetition OpCo Third Out Notes Claims*" means, collectively, any Claims on account of the Prepetition OpCo Third Out Notes arising under or pursuant to the Prepetition OpCo Notes Indenture.  For the avoidance of doubt, such Claims shall constitute OpCo General Unsecured Claims.

1.217.    "*Prepetition OpCo Third Out Noteholders*" means, collectively, the holders of Prepetition OpCo Third Out Notes under the Prepetition OpCo Notes Indenture.

1.218.    "*Prepetition Secured Claims*" means, collectively, the Prepetition OpCo Notes Claims, the Prepetition SGUS Notes Claims, the Prepetition FILO and NPC Claims, and the Prepetition Initial Notes Claims.

1.219.    "*Prepetition SGUS Notes*" means, collectively, the Initial SGUS Notes and the Additional SGUS Notes.

1.220.     "*Prepetition SGUS Notes Claim(s)*" means, to the extent not converted into a DIP Term Loan Claim, any Claim against a Global Debtor arising under, derived from, related to, or based on the Prepetition SGUS Notes.

1.221.     "*Prepetition SGUS Notes Indenture*" means that certain Asset Based Indenture, by and among SGUS, as issuer, Prepetition SGUS Notes Trustee, as trustee and collateral agent for the benefit of Prepetition SGUS Noteholders and HoldCo II, dated as of June 27, 2025, as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date.

1.222.     "*Prepetition SGUS Notes Trustee*" means Citibank, N.A., in its capacity as trustee and collateral agent under the Prepetition SGUS Notes Indenture, together with its successors and permitted assigns.

1.223.     "*Prepetition SGUS Noteholders*" means, collectively, the holders of certain Prepetition SGUS Notes under the Prepetition SGUS Notes Indenture.

1.224.     "*Prepetition TopCo Agent*" means GLAS USA LLC, in its capacity as administrative agent under the Prepetition TopCo Credit Agreement, together with its successors and permitted assigns.

1.225.     "*Prepetition TopCo Credit Agreement*" means that certain Credit Agreement, by and among TopCo, as borrower, Global Debtor Mercury Aggregator Holdco LLC, a Delaware limited liability company, as holdings, HBSFA Holdings Ltd., a Canadian limited company, as Canadian holdings, the other guarantors party thereto, the Prepetition TopCo Lenders, and Prepetition TopCo Agent.

1.226.     "*Prepetition TopCo Facility*" means the credit facility provided for under the Prepetition TopCo Credit Agreement.

1.227.     "*Prepetition TopCo Facility Claims*" means, collectively, any Claims on account of the Prepetition TopCo Facility arising under or pursuant to the Prepetition TopCo Credit Agreement.

1.228.     "*Prepetition TopCo Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the Prepetition TopCo Credit Agreement.

1.229.     "*Priority Non-Tax Claim*" means any Claim, other than a DIP Facility Claim, an Administrative Expense Claim, a Professional Fee Claim, a Cure Cost, or a Priority Tax Claim, that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.230.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.231.     "*Priority Tax Claims Bar Date*" means the date that is 180 days after the Petition Date.

24

1.232.    "*Professional Fee Claim*" means any Claim by a Professional Person for compensation for services rendered or reimbursement of expenses incurred by such Professional Person on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court, including in connection with final fee applications of such Professional Persons.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional Person's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

1.233.    "*Professional Fee Escrow Account*" means an account funded by the Global Debtors with Cash no later than the Effective Date in the amount equal to the Professional Fee Escrow Amount.

1.234.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professional Persons have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Effective Date, which shall be estimated pursuant to the method set forth in Article III of this Plan.

1.235.    "*Professional Person(s)*" means any Persons (a) retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.236.    "*Proof of Claim*" means a proof of Claim Filed against any of the Global Debtors in the Chapter 11 Cases.

1.237.    "*Proof of Equity Interest*" means a proof of Equity Interest Filed against any of the Global Debtors in the Chapter 11 Cases.

1.238.    "*Reinstate*" means with respect to Claims or Equity Interests, that the Claim or Equity Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  "Reinstated" and "Reinstatement" shall have correlative meanings.

1.239.    "*Rejected Contracts / Leases List*" means the list (as determined by the Global Debtors) of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto), if any, that will be rejected pursuant to this Plan.

1.240.    "*Related Parties*" means, collectively with respect to any Person, such Person's predecessors, successors, assigns, and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at

25

any time, and any Person claiming by or through any of them, including such Related Parties' respective heirs, executors, estates, servants, and nominees.

1.241.    "*Release Opt-In Forms*" means the form to be provided to Holders of Claims or Interests in Classes [4-D], [5-B], 6-A, 6-B, 8, and 9 through which such Holders may elect to affirmatively opt into the Third-Party Release.

1.242.    "*Release Opt-Out Forms*" means the form to be provided to Holders of Claims in Classes 1 and 2 through which such Holders may elect to affirmatively opt out of the Third-Party Release.

1.243.    ["*Released Parties*"[5] means, collectively, and each solely in its capacity as such: (a) the Global Debtors, their Estates, and the Reorganized Global Debtors; (b) the DIP Agents and the DIP Lenders; (c) the New Capital Commitment Parties; (d) the Creditors' Committee and each of its members solely in their capacity as members of the Creditors' Committee; (e) the Ad Hoc Group and each of its members; and (f) each of such parties' Related Parties (including, for the avoidance of doubt, each member of the Special Restructuring Committee and their Related Parties); <u>provided</u> that no Person or Entity shall be a Released Party, unless they are also a Releasing Party; <u>provided</u>, further that no Excluded Party will be a Released Party; <u>provided</u>, further that no Insider shall be a Released Party other than, as of the Effective Date, directors and officers of the Global Debtors or independent contractors retained by the Global Debtors that previously served as directors and officers of the Global Debtors.]

1.244.    ["*Releasing Parties*"[6] means, collectively, and each solely in its capacity as such: (a) the Global Debtors, their Estates, and the Reorganized Global Debtors; (b) the DIP Agents and the DIP Lenders; (c) the New Capital Commitment Parties; (d) the Creditors' Committee and each of its members solely in their capacity as members of the Creditors' Committee; (e) the Ad Hoc Group and each of its members; (f) all Holders of Claims in Voting Classes that do not affirmatively elect to "opt out" of the Third-Party Release as provided on their respective Ballots; (g) all Holders of Claims in Classes 1 and 2 that do not affirmatively elect to "opt out" of the Third-Party Release as provided on their respective Release Opt-Out Forms; (h) all Holders of Claims or Interests in Classes 6-A, 6-B, 8, and 9 that affirmatively elect to "opt in" to the Third-Party Release as provided on their respective Release Opt-In Forms; and (i) each of such parties' Related Parties for which such Entity is legally entitled to bind such Related Party to the releases contained in this Plan under applicable non-bankruptcy law; <u>provided</u>, <u>however</u>, that, in each case, the following Persons or Entities shall not be a Releasing Party:   (A) all Holders of Claims that are presumed to accept the Plan who affirmatively opt out of the Third-Party Release by checking the box on the applicable notice of non-voting status indicating that they opt to not grant the Third-Party Release; (B) all Holders of Claims in Voting Classes who affirmatively opt out of the Third-Party Release by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party

---

[5]    [**NTD**:   The definition of "Released Parties" remains subject to the outcome of the Special Restructuring Committee Independent Investigation.]

[6]    [**NTD**:   The definition of "Releasing Parties" remains subject to the outcome of the Special Restructuring Committee Independent Investigation.]

Release; (C) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt into the Third-Party Release by checking the box on the applicable notice of non-voting status indicating that they opt to grant the Third-Party Release; or (D) any Holder of a Claim or Interest who timely objects to the Third-Party Release and whose objection is not resolved before the Confirmation Date.]

1.245.    "*Reorganized Global Debtor(s)*" means, on or after the Effective Date, the Global Debtors or any successors thereto, by merger, consolidation, reorganization or otherwise, as the case may be.

1.246.    "*Reorganized Global Debtor Retained Causes of Action*" means those Causes of Action of any Global Debtor that shall be retained by the Reorganized Global Debtors on the Effective Date, which shall be set forth on the Schedule of Retained Causes of Action.

1.247.    "*Required Consenting DIP Term Loan Lenders*" means, at any time, Consenting DIP Term Loan Lenders holding DIP Term Loan Claims that, taken together, represent more than 50.0% of the sum of all DIP Term Loan Claims outstanding at such time, voting as a single class, subject to the exclusions and modifications provided for in the DIP Term Loan Credit Agreement or, solely with respect to any treatment (including the DIP Conversion) which does not provide for the repayment in full in cash of the First Out DIP Term Loan Facility Claims, DIP Term Loan Lenders holding at least 80% of the aggregate outstanding principal amount of First Out DIP Term Loan Facility Claims (exclusive of any fees, premiums, interest, or First Out DIP PIK Loans) that are held by all DIP Term Loan Lenders under the DIP Term Loan Credit Agreement.

1.248.    "*Restructuring Fees and Expenses*" means all documented fees, costs, and expenses of each of the Ad Hoc Group Advisors and DIP ABL Advisors.

1.249.    "*Restructuring Steps Plan*" means a document to be included in the Plan Supplement that will set forth the material components of the applicable Restructuring Transactions, including a summary of any transaction steps necessary to complete this Plan, and shall otherwise be in form and substance acceptable to the Global Debtors and the Required Consenting DIP Term Loan Lenders, each in their sole discretion.

1.250.    "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of April 1, 2026, inclusive of all exhibits and schedules thereto, by and among the Global Debtors, the Consenting DIP Term Loan Lenders, and any other Person that may become a party to such agreement pursuant to its terms, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms.

1.251.    "*Restructuring Transactions*" means the transactions described in Article VI of this Plan and the Restructuring Steps Plan, including, for the avoidance of doubt, the DIP Conversion.

1.252.    "*Retained Causes of Action*" means, collectively, the Litigation Trust Retained Causes of Action (if applicable) and the Reorganized Global Debtor Retained Causes

27

of Action; <u>provided</u> that, for the avoidance of doubt, Retained Causes of Action shall include Causes of Action held by or assertable on behalf of any OpCo Global Debtor, any TopCo Global Debtor, or any other Global Debtor, in each case, as identified in the Schedule of Retained Causes of Action.

1.253. "*Saks*" means Saks Global Enterprises LLC.

1.254. "*Schedule of Retained Causes of Action*" means the schedule of the Litigation Trust Retained Causes of Action (if applicable) and the Reorganized Global Debtor Retained Causes of Action, which will be contained in the Plan Supplement.

1.255. "*Schedule of Excluded Parties*" means the schedule of Excluded Parties, which will be contained in the Plan Supplement.

1.256. "*Schedules*" means, collectively, the schedules of assets and liabilities, the schedules of Executory Contracts and Unexpired Leases, the Schedule of Retained Causes of Action, and the statements of financial affairs Filed by the Global Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

1.257. "*Second A&R Intercreditor Agreement*" means that certain Second Amended and Restated Intercreditor Agreement, dated as of August 8, 2025, by and among Bank of America, N.A., as the Initial ABL Agent, Citibank, N.A., as trustee and collateral agent, Holdings, Saks, and each subsidiary of Saks signatory thereto, as amended, restated, supplemented, waived, or otherwise modified as of the date hereof.

1.258. "*Second Out DIP Term Loan Facility Claims*" means, collectively, any Claims against a Global Debtor arising under, derived from, based on, or related to the Second Out DIP Term Loans.

1.259. "*Second Out DIP Term Loans*" means, collectively, the "Second Out Term Loans" under and as defined in the DIP Term Loan Credit Agreement.

1.260. "*Secured Claim*" means a Claim: (a) that is secured by a valid, perfected and enforceable Lien on Collateral, to the extent of the value of the Claim Holder's interest in such Collateral as of the Confirmation Date; (b) to the extent that the Holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code; or (c) that is otherwise Allowed pursuant to this Plan or Final Order of the Bankruptcy Court as a secured Claim.

1.261. "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local Law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

1.262. "*SGUS*" means SGUS LLC, a Delaware limited liability company and wholly owned subsidiary of Saks.

1.263. "*SIR*" has the meaning set forth in <u>Section 7.16</u> of this Plan.

28

1.264.     "*SO5 Digital Debtors*" means, collectively, Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC, represented by Bradley Arant Boult Cummings LLP.

1.265.     "*Solicitation Materials*" means, collectively, all solicitation materials with respect to this Plan, including the Disclosure Statement and related Ballots, which have been approved by the Bankruptcy Court pursuant to the Conditional Disclosure Statement Order.

1.266.     "*Solicitation Procedures*" means, collectively, the procedures concerning the solicitation of votes on this Plan approved by the Bankruptcy Court pursuant to the Conditional Disclosure Statement Order.

1.267.     "*Special Restructuring Committee*" means the special committee of the board of managers of the applicable Global Debtors, in each case, comprised of the Independent Managers.

1.268.     "*Special Restructuring Committee Independent Investigation*" means any investigation conducted by the Special Restructuring Committee.

1.269.     "*Subordinated Claim*" means any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise.

1.270.     "*Take Back Debt Facility*" means the senior secured first lien term loan facility consisting of term loans in an aggregate principal amount equal to $750 million *minus* the principal amount of term loans issued under the Incremental New Money Debt Facility (including term loans issued through the payment in kind of any fees or premiums).

1.271.     "*Take Back Preferred Equity Facility*" means the facility pursuant to which the Take Back Preferred Units are issued.

1.272.     "*Take Back Preferred Equity Facility Documents*" means collectively, the Take Back Preferred Equity Facility Share Purchase Agreement and any other agreements or documents related to or executed in connection with the Take Back Preferred Equity Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

1.273.     "*Take Back Preferred Equity Facility Parties*" means the Consenting DIP Term Loan Lenders that become party from time to time to the Take Back Preferred Equity Facility Share Purchase Agreement, together with their successors and permitted assigns.

1.274.     "*Take Back Preferred Equity Facility Share Purchase Agreement*" means the share purchase agreement memorializing the Take Back Preferred Equity Facility, the material terms of which shall be included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Global Debtors and the Take Back Preferred Equity Facility Parties.

1.275.     "*Take Back Preferred Units*" means the single class of redeemable preferred units of the Reorganized Global Debtors with an aggregate initial liquidation preference equal

29

to (a) the outstanding amount of First Out DIP Term Loan Facility Claims on the Effective Date *minus* (b) the principal amount of Take Back Term Loans issued on the Effective Date.

1.276.     "*Take Back Term Loans*" means the senior secured first lien term loans issued under the Take Back Debt Facility.

1.277.     "*Third Out DIP Term Loan Facility Claims*" means, collectively, any Claims against a Global Debtor arising under, derived from, based on, or related to the Third Out DIP Term Loans.

1.278.     "*Third Out DIP Term Loans*" means, collectively, the "Third Out Term Loans" under and as defined in the DIP Term Loan Credit Agreement.

1.279.     "*Third-Party Release*" has the meaning set forth in Article XI of this Plan.

1.280.     "*TopCo*" means Global Debtor Mercury Aggregator L.P.

1.281.     "*TopCo General Unsecured Claim(s)*" means any General Unsecured Claim against the TopCo Global Debtors.

1.282.     "*TopCo Global Debtor(s)*" means TopCo, HBSFA Holdings Ltd., Mercury Aggregator HoldCo LLC, HBC GP IV LLC, HBC GP LLC, HBC IV LP, HBC I L.P., and Saks Global Investor L.P.

1.283.     "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

1.284.     "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

1.285.     "*Unexpired Lease*" means a lease of non-residential real property to which one or more of the Global Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof.

1.286.     "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

1.287.     "*Unsecured Claim*" means (a) any Claim that is not secured by a Lien on property in which one of the Global Debtors' Estates has an interest, (b) any Prepetition OpCo Third Out Notes Claim, (c) any Prepetition Initial Notes Claim, or (d) any Prepetition TopCo Facility Claim.

1.288.     "*Voting Classes*" means, collectively, Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, [4-D], 5-A, and [5-B].

30

### B.      *Interpretation; Application of Definitions and Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. The use of "include" or "including" is without limitation, whether stated or not. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan. Any reference in this Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. References to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Equity Interests," "Holders of Equity Interests," "Disputed Equity Interests," and the like, as applicable. Subject to the provisions of any contracts, certificates, or articles of incorporation, instruments, releases, or other agreements or documents entered into in connection with this Plan, including, without limitation, the Restructuring Support Agreement, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal Law, including the Bankruptcy Code and the Bankruptcy Rules. The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns. Any reference to directors or board of directors includes managers, managing members or any similar governing body, as the context requires, and references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws.

### C.      *Appendices and Plan Documents.*

All Plan Documents and appendices to this Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Holders of Claims and Equity Interests may inspect a copy of the Plan Documents, once Filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or, free of charge, via the Global Debtors' restructuring website maintained by the Claims Agent at https://cases.stretto.com/saks/, or obtain a copy of any of the Plan Documents, at the Global Debtors' expense, by a written request sent to the Claims Agent at the following mailing or email addresses or by calling the Claims Agent at the following telephone numbers:

Saks Global Enterprises LLC
c/o Stretto, Inc.
410 Exchange, Suite 100
Irvine, CA 92602

+1 (833) 232-5246 (U.S./Canada, Toll-Free); +1 (949) 373-7589 (International, Toll)
SaksInquiries@stretto.com

31

### D.      *Definitive Document Consent Rights.*

Notwithstanding anything to the contrary in this Plan, certain of the Definitive Documents remain subject to negotiation and completion, as applicable.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of the Restructuring Support Agreement and the New Capital Commitment Letter, in each case, and shall otherwise be in form and substance acceptable to the Global Debtors and the Required Consenting DIP Term Loan Lenders, except in each case, as otherwise specified in this Plan, the applicable Definitive Document, or the Confirmation Order.  Failure to reference in this Plan the rights referred to in this paragraph shall not impair such rights and obligations.

### E.      *Nature of the Restructuring Transactions.*

The Restructuring Transactions will be consummated (a) on the terms and conditions set forth in the Restructuring Support Agreement, the New Capital Commitment Letter, this Plan, and the Plan Documents, and (b) pursuant to the Confirmation Order.

## ARTICLE II.
## CERTAIN INTERCREDITOR AND INTER-DEBTOR ISSUES

### 2.1.      *Settlement of Certain Intercreditor and Inter-Global Debtor Issues.*

The treatment of Claims and Equity Interests under this Plan represents, among other things, the settlement and compromise of certain potential intercreditor and inter-Global Debtor disputes.

### 2.2.      *Formation of Global Debtor Groups for Convenience Purposes.*

This Plan groups the Global Debtors together solely for purposes of describing treatment under this Plan, Confirmation of this Plan and making distributions under this Plan in respect of Claims against and Equity Interests in the Global Debtors under this Plan.  Such groupings shall not affect any Global Debtor's status as a separate legal Entity, change the organizational structure of the Global Debtors' business enterprise, constitute a change of control of any Global Debtor for any purpose, cause a merger or consolidation of any legal Entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in this Plan, all Global Debtors shall continue to exist as separate legal Entities.

## ARTICLE III.
## DIP ABL FACILITY CLAIMS,
## DIP OPCO CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,
## PROFESSIONAL FEE CLAIMS, U.S. TRUSTEE FEES, AND PRIORITY TAX CLAIMS

This Plan constitutes a joint chapter 11 plan for all of the Global Debtors.  All Claims and Equity Interests, except DIP ABL Facility Claims, DIP OpCo Claims, Administrative Expense Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims, are placed in the

Classes set forth in Article IV. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP ABL Facility Claims, DIP OpCo Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on this Plan, and thus are excluded from the Classes of Claims and Equity Interests set forth in Article IV.

A Claim or Equity Interest is placed in a particular Class only to the extent that any portion of such Claim or Equity Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim or Equity Interest is placed in a particular Class for all purposes, including voting, Confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim or Equity Interest is placed in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest and has not been paid, released, or otherwise settled prior to the date of such distribution.

### 3.1.   *DIP ABL Facility Claims.*

On the Effective Date, DIP ABL Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. On the Effective Date, each Holder of DIP ABL Facility Claims shall receive, in full satisfaction, settlement, release and discharge of the Allowed DIP ABL Facility Claims, payment in Cash in full from the proceeds, as applicable, of the Exit ABL Credit Facility or the New Exit Facilities.

### 3.2.   *DIP OpCo Claims.*

On the Effective Date, DIP OpCo Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. On the Effective Date, SGUS, as sole holder of the DIP OpCo Claims shall receive, in full satisfaction, settlement, release and discharge of the Allowed DIP OpCo Claims, and in accordance with the Restructuring Steps Plan, [(a) 100% of the Equity Interests in Holdings, (b) 100% of the Take Back Term Loans, and (c) 100% of the Take Back Preferred Units] (the "DIP OpCo Claims Distribution"), which DIP OpCo Claims Distribution shall subsequently be distributed pursuant to and in accordance with Section 5.3, Section 5.4, and Section 5.5 of this Plan, as applicable, and the Restructuring Steps Plan.

Upon payment in full or satisfaction of all Allowed DIP Facility Claims in accordance with the terms of this Plan, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

**3.3.** *Administrative Expense Claims.*

    (a)    <u>Time for Filing Administrative Expense Claims</u>.

The Holder of an Administrative Expense Claim, other than New Capital Commitment Claims, DIP Facility Claims, Intercompany Claims, or U.S. Trustee fees that accrued on or before the Effective Date and other than in the ordinary course of business, must File with the Bankruptcy Court and serve on the Reorganized Global Debtors a proof of such Administrative Expense Claim no later than the Administrative Bar Date.  Such proof of Administrative Expense Claim must include at a minimum:  (i) the name of the applicable Global Debtor that is purported to be liable for the Administrative Expense Claim, and if the Administrative Expense Claim is asserted against more than one Global Debtor, the exact amount asserted to be owed by each such Global Debtor; (ii) the name of the Holder of the Administrative Expense Claim; (iii) the asserted amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THIS PLAN.**

The Global Debtors or the Plan Administrator, as applicable, in consultation with the Required Consenting DIP Term Loan Lenders, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval.  The Global Debtors or the Plan Administrator, as applicable, may also choose to object to any Administrative Expense Claim (other than a Cure Cost, which will be addressed pursuant to <u>Section 9.2</u> of this Plan) no later than the Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Global Debtors or the Plan Administrator, as applicable (or other party with standing) object to a timely Filed and properly served Administrative Expense Claim, such Administrative Expense Claim will be deemed Allowed in the amount requested after expiration of the Claims Objection Deadline, as such Claims Objection Deadline may be extended.  In the event that the Global Debtors or the Plan Administrator, as applicable, object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

    (b)    <u>Treatment of Administrative Expense Claims</u>.

Except with respect to Administrative Expense Claims that are Professional Fee Claims, and except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Global Debtor(s) or the Plan Administrator, as applicable, agree to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash:  (i) if such Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter);

(ii) if such Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Expense Claim is based on liabilities incurred by the Global Debtors in the ordinary course of their business after the Petition Date, to the extent consistent with the DIP Budget, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense Claim without any further action by the Holder of such Allowed Administrative Expense Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Global Debtor or the Plan Administrator, as applicable; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### 3.4. *Professional Fee Claims.*

(a)  Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and opportunity for a hearing in accordance with the procedures established by the Bankruptcy Court. The Global Debtors or the Plan Administrator shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account. The Global Debtors or the Plan Administrator, as applicable, shall establish the Professional Fee Escrow Account in trust for the Professional Persons and fund such account with Cash equal to the Professional Fee Escrow Amount on the Effective Date.

(b)  Professional Fee Escrow Account.

No later than the Effective Date, the Global Debtors or the Plan Administrator, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professional Persons. No Liens, Claims, or Equity Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates of the Global Debtors or the Reorganized Global Debtors, as applicable, on the Effective Date. The amount of Professional Fee Claims owing to the Professional Persons shall be paid in Cash to such Professional Persons by the Global Debtors or the Plan Administrator from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professional Persons have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Global Debtors without any further notice to or action, approval, or order of the Bankruptcy Court.

(c)  Professional Fee Escrow Amount.

Professional Persons shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Global Debtors before and as of the Effective Date and shall deliver such estimates to the Global Debtors and counsel to the Ad

Hoc Group no later than three (3) Business Days before the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional Person's final request for payment of Filed Professional Fee Claims. If a Professional Person does not provide an estimate, the Global Debtors or the Plan Administrator, as applicable, with notice to and the consent of the Required Consenting DIP Term Loan Lenders, which is not to be unreasonably withheld may estimate the unpaid and unbilled fees and expenses of such Professional Person.

(d)     Post-Effective Date Fees and Expenses.

Upon the Effective Date, any requirement that Professional Persons comply with sections 327-331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Global Debtors or the Reorganized Global Debtors, as applicable, may employ and pay any Professional Person in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**3.5.     *Priority Tax Claims.***

(a)     Time for Filing Priority Tax Claims.

The Holder of a Priority Tax Claim must File with the Bankruptcy Court and serve on the Reorganized Global Debtors, the Plan Administrator, the Claims Agent, and the U.S. Trustee, proof of such Priority Tax Claim by the Priority Tax Claims Bar Date.  Such proof of Priority Tax Claim must include at a minimum:  (i) the name of the applicable Global Debtor that is purported to be liable for the Priority Tax Claim and if the Priority Tax Claim is asserted against more than one Global Debtor, the exact amount asserted to be owed by each such Global Debtor; (ii) the name of the Holder of the Priority Tax Claim; (iii) the asserted amount of the Priority Tax Claim; (iv) the basis of the Priority Tax Claim; and (v) supporting documentation for the Priority Tax Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF PRIORITY TAX CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH PRIORITY TAX CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THIS PLAN.**

(b)     Treatment of Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting DIP Term Loan Lenders, each Holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, either:  (i) on the Effective Date or as soon thereafter as reasonably practicable if the Priority Tax Claims Bar Date has not yet occurred, Cash in an amount equal to such Claim; or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the Holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided that all Allowed Priority Tax Claims that are not

due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due; provided, further, that notwithstanding any provision of this Plan or the Restructuring Support Agreement to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state Law shall be assumed by and Reinstated against the applicable Reorganized Global Debtor. On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable Law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.

### 3.6. *U.S. Trustee Fees and Related Reporting Obligations.*

All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Global Debtors or Plan Administrator in full in Cash on the Effective Date. The Global Debtors shall File all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Global Debtors or Plan Administrator, as applicable, shall File with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. After the Effective Date, each of the Reorganized Global Debtors or the Disbursing Agent acting on behalf of each of the Reorganized Global Debtors shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable. The Reorganized Global Debtors shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under chapter 7 of the Bankruptcy Code of the Chapter 11 Case of that particular Global Debtor for whom the Global Debtors, the Reorganized Global Debtors, or Plan Administrator, as applicable, is responsible. The U.S. Trustee shall not be treated as providing any release under this Plan. U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to File any Proof of Claim or any request for administrative expense for U.S. Trustee Fees. The provisions of this Section 3.6 shall control notwithstanding any other provision(s) in this Plan to the contrary.

### ARTICLE IV.
### CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS[7]

### 4.1. *Classification of Claims and Equity Interests.*

Except for the Claims addressed in Article III hereof or as otherwise set forth herein, all Claims and Equity Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Equity Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Equity Interest qualifies within the description of such other Classes. A Claim or an Equity Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

---

[7]  [**NTD**: Classification of Claims and Equity Interests remain under review and subject to material revision.]

This Plan constitutes a separate Plan for each of the Global Debtors, and the classification of Claims and Equity Interests, as applicable, set forth herein shall apply separately to each of the Global Debtors.   All of the potential Classes for the Global Debtors are set forth herein. Such groupings shall not affect any Global Debtor's status as a separate legal Entity, change the organizational structure of the Global Debtors' business enterprise, constitute a change of control of any Global Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Global Debtors shall continue to exist as separate legal Entities.

The classification of Claims against and Equity Interests in the Global Debtors pursuant to this Plan is as follows:

| Class | Claims and Equity Interest | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3-A | First Out DIP Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 3-B | Second Out DIP Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 3-C | Third Out DIP Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 4-A | Prepetition SGUS Notes Claims | Impaired | Entitled to Vote |
| Class 4-B | Prepetition FILO and NPC Claims | Impaired | Entitled to Vote |
| Class 4-C | Prepetition OpCo Second Out Notes Claims | Impaired | Entitled to Vote |
| Class 4-D | OpCo General Unsecured Claims | Impaired | [Entitled to Vote / Not Entitled to Vote (Deemed to Reject)][8] |
| Class 5-A | HoldCo II SGUS Notes Guarantee Claims | Impaired | Entitled to Vote |
| Class 5-B | HoldCo II General Unsecured Claims | Impaired | [Entitled to Vote / Not Entitled to Vote (Deemed to Reject)][9] |
| Class 6-A | Prepetition TopCo Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6-B | TopCo General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |

[8]     [**NTD**:  Subject to ongoing review and discussion.]

[9]     [**NTD**:  Subject to ongoing review and discussion.]

| Class | Claims and Equity Interest | Status | Voting Rights |
|---|---|---|---|
| Class 8 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing TopCo Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Existing Intercompany Equity Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |

This Plan consolidates certain Claims against all Global Debtors solely for purposes of voting and Confirmation. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Global Debtors have not classified Administrative Expense Claims, DIP ABL Facility Claims, DIP OpCo Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims as described in Article III.

If a controversy arises regarding whether any Claim is properly classified under this Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Combined Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on this Plan.

### 4.2. *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under this Plan.

**ARTICLE V.**
**TREATMENT OF CLAIMS AND EQUITY INTERESTS[10]**

### A. Treatment of Claims and Equity Interests.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Equity Interest, except to the extent different treatment is agreed to by the Global Debtors or the Reorganized Global Debtors, as applicable, and such Holder. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Equity Interest, as applicable, shall receive such treatment on the later

---

[10] [**NTD**: All provisions related to Treatment of Claims and Equity Interests remain under review and subject to material revision.]

39

of the Effective Date and the date such Claim or Equity Interest becomes an Allowed Claim or an Allowed Equity Interest, as applicable, or as soon as reasonably practicable thereafter.

### 5.1.  *Class 1 – Priority Non-Tax Claims.*

(a)  <u>Classification</u>:  Class 1 consists of all Priority Non-Tax Claims.

(b)  <u>Treatment</u>:  The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by this Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall receive, at the election of the Global Debtors and subject to the reasonable consent of the Required Consenting DIP Term Loan Lenders:  (i) Cash in an amount equal to such Allowed Claim or in the ordinary course of business as and when due; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)  <u>Voting</u>:  Priority Non-Tax Claims are not Impaired Claims.  The Holders of Priority Non-Tax Claims are conclusively presumed to accept this Plan.  The Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 5.2.  *Class 2 – Other Secured Claims.*

(a)  <u>Classification</u>:  Class 2 consists of all Other Secured Claims.

(b)  <u>Treatment</u>:  The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by this Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date each Holder of an Allowed Other Secured Claim shall receive, at the election of the Global Debtors and subject to the reasonable consent of the Required Consenting DIP Term Loan Lenders:  (i) Cash in an amount equal to such Allowed Claim; (ii) the Collateral securing its Other Secured Claim; (iii) Reinstatement of such Allowed Claim; or (iv) such other treatment that will render such Other Secured Claim Unimpaired.

Upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Global Debtors or the Reorganized Global Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

(c)  <u>Voting</u>:  The Other Secured Claims are not Impaired Claims.  The Holders of Other Secured Claims are conclusively presumed to accept this Plan.  The Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

**5.3.** *Class 3-A – First Out DIP Term Loan Facility Claims.*

(a)  Classification:  Class 3-A consists of all First Out DIP Term Loan Facility Claims.

(b)  Treatment:  On the Effective Date, the First Out DIP Term Loan Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of First Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed First Out DIP Term Loan Facility Claims, its *pro rata* share of the $[●] in aggregate amount of Take Back Term Loans and Take Back Preferred Units, based upon the treatment elected by the Majority Commitment Parties under the terms of the New Capital Commitment Letter.

(c)  Voting:  The First Out DIP Term Loan Facility Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such First Out DIP Term Loan Facility Claims.

**5.4.** *Class 3-B – Second Out DIP Term Loan Facility Claims.*

(a)  Classification:  Class 3-B consists of all Second Out DIP Term Loan Facility Claims.

(b)  Treatment:  On the Effective Date, the Second Out DIP Term Loan Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of Second Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Second Out DIP Term Loan Facility Claims:  (i) [●] shares of New Saks Common Stock; and (ii) its *pro rata* share of the DIP Lender Litigation Trust Allocation of Litigation Trust Proceeds (if any), as set forth in the Litigation Trust Agreement.

(c)  Voting:  The Second Out DIP Term Loan Facility Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Second Out DIP Term Loan Facility Claims.

**5.5.** *Class 3-C – Third Out DIP Term Loan Facility Claims.*

(a)  Classification:  Class 3-C consists of all Third Out DIP Term Loan Facility Claims.

(b)  Treatment:  On the Effective Date, the Third Out DIP Term Loan Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance,

41

reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of Third Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Third Out DIP Term Loan Facility Claims:  (i) [●] shares of New Saks Common Stock; and (ii) its *pro rata* share of the DIP Lender Litigation Trust Allocation of Litigation Trust Proceeds (if any), as set forth in the Litigation Trust Agreement.

(c)     Voting:     The Third Out DIP Term Loan Facility Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Third Out DIP Term Loan Facility Claims.

**5.6.    *Class 4-A – Prepetition SGUS Notes Claims.***

(a)     Classification:  Class 4-A consists of all Prepetition SGUS Notes Claims.

(b)     Treatment:  On the Effective Date, the Prepetition SGUS Notes Claims shall be Allowed under this Plan in the amount of $[●], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition SGUS Notes Claim, except to the extent that the Prepetition SGUS Notes Trustee or a Holder of a Prepetition SGUS Notes Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of a Prepetition SGUS Notes Claim shall receive, subject to the terms of this Plan, [●].

(c)     Voting:  The Prepetition SGUS Notes Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Prepetition SGUS Notes Claims.

**5.7.    *Class 4-B – Prepetition FILO and NPC Claims.***

(a)     Classification:  Class 4-B consists of all Prepetition FILO and Prepetition NPC Claims.

(b)     Treatment:  On the Effective Date, the Prepetition FILO and Prepetition NPC Claims shall be Allowed under this Plan in the aggregate amount of $10 million, consisting of $5 million of Allowed Prepetition FILO Claims and $5 million of Allowed Prepetition NPC Claims, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition FILO Claim and Prepetition NPC Claim, as applicable, except to the extent that the Prepetition FILO Agent or Prepetition NPC Agent, as applicable, or a Holder of a Prepetition FILO Claim or Prepetition NPC Claim, as applicable, agrees to less

42

favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of an Allowed Prepetition FILO Claim and an Allowed Prepetition NPC Claim shall receive, subject to the terms of this Plan, [●].  The Holders of Allowed Prepetition FILO and NPC Claims shall be entitled to receive, retain, and not turn over the distributions described herein notwithstanding anything in the Equal Priority Intercreditor Agreement, Second A&R Intercreditor Agreement, or PAA to the contrary.

(c)     Voting:  The Prepetition FILO and NPC Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Prepetition FILO and NPC Claims.

### 5.8.     *Class 4-C – Prepetition OpCo Second Out Notes Claims.*

(a)     Classification:  Class 4-C consists of all Prepetition OpCo Second Out Notes Claims.

(b)     Treatment:  On the Effective Date, the Prepetition OpCo Second Out Notes Claims shall be Allowed under this Plan in the amount of $[1,439,252,628.00], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, the Prepetition OpCo Second Out Notes Claims [shall receive, subject to the terms of this Plan, [●]].

(c)     Voting:  The Prepetition OpCo Second Out Notes Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Prepetition OpCo Second Out Notes Claims.

### 5.9.     *Class 4-D – OpCo General Unsecured Claims.*

(a)     Classification:  Class 4-D consists of all OpCo General Unsecured Claims.

(b)     Treatment:  [In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed OpCo General Unsecured Claim, except to the extent that a Holder of an OpCo General Unsecured Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed OpCo General Unsecured Claim shall receive [●].  /  On the Effective Date, all OpCo General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such OpCo General Unsecured Claims.] [11]

(c)     Voting:  [The OpCo General Unsecured Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such OpCo General Unsecured Claims at the applicable OpCo Global Debtors.  /  Holders of OpCo General Unsecured Claims are conclusively deemed

---

[11]     [**NTD**:  Subject to ongoing review and discussion]

to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of OpCo General Unsecured Claims are not entitled to vote to accept or reject this Plan.] [12]

### 5.10.   *Class 5-A – HoldCo II SGUS Notes Guarantee Claims.*

(a)    <u>Classification</u>:   Class 5-A consists of all  HoldCo II  SGUS  Notes Guarantee Claims.

(b)    <u>Treatment</u>:  On the Effective Date, the HoldCo II SGUS Notes Guarantee Claims shall be Allowed under this Plan in the amount of $[200,000,000.00], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each HoldCo II SGUS Notes Guarantee Claim, except to the extent that a Holder of a HoldCo II SGUS Notes Guarantee Claim agrees to less favorable treatment on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo II SGUS Notes Guarantee Claim shall receive [●].

(c)    <u>Voting</u>:   The HoldCo II SGUS Notes Guarantee Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such HoldCo II SGUS Notes Guarantee Claims.

### 5.11.   *Class 5-B – HoldCo II General Unsecured Claims.*

(a)    <u>Classification</u>:    Class  5-B  consists  of  all  HoldCo  II  General Unsecured Claims.

(b)    <u>Treatment</u>:  [In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo II General Unsecured Claim, except to the extent that a Holder of a HoldCo II General Unsecured Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo II General Unsecured Claim shall receive [●].  / On the Effective Date, all HoldCo II General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.] [13]

(c)    <u>Voting</u>:  [The HoldCo II General Unsecured Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such HoldCo II General Unsecured Claims.  / Holders of HoldCo II General Unsecured Claims are conclusively deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of HoldCo II General Unsecured Claims are not entitled to vote to accept or reject this Plan.] [14]

---

[12]    [**NTD**: Subject to ongoing review and discussion]

[13]    [**NTD**: Subject to ongoing review and discussion]

[14]    [**NTD**: Subject to ongoing review and discussion]

**5.12.** *Class 6-A – Prepetition TopCo Facility Claims.*

(a)     Classification:  Class 6-A consists of all Prepetition TopCo Facility Claims.

(b)     Treatment:  [On the Effective Date, the Prepetition TopCo Facility Claims shall be Allowed under this Plan in the amount of $[●], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.]  On the Effective Date, the Prepetition TopCo Facility Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.

(c)     Voting:  The Prepetition TopCo Facility Claims are Impaired Claims. Holders of such Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Prepetition TopCo Facility Claims are therefore not entitled to vote to accept or reject this Plan.

**5.13.** *Class 6-B – TopCo General Unsecured Claims.*

(a)     Classification:  Class 6-B consists of all TopCo General Unsecured Claims.

(b)     Treatment:  On the Effective Date, the TopCo General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.

(c)     Voting:  The TopCo General Unsecured Claims are Impaired Claims. Holders of such Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of TopCo General Unsecured Claims are therefore not entitled to vote to accept or reject this Plan.

**5.14.** *Class 7 – Intercompany Claims.*

(a)     Classification:  Class 7 consists of all Intercompany Claims.

(b)     Treatment:  On or after the Effective Date, or as soon as practicable thereafter, any and all Intercompany Claims shall, at the option of the Global Debtors and upon the consent of the Required Consenting DIP Term Loan Lenders, be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Global Debtors; provided that no distributions shall be made on account of any Intercompany Claims.

(c)     Voting:  The Intercompany Claims are Unimpaired if Reinstated or Impaired if the Allowed Intercompany Claims are cancelled.  Holders of Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan.

45

**5.15.** *Class 8 – Subordinated Claims.*

(a)    Classification:  Class 8 consists of all Subordinated Claims.

(b)    Treatment:   On the Effective Date, all Subordinated Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.

(c)    Voting:  The Subordinated Claims are Impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Subordinated Claims are conclusively deemed to reject this Plan.  Therefore, Holders of Allowed Subordinated Claims are not entitled to vote to accept or reject this Plan.

**5.16.** *Class 9 – Existing TopCo Equity Interests.*

(a)    Classification:  Class 9 consists of all Existing TopCo Equity Interests.

(b)    Treatment:  On the Effective Date, all Existing TopCo Equity Interests shall be cancelled, released, and extinguished, and each Holder of an Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under this Plan on account of such Allowed Existing TopCo Equity Interests.

(c)    Voting:  The Existing TopCo Equity Interests are Impaired.  Holders of Existing TopCo Equity Interests are conclusively deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing TopCo Equity Interests are not entitled to vote to accept or reject this Plan.

**5.17.** *Class 10 – Existing Intercompany Equity Interests.*

(a)    Classification:   Class 10 consists of all Existing Intercompany Equity Interests.

(b)    Treatment:  Subject to the Restructuring Steps Plan, each Allowed Existing Intercompany Equity Interest shall be Reinstated, distributed, contributed, set off, settled, cancelled, and released, or otherwise addressed at the option of the Global Debtors and upon the consent of the Required Consenting DIP Term Loan Lenders.

(c)    Voting:  The Existing Intercompany Equity Interests are Unimpaired if Reinstated or Impaired if the Allowed Existing Intercompany Equity Interests are canceled. Holders of Allowed Existing Intercompany Equity Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Intercompany Equity Interests are not entitled to vote to accept or reject this Plan.

**B.    Class Acceptance Requirement.**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number

46

of Holders of the Allowed Claims in such Class that have voted on this Plan.  A Class of Equity Interests that is entitled to vote on this Plan has accepted this Plan if it is accepted by at least two-thirds (2/3) in amount of Allowed Equity Interests of such Class that have voted on this Plan.

### C.      Tabulation of Votes on a Non-Consolidated Basis.

All votes on this Plan shall be tabulated on a non-consolidated basis by Class and by Global Debtor for the purpose of determining whether this Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.

### D.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by at least one Impaired Class of Claims.  Because certain Classes are deemed to have rejected this Plan or may vote to reject this Plan, the Global Debtors will request Confirmation of this Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Section 13.3 and Section 13.4 of this Plan, the Global Debtors reserve the right at any time to alter, amend, modify, revoke, or withdraw this Plan or any Plan Document as to any particular Global Debtor, in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to Section 13.3 and Section 13.4 of this Plan, the Global Debtors also reserve the right at any time to request Confirmation of this Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject this Plan.

### E.      Voting Classes; Deemed Acceptance or Rejection by Non-Voting Classes.

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims or Equity Interests in such Class shall be deemed to have accepted this Plan.  To the extent that Claims or Equity Interests of any Class are Unimpaired, each Holder of a Claim or Equity Interest in such Class is presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject this Plan.

### F.      Vacant and Abstaining Classes.

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  Moreover, any Class of Claims or Equity Interests that is occupied as of the commencement of the Combined Hearing by a Claim or Equity Interest eligible to vote, but as to which no vote is cast, shall be presumed to accept this Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

### G.      Controversy Concerning Impairment.

If a controversy arises as to whether any Claim or Equity Interest (or any Class of Claims or Equity Interests) is Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date, absent consensual resolution of such controversy among the Global Debtors and the complaining Entity or Entities.

### H.      Special Provision Governing Unimpaired Claims.

Except as otherwise provided in this Plan, nothing under this Plan or the Plan Supplement shall affect the rights of the Global Debtors or the Reorganized Global Debtors, as applicable, regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

### 6.1.    *Non-Substantive Consolidation.*

This Plan is a joint plan that does not provide for substantive consolidation of the Global Debtors' Estates, and on the Effective Date, the Global Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Nothing in this Plan shall constitute or be deemed to constitute an admission that any one of the Global Debtors is subject to or liable for any Claim against any other Global Debtor.  Additionally, Holders of Claims and Equity Interests against multiple Global Debtors, to the extent Allowed in each Global Debtor's Chapter 11 Case, will be treated as holding a separate Claim or separate Equity Interest, as applicable, against each Global Debtor's Estate; provided, however, that no Holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.

### 6.2.    *Plan Administrator.*

(a)      *Appointment.*  The Plan Administrator may be appointed at the option of the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders.  If appointed, the Plan Administrator's retention shall commence on the Effective Date and shall continue until:  (i) the Bankruptcy Court enters an order closing the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause (as defined below); or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with this Plan and the Plan Administrator Agreement.

(b)      *Authority.*  Subject to Section 6.2(c) of this Plan, the Plan Administrator, as applicable, shall have the authority and right on behalf of each of the Global Debtors, without need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

48

(i)     Except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of this Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Global Debtors, other than with respect to any Claims that constitute Litigation Trust Assets (if applicable, and for the avoidance of doubt, the Litigation Trustee shall be responsible for objecting to, reconciling, prosecuting, or settling Claims that constitute Litigation Trust Assets);

(ii)    Make distributions to Holders of Allowed Claims in accordance with the Plan, other than with respect to distributions (if any) made pursuant to the Litigation Trust and Litigation Trust Agreement;

(iii)    Prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(iv)    retain professionals to assist in performing its duties under the Plan;

(v)    maintain the books and records and accounts of the Global Debtors;

(vi)    incur and pay reasonable and necessary expenses in connection with the performance of duties under this Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(vii)    administer each Debtor's tax obligations, including (a) filing tax returns and paying tax obligations, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Global Debtor ending after the Petition Date through the liquidation of such Global Debtor as determined under applicable tax laws, and (c) representing the interest and account of each Global Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(viii)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Global Debtors that are required hereunder, by any Governmental Unit or applicable law;

(ix)    pay statutory fees in accordance with this Plan;

(x)    perform other duties and functions that are consistent with the implementation of the Plan; and

49

(xi)     close the Chapter 11 Cases, subject to the reasonable consent of the Litigation Trustee (if applicable).

(c)     *Oversight*.  The New Board shall, among other things, oversee and direct the Plan Administrator, as applicable, and the administration of the Plan.  On the Effective Date, or as soon as is reasonably practicable thereafter, the New Board shall establish such procedures and protocols as it deems necessary to carry out its oversight and direction over the Plan Administrator and as are otherwise acceptable to the Required Consenting DIP Term Loan Lenders.

(d)     *Indemnification*.  Each of the Global Debtor Estates shall indemnify and hold harmless the Plan Administrator, as applicable, solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's bad faith, gross negligence, willful misconduct or criminal conduct.

### 6.3.   *Restructuring Transactions.*

Before, on, and after the Effective Date, the applicable Global Debtors or the Reorganized Global Debtors, as applicable, may, consistent with the terms of the Restructuring Support Agreement, enter into any transaction and take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan), that are consistent with and pursuant to the terms and conditions of this Plan, including, as applicable:  (a) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, migration, consolidation, or other Organizational Documents with the appropriate governmental authorities pursuant to applicable Law; (d) the execution, delivery, and filing, if applicable, of the New Organizational Documents, the New Exit Facilities Documents, the Exit ABL Facility Documents; (e) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (f) all other actions that the applicable Global Debtors or Reorganized Global Debtors reasonably determine, in consultation with the Required Consenting DIP Term Loan Lenders, are necessary or appropriate, including making filings or recordings that may be required by applicable Law.  For the purposes of effectuating this Plan, none of the Restructuring Transactions contemplated herein shall constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction or matter that would result in a violation, breach, or default under, or increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Global Debtors or the Reorganized Global Debtors under, or result in the creation or imposition of a Lien upon any property or asset of the Global Debtors or the Reorganized Global Debtors pursuant to any agreement, contract, or document of the Global Debtors, and any consent or advance notice required under any agreement, contract, or document of the Global Debtors shall be deemed satisfied by Confirmation.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan. The Confirmation Order shall authorize the Global Debtors and the Reorganized Global Debtors, as applicable, to undertake the DIP Conversion contemplated by this Plan and enter into other Definitive Documents.

### 6.4.   *Continued Corporate Existence in Certain Debtors; Vesting of Assets.*

(a)   General. Except as otherwise provided in this Plan or as otherwise may be agreed between the Global Debtors and the Required Consenting DIP Term Loan Lenders, each of the Global Debtors, as Reorganized Global Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable Laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Global Debtor, each of the Reorganized Global Debtors may take such action as permitted by applicable Law and such Reorganized Global Debtor's New Organizational Documents, as such Reorganized Global Debtor may determine is reasonable and appropriate, including, but not limited to, causing: (a) a Reorganized Global Debtor to be merged with and into another Reorganized Global Debtor, or a subsidiary and/or Affiliate of a Reorganized Global Debtor; (b) a Reorganized Global Debtor to be dissolved; (c) the conversion of a Reorganized Global Debtor from one Entity type to another Entity type; (d) the legal name of a Reorganized Global Debtor to be changed; (e) the closure of a Reorganized Global Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Global Debtor under the Law of jurisdictions other than the Law under which the Global Debtor currently is incorporated.

(b)   Vesting of Assets. Except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property of the Estates, wherever located, including any property, wherever located, acquired by the Global Debtors under or in connection with this Plan, shall vest in the applicable Reorganized Global Debtor, free and clear of all Claims, Liens, charges, other encumbrances and Equity Interests, other than the Liens securing the obligations under the Exit ABL Facility and New Exit Debt Facilities, respectively. On and after the Effective Date, except as otherwise provided in this Plan or in the Confirmation Order, each applicable Reorganized Global Debtor may operate its business(es) and may use, acquire and dispose of property, wherever located, and each Reorganized Global Debtor, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims), Equity Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Without limiting the foregoing, the Reorganized Global Debtors may pay the charges that they incur on or after the Effective Date, if any, for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court. Anything in this Plan to the contrary notwithstanding, any Unimpaired Claims against a Global Debtor shall remain the obligations solely of such Global Debtor or such Reorganized Global Debtor, as applicable, and shall not become obligations of any other Global Debtor or

Reorganized Global Debtor, as applicable, by virtue of this Plan, the Chapter 11 Cases, or otherwise.

### 6.5.    *Indemnification Provisions in Organizational Documents.*

On and as of the Effective Date, all indemnification obligations of the Global Debtors that were in place as of the Petition Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such persons than the indemnification provisions in place prior to the Restructuring Transactions; provided that, with respect to former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable, such indemnification provisions shall be reinstated solely to the extent necessary to access D&O Liability Insurance Policies, and the Reorganized Global Debtors shall have no out-of-pocket liability for any such indemnification obligations owed to former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable.  On the Effective Date, each applicable Reorganized Global Debtor shall be deemed to have assumed all unexpired D&O Liability Insurance Policies.

### 6.6.    *Sources for Cash Distributions under this Plan.*

The Global Debtors or the Plan Administrator, as applicable, shall fund Cash distributions under this Plan with Cash on hand, including Cash from operations and the proceeds of the DIP Facilities, the Exit ABL Facility, and the New Exit Facilities.  Cash payments to be made pursuant to this Plan will be made by the Reorganized Global Debtors or the Disbursing Agent in accordance with Article VII.

From and after the Effective Date, subject to any applicable limitations set forth in any agreement entered into on or after the Effective Date (including, without limitation, the New Organizational Documents, the New Exit Facilities Documents, and the Exit ABL Facility Documents), the Reorganized Global Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of managers or directors, as applicable (or other applicable governing bodies), of the applicable Reorganized Global Debtors deem appropriate.

### 6.7.    *Exit ABL Facility.*

Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit ABL Facility and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit ABL Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the

52

applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the Exit ABL Facility. The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the Exit ABL Facility Documents, necessary or appropriate to incur loans under the Exit ABL Facility without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the Exit ABL Parties may mutually agree to be necessary to consummate the Exit ABL Facility.

On the Effective Date, the agreements with respect to the Exit ABL Facility shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit ABL Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. On the Effective Date, all of the Liens and security interests to be granted in connection with the Exit ABL Facility (a) shall be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the Exit ABL Facility, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under or in connection with the Exit ABL Facility, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law. The Reorganized Global Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

### 6.8.  *New Exit Facilities.*

Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the New Exit Facilities, the New Exit Facilities Documents, and all transactions contemplated thereby (including the New Capital Syndication and any supplementation thereof, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the New Exit Facilities and the New Exit Facilities Documents. The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the New Exit Facilities Documents, necessary or appropriate to consummate the New Exit Facilities without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule

or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the New Capital Commitment Parties may mutually agree to be necessary to consummate the New Exit Facilities and the transactions contemplated by the New Exit Facilities Documents.

On the Effective Date, the New Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, and enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law.

The Reorganized Global Debtors are authorized to conduct the New Capital Syndication on terms acceptable to the New Capital Commitment Parties, and to execute, deliver, and perform any New Capital Syndication Documents in connection therewith, in each case without further notice to or order of the Bankruptcy Court.

(a)      New Exit Debt Facilities.

Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the New Exit Debt Facilities and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the New Exit Debt Facilities, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the New Exit Debt Facilities.  The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the New Exit Debt Facilities Documents, necessary or appropriate to incur loans under the New Exit Debt Facilities without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the New Exit Term Loan Secured Parties may mutually agree to be necessary to consummate the New Exit Debt Facilities.

On the Effective Date, the agreements with respect to the New Exit Debt Facilities shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Exit Debt Facilities are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law.  On the Effective Date, all of the Liens and security interests to be granted in connection with the New Exit Debt Facilities (a) shall be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the New Exit Debt Facilities,

(c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under or in connection with the New Exit Debt Facilities, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.  The Reorganized Global Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

(b)  <u>Preferred Equity Facilities</u>.

Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the Preferred Equity Facilities and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Preferred Equity Units, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the Preferred Equity Facilities.  The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the Preferred Equity Facilities Documents, necessary or appropriate to issue preferred equity under the Preferred Equity Facilities Documents without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the Preferred Equity Facilities Parties may mutually agree to be necessary to issue the Preferred Equity Units and consummate the transactions contemplated by the Preferred Equity Facilities Documents.

On the Effective Date, the agreements with respect to the Preferred Equity Facilities shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Preferred Equity Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law.  The Preferred Equity Units shall be issued and distributed in accordance with the terms of this Plan free and clear of all Liens, Claims, and other Interests.  All of the Preferred Equity Units issued pursuant to this Plan shall be duly authorized and validly issued.

55

## 6.9.   *Litigation Trust.*[15]

(a)      <u>General</u>.  On the Effective Date the Global Debtors shall, subject to all consents in favor of the Required Consenting DIP Term Loan Lenders in this Plan and the Restructuring Support Agreement, execute the Litigation Trust Agreement and take such steps as necessary to establish the Litigation Trust in accordance with the terms of this Plan.  The beneficial interests with respect to the Litigation Trust shall be for the benefit of the Holders of DIP Term Loan Claims, and the Global Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title and interest in the Litigation Trust Assets. Pursuant to section 1141 of the Bankruptcy Code, such Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests, except as otherwise set forth in this Plan.  For the avoidance of doubt, if applicable, the Litigation Trust Assets shall include Litigation Trust Retained Causes of Action held by or assertable by any Global Debtor (including any TopCo Global Debtor), in each case to the extent set forth in the Schedule of Retained Causes of Action.

The   (A) establishment,   purpose,   and   administration   of   the   Litigation   Trust, (B) appointment, rights, and powers, of the Litigation Trustee, and (C) treatment of the Litigation Trust for federal income tax purposes, among other things, shall be governed by the Litigation Trust Agreement.  On and after the Effective Date, the Litigation Trustee shall be authorized, in accordance with the terms of this Plan and the Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any Litigation Trust Assets.

In  furtherance of this section of this Plan:  (1) it is intended that the Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of DIP Term Loan Claims, consistent with the terms of this Plan, and accordingly, all assets held by the Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Global Debtors or the Reorganized Global Debtors, as applicable, to the Holders of DIP Term Loan Claims and then contributed by the Holders of DIP Term Loan Claims to the Litigation Trust in exchange for their interests in the Litigation Trust; (2) the sole purpose of the Litigation Trust shall be the liquidation and distribution of the net assets of the Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of  a  trade  or  business;  (3) all  parties  (including,  without  limitation,  the  Global  Debtors, the Reorganized Global Debtors, or the Holders of DIP Term Loan Claims receiving interests in the Litigation Trust, and the Litigation Trustee) shall report consistently with such treatment described in provisos (1) and (2) of this paragraph; (4) all parties (including, without limitation, the Global Debtors, the Reorganized Global Debtors, and the Holders of DIP Term Loan Claims receiving interests in the Litigation Trust, and the Litigation Trustee) shall report consistently with the valuation of the assets transferred to the Litigation Trust as determined by the Litigation Trustee (or its designee); (5) the Litigation Trustee shall be responsible for filing all applicable tax returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-

---

[15]     [**NTD**:  All provisions related to Litigation Trust remain under review and subject to material revision.]

56

4(a); and (6) the Litigation Trustee shall annually send to each Holder of an interest in the Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee may timely elect to (x) treat any portion of the Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (y) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes.  If a "disputed ownership fund" election is made, (I) the portion of the Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation, and (II) all parties (including, without limitation, the Global Debtors or Reorganized Global Debtors, as applicable, and the Holders of DIP Term Loan Claims receiving interests in the Litigation Trust, and the Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing.  Any taxes (including with respect to earned interest, if any) imposed on the Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

(b)     Litigation Trustee.

(i)     *Appointment; Duties*.  As of the Effective Date, the Litigation Trustee shall be appointed as trustee of the Litigation Trust pursuant to the Litigation Trust Agreement and this Plan.  On or after the Effective Date, the Litigation Trustee shall assume all of its obligations, powers, and authority under the Litigation Trust Agreement to investigate, pursue, litigate, and/or settle the Litigation Trust Retained Causes of Action (the "Litigation Trustee Duties").

(ii)    *Litigation Trustee as Fiduciary*.  The Litigation Trustee shall be a fiduciary of the beneficiaries of the Litigation Trust, including the Holders of DIP Term Loan Claims, regarding Litigation Trustee Duties, shall have such qualifications and experience as are sufficient to enable the Litigation Trustee to perform its obligations under this Plan and under the Litigation Trust Agreement, as applicable, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Litigation Trust Agreement.  To the extent necessary and in furtherance of the

Litigation Trustee Duties, following the Effective Date, the Litigation Trustee shall be deemed to be a judicial substitute for the Reorganized Global Debtors as the party in interest in the Chapter 11 Cases, under this Plan or in any judicial proceeding or appeal to which the Global Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code. The Litigation Trustee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers, including upon advice of counsel, unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence, or willful misconduct.

(iii) *Resignation, Death or Removal*. The Litigation Trustee may be removed by the Bankruptcy Court upon application by any party in interest for cause shown. In the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Litigation Trustee, the Bankruptcy Court shall designate another Person to become the Litigation Trustee and thereupon the successor Litigation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor.

(c) <u>Litigation Trust Agreement</u>.

(i) *Provisions of Agreement and Order*. The Litigation Trust Agreement and the Confirmation Order shall provide that: (1) the Litigation Trustee shall be a fiduciary of the beneficiaries of the Litigation Trust with respect to the Litigation Trustee Duties; and (2) neither the Reorganized Global Debtors (except as expressly set forth in the Litigation Trust Agreement) nor their respective boards of directors, management, employees, and professionals shall have any liability for any action taken or omitted to be taken by the Litigation Trustee in performing the Litigation Trustee Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to this Plan on account of any such action taken or omitted to be taken.

(ii) The Litigation Trust Agreement will be filed with the Plan Supplement and will provide for, among other things: (1) the transfer of the Litigation Trust Assets to the Litigation Trust; (2) the payment of expenses of the Litigation Trust from the Litigation Trust Assets; (3) distributions to Holders of Allowed DIP Term Loan Claims in accordance with the DIP Lender Litigation Trust Allocation, as provided herein and in the Litigation Trust Agreement; (4) reasonable access to the Global Debtors' books and records; (5) the identity of the Litigation Trustee; (6) the terms of

the Litigation Trustee's engagement; (7) reasonable and customary provisions that allow for limitation of liability and indemnification of the Litigation Trustee and its professionals by the Litigation Trust, <u>provided</u> that any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets; and (8) the term and dissolution of the Litigation Trust.   Following the Effective Date, the Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trustee Duties, except as otherwise provided in this Plan, the Confirmation Order, or the Litigation Trust Agreement.

(d)      <u>Litigation Trust Funding</u>.   On the Effective Date and at the election of the Required Consenting DIP Term Loan Lenders, the Global Debtors shall fund the Litigation Trust Escrow Account in an amount equal to the Litigation Trust Escrow Amount.   If funded, the Litigation Trust Escrow Amount shall automatically and irrevocably vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests.   If funded, the Litigation Trust Escrow Amount shall be used for the administration of the Litigation Trust, to pay expenses of the Litigation Trust, and to pursue the Litigation Trust Retained Causes of Action, with any excess amount being used to distribute to Holders of DIP Term Loan Claims, as set forth in the Litigation Trust Agreement.   All proceeds from the pursuit of the Litigation Trust Retained Causes of Action shall be used by the Litigation Trustee to pay for the costs and expenses of administration of the Litigation Trust, pursuit of the Litigation Trust Retained Causes of Action, and distribution to Holders of DIP Term Loan Claims, as set forth in the Litigation Trust Agreement.   The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with this Plan and the Litigation Trust Agreement, respectively.

### 6.10.   *Reorganized Global Debtors' Ownership.*

On the Effective Date, in accordance with the terms of this Plan, New Saks shall issue and deliver all of the New Saks Common Stock and Preferred Equity Units pursuant to the terms and conditions of this Plan, the Confirmation Order, the Restructuring Steps Plan, and the New Organizational Documents. The issuance of New Saks Common Stock and Preferred Equity Units pursuant to this Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Equity Interest, and all of the New Saks Common Stock and Preferred Equity Units issued or issuable pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Any Holder of an Allowed Claim receiving New Saks Common Stock and Preferred Equity Units pursuant to the terms and conditions of this Plan may designate that all or a portion of such Holder's *pro rata* share of the New Saks Common Stock and Preferred Equity Units be registered in the name of, and delivered to, its designee by delivering notice thereof to the Global Debtors and/or by the designee delivering notice thereof to the Claims Agent in accordance with such other procedures for such designations and/or delivery that the Global Debtors or the Reorganized Global Debtors, as applicable, may establish in accordance with this Plan.   Any such designee

59

shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

### 6.11.   *Exemption from Registration Requirements.*

The offering, issuance, and distribution of any securities, including the New Saks Common Stock and Take Back Preferred Units in exchange for Claims pursuant to Article III or Article V of this Plan, shall be exempt from, among other things, the registration requirements of the Securities Act and any other applicable U.S. state or local Laws requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code (except with respect to an Entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) to the extent permitted and available.  Except as otherwise provided in this Plan or the governing certificates or instruments, any and all such New Saks Common Stock and Take Back Preferred Units so issued under this Plan (a) will not be "restricted securities" (as defined under the Securities Act), and (b) will be freely tradable and transferable under the Securities Act by the recipients thereof that are not, and have not been within ninety (90) days of such transfer, an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Global Debtors or the Reorganized Global Debtors, in each case, subject to (x) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (y) compliance with applicable securities Laws and any rules and regulations, including those of the United States Securities and Exchange Commission or U.S. state or local securities Laws, if any, applicable at the time of any future transfer of such securities or instruments, and (z) any restrictions in the New Organizational Documents.

The offering, issuance, and sale of the Incremental New Money Preferred Units shall be exempt from the registration requirements of the Securities Act pursuant to section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.  Each recipient of Incremental New Money Preferred Units shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act, and the Incremental New Money Preferred Equity Facility Share Purchase Agreement shall contain such representations, warranties, and covenants as are customary for transactions exempt from registration under section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.  The Incremental New Money Preferred Units shall constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, and any resale of such securities shall be subject to applicable restrictions under the Securities Act, including the requirements of Rule 144 or another available exemption from the registration requirements of the Securities Act.

Notwithstanding anything to the contrary in any Plan Document or the Restructuring Support Agreement, no Entity (including DTC, ClearPar, or any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether issuance of the New Saks Common Stock and Preferred Equity Units is exempt from registration and/or eligible for book-entry delivery, settlement, and depository (to the extent applicable).

60

### 6.12. *Organizational Documents.*

The Reorganized Global Debtors shall enter into such agreements and/or amend their Organizational Documents to the extent necessary to implement the terms and provisions of this Plan and the Bankruptcy Code, which shall: (a) contain terms consistent with the Plan Supplement; and (b) authorize the issuance, distribution, and reservation of the New Saks Common Stock and Preferred Equity Units to the Entities entitled to receive such issuances, distributions and reservations, as applicable under this Plan. The New Organizational Documents will be deemed to be modified to prohibit (and will include a provision prohibiting) the issuance of non-voting equity securities, pursuant to and solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Global Debtors shall be governed by the New Organizational Documents applicable to such Reorganized Global Debtor. On or immediately before the Effective Date, each Global Debtor and each Reorganized Global Debtor, as applicable, will file its respective New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable Laws of its state of incorporation or formation, to the extent required under this Plan or applicable non-bankruptcy Law for such New Organizational Documents to become effective. After the Effective Date, the Reorganized Global Debtors may amend and restate the formation, incorporation, organizational, and constituent documents (including, without limitation, any Organizational Documents), as applicable, as permitted by the Laws of their respective jurisdiction of formation or incorporation, as applicable, and the terms of such documents.

Any Entity's or Person's receipt of New Saks Common Stock and Preferred Equity Units, under, or as contemplated by, this Plan shall be deemed as its agreement to the applicable New Organizational Documents for New Saks, and such Entities and Persons shall be deemed signatories to the applicable New Organizational Documents for New Saks without further action required on their part (solely in their capacity as members of New Saks). The New Organizational Documents for New Saks will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each recipient of New Saks Common Stock and Preferred Equity Units, as applicable, will be bound thereby in all respects even if such recipient has not actually executed and delivered a counterpart thereof.

### 6.13. *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Global Debtor to a Reorganized Global Debtor or to any Entity pursuant to or in connection with this Plan, including: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Global Debtors or the Reorganized Global Debtors, including, without limitation, the New Saks Common Stock, the Preferred Equity Units, the Exit ABL Facility, and the New Exit Debt Facilities; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral under the Exit ABL Facility Documents and the New Exit Debt Facilities Documents, as applicable; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer executed in

61

connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any U.S. federal, state or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate U.S. federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Plan.

### 6.14.   *Other Tax Matters.*

From and after the Effective Date, the Reorganized Global Debtors shall be authorized to make and to instruct any of their wholly owned subsidiaries to make any elections available to them under applicable Law with respect to the tax treatment of the Restructuring Transactions as specified in the Restructuring Steps Plan.

### 6.15.   *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to distribution under this Plan, and except as otherwise set forth in this Plan, on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents directly or indirectly evidencing, related to or connected with any Claim, other than certain Intercompany Claims and Existing Intercompany Equity Interests, as expressly set forth in this Plan, and any rights of any Holder in respect thereof, shall be deemed canceled, discharged, and of no force or effect without further act or action under any applicable agreement, Law, regulation, order, or rule.  The holders of or parties to such canceled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation or the cancellation thereof, except the rights provided for in this Plan.  Notwithstanding anything to the contrary herein and in the Restructuring Support Agreement, each of the DIP Credit Agreements, the Prepetition OpCo Notes Indenture, the Prepetition SGUS Notes Indenture, the Prepetition FILO Credit Agreement, the Prepetition NPC Credit Agreement, the Prepetition Initial Notes Indenture, and the HoldCo II SGUS Notes Guarantee shall continue in effect solely to the extent necessary to:   (a) permit Holders of the DIP Facility Claims, Prepetition SGUS Notes Claims, Prepetition FILO Claims, Prepetition NPC Claims, Prepetition OpCo Second Out Notes Claims, and HoldCo II SGUS Notes Guarantee Claims to receive distributions under this Plan on account of such respective Claims; and (b) preserve all rights of (i) the Prepetition SGUS Noteholders with respect to the Prepetition SGUS Notes Indenture and vice versa, (ii) the Prepetition FILO Lenders with respect to the Prepetition FILO Credit Agreement and vice versa, (iii) the Prepetition NPC Lenders with respect to the Prepetition NPC Credit Agreement and vice versa, (iv) the Prepetition OpCo Second Out Noteholders with respect to the Prepetition OpCo Notes Indenture and vice versa, (v) the Prepetition OpCo Third Out Noteholders with respect to the Prepetition OpCo Notes Indenture and vice versa, (vi) the Holders of Prepetition Initial Notes with respect to the Prepetition Initial Notes Indenture and vice versa, and (vii) the HoldCo II SGUS Notes Guarantee Claims with respect to the HoldCo II SGUS Notes Guarantee and vice versa, in each case with respect to any

rights or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement, in each case that they may have under such agreements that survive termination of such agreements against any entity that is not a Global Debtor or a Reorganized Global Debtor, and otherwise in accordance with the terms of this Plan. Except as provided pursuant to this Plan, upon satisfaction of the DIP Facility Claims, Prepetition SGUS Notes Claims, Prepetition FILO Claims, Prepetition NPC Claims, Prepetition OpCo Second Out Notes Claims, Prepetition OpCo Third Out Notes Claims, Prepetition Initial Notes Claims, and HoldCo II SGUS Notes Guarantee Claims respectively (and as the case may be), each of the DIP Credit Agreements, the Prepetition OpCo Notes Indenture, the Prepetition SGUS Notes Indenture, the Prepetition FILO Credit Agreement, the Prepetition NPC Credit Agreement, the Prepetition Initial Notes Indenture, and the HoldCo II SGUS Notes Guarantee, respectively (and as the case may be), shall be discharged of all of their respective obligations associated with the DIP Credit Agreements, the Prepetition SGUS Notes Indenture, the Prepetition FILO Credit Agreement, the Prepetition NPC Credit Agreement, the Prepetition OpCo Notes Indenture, the Prepetition Initial Notes Indenture, and the HoldCo II SGUS Notes Guarantee, respectively and as the case may be.

On the Effective Date, except as otherwise specifically provided for in this Plan (including in the Restructuring Steps Plan): (i) the obligations of the Global Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Global Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Global Debtors that are specifically Reinstated pursuant to this Plan, if any) shall be cancelled, terminated and of no further force or effect solely as to the Global Debtors, without further act or action, and the Global Debtors and the Reorganized Global Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Global Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Global Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Global Debtors that are specifically Reinstated pursuant to this Plan, if any) shall be automatically and fully released and discharged.

### 6.16. *Boards.*

Subject to the terms of the Restructuring Support Agreement, the Confirmation Order, and the applicable New Organizational Documents, on the Effective Date, the New Boards shall be established and new members of the New Boards appointed. The initial members of the New Boards, who shall each be selected by the Required Consenting DIP Term Loan Lenders, in consultation with the Global Debtors, shall be identified in the Plan Supplement to be Filed with the Bankruptcy Court prior to the Effective Date. Unless reappointed, the members of the Boards prior to the Effective Date shall have no continuing obligations to any of the Reorganized Global Debtors on and after the Effective Date and each such member shall be deemed to have resigned

63

or shall otherwise cease to be a director of the applicable Global Debtor on the Effective Date. Commencing on the Effective Date, the members of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Global Debtor, as applicable, and may be replaced or removed in accordance therewith, as applicable.

### 6.17.   *Directors and Officers Insurance Policies.*

In accordance with this Plan:  (a) on the Effective Date, the Global Debtors or Reorganized Global Debtors, as applicable, shall be deemed to have assumed all of the Global Debtors' D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, which "tail policy" shall not be otherwise terminated or reduced) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; provided that any indemnity obligations that would otherwise be assumed by the foregoing assumption of the D&O Liability Insurance Policies shall be governed as provided elsewhere in this Plan and shall not be deemed to be assumed with assumption of such D&O Liability Insurance Policies;  (b) the Global Debtors and the Reorganized Global Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the Global Debtors or Reorganized Global Debtors, as applicable, may deem necessary and upon consent from the Required Consenting DIP Term Loan Lenders; and (c) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies.

For the avoidance of doubt, on and after the Effective Date, each of the Reorganized Global Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

### 6.18.   *New Capital Commitment Claims and DIP Term Loan Documents Indemnification Obligations.*

Notwithstanding anything to the contrary herein, (a) the New Capital Commitment Claims and (b) all indemnification, expense reimbursement, and contribution obligations of the Global Debtors or Reorganized Global Debtors, as applicable, arising under or in connection with the DIP Term Loan Documents (including indemnification obligations in favor of the DIP Term Loan Agent and the DIP Term Loan Lenders), shall, to the extent such obligations survive the termination of the DIP Term Loan Credit Agreement pursuant to its terms, survive, remain in full force and effect, and be binding on the applicable Reorganized Global Debtor from and after the Effective Date; provided, however, that any such indemnification obligations that relate to or arise from any claim or Cause of Action that is (i) released pursuant to Article XI of this Plan or (ii) subject to the Exculpation provided under Section 11.4 of this Plan shall not be preserved hereunder and shall be deemed released and discharged as of the Effective Date. For the avoidance of doubt, nothing in this Section 6.18 shall limit, modify, or impair any rights of the DIP Term Loan Agent, the DIP Term Loan Lenders, and the New Capital Commitment Parties, as applicable, to seek indemnification, expense reimbursement, or contribution from any entity that is not a Global Debtor or a Reorganized Global Debtor to the extent such rights exist under the DIP Term

Loan Documents and the New Capital Commitment Letter, as applicable, and survive the termination thereof.

**6.19.** *Corporate Action.*

(a)     On the Effective Date, the New Organizational Documents and any other applicable amended and restated corporate Organizational Documents of each of the Reorganized Global Debtors and New Saks, the New Exit Facilities Documents and the Exit ABL Facility Documents shall be deemed authorized in all respects.  On the Effective Date, all actions contemplated by this Plan and the Restructuring Transactions shall be deemed authorized and approved in all respects, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.

(b)     Any action under this Plan to be taken by or required of the Global Debtors or the Reorganized Global Debtors, including the adoption or amendment of certificates of formation, incorporation, and bylaws, the issuance of securities and instruments, or the selection of officers or directors shall be authorized and approved in all respects, without any requirement of further action by any of the Global Debtors' or Reorganized Global Debtors' or New Saks' equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

(c)     On or (as applicable) before the Effective Date, the appropriate officers of the Global Debtors, the Reorganized Global Debtors, or New Saks, as applicable, shall be authorized and, as applicable, directed to issue, execute, deliver, acknowledge, file, and/or record, as applicable, such securities, documents, contracts, instruments, releases and other agreements and take such other action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, in the name of and on behalf of the Global Debtors, the Reorganized Global Debtors, and New Saks, as applicable, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, or member approval or action. In addition, the selection of the Persons who will serve as the New Board shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Global Debtor or New Saks, and each shall serve from and after the Effective Date pursuant to and in accordance with the terms of the applicable New Organizational Documents and other applicable documents until such director, officer, or manager resigns or is removed or terminated in accordance with the applicable New Organizational Documents and other applicable documents or Laws.

(d)     The authorizations, approvals, and directives contemplated by this Section 6.19 shall be effective, notwithstanding any requirements under non-bankruptcy Law.

**6.20.** *Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights.*

(a)     Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims, Equity Interests, Causes of Action, or controversies (i) belonging to the Global Debtors or the Global Debtors' Estates as set

65

forth in this Plan and (ii) by and among the Global Debtors, the Creditors' Committee, the DIP Lenders, and the Consenting DIP Term Loan Lenders. This Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Equity Interests, Causes of Action, and controversies belonging to the Global Debtors or the Global Debtors' Estates pursuant to section 1123 of the Bankruptcy Code and, with respect to the compromise and settlement by and among the Global Debtors, the Creditors' Committee, the DIP Lenders, and the Consenting DIP Term Loan Lenders, Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (i) in the best interest of the Global Debtors, the Reorganized Global Debtors, and their respective Estates and property, and of Holders of Claims or Equity Interests; and (ii) fair, equitable, and reasonable.

(b) Except as provided herein, the classification and manner of satisfying all Claims and Equity Interests and the respective distributions and treatments under this Plan take into account or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b), or 510(c) of the Bankruptcy Code or otherwise, and any and all such rights against the Global Debtors and/or their Estates are terminated pursuant to this Plan. Pursuant to section 510 of the Bankruptcy Code, the Global Debtors, or the Reorganized Global Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Equity Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

### 6.21. *Additional Transactions Authorized Under this Plan.*

On or prior to the Effective Date, the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders, shall be authorized to take any such actions, as may be necessary or appropriate to Reinstate Claims or Equity Interests or render Claims or Equity Interests Unimpaired, as provided for under this Plan.

### 6.22. *Insurance Policies.*

Each of the Global Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder. Unless otherwise provided in this Plan, on the Effective Date, (a) the Global Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Global Debtors.

Nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (x) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies, or (y) alters or modifies the duty, if any, that the insurers or third-party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Global Debtors (or the

purchaser, solely to the extent assumed and assigned to the purchaser under an asset purchase agreement) or draw on any Collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to File or serve a Cure Dispute or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any Claims Bar Date or similar deadline governing Cure Costs or Claims.

For the avoidance of doubt, all of the Global Debtors' D&O Liability Insurance Policies shall be governed by Section 6.5 and Section 6.17 of this Plan and not this Section 6.22.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1. *Distributions.*

Except as otherwise provided herein, the Disbursing Agent shall make all distributions under this Plan to the applicable Holders of Allowed Claims in accordance with the terms of this Plan.

### 7.2. *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Final DIP Order or the Confirmation Order or otherwise permitted or required by applicable bankruptcy Law, including, but not limited to, section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date. For the avoidance of doubt, this Section 7.2 shall not apply to any DIP Facility Claims for which the Final DIP Order contemplates the payment of postpetition interest.

### 7.3. *Date of Distributions.*

Unless otherwise provided in this Plan, on the Effective Date (or, if a Claim or Equity Interest is not an Allowed Claim or Allowed Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest), or as soon as reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Equity Interest shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests (as applicable) in the applicable Class. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Equity Interests, distributions on account of any such Disputed Claims or Disputed Equity Interests shall be made pursuant to the provisions set forth in Article VIII hereof.

### 7.4. *Distribution Record Date.*

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable). Neither the Global Debtors nor the

Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Costs or any Cure Disputes in connection with the assumption and/or assignment of the Global Debtors' Executory Contracts and Unexpired Leases, neither the Global Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Global Debtor party to the applicable Executory Contract or Unexpired Lease, even if such non-Global Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Cost. For the avoidance of doubt, the Distribution Record Date shall not apply to any securities of the Global Debtors deposited with DTC or ClearPar, the Holders of which shall receive any distribution (if any) in accordance with the customary procedures of DTC or ClearPar, as applicable.

### 7.5.   *Disbursing Agent.*

(a)     Powers of Disbursing Agent. The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions under this Plan or payments contemplated hereby in respect of the Reorganized Global Debtors; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)     Expenses Incurred by the Disbursing Agent On or After the Effective Date. Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Global Debtors (solely if the Disbursing Agent is not a Reorganized Global Debtor), the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash and will not be deducted from distributions under this Plan made to Holders of Allowed Claims by the Disbursing Agent. The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Reorganized Global Debtors and without the need for approval by the Bankruptcy Court. In the event that the Disbursing Agent and the Reorganized Global Debtors are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs, and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

(c)     Bond. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Global Debtors. Furthermore, any such Entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

(d)     Cooperation with Disbursing Agent. The Reorganized Global Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of Holders of Claims, in each case, that are entitled to receive

distributions under this Plan, as set forth in the Global Debtors' or the applicable Reorganized Global Debtors' books and records. The Reorganized Global Debtors will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in Section 7.15 of this Plan.

### 7.6.    *Delivery of Distribution.*[16]

Subject to the provisions contained in this Article VII, with respect to distributions required to be made to Holders of Allowed Claims by the Reorganized Global Debtors or Disbursing Agent under this Plan, the Disbursing Agent will, subject to Bankruptcy Rule 9010, make all distributions under this Plan or payments to any Holder of an Allowed Claim as and when required by this Plan at:  (a) the address of such Holder on the books and records of the Global Debtors or their agents; or (b) the address in any written notice of address change delivered to the Global Debtors or the Disbursing Agent, including any addresses included on any Filed Proofs of Claim or transfers of Claim Filed with the Bankruptcy Court.  In the event that any distribution under this Plan to any such Holder is returned as undeliverable, no distribution or payment to such Holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter such distribution under this Plan shall be made to such Holder without interest; provided, however, that such distributions under this Plan or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from: (y) the Effective Date and (z) the date that such Holder's Claim is first Allowed.  Notwithstanding the foregoing, any distributions to be made on account of (i) the DIP ABL Facility Claims shall be delivered to the DIP ABL Agent for the benefit of itself and the DIP ABL Lenders in accordance with the terms of the DIP ABL Credit Agreement, (ii) the Prepetition FILO Claims shall be delivered to the Prepetition FILO Agent for the benefit of itself and the Prepetition FILO Lenders in accordance with the terms of the Prepetition FILO Credit Agreement, and (iii) the Prepetition NPC Claims shall be delivered to the Prepetition NPC Agent for the benefit of itself and the Prepetition NPC Lenders in accordance with the terms of the Prepetition NPC Credit Agreement.

### 7.7.    *Unclaimed Property.*

Ninety (90) days from the later of (a) the Effective Date and (b) the date that such Holder's Claim is first Allowed, all unclaimed property, wherever located, or interests in property distributable hereunder on account of such Claim or otherwise in possession of a Global Debtor on the Effective Date shall revert to the applicable Reorganized Global Debtor or its successor or assign and automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary), and any Claim or right of the Holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred.  The Reorganized Global Debtors and the Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Global Debtors' books and records, and the Proofs of Claim Filed against the Global Debtors, as reflected on the Claims Register maintained by the Claims Agent.  Further, for administrative convenience, any Holder of an Allowed Claim may affirmatively reject the receipt of any distribution, including the distribution

---

[16]    [**NTD**:  Section 7.6 remains under review and subject to material revision.]

of any New Saks Common Stock, after the Distribution Record Date and prior to the Effective Date.

**7.8.    *Satisfaction of Claims.***

Unless otherwise specifically provided herein, any distributions under this Plan and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

**7.9.    *Manner of Payment Under Plan.***

Except as specifically provided herein, at the option of the Reorganized Global Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Global Debtors or the applicable Reorganized Global Debtor, as the case may be.

**7.10.    *De Minimis Cash Distributions.***

None of the Reorganized Global Debtors or the Disbursing Agent shall have any obligation to make a distribution that is less than $500.00 in Cash.

**7.11.    *Distributions on Account of Allowed Claims Only.***

Notwithstanding anything herein and in the Restructuring Support Agreement to the contrary, no distribution under this Plan shall be made on account of a Claim until such Claim becomes an Allowed Claim.

**7.12.    *Fractional Shares.***

No fractional interests in New Saks Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution would otherwise result in the issuance of a number of interests that is not a whole number, the actual distribution of interests shall be rounded as follows: (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number; and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized interests to be distributed shall be adjusted as necessary to account for the foregoing rounding. For distribution purposes (including rounding), DTC or ClearPar, as applicable, will be treated as a single Holder, if applicable.

**7.13.    *No Distribution in Excess of Amount of Allowed Claims.***

Notwithstanding anything herein and in the Restructuring Support Agreement to the contrary, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution under this Plan of a value in excess of the Allowed amount of such Claim.

### 7.14. *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)* on the Effective Date.

### 7.15. *Withholding and Reporting Requirements.*

In connection with this Plan and all distributions under this Plan hereunder, the Reorganized Global Debtors, the Disbursing Agent, and any Claims Agent shall comply with all withholding and reporting requirements imposed by any U.S. federal, state, provincial, local, or foreign taxing authority, and all distributions under this Plan hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Global Debtors, the Disbursing Agent, and any Claims Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including requiring a Holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of this Plan: (a) each Holder of an Allowed Claim that is to receive a distribution under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations on account of such distribution; and (b) no distributions under this Plan shall be required to be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Global Debtors, the Disbursing Agent, or the Claims Agent, as applicable, for the payment and satisfaction of such tax obligations or has, to their satisfaction, established an exemption therefrom.

### 7.16. *Claims Payable by Third Parties.*

To the extent that one or more of the Global Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. If an applicable insurance policy has a self-insured retention ("SIR") or a deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy, upon the Allowance of such Claim, shall have an Allowed General Unsecured Claim against the applicable Global Debtor's Estate up to the amount of the SIR or deductible amount that may be established upon the liquidation of the Claim, and such Holder's recovery from the Global Debtors or the Reorganized Global Debtors, as applicable, shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under this Plan. Such SIR shall be considered satisfied pursuant to this Plan through allowance of the General Unsecured Claim solely up to the amount of the applicable SIR or deductible, if any; provided, however, that nothing herein obligates the Global Debtors, the Reorganized Global Debtors, or any of their successors or assigns to satisfy any SIR under any insurance policy, including any D&O Liability Insurance Policies. Any recovery on account of the Claim in excess of the SIR or the deductible established upon the liquidation of the Claim shall be recovered solely from the Global Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof. For the avoidance of doubt, nothing herein or in the

Confirmation Order shall modify or impair any of the Global Debtors' insurers' rights to be reimbursed or paid in the ordinary course according to the terms of the applicable insurance policy, including, without limitation, with respect to any amounts owed to the Global Debtors' insurers under an applicable SIR.  Nothing in this Plan shall be construed to limit, extinguish, expand, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.  Nothing herein relieves any Entity from the requirement to timely File a Proof of Claim or Proof of Equity Interest by the applicable Bar Date.

## ARTICLE VIII.
## PROCEDURES FOR RESOLVING CLAIMS

### 8.1.  *Allowance of Claims*

On and after the Effective Date and subject to the terms of this Plan, each of the Reorganized Global Debtors shall have and retain any and all rights and defenses the applicable Global Debtor had with respect to any Claim or Equity Interest immediately prior to the Effective Date.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Equity Interest shall become an Allowed Claim or Allowed Equity Interest unless and until such Claim or Equity Interest (a) is deemed Allowed under this Plan or pursuant to the Bankruptcy Code or (b) the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases Allowing such Claim or Equity Interest.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim or Proof of Equity Interest is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Global Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

### 8.2.  *Claims Administration Responsibilities*

Except as otherwise specifically provided by this Plan or the Confirmation Order, as applicable, and other than with respect to Professional Fee Claims, after the Effective Date, the Reorganized Global Debtors shall have the sole authority to:  (a) File and prosecute objections to Claims or Equity Interests; (b) settle, compromise, withdraw, litigate to judgment, or otherwise resolve any and all obligations to Claims or Equity Interests without any further notice to or action, order, or approval by the Bankruptcy Court; (c) settle or compromise any Disputed Claim or Equity Interest; and (d) direct the Claims Agent to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, after the Effective Date, the Reorganized Global Debtors shall have the right to object to Claims and Equity Interests and shall retain any and all rights and defenses that the Global Debtors had with respect to any Claim or Equity Interest immediately before the Effective Date.  A motion to extend the applicable Claims Objection Deadline shall automatically extend the deadline until the Bankruptcy Court enters an order on such motion.

### 8.3. *Estimation of Claims*

Before the Effective Date the Global Debtors, and on or after the Effective Date the Reorganized Global Debtors, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Equity Interest, including during the litigation of any objection to any Claim or Equity Interest or during the appeal, if applicable, relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Equity Interest, that estimated amount shall constitute a maximum limitation on such Claim or Equity Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Global Debtor or Reorganized Global Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Equity Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 8.4. *Disputed Claims Process.*

Until the Effective Date, the Global Debtors shall have the authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed, and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  On and after the Effective Date, the Reorganized Global Debtors shall have the sole authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed, and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.

**Except as otherwise provided herein, all Proofs of Claim that are not timely Filed by the applicable Bar Date or that have not otherwise been Allowed pursuant to this Plan or a Final Order shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Global Debtor or any Reorganized Global Debtor, as applicable, without the need for any objection by the Global Debtors or the Reorganized Global Debtors, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.**

**8.5.** *Adjustment to Claims or Equity Interests without Objection.*

Any duplicate Claim or Equity Interest or any Claim or Equity Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to this Plan) on the Claims Register by the Reorganized Global Debtors, the Litigation Trust (if established), or the Disbursing Agent without such party having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Equity Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**8.6.** *No Distributions Pending Allowance.*

If an objection to a Claim is Filed as set forth in <u>Section 8.4</u> of this Plan, or if any portion of a Claim other than a Professional Fee Claim is a Disputed Claim, then except as otherwise agreed by the Global Debtors or Reorganized Global Debtors, as applicable (in consultation with the Required Consenting DIP Term Loan Lenders), no payment or distribution (partial or otherwise) provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**8.7.** *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Equity Interest ultimately becomes an Allowed Claim or Allowed Equity Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Equity Interest in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Disputed Equity Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Equity Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim or Equity Interest.

**8.8.** *Claim for Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim, and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

**9.1.** *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

Except as otherwise provided herein, any Executory Contracts and Unexpired Leases (a) not previously assumed, (b) not previously rejected pursuant to an order of the Bankruptcy Court, and (c) identified on the Assumed Contracts / Leases List will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation

74

Order, except any Executory Contract or Unexpired Lease (i) identified on the Rejected Contracts / Leases List, (ii) that is the subject of (A) a separate motion or notice to reject, assume, or assume and assign or a Cure Dispute that is pending as of the Confirmation Date or (B) an order of the Bankruptcy Court that is not yet a Final Order, or (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Global Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such other date as may be identified on the Rejected Contracts / Leases List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

Each Executory Contract and Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Global Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by an order of the Bankruptcy Court. To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, increases, accelerates or otherwise alters any obligations, rights or liabilities of the Global Debtors or the Reorganized Global Debtors thereunder as a result of, gives rise to any rights or benefits to any non-Global Debtor party to any such Executory Contract or Unexpired Lease, or creates any Lien on any asset or property, as applicable, of the Global Debtors or the Reorganized Global Debtors as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of this Plan or any other Restructuring Transaction (including any change of control, sale of business, assignment, vesting, termination, acceleration, or similar provisions therein), then such provision shall be deemed unenforceable and modified (solely for purposes of the transactions contemplated under this Plan) such that the transactions contemplated by this Plan or any other Restructuring Transaction shall not entitle the non-Global Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Global Debtors or the Reorganized Global Debtors thereunder, to be entitled to any rights or benefits thereunder, or create or impose a Lien on any asset or property of the Global Debtors or the Reorganized Global Debtors.

Notwithstanding anything to the contrary herein (other than Section 9.8 of this Plan) and in the Restructuring Support Agreement, except as otherwise agreed to by the Global Debtors and any applicable counterparty to an Unexpired Lease (with consent from the Required Consenting DIP Term Loan Lenders), the Global Debtors or Reorganized Global Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts / Leases List in their discretion prior to the Effective Date and the Assumed Contracts / Leases List in their discretion, prior to the later of (1) Effective Date and (2) seven (7) days after the date on which the Bankruptcy Court determines that the Allowed Cure Cost with

75

respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts / Leases List (or, in either case, such later date as may be agreed with a counterparty); provided that the Global Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds. For the avoidance of doubt, the inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Global Debtor that such contract or lease is an Executory Contract or Unexpired Lease, or that any Global Debtor has liability thereunder.

**9.2.**    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Costs that differ from the amounts paid or proposed to be paid by the Global Debtors or the Reorganized Global Debtors on the Assumed Contracts / Leases List to a counterparty must be Filed, served, and actually received by the Global Debtors on or before fourteen (14) days after such notice (together with any outstanding objections to the amount proposed on the Assumed Contracts / Leases List, a "Cure Dispute"). Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Global Debtor, or Reorganized Global Debtor without the need for any objection by the Global Debtors or the Reorganized Global Debtors or any other party in interest, or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Costs shall be deemed fully satisfied, released, and discharged upon payment by the Global Debtors or the Reorganized Global Debtors of the applicable Cure Costs; provided, however, that nothing herein shall prevent (if applicable) the Reorganized Global Debtors from paying any Cure Costs despite the failure of the relevant counterparty to File such request for payment of such Cure Costs. The Reorganized Global Debtors also may settle any Cure Costs without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that a non-Global Debtor contract counterparty Files a timely Cure Dispute and the Global Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard on at least seven (7) days' notice to the applicable non-Global Debtor contract counterparty, or such date as the parties agree, subject to the Bankruptcy Court's calendar. Any objection by a counterparty to an Executory Contract or Unexpired Lease, as applicable, to (a) the ability of the applicable Global Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned, or (b) any other matter pertaining to the proposed assumption or proposed assumption and assignment must be Filed, served, and actually received by the Global Debtors by the date on which objections to Confirmation of this Plan are due. The Reorganized Global Debtors may settle any Cure Dispute without any further notice to or action, order, or approval of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment, as applicable.

Except to the extent that less favorable treatment has been agreed to by the non-Global Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to this Plan, the Global Debtors shall pay any Cure Costs, if monetary, in full in Cash either (i) on the Effective Date or as soon as reasonably practicable

76

thereafter, or (ii) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (x) the Effective Date, or as soon as reasonably practicable thereafter, and (y) seven (7) days after the date on which such Cure Dispute has been resolved.   The Global Debtors and the Reorganized Global Debtors, as applicable, reserve the right at any time (including, with respect to the Reorganized Global Debtors, after the Effective Date) to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved Cure Dispute.   If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease, as applicable, is greater than the amount set forth in the Assumed Contracts / Leases List, the Global Debtors or the Reorganized Global Debtors, as applicable, shall have the right to reject such Executory Contract or Unexpired Lease by amending the Rejected Contracts / Leases List to include such Executory Contract or Unexpired Lease and providing prompt notice of any such amendment to any applicable counterparty, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to this Plan and payment or performance of the applicable Cure Costs shall result in the full release and satisfaction of any Claims and defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption.   **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid pursuant to this <u>Section 9.2</u>, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court; <u>provided</u>, <u>however</u>, that nothing herein shall affect the allowance of any Claims or any Cure Costs agreed to by the Global Debtors in any written agreement amending or modifying any Executory Contract or Unexpired Lease prior to the assumption of such Executory Contract or Unexpired Lease pursuant to this Plan or otherwise.**

To the extent applicable, rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Global Debtors or the Reorganized Global Debtors, as applicable, under such Executory Contracts or Unexpired Leases and the Global Debtors are entitled to all the rights provided under section 365 of the Bankruptcy Code.

**9.3.**   *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases under this Plan must be Filed with the Claims Agent within thirty (30) days after the date of the effectiveness of the rejection of the applicable Executory Contract or Unexpired Lease.   **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely Filed shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Global Debtors, the Reorganized Global Debtors, the Estates,**

77

**or their respective property without the need for any objection by the Global Debtors or the Reorganized Global Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article V of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, respectively.

**9.4.** *Contracts and Leases Entered into After the Petition Date.*

The Global Debtors or Reorganized Global Debtors will perform under any contracts and leases entered into after the Petition Date by any Global Debtor, including any Executory Contracts and Unexpired Leases assumed by any Global Debtor, and will be liable thereunder in the ordinary course of business.

**9.5.** *Modifications, Amendments, Supplements, or Other Agreements.*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Global Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**9.6.** *Non-Occurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**9.7.** *Reservation of Rights.*

Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts / Leases List or Assumed Contracts / Leases List, as applicable, nor anything contained in this Plan, nor the Global Debtors' delivery of a notice of the proposed assumption and proposed Cure Cost to any contract and lease counterparties set forth in the Assumed Contracts / Leases List shall constitute an admission by the Global Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Global Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or

78

unexpired at the time of assumption or rejection, the Global Debtors or Reorganized Global Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Global Debtor's or Reorganized Global Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Global Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article XII.  If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts / Leases List, the Global Debtors shall have the right to reject such Executory Contract or Unexpired Lease, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

### 9.8.    *Employee Compensation and Benefits.*[17]

The Global Debtors or Reorganized Global Debtors, as applicable, shall, subject to the provisions of this Section 9.8 and pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, include the following on the Assumed Contracts / Leases List or the Rejected Contracts / Leases List, as applicable:  (a) all qualified pension plans and collective bargaining agreements; and [(b) each of the written contracts, agreements, policies, programs and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance, and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Global Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Global Debtors, in each case to the extent not already assumed or rejected during the Chapter 11 Cases.][18]  Except to the extent provided by Article XI of this Plan, nothing in this Plan shall limit, diminish, or otherwise alter the Global Debtors' or the Reorganized Global Debtors' defenses, claims, Causes of Action, or other rights with respect to any such employment agreements.

Confirmation of this Plan, the consummation of any of the Restructuring Transactions, or any assumption or assumption and assignment of compensation and benefits agreements, plans, programs, or other arrangements pursuant to the terms herein shall not be deemed to trigger any applicable change of control, sale of business, assignment, vesting, termination, acceleration, or similar provisions in any compensation and benefits agreements, plans, programs, or arrangements.  No counterparty shall have rights under any compensation or benefits agreement, plan, program, or arrangement assumed or assumed and assigned pursuant to this Plan other than those applicable immediately prior to such assumption or assumption and assignment.

---

[17]    [**NTD**:  The entirety of Section 9.8 remain under review and subject to further diligence and material revision.]

[18]    [**NTD**:  The Global Debtors continue to evaluate their current and historical benefit programs and related obligations, and any assumption or rejection thereof, including post-retirement plans and obligations, shall be subject to the consent of the Required Consenting DIP Term Loan Lenders.]

The New Board shall be authorized to adopt and implement the Management Incentive Plan on the terms set forth in the Plan Supplement.

After the Effective Date, in accordance with the terms of the Post-Emergence Incentive Program, and in consultation with the New Board, the Reorganized Global Debtors may pay the Post-Emergence Bonuses to the Key Employees.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

**10.1.** *Conditions Precedent to Confirmation.*

Confirmation of this Plan is subject to the satisfaction or waiver of the following conditions:

(a)     the DIP Orders shall be in full force and effect;

(b)     the Global Debtors shall have paid in full in Cash (or the Global Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Fees and Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Orders;

(c)     the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with this Plan;

(d)     entry of the Confirmation Order; and

(e)     each of the Restructuring Support Agreement, the DIP Facilities, and the DIP Orders, shall not have been terminated in accordance with their respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting DIP Term Loan Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facilities), or the DIP Facilities in accordance with their respective terms upon the expiration of such time.

**10.2.** *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date is subject to the satisfaction or waiver of the following conditions:

(a)     the Confirmation Order (which shall include final approval of the Disclosure Statement) having become a Final Order in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, unless otherwise agreed by the Global Debtors and the Required Consenting DIP Term Loan Lenders;

(b)     the DIP Orders having become Final Orders in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified,

unless otherwise agreed by the Global Debtors and the Required Consenting DIP Term Loan Lenders;

(c)      no court of competent jurisdiction or other competent governmental or regulatory authority having issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the consummation of this Plan;

(d)      each of the applicable Plan Documents having been executed, delivered, acknowledged, and/or Filed, as applicable, by the Entities and Persons intended to be parties thereto and effectuated and remain in full force and effect, and any conditions precedent and consent rights held by the Required Consenting DIP Term Loan Lenders related thereto or contained therein having been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Plan Documents;

(e)      any non-technical and/or material amendments, modifications or supplements to this Plan having been acceptable to the Global Debtors and the Required Consenting DIP Term Loan Lenders except as otherwise provided in Section 13.3 of this Plan;

(f)      each of the offers, issuances, sales, and/or deliveries of New Saks Common Stock, Preferred Equity Facilities, and Preferred Equity Units, in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no proceeding by any Governmental Unit or other Entity or Person that alleges that any such offer, issuance, sale, and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such proceeding shall be threatened in writing or instituted by any Governmental Unit on or prior to the Effective Date;

(g)      each of the Restructuring Support Agreement, the DIP Facilities, and the DIP Orders, having not been terminated in accordance with their respective terms, and there having not occurred and been continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting DIP Term Loan Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facilities), or the DIP Facilities in accordance with their respective terms upon the expiration of such time;

(h)      all of the actions set forth in the Restructuring Steps Plan, as applicable, having been completed and implemented;

(i)      there not having been instituted or threatened to be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Unit (i) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transactions contemplated herein, in the Restructuring Support Agreement, and in the Plan Documents or (ii) imposing a material award, claim, injunction, fine, or penalty that, in each case, both (x) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (y) has a material adverse effect on the financial condition or operations of the Reorganized Global Debtors, taken as whole;

(j)      the Global Debtors having obtained all authorizations, consents, and regulatory approvals, if any, required to be obtained, and having filed all notices and reports, if any, required to be filed, including with any Governmental Unit, by the Global Debtors in connection with this Plan's effectiveness, in each case, as may be required by a Governmental Unit;

(k)      the New Saks Common Stock and Preferred Equity Units, to be issued and/or delivered on the Effective Date having been validly issued by New Saks, having been fully paid and non-assessable, and being free and clear of all taxes, Liens, and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights, and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents;

(l)      all conditions precedent to the effectiveness of the Exit ABL Facility having been satisfied or duly waived by the party whose consent is required thereunder, and the Exit ABL Facility shall be in full force and effect;

(m)      all conditions precedent to the effectiveness of the New Exit Facilities, as memorialized in the New Exit Facilities Documents, have been satisfied or duly waived by the party whose consent is required thereunder, and the New Exit Facilities Documents shall be in full force and effect;

(n)      all requisite filings with any Governmental Unit and third parties having become effective, and all such Governmental Unit and third parties having approved or consented to the Restructuring Transactions, to the extent required;

(o)      any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions having been obtained;

(p)      the Flagship CMBS Settlement shall have been consummated;

(q)      all accrued and unpaid Restructuring Fees and Expenses having been paid in full in Cash by the Global Debtors, consistent with the terms of this Plan and the Restructuring Support Agreement; and

(r)      the following documents being in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions, and not having been, as applicable, stayed, modified, reversed, vacated, subject to any pending appeal, and/or terminated prior to the Effective Date:  (i) the New Organizational Documents; (ii) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (iii) all other documents necessary to consummate a transaction of the type contemplated by this Plan to the extent not otherwise listed above.

For the avoidance of doubt, the conditions precedent to the Effective Date enumerated above shall apply to each Global Debtor on an individual basis (and may be satisfied and/or waived on an individual basis), and the Effective Date for any individual Global Debtor may occur prior to the Effective Date of any other individual Global Debtor.

**10.3.** *Satisfaction and Waiver of Conditions Precedent.*

Except as otherwise provided herein, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Any of the conditions set forth in Section 10.1 and Section 10.2 of this Plan may be waived in whole or part by the Global Debtors with consent from the Required Consenting DIP Term Loan Lenders, and as the case may be, without notice, leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan; provided that any condition to effectiveness with respect to the DIP Conversion with respect to (a) the First Out DIP Term Loan Claims shall require the consent of DIP Term Loan Lenders holding at least 80% of the aggregate outstanding principal amount of First Out DIP Term Loan Claims (exclusive of any fees, premiums, interest, or First Out DIP PIK Loans) that are held by all DIP Term Loan Lenders, and (b) the Second Out DIP Term Loan Facility Claims and Third Out DIP Term Loan Facility Claims shall require the consent of DIP Term Loan Lenders holding at least two-thirds in aggregate outstanding principal amount of DIP Term Loan Claims that are held by all DIP Term Loan Lenders, in each case, in accordance with section 10.08(2)(i) of the DIP Term Loan Credit Agreement. The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

**10.4.** *Effect of Failure of Conditions.*

If all of the conditions to effectiveness have not been satisfied (as provided in Section 10.1 and Section 10.2 hereof) or duly waived (as provided in Section 10.3 hereof) and the Effective Date has not occurred on or before the first Business Day that is more than thirty (30) days after the Confirmation Date, or by such later date as set forth by the Global Debtors in a notice Filed with the Bankruptcy Court prior to the expiration of such period, then the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders, may File a motion to vacate the Confirmation Order. Notwithstanding the Filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 10.1 and Section 10.2 hereof are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to this Section 10.4, this Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under this Plan shall be made, the Global Debtors and all Holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in the Global Debtors; (b) prejudice in any manner the rights of the Global Debtors, any Holders of Claims or Equity Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by any Global Debtor or any other Person with respect to any matter set forth in this Plan.

**10.5.** *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this

Plan shall bind any Holder of a Claim against, or Equity Interest in, the Global Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan.

**10.6.    *Substantial Consummation.***

Substantial consummation of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE XI.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

**11.1.    *Discharge of Claims and Termination of Certain Equity Interests; Compromise and Settlement of Claims, Certain Equity Interests, and Controversies.***

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan or in any contract, instrument, or other agreement or document created pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are Reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Global Debtors, the Reorganized Global Debtors, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim or Proof of Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim is Allowed; or (c) the Holder of such Claim or Equity Interest has accepted this Plan.  Except as otherwise provided herein (and unless a Court of competent jurisdiction otherwise determines that a default is incurable), any default by the Global Debtors with respect to any Claim that existed immediately prior to or on account of the Filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests (other than any Existing Intercompany Equity Interests that are Reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in this Plan.  For the avoidance of doubt, nothing in this Section 11.1 shall affect the rights of Holders of Claims to seek to enforce this Plan, including the distributions to which Holders of Allowed Claims are entitled under this Plan.

In consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest, or any distribution to be made on account of such Allowed Claim or Allowed Equity Interest,

84

as applicable.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Global Debtors, their Estates, and Holders of Claims and Equity Interests, and is fair, equitable, and reasonable.  In accordance with the provisions of this Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Global Debtors may compromise and settle any Claims against the Global Debtors and their Estates, as well as claims and Causes of Action against other Entities.

### 11.2.  *[Releases by the Global Debtors.]*[19]

**[Notwithstanding anything else contained herein to the contrary, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally, and forever released and discharged by each and all of the Global Debtor Releasing Parties, including any successors to the Global Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities (the "<u>Global Debtor Release</u>"), from any and all Claims and Causes of Action, including any derivative Claims asserted or assertable on behalf of the Global Debtors, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, other than Retained Causes of Action, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Global Debtors, including, without limitation:  (a) the Chapter 11 Cases, the Special Restructuring Committee Independent Investigation, the Disclosure Statement, this Plan, or the Definitive Documents; (b) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (c) the business or contractual arrangements between any Global Debtor and any Released Parties; (d) the negotiation, formulation, or preparation of this Plan, the Disclosure Statement, the Plan Supplement, any materials prepared in connection with the Special Restructuring Committee Independent Investigation, the Definitive Documents, the DIP Documents (including with respect to the DIP Loans), the Exit ABL Facility Documents, the New Exit Facilities Documents, or any agreements, instruments or other documents related to any of the foregoing or the Chapter 11 Cases; (e) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (f) the purchase, sale, or rescission of the purchase or sale of any Equity Interest**

---

[19]   **[NTD**:  The Global Debtor Release, Third Party Release, and Exculpation provisions are subject to the outcome of the Special Restructuring Committee Independent Investigation.]

of the Global Debtors or the Reorganized Global Debtors; and/or (g) the Confirmation or consummation of this Plan or the solicitation of votes on this Plan, in each case, that such Global Debtor Releasing Party would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Global Debtor, its respective Estate or any Reorganized Global Debtor (whether directly or derivatively) against any of the Released Parties.

Notwithstanding anything contained herein to the contrary, the foregoing provisions of this Global Debtor Release shall not operate to waive or release: (a) any post-Effective Date obligations of any party or Entity under this Plan, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Effective Date (including, for the avoidance of doubt, those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement this Plan as set forth herein, including the Exit ABL Facility Documents, the New Exit Facilities Documents, (b) the rights of Holders of Allowed Claims or Interests to receive distributions under this Plan, (c) any Retained Causes of Action, including Causes of Action included on the Schedule of Retained Causes of Action, (d) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party, as determined by a Final Order of a court of competent jurisdiction; and/or (e) the rights of such Global Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court.]

[Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Global Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Global Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (b) a good faith settlement and compromise of the Claims released by the Global Debtor Release; (c) in the best interests of the Global Debtors and all Holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Global Debtors, the Reorganized Global Debtors, or the Global Debtors' Estates asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Global Debtor Release. Entry of the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Global Debtor Release.

Without limiting the generality of the foregoing, each Global Debtor Releasing Party expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to claims or Causes of

86

Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Global Debtor Releasing Parties expressly acknowledges that the releases and covenants not to sue contained in this Plan are effective regardless of whether those released matters or released claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.]

**11.3.** *[Third-Party Release.]*[20]

[Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, pursuant to Bankruptcy Rule 9019 and to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Global Debtor Release provided by the Global Debtor Releasing Parties above, each Non-Global Debtor Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Non-Global Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Global Debtor Releasing Parties) and their respective assets and properties (the "<u>Third-Party Release</u>") from any and all claims, interests, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in Law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common Laws, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Global Debtors, including,

---

[20]   [**NTD**:   The Global Debtor Release, Third Party Release, and Exculpation provisions are subject to the Special Committee Report.]

without limitation:   (a) the Global Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Special Restructuring Committee Independent Investigation, the Disclosure Statement, this Plan, or the Definitive Documents; (b) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (c) the business or contractual arrangements between any Global Debtor and any Released Parties; (d) the negotiation, formulation, or preparation of this Plan, the Disclosure Statement, the Plan Supplement, any materials prepared in connection with the Special Restructuring Committee Independent Investigation, the Definitive Documents, the DIP Documents (including with respect to the DIP Loans), the Exit ABL Facility Documents, the New Exit Facilities Documents, or any agreements, instruments or other documents related to any of the foregoing; (e) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (f) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Global Debtors or the Reorganized Global Debtors, as applicable; and/or (g) the Confirmation or consummation of this Plan or the solicitation of votes on this Plan that such Non-Global Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties.

Notwithstanding anything contained herein to the contrary, the foregoing provisions of this Third-Party Release shall not operate to waive or release:  (a) any post-Effective Date obligations of any party or Entity under this Plan, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Effective Date (including, for the avoidance of doubt, those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement this Plan as set forth herein, including the Exit ABL Facility Documents, the New Exit Facilities Documents, (b) the rights of Holders of Allowed Claims or Interests to receive distributions under this Plan, (c) any Retained Causes of Action, including Causes of Action included on the Schedule of Retained Causes of Action, (d) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party, as determined by a Final Order of a court of competent jurisdiction; and/or (e) the rights of such Non-Global Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court.]

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of this Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Global Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.  Entry of the Confirmation Order

88

will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release.

Without limiting the generality of the foregoing, each Non-Global Debtor Releasing Party expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Non-Global Debtor Releasing Parties expressly acknowledges that the releases and covenants not to sue contained in this Plan are effective regardless of whether those released matters or released claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.]

### 11.4.   [Exculpation.][21]

[Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Global Debtor Release or the Third-Party Release, and except as otherwise specifically provided in this Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to:  the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, the Special Restructuring Committee Independent Investigation, pursuit of confirmation and consummation of this Plan, making distributions under this Plan, the Disclosure Statement, or the solicitation of votes for, or Confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Global Debtors; or the transactions or documentation in furtherance of any of the foregoing; the formulation, preparation,

---

[21]   [**NTD**:  The Global Debtor Release, Third Party Release, and Exculpation provisions are subject to the outcome of the Special Restructuring Committee Independent Investigation.]

89

dissemination, negotiation, entry into, or filing of, as applicable the Plan, the Plan Supplement, any materials prepared in connection with the Special Restructuring Committee Independent Investigation, the DIP Documents (including with respect to the DIP Loans), the Exit ABL Facility Documents, the New Exit Facilities Documents, or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Global Debtors, the approval of the Disclosure Statement or Confirmation or consummation of this Plan; provided, however, that the foregoing provisions of this Exculpation shall not operate to waive or release: (a) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party, as determined by a Final Order of a court of competent jurisdiction; and/or (b) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy Law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions, or inactions. The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in this **Article XI** shall or shall be deemed to prohibit the Global Debtors or the Reorganized Global Debtors, as applicable, from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Global Debtors or the Reorganized Global Debtors, in each case unless otherwise expressly provided for in this Plan. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.]

### 11.5.   *Discharge of Claims and Termination of Equity Interests.*

Except as otherwise provided for herein, effective as of the Effective Date, with respect to the Reorganized Global Debtors: (a) the rights afforded in this Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Global Debtors or any of their assets, property or Estates; (b) this Plan shall bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders failed to vote to accept or reject this Plan or voted to reject this Plan; (c) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and the Global Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Persons and Entities shall be precluded from asserting against the Global Debtors, the Global Debtors' Estates, the Reorganized Global Debtors, their successors and assigns and their assets and properties any other Claims or Equity Interests based upon any documents, instruments, or any act or

omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

      **11.6.**   *Injunction.*

      **Except as otherwise provided herein or for obligations issued pursuant hereto, all Persons or Entities that have held, hold, or may hold, as applicable, Causes of Action, Claims, or Equity Interests that have been released, discharged, or are subject to Exculpation pursuant to Article XI, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties or the property or Estates of the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable, unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Cause of Action, Claim, or Equity Interest released, exculpated, or settled pursuant to this Plan.**

      **No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Exculpated Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to the release and exculpation provisions of Article XI of this Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim or Cause of Action of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Global Debtor, Reorganized Global Debtor, or Exculpated Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable, and, only to the extent legally permissible and as provided for in Article XII of this Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.**

### 11.7.    *Setoffs and Recoupment.*

Except as otherwise provided herein or in the Plan Supplement, each Reorganized Global Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that the applicable Global Debtors or Reorganized Global Debtors may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); <u>provided</u> that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Global Debtors, of any such claims, rights, and Causes of Action. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Global Debtors or the Reorganized Global Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Global Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or Proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

Notwithstanding anything to the contrary herein, nothing in this Plan or the Confirmation Order shall modify the rights of the Global Debtors, the Reorganized Global Debtors, the Plan Administrator (if appointed), or any current or former counterparty to an Unexpired Lease or Executory Contract with the Global Debtors, as applicable, to assert any right of setoff or recoupment, if any, that such party may have under applicable bankruptcy Law or non-bankruptcy Law, including, but not limited to, the ability to (a) setoff or recoup a security deposit, if any, held pursuant to the terms of an Unexpired Lease or Executory Contract, as applicable, (b) assert rights of setoff or recoupment, if any, in connection with reconciliation of Claims, or (c) assert rights of setoff or recoupment, if any, as a defense to any claim (including any Claim) or Cause of Action held by or against the Global Debtors or the Reorganized Global Debtors, or any of its or their successors, as applicable.

### 11.8.    *Waiver of Statutory Limitations on Releases.*

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the releases contained in this Plan the possible existence of such unknown losses or Claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known may have materially affected its settlement with the Released Party. The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

**11.9.** *Protection Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the Constitution of the United States, all Entities, including Governmental Units, shall not discriminate against the Reorganized Global Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against the Reorganized Global Debtors, or another Entity with whom the Reorganized Global Debtors have been associated, solely because each Global Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases, but before the Global Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**11.10.** *Release of Liens.*

Except as otherwise provided in the Confirmation Order, herein or in any contract, instrument, release, or other agreement or document amended or created pursuant to this Plan, including the Exit ABL Facility Documents, the New Exit Facilities Documents, and except for Other Secured Claims that the Global Debtors elect to Reinstate in accordance with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Global Debtors and its successors and assigns. Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the applicable Reorganized Global Debtor, to release any Collateral or other property of any Global Debtors (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Global Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Global Debtors, the Reorganized Global Debtors, or any administrative agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Reorganized Global Debtors shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

93

## ARTICLE XII.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     To hear and determine any matters related to:  (i) applications for the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which a Global Debtor is party or with respect to which a Global Debtor may be liable and any Claims and Cure Disputes resulting therefrom; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Global Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article IX ARTICLE IX hereof, the Assumed Contracts / Leases List or the Rejected Contracts / Leases List; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(b)     To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending or commenced on the Effective Date;

(c)     To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     To ensure that distributions under this Plan to Holders of Allowed Claims are accomplished as provided herein, including resolving any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions;

(e)     To adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

(f)     To consider Claims or the Allowance, Disallowance, Classification, priority, compromise, estimation, secured or unsecured status, or payment of any Claim, including any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Equity Interests, as applicable;

(g)     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(h)     To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(i)     To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court,

94

including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(j)       To hear and determine all Professional Fee Claims;

(k)       To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing; provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(l)       To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of this Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan or Confirmation Order or to maintain the integrity of this Plan following consummation;

(m)       To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)       To hear and determine all disputes involving the existence, nature, scope, or enforcement of the discharge, exculpations, releases, and injunction provisions contained in Article XI of this Plan;

(o)       To enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(p)       To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(q)       To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(r)       To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Conditional Disclosure Statement Approval Hearing, the Combined Hearing, the Administrative Bar Date, or the deadline for responding or objecting to a Cure Cost, for the purpose of determining whether a Claim or Equity Interest is discharged hereunder, or for any other purpose;

(s)       To enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed reversed, revoked, or vacated;

(t)       To adjudicate any and all disputes arising from or relating to distributions under or pursuant to this Plan;

(u)    To recover all assets of the Global Debtors and property of the Estates, wherever located; and

(v)    To enter a final decree closing each of the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of this Article XII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### 13.1.   *Dissolution of Creditors' Committee.*

The Creditors' Committee shall be automatically dissolved on the Effective Date and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases under the Bankruptcy Code, except for purposes of Filing applications for Professional Person compensation in accordance with this Plan. The Reorganized Global Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

### 13.2.   *Termination of Professional Persons.*

On the Effective Date, the engagement of each Professional Person retained by the Global Debtors and the Creditors' Committee shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Professional Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Professional Fee Claims, and the Reorganized Global Debtors shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Professional Fee Claims.  Nothing herein shall preclude any Reorganized Global Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

### 13.3.   *Modifications and Amendments.*

This Plan may be amended, modified, or supplemented by the Global Debtors, with the express written consent of the Required Consenting DIP Term Loan Lenders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by Law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of Holders of Allowed Claims and Allowed Equity Interests pursuant to this Plan, the Global Debtors, with the express written consent of the Required Consenting DIP Term Loan Lenders, may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents, and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes

and effects of this Plan, and any Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented. The Global Debtors, with the express written consent of the Required Consenting DIP Term Loan Lenders, may make technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications are immaterial or do not adversely affect the treatment of Holders of Claims or Equity Interests under this Plan. Subject to the restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Global Debtors expressly reserves its respective rights to alter, amend, or modify this Plan with respect to such Global Debtor one or more times, in each instance with the express written consent of the Required Consenting DIP Term Loan Lenders, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or to remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

### 13.4.  *Revocation or Withdrawal of this Plan.*

Each of the Global Debtors expressly reserves its respective rights to revoke or withdraw this Plan as to any particular Global Debtors, one or more times, prior to the Effective Date and to File subsequent chapter 11 plans. If the Global Debtors revoke or withdraw this Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Global Debtors, or if Confirmation or consummation as to any or all of the Global Debtors does not occur, then, with respect to such Global Debtors: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Global Debtors or any other Person, (ii) prejudice in any manner the rights of such Global Debtors or any other Person, or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Global Debtors or any other Person; and (d) all procedural and substantive rights of any of the Global Debtors or any other Person shall be preserved, including with respect to (i) all litigation rights, (ii) any plan-related issues (including with respect to an appropriate schedule for any alternative plan confirmation), and (iii) any of the factual, valuation, or other assertions set forth in the Disclosure Statement.

### 13.5.  *Allocation of Distributions under this Plan Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under this Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall for U.S. federal (and applicable state and local) income tax purposes be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (but solely to the extent that such other amount is an allowable portion of such Allowed Claim).

97

### 13.6.   *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Global Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing is:  (a) valid and enforceable pursuant to its terms; (b) integral to this Plan and may not be deleted or modified without the consent of the Global Debtors and the Required Consenting DIP Term Loan Lenders; and (c) non-severable and mutually dependent.

### 13.7.   *Governing Law.*

Except to the extent that the Bankruptcy Code or other U.S. federal Law is applicable, or to the extent a Plan Document or exhibit or schedule to this Plan provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the Laws of the State of New York, without giving effect to the principles of conflict of Laws thereof to the extent such principles would result in the application of the Laws of any other jurisdiction.

### 13.8.   *Section 1125(e) of the Bankruptcy Code.*

The Global Debtors have, and upon Confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the Bankruptcy Code, and the Global Debtors, and the Consenting DIP Term Loan Lenders (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, solicitation, and/or purchase of the securities offered and sold under this Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

### 13.9.   *Inconsistency.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan or the Disclosure Statement, the Confirmation Order shall control.

**13.10.** *Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Subject to the requirements of the Restructuring Steps Plan, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

**13.11.** *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

**13.12.** *Exhibits.*

All exhibits to this Plan (including, without limitation, all documents Filed with the Plan Supplement and all exhibits and ancillary agreements thereto) are incorporated and are a part of this Plan as if set forth in full herein.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

**13.13.** *Reservation of Rights.*

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of this Plan, any statement or provision contained herein, or the taking of any action by the Global Debtors with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Global Debtors with respect to any Claims or Equity Interests prior to the Effective Date.

**13.14.** *Successors and Assigns.*

The rights, benefits, and obligations of any Entity or Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity or Person, as applicable.

**13.15.** *Notices.*

All notices, demands, or requests in connection with this Plan shall be in writing (including by facsimile or electronic mail transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or electronic mail transmission, when received and telephonically confirmed, addressed as follows:

99

(a)    if to the Global Debtors:

Saks Global Enterprises LLC
225 Liberty Street, 31st Floor
New York, New York 10281
Attention:  Andrew Woodworth, Chief Legal Officer; Mark Weinsten, Chief
Restructuring Officer

with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention: Debra M. Sinclair; Robin Spigel; Allyson B. Smith; Betsy L.
Feldman; Jessica D. Graber
Email address:  dsinclair@willkie.com; rspigel@willkie.com;
absmith@willkie.com; bfeldman@willkie.com; jgraber@willkie.com

(b)    if to a Consenting DIP Term Loan Lender:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Andrew N. Rosenberg; Robert A. Britton; Christopher Hopkins; Jessica
Choi; Martin J. Salvucci
Email address:  arosenberg@paulweiss.com; rbritton@paulweiss.com;
chopkins@paulweiss.com; jchoi@paulweiss.com; msalvucci@paulweiss.com

(c)    if to the Creditors' Committee:

Morrison Foerster LLP
250 West 55th Street
New York, NY 10019
Attention:  Lorenzo Marinuzzi; Doug Mannal; Benjamin Butterfield; Raff Ferraioli
Email address:  lmarinuzzi@mofo.com; dmannal@mofo.com;
bbutterfield@mofo.com; rferraioli@mofo.com

After the Effective Date, the Reorganized Global Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Global Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

### 13.16.  *Filing of Additional Documents.*

Subject to the terms and conditions of the Restructuring Support Agreement and this Plan, on or before substantial consummation of this Plan, the Global Debtors shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Global Debtors, the Reorganized Global Debtors, the Plan Administrator (if appointed) and, as applicable, all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

The Claims Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

### 13.17.  *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Global Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases, as determined by the Reorganized Global Debtor with consent from the Required Consenting DIP Term Loan Lenders, and all contested matters relating to each of the Global Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

### 13.18.  *Tax Matters.*

The Global Debtors will cooperate with any advisors selected by the Required Consenting DIP Term Loan Lenders in respect of all tax structuring matters.  The Reorganized Global Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Global Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

[*Remainder of Page Intentionally Left Blank*]

Dated: April 5, 2026
      Houston, Texas

Respectfully submitted,

**SAKS GLOBAL ENTERPRISES LLC** on behalf of itself and its affiliated Global Debtors

By: /s/ _____
Name: [●]
Title: [●]