**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26- 90103 (ARP)<br><br>(Jointly Administered) |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF**
**SAKS GLOBAL ENTERPRISES LLC AND ITS GLOBAL DEBTOR AFFILIATES**

<table>
<tr><td valign="top">

**HAYNES AND BOONE, LLP**
Kelli Stephenson Norfleet (TX Bar No. 24070678)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney P. Lyda (TX Bar No. 24013330)
David Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone:    (713) 547 2000
Facsimile:    (713) 547 2600
Email:    kelli.norfleet@haynesboone.com
    kenric.kattner@haynesboone.com
    arsalan.muhammad@haynesboone.com
    kourtney.lyda@haynesboone.com
    david.trausch@haynesboone.com

*Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

</td><td valign="top">

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Robin Spigel (admitted *pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
Betsy L. Feldman (admitted *pro hac vice*)
Jessica D. Graber (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:    (212) 728-8000
Facsimile:    (212) 728-8111
Email:    dsinclair@willkie.com
    rspigel@willkie.com
    absmith@willkie.com
    bfeldman@willkie.com
    jgraber@willkie.com

-and-

Jennifer J. Hardy (TX Bar No. 24096068)
600 Travis Street
Houston, TX 77002
Telephone:    (713) 510-1766
Facsimile:    (713) 510-1799
Email:    jhardy2@willkie.com

-and-

Ryan Blaine Bennett (admitted *pro hac vice*)
300 North LaSalle Drive
Chicago, IL 60654
Telephone:    (312) 728-9123
Facsimile:    (312) 728-9199
Email:    rbennett@willkie.com

</td></tr>
</table>

Dated: April 5, 2026

*Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

---

[1]    A complete list of each of the debtors in these chapter 11 cases (collectively, the "Debtors") may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively, the "SO5 Digital Debtors").  Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are co-counsel for the Global Debtors.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE GLOBAL DEBTORS' JOINT CHAPTER 11 PLAN DISCLOSED HEREIN (AS MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME). THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN, BUT TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A AND INCORPORATED HEREIN BY REFERENCE. IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS ATTACHED HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CHAPTER 11 CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH HIS OR HER OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE GLOBAL DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT AND THE PLAN. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES.

THE CONSUMMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND

**SET FORTH IN <u>ARTICLE X</u> OF THE PLAN.  THERE IS NO ASSURANCE THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN OR, IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, THAT THE CONDITIONS NECESSARY FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED OR, IN THE ALTERNATIVE, WAIVED.**

**NO PERSON HAS BEEN AUTHORIZED BY THE GLOBAL DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE GLOBAL DEBTORS.**

**EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.[2]**

---

[2]   [**NTD**: For the avoidance of doubt, all terms of this Disclosure Statement and the Plan remain subject to negotiation, material revision, and the consent rights set forth in the Restructuring Support Agreement (as defined herein).]

**TABLE OF CONTENTS**

I.  PURPOSE OF THIS DISCLOSURE STATEMENT.....................................................1

II.  PRELIMINARY STATEMENT ................................................................................4

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
STATEMENT AND PLAN.........................................................................................6

    A.  What is chapter 11?.....................................................................................6
    B.  Why are the Global Debtors sending me this Disclosure Statement? ....................6
    C.  What does it mean that the Global Debtors are seeking conditional approval
of this Disclosure Statement?.....................................................................7
    D.  What is the effect of the Plan on the Global Debtors' ongoing business?...............7
    E.  Am I entitled to vote on the Plan? ...............................................................7
    F.  What will I receive from the Global Debtors if the Plan is consummated? ............9
    G.  What will I receive from the Global Debtors if I hold a DIP Facility Claim,
Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim,
Other Secured Claim, or Priority Non-Tax Claim? ......................................16
    H.  What is the Litigation Trust and how will the Litigation Trust be funded? ..........17
    I.  Are any regulatory approvals required to consummate the Plan? .........................18
    J.  What happens to my recovery if the Plan is not confirmed or does not go
effective?.................................................................................................18
    K.  If the Plan provides that I get a distribution, do I get it upon Confirmation
or when the Plan goes effective, and what is meant by "Confirmation,"
"Effective Date," and "Consummation?" ............................................................18
    L.  Is there potential litigation related to the Plan? ....................................................19
    M.  Will there be releases, injunctions, and exculpations granted to parties in
interest as part of the Plan? .....................................................................19
    N.  How do I vote for or against the Plan? .................................................................20
    O.  What is the deadline to vote on the Plan?.............................................................20
    P.  Why is the Bankruptcy Court holding a Combined Hearing? ...............................20
    Q.  When is the Combined Hearing set to occur?.......................................................20
    R.  Who do I contact if I have additional questions with respect to this
Disclosure Statement or the Plan? .........................................................21
    S.  Do the Global Debtors recommend voting in favor of the Plan? .........................21
    T.  Who supports the Plan? ........................................................................................21

IV.  GENERAL HISTORICAL INFORMATION ABOUT THE GLOBAL
DEBTORS ................................................................................................................21

    A.  General Background, Corporate History, and Business Operations.....................21
    B.  Prepetition Capital Structure................................................................................28

| V. | SUMMARY OF KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES | 35 |
|---|---|---|
| VI. | MATERIAL DEVELOPMENTS SINCE THE PETITION DATE | 38 |
| | A. The Global Debtors' First-Day Motions and Certain Related Relief | 38 |
| | B. Appointment of Official Committee of Unsecured Creditors | 39 |
| | C. Claims Process and Bar Date | 39 |
| | D. Simon Property Group, L.P.'s Lift Stay Motion | 41 |
| | E. Store Closing Sales | 41 |
| | F. Interchange Defendants Claims Settlement | 42 |
| | G. Rejections of Executory Contracts and Unexpired Leases | 42 |
| | H. Retention of Professionals | 43 |
| | I. Entry into the Key Employee Incentive Plan and Non-Insider Compensation Program | 43 |
| | J. Supplemental Employee Wages Motion | 44 |
| | K. Special Restructuring Committee Independent Investigation | 44 |
| | L. Entry into Restructuring Support Agreement | 45 |
| | M. Entry into the Exit ABL Facility | 46 |
| VII. | SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11 CASES AND THE PLAN | 47 |
| | A. Voting on the Plan | 47 |
| | B. The Combined Hearing | 48 |
| | C. Summary of Treatment Under the Plan | 49 |
| VIII. | SECURITIES LAWS MATTERS REGARDING ISSUANCE AND RESALE OF NEW SAKS COMMON STOCK UNDER THE PLAN | 59 |
| IX. | ALTERNATIVES TO CONSUMMATION OF THE PLAN | 60 |
| | A. Liquidation Under the Bankruptcy Code | 61 |
| | B. Alternative Plan of Reorganization | 61 |
| | C. Alternative Implementation Through a Section 363 Sale Transaction | 61 |
| | D. Inaction/Maintenance of Status Quo | 62 |
| X. | RISK FACTORS | 62 |
| | A. Risks Associated with the Global Debtors' Business | 62 |
| | B. Certain Bankruptcy Considerations | 65 |
| | C. Risks Relating to Tax and Accounting Consequences of the Plan. | 69 |
| | D. Other Risks | 69 |

| | | | |
|---|---|---|---|
| XI. | | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** | **71** |
| | A. | Certain Material U.S. Federal Income Tax Consequences to the Global Debtors and the Reorganized Global Debtors | 72 |
| | B. | Certain Material U.S. Federal Income Tax Consequences to All Holders With Respect to the Litigation Trust | 75 |
| | C. | Certain Material U.S. Federal Income Tax Consequences to U.S. Holders | 77 |
| | D. | Certain Material U.S. Federal Income Tax Consequences to Non-U.S. Holders | 82 |
| | E. | FATCA | 87 |
| | F. | Information Reporting and Back-Up Withholding | 87 |
| XII. | | **IMPLEMENTATION OF THE PLAN** | **88** |
| | A. | Plan Distributions and Transactions | 88 |
| | B. | Plan Administrator | 89 |
| | C. | Exit ABL Facility | 90 |
| | D. | New Exit Facilities | 91 |
| | E. | New Capital Commitment Claims and DIP Term Loan Documents Indemnification Obligations | 93 |
| | F. | Litigation Trust | 94 |
| | G. | Continued Corporate Existence and Corporate Action | 95 |
| | H. | Corporate Action | 95 |
| | I. | Cancellation of Existing Securities and Agreements | 96 |
| | J. | Release of Liens, Claims and Equity Interests | 97 |
| | K. | Directors of the Reorganized Global Debtors | 98 |
| | L. | Management Incentive Plans | 98 |
| | M. | General Distribution Mechanics | 98 |
| | N. | Allocation of Plan Distributions Between Principal and Interest | 99 |
| | O. | Withholding Taxes | 99 |
| | P. | Exemption from Certain Transfer Taxes and Recording Fees | 100 |
| | Q. | Exemption from Securities Laws | 100 |
| | R. | Setoffs and Recoupments | 101 |
| | S. | Modifications and Amendments | 102 |
| | T. | Inconsistency | 103 |
| | U. | Reservation of Rights | 103 |
| | V. | Closing of Chapter 11 Cases | 103 |
| XIII. | | **EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND EQUITY INTERESTS** | **103** |
| | A. | Discharge of Claims and Termination of Certain Equity Interests | 103 |
| | B. | Claims Administration Responsibilities | 111 |

C.	Estimation of Claims...................................................................................111

D.	Disputed Claims Process..............................................................................112

**XIV.	EXECUTORY CONTRACTS UNDER THE PLAN ..................................................112**

A.	Assumption and Rejection of Executory Contracts and Unexpired Leases ........112

B.	Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .......114

C.	Claims Based on Rejection of Executory Contracts and Unexpired Leases. ......115

D.	Ipso Facto and Similar Provisions Ineffective .....................................................116

E.	Insurance Policies .................................................................................................116

F.	Directors and Officers Insurance Policies.............................................................116

G.	Indemnification Provisions in Organizational Documents...................................117

**XV.	CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN................................................................................117**

A.	Conditions Precedent to Confirmation..................................................................117

B.	Conditions to the Effective Date...........................................................................118

C.	Satisfaction and Waiver of Conditions Precedent ................................................120

D.	Effect of Failure of Conditions .............................................................................120

E.	Binding Effect........................................................................................................121

F.	Revocation or Withdrawal of the Plan..................................................................121

**XVI.	CONFIRMATION OF THE PLAN.................................................................................122**

A.	Confirmation Generally ........................................................................................122

B.	Voting Procedures and Standards .........................................................................122

C.	Acceptance.............................................................................................................125

D.	Confirmation and Consummation.........................................................................125

**XVII.	ADDITIONAL INFORMATION....................................................................................131**

**XVIII.	CONCLUSION ................................................................................................................131**

## INDEX OF EXHIBITS

**EXHIBIT A**   Plan of Reorganization

**EXHIBIT B**   Liquidation Analysis

**EXHIBIT C**   Financial Projections

**EXHIBIT D**   Valuation Analysis

**EXHIBIT E**   Restructuring Support Agreement

**EXHIBIT F**   List of Global Debtors

**EXHIBIT G**   Corporate Organization Chart

## I.   PURPOSE OF THIS DISCLOSURE STATEMENT

On January 13, 2026 (the "Petition Date") and January 14, 2026, the Global Debtors[3] in the above-captioned chapter 11 cases (the "Chapter 11 Cases") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

On April 1, 2026, the Global Debtors and certain holders of, or investment advisors, sub- advisors, or managers of discretionary accounts that hold or beneficially own, DIP Term Loan Claims (the "Consenting DIP Term Loan Lenders") entered into that certain *Restructuring Support Agreement* (the "Restructuring Support Agreement"), attached to this Disclosure Statement as **Exhibit E**.

The Global Debtors jointly submit this *Disclosure Statement for the Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances or rejections from Holders of Claims against and Equity Interests in the Global Debtors with respect to the *Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates*, attached to this Disclosure Statement as **Exhibit A** (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

All capitalized terms used in this Disclosure Statement that are not otherwise defined herein shall have the meanings ascribed to them later in this Disclosure Statement, the Conditional DS Motion (as defined below), the Plan, the Restructuring Support Agreement, or the New Capital Commitment Letter, as applicable.

The Global Debtors urge all parties in interest to read this Disclosure Statement and the Plan carefully.  This Disclosure Statement contains information regarding the history of the Global Debtors and their businesses, the events leading up to these Chapter 11 Cases, and descriptions of the Plan.  This Disclosure Statement does not include a description of each and every term of the Plan.  Accordingly, the description of the Plan set forth in this Disclosure Statement is qualified by the full terms of the Plan, which is incorporated herein by reference.

The overall purpose of the Plan is to provide for the restructuring of the Global Debtors' liabilities in a manner designed to maximize recoveries for stakeholders and to enhance the ongoing financial viability of the Global Debtors.

**PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT, THE CONSENTING DIP TERM LOAN LENDERS, REPRESENTING OVER TWO-THIRDS (2/3) IN DOLLAR AMOUNT AND MORE THAN ONE-HALF (1/2) IN NUMBER OF CLAIMS IN CLASSES [3-A, 3-B, 3-C, 4-A, AND 4-B] HAVE ALREADY AGREED TO**

---

[3]   On the Petition Date, the SO5 Digital Debtors also filed voluntary petitions for relief under chapter 11 the Bankruptcy Code in the Bankruptcy Court.  The SO5 Digital Debtors are represented by Bradley Arant Boult Cummings LLP and may file and prosecute a separate plan in these Chapter 11 Cases.

**CONSENT TO AND VOTE TO APPROVE THE PLAN SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT.**

**The Global Debtors strongly encourage Holders of Claims in Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, [4-D], 5-A, and [5-B] to read this Disclosure Statement (including the Risk Factors described in <u>Article X</u> hereof) and the Plan in their entirety before voting to accept or reject the Plan. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at a combined hearing on the adequacy of this Disclosure Statement on a final basis and confirmation of the Plan (the "<u>Combined Hearing</u>").**

Additional copies of this Disclosure Statement (including its exhibits) are available upon request made to the office of the Global Debtors' counsel:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention:         Debra M. Sinclair
                    Robin Spigel
                    Allyson B. Smith
                    Betsy L. Feldman
                    Jessica D. Graber

E-mail address:    dsinclair@willkie.com
                    rspigel@willkie.com
                    absmith@willkie.com
                    bfeldman@willkie.com
                    jgraber@willkie.com

and

Haynes and Boone, LLP
1221 McKinney Street, Suite 4000
Houston, TX 77010
Attention:         Kelli Stephenson Norfleet
                    Kenric D. Kattner
                    Arsalan Muhammad
                    Kourtney P. Lyda
                    David Trausch

E-mail Address:    kelli.norfleet@haynesboone.com
                    kenric.kattner@haynesboone.com
                    arsalan.muhammad@haynesboone.com
                    kourtney.lyda@haynesboone.com
                    david.trausch@haynesboone.com

3

If you have any questions concerning the procedures for voting on the Plan, please contact Stretto, Inc., the Global Debtors' solicitation and balloting agent (the "Solicitation Agent"), at:

Saks Global Enterprises LLC
c/o Stretto, Inc.
410 Exchange, Suite 100
Irvine, CA 92602
Telephone:     +1 (833) 232-5246  (U.S./Canada, toll-free) or
                      +1 (949) 373-7589  (international, toll)

E-mail:         SaksInquiries@stretto.com

## II.   PRELIMINARY STATEMENT

The Global Debtors comprise three iconic American luxury retail brands, including Saks Fifth Avenue, which traces its founding back to 1867 and has operated its world-famous Manhattan flagship store for over 100 years.  In December 2024, the Global Debtors acquired their other two iconic brands, Neiman Marcus and Bergdorf Goodman, each of which has its own storied history and deep roots as leaders in the fashion industry. The acquisition of Neiman Marcus and Bergdorf Goodman was transformative for both the Global Debtors and the luxury retail industry as a whole. Through deep relationships with brand partners, cutting-edge personalization, and strategic technology partnerships, the combination of these iconic brands under the Global Debtors has created an unparalleled portfolio of multi-brand luxury retailers, delivering expertly curated merchandise assortments, high-touch service and exceptional experiences. The Global Debtors' multi-brand luxury portfolio also includes certain off-price locations and brands, as well as distinct e-commerce platforms.

As further described in Article V hereof, despite the growth potential and synergies expected, and partially realized, from the acquisition of Neiman Marcus and Bergdorf Goodman, the Global Debtors faced certain challenges and liquidity issues immediately following the acquisition.  The Global Debtors sought to address these challenges by raising incremental financing, and in the summer of 2025 the Global Debtors secured $600 million (before fees and prepaid interest) in new money financing through an exchange transaction the ("Exchange Transaction") with their existing bondholders, whereby the Global Debtors also captured approximately $115 million of discount in face value of their existing notes.  The Global Debtors planned to use a significant portion of the net proceeds from the Exchange Transaction to pay aged payables and restore a normal flow of inventory.  However, the new money financing from the transaction was insufficient to normalize aged payables or restore inventory flow to planned levels in the time leading up to the 2025 holiday season.  The Global Debtors' inventory challenges led to a business slowdown through the holiday season.  The Global Debtors also faced additional challenges during this critical time, including merchandising system integration issues that disrupted inventory receipts at Neiman Marcus and Bergdorf Goodman, as well as a reduction in the borrowing base availability and the imposition of discretionary reserves under their Prepetition ABL Facility.  Moreover, on December 4, 2025, the Prepetition ABL Agent sent notices to the Global Debtors triggering the Prepetition ABL Agent's ability to exercise control over certain of the Global Debtors' deposit accounts. Compounding this with additional near-term obligations, including interest payments due at the end of December 2025, the Global Debtors faced a perfect storm of liquidity challenges leading into January, historically a seasonal low point for sales and liquidity.

To help address these challenges, in the months leading up to the Petition Date, the Global Debtors engaged restructuring professionals at Willkie Farr & Gallagher LLP and PJT Partners LP to augment the professionals of Berkeley Research Group LLC ("BRG"), who the Global Debtors previously retained to assist with considering strategic alternatives.  The Global Debtors also appointed (i) Mark Weinsten of BRG as their Chief Restructuring Officer, and (ii) independent managers Paul Aronzon and William Tracy to the Board of Managers of HBC GP LLC (the parent company of the Global Debtors) and the governing body at each subsidiary Global Debtor that is not member-managed, as well as to a special committee of the board of managers or applicable governing body that was formed at each of the applicable Global Debtors

4

(the "Special Restructuring Committee").  In addition, the Board of Managers of HBC GP LLC subsequently approved the appointment of Scott Vogel (together with Mr. Aronzon and Mr. Tracy, the "Independent Managers") to serve as an independent manager of HBC GP LLC and each subsidiary Global Debtor that is not member-managed, and to the Special Restructuring Committee.

In the weeks leading up to the Petition Date, the Global Debtors, with the assistance of their restructuring professionals, explored the possibility of consummating one or more potential transactions outside of chapter 11, including with key equity holders and third-party investors. However, the Global Debtors were ultimately unable to consummate any out-of-court transaction and, in mid-December 2025, began engaging with their key creditor constituents and certain third-party investors on the terms of debtor-in-possession financing that would be provided through a chapter 11 process.  As further described in Article VI of this Disclosure Statement, these negotiations culminated in three court-approved debtor-in-possession financing facilities (the "DIP Facilities") that have provided (and will continue to provide) the Global Debtors with, among other things, up to approximately $1.24 billion in new money financing during the course of these Chapter 11 Cases.  The Global Debtors sought approval of the DIP Facilities upon filing these Chapter 11 Cases on January 13 and 14, 2026.

Prior to the Petition Date, the Global Debtors also appointed a new senior leadership team with deep operating experience in luxury retail, including appointing Geoffroy van Raemdonck as their Chief Executive Officer.  Mr. van Raemdonck previously served as Chief Executive Officer of Neiman Marcus prior to its acquisition in 2024.

As further described in Article VI of this Disclosure Statement, the Global Debtors have made significant progress and continue to operate their businesses during these Chapter 11 Cases. Importantly, the DIP Facilities have provided the Global Debtors with the liquidity necessary to strengthen vendor relationships and rebuild inventory levels.  Indeed, since the Petition Date, the Global Debtors have experienced a significant acceleration of inventory flow, with shipping resumed by nearly 650 brands releasing $1.5 billion in retail receipts. This accounts for more than 90% of the inventory that the Global Debtors expect to receive from February through April 2026. As of the date hereof, the Global Debtors have also reached or nearly reached agreements with approximately 250 brands across all categories regarding go-forward terms, including large maisons as well as smaller brands.

The Global Debtors and their stakeholders have also taken steps in these cases to right-size their capital structure, which in turn will best position the Global Debtors to become a stronger company going forward.  In connection with these efforts, on April 1, 2026, the Global Debtors and the Consenting DIP Term Loan Lenders entered into the Restructuring Support Agreement. Pursuant to the Restructuring Support Agreement, the Consenting DIP Term Loan Lenders have committed to, among other things, support and cooperate with the Global Debtors to take commercially reasonable steps necessary and desirable to implement and consummate the Restructuring Transactions and the Plan, including voting all of their claims against the Global Debtors in favor of the Plan.  Concurrently with the execution of the Restructuring Support Agreement, certain of the Consenting DIP Term Loan Lenders (in their capacity as the New Capital Commitment Parties) entered into the New Capital Commitment Letter, pursuant to which such parties have committed to provide $500,000,000 in new money financing in the form of the

Incremental New Money Facilities (consisting of an Incremental New Money Debt Facility and/or an Incremental New Money Preferred Equity Facility), on the terms and subject to the conditions set forth in the New Capital Commitment Letter, the Restructuring Support Agreement, and the Plan. The material terms of the Restructuring Support Agreement, the New Capital Commitment Letter, the Definitive Documents, the Restructuring Transactions, and the Plan are described in detail in this Disclosure Statement.

The Restructuring Transactions embodied in the Plan and Restructuring Support Agreement are a significant achievement for the Global Debtors in the wake of the challenges they faced prior to the Petition Date. The Global Debtors strongly believe that the Plan is in the best interests of their estates and represents the best available path forward in these Chapter 11 Cases at this time, as supported by a material threshold of their key lender constituency. The Global Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan, ensure their efficient emergence from chapter 11, and continue to perform as leaders in the luxury retail industry. For these reasons, the Global Debtors strongly recommend that Holders of Claims or Interests entitled to vote on the Plan vote to accept the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Global Debtors sending me this Disclosure Statement?

The Global Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Global Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims

6

whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. What does it mean that the Global Debtors are seeking conditional approval of this Disclosure Statement?

Pursuant to the Conditional DS Motion,[4] the Global Debtors are seeking conditional approval of this Disclosure Statement pursuant to Rule 3016-2 of the Local Rules. Upon entry of an order approving the Conditional DS Motion, the Global Debtors will commence solicitation of votes on the Plan in accordance with the timeline set forth therein. The Global Debtors will subsequently seek final approval of the Disclosure Statement contemporaneously with Confirmation of the Plan at the Combined Hearing.

### D. What is the effect of the Plan on the Global Debtors' ongoing business?

The Global Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Global Debtors will continue to operate their business as a going concern. Following confirmation, the Plan will be consummated on the Effective Date, which is the date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article X of the Plan have been satisfied or waived in accordance with Article X of the Plan, and (b) the Plan is declared effective by the Global Debtors. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Global Debtors may operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### E. Am I entitled to vote on the Plan?

Your ability to vote on the Plan depends on what type of Claim or Equity Interest you hold and whether you held that Claim or Equity Interest as of the Voting Record Date. Article IV of the Plan, pursuant to section 1122(a) of the Bankruptcy Code, categorizes Holders of Claims or Equity Interests in a specific "Class." The respective voting status of each Class under the Plan is set forth below:

---

[4] The "Conditional DS Motion" means the [*Global Debtors' Motion for an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Procedures and Solicitation Package; (III) Scheduling a Combined Hearing; (IV) Establishing Procedures for Objecting to the Plan and Final Approval of the Disclosure Statement; (V) Approving the Form, Manner, and Sufficiency of Notice of the Combined Hearing; and (VI) Granting Related Relief*, filed contemporaneously herewith, Docket No. [●]].

| Class | Claims and Equity Interest | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3-A | First Out DIP Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 3-B | Second Out DIP Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 3-C | Third Out DIP Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 4-A | Prepetition SGUS Notes Claims | Impaired | Entitled to Vote |
| Class 4-B | Prepetition FILO and NPC Claims | Impaired | Entitled to Vote |
| Class 4-C | Prepetition OpCo Second Out Notes Claims | Impaired | Entitled to Vote |
| Class 4-D | OpCo General Unsecured Claims | Impaired | [Entitled to Vote / Not Entitled to Vote (Deemed to Reject)][5] |
| Class 5-A | HoldCo II SGUS Notes Guarantee Claims | Impaired | Entitled to Vote |
| Class 5-B | HoldCo II General Unsecured Claims | Impaired | [Entitled to Vote / Not Entitled to Vote (Deemed to Reject)][6] |
| Class 6-A | Prepetition TopCo Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6-B | TopCo General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing TopCo Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Existing Intercompany Equity Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Global Debtors' or the Reorganized Global Debtors' rights, as applicable, regarding any Unimpaired

---

[5]   [**NTD**: Subject to ongoing review and discussion.]

[6]   [**NTD**: Subject to ongoing review and discussion.]

Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### F.      What will I receive from the Global Debtors if the Plan is consummated?

The following table summarizes the classification and treatment of Claims and Equity Interests and the anticipated recovery contemplated to be distributed to the Holders of certain Allowed Claims and Equity Interests under the Plan.  Unless otherwise noted, the estimates below are as of the date hereof.  For an explanation of the assumptions and uncertainties regarding these calculations, *see* Article X of this Disclosure Statement.

**STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS AND EQUITY INTERESTS OR DISTRIBUTIONS ARE ESTIMATES BY THE GLOBAL DEBTORS BASED ON CURRENT INFORMATION AND ARE NOT REPRESENTATIONS AS TO THE ACCURACY OF THESE AMOUNTS.  EXCEPT AS OTHERWISE INDICATED, THESE STATEMENTS ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, IMPLY THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY OTHER TIME.  ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS OR EQUITY INTERESTS ALLOWED BY THE BANKRUPTCY COURT. THE NUMERICAL INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE FINANCIAL PROJECTIONS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT C AND THE ESTIMATED ALLOWED CLAIM AMOUNTS, HAS BEEN PREPARED BY THE GLOBAL DEBTORS, WITH THE ASSISTANCE OF THEIR ADVISORS.  THE ASSUMPTIONS USED IN PREPARING SUCH FINANCIAL PROJECTIONS AND CLAIM ESTIMATES ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND ACTUAL RESULTS MAY DIFFER FROM SUCH FINANCIAL PROJECTIONS AND CLAIM ESTIMATES, AS FURTHER DESCRIBED IN ARTICLE XVI.D.ii. YOUR ABILITY TO RECEIVE DISTRIBUTIONS UNDER THE PLAN DEPENDS UPON THE ABILITY OF THE GLOBAL DEBTORS TO OBTAIN CONFIRMATION AND MEET THE CONDITIONS NECESSARY TO CONSUMMATE THE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES[7] | | | |
|---|---|---|---|
| **Class** | **Treatment** | **Estimated Amount of Claims in Class[8]** | **Estimated Recovery (%)[9]** |
| Class 1 (Priority Non-Tax Claims) | The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan. In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall receive, at the election of the Global Debtors and subject to the reasonable consent of the Required Consenting DIP Term Loan Lenders:  (i) Cash in an amount equal to such Allowed Claim or in the ordinary course of business as and when due; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | $[●] | [●]% |
| Class 2 (Other Secured Claims) | The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan. In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date each Holder of an Allowed Other Secured Claim shall receive, at the election of the Global Debtors and subject to the reasonable consent of the Required Consenting DIP Term Loan Lenders:  (i) Cash in an amount equal to such | $[●] | [●]% |

---

[7]   [**NTD**: All provisions related to treatment of Claims and Equity Interests remain under review and subject to material revision.]

[8]   The amounts set forth in this chart reflect the Global Debtors' most current estimates of projected claim amounts, and do not reflect potential unsecured damages claims resulting from the rejection of any Executory Contracts or Unexpired Leases.  Additional Claims and Equity Interests may be asserted against the Global Debtors prior to the applicable Bar Dates for filing proofs of Claim or Interests in these Chapter 11 Cases, which, as of the date of this Disclosure Statement, have not passed.  Thus, the total amount of Claims may be materially more or less than the estimate set forth in this Disclosure Statement.

[9]   This chart does not purport to set forth a valuation of the Global Debtors' assets.

| | SUMMARY OF EXPECTED RECOVERIES[7] | | |
|---|---|---|---|
| **Class** | **Treatment** | **Estimated Amount of Claims in Class[8]** | **Estimated Recovery (%)[9]** |
| | Allowed Claim; (ii) the Collateral securing its Other Secured Claim; (iii) Reinstatement of such Allowed Claim; or (iv) such other treatment that will render such Other Secured Claim Unimpaired. | | |
| Class 3-A (First Out DIP Term Loan Facility Claims) | On the Effective Date, the First Out DIP Term Loan Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of First Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed First Out DIP Term Loan Facility Claims, its *pro rata* share of the $[●] in aggregate amount of Take Back Term Loans and Take Back Preferred Units, based upon the treatment elected by the Majority Commitment Parties under the terms of the New Capital Commitment Letter. | $[●] | [●]% |
| Class 3-B (Second Out DIP Term Loan Facility Claims) | On the Effective Date, the Second Out DIP Term Loan Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of Second Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Second Out DIP Term Loan Facility Claims:  (i) [●] shares of New Saks Common Stock; and (ii) its *pro rata* share of the DIP Lender Litigation Trust Allocation of | $[●] | [●]% |

11

| | SUMMARY OF EXPECTED RECOVERIES[7] | | |
|---|---|---|---|
| **Class** | **Treatment** | **Estimated Amount of Claims in Class[8]** | **Estimated Recovery (%)[9]** |
| | Litigation Trust Proceeds (if any), as set forth in the Litigation Trust Agreement. | | |
| Class 3-C (Third Out DIP Term Loan Facility Claims) | On the Effective Date, the Third Out DIP Term Loan Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of Third Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Third Out DIP Term Loan Facility Claims:  (i) [●] shares of New Saks Common Stock; and (ii) its *pro rata* share of the DIP Lender Litigation Trust Allocation of Litigation Trust Proceeds (if any), as set forth in the Litigation Trust Agreement. | $[●] | [●]% |
| Class 4-A (Prepetition SGUS Notes Claims) | On the Effective Date, the Prepetition SGUS Notes Claims shall be Allowed under the Plan in the amount of $[●], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition SGUS Notes Claim, except to the extent that the Prepetition SGUS Notes Trustee or a Holder of a Prepetition SGUS Notes Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of a Prepetition SGUS Notes Claim shall receive, subject to the terms of the Plan, [●]. | $[●] | [●]% |

12

| SUMMARY OF EXPECTED RECOVERIES[7] | | | |
|---|---|---|---|
| **Class** | **Treatment** | **Estimated Amount of Claims in Class[8]** | **Estimated Recovery (%)[9]** |
| Class 4-B<br><br>(Prepetition FILO and NPC Claims) | On the Effective Date, the Prepetition FILO and Prepetition NPC Claims shall be Allowed under the Plan in the aggregate amount of $10 million, consisting of $5 million of Allowed Prepetition FILO Claims and $5 million of Allowed Prepetition NPC Claims, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition FILO Claim and Prepetition NPC Claim, as applicable, except to the extent that the Prepetition FILO Agent or Prepetition NPC Agent, as applicable, or a Holder of a Prepetition FILO Claim or Prepetition NPC Claim, as applicable, agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of an Allowed Prepetition FILO Claim and an Allowed Prepetition NPC Claim shall receive, subject to the terms of the Plan, [●].  The Holders of Allowed Prepetition FILO and NPC Claims shall be entitled to receive, retain, and not turn over the distributions described herein notwithstanding anything in the Equal Priority Intercreditor Agreement, Second A&R Intercreditor Agreement, or PAA to the contrary. | $[●] | [●]% |
| Class 4-C<br><br>(Prepetition OpCo Second Out Notes Claims) | On the Effective Date, the Prepetition OpCo Second Out Notes Claims shall be Allowed under the Plan in the amount of $[1,439,252,628.00], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or | $[●] | [●]% |

| | SUMMARY OF EXPECTED RECOVERIES[7] | | |
|---|---|---|---|
| **Class** | **Treatment** | **Estimated Amount of Claims in Class[8]** | **Estimated Recovery (%)[9]** |
| | regulation by any Person. On the Effective Date, the Prepetition OpCo Second Out Notes Claims [shall receive, subject to the terms of the Plan, [●]]. | | |
| Class 4-D (OpCo General Unsecured Claims) | [In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed OpCo General Unsecured Claim, except to the extent that a Holder of an OpCo General Unsecured Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed OpCo General Unsecured Claim shall receive [●]. / On the Effective Date, all OpCo General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such OpCo General Unsecured Claims.][10] | $[●] | [●]% |
| Class 5-A (HoldCo II SGUS Notes Guarantee Claims) | On the Effective Date, the HoldCo II SGUS Notes Guarantee Claims shall be Allowed under the Plan in the amount of $[200,000,000.00], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. In full and final satisfaction, compromise, settlement, release, and discharge of each HoldCo II SGUS Notes Guarantee Claim, except to the extent that a Holder of a HoldCo II SGUS Notes Guarantee Claim agrees to less favorable treatment on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo II SGUS Notes Guarantee Claim shall receive [●]. | $[●] | [●]% |
| Class 5-B | [In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo II General Unsecured Claim, | $[●] | [●]% |

---

[10]   [**NTD**: Subject to ongoing review and discussion.]

| | SUMMARY OF EXPECTED RECOVERIES[7] | | |
|---|---|---|---|
| Class | Treatment | Estimated Amount of Claims in Class[8] | Estimated Recovery (%)[9] |
| (HoldCo II General Unsecured Claims) | except to the extent that a Holder of a HoldCo II General Unsecured Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo II General Unsecured Claim shall receive [●].  / On the Effective Date, all HoldCo II General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.][11] | | |
| Class 6-A (Prepetition TopCo Facility Claims) | [On the Effective Date, the Prepetition TopCo Facility Claims shall be Allowed under the Plan in the amount of $[●], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.]  On the Effective Date, the Prepetition TopCo Facility Claims will be cancelled, released, and extinguished without any distribution on account of such Claims. | $[●] | [●]% |
| Class 6-B (TopCo General Unsecured Claims) | On the Effective Date, the TopCo General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such Claims. | $[●] | [●]% |
| Class 7 (Intercompany Claims) | On or after the Effective Date, or as soon as practicable thereafter, any and all Intercompany Claims shall, at the option of the Global Debtors and upon the consent of the Required Consenting DIP Term Loan Lenders, be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Global Debtors; provided that no distributions shall be made on account of any Intercompany Claims. | $[●] | [●]% |

---

[11]   [**NTD**: Subject to ongoing review and discussion.]

15

| SUMMARY OF EXPECTED RECOVERIES[7] | | | |
|---|---|---|---|
| Class | Treatment | Estimated Amount of Claims in Class[8] | Estimated Recovery (%)[9] |
| Class 8 (Subordinated Claims) | On the Effective Date, all Subordinated Claims will be cancelled, released, and extinguished without any distribution on account of such Claims. | $[●] | [●]% |
| Class 9 (Existing TopCo Equity Interests) | On the Effective Date, all Existing TopCo Equity Interests shall be cancelled, released, and extinguished, and each Holder of an Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interests. | $[●] | [●]% |
| Class 10 (Existing Intercompany Equity Interests) | Subject to the Restructuring Steps Plan, each Allowed Existing Intercompany Equity Interest shall be Reinstated, distributed, contributed, set off, settled, cancelled, and released, or otherwise addressed at the option of the Global Debtors and upon the consent of the Required Consenting DIP Term Loan Lenders. | $[●] | [●]% |

G. **What will I receive from the Global Debtors if I hold a DIP Facility Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, Other Secured Claim, or Priority Non-Tax Claim?**

Holders of Allowed Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Other Secured Claims, and Priority Non-Tax Claims will be paid in full in Cash or receive such other treatment that renders such Claims unimpaired.

Holders of Allowed DIP ABL Facility Claims will receive payment in Cash in full from the proceeds of the Exit ABL Facility or the New Exit Facilities, as applicable, in full satisfaction, settlement, release, and discharge of the Allowed DIP ABL Facility Claims.

The Holder of the DIP OpCo Claims will receive, in full satisfaction, settlement, release and discharge of the Allowed DIP OpCo Claims, and in accordance with the Restructuring Steps Plan, [(a) 100% of the Equity Interests in Holdings, (b) 100% of the Take Back Term Loans, and (c) 100% of the Take Back Preferred Units, which DIP OpCo Claims Distribution shall subsequently be distributed pursuant to and in accordance with Section 5.3, Section 5.4, and Section 5.5 of the Plan, as applicable, and the Restructuring Steps Plan.]

Each Holder of Allowed First Out DIP Term Loan Facility Claims will receive, based upon the treatment elected by the Majority Commitment Parties under the terms of the New Capital Commitment Letter, and in full satisfaction, settlement, release, and discharge of its respective Allowed First Out DIP Term Loan Facility Claims its *pro rata* share of the $[●] in aggregate

16

amount of Take Back Term Loans and Take Back Preferred Units.  Such distribution shall be made in accordance with Section 5.3 of the Plan and the Restructuring Steps Plan. The DIP Conversion with respect to the First Out DIP Term Loan Facility Claims requires the consent of DIP Term Loan Lenders holding at least 80% of the aggregate outstanding principal amount of First Out DIP Term Loan Claims (exclusive of any fees, premiums, interest, or First Out DIP PIK Loans) that are held by all DIP Term Loan Lenders.

Each Holder of Allowed Second Out DIP Term Loan Facility Claims will receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Second Out DIP Term Loan Facility Claims: (a) [●] shares of New Saks Common Stock; and (b) its *pro rata* share of the DIP Lender Litigation Trust Allocation of Litigation Trust Proceeds (if any), as set forth in the Litigation Trust Agreement.

Each Holder of Allowed Third Out DIP Term Loan Facility Claims will receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Third Out DIP Term Loan Facility Claims:  (a) [●] shares of New Saks Common Stock; and (b) its *pro rata* share of the DIP Lender Litigation Trust Allocation of Litigation Trust Proceeds (if any), as set forth in the Litigation Trust Agreement.

### H.      What is the Litigation Trust and how will the Litigation Trust be funded?[12]

On the Effective Date the Global Debtors shall, subject to all consents in favor of the Required Consenting DIP Term Loan Lenders in the Plan and the Restructuring Support Agreement, execute the Litigation Trust Agreement and take such steps as necessary to establish the Litigation Trust in accordance with the terms of the Plan.  The beneficial interests with respect to the Litigation Trust shall be for the benefit of the Holders of DIP Term Loan Claims, and the Global Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title and interest in the Litigation Trust Assets.  Pursuant to section 1141 of the Bankruptcy Code, such Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests, except as otherwise set forth in the Plan.  For the avoidance of doubt, if applicable, the Litigation Trust Assets shall include Litigation Trust Retained Causes of Action held by or assertable by any Global Debtor (including any TopCo Global Debtor), in each case to the extent set forth in the Schedule of Retained Causes of Action.

As of the Effective Date, the Litigation Trustee shall be appointed as trustee of the Litigation Trust pursuant to the Litigation Trust Agreement and the Plan.  On or after the Effective Date, the Litigation Trustee will assume all of its obligations, powers, and authority under the Litigation Trust Agreement to investigate, pursue, litigate, and/or settle the Litigation Trust Retained Causes of Action (the "<u>Litigation Trustee Duties</u>").

The (A) establishment, purpose, and administration of the Litigation Trust, (B) appointment, rights, and powers, of the Litigation Trustee, and (C) treatment of the Litigation Trust for federal income tax purposes, among other things, shall be governed by the Litigation Trust Agreement.  On and after the Effective Date, the Litigation Trustee shall be authorized, in

---

[12]      [**NTD**: All provisions related to Litigation Trust remain under review and subject to material revision.]

accordance with the terms of the Plan and the Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any Litigation Trust Assets.

On the Effective Date and at the election of the Required Consenting DIP Term Loan Lenders, the Global Debtors shall fund the Litigation Trust Escrow Account in an amount equal to the Litigation Trust Escrow Amount.  If funded, the Litigation Trust Escrow Amount shall automatically and irrevocably vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests.  If funded, the Litigation Trust Escrow Amount shall be used for the administration of the Litigation Trust, to pay expenses of the Litigation Trust, and to pursue the Litigation Trust Retained Causes of Action, with any excess amount being used to distribute to Holders of DIP Term Loan Claims, as set forth in the Litigation Trust Agreement.  All proceeds from the pursuit of the Litigation Trust Retained Causes of Action shall be used by the Litigation Trustee to pay for the costs and expenses of administration of the Litigation Trust, pursuit of the Litigation Trust Retained Causes of Action, and distribution to Holders of DIP Term Loan Claims, as set forth in the Litigation Trust Agreement.  The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement, respectively.

### I. Are any regulatory approvals required to consummate the Plan?

Whether any regulatory or other approvals are required to consummate the Plan will depend on the final structure of the Plan (including the Restructuring Transactions).  To the extent that any regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained, and the Global Debtors are engaging as appropriate in order to procure such approvals, authorizations, consents, rulings, or documents (as applicable).

### J. What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Global Debtors will be able to confirm a chapter 11 plan.  It is possible that any alternative to the Plan may provide Holders of Claims or Equity Interests with less than they would have received pursuant to the Plan.

### K. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan and entry of the Confirmation Order on the docket of the Chapter 11 Cases.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived before the Plan can go effective.  Unless otherwise provided in the Plan, on the date that the Plan becomes

18

effective, *i.e.*, the "Effective Date," (or, if a Claim or Equity Interest is not an Allowed Claim or Allowed Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest), or as soon as reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Equity Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Equity Interests (as applicable) in the applicable Class. Substantial consummation of the Plan shall be deemed to occur on the Effective Date. *See* Article XV of this Disclosure Statement entitled "*Conditions Precedent to Confirmation and Consummation of the Plan*" for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

L.      **Is there potential litigation related to the Plan?**

Parties in interest may object to the final approval of this Disclosure Statement and Confirmation of the Plan, which objections potentially could give rise to litigation.

There are a number of Classes that are deemed to reject the Plan (and therefore, will not be solicited to vote on the Plan) as well as other Classes that are entitled to vote that may vote to reject the Plan. In the event that any Class or Classes entitled to vote on the Plan vote to reject it, the Global Debtors intend to seek Confirmation of the Plan pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article XVI.D.v. of this Disclosure Statement, entitled "*Cram Down.*"

M.      **Will there be releases, injunctions, and exculpations granted to parties in interest as part of the Plan?**

Yes, subject to the outcome of the Special Restructuring Committee Independent Investigation, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS IN CLASSES 1, 2, 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, [4-D], 5-A, and [5-B] UNDER THE PLAN THAT  DO NOT VALIDLY OPT OUT OF THE RELEASES WILL BE DEEMED TO HAVE CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE GLOBAL DEBTORS AND THE RELEASED PARTIES.**

**ALL HOLDERS OF CLAIMS AND INTERESTS IN CLASSES [4-D], [5-B], 6-A, 6-B, 8, AND 9 UNDER THE PLAN THAT  DO NOT VALIDLY OPT IN TO THE RELEASES WILL BE DEEMED TO HAVE NOT CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE GLOBAL DEBTORS AND THE RELEASED PARTIES.**

Subject to the outcome of the Special Restructuring Committee Independent Investigation, the Global Debtors believe that the release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standards for approval. The release, exculpation, and injunction provisions that are contained in the Plan are described in Article XIII

19

of this Disclosure Statement and are subject to the outcome of the Special Restructuring Committee Independent Investigation.

**N.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are set forth on the ballot distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballot").  For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and submitted via the E-Ballot Portal maintained by the Solicitation Agent at https://cases.stretto.com/saks so that the applicable Ballot is **actually received** by the Global Debtors' Solicitation Agent **on or before the deadline to vote on the Plan**, *i.e.*, **[●], 2026, at 4:00 p.m., Prevailing Central Time** (the "Voting Deadline").  Ballots will also be accepted in paper form.  Paper Ballots may be delivered by first-class mail postage prepaid, personal delivery, or overnight courier to the Solicitation Agent at the following address:

Saks Global Enterprises LLC
c/o Stretto, Inc.
410 Exchange, Suite 100
Irvine, CA 92602

Please reference Article XVI of this Disclosure Statement for more information about the voting procedures.

**O.      What is the deadline to vote on the Plan?**

The Voting Deadline is **[●], 2026, at 4:00 p.m., Prevailing Central Time**.

**P.      Why is the Bankruptcy Court holding a Combined Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. In addition, the Global Debtors are seeking approval of this Disclosure Statement on a final basis at such Confirmation Hearing. Such Combined Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served a notice with the time, date, and location of the Combined Hearing once scheduled. The Combined Hearing may be adjourned from time to time without further notice.

**Q.      When is the Combined Hearing set to occur?**

The Bankruptcy Court has scheduled the Combined Hearing for **[●], 2026, at [●]:00 [●].m., Prevailing Central Time**.  The Combined Hearing may be continued from time to time by the Bankruptcy Court or the Global Debtors without further notice other than by an adjournment in open court followed by a notice filed by the Global Debtors, or may be adjourned from time to time by notice filed by the Global Debtors with the Bankruptcy Court and served in accordance with the Bankruptcy Rules and Local Rules.

Objections to Confirmation of the Plan and approval of the Disclosure Statement on a final basis must be filed and served on the Global Debtors, and certain other parties, by no later than

**[●], 2026, at [●]:00 [●].m., Prevailing Central Time**, in accordance with the Combined Hearing Notice that accompanies this Disclosure Statement and the Conditional Disclosure Statement Order.

### R. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions concerning this Disclosure Statement or the Plan, please contact the Solicitation Agent at:

Saks Global Enterprises LLC
c/o Stretto, Inc.
410 Exchange, Suite 100
Irvine, CA 92602

+1 (833) 232-5246  (U.S./Canada, Toll-Free); +1 (949) 373-7589  (International, Toll)
SaksInquiries@stretto.com

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available electronically free of charge at https://cases.stretto.com/saks/, or upon request made to the office of the Global Debtors' counsel, as listed on the first page of this Disclosure Statement.

### S. Do the Global Debtors recommend voting in favor of the Plan?

Yes.  The Global Debtors believe that the Plan, which contemplates a significant deleveraging of the Global Debtors' balance sheet, is in the best interest of Holders of Claims and Equity Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### T. Who supports the Plan?

As evidenced by the Restructuring Support Agreement, the Plan is currently supported by the Global Debtors and the Consenting DIP Term Loan Lenders, who represent over two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in Classes [3-A, 3-B, 3-C, 4-A, and 4-B].

## IV. GENERAL HISTORICAL INFORMATION ABOUT THE GLOBAL DEBTORS

### A. General Background, Corporate History, and Business Operations.

The Global Debtors, together with their non-Debtor affiliates (collectively, the "Company"), are a world-renowned multi-brand luxury retailer, comprising Saks Fifth Avenue, Neiman Marcus, Bergdorf Goodman, and Saks OFF 5TH.  As of the date hereof, the Company's current retail

portfolio includes approximately 50 go-forward full-line luxury locations, additional off-price locations, and e-commerce experiences.

The Company's organization chart as of the Petition Date is attached to this Disclosure Statement as **Exhibit G**.

           i.      Retail Brands

           a.      **Saks Fifth Avenue and Saks OFF 5TH.** Saks Fifth Avenue is a leading destination for luxury fashion, driven by a mission to help customers express themselves through relevant and inspiring style.  The first Saks store opened in Washington, D.C. in 1867 and, in 1902, the first New York City location opened in Herald Square.  When customers moved uptown, so did Saks: on September 15, 1924, Saks Fifth Avenue was born, opening its flagship store on 50th Street and Fifth Avenue and becoming the first large retailer to operate in what was then primarily a residential district of Manhattan.  Saks also evolved to meet demand as luxury shoppers started to move online, establishing Saks.com in the year 2000 and reorienting its business around the e-commerce experience in the following years. Since then, Saks Fifth Avenue has become a world-renowned luxury retailer operating physical store locations in high-value markets in the U.S. and a highly-trafficked e-commerce site.  The Saks Fifth Avenue experience will serve its loyal customers through a network of 15 extraordinary stores and its e-commerce channels, offering an expertly curated assortment of fashion and highly personalized customer service.

The Company also established itself as a leader in off-price luxury.  In 1992, due to growing consumer demand, Saks piloted its original off-price experience, an outlet store in Franklin Mills, Pennsylvania called "Saks Clearinghouse." After the model proved successful, the Company expanded the concept and launched Saks OFF 5TH in 1995.  In 2013, Saks OFF 5TH launched SaksOFF5TH.com, offering a broad assortment of goods across all categories and operating as a true off price retailer buying merchandise from across the fashion and retail industry.

On January 29, 2026, following a thorough review of their off-price businesses, the Global Debtors announced their decision to close the majority of their Saks OFF 5TH retail locations. The Global Debtors commenced closing sales at the majority of their Saks OFF 5TH stores beginning January 31, 2026.

The Global Debtors have also taken strategic steps during the Chapter 11 Cases to optimize their full-line store portfolio, including by closing certain of their Saks Fifth Avenue and Neiman Marcus store locations.

           b.      **Saks OFF 5TH Digital**.  In 2021, Saks OFF 5TH's e-commerce business ("SO5 Digital") entered into a series of agreements that resulted in the SO5 Digital Debtors effectively operating as a standalone company within the broader Saks corporate group. The SO5 Digital Debtors, which have their own capital structure and governance, are approximately 80% owned by the Global Debtors, with the remaining equity owned by funds affiliated with Insight Partners.  Notwithstanding the separate capital structure, certain operations of the SO5 Digital Debtors remain consolidated within one or more of the Global Debtors. Consequently, from time to time in the ordinary course of business, the Global Debtors make

22

certain payments for the benefit of, or allocable to, the SO5 Digital Debtors for which the SO5 Digital Debtors remit reimbursement to the applicable Global Debtor.  On January 29, 2026, the SO5 Digital Debtors announced the wind-down of SaksOFF5TH.com and the SO5 Digital business.  Online closing sales commenced on January 30, 2026 and the closing sales and wind-down have since concluded.

In light of potential conflicts between the SO5 Digital Debtors and the Global Debtors (including with respect to potential intercompany claims), the SO5 Digital Debtors implemented revised governance and professional structures to ensure that their interests are independently represented in these chapter 11 cases, including by retaining Bradley Arant Boult Cummings LLP as their independent general bankruptcy counsel and Accordion Partners, LLC as their independent financial advisor, as well as appointing Gary D. Begeman as their Independent Director.  The Plan and this Disclosure Statement do not deal with the claims against and interests in the SO5 Digital Debtors.  However, the SO5 Digital Debtors may in the future file and prosecute a separate plan in these Chapter 11 Cases.

c.  **Neiman Marcus**.  Innovation has been at the forefront of Neiman Marcus since the opening of its first store in Dallas, Texas in 1907.  The first Neiman Marcus store aimed to launch a concept featuring ready-to-wear fashion over custom-made creations, which were favored at the time.  The founders' unique vision brought new designers to a mass market and made Neiman Marcus a gateway to high fashion.  Neiman Marcus is a pioneer in customer loyalty programs, and one of the first retailers to offer a gift card. Following its footprint optimization, Neiman Marcus remains a leading luxury retailer serving customers across 33 go-forward stores that are in highly desirable markets across the country, via its integrated digital platforms, and through its network of highly trained selling associates, who offer both in-store and remote selling services.  Neiman Marcus has a highly loyal customer base and is known for its exceptional customer service and immersive luxury experiences, including large-scale exclusives and store-takeover events, the Neiman Marcus Awards, its beloved annual holiday Fantasy Gifts collections, and other seasonal campaigns.

On January 29, 2026, following the thorough review of their off-price businesses described above, the Global Debtors announced their decision to close their Last Call clearance locations. The Global Debtors commenced closing sales at the Last Call locations beginning January 31, 2026.

d.  **Bergdorf Goodman**.  Bergdorf Goodman represents the pinnacle of style, service and modern luxury.  The store traces its roots back to a tailor's shop established in Manhattan in 1899 by Herman Bergdorf and later joined by his apprentice Edwin Goodman, who ultimately bought Bergdorf's interest in the business.  By 1914, Goodman had become the first couturier in Manhattan to introduce ready-to-wear attire, making Bergdorf Goodman a destination for American and French fashion.  In 1972, the Goodman family sold Bergdorf Goodman to what would become the Carter Hawley Hale Stores (which owned Neiman Marcus at the time), with the two brands being spun off into the Neiman Marcus Group in 1987. Bergdorf Goodman's renowned location on Fifth Avenue and 58th Street, along with the Bergdorf Goodman Men's Store across the avenue, continue to embody the pinnacle of luxury shopping destinations for discerning customers around the world.  On the e-commerce front, BG.com expands on

Bergdorf Goodman's heritage, showcasing coveted collections for men and women in an unparalleled online shopping experience.

e. **Horchow**. Horchow is a home furnishings retailer that has been dedicated to bringing customers unique, high-quality furniture, fine linens, and unique décor since 1973. Horchow was founded by Roger Horchow in 1973 as the first luxury mail-order catalog without a brick-and-mortar store, and was acquired by Neiman Marcus Group in 1988. Prior to the Petition Date, the Company conducted Horchow operations through its e-commerce platform, horchow.com. In February 2026, the Company retired its Horchow e-commerce platform and redirected shoppers to the "Home" category on its Neiman Marcus e-commerce platform (NeimanMarcus.com).

ii. Corporate History

In 2013, Hudson's Bay Company ("HBC"), then a publicly-traded company with operations led by Richard Baker, acquired Saks Incorporated (the predecessor to Saks Global). At the time of the merger, HBC operated well-known brands across the United States and Canada, including Hudson's Bay, Home Outfitters, and Lord & Taylor. The merger reflected the companies' focus on how the strategic interplay between retail and real estate would create substantial value. Following the acquisition, HBC was impacted by the macro-economic trends faced by other brick-and-mortar retailers across the United States and Canada, such as the shift to online commerce and the resulting decline in foot traffic in physical stores. Due to the company's continued underperformance, HBC consummated a take-private transaction in March 2020, shortly before temporary store closures arising from the COVID-19 pandemic impacted the entire retail industry.

As the retail industry navigated the COVID-19 pandemic and its aftermath, between 2020 and 2024, HBC and Saks Global were reorganized under the same ownership, with HBC, Saks Fifth Avenue, and Saks OFF 5TH physical locations financed as a single credit group. During this time period, the Saks e-commerce business, like the SO5 Digital Debtors, effectively operated a standalone company within the broader Saks corporate group, and was financed as a separate credit group during this period. The Saks.com business platform and operations were reintegrated into the Saks Global credit group beginning in December 2024. During this time, unforeseen challenges in the Canadian market impacted HBC's ability to invest in the Saks Fifth Avenue and Saks OFF 5TH stores. This negatively impacted inventory receipts at both stores and Saks.com.

On December 23, 2024, Saks Global consummated the acquisition of Neiman Marcus Group, for a total enterprise value of $2.7 billion (the "Acquisition"). Following the Acquisition, the retail operations of the Neiman Marcus, Bergdorf Goodman and Last Call businesses were consolidated into Saks Global. In conjunction with the Acquisition, the combined companies established a separate capital structure from HBC and raised capital from the issuance of new equity and debt, including $275 million in seller financing, a new $1.8 billion asset-based revolving credit facility, and new senior secured notes in an aggregate principal amount of $2.2 billion. New equity investors at the time of the Acquisition included Amazon, Authentic Brands Group, and Salesforce. In early 2025, HBC filed proceedings in Canada under the Companies' Creditors Arrangement Act and ultimately commenced liquidation in 2025, due to a challenging economic environment stemming from inflation, rising interest rates, and the lingering impacts of

24

post-COVID shifts in consumer behavior, all of which were further compounded by tariff-related uncertainty that disrupted liquidity discussions with potential lenders.

As described further herein, in Summer 2025, the Global Debtors secured $600 million (before fees and prepaid interest) in new money financing from existing bondholders and completed the Exchange Transaction, allowing the Global Debtors to capture approximately $115 million of discount in face value of their existing notes.

### iii.    Real Estate Portfolio

The Company utilizes both owned and leased properties in its operations. As of the Petition Date, the Company owned or controlled ground leases, either entirely or with joint venture partners, on 39 retail properties located throughout the United States. The owned and ground leased real estate portfolio is concentrated in top metropolitan regions with high population density and higher than average household income, and includes the Saks Fifth Avenue New York City flagship, which is recognized as one of the world's premier luxury department stores.

a.    **Saks Flagship**. The Saks Fifth Avenue flagship building and land is owned by non-Debtor affiliate Saks Flagship Real Property LLC and is subject to a $1.25 billion mortgage loan that has been securitized. The Saks Fifth Avenue flagship building has been ground leased by Global Debtor 12 East 49th Street LLC, as tenant.

b.    **Other Real Estate**. In total, including both owned and leased properties, the Company will operate (i) 15 go-forward Saks Fifth Avenue stores, (ii) 12 go-forward Saks Off 5TH stores, (iii) 33 go-forward Neiman Marcus stores, and (iv) two Bergdorf Goodman stores, both of which are located in Manhattan at 58th Street and Fifth Avenue. In addition, the Company utilizes various distribution, support and office facilities to support store and online operations.

### iv.    Commercial and Joint Venture Arrangements

a.    **Real Estate Joint Venture**. The Company is a partner in a real estate joint venture (referred to as the "HBS JV") with Simon Property Group Inc. (collectively with its affiliates, "Simon") and other third-party investors. The HBS JV holds 31 properties in the United States, and the Global Debtors currently own approximately 62.4% of the equity interests in the HBS JV. Each property is held in a separate special purpose entity which operates as landlord. Each of the properties contributed by the Company to the HBS JV has been leased back to the Company pursuant to portfolio operating leases, with an initial term of 20 years with five six-year extension options. Certain of the fee and leasehold interests owned by the HBS JV secure a real estate loan in an aggregate outstanding principal amount of approximately $428.1 million (the "JV CMBS Loan"), which has been securitized.

b.    **Axonic Pledge**. In 2021, an affiliate of Axonic Coinvest II, LP ("Axonic") purchased certain JV CMBS Loan bonds. In connection with this purchase, an affiliate of Axonic and certain Global Debtors entered into several agreements, which have since been amended, including (i) HoldCo II and Saks Global Enterprises LLC each having entered into an Amended and Restated Conditional Bond Purchase Agreement, made on March 18, 2021 (as amended from time to time, collectively, the "CBPAs") with Axonic Credit Opportunities Master

25

Fund, LP (predecessor in interest to Axonic); (ii) various Global Debtors, including HoldCo II, having entered into an Amended and Restated Investment Structuring Agreement, dated as of March 18, 2021 (as amended from time to time, the "2024 A&R ISA") with Axonic Capital LLC; (iii) various Global Debtors, including HoldCo II, having entered into an Amended and Restated Guaranty, dated as of March 18, 2021 (as amended, the "2024 HoldCo II Guaranty"); and (iv) HoldCo II having entered into the Amended and Restated Pledge Agreement, as of March 18, 2021, whereby HoldCo II pledged the equity of 12 East 49th Street LLC to secure the guarantees made by HoldCo II under the 2024 HoldCo II Guaranty.

The CBPAs provided Axonic with the ability to require Saks Global Enterprises LLC or HoldCo II to purchase certain bonds (which are more fully described in the CBPAs) at specified times and for specified prices (the "Put"). The Put originally became exercisable on March 14, 2024, but was extended several times to October 31, 2025. Axonic has received at least $5.5 million in exchange for such extensions. Prior to October 31, 2025, the Global Debtors were in discussions with Axonic regarding a further one-year extension of the Put. In connection with these negotiations, the Global Debtors paid Axonic $12 million. On December 15, 2025, Axonic agreed to forbear from exercising the Put until January 31, 2026, provided (i) the Global Debtors paid an additional $13 million that was part of the extension agreement that was then being negotiated, (ii) the parties continued to negotiate in good faith, (iii) none of the parties to the Put or the 2024 A&R ISA, or their affiliates, had filed for bankruptcy, and (iv) there was no default under the HBS CMBS Loan. Thereafter, the Global Debtors paid Axonic the additional $13 million and continued to engage in good faith negotiations regarding the terms of extending the Put for one year.

On January 7, 2026, Axonic sent a notice to certain of the Global Debtors, including HoldCo II, purporting to exercise its rights under the Put. Axonic's notice asserted a right to elect to sell one of the series of bonds, with a purported settlement date of January 9, 2026. The Global Debtors responded to Axonic, asserting that the purported exercise of the Put was in breach of the forbearance agreement and therefore invalid. Axonic refused to withdraw the purported exercise of the Put. It is the Global Debtors' position that the Put was not properly exercised and is null and void and that Axonic has been stayed from exercising the Put and taking any action in connection therewith since the Petition Date.

Following the Petition Date and certain disputes with Axonic at the first day hearing related to the Global Debtors' DIP Facilities, the Global Debtors and Axonic entered into the *Stipulation and Agreed Order Regarding Axonic Coinvest II, LP's Objections To Global Debtors' Postpetition Financing And Resolving Certain Matters Among the Global Debtors, the SGUS DIP Secured Parties and Axonic Coinvest II, LP* [Docket No. 876] (the "Axonic Stipulation") whereby, among other things, Axonic agreed not to object to final approval of the DIP Facilities and Axonic and the Global Debtors agreed to a standstill with respect to litigation related to the parties' prepetition relationship and Axonic's purported prepetition exercise of the Put Right, subject to the terms and conditions set forth in the Axonic Stipulation.

        c.      **Authentic Brands**. The Company is also party to a joint venture with Authentic Brands, the owner of more than 50 global brands such as Reebok, Champion and Nautica. As of the Petition Date, the Company and Authentic Brands each owned 50% of the equity of the joint venture, Authentic Luxury Group LLC ("ALG"), which collects royalties from

26

sales of products and services using the Saks Fifth Avenue, Neiman Marcus and Bergdorf Goodman brands (excluding the use of those brands in connection with the operation of retail stores in the United States and Canada, as well as the Saks, Neiman Marcus and Bergdorf Goodman e-commerce businesses globally) as well as several brands under the control of Authentic Brands. The Global Debtors also agreed to certain purchase commitments for wholesale purchases of products from Authentic Brands' third-party licensees of certain brands under Authentic Brands' control and ALG's sublicensees of Saks Global's brands. The Global Debtors wholly own the intellectual property rights of their luxury retail brands, including Saks Fifth Avenue, Neiman Marcus, and Bergdorf Goodman, and license a subset of those rights to ALG.

Certain agreements between the Company and Authentic Brands provide that, upon certain triggers, including the bankruptcy filing of certain of the Global Debtors, Authentic Brands' and certain other shareholders' preferred equity in Saks Global Investor L.P. would be exchangeable for newly-issued equity in ALG (which would dilute the Company's existing equity in ALG). Following the Petition Date, Authentic Brands exercised such exchange rights and, as a result, the Company's existing equity in ALG was diluted to a de minimis percentage. ALG is fully controlled from a governance perspective by Authentic Brands. The Company's equity in ALG is not pledged as collateral under the Global Debtors' prepetition indebtedness.

Moreover, following the Petition Date, the Bankruptcy Court entered an order approving the Global Debtors' rejection of certain agreements related to ALG, including agreements related to the purchase commitments described above [Docket No. 863].

d.  **Amazon**.  Prior to the Petition Date and in connection with Amazon's equity investment in the Global Debtors, certain Global Debtors entered into a commercial agreement with Amazon to maintain a "Saks on Amazon" virtual storefront on Amazon.com, which launched in April 2025. The partnership was intended to combine the Company's luxury fashion expertise with Amazon's expertise in delivering a technology-driven, highly convenient shopping experience to a broader audience.

Following the Petition Date, the Global Debtors ended their partnership with Amazon and on February 19, 2026, the Bankruptcy Court entered an order approving the Global Debtors' rejection of their prepetition commercial agreements with Amazon, including the agreement to maintain the "Saks on Amazon" virtual storefront [Docket No. 863]. The "Saks on Amazon" virtual storefront has been removed from Amazon.com.

v.  Employees

As of the Petition Date, the Global Debtors employed approximately 14,610 full-time employees and 2,220 part-time employees.[13] Each of the Global Debtors' business units employs a mix of full-time and part-time employees. The Global Debtors also hire seasonal in-store associates and seasonal employees at their fulfillment centers during peak seasons (such as the holiday shopping season), which provides the Global Debtors with greater workforce flexibility

---

[13] Following the Petition Date, the Global Debtors' total employees have decreased as a result of the store closing sales and the closure of a majority of the Global Debtors' off-brand store locations, as well as the closure of certain of their full-line store locations. The store closing sales are further described below.

27

and allows the Global Debtors to address busier periods. The Global Debtors have a small number of unionized employees and are party to seven (7) collective bargaining agreements.

   **B.**   **Prepetition Capital Structure.** As of the Petition Date, the Global Debtors had approximately $3.4 billion in prepetition funded debt obligations, (excluding the $1.25 billion Flagship CMBS Loan (as defined below), which is an obligation of non-Debtor affiliate Saks Flagship Real Property LLC, as described in subsection (viii) below)), consisting of the following:

  i.  approximately $275 million in aggregate principal amount outstanding under a senior secured term loan facility arising from seller financing incurred in connection with the Acquisition (the "Prepetition TopCo Facility");14

  ii.  approximately $442.16 million in aggregate principal amount of loans, not including the face amount of issued and undrawn letters of credit, outstanding under a senior secured asset-based revolving credit facility (the "Prepetition ABL Facility");

  iii.  approximately $762.5 million in aggregate principal amount outstanding of Prepetition SGUS Notes (as defined below), issued in June and August 2025;

  iv.  approximately $1.4 billion in aggregate principal amount outstanding of Prepetition OpCo Second Out Notes (as defined below), issued in connection with the Exchange Transaction;

  v.  approximately $440.8 million in aggregate principal amount outstanding of Prepetition OpCo Third Out Notes (as defined below), issued in connection with the Exchange Transaction; and

  vi.  approximately $51.2 million in aggregate principal amount outstanding of Prepetition Initial Notes (as defined below) (together with the OpCo Second Out Notes and the OpCo Third Out Notes, the "Prepetition OpCo Notes").

A summary of the approximate outstanding principal amounts of the Global Debtors' funded debt obligations as of the Petition Date is set forth below:

---

[14] As described below, the obligors under the Prepetition TopCo Facility are certain parent entities of Saks Global Holdings LLC and Saks Global Enterprises LLC. Saks Global Holdings LLC and Saks Global Enterprises LLC and their subsidiaries are not obligors under the Prepetition TopCo Facility.

28

| Facility | Maturity Date | Outstanding Principal Amount (Approximate) |
|---|---|---|
| **Prepetition TopCo Facility** | February 3, 2026 | **$275 million**[15] |
| **Prepetition ABL Facility** | December 23, 2029 | **$442.16 million**[16] |
| **Prepetition SGUS Notes** | December 15, 2029 | **$762.5 million** |
| **Prepetition Second Out Notes** | December 15, 2029 | **$1.4 billion** |
| **Prepetition Third Out Notes** | December 15, 2029 | **$440.8 million** |
| **Prepetition Initial Notes** | December 15, 2029 | **$51.2 million** |
| **Total**: | | **$3.4 billion** |

      i.      Prepetition TopCo Facility[17]

In connection with the consummation of the Acquisition, then-holders of equity interests in Neiman Marcus Group, as lenders, agreed to permit the Global Debtors to defer payment of a portion of the purchase price, ultimately providing term loans on a cashless basis in the original principal amount of $275 million (which amount is subject to adjustment in connection with certain purchase price adjustments relating to the Acquisition) to Mercury Aggregator L.P. ("Mercury") for the purpose of financing the deferred payment. The term loan is governed by that certain Credit Agreement, dated as of December 23, 2024 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition TopCo Credit Agreement"), by and among Mercury, as borrower, Global Debtor Mercury Aggregator Holdco LLC, a Delaware limited liability company ("Mercury Holdings"), Global Debtor HBSFA Holdings Ltd., a Canadian limited company ("Mercury Holdings Canada"), the other guarantors party thereto, the lenders party thereto from time to time (the "Prepetition TopCo Lenders"), and GLAS USA LLC, as administrative agent (the "Prepetition TopCo Agent").

The Prepetition TopCo Facility matured on February 3, 2026. Mercury Holdings, Mercury Holdings Canada, and Debtor HBC GP IV LLC, a Bermuda exempted limited liability company ("HBC GP IV"), guarantee the Prepetition TopCo Facility. The Prepetition TopCo Facility is secured by substantially all personal property of Mercury, Mercury Holdings, Mercury Holdings Canada and HBC GP IV, including pledges of the equity interests owned by these entities.

Pursuant to the Springing Guaranty, dated as of December 23, 2024 (the "Springing Guaranty"), made by Lisa and Richard Baker Enterprises, LLC, a Delaware limited liability company ("LARBE"), in favor of the Prepetition TopCo Agent, LARBE agreed to guarantee the Prepetition TopCo Facility on a non-recourse contingent basis. The obligations

---

[15] Inclusive of paid-in-kind interest, the Prepetition TopCo Facility is approximately $310 million as of the Petition Date.

[16] This amount does not include $56.6 million in face amount of issued but undrawn letters of credit.

[17] The outstanding amount under the Prepetition TopCo Facility is approximately $310 million, inclusive of paid-in-kind interest. As described below, the obligors under the Prepetition TopCo Facility are certain parent entities of Saks Global Holdings LLC and Saks Global Enterprises LLC. Saks Global Holdings LLC and Saks Global Enterprises LLC and their subsidiaries are not obligors under the Prepetition TopCo Facility.

29

of LARBE under the Springing Guaranty are limited to an aggregate amount not to exceed $100 million.

### ii.        Prepetition ABL Facility

As of the Petition Date, Saks Global Enterprises LLC, as borrower, Saks Global Holdings LLC ("Holdings"), as Holdings, the other guarantors party thereto (the "Prepetition Opco Subsidiary Guarantors"), the lenders party thereto from time to time (the "Prepetition ABL Lenders"), and Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "Prepetition ABL Agent"), were party to that certain ABL Credit Agreement, dated as of December 23, 2024 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition ABL Credit Agreement").

The Prepetition ABL Credit Agreement provided for the Prepetition ABL Facility with prepetition commitments in an aggregate principal amount of $1.8 billion (with borrowing capacity subject to borrowing base availability). Holdings and the Prepetition Opco Subsidiary Guarantors guaranteed the Prepetition ABL Facility. The Prepetition ABL Facility was set to mature on December 23, 2029. Subject to the terms of the ABL / Notes Intercreditor Agreement (as defined below), Saks Global Enterprises LLC's obligations under the Prepetition ABL Facility were secured by (a) a first priority lien on all ABL Priority Collateral (as defined in the ABL / Notes Intercreditor Agreement) (the "ABL Priority Collateral"), and (b) a second priority lien on all Notes / Term Priority Collateral (as defined in the ABL / Notes Intercreditor Agreement) (the "Notes / Term Priority Collateral").

In addition, subject to the terms of the ABL / FILO Intercreditor Agreement (as defined below), Saks Global Enterprises LLC's obligations under the Prepetition ABL Facility were secured (x) on a senior basis to the Prepetition FILO Facility on ABL Priority Collateral and (y) on a junior basis to the Prepetition FILO Facility on Notes / Term Priority Collateral with respect to an aggregate principal amount of the Prepetition FILO Facility not to exceed $300 million.

As of the Petition Date, approximately $442.16 million of principal was outstanding under the Prepetition ABL Facility, in addition to approximately $56.6 million in face amount of letters of credit outstanding. As described below, following the Petition Date, amount outstanding under the Prepetition ABL Facility were replaced and refinanced by the DIP ABL Facility.

### iii.        Prepetition SGUS Notes

SGUS LLC ("SGUS"), a Delaware limited liability company and wholly-owned subsidiary of Saks Global Enterprises, LLC, as issuer, Citibank N.A., as trustee and collateral agent (in such capacities, the "Prepetition SGUS Trustee") for the benefit of the "Holders" (as defined in the Prepetition SGUS Notes Indenture) (the "Prepetition SGUS Noteholders") and HoldCo II are party to that certain Asset Based Indenture, dated as of June 27, 2025 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "Prepetition SGUS Notes Indenture").

On June 27, 2025, SGUS authorized the issuance of $300.0 million aggregate principal amount of 11.00% senior secured asset-based notes due 2029 (the "Initial Prepetition SGUS

30

Notes"). In connection with the Exchange Transaction, on August 8, 2025, SGUS authorized the issuance of an additional $462.5 million aggregate principal amount of 11.000% senior secured asset-based notes due 2029 (the "Additional Prepetition SGUS Notes" and, together with the Initial Prepetition SGUS Notes, the "Prepetition SGUS Notes"). In addition, in connection with the Exchange Transaction, HoldCo II entered into a supplemental indenture to the Prepetition SGUS Notes Indenture on August 8, 2025, pursuant to which HoldCo II guaranteed the Prepetition SGUS Notes up to a maximum guaranteed amount of $200 million.

On the Petition Date, approximately $762.5 million of principal was outstanding under the Prepetition SGUS Notes. The Prepetition SGUS Notes mature on December 15, 2029. As further described below, following the Petition Date, approximately $[●] of the remaining principal amount of Prepetition SGUS Notes was replaced and refinanced under the DIP Term Loan Credit Facility. As of the date hereof, approximately $[●] of principal remains outstanding under the Prepetition SGUS Notes.

iv.     Prepetition Opco Notes: Prepetition Second Out Notes, Prepetition Third Out Notes and Prepetition Initial Notes

Saks Global Enterprises LLC, as issuer (as successor in interest to SFA Issuer LLC), Holdings, the Prepetition Opco Subsidiary Guarantors, and Citibank, N.A., as trustee (in such capacity, the "Prepetition Initial Notes Trustee") and as collateral agent (in such capacity, the "Notes / Term Collateral Agent") for the benefit of the "Holders" (as defined in the Prepetition Initial Notes Indenture) (the "Prepetition Initial Noteholders") are party to that certain Indenture, dated as of December 16, 2024 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "Prepetition Initial Notes Indenture"). On December 23, 2024, Saks Global Enterprises LLC assumed $2.2 billion aggregate principal amount of notes (the "Prepetition Initial Notes") issued under the Prepetition Initial Notes Indenture and the Prepetition Initial Notes were guaranteed by Holdings and the Prepetition OpCo Subsidiary Guarantors.

In connection with the Exchange Transaction, Saks Global Enterprises LLC, as issuer, the Prepetition Opco Subsidiary Guarantors, and Citibank, N.A., as trustee (in such capacity, the "Prepetition Second Out / Third Out Trustee") and as Notes / Term Collateral Agent for the benefit of the "Holders" (as defined in the Prepetition OpCo Notes Indenture) (the "Prepetition Second Out / Third Out Noteholders") are party to that certain Indenture, dated as of August 8, 2025 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "Prepetition OpCo Notes Indenture"). Under the Prepetition OpCo Notes Indenture, Saks Global Enterprises LLC issued (i) $1,439,252,628 in aggregate principal amount of second out notes (the "Prepetition Second Out Notes") and (ii) $440,763,140 in aggregate principal amount of third out notes (the "Prepetition Third Out Notes").

Subject to the terms of the Equal Priority Intercreditor Agreement (as defined below), Saks Global Enterprises LLC's obligations under the Prepetition OpCo Notes are secured on a pari passu basis with its obligations under the Prepetition NPC Credit Facility. In addition, subject to the terms of the ABL / Notes Intercreditor Agreement, Saks Global Enterprises LLC's obligations under the Prepetition OpCo Notes were secured as of the Petition Date by (a) a first priority lien on all Notes / Term Priority Collateral and (b) a second priority lien on all ABL Priority Collateral.

31

The Prepetition OpCo Notes mature on December 15, 2029. Subject to the terms of the PAA (as defined below), (a) the Prepetition OpCo Notes rank junior in payment priority to the Prepetition FILO Credit Facility and the Prepetition NPC Credit Facility, (b) the Prepetition Second Out Notes rank senior in payment priority to the Prepetition Third Out Notes and the Prepetition Initial Notes, (c) the Prepetition Third Out Notes rank junior in payment priority to the Prepetition Second Out Notes and senior in payment priority to the Prepetition Initial Notes and (d) the Prepetition Initial Notes are fourth out, and rank junior in payment priority to the Prepetition Second Out Notes, the Prepetition Third Out Notes, and the Prepetition FILO Credit Facility and the Prepetition NPC Credit Facility.

        v.        Intercompany On-Loans.

        a.        **Prepetition FILO Credit Facility**. Following the issuance of the Prepetition SGUS Notes by SGUS, SGUS lent an aggregate original principal amount of $400 million as an intercompany on-loan (the "Prepetition FILO Credit Facility") to Saks Global Enterprises LLC under that certain Term Loan Credit Agreement, dated as of June 27, 2025 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition FILO Credit Agreement") among Saks Global Enterprises LLC, as borrower, the Prepetition Opco Subsidiary Guarantors, the lenders party thereto from time to time (the "Prepetition FILO Lenders"), and SGUS, as administrative agent. Subject to the terms of the ABL / Notes Intercreditor Agreement, Saks Global Enterprises LLC's obligations under the FILO Credit Agreement are secured by (a) a first priority lien on all ABL Priority Collateral and (b) a second priority lien on all Notes / Term Priority Collateral (in each case, other than the assets of Holdings). In addition, subject to the terms of the ABL / FILO Intercreditor Agreement, Saks Global Enterprises LLC's obligations under the Prepetition FILO Credit Agreement were secured as of the Petition Date (x) on a junior basis to the Prepetition ABL Facility on ABL Priority Collateral and (y) on a senior basis to the ABL Facility on Notes / Term Priority Collateral with respect to an aggregate principal amount of the Prepetition FILO Credit Facility not to exceed $300 million, and thereafter on a junior basis to the Prepetition ABL Facility on Notes / Term Priority Collateral. Subject to the terms of the PAA, as of the Petition Date, the Prepetition FILO Credit Facility (a) ranked senior in payment priority to the Prepetition NPC Facility for so long as the outstanding aggregate principal amount of the Prepetition FILO Credit Facility exceeds $300.0 million (in an amount up to such excess), and thereafter ranked equal in payment priority to the Prepetition NPC Facility and (b) ranked senior in payment priority to the Prepetition Opco Notes.

        As further described below, following the Petition Date, $395 million of the $400 million of principal amount outstanding under the Prepetition FILO Credit Facility was replaced and refinanced by the DIP OpCo Credit Facility. On [●], 2026, the Required Consenting DIP Term Loan Lenders exercised a call option to acquire the outstanding portion of the Prepetition FILO Credit Facility that was not replaced and refinanced by the DIP OpCo Credit Facility, in accordance with the terms of the DIP Term Loan Credit Agreement and the Final DIP Order.

        b.        **Prepetition NPC Facility**. In addition, following the issuance of the Prepetition SGUS Notes by SGUS, SGUS lent an additional aggregate original principal amount of approximately $362.5 million as an intercompany on-loan (the "Prepetition NPC Credit Facility") to Saks Global Enterprises under that certain Term Loan Credit Agreement, dated as of

August 8, 2025 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Prepetition NPC Credit Agreement"), among Saks Global Enterprises LLC, as borrower, the Prepetition Opco Subsidiary Guarantors, the lenders party thereto from time to time (the "Prepetition NPC Lenders"), SGUS, as administrative agent (the "Prepetition NPC Agent"), and the Notes / Term Collateral Agent. Subject to the terms of the Equal Priority Intercreditor Agreement, Saks Global Enterprises LLC's obligations under the Prepetition NPC Credit Facility were secured as of the Petition Date on a pari passu basis with its obligations under the Prepetition Opco Notes.  In addition, subject to the terms of the ABL / Notes Intercreditor Agreement, Saks Global Enterprises LLC's obligations under the Prepetition NPC Credit Agreement were secured as of the Petition Date by (a) a first priority lien on all ABL Priority Collateral and (b) a second priority lien on all Notes / Term Priority Collateral.  Subject to the terms of the PAA, as of the Petition Date, the Prepetition NPC Credit Facility (a) ranked junior in payment priority to the Prepetition FILO Credit Facility for so long as the outstanding aggregate principal amount of the Prepetition FILO Credit Facility exceeds $300 million (in an amount up to such excess), and thereafter ranked equal in payment priority to the Prepetition FILO Credit Facility and (b) ranked senior in payment priority to the Prepetition Opco Notes.

As further described below, following the Petition Date, approximately $357.5 million of the $362.5 million of principal amount outstanding under the Prepetition NPC Credit Facility was replaced and refinanced by the DIP OpCo Credit Facility.  [On [●], 2026, the Required Consenting DIP Term Loan Lenders exercised a call option to acquire the outstanding portion of the Prepetition NPC Credit Facility that was not replaced and refinanced by the DIP OpCo Credit Facility, in accordance with the terms of the DIP Term Loan Credit Agreement and the Final DIP Order.]

vi.      Intercreditor Agreements.

a.      **ABL / Notes Intercreditor Agreement**.  The ABL Agent, the Notes / Term Collateral Agent, Holdings, Saks Global Enterprises LLC, and the Prepetition Opco Subsidiary Guarantors entered into that certain Second Amended and Restated Intercreditor Agreement, dated as of August 8, 2025 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "ABL / Notes Intercreditor Agreement").  The ABL / Notes Intercreditor Agreement sets forth the agreement among the Prepetition ABL Agent, in its capacity as collateral agent under the Prepetition ABL Facility and Prepetition FILO Credit Facility, and the Notes / Term Collateral Agent, in its capacity as collateral agent under the Prepetition Opco Notes and the Prepetition NPC Credit Facility, with respect to the priority of liens on the collateral securing the Prepetition ABL Facility and the Prepetition FILO Credit Facility, on the one hand, and the Prepetition Opco Notes and the Prepetition NPC Credit Facility, on the other hand, and the respective rights and remedies of the various lenders, among other things.

b.      **The Equal Priority Intercreditor Agreement**.  Saks Global Enterprises LLC, Holdings, the Prepetition Opco Subsidiary Guarantors, the Prepetition NPC Agent, the Notes / Term Collateral Agent, the Prepetition Initial Notes Trustee, and the Prepetition OpCo Notes Trustee entered into that certain Equal Priority Intercreditor Agreement, dated as of August 8, 2025 (as amended, restated, supplemented, waived, or otherwise modified from time to

33

time prior to the Petition Date, the "Equal Priority Intercreditor Agreement"). The Equal Priority Intercreditor Agreement sets forth the agreement among the Prepetition NPC Agent, as Initial First Out Administrative Agent (as defined therein) for the Initial First Out Secured Parties (as defined therein), the Notes / Term Collateral Agent, as the Initial Notes Collateral Agent (as defined therein) for the Initial Notes Secured Parties (as defined therein), the Prepetition Initial Notes Trustee, as the Initial Fourth Out Trustee (as defined therein) for the Initial Fourth Out Secured Parties (as defined therein), and the Prepetition OpCo Notes Trustee, as Initial Second Out/Third Out Trustee (as defined therein) for the Initial Second Out/Third Out Secured Parties (as defined therein), with respect to the priority of liens in the collateral securing the Prepetition NPC Credit Facility and the Prepetition Opco Notes, and the respective rights and remedies of the various creditors, among other things.

c. **Collateral Agency Agreement and Intercreditor Agreement.** The Prepetition ABL Agent and the Prepetition FILO Agent entered into that certain Collateral Agency Agreement and Intercreditor Agreement, dated as of June 27, 2025 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "ABL / FILO Intercreditor Agreement"). The ABL / FILO Intercreditor Agreement sets forth the agreement between the Prepetition ABL Agent and the Prepetition FILO Agent with respect to the appointment of the Prepetition ABL Agent as the collateral agent for the Prepetition FILO Credit Facility, the priority of liens in the collateral securing the Prepetition ABL Facility and the Prepetition FILO Credit Facility, and the respective rights and remedies of the various lenders.

d. **Payment Administration Agreement.** Saks Global Enterprises LLC, Holdings, the Prepetition OpCo Subsidiary Guarantors, the Prepetition FILO Agent, the Prepetition NPC Agent, the Prepetition SGUS Notes Trustee, the Notes / Term Collateral Agent, the Prepetition OpCo Notes Trustee, and the Prepetition Initial Notes Trustee entered into that certain Payment Administration Agreement, dated as of August 8, 2025 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "PAA"). The PAA sets forth the agreement among the Prepetition FILO Agent, as the Initial First Out Administrative Agent (as defined therein) for the Initial First Out Secured Parties (as defined therein), the Prepetition NPC Agent, as the Initial Additional First Out Administrative Agent (as defined therein) for the Initial Additional First Out Secured Parties (as defined therein), the Prepetition SGUS Notes Trustee, as the SPV Notes Collateral Agent (as defined therein) for the SPV Noteholders (as defined therein), the Notes / Term Collateral Agent, as Initial Notes Collateral Agent (as defined therein) for the Initial Notes Secured Parties (as defined therein), the Prepetition OpCo Notes Trustee, as the Initial Second Out/Third Out Trustee (as defined therein) for the Initial Second Out/Third Out Secured Parties (as defined therein) and the Prepetition Initial Notes Trustee, as the Initial Fourth Out Trustee (as defined therein) for the Initial Fourth Out Secured Parties (as defined therein) with respect to the priority of payment among the Prepetition FILO Credit Facility, the Prepetition NPC Credit Facility, the Prepetition Opco Notes and certain indemnification obligations in favor of the Prepetition SGUS Notes, and the respective rights and remedies of the various creditors, among other things.

vii.     LC Facility Obligations

Saks Global Enterprises LLC and Evolution Credit Partners ("Evolution") are party to that certain Uncommitted Master Continuing Agreement for Letters of Credit, dated as of October 7,

34

2025 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "LC Facility Agreement") solely in connection with backstopping certain workers' compensation insurance obligations.  The LC Facility Agreement provides for an uncommitted facility under which Evolution may arrange for the issuance of standby letters of credit by third-party issuing banks to support Saks Global Enterprises LLC.  Letters of credit in an undrawn face amount of $32,741,098.40 have been issued under the LC Facility Agreement as of the Petition Date.  The LC Facility Agreement terminates on October 7, 2028.  On January 14, 2026, the Bankruptcy Court entered an order authorizing the Global Debtors to, among other things, maintain the LC Facility Agreement and honor their obligations thereunder in the ordinary course [Docket No. 151].

> viii.        Flagship CMBS Loan

Saks Flagship Real Property LLC, a non-Debtor affiliate of the Global Debtors, is the borrower under a $1.25 billion securitized mortgage loan (the "Flagship CMBS Loan") on the Saks Fifth Avenue flagship property in New York City, governed by that certain loan agreement, dated as of December 3, 2014 (as amended, restated, supplemented, waived, or otherwise modified as of the date hereof, the "Flagship CMBS Loan Agreement"), by and among Saks Flagship Real Property LLC and the lenders party thereto (the "Flagship CMBS Lenders").  The flagship building has been ground leased by 12 East 49th Street LLC, a Global Debtor, as tenant.  The Flagship CMBS Loan is not an obligation of the Global Debtors and is not included in the approximately $3.4 billion of prepetition funded debt described above.  [Subject to the consents set forth in the Restructuring Support Agreement, the applicable Company Parties (or their subsidiaries) shall reinstate the Flagship CMBS Loan on terms substantially identical to the current terms or otherwise on terms acceptable to the Required Consenting DIP Term Loan Lenders (the "Flagship CMBS Settlement").  Consummation of the Flagship CMBS Settlement is a condition precedent to the Effective Date of the Plan.]

## V.   SUMMARY OF KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

Following the Acquisition in December 2024, the Company faced liquidity challenges and it became apparent that its post-Acquisition capital structure was unsustainable.  Moreover, during the Company's fiscal year ending February 1, 2025, consolidated total revenue declined by 13.6% year over year, largely driven by lower retail sales across all channels due to inventory shortages. Although the Company expects to realize $600 million of total run-rate synergies over the five years post-Acquisition, its immediate-term liquidity position following the Acquisition remained severely constrained, making it difficult for the Company to pay vendors on time, which strained relations with brand partners.  In turn, vendors were less willing to ship goods to the Company, leaving the Company unable to build an adequate amount of seasonal inventory leading into Spring of 2025. The Company also suffered from a reduced borrowing base and corresponding reduced availability under its Prepetition ABL Facility as a result of declining inventory and increased discretionary reserves imposed under the Prepetition ABL Facility.

In February of 2025, the Company began considering strategies to address these challenges.  In addition to implementing changes to the business model, including extending payment terms, and continuing to execute on identified synergy opportunities, the Company

recognized that a new money financing solution was required to provide it the flexibility necessary to catch up on vendor payments, obtain runway to continue recognizing synergies from the Acquisition, and address a June 30 interest payment date on the Prepetition Initial Notes. The Company targeted closing a new financing in early to mid-May to address these liquidity needs.

On May 29, 2025, the Company announced that it had secured commitments for a new money financing facility from SLR Credit Solutions ("SLR") in the form of a $300 million FILO loan for Saks Global Enterprises LLC and a $50 million secured term loan for certain subsidiaries. However, the SLR financing could not be executed on the terms of the commitments previously obtained from SLR.

In late June 2025, the Global Debtors secured commitments for $600 million (before associated fees and payment of accrued interest) in Prepetition SGUS Notes from a majority of their existing bondholders to be funded in two parts, beginning with the issuance of $300 million in Prepetition SGUS Notes in June. The transaction required the $400 million Prepetition FILO Credit Facility described above, with $300 million in intercompany term loans funded by SGUS to Saks Global Enterprises LLC upon closing of the initial sale of Prepetition SGUS Notes in June 2025.

Subsequently, in August 2025, the Global Debtors completed the Exchange Transaction in which (i) holders of approximately 98% of the aggregate principal amount of the Prepetition Initial Notes tendered their notes in exchange for $162.5 million in Prepetition SGUS Notes, (ii) the Global Debtors received $300 million in additional gross proceeds from the sale of additional Prepetition SGUS Notes to existing holders, and (iii) the proceeds of the Prepetition SGUS Notes were on-lent to Saks Global Enterprises LLC in the form of (a) the $362.5 million Prepetition NPC Credit Facility and (b) $100 million of additional delayed draw term loans under the Prepetition FILO Credit Agreement.

In addition to accessing new capital, the transaction allowed the Global Debtors to capture approximately $115 million of discount in principal amount of Prepetition Initial Notes upon issuance of the Prepetition SGUS Notes and cancellation of the tendered Prepetition Initial Notes. Despite the closing of the Exchange Transaction, the Company was only able to use $244 million of proceeds for catch-up payments to vendors, as the remaining proceeds were needed to pay transaction-related fees and for working capital purposes as the Global Debtors continued to expend funds to integrate Neiman Marcus, while they faced a significant second quarter EBITDA loss driven by lower receipts.

Following the closing of the Exchange Transaction, the Global Debtors engaged with vendors in order to reduce past due amounts and to facilitate the purchase of inventory entering into the 2025 holiday season. Concurrently, the Global Debtors were affected by one-time merchandising system integration issues which disrupted inventory receipts at Neiman Marcus and Bergdorf Goodman when sales and inventory were already at a seasonal low point. This resulted in a significant reduction in the Global Debtors' borrowing base, negatively impacting liquidity. With less liquidity to continue paying brand partners and other vendors according to agreed-upon terms, the benefits of the $244 million vendor paydown were negated. These liquidity issues and the continued backlog of past due trade payables caused the Global Debtors to lose out on

opportunities for "chase" inventory—in-season replenishment of in-demand items—and the downward trend in the Global Debtors' business and liquidity continued.

The Global Debtors' business is seasonal, and the second quarter is typically the smallest of the year from a profit standpoint. With interest payments of $130 million paid in June, the merchandise integration issues in August that disrupted shipments, and soft second quarter results, liquidity was stretched in a way that did not allow the Global Debtors to restore inventory receipts to normalized levels. At the end of the second fiscal quarter, inventory was 9% below the prior year's levels—which were already constrained—on a combined basis. Moreover, increasing payment delays damaged trust with the Company's brand partners.

These factors resulted in an estimated loss of approximately $550 million of inventory receipts in the second half of 2025 compared to the Company's July forecast, and consequently a materially lower borrowing base under the Prepetition ABL Facility, which is calculated largely based on inventory value. Compounding these issues, the Global Debtors' minimum excess availability covenant under the Prepetition ABL Facility stepped up from $200 million to $375 million on December 1, 2025 and up to $500 million on December 16, 2025, greatly reducing the Global Debtors' ability to borrow under that facility. Due to these step ups and the implementation of reserves, the Global Debtors' borrowing capacity under the Prepetition ABL Facility was reduced to less than fifty percent. The Global Debtors also faced interest payments on the Prepetition FILO Credit Facility, Prepetition NPC Credit Facility, Prepetition SGUS Notes and Prepetition OpCo Notes totaling about $126 million at the end of December 2025, which they were unable to pay.

Despite the prepetition constraints on the business due to tight liquidity, the business showed multiple positive indicators. Importantly, Company data indicates that when stores have inventory, the inventory sells. The Company has achieved substantial synergies with the integration of Neiman Marcus Group faster than expected. The initial target for run-rate synergies expected to be realized by the end of fiscal 2025 was approximately $150 million. As of the Company's results for the quarter ended August 2, 2025, the Company had identified and continues to execute on approximately $300 million in run-rate synergies, nearly double the expectations outlined at transaction close for year one. Since August, the Company has been operating from one unified merchandising platform which allows its teams to buy and sell inventory across Saks Fifth Avenue and Neiman Marcus to optimize inventory buys and allows allocation of inventory across all of its luxury retail brands. This unlocks significant margin potential by allowing the Company to maximize its working capital efficiency. Sellers at all three of the luxury banners benefit, with the ability, with vendor permission, to offer customers merchandise from across the entire network in the future.

Prior to the Petition Date, the Global Debtors pursued alternative liquidity solutions from both third parties and existing stakeholders, and implemented liquidity-enhancing steps and other expense reduction actions, including delaying or halting vendor payments, while engaging with stakeholders on terms of a comprehensive restructuring and debtor-in-possession financing. After intense negotiations, the Global Debtors determined that the best path forward was to pursue the DIP Term Loan Credit Facility offered by the Ad Hoc Group, which has provided more than $1 billion in new money during the course of these cases, as well as a commitment to provide an additional $500 million upon exit from bankruptcy. This vital liquidity boost, along with the

37

benefits of the chapter 11 process, including the ability to re-focus its operations through closing select locations and restructuring its debt through the Plan, has provided, and will continue to provide the Company critical debt relief and cash for its operations, allowing the Global Debtors to emerge from bankruptcy with a strong financial foundation so that the Company can continue to play a central role in shaping the luxury retail industry well into the future.

## VI.   MATERIAL DEVELOPMENTS SINCE THE PETITION DATE

### A.   The Global Debtors' First-Day Motions and Certain Related Relief

#### i.   First-Day Pleadings

To minimize disruption to the Global Debtors' operations upon the commencement of these Chapter 11 Cases, the Global Debtors filed and obtained final court approval of various first-day motions seeking authority to, among other things, (i) jointly administer the Chapter 11 Cases, (ii) appoint the Claims Agent, (iii) honor customer obligations and otherwise continue prepetition customer programs in the ordinary course of business, (iv) establish notice and hearing procedures for transfers of interests in certain of the Global Debtors and/or declarations of worthlessness with respect to the equity interests in Saks Global Holdings LLC, (v) pay prepetition claims owed due to maintaining insurance and continue maintaining the Global Debtors' insurance, including under their premium financing arrangements, (vi) provide adequate assurance of payment to utility companies, (vii) redact certain personally identifiable information of individuals from publicly filed documents, (viii) continue using the Global Debtors' existing cash management system; (ix) pay prepetition claims owed to certain critical vendors, section 503(b)(9) claimants, lien claimants, and customs and regulatory claimants, (x) pay prepetition claims owed to employees and on account of employee benefit programs and to continue offering employee benefit programs postpetition, (xi) pay prepetition claims owed to taxing authorities and continue paying taxes in the ordinary course of business; (xii) extend the deadline by which the Global Debtors were required to file their schedules of assets and liabilities and statements of financial affairs; and (xiii) obtain debtor-in-possession financing and use cash collateral.

#### ii.   Postpetition Debtor-in-Possession Financing

The Global Debtors sought approval of the DIP Facilities on an interim and final basis. The DIP Facilities are comprised of the DIP ABL Credit Facility, the DIP Term Loan Credit Facility, and the DIP OpCo Credit Facility, each of which is described below:

- **DIP ABL Facility**.  The Global Debtors' Prepetition ABL Lenders agreed to enter into a new debtor-in-possession ABL facility with commitments in an aggregate principal amount of $1.5 billion, subject to a borrowing base formula.  The DIP ABL Facility provides materially improved terms as compared to the Prepetition ABL Facility through a reduction of the reserves and required minimum excess availability.  These concessions allow the Global Debtors to borrow approximately an incremental $240 million more than was available to them under the terms of the Prepetition ABL Facility.  The DIP ABL Facility also includes a roll-up of the Global Debtors' prepetition obligations under the Prepetition ABL Facility into the DIP ABL Facility.

- **DIP Term Loan Credit Facility**. The DIP Term Loan Credit Facility is a $2.6 billion delayed draw term loan debtor-in-possession financing facility provided by members of the Ad Hoc Group, which consists of (a) $1 billion of new money "first out" (first in right of payment) term loans (the "SGUS First Out DIP Loans") available in three draws, (b) up to $808 million (excluding fees, premiums and other amounts payable-in-kind) in "second out" term loans (the "SGUS Second Out DIP Loans"), which shall be immediately junior in right of payment to the SGUS First Out DIP Loans, to replace and finance the Prepetition SGUS Notes on a dollar-for-dollar, cashless basis, and (c) up to $751 million (excluding fees, premiums, and other amounts payable-in-kind) of "third out" loans (the "SGUS Third Out DIP Loans"), which were used by SGUS to purchase participation interests in prepetition notes issued by Saks Global Enterprises LLC. As of the date hereof, approximately $[●] of Prepetition SGUS Notes have been replaced and refinanced under the DIP Term Loan Credit Facility, and approximately $[●] of principal remains outstanding under the Prepetition SGUS Notes.

- **DIP OpCo Credit Facility**. The DIP OpCo Credit Facility is a $1.75 billion intercompany debtor-in-possession facility that provides for (a) delayed draw term loans of up to $1 billion (excluding fees, premiums, and other amounts payable-in-kind) in principal amount from SGUS (consisting of the proceeds of the new money DIP Term Loan Credit Facility) to Saks Global Enterprises LLC, as borrower, in accordance with the terms of the DIP OpCo Credit Facility, and (b) a cashless roll-up of approximately $752 million of loans outstanding under the Prepetition FILO Credit Facility and the Prepetition NPC Credit Facility.

On January 15, 2026, the Bankruptcy Court entered an interim order approving the DIP Facility [Docket No. 206]. Following a hearing, on February 20, 2026, the Bankruptcy Court entered an order approving the DIP Facilities on a final basis [Docket No. 917].

**B.       Appointment of Official Committee of Unsecured Creditors**

On January 27, 2026, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") [Docket No. 480]. On January 29, 2026, the U.S. Trustee filed a notice amending the composition of the Committee. [Docket No. 522]. As of the date hereof, the members of the Committee are (i) Amazon.com Services LLC, (ii) Chanel, Inc., (iii) Pension Benefit Guaranty Corporation, (iv) Brookfield Properties Retail Inc., (v) Rosen-X, (vi) Kering Americas, Inc., (vii) LVMH Moët Hennessy Louis Vuitton Inc., (viii) Ermenegildo Zegna NV, (ix) Kellermeyer Bergensons Services, LLC, (x) Local 1102 RWDSU UFCW, and (xi) Computershare Trust Company, N.A., in its capacity as successor Trustee for the Prepetition Initial Notes, issued by Saks Global Enterprises LLC (as successor in interest to SFA Issuer LLC).

**C.       Claims Process and Bar Date**

i.       Schedules of Assets and Liabilities and Statements of Financial Affairs

On January 14, 2026, the Bankruptcy Court entered the Order (I) Extending Debtors' Time to File Schedules and Statements and 2015.3 Reports; (II) Modifying the Requirements of Local Rule 2015-3; and (III) Granting Related Relief [Docket No. 160] (the "Extension Order"), which

39

extended the Global Debtors' deadline to file their schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "Statements") in these Chapter 11 Cases through and including March 13, 2026. On March 13, 2026, the Debtors filed the Notice of Extension of Deadline for the Debtors to File Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket No. 1172], which disclosed that pursuant to the Extension Order, the U.S. Trustee agreed to further extend such deadline through and including March 20, 2026.

On March 15, 2026, the Global Debtors filed their Schedules and Statements. [Docket Nos. 1175–1218; 1219–1419].

### ii. Claim Bar Dates

On March 12, 2026, the Bankruptcy Court entered that certain *Order (I) Establishing Deadlines for the Filing of Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Approving the Form and Manner for Filing Proofs of Claim, (III) Approving the Form and Manner of Notice Thereof, Including Section 503(b)(9) Requests, and (IV) Granting Related Relief* [Docket No. 1158] (the "Bar Date Order"). The Bar Date Order set the following deadlines:

- Claims Bar Date: April 24, 2026 at 11:59 p.m. (Prevailing Central Time). The "Claims Bar Date" is the last date for all entities (except governmental units) to file a proof of claim in respect of any claims against the Global Debtors that arose or are deemed to have arisen prior to the Petition Date, including requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code.

- Governmental Bar Date: July 13, 2026 at 11:59 p.m. (Prevailing Central Time). The "Governmental Bar Date" is the last date for a governmental unit, as defined in section 101(27) of the Bankruptcy Code, to file a proof of claim against the Global Debtors in respect of any claims against the Global Debtors (whether secured, unsecured priority, or unsecured non-priority) that arose on or prior to the Petition Date, including governmental units with claims against the Global Debtors for unpaid taxes, whether such claims arise from prepetition tax years or periods or prepetition transactions to which the Global Debtors were a party.

Additionally, pursuant to the Bar Date Order, unless otherwise ordered by the Bankruptcy Court, all entities holding claims against the Global Debtors arising from the rejection of executory contracts and unexpired leases of the Global Debtors are required to file Proofs of Claim by the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable and (b) 11:59 p.m. (Prevailing Central Time) on the date that is thirty (30) days following the later of (i) entry of the order approving the Global Debtors' rejection of the applicable executory contract or unexpired lease or (ii) the effective date of a rejection of the applicable executory contract or unexpired lease operation of any Court order.

The Bar Date Order also provides that if any Global Debtor amends the Schedules after having given notice of the Bar Dates, then the Global Debtors shall give notice of any such amendment or supplement to the holders of claims affected thereby and the time for those holders to file Proofs of Claim, if necessary, shall be the later of (a) the Claims Bar Date or the

Governmental Bar Date, as applicable, and (b) 11:59 p.m., Prevailing Central Time, on the date that is 30 days from the date the notice of the Schedules amendment is sent.

Notice of the foregoing deadline was provided by mail and publication in accordance with the procedures outlined in the Bar Date Order.

### D.     Simon Property Group, L.P.'s Lift Stay Motion

On January 22, 2026, Simon filed the *Motion of Simon Property Group, L.P. for Entry of an Order (A) Declaring the Automatic Stay Does Not Apply, (B) in the Alternative, Granting Relief from the Automatic Stay, and (C) Granting Related Relief* [Docket No. 421] (the "Simon Lift Stay Motion").  Pursuant to the Simon Lift Stay Motion, Simon is seeking an order from the Bankruptcy Court (a) confirming that the Debtors' lease agreements with Simon for certain premises were terminated by Simon prior to the Petition Date and thus, any interests of the Global Debtors under such leases are not property of the Global Debtors' estates and the automatic stay does not prevent Simon from obtaining possession of the premises, and (b) in the alternative, granting Simon relief from the automatic stay under section 362(d)(1) to take such acts as are necessary to obtain possession of the certain premises.

On February 16, 2026, the Global Debtors filed an objection to the Simon Lift Stay Motion [Docket No. 799].  The Ad Hoc Group and the Committee each filed joinders to the Debtors' objection [Docket Nos. 800, 801].

On February 24, February 27, and March 2, 2026, the Bankruptcy Court held a hearing on the Simon Lift Stay Motion.  As of the date hereof, the Bankruptcy Court has not issued its decision on the Simon Lift Stay Motion and the Global Debtors and Simon are continuing discussions regarding a potential resolution of the Simon Lift Stay Motion.

### E.     Store Closing Sales

On January 29, 2026, the Global Debtors filed the Global Debtors' Emergency Motion *For Entry of Interim and Final Orders (I) Approving and Authorizing the Global Debtors to Enter Into and Perform Under the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Authorizing Bonuses for Non-Insider Employees of Closing Stores, (IV) Approving Modifications to Certain Customer Programs, and (V) Granting Related Relief [Docket No. 513] (the "SO5 Store Closing Motion").  On February 10, 2026, the Global Debtors filed the Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving and Authorizing Global Debtors to Enter Into and Perform Under Consulting Agreement; (II) Approving Procedures for Store Closing Sales; (III) Authorizing Severance for Non-Insider Employees; (IV) Approving Modifications to Certain Customer Programs; and (V) Granting Related Relief [Docket No. 733] (together with the SO5 Store Closing Motion, the "Store Closing Motions").*  The Global Debtors filed the Store Closing Motions in connection with their decision to close the majority of their Saks OFF 5th and Last Call retail locations, as well as their efforts to optimize their full-priced luxury store profile.

On February 13 and February 24, 2026, the Bankruptcy Court entered orders approving the Store Closing Motions on a final basis [Docket Nos. 778, 983].  Pursuant to the Store Closing Orders, the Bankruptcy Court authorized the Global Debtors to, among other things, (a) sell or

41

otherwise dispose, through "store closing" or similarly themed sales, certain merchandise located at the majority of the Global Debtors' Saks OFF 5TH and Last Call store locations and certain of their Saks Fifth Avenue and Neiman Marcus store locations, and (b) enter into certain consulting agreements with GA Retail Solutions, LLC (the "Consultant") whereby the Consultant has consulted, and continues to consult, the Global Debtors with respect to the store closing sales. As of the date hereof, the Global Debtors have initiated store closings with respect to 34 Saks OFF 5TH stores, 5 Last Call stores, 21 Saks Fifth Avenue stores, and 4 Neiman Marcus stores.

### F.    Interchange Defendants Claims Settlement

On February 3, 2026, the Global Debtors and the SO5 Debtors filed the Debtors' Joint Motion for Order (I) Approving and Authorizing Debtors' Entry Into Settlement Agreements with the Interchange Defendants and (II) Granting Related Relief [Docket No. 642] (the "Interchange Settlement Motion").   Pursuant to the Interchange Settlement Motion, the Debtors sought approval of their entry into certain settlement agreements, which settled the Debtors' claims in the multidistrict litigation titled In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, No. 1:05-md-01720 (E.D.N.Y).   The settlement agreements provided for, among other things, the distribution of certain settlement payments to both the Global Debtors' and the SO5 Debtors' estates.  On February 27, 2026, the Bankruptcy Court entered an order approving the motion [Docket No. 1047] (the "Interchange Settlement Order").

Pursuant to the Interchange Settlement Order, the settlement agreements provided for the distribution of certain proceeds to both the Global Debtors' and the SO5 Debtors' estates.  A portion of the Global Debtors' settlement proceeds is claimed by an unaffiliated third-party pursuant to the terms of a participation agreement between such unaffiliated third party and Saks Global Enterprises LLC (f/k/a HBC US Holdings LLC), dated as of August 5, 2024.  The Interchange Settlement Order provides that no payment may be made to such unaffiliated third party in connection therewith until the Bankruptcy Court enters a subsequent order authorizing such payment. The Global Debtors are required to hold the amount of such payment in a segregated account pending entry of such order.  The Global Debtors' entitlement to, and the ultimate disposition of, the amount of such payment remains uncertain and may be the subject of further proceedings before the Bankruptcy Court.

### G.    Rejections of Executory Contracts and Unexpired Leases

On January 14, January 30, February 13, and February 27, 2026, the Global Debtors filed omnibus motions to reject certain of their executory contracts and unexpired leases [Docket Nos. 32, 558, 786, 1060, 1062] (the "Omnibus Rejection Motions").  On February 19, March 1, March 8, and March 22, 2026, the Bankruptcy Court entered orders approving the first, second, third, and fifth Omnibus Rejection Motions, respectively.  [Docket Nos. 863, 1074,1135, 1462].

The Global Debtors intend to file additional Omnibus Rejection Motions in these Chapter 11 Cases to reject additional executory contracts and unexpired leases.

### H.     Retention of Professionals

The Global Debtors have filed various applications to retain professionals during these Chapter 11 Cases, as is common in chapter 11 cases of similar size and complexity, including applications for the entry of orders authorizing the retention of:

- Willkie Farr & Gallagher LLP, as co-counsel to the Global Debtors [Docket No. 466], which the Bankruptcy Court approved on February 19, 2026 [Docket No. 862];

- Haynes and Boone, LLP, as co-counsel to the Global Debtors [Docket No. 717], which the Bankruptcy Court approved on March 1, 2026 [Docket No. 1075];

- PJT Partners LP ("PJT"), as investment banker to the Global Debtors [Docket No. 467], which the Bankruptcy Court approved on March 1, 2026 [Docket No. 1073];

- Berkeley Research Group, LLC, to provide Mark Weinsten as Chief Restructuring Officer and as financial advisor to the Global Debtors and additional staff to support the Chief Restructuring Officer [Docket No. 716], which the Bankruptcy Court approved on March 3, 2026 [Docket No. 1108];

- A&G Realty Partners, as real estate consultant and advisor to the Global Debtors [Docket No. 481], which the Bankruptcy Court approved on March 4, 2026 [Docket No. 1111];

- Deloitte & Touche LLP, as independent auditor to the Global Debtors [Docket No. 1146];

- Deloitte Tax LLP, as tax advisory services provider to the Global Debtors [Docket No. 1457];

- Milbank LLP, as counsel to the Special Restructuring Committee of HBC GP LLC's Board of Managers [Docket No. 884], which the Bankruptcy Court approved on March 15, 2026 [Docket No. 1424];

- Alvarez & Marsal North American, LLC, as financial advisors to the Special Restructuring Committee [Docket No. 1171];

- Ernst & Young LLP, as tax advisor to the Global Debtors [Docket No. [●]]; and

- Stretto, Inc., as Claims, Noticing, and Solicitation Agent [Docket No. 3], which the Bankruptcy Court approved on January 14, 2026 [Docket No. 48].

### I.     Entry into the Key Employee Incentive Plan and Non-Insider Compensation Program

On April 1, 2026, the Global Debtors filed a motion [Docket No. 1773] seeking approval of a key employee incentive plan (the "KEIP") and a non-insider compensation program (the "NICP" and, together with the KEIP, the "Compensation Plans") pursuant to sections 363(b)

and 503(c)(3) of the Bankruptcy Code. The Compensation Plans are subject to the Bankruptcy Court's approval. The Compensation Plans were developed by the Global Debtors, in consultation with Willis Towers Watson US LLC, their expert compensation consultants, and were reviewed, modified, and approved by the Special Restructuring Committee of the applicable boards of the Global Debtors.

The high performance and continued dedication of an exceptional management team, as well as a cadre of key employees with critical institutional knowledge and relationships, are essential to the Global Debtors' successful restructuring. To that end, the Compensation Programs are intended to properly incentivize their senior management team and retain critical non-insider employees throughout a critical period in these Chapter 11 Cases by ensuring market competitive pay for the non-insider participants, especially given that all ordinary course short-term and long-term incentive plans have been discontinued.

## J.      Supplemental Employee Wages Motion

On April 1, 2026, the Global Debtors filed a motion [Docket No. 1774] (the "Supplemental Wages Motion") seeking to expand the relief granted in the original employee wages motion [Docket Nos. 10, 149] pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. The Supplemental Wages Motion seeks authority for the Global Debtors to pay, in their discretion, certain discretionary bonuses—comprised of seller bonuses (the "Seller Bonuses") for top-performing sales associates and sign-on bonuses (the "Sign-On Bonuses") for new hires (collectively, the "Discretionary Bonuses")—as well as one-time severance payments (the "Severance Payments") of between four and ten weeks of pay to full-time non-insider employees who are separated without cause. As of the date hereof, the Supplemental Wages Motion is pending and subject to the Bankruptcy Court's approval.

## K.      Special Restructuring Committee Independent Investigation

As described in the Preliminary Statement, in connection with their restructuring efforts, the Global Debtors appointed independent managers Paul Aronzon, William Tracy, and Scott Vogel to serve as independent managers of HBC GP LLC, each subsidiary Global Debtor that is not member-managed, and to the Special Restructuring Committee. Also as described above, the Special Restructuring Committee retained Milbank LLP as independent counsel. The Global Debtors' application for approval of the retention of Alvarez & Marsal North America, LLC as independent financial advisor to the Special Restructuring Committee [Docket No. 1171] is currently pending before the Court.

In addition to serving in their roles as independent managers, the members of the Special Restructuring Committee, along with the advisors acting at their exclusive direction, are conducting an independent investigation into certain matters (the "Special Restructuring Committee Independent Investigation"). The Special Restructuring Committee's activities also include evaluating a restructuring transaction, approving or terminating the restructuring transaction, participating in consultation with management and advisors, and if necessary, authorizing approval of a restructuring, including the Global Debtors' entry into the Restructuring Support Agreement and the Global Debtors' pursuit of the Plan.

44

The Special Restructuring Committee Independent Investigation remains ongoing as of the date hereof. The Global Debtors expect that the Special Restructuring Committee will be in a position to make a final recommendation, based on the outcome of the Special Restructuring Committee Independent Investigation, regarding whether the release and exculpation provisions contemplated by the Plan are appropriate in advance of the hearing on Confirmation of the Plan.

### L.      Entry into Restructuring Support Agreement

On April 1, 2026, the Global Debtors and the Consenting DIP Term Loan Lenders entered into the Restructuring Support Agreement.

Pursuant to the Restructuring Support Agreement, the Global Debtors and the Consenting DIP Term Loan Lenders have committed to, among other things, support and take commercially reasonable steps to implement and consummate the Restructuring Transactions and the Plan, including voting all of their claims against the Global Debtors, including any and all claims arising out of the Prepetition OpCo Notes, in favor of the Plan.

The Restructuring Support Agreement contains a number of termination events that may be triggered if, among other things, the Global Debtors pursue a restructuring transaction that is inconsistent with the Plan, or otherwise file documents in the Bankruptcy Court that are not in form and substance consistent with the terms and consent rights contemplated by the Restructuring Support Agreement.  Importantly, the Global Debtors maintain a "fiduciary out" under the Restructuring Support Agreement and can terminate the Restructuring Support Agreement if the board of directors, board of managers, or such similar governing body of any of the Global Debtors, after consulting with counsel, determines that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law, or, in the exercise of its fiduciary duties, determines to pursue an alternative restructuring transaction.

The Restructuring Support Agreement also incorporates the case milestones that are set forth in the DIP Term Loan Credit Facility Agreement and the DIP OpCo Credit Facility Agreement.  Unless otherwise extended with the consent of the Required Consenting DIP Term Loan Lenders, failure to achieve these milestones gives the Required Consenting DIP Term Loan Lenders the right to terminate their obligations under the Restructuring Support Agreement.

In connection with the Restructuring Support Agreement, on April 1, 2026, the Global Debtors entered into the New Capital Commitment Letter with certain Consenting DIP Term Loan Lenders.  Pursuant to the New Capital Commitment Letter, the New Capital Commitment Parties have severally (and not jointly) committed to provide $500,000,000 in the aggregate in new financing in the form of either (a) a first lien senior secured term loan facility or an issuance of first lien senior secured notes and/or (b) senior preferred equity issued by Saks Global Holdings, LLC (collectively, the "Incremental New Money Facilities"), in each case subject to any in-kind increases and/or dollar-for-dollar reductions as more fully set forth in the New Capital Commitment Letter.  The form of the Incremental New Money Facilities will be determined at the election of the Majority Commitment Parties on or prior to the earlier of May 15, 2026 and seven (7) days before the date of the Combined Hearing.  As consideration for the commitments, the Global Debtors have agreed to pay a commitment premium equal to 17.5% of the Aggregate Funding Amount as of the date of the New Capital Commitment Letter (without giving effect to

any adjustments thereto as described therein, including any Excess Liquidity Reduction), which shall be fully earned, non-refundable, and non-avoidable upon entry of the Commitment Letter Approval Order.  The Commitment Premiums, expense reimbursement obligations, and indemnity obligations under the New Capital Commitment Letter shall constitute allowed Administrative Expense Claims that are senior in priority to all other Administrative Expense Claims (other than the DIP Superpriority Claims (as defined in the Final DIP Order)).

The New Capital Commitment Letter contains a number of termination events that may be triggered if, among other things, the Restructuring Support Agreement is terminated, the Chapter 11 Cases are dismissed or converted, the Bankruptcy Court fails to enter the order approving the New Capital Commitment Letter or the Confirmation Order by certain specified dates, the Effective Date does not occur by June 22, 2026 (as may be waived or extended with the prior written consent of the Majority Commitment Parties), or a Material Adverse Effect (as defined in the DIP Term Loan Credit Agreement as in effect on the date hereof) occurs.  The New Capital Commitment Letter also provides that, in the event a New Capital Commitment Party fails to fund its respective commitment on the Plan Effective Date, the remaining non-defaulting New Capital Commitment Parties shall have the right, but not the obligation, to fund all or any portion of such defaulted amounts.

### M.    Entry into the Exit ABL Facility

On the Effective Date, the Reorganized Global Debtors will enter into the Exit ABL Facility, a new asset-based loan facility with first-lien priority.  The Exit ABL Facility is intended to refinance and replace the DIP ABL Credit Facility upon the Effective Date, and its quantum will be sized in line with the Business Plan, subject to the consent of the Required Consenting DIP Term Loan Lenders.  The material terms of the Exit ABL Credit Agreement will be included in the Plan Supplement, and the Exit ABL Facility Documents shall be subject to the consents and conditions precedent set forth in the Restructuring Support Agreement and the Plan.

On the Effective Date, each Holder of Allowed DIP ABL Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of such Allowed DIP ABL Facility Claims, payment in Cash in full from the proceeds, as applicable, of the Exit ABL Credit Facility or the New Exit Facilities. Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit ABL Facility and related agreements, including all transactions contemplated thereby, and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the Exit ABL Facility.

On the Effective Date, all of the Liens and security interests to be granted in connection with the Exit ABL Facility shall be deemed automatically perfected and shall not be subject to avoidance, recharacterization, or subordination for any purposes whatsoever.  All conditions precedent to the effectiveness of the Exit ABL Facility must be satisfied or duly waived by the party whose consent is required thereunder as a condition to the occurrence of the Effective Date.

## VII.    SUMMARY OF CERTAIN ISSUES RELATING TO THESE CHAPTER 11 CASES AND THE PLAN

### A.    Voting on the Plan

The Global Debtors will be soliciting acceptances, subject to the conditions set forth in this Disclosure Statement, from all Voting Classes under the Plan consistent with sections 1125 and 1126 of the Bankruptcy Code, Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.

An acceptance of the Plan will constitute an acceptance and consent to all of the terms and provisions in the Plan, including, without limitation, the releases, exculpations, and injunction provisions included therein.

**All Voting Classes are urged to read this Disclosure Statement and the documents attached hereto and enclosed herewith in full.  The Global Debtors believe that the Plan is in the best interests of the Global Debtors, their Estates, and all of their stakeholders, including the Voting Classes.  Accordingly, the Voting Classes are urged to vote in favor of the Plan.**

**No person has been authorized to give any information or make any representation about the Plan not contained in this Disclosure Statement.  The statements in this Disclosure Statement are made as of the date hereof.  Neither this Disclosure Statement's distribution nor the consummation of Plan will, under any circumstance, create any implication that the statements and information contained herein are correct as of the date that any such statement or information was made or provided, or as of any time after the date hereof.  All summaries herein are qualified by reference to the actual terms of each of the documents attached to this Disclosure Statement.  In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability.  Unless otherwise indicated, the Global Debtors have provided the factual information in this Disclosure Statement.**

As described herein and in the Plan, only certain classes under the Plan are entitled to vote on the Plan.  Specifically, Holders of Claims in Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, [4-D], 5-A, and [5-B] are members of the only Classes that are "impaired" and entitled to vote to accept or reject the Plan.  Any Holder of a Claim or Equity Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan, or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code, is considered "impaired."  Each Holder of a Claim or Equity Interest in a Class that is deemed to accept or reject the Plan will receive a notice of non-voting status after the Petition Date, but will not receive a Ballot because they are not eligible to vote on the Plan.  These Classes include Classes [4-D], [5-B], 6-A, 6-B, 8, and 9.  All Holders of Claims or Equity Interests may receive a copy of these documents and the Plan Supplement, as applicable, by mailing a written request to the Solicitation Agent.  Such documents are available electronically free of charge at https://cases.stretto.com/saks/.

47

> **Which Classes of Claims and Equity Interests Are Entitled to Vote on the Plan?**
>
> Classes of Claims and Equity Interests are entitled to vote on the Plan as follows:
>
> - Claims in Classes 1 and 2 are unimpaired under the Plan, are deemed to have accepted the Plan, and are not entitled to vote on the Plan.
>
> - Claims in Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, [4-D], 5-A, and [5-B] are impaired and entitled to vote on the Plan.
>
> - Claims and Equity Interests in Classes [4-D], [5-B], 6-A, 6-B, 8, and 9 are impaired and deemed to have rejected the Plan and are not entitled to vote on the Plan.
>
> - Claims and Equity Interests in Classes 7 and 10 are either impaired or unimpaired and are deemed to have rejected or accepted the Plan, as applicable, and are not entitled to vote on the Plan.

For a description of the Classes of Claims and Equity Interests and their treatment under the Plan, *see* Article VII.C of this Disclosure Statement.

Under the Bankruptcy Code, a Class of Claims shall have accepted the Plan if it is accepted or deemed accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Holders of the Allowed Claims or Equity Interests in such Class that have voted on the Plan. As a prerequisite to confirming the Plan, the Bankruptcy Code requires that votes in favor of the Plan must be obtained from at least one impaired accepting Class, excluding the votes of any insiders.

### B.     The Combined Hearing

The Global Debtors will request that the Bankruptcy Court schedule, as promptly as practicable, a hearing to approve this Disclosure Statement on a conditional basis as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code.

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to confirm a plan. Section 1128(b) provides that a party-in-interest may object to confirmation of a plan. Objections to confirmation must be filed with the Bankruptcy Court and served on the Global Debtors as well as the other parties set forth in the notice of the Combined Hearing (the "Notice of Combined Hearing") by the objection deadline of [●], as set forth in the Notice of Combined Hearing.

At the Combined Hearing, the Bankruptcy Court will:

- determine, on a final basis, whether this Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code;

- determine whether the solicitation of votes on the Plan was in compliance with section 1126 of the Bankruptcy Code;

- determine whether the Plan has been accepted by a sufficient number of Holders and amount of claims entitled to vote on the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

## C.     Summary of Treatment Under the Plan

The following section describes more fully the treatment to be provided to each Class of Claims and Equity Interests under the Plan.  This description is only a summary of certain important provisions of the Plan and should not replace careful review of the Plan.  Each Holder of a Claim or Equity Interest should read the Plan carefully.  Please refer particularly to Articles III and IV of the Plan, this Article VII, and the liquidation analysis attached as **Exhibit B** to this Disclosure Statement (the "Liquidation Analysis") for a more detailed description of the classification and treatment of Claims and Equity Interests provided under the Plan.

[The Plan designates the following Classes of Claims and Equity Interests: Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3-A (First Out DIP Term Loan Facility Claims), Class 3-B (Second Out DIP Term Loan Facility Claims), Class 3-C (Third Out DIP Term Loan Facility Claims), Class 4-A (Prepetition SGUS Notes Claims), Class 4-B (Prepetition FILO and NPC Claims), Class 4-C (Prepetition OpCo Second Out Notes Claims), Class 4-D (OpCo General Unsecured Claims), Class 5-A (HoldCo II SGUS Notes Guarantee Claims), Class 5-B (HoldCo II General Unsecured Claims), Class 6-A (Prepetition TopCo Facility Claims), Class 6-B (TopCo General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Subordinated Claims), Class 9 (Existing TopCo Equity Interests), and Class 10 (Existing Intercompany Equity Interests.]

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not designate Classes of Claims for: DIP ABL Facility Claims, DIP OpCo Claims, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and U.S. Trustee Fees.

### i.     DIP ABL Facility Claims

On the Effective Date, DIP ABL Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment,

49

recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of DIP ABL Facility Claims shall receive, in full satisfaction, settlement, release and discharge of the Allowed DIP ABL Facility Claims, payment in Cash in full from the proceeds, as applicable, of the Exit ABL Credit Facility or the New Exit Facilities.

ii.     DIP OpCo Claims

On the Effective Date, DIP OpCo Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, SGUS, as sole holder of the DIP OpCo Claims shall receive, in full satisfaction, settlement, release and discharge of the Allowed DIP OpCo Claims, [(a) 100% of the Equity Interests in [Saks Global Holdings LLC], (b) 100% of the Take Back Term Loans, and (c) 100% of the Take Back Preferred Units] (the "DIP OpCo Claims Distribution"), which DIP OpCo Claims Distribution shall subsequently be distributed pursuant to and in accordance with Section 5.3, Section 5.4, and Section 5.5 of the Plan, as applicable, and the Restructuring Steps Plan.

Upon payment in full or satisfaction of all Allowed DIP Facility Claims in accordance with the terms of the Plan, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

iii.    Administrative Expense Claims

Except with respect to Administrative Expense Claims that are Professional Fee Claims, and except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Global Debtor(s) or the Plan Administrator, as applicable, agree to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash:  (i) if such Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Expense Claim is based on liabilities incurred by the Global Debtors in the ordinary course of their business after the Petition Date, to the extent consistent with the DIP Budget, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense Claim without any further action by the Holder of such Allowed Administrative Expense Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Global Debtor or the Plan Administrator, as applicable; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### iv.  Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and opportunity for a hearing in accordance with the procedures established by the Bankruptcy Court. The Global Debtors or the Plan Administrator shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account. The Global Debtors or the Plan Administrator, as applicable, shall establish the Professional Fee Escrow Account in trust for the Professional Persons and fund such account with Cash equal to the Professional Fee Escrow Amount on the Effective Date.

### v.  Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting DIP Term Loan Lenders, each Holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, either: (i) on the Effective Date or as soon thereafter as reasonably practicable if the Priority Tax Claims Bar Date has not yet occurred, Cash in an amount equal to such Claim; or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the Holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due; provided, further, that notwithstanding any provision of the Plan or the Restructuring Support Agreement to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state Law shall be assumed by and Reinstated against the applicable Reorganized Global Debtor. On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable Law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.

### vi.  U.S. Trustee Fees

All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Global Debtors or Plan Administrator in full in Cash on the Effective Date. The Global Debtors shall File all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Global Debtors or Plan Administrator, as applicable, shall File with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. After the Effective Date, each of the Reorganized Global Debtors or the Disbursing Agent acting on behalf of each of the Reorganized Global Debtors shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable. The Reorganized Global Debtors shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under chapter 7 of the Bankruptcy Code of the Chapter 11 Case of that particular Global Debtor for whom the Global Debtors, the Reorganized

51

Global Debtors, or Plan Administrator, as applicable, is responsible.  The U.S. Trustee shall not be treated as providing any release under the Plan.  U.S. Trustee Fees are Allowed.  The U.S. Trustee shall not be required to File any Proof of Claim or any request for administrative expense for U.S. Trustee Fees.  The provisions of Section 3.6 of the Plan shall control notwithstanding any other provision(s) in the Plan to the contrary.

        vii.        Class 1 – Priority Non-Tax Claims

Classification:  Class 1 consists of all Priority Non-Tax Claims.

Treatment:  The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall receive, at the election of the Global Debtors and subject to the reasonable consent of the Required Consenting DIP Term Loan Lenders: (i) Cash in an amount equal to such Allowed Claim or in the ordinary course of business as and when due; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

Voting:  Priority Non-Tax Claims are not Impaired Claims.  The Holders of Priority Non-Tax Claims are conclusively presumed to accept the Plan.  The Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

        viii.        Class 2 – Other Secured Claims

Classification:  Class 2 consists of all Other Secured Claims.

Treatment:  The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date each Holder of an Allowed Other Secured Claim shall receive, at the election of the Global Debtors and subject to the reasonable consent of the Required Consenting DIP Term Loan Lenders:  (i) Cash in an amount equal to such Allowed Claim; (ii) the Collateral securing its Other Secured Claim; (iii) Reinstatement of such Allowed Claim; or (iv) such other treatment that will render such Other Secured Claim Unimpaired.

Upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Global Debtors or the Reorganized Global Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

Voting:  The Other Secured Claims are not Impaired Claims.  The Holders of Other Secured Claims are conclusively presumed to accept the Plan.  The Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

ix.        Class 3-A – First Out DIP Term Loan Facility Claims

Classification:  Class 3-A consists of all First Out DIP Term Loan Facility Claims.

Treatment:  On the Effective Date, the First Out DIP Term Loan Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of First Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed First Out DIP Term Loan Facility Claims, its *pro rata* share of the $[●] in aggregate amount of Take Back Term Loans and Take Back Preferred Units, based upon the treatment elected by the Majority Commitment Parties under the terms of the New Capital Commitment Letter.

Voting:  The First Out DIP Term Loan Facility Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such First Out DIP Term Loan Facility Claims.

x.        Class 3-B – Second Out DIP Term Loan Facility Claims

Classification: Class 3-B consists of all Second Out DIP Term Loan Facility Claims.

Treatment: On the Effective Date, the Second Out DIP Term Loan Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of Second Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Second Out DIP Term Loan Facility Claims: (i) [●] shares of New Saks Common Stock; and (ii) its *pro rata* share of the DIP Lender Litigation Trust Allocation of Litigation Trust Proceeds (if any), as set forth in the Litigation Trust Agreement.

Voting: The Second Out DIP Term Loan Facility Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Second Out DIP Term Loan Facility Claims.

xi.  Class 3-C – Third Out DIP Term Loan Facility Claims

Classification: Class 3-C consists of all Third Out DIP Term Loan Facility Claims.

Treatment: On the Effective Date, the Third Out DIP Term Loan Facility Claims shall be Allowed in the amount of $[●] and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of Third Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Third Out DIP Term Loan Facility Claims:  (i) [●] shares of New Saks Common Stock; and (ii) its *pro rata* share of the DIP Lender Litigation Trust Allocation of Litigation Trust Proceeds (if any), as set forth in the Litigation Trust Agreement.

Voting: The Third Out DIP Term Loan Facility Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Third Out DIP Term Loan Facility Claims.

xii.  Class 4-A – Prepetition SGUS Notes Claims

Classification:  Class 4-A consists of all Prepetition SGUS Notes Claims.

Treatment:  On the Effective Date, the Prepetition SGUS Notes Claims shall be Allowed under the Plan in the amount of $[●], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition SGUS Notes Claim, except to the extent that the Prepetition SGUS Notes Trustee or a Holder of a Prepetition SGUS Notes Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of a Prepetition SGUS Notes Claim shall receive, subject to the terms of the Plan, [●].

Voting:  The Prepetition SGUS Notes Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition SGUS Notes Claims.

xiii.  Class 4-B – Prepetition FILO and NPC Claims

Classification:  Class 4-B consists of all Prepetition FILO and Prepetition NPC Claims.

Treatment:  On the Effective Date, the Prepetition FILO and Prepetition NPC Claims shall be Allowed under the Plan in the aggregate amount of $10 million, consisting of $5 million of Allowed Prepetition FILO Claims and $5 million of Allowed Prepetition NPC Claims, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and

54

discharge of each Prepetition FILO Claim and Prepetition NPC Claim, as applicable, except to the extent that the Prepetition FILO Agent or Prepetition NPC Agent, as applicable, or a Holder of a Prepetition FILO Claim or Prepetition NPC Claim, as applicable, agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of an Allowed Prepetition FILO Claim and an Allowed Prepetition NPC Claim shall receive, subject to the terms of the Plan, [●].  The Holders of Allowed Prepetition FILO and NPC Claims shall be entitled to receive, retain, and not turn over the distributions described herein notwithstanding anything in the Equal Priority Intercreditor Agreement, Second A&R Intercreditor Agreement, or PAA to the contrary.

Voting:  The Prepetition FILO and NPC Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition FILO and NPC Claims.

### xiv.      Class 4-C – Prepetition OpCo Second Out Notes Claims

Classification:  Class 4-C consists of all Prepetition OpCo Second Out Notes Claims.

Treatment:  On the Effective Date, the Prepetition OpCo Second Out Notes Claims shall be Allowed under the Plan in the amount of $[1,439,252,628.00], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, the Prepetition OpCo Second Out Notes Claims [shall receive, subject to the terms of the Plan, [●]].

Voting:  The Prepetition OpCo Second Out Notes Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Prepetition OpCo Second Out Notes Claims.

### xv.      Class 4-D – OpCo General Unsecured Claims

Classification:  Class 4-D consists of all OpCo General Unsecured Claims.

Treatment:  [In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed OpCo General Unsecured Claim, except to the extent that a Holder of an OpCo General Unsecured Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed OpCo General Unsecured Claim shall receive [●].  /  On the Effective Date, all OpCo General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such OpCo General Unsecured Claims.] [18]

Voting:  [The OpCo General Unsecured Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such OpCo General Unsecured Claims at the applicable OpCo Global Debtors.  /  Holders of OpCo General Unsecured Claims are conclusively deemed to reject the

---

[18]      [**NTD**: Subject to ongoing review and discussion.]

55

Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of OpCo General Unsecured Claims are not entitled to vote to accept or reject the Plan.] [19]

> xvi.        Class 5-A – HoldCo II SGUS Notes Guarantee Claims

Classification:  Class 5-A consists of all HoldCo II SGUS Notes Guarantee Claims.

Treatment:  On the Effective Date, the HoldCo II SGUS Notes Guarantee Claims shall be Allowed under the Plan in the amount of $[200,000,000.00], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each HoldCo II SGUS Notes Guarantee Claim, except to the extent that a Holder of a HoldCo II SGUS Notes Guarantee Claim agrees to less favorable treatment on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo II SGUS Notes Guarantee Claim shall receive [●].

Voting:  The HoldCo II SGUS Notes Guarantee Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such HoldCo II SGUS Notes Guarantee Claims.

> xvii.       Class 5-B – HoldCo II General Unsecured Claims

Classification:  Class 5-B consists of all HoldCo II General Unsecured Claims.

Treatment:  [In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed HoldCo II General Unsecured Claim, except to the extent that a Holder of a HoldCo II General Unsecured Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed HoldCo II General Unsecured Claim shall receive [●].  / On the Effective Date, all HoldCo II General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.] [20]

Voting:  [The HoldCo II General Unsecured Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such HoldCo II General Unsecured Claims.  / Holders of HoldCo II General Unsecured Claims are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of HoldCo II General Unsecured Claims are not entitled to vote to accept or reject the Plan.] [21]

---

[19]    [**NTD**: Subject to ongoing review and discussion.]

[20]    [**NTD**: Subject to ongoing review and discussion.]

[21]    [**NTD**: Subject to ongoing review and discussion.]

xviii.        Class 6-A – Prepetition TopCo Facility Claims

Classification:  Class 6-A consists of all Prepetition TopCo Facility Claims.

Treatment:  [On the Effective Date, the Prepetition TopCo Facility Claims shall be Allowed under the Plan in the amount of $[●], and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.]  On the Effective Date, the Prepetition TopCo Facility Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.

Voting:  The Prepetition TopCo Facility Claims are Impaired Claims.  Holders of such Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Prepetition TopCo Facility Claims are therefore not entitled to vote to accept or reject the Plan.

xix.        Class 6-B – TopCo General Unsecured Claims

Classification:  Class 6-B consists of all TopCo General Unsecured Claims.

Treatment:  On the Effective Date, the TopCo General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.

Voting:  The TopCo General Unsecured Claims are Impaired Claims.  Holders of such Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of TopCo General Unsecured Claims are therefore not entitled to vote to accept or reject the Plan.

xx.        Class 7 – Intercompany Claims

Classification:  Class 7 consists of all Intercompany Claims.

Treatment:  On or after the Effective Date, or as soon as practicable thereafter, any and all Intercompany Claims shall, at the option of the Global Debtors and upon the consent of the Required Consenting DIP Term Loan Lenders, be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Global Debtors; provided that no distributions shall be made on account of any Intercompany Claims.

Voting:  The Intercompany Claims are Unimpaired if Reinstated or Impaired if the Allowed Intercompany Claims are cancelled.  Holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

xxi.        Class 8 – Subordinated Claims

Classification:  Class 8 consists of all Subordinated Claims.

Treatment:  On the Effective Date, all Subordinated Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.

Voting:   The Subordinated Claims are Impaired Claims.   In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Subordinated Claims are conclusively deemed to reject the Plan.  Holders of Allowed Subordinated Claims are not entitled to vote to accept or reject the Plan.

xxii.        Class 9 – Existing TopCo Equity Interests

Classification:  Class 9 consists of all Existing TopCo Equity Interests.

Treatment:  On the Effective Date, all Existing TopCo Equity Interests shall be cancelled, released, and extinguished, and each Holder of an Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interests.

Voting:  The Existing TopCo Equity Interests are Impaired.  Holders of Existing TopCo Equity Interests are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Existing TopCo Equity Interests are not entitled to vote to accept or reject the Plan.

xxiii.        Class 10 – Existing Intercompany Equity Interests

Classification:  Class 10 consists of all Existing Intercompany Equity Interests.

Treatment:  Subject to the Restructuring Steps Plan, each Allowed Existing Intercompany Equity Interest shall be Reinstated, distributed, contributed, set off, settled, cancelled, and released, or otherwise addressed at the option of the Global Debtors and upon the consent of the Required Consenting DIP Term Loan Lenders.

Voting:   The Existing Intercompany Equity Interests are Unimpaired if Reinstated or Impaired if the Allowed Existing Intercompany Equity Interests are canceled.  Holders of Allowed Existing Intercompany Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Existing Intercompany Equity Interests are not entitled to vote to accept or reject the Plan.

## VIII.  [SECURITIES LAWS MATTERS REGARDING ISSUANCE AND RESALE OF NEW SAKS COMMON STOCK UNDER THE PLAN][22]

> **The Issuance of the New Saks Common Stock Implicates U.S. Federal and State Securities Laws.**
>
> The issuance of the New Saks Common Stock under the Plan implicates certain securities law issues under the Bankruptcy Code and U.S. federal and state securities laws that are discussed below.  The information in this section should not be considered applicable to all situations or to all Holders of Claims receiving the New Saks Common Stock.  Holders of Claims should consult their own legal counsel concerning the New Saks Common Stock.

On the Effective Date, in accordance with the terms of the Plan, New Saks shall issue and deliver all of the New Saks Common Stock and Preferred Equity Units pursuant to the terms and conditions of the Plan, the Confirmation Order, the Restructuring Steps Plan, and the New Organizational Documents.  The issuance of New Saks Common Stock and Preferred Equity Units pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Equity Interest, and all of the New Saks Common Stock and Preferred Equity Units issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Any Holder of an Allowed Claim receiving New Saks Common Stock and Preferred Equity Units pursuant to the terms and conditions of the Plan may designate that all or a portion of such Holder's *pro rata* share of the New Saks Common Stock and Preferred Equity Units be registered in the name of, and delivered to, its designee by delivering notice thereof to the Global Debtors and/or by the designee delivering notice thereof to the Claims Agent in accordance with such other procedures for such designations and/or delivery that the Global Debtors or the Reorganized Global Debtors, as applicable, may establish in accordance with the Plan.  Any such designee shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

The Global Debtors will seek, pursuant to section 1145 of the Bankruptcy Code, to exempt the New Saks Common Stock from the registration requirements of the Securities Act of 1933 (as amended, the "Securities Act") (and of any state securities or "blue sky" laws).  Section 1145 exempts from registration the sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administration expense in a case concerning, such debtor.  In reliance upon this exemption, the Global Debtors believe that the New Saks Common Stock generally will be exempt from the registration requirements of the Securities Act.  The Global Debtors intend that recipients will be able to resell the New Saks Common Stock without registration under the Securities Act or other federal securities laws, unless the recipient is (i) an "underwriter" with respect to such securities,

---

[22]  [**NTD**: Subject to ongoing review and discussion.]

59

within the meaning of section 1145(b) of the Bankruptcy Code, or (ii) an affiliate of the issuer. Section 1145(b)(1) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan, or (iv) is an "issuer" of the relevant security, as such term is used in section 2(a)(11) of the Securities Act.  An entity is not an "underwriter" under section 2(a)(11) of the Securities Act with regard to securities received under section 1145(a)(1), in "ordinary trading transactions" made on a national securities exchange.  However, the Global Debtors do not anticipate that the New Saks Common Stock will be listed in the near term on a stock exchange.  What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC.  Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the Plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), or (iii) payment of special compensation to brokers or dealers in connection with the sale.  The term "issuer" is defined in section 2(a)(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(a)(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer.  Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a "controlling person" and therefore a statutory underwriter within the meaning of section 1145(b)(1) of the Bankruptcy Code.

You should confer with your own legal advisors to determine whether or not you are an "underwriter" or an "affiliate."

## IX.     ALTERNATIVES TO CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Global Debtors' capital structure will remain over-leveraged and the Global Debtors may be unable to service their debt obligations. Accordingly, if the Plan is not consummated, the alternatives include:

### A. Liquidation Under the Bankruptcy Code

If the Plan is not consummated, the Global Debtors could be liquidated under chapter 7 of the Bankruptcy Code.  A discussion of how a chapter 7 liquidation would affect the recoveries of the Holders of Claims is set forth in this Article IX.  The Global Debtors believe that liquidation would result in either the same, or lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis attached as **Exhibit B** to this Disclosure Statement.

Specifically, in the event of a chapter 7 liquidation, the Liquidation Analysis provides that: [●]

### B. Alternative Plan of Reorganization

Since the Petition Date, the Global Debtors have engaged in extensive discussions and, where applicable, arm's length negotiations with the Consenting DIP Term Loan Lenders regarding, among other things, the terms of their postpetition debtor-in-possession financing, payments to creditors under the first day and second day orders, the Global Debtors' go-forward business plan, and the terms of the Restructuring Support Agreement and the Plan.  The Global Debtors believe that the Plan fairly adjusts the rights of various Classes of Claims and Equity Interests, and also provides superior recoveries to Classes [●] over any likely alternative (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns.

**THE GLOBAL DEBTORS BELIEVE THAT THE PLAN IS PREFERABLE TO ANY ALTERNATIVE PLAN OR TRANSACTION BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS. AS OF THE DATE HEREOF, THE GLOBAL DEBTORS HAVE NOT IDENTIFIED ANY VIABLE ALTERNATIVE TO THE PLAN, AND ACCORDINGLY, ANY ALTERNATIVE TO THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.**

### C. Alternative Implementation Through a Section 363 Sale Transaction

If the Global Debtors and the Required Consenting DIP Term Loan Lenders mutually determine that implementation of the Restructuring Transactions under the Plan is likely to result in a material delay of the consummation of the Restructuring Transactions, or otherwise mutually agree, the parties may elect to implement the restructuring through an alternative transaction structure, including a sale transaction pursuant to section 363 of the Bankruptcy Code (an "Alternative Sale Transaction").  In connection with any Alternative Sale Transaction, the Consenting DIP Term Loan Lenders would be permitted to credit bid their DIP Term Loan Claims, subject to section 363(k) of the Bankruptcy Code and Bankruptcy Court approval.

The Alternative Sale Transaction presents a potential means of achieving the same overall restructuring objectives if circumstances warrant a change in the method of implementation.  No determination has been made at this time as to whether an Alternative Sale Transaction will be pursued.  The Global Debtors currently intend to consummate the Restructuring Transactions through confirmation and effectiveness of the Plan.

### D.    Inaction/Maintenance of Status Quo

If the Restructuring Transactions are not consummated, the Global Debtors could be in default under the DIP Facilities.  The Global Debtors will be unable to repay the indebtedness under the DIP Facilities if they are accelerated or mature.  Accordingly, inaction is not a viable alternative to consummation of the Restructuring Transactions.

### X.    RISK FACTORS

> **Important Risks to Be Considered**
>
> Holders of Claims against and Equity Interests in the Global Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Supplement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan before voting to accept or reject the Plan.
>
> These risk factors should not, however, be regarded as constituting the only risks involved in connection with the implementation of the Plan.

### A.    Risks Associated with the Global Debtors' Business

#### i.    The Global Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Global Debtors' ability to make scheduled payments on, or refinance their debt obligations following the Effective Date of the Plan, depends on the Global Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Global Debtors' control.  The Global Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Global Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness.

#### ii.    The Global Debtors Are Subject to the Conditions of the General Economy

Unfavorable economic conditions may adversely affect the Global Debtors' business, financial condition or results of operations.  The Global Debtors are vulnerable to general economic downturns.  Any decline in customer demand and spending resulting from a general economic downturn could materially and adversely affect the Global Debtors' business, financial condition or results of operations.  A prolonged period of sluggish economic conditions has had and may continue to have an adverse impact on the level of maintenance expenditures of the Global Debtors' customers and their ability to maintain historic levels of these expenditures.  As a result of significantly increased volatility and instability in the international financial markets and

62

unfavorable global economic conditions, it is difficult for the Global Debtors, their customers and their suppliers/vendors to forecast demand trends accurately.  The Global Debtors are unable to accurately predict the extent or duration of cycles or their effect on the Global Debtors' financial condition or results of operations and can give no assurance as to the timing, extent or duration of the current or future business cycles.

### iii.    Loss of Key Management or Personnel Could Negatively Impact the Global Debtors' Business

The Global Debtors have an experienced management team and key personnel who have played, and continue to play, critical roles in the Global Debtors' operations and restructuring efforts.  Each member of the management team is uniquely qualified by virtue of his or her substantial industry expertise and proven leadership experience.  The management team has a deep understanding of luxury retail and strong relationships with the brand partners that the Global Debtors rely on to provide the experience that their customers expect from Saks Global.  Moreover, certain members of the management team have firsthand restructuring experience, having served on the leadership team that successfully reorganized Neiman Marcus Group in 2020.

The Global Debtors believe that their ability to be successful in the future will be due, in large part, to their management team and key personnel.  Losing the services of one or more members of the Global Debtors' management team or key personnel could have a material adverse effect on the Global Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Global Debtors' businesses and the results of operations.

### iv.    The Difficulty in Attracting and Retaining Qualified Employees Could Detrimentally Impact the Global Debtors' Business

The Global Debtors depend on the ability to find, hire and retain qualified employees to manage day-to-day business activities.  The Global Debtors also need qualified and competent personnel to execute their business plans and serve their customers.  The Global Debtors' inability to recruit and retain qualified and competent managers and personnel could have a material adverse effect on their business, financial condition, and results of operations.

### v.    The Success of the Global Debtors' Businesses Is Dependent on Factors Affecting Consumer Spending Outside of the Global Debtors' Control

Consumer spending is affected by general economic conditions and other factors including levels of employment, disposable consumer income, prevailing interest rates, consumer debt and availability of credit, costs of fuel, inflation, recession and fears of recession, war and fears of war, pandemics (such as the COVID-19 pandemic), inclement weather, tariff policies, tax rates and rate increases, timing of receipt of tax refunds, consumer confidence in future economic conditions and political conditions, and consumer perceptions of personal well-being and security.  Unfavorable changes in factors affecting discretionary spending could reduce demand for the Global Debtors' products and services resulting in lower revenue and negatively impacting their businesses and financial results.

63

vi.     The Global Debtors' Business and Operating Results Will Be Adversely Affected if They Do not Manage Their Inventory Levels or Fail to Maintain Positive Relationships With Their Brand Partners

The Global Debtors' business requires them to manage a large volume of inventory effectively and maintain positive relationships with brand partners.  As discussed above, prior to the Petition Date, the Company's liquidity challenges following the Acquisition made it difficult for the Company to pay vendors on time, which strained relations with brand partners.  In turn, vendors were less willing to ship goods to the Company, leaving the Company unable to maintain sufficient inventory levels.  Following the Petition Date, the DIP Facilities provided the Global Debtors with the liquidity necessary to maintain sufficient inventory levels and rebuild their vendor relationships.

The Global Debtors must continue to maintain sufficient inventory levels and rebuild their relationship with vendors to operate their business successfully.  However, the Global Debtors also must avoid accumulating excess inventory as they seek to minimize out-of-stock levels across all product categories and to maintain in-stock levels.  As a result, the Global Debtors may experience difficulty in responding to changes in the retail environment generally as well as any changes to their vendor relationships specifically, which makes them vulnerable to changes in price and consumer preferences.  If the Global Debtors do not accurately anticipate the future demand for a particular product or the time it will take to obtain new inventory, their inventory levels will not be appropriate, and the results of operations may be negatively impacted.

Moreover, any adverse impact on the Global Debtors' relationship with the brand partners from whom they generate a significant portion of their revenue could have a material adverse effect on their business and results of operations.

vii.    The Global Debtors Operate in a Highly Competitive Sector

The luxury sector is highly competitive.  The Global Debtors compete for customers primarily with department stores, global multi-brand online luxury retailers, online marketplaces, luxury mono-brand retailers, luxury multi-brand retailers, specialty stores, general merchandise stores, off-price and discount stores, secondhand luxury online and store retailers, new and established forms of home shopping and manufacturers' outlets.  If the Global Debtors do not compete effectively, their results of operations could be adversely affected.

viii.   The Imposition or Increase of Tariffs and the Current Uncertainty Regarding International Economic Relations Could Have an Adverse Effect on our Business and Results of Operations

The United States, European Union and the other regions in which the Global Debtors' products are manufactured or sold have imposed and may impose additional quotas, duties, tariffs, retaliatory or trade protection measures, or other restrictions or regulations, which can affect the sale of the Global Debtors' products.  Other governmental action related to tariffs or international trade agreements may adversely impact demand for the Global Debtors' products, their costs, their customers, their suppliers and global economic conditions and cause higher volatility in financial

64

markets.  The luxury industry has been impacted by ongoing uncertainty surrounding tariffs and import duties, and international trade relations generally.

While the Global Debtors actively review existing and proposed measures to seek to assess the impact of them on their business, changes in tariff rates, import duties and other new or augmented trade restrictions could have a number of negative impacts on their business.  The imposition or increase of tariffs might cause the Global Debtors to consider increasing prices to their end customers.  However, this could reduce the competitiveness of the Global Debtors' merchandise and customers might refrain from purchasing products from the Global Debtors, and/or might switch to competitors, which could adversely affect total revenue.  If the Global Debtors fail to manage these dynamics successfully, their gross margins and profitability could be adversely affected.  Increased tariffs or trade restrictions implemented by the United States or other countries in connection with a global trade war could have a material adverse effect on their business, financial condition and results of operations.

ix.    The Global Debtors' Failure to Invest in and Adapt to Technological Developments and Industry Trends Could Harm their Business

The Global Debtors rely heavily on their information technology systems to operate their business, including retail, financial, planning, sourcing and merchandising systems, and have made, and expect to continue to make, significant investments to upgrade, enhance or replace certain of these systems. The satisfactory performance, reliability and availability of the Global Debtors' website and mobile app, transaction-processing systems and technology infrastructure are critical to their reputation and ability to acquire and retain customers, as well as maintain adequate customer service levels.  The Global Debtors have experienced, and in the future may experience, interruptions, delays and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions and capacity constraints.

In order to remain competitive, the Global Debtors must continue to enhance and improve the responsiveness, functionality and features of their website, mobile app and other information technology systems, which is particularly challenging given the rapid rate at which new technologies, customer preferences and expectations, and industry standards and practices are evolving in the e-commerce industry.

## B.    Certain Bankruptcy Considerations

i.    Operating in Bankruptcy for a Long Period of Time

While the Global Debtors anticipate that the Plan will be confirmed and they will emerge from these Chapter 11 Cases in the coming months, the Global Debtors cannot be certain of this timing.  Any prolonged duration of these Chapter 11 Cases could materially disrupt the Global Debtors' businesses, including by adversely affecting the Global Debtors' relationships with their key vendors and suppliers, notwithstanding the progress that the Global Debtors have made during these Chapter 11 Cases rebuilding these relationships with the liquidity provided by the DIP Facilities.  A prolonged duration of these Chapter 11 Cases would also require the Global Debtors to incur additional costs for professional fees and other expenses associated with the administration

65

of these Chapter 11 Cases.  It would also divert the attention of the Global Debtors' management away from the operation of their businesses for a longer period of time.

The extent to which bankruptcy proceedings disrupt the Global Debtors' businesses will likely be directly related to the length of time it takes to complete the proceedings.  If the Global Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different reorganization plan that can be confirmed.  That would increase both the probability and the magnitude of the potentially adverse effects described herein.

ii.      Failure to Receive Adequate Acceptances

The Global Debtors believe they will receive the requisite amount of votes in favor of the Plan in light of the fact that, as set forth herein, the Required Consenting DIP Term Loan Lenders, who hold approximately [92.19]% [$2,423,091,029.44] of the Global Debtors' Claims, agreed to vote for, support and not object to the Plan pursuant to the terms of the Restructuring Support Agreement.  However, if for some reason, the Global Debtors do not receive the requisite votes in favor of the Plan (the "Requisite Acceptances"), the Global Debtors may not be able to confirm the Plan.

Further, if the Requisite Acceptances are not received, the Global Debtors may have no alternative but to seek to obtain acceptances to an alternative plan of reorganization or another alternative transaction that may not have the support of the Required Consenting DIP Term Loan Lenders, and/or the Global Debtors may be required to sell their businesses (either in these Chapter 11 Cases or under chapter 7 of the Bankruptcy Code).  There can be no assurance that the terms of any such alternative restructuring plan, sale, or other arrangement would be similar to or as favorable to the Global Debtors' creditors as those proposed in the Plan.

iii.      Failure to Confirm the Plan

There is some risk that the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may deny confirmation of the Plan.  Denial of confirmation could happen for several different reasons.  A non-accepting (or deemed rejecting) creditor or equity security Holder of the Global Debtors might, among other things, challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting Holders of Claims and Equity Interests within a particular class under the Plan will not be less than the value of distributions such Holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. While the Global Debtors cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Global Debtors believe that the Plan will satisfy the statutory requirements for confirmation and will not be

66

followed by a need for further financial reorganization, and that non-accepting Holders within each Class under the Plan will receive property of a value not less than what would be received following a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, the Global Debtors may seek to revise the Plan and to confirm such revised plan or, alternatively, to implement the restructuring through an Alternative Sale Transaction. Further, if the Plan is not confirmed and an Alternative Sale Transaction is not consummated, it is unclear whether a restructuring of the Global Debtors could be implemented and what distribution Holders of Claims and Equity Interests ultimately would receive with respect to their Claims and Equity Interests, which may constitute less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative restructuring arrangement (including an Alternative Sale Transaction) or revised plan would be similar to or as favorable to the Global Debtors' creditors as those proposed in the Plan. If an alternative restructuring transaction or reorganization could not be agreed to with the Required Consenting DIP Term Loan Lenders in that scenario, it is possible that the Global Debtors would have to liquidate their assets, in which case the Global Debtors believe that Holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.

### iv. Failure to Receive Bankruptcy Court Approval of the Compromises and Settlements Contemplated by the Plan

The Plan provides for certain releases, injunctions and exculpations that may otherwise be asserted against the Global Debtors, Reorganized Global Debtors, or Released Parties. The releases, injunctions, and exculpations may not be approved, in which case certain Released Parties may withdraw their support from the Plan.

### v. Alternative Plans of Reorganization may be Proposed

Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose a chapter 11 plan until the 120th day following the Petition Date. A debtor-in-possession also has the exclusive right to solicit acceptances of a plan of reorganization until the 180th day following the Petition Date. However, such exclusivity period can be reduced or terminated by the Bankruptcy Court upon a showing of cause by a movant. Were such an order to be entered with respect to the Debtors' plan filing exclusivity period, other parties-in-interest would then have the opportunity to propose alternative plans of reorganization.

If a non-Debtor party-in-interest were to propose an alternative plan following expiration or termination of the Global Debtors' exclusivity period, such a plan may be less favorable to Holders of Claims or Equity Interests. If there are competing plans of reorganization, these Chapter 11 Cases are likely to become longer and more complicated, including because of potential litigation surrounding the exclusivity periods and/or the contents of any such competing plans.

### vi. Failure to Consummate the Plan

Article X of the Plan contains various conditions to consummation of the Plan, including the Confirmation Order having become final and non-appealable, the Global Debtors having entered into the Definitive Documents, and all conditions precedent to effectiveness of such agreements having been satisfied or waived in accordance with the terms thereof. As of the date

67

of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.  If the Plan is not consummated and the restructuring completed, these Chapter 11 Cases will be prolonged and the Global Debtors may lack sufficient liquidity to effect a successful restructuring under chapter 11 of the Bankruptcy Code.

vii.     Termination of the Restructuring Support Agreement and New Capital Commitment Letter in Certain Circumstances

Pursuant to the Restructuring Support Agreement, the Consenting DIP Term Loan Lenders have agreed to support the Plan, however, such support can be terminated and such votes revoked pursuant to the terms and conditions thereof upon the occurrence of certain "Termination Events" (as defined therein) under the Restructuring Support Agreement.  Such Termination Events include, among other things, the failure of the Global Debtors to reach certain milestones that are set forth in the DIP Term Loan Credit Facility in a timely manner.  As of the date hereof, the Global Debtors have already satisfied certain milestones under the DIP Term Loan Credit Facility, including by: obtaining entry of the Final DIP Order; delivering a draft business plan to the Required Consenting DIP Term Loan Lenders; entering into the Restructuring Support Agreement; and filing this Disclosure Statement and the Plan.

While the Global Debtors believe that they will be able to meet the remaining milestones, there can be no assurance that will be the case.  Additional events that constitute Termination Events under the Restructuring Support Agreement include the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, a material breach by the Global Debtors of their obligations under the Restructuring Support Agreement, or a final determination by a governmental agency of competent jurisdiction that the Restructuring Transactions contemplated by the Plan cannot legally go forward.

The termination of the Restructuring Support Agreement, among other things, also triggers a termination event under the New Capital Commitment Letter, which would terminate the commitments therein and the New Capital Commitment Parties' obligations thereunder.

If a Termination Event occurs and the support of the Consenting DIP Term Loan Lenders were to be withdrawn, the votes of such Holders were revoked, and the commitments of the New Capital Commitment Parties to provide the Incremental New Money Facilities were terminated, the Global Debtors may need to amend the Plan and re-solicit votes thereon, formulate a new chapter 11 plan and solicit votes on such new plan and/or seek alternative financing arrangements. Such amendment, re-solicitation and/or alternative financing arrangement(s) could cause material delay in these Chapter 11 Cases, and may adversely impact the Global Debtors' businesses and its ability to reorganize.

viii.    Distributions Could Be Delayed

If the Plan is confirmed, the date of the distributions to be made pursuant to the Plan will not occur until the Effective Date.  While the Global Debtors anticipate making distributions under

the Plan upon or shortly after entry of the Confirmation Order, they may be delayed if the conditions to consummation of the Plan have not yet been met.

### ix.     Objections to Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Global Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### C.     Risks Relating to Tax and Accounting Consequences of the Plan.

### i.     Use of Historical Financial Information

As a result of the consummation of the Plan and the transactions contemplated thereby, the Global Debtors believe they will be subject to the fresh start accounting rules.  Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued.  This process is guided by purchase price allocation standards under GAAP.  Application of fresh start accounting rules could result in the values of certain of the Debtors' assets being written down.

### D.     Other Risks

### i.     The Effective Date May Not Occur

Although the Global Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.  Effectiveness of the Plan is also subject to certain conditions as described in Article X of the Plan.  If these conditions have not occurred or have not been waived as set forth in the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Global Debtors and all Holders of Claims or Equity Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Global Debtors' obligations with respect to the Claims and Equity Interests would remain unchanged.

### ii.     The Global Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Global Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Global Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

iii.     No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Global Debtors or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your vote to accept the Plan, other than those contained in or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

iv.     No Legal or Tax Advice Is Provided by This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or Equity Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Equity Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to provide you with information regarding the Global Debtors and the proposed Restructuring Transactions to assist you in making a decision regarding whether or not to support the Plan.

v.     The Conditions Precedent to the Exit ABL Facility May Not be Satisfied by the Effective Date

The consummation of the Plan is conditioned on the satisfaction or waiver of all conditions precedent to the effectiveness of the Exit ABL Facility.  There can be no assurance that such conditions will be satisfied or waived on or prior to the Effective Date.  If they are not, the Effective Date will not occur and the Plan will not be consummated.

The Exit ABL Credit Agreement and related documentation remain subject to the consents and conditions precedent set forth in the Restructuring Support Agreement and the Plan.  Certain material terms of the Exit ABL Credit Agreement have not yet been finalized and will be included in the Plan Supplement, and the size of the Exit ABL Facility is expected to be determined in accordance with the Business Plan, subject to the consent of the Required Consenting DIP Term Loan Lenders.  There can be no assurance that the Exit ABL Facility will be finalized on acceptable terms or become effective by the Effective Date.

vi.     The Conditions Precedent to the New Capital Commitment Letter May Not be Satisfied by the Effective Date

The funding of the Incremental New Money Facilities pursuant to the New Capital Commitment Letter is subject to the satisfaction of specified closing conditions and the absence of termination events.  The New Capital Commitment Letter permits termination of the commitments prior to the Effective Date upon the occurrence of certain events, including the termination of the Restructuring Support Agreement, the failure to obtain required Bankruptcy Court orders by specified deadlines, dismissal or conversion of the Chapter 11 Cases, the failure of the Effective Date to occur by the applicable expiration date, or the occurrence of a Material Adverse Effect.  If the commitments are terminated, the Global Debtors would be required to pay the Commitment Cash Premium in cash and may lack sufficient exit financing to consummate the Plan.

Further, there can be no assurance that all New Capital Commitment Parties will fund their commitments on the Effective Date.  Although the New Capital Commitment Letter includes replacement mechanics, non-defaulting parties are not obligated to fund the commitments of any Defaulting New Capital Commitment Party.  If commitments are not fully replaced, the Global Debtors may not receive the full Aggregate Funding Amount, which could impair their ability to consummate the Plan and make distributions to holders of Claims.

## XI.     [CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES][23]

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Global Debtors, the Reorganized Global Debtors, and certain holders of Claims (each, a "Holder") entitled to vote on the Plan. This summary is based on the United States Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.  Changes to, or new interpretations of, the applicable law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Global Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a position different from any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Global Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, pass-through entities (including subchapter S corporations) and their beneficial owners, persons who hold Claims or who will hold the New Saks Common Stock, Take Back Preferred Units and/or Take Back Term Loans as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders who are themselves in bankruptcy). Further, this summary assumes that (i) a Holder holds only Claims in a single Class and holds a Claim, or will hold the New Saks Common Stock, Take Back Preferred Units and/or Take Back Term Loans, as the case may be, only as a "capital asset" (within the meaning of section 1221 of the Tax Code), (ii) the various debt and other arrangements to which any of the Global Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, (iii) no Holder will exchange its Claims for a debt obligation under the Exit ABL Facility and (iv) the issuer of New Saks Common Stock and Take Back Preferred Units will be Holdings. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity

---

[23]     [**NTD**: Subject to ongoing review and discussion.]

other than as a Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from those described below.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (i) an individual citizen or resident of the United States for U.S. federal income tax purposes; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is a Holder that is not a U.S. Holder.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult with their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

A.    **Certain Material U.S. Federal Income Tax Consequences to the Global Debtors and the Reorganized Global Debtors**

i.    Cancellation of Debt

The Global Debtors expect to realize a substantial amount of cancellation of indebtedness income ("COD Income") as a result of the Plan.

In general, a taxpayer that satisfies an outstanding indebtedness for less than its adjusted issue price must include the difference as COD Income in gross income.  However, if COD Income is recognized by a debtor in a bankruptcy case, it is generally excluded from the debtor's gross income.  The Tax Code provides that where COD Income is excluded because of this bankruptcy exception, the debtor must reduce certain of its tax attributes, generally in  the following order: (1) net operating losses ("NOLs") and NOL carryforwards; (2) general business credits; (3) minimum tax credits; (4) capital loss carryovers; (5) tax basis in property (subject to certain limitations); (6) passive activity loss and credit carryovers; and (7) foreign tax credit carryovers, by the amount of any excluded COD Income after the determination of the U.S. federal income tax for the taxable

year of the discharge of the debt.  Although not free from doubt, it is expected that carryover of disallowed business interest expense would not be a tax attribute subject to such reduction.  The Global Debtors expect that COD Income realized as a result of the implementation of the Plan will be excluded from the Global Debtors' gross income under the bankruptcy exception, resulting in a reduction of certain tax attributes.

The amount of COD Income will generally equal the excess of (i) the adjusted issue price of the indebtedness satisfied over (ii) the sum of (a) the amount of cash paid, (b) the issue price of any new indebtedness of the taxpayer issued, and (c) the fair market value of any other consideration (including stock of the debtor or a party related to the debtor) given in satisfaction of such indebtedness at the time of the exchange, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD Income (such as where the payment of the cancelled debt would have given rise to a tax deduction).  To the extent the amount of COD Income exceeds the tax attributes available for reduction, the remaining COD Income is excluded without further current or future tax cost to the debtor.  Special rules apply where the excluded COD Income is recognized by a debtor that is a member of a consolidated group.  Under these rules, the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member) are first subject to reduction.  To the extent that the excluded COD Income exceeds the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member), the Treasury Regulations generally require the reduction of certain consolidated tax attributes attributable to other members of the group. If one of the attributes of the debtor member reduced under the above rules is the basis of stock of another member of the group, a "look-through rule" applies requiring that certain corresponding reductions be made to the tax attributes of the lower-tier member (including consolidated tax attributes of such lower-tier member).

The Plan provides that Holders of certain Claims may receive New Saks Common Stock and/or Take Back Preferred Units in exchange for their Claims, so the amount of COD Income for the Global Debtors will depend, in part, on the fair market value of the New Saks Common Stock, the Litigation Trust Assets and the Take Back Preferred Units, if any, at the time the Plan is consummated. Accordingly, the expected amount of COD Income is uncertain at this time.  Under the rules discussed above, certain tax attributes of the Global Debtors could be substantially reduced if there is significant COD Income.

ii.     Section 382

Section 382 of the Tax Code places significant limitations upon the use of a corporation's (or consolidated group's) NOLs and certain other tax attributes if an "ownership change" occurs with respect to such corporation's stock.  In general, an "ownership change" occurs if one or more "5-percent shareholders" increase their aggregate percentage ownership of a corporation's stock by more than 50 percentage points over the lowest percentage owned by such shareholders at any time during a rolling three-year "testing period."  It is anticipated that an ownership change will occur with respect to the Global Debtors on the Effective Date.

Section 382 generally imposes an annual limitation on the use of pre-ownership change losses equal to the product of (i) the fair market value of the corporation immediately before the ownership change multiplied by (ii) the "long term tax-exempt rate" for the month in which the ownership change occurs.  If a corporation (or consolidated group) recognizes tax losses during

the taxable year in which an ownership change occurs, those losses are generally apportioned between the period prior to the ownership change and the period after the ownership change using a "daily proration" methodology. Losses that are apportioned to the period prior to the ownership change will be subject to the section 382 limitations, and losses that are apportioned to the period after the ownership change will not.

If a corporation (or consolidated group) has a "net unrealized built-in loss" at the time of an ownership change, built-in losses recognized during the five-year recognition period following the ownership change generally will be treated as pre-ownership change losses and will be subject to the annual limitation provided under section 382. If a corporation (or consolidated group) has a "net unrealized built-in gain" at the time of an ownership change, built-in gains recognized during the five-year recognition period following the ownership change generally will increase the annual limitation in the year such gains are recognized.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's pre-ownership change losses are not limited on an annual basis, but, instead, NOLs will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Global Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Global Debtors' pre-ownership change losses effectively would be eliminated in their entirety.

The Global Debtors have not yet determined whether the 382(l)(5) Exception will be available or, if it is available, whether (i) there will be material pre-ownership change NOLs following the reduction of such NOLs pursuant to the COD Income bankruptcy exception as discussed above in ¶ XI.A.i or (ii) the Reorganized Global Debtors will elect out of its application. The determination as to whether the consummation of the Plan will meet the requirements of the 382(l)(5) Exception is subject to uncertainty, and such determination will depend on, among other things, the extent to which Holders immediately prior to the consummation of the Plan may be treated as qualified creditors for purposes of section 382(l)(5) of the Tax Code.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities and certain other adjustments) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of the stock of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) Exception the debtor

74

corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without triggering the elimination of its pre-ownership change losses. Instead, if a subsequent ownership change occurs, the resulting limitation would be determined under the regular rules for ownership changes.

### B.   Certain Material U.S. Federal Income Tax Consequences to All Holders With Respect to the Litigation Trust

Other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, the Litigation Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of the DIP Term Loan Claims. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, it is intended that the Litigation Trust will be structured with the intention of generally complying with such general criteria. The Global Debtors intend to take the position that this treatment applies to the extent reasonably practicable. In such case, any beneficiaries of the Litigation Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Litigation Trust and then contributed such undivided interest to the Litigation Trust. If this treatment applies, the person or persons responsible for administering the Litigation Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the Litigation Trust pursuant to the Plan and not unduly prolong its duration.

Other than with respect to any assets of the Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Litigation Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Litigation Trust, even if no distributions are made. Allocations of taxable income with respect to the Litigation Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described in the Plan) if, immediately before such deemed distribution, the Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable losses of the Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne in connection with a hypothetical deemed distribution of the remaining assets. The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any Holder of a beneficial interest in the Litigation Trust, and the ability of such Holder to benefit from any

deductions or losses, may depend on the particular circumstances or status of the Holder. Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the Litigation Trust and not as income or loss with respect to such beneficiary's DIP Term Loan Claims. In the event any tax is imposed on the Litigation Trust, the person or persons responsible for administering the Litigation Trust shall be responsible for payment, solely out of the assets of the Litigation Trust, of any such taxes imposed on the Litigation Trust.

The person or persons responsible for administering the Litigation Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income. The person or persons responsible for administering the Litigation Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the Litigation Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations. As soon as reasonably practicable after the close of each calendar year, the person or persons responsible for administering the Litigation Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to perform all necessary reporting in respect of such items on its tax return for such year and to pay any tax due with respect thereto.

With respect to any of the assets of the Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable, the Global Debtors anticipate that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate U.S. federal income tax return shall be filed with the IRS for any such account, and such account will be subject to tax annually on a separate entity basis on any net income earned with respect to the assets in such account (including any gain recognized upon the disposition of such assets). Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to Holders of applicable DIP Term Loan Claims on the Effective Date but, instead, is transferred to any such account, Holders should generally not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such Holders.

The Litigation Trust will comply with all applicable governmental withholding requirements, which may include a 30% withholding tax for non-U.S. Holders depending on, among other things, the particular type of income at issue and whether the type of income is subject to an applicable lower treaty rate. See the discussion in ¶ XI.D (insofar as such discussion relates to withholding), ¶ XI.E and ¶ XI.F below. Holders are urged to consult their tax advisors regarding the ownership and disposition of interests in the Litigation Trust.

### C.      Certain Material U.S. Federal Income Tax Consequences to U.S. Holders

#### i.      General; Recognition of Gain or Loss[24]

Holders should refer to Article V of the Plan for the treatment of each Claim. The tax consequences of the Plan to a U.S. Holder of a Claim may depend in part upon (i) whether such Claim is based on an obligation that constitutes a "security" for U.S. federal income tax purposes and (ii) whether all or a portion of the consideration received for such Claim is an obligation that constitutes a "security" for U.S. federal income tax purposes. The determination of whether a debt obligation constitutes a security for U.S. federal tax purposes is complex and depends on all relevant facts and circumstances surrounding the origin and nature of the claim. The debt obligations under DIP Facility Claims are not expected to be considered securities for U.S. federal income tax purposes.

Other than with respect to any amounts received that are attributable to accrued but unpaid interest and market discount as discussed in ¶ XI.C.ii and ¶ XI.C.iii below, each U.S. Holder would be treated as engaging in a fully taxable exchange and should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) cash received by such U.S. Holder, if any, plus (b) the fair market value of New Saks Common Stock received by such U.S. Holder, if any,  plus (c) the fair market value of the Take Back Preferred Units received by such U.S. Holder, if any, plus (d) the fair market value of beneficial interests in the Litigation Trust received by such U.S. Holder, if any, plus (e) the issue price of the Take Back Term Loans received, if any, in each case, in exchange for satisfaction, compromise, settlement, release and/or discharge of their Claims and (ii) such U.S. Holder's adjusted tax basis in its Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the exchange.  If the U.S. Holder realizes a capital loss, the U.S. Holder's deduction of the loss may be subject to limitations.

#### ii.      Accrued Interest

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims.  In general, to the extent such amount has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes, such amount will be taxable as ordinary income.  Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Global Debtors.

It is unclear whether a U.S. Holder would be required to recognize a capital loss, rather than an ordinary loss, with respect to such loss.  If the fair value of the consideration is not

---

[24]     [**NTD**: This discussion may be supplemented after the date hereof to the extent necessary to address the U.S. federal income tax consequences to the Holders of Prepetition FILO and NPC Claims.]

sufficient to fully satisfy all principal and interest on the Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall for U.S. federal (and applicable state and local) income tax purposes be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (but solely to the extent that such other amount is an allowable portion of such Allowed Claim). Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

### iii. Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  U.S. Holders are urged to consult their tax advisors concerning the application of the market discount rules to the Claims.

### iv. Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets and certain interest income.  U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

v.   U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Saks Common Stock

a.   **Dividends on New Saks Common Stock**

Generally, distributions made on account of the New Saks Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Holdings as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates, provided certain holding period and other requirements are met. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Saks Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits and certain holding period requirements are satisfied. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividend-received deduction may be disallowed.

b.   **Sale, Redemption, or Other Taxable Disposition of New Saks Common Stock**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption (assuming such redemption is treated as a sale or exchange, and not a distribution, under the Tax Code), or other taxable disposition of the New Saks Common Stock in an amount equal to the difference between the amount realized and the U.S. Holder's tax basis in such stock. Such capital gain or loss will be long-term capital gain or loss if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Saks Common Stock for more than one year. Long-term capital gains of non-corporate U.S. Holders (including individuals) generally are taxed at preferential rates. If the U.S. Holder realizes a capital loss, the deductibility of such loss may be subject to limitations.

vi.   [U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing the Take Back Preferred Units

The following discussion assumes that the Take Back Preferred Units will be treated as preferred stock of Holdings for U.S. federal income tax purposes. The U.S. federal income tax consequences of the Take Back Preferred Units are complex and uncertain in certain respects. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of owning and disposing of the Take Back Preferred Units.

a.   **Distributions on the Take Back Preferred Units**

Distributions of cash or other property made on account of the Take Back Preferred Units generally will be treated in the same manner as distributions on the New Saks Common Stock, as described in ¶ XI.C.v.a above. To the extent such distributions are paid out of current or

79

accumulated earnings and profits of Holdings, they will constitute dividends for U.S. federal income tax purposes; distributions in excess thereof will be treated first as a non-taxable return of capital and then as capital gain.

[Under section 305(c) of the Tax Code and Treasury Regulations thereunder, if the Take Back Preferred Units are redeemable at a price that exceeds their issue price by more than a de minimis amount, the difference (the "redemption premium") may be treated as a constructive distribution (or series of constructive distributions) of additional stock on preferred stock. Such constructive distributions would be taken into account under principles similar to the principles of section 1272(a) of the Tax Code (relating to original issue discount) over the period during which the Take Back Preferred Units are outstanding. Any such constructive distributions generally would be treated in the same manner as actual distributions, as described above, to the extent of the current or accumulated earnings and profits of Holdings. The Global Debtors intend to take the position that the accrual of an undeclared dividend on Take Back Preferred Units does not result in a constructive distribution under section 305(c) of the Tax Code and that, as a result, dividends on the Take Back Preferred Units would not be includible in the gross income of a Holder until a dividend is declared and paid. This position is not binding on the IRS and the IRS could assert that the accrual of an undeclared dividend on the Take Back Preferred Units results in a constructive distribution (or series of constructive distributions) under section 305(c) of the Tax Code. U.S. Holders receiving Take Back Preferred Units under the Plan are urged to consult their tax advisors regarding the application of section 305 to the Take Back Preferred Units.]

### b. **Sale, Redemption, or Other Taxable Disposition of Take Back Preferred Units**

The tax consequences of a sale, redemption, or other taxable disposition of the Take Back Preferred Units generally will be determined in the same manner as described with respect to the New Saks Common Stock in ¶ XI.C.v.b above.][25]

### vii. U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of the Take Back Term Loans

### a. **Interest and Original Issue Discount**

Payments of stated interest under the Take Back Term Loans that constitute "qualified stated interest" generally will be taxable to U.S. Holders as ordinary income at the time the payments are received or accrued, in accordance with the U.S. Holder's method of tax accounting. The Take Back Term Loans generally would be treated as issued with OID if the stated redemption price at maturity of the Take Back Term Loans exceeds their issue price by more than a de minimis amount (generally, 0.25 percent of the stated redemption price at maturity multiplied by the number of complete years to maturity). The stated redemption price at maturity of a debt instrument is the sum of all payments to be made under the instrument other than payments of qualified stated interest.

---

[25]     [**NTD**: Subject to modification based on the terms of the Take Back Preferred Units.]

In general, U.S. Holders of Take Back Term Loans must follow Holdings' determination of issue price, unless a U.S. Holder specifically discloses its disagreement with such determination in connection with such U.S. Holder's filing of its tax return. Holdings will make available its determination of the issue price to Holders of Take Back Term Loans in accordance with applicable Treasury Regulations.  Holdings and the Global Debtors expect, and intend to take the position that, the Take Back Term Loans and the Incremental New Money Term Loans to be fungible for U.S. federal income tax purposes, and therefore, have the same issue price and issue date. Generally, if a substantial amount of the debt instruments in an issue is issued for money, the issue price of each debt instrument in the issue is the first price at which a substantial amount of the debt instruments is sold for money. Assuming the issuance of a substantial amount of the Take Back Term Loans and the Incremental New Money Term Loans is for cash, it is expected that the price paid for Incremental New Money Term Loans will establish the "issue price" of the Take Back Term Loans and the Incremental New Money Term Loans.

If the issuance of a substantial amount of the Take Back Term Loans and the Incremental New Money Term Loans is not for cash (e.g., if no Incremental New Money Term Loans are issued), the issue price of the Take Back Term Loans and the Incremental New Money Term Loans will be determined under the rules of governing the issue price for a debt instrument issued in exchange for another debt instrument, which depends on whether either debt instrument is considered "publicly traded" for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance.  If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (i.e., interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is readily available on a quotation medium.

If the Take Back Term Loans are issued with more than a de minimis amount of OID (including as a result of any premiums payable in connection with the issuance of the Incremental New Money Term Loans), a U.S. Holder will be required to include OID in gross income as ordinary income for U.S. federal income tax purposes as it accrues under a constant-yield method, in advance of the receipt of cash payments attributable to such income and regardless of such U.S. Holder's regular method of tax accounting. The amount of OID includable in income by a U.S. Holder will equal the sum of the "daily portions" of OID for each day during the taxable year (or portion of the taxable year) on which the U.S. Holder holds the Take Back Term Loans. The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The amount of OID allocable to an accrual period is equal to the product of the "adjusted issue price" of the Take Back Term Loans at the beginning of that accrual period and its yield to maturity, determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period, minus the amount of qualified stated interest allocable to such accrual period. The "adjusted issue price" of the Take Back Term Loans at the start of any accrual period is equal to its issue price, increased by the

aggregate amount of OID previously includable in the gross income of the U.S. Holder with respect to such Take Back Term Loans, and decreased by any payments previously made on such Take Back Term Loans that were not payments of qualified stated interest.

### b.     **Sale, Retirement, or Other Taxable Disposition**

A U.S. Holder of the Take Back Term Loans will recognize gain or loss upon the sale, redemption, retirement, or other taxable disposition of the obligations due under the Take Back Term Loans equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest, which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in the Take Back Term Loans.  A U.S. Holder's adjusted tax basis in the Take Back Term Loans generally will equal the issue price thereof, increased by any OID previously included in income and decreased by any payments received (other than payments of qualified stated interest).  Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the Take Back Term Loans for more than one year as of the date of disposition.  If the U.S. Holder realizes a capital loss, the deductibility of such loss may be subject to limitations.

### D.     **Certain Material U.S. Federal Income Tax Consequences to Non-U.S. Holders**

The following discussion includes only certain material U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders are urged to consult their tax advisors regarding the U.S. federal, state, and local and non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holders, including the ownership and disposition of any consideration received pursuant to or in connection with the Plan.

### i.     General; Recognition of Gain or Loss

Whether a Non-U.S. Holder recognizes gain or loss on the exchange of the Claims pursuant to the Plan or upon a subsequent disposition of the consideration received under the Plan, as well as the amount of such gain or loss, is determined in the same manner as set forth above in connection with U.S. Holders of the applicable Claims. See ¶ XI.B.i above. Any amounts treated as received with respect to accrued but unpaid interest will be treated as described below under ¶ XI.D.iv below.

Any gain recognized by a Non-U.S. Holder on the exchange of its Claim (which, as discussed above, does not include amounts received in respect of accrued but unpaid interest) generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for one hundred and eighty-three (183) days or more during the taxable year in which the gain is realized and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). If the exception in clause (i) above applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or such lower rate as may be specified under an

applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year. If the exception in clause (ii) above applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder with respect to such gain. To claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to 30% (or such lower rate as may be specified by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

ii.  U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Saks Common Stock

a.  **Dividends on New Saks Common Stock**

Any distributions made with respect to New Saks Common Stock will constitute dividends for U.S. federal income tax purposes to the extent such distributions are paid out of current or accumulated earnings and profits of Holdings as determined for U.S. federal income tax purposes. Except as described below, dividends paid with respect to New Saks Common Stock held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or a successor form), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.

Dividends paid with respect to New Saks Common Stock held by a Non-U.S. Holder that are effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and if required by an applicable income tax treaty, such dividend income is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will not be subject to withholding tax, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or a successor form). However, such dividends generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax equal to 30% (or such lower rate as may be specified by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

Distributions by Holdings that are not paid out of its current or accumulated earnings and profits will not be subject to U.S. income or withholding tax (except as described under the Foreign Investment in Real Property Tax Act ("FIRPTA") discussion in ¶ XI.D.ii.c below), but instead will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares,

83

and thereafter as capital gain from the sale or exchange of such shares. If it cannot be determined at the time a distribution is made whether or not such distribution will be in excess of current and accumulated earnings and profits of Holdings, the distribution will be subject to withholding at the rate applicable to dividends. However, the Non-U.S. Holder may seek a refund of such amounts from the IRS if it is subsequently determined that such distribution was, in fact, in excess of current and accumulated earnings and profits of Holdings.

b.    **Sale, Redemption, or Other Taxable Disposition of New Saks Common Stock**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax on any gain recognized on a sale, redemption, repurchase, or other taxable disposition of New Saks Common Stock unless:

- such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), in which case such gain generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder (and a corporate Non-U.S. Holder may also be subject to the branch profits tax described above);

- the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year of the disposition and certain other conditions are met, in which case such Non-U.S. Holder will be subject to a 30% tax (or such lower rate under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year; or

- the New Saks Common Stock constitutes a "United States real property interest" ("USRPI") for purposes of FIRPTA, as discussed in ¶ XI.D.ii.c below.

c.    **FIRPTA**

Under FIRPTA, gain on the disposition of a USRPI by a Non-U.S. Holder is generally subject to U.S. federal income tax as if such gain were effectively connected with a U.S. trade or business of such Non-U.S. Holder. A USRPI includes, among other things, an interest in a corporation that is a "United States real property holding corporation" ("USRPHC"). In general, a corporation is a USRPHC if the fair market value of its USRPIs equals or exceeds 50% of the sum of the fair market values of its USRPIs, its interests in real property located outside the United States, and its other assets used or held for use in a trade or business. Stock of a corporation will be treated as a USRPI if the corporation was a USRPHC at any time during the shorter of (a) the five-year period ending on the date of the disposition or (b) the Non-U.S. Holder's holding period for such stock.

If Holdings is a USRPHC, gain on the disposition of New Saks Common Stock by a Non-U.S. Holder generally would be subject to U.S. federal income tax under FIRPTA, and the purchaser of such stock may be required to withhold 15% of the amount realized on the disposition.

84

Additionally, if Holdings is a USRPHC, distributions in excess of current and accumulated earnings and profits may be subject to a 15% withholding tax, and may be subject to additional taxation under FIRPTA.

The Global Debtors have not completed an analysis of whether Holdings will be a USRPHC upon emergence. As discussed above, the determination of whether Holdings is a USRPHC will depend on a number of factors, including the relative fair market values of Holdings' USRPIs, its interests in real property located outside the United States, and its other assets used or held for use in a trade or business at the relevant testing time. Given the nature of the Global Debtors' business, which includes significant owned and leased real estate holdings in the United States, there can be no assurance that Holdings will not be classified as a USRPHC at the time of emergence or at any time thereafter. Non-U.S. Holders are urged to consult their tax advisors regarding the application of FIRPTA to their ownership and disposition of New Saks Common Stock.

iii.     [U.S. Federal Income Tax Consequences to Non-U.S. holders of Owning and Disposing of the Take Back Preferred Units

a.     **Distributions on the Take Back Preferred Units**

Distributions on the Take Back Preferred Units that are treated as dividends for U.S. federal income tax purposes (as described in ¶ XI.C.vi above) generally will be subject to U.S. federal withholding tax and other tax consequences in the same manner as dividends on the New Saks Common Stock, as described in ¶ XI.D.ii.a above. Any constructive distributions under section 305(c) of the Tax Code (as described in ¶ XI.C.vi.a above) may also be subject to U.S. federal withholding tax at the same rates. However, as discussed above, the Global Debtors intend to take the position that the accrual of an undeclared dividend on the Take Back Preferred Units does not result in a constructive distribution under section 305(c) of the Tax Code and that, as a result, dividends on the Take Back Preferred Units would not be subject to any such withholding unless and until dividends are declared and paid. This position is not binding on the IRS and the IRS could assert that the accrual of an undeclared dividend on the Take Back Preferred Units results in a constructive distribution (or series of constructive distributions) under section 305(c) of the Tax Code. Non-U.S. Holders receiving Take Back Preferred Units under the Plan are urged to consult their tax advisors regarding the application of section 305 to the Take Back Preferred Units (and any potential withholding related to section 305).

b.     **Sale, Redemption, or Other Taxable Disposition of the Take Back Preferred Units**

[The tax consequences of a sale, redemption, or other taxable disposition of the Take Back Preferred Units by a Non-U.S. Holder generally will be determined in the same manner as described with respect to the New Saks Common Stock in ¶ XI.D.ii.b and ¶ XI.D.ii.c above. Non-U.S. Holders are urged to consult their tax advisors regarding the U.S. federal income tax consequences of owning and disposing of the Take Back Preferred Units.][26]

---

[26]     [**NTD**: Subject to modification based on the terms of the Take Back Preferred Units.]

iv.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of the Take Back Term Loans

Generally, payments to a Non-U.S. Holder that are attributable to interest on the Take Back Term Loans (including, for purposes of this discussion of Non-U.S. Holders, any OID) that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States for U.S. federal income tax purposes generally will not be subject to U.S. federal income or withholding tax, provided that it qualifies as "portfolio interest." Interest will qualify for the portfolio interest exemption if:

- the Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of stock of Holdings entitled to vote;

- the Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" (each, within the meaning of the Tax Code) with respect to Holdings; and

- either (1) the Non-U.S. Holder certifies in a statement provided to the applicable withholding agent under penalties of perjury that it is not a United States person and provides its name and address; (2) a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and holds the applicable Take Back Term Loans on behalf of the Non-U.S. Holder certifies to the applicable withholding agent under penalties of perjury that it, or the financial institution between it and the Non-U.S. Holder, has received from the Non-U.S. Holder a statement under penalties of perjury that such holder is not a United States person and provides a copy of such statement to the applicable withholding agent; or (3) the Non-U.S. Holder holds the Take Back Term Loans directly through a "qualified intermediary" (within the meaning of applicable Treasury Regulations) and certain conditions are satisfied.

A Non-U.S. Holder that does not qualify for the portfolio interest exemption with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax on such interest at a 30% rate, unless such Non-U.S. Holder is entitled to a reduction in or exemption from withholding on such interest as a result of an applicable income tax treaty. To claim such entitlement, the Non-U.S. Holder generally must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax on such payments of interest under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established.

If interest paid to a Non-U.S. Holder is effectively connected with the conduct by such Non-U.S. Holder of a trade or business within the United States for U.S. federal income tax purposes (and if required by an applicable income tax treaty, such interest is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), the Non-U.S. Holder generally will not be subject to U.S. federal withholding tax but will be subject to U.S. federal income tax with respect to such interest in the same manner as a U.S. Holder. To claim the exemption from withholding, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that interest paid on the applicable Take Back Term

86

Loans is not subject to withholding tax because it is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States.

E.    FATCA

Withholding taxes may be imposed under sections 1471 to 1474 of the Tax Code (such sections commonly referred to as the Foreign Account Tax Compliance Act ("FATCA")) on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a 30% withholding tax may be imposed on dividends with respect to New Saks Common Stock or the Take Back Preferred Units or interest on the Take Back Term Loans, in each case, paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Tax Code), unless (a) the foreign financial institution undertakes certain diligence and reporting obligations, (b) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Tax Code) or furnishes identifying information regarding each substantial United States owner, or (c) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in clause (a) above, it must enter into an agreement with the United States Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States owned foreign entities" (each as defined in the Tax Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA may apply to payments of dividends on the New Saks Common Stock or the Take Back Preferred Units and interest on the Take Back Term Loans. Proposed Treasury Regulations, on which taxpayers generally may rely pending finalization, eliminate FATCA withholding on gross proceeds from the sale or other disposition of such instruments.

Non-U.S. Holders should consult their tax advisors regarding the potential application of FATCA withholding to their particular circumstances.

F.    Information Reporting and Back-Up Withholding

In general, information reporting requirements may apply to distributions or payments made under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or by otherwise establishing such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but

87

is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns. The IRS may make the information returns reporting interest and dividends and any backup withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION**

## XII. IMPLEMENTATION OF THE PLAN

### A. Plan Distributions and Transactions

As soon as reasonably practicable after the Effective Date, the distributions provided for under the Plan will be effectuated pursuant to the following restructuring transactions, which shall take place, *in seriatim*, pursuant to documentation satisfactory to the Global Debtors and the Required Consenting DIP Term Loan Lenders, except as otherwise specified in the Plan, the applicable Definitive Document or the Confirmation Order:

- the Global Debtors will implement the transactions as set forth in Article VI of the Plan;

- the Reorganized Global Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order;

- certificates of incorporation, by-laws and other organizational documents of the Reorganized Global Debtors, in form and substance satisfactory to the Required Consenting DIP Term Loan Lenders, shall be amended and restated as necessary to effectuate the terms of the Plan;

- New Saks will issue the New Saks Common Stock pursuant to the terms of the Plan;

88

- The Global Debtors will execute the Litigation Trust Agreement and take such steps as necessary to establish the Litigation Trust in accordance with the terms of the Plan; and

- the releases, exculpation, and injunction provided for in the Plan, which are essential elements of the Restructuring Transactions, shall become effective.

## B.      Plan Administrator

The Plan Administrator may be appointed at the option of the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders.   If appointed, the Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause (as defined below); or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with the Plan and the Plan Administrator Agreement.

Subject to Section 6.2(c) of the Plan, the Plan Administrator, as applicable, shall have the authority and right on behalf of each of the Global Debtors, without need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

- Except to the extent Claims have been previously Allowed, manage and effectuate the Claims reconciliation process in accordance with the terms of the Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Global Debtors, other than with respect to any Claims that constitute Litigation Trust Assets (if applicable, and for the avoidance of doubt, the Litigation Trustee shall be responsible for objecting to, reconciling, prosecuting, or settling Claims that constitute Litigation Trust Assets);

- Make distributions to Holders of Allowed Claims in accordance with the Plan, other than with respect to distributions (if any) made pursuant to the Litigation Trust and Litigation Trust Agreement;

- Prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

- Retain professionals to assist in performing its duties under the Plan;

- Maintain the books and records and accounts of the Global Debtors;

- Incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

- Administer each Debtor's tax obligations, including (a) filing tax returns and paying tax obligations, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all

89

taxable periods of such Global Debtor ending after the Petition Date through the liquidation of such Global Debtor as determined under applicable tax laws, and (c) representing the interest and account of each Global Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

- Prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Global Debtors that are required hereunder, by any Governmental Unit or applicable law;

- Pay statutory fees in accordance with the Plan;

- Perform other duties and functions that are consistent with the implementation of the Plan; and

- Close the Chapter 11 Cases, subject to the reasonable consent of the Litigation Trustee (if applicable).

The New Board shall, among other things, oversee and direct the Plan Administrator, as applicable, and the administration of the Plan.  On the Effective Date, or as soon as is reasonably practicable thereafter, the New Board shall establish such procedures and protocols as it deems necessary to carry out its oversight and direction over the Plan Administrator and as are otherwise acceptable to the Required Consenting DIP Term Loan Lenders.

Each of the Global Debtor Estates shall indemnify and hold harmless the Plan Administrator, as applicable, solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's bad faith, gross negligence, willful misconduct or criminal conduct.

### C.  Exit ABL Facility

Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit ABL Facility and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit ABL Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the Exit ABL Facility.  The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the Exit ABL Facility Documents, necessary or appropriate to incur loans under the Exit ABL Facility without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the Exit ABL Parties may mutually agree to be necessary to consummate the Exit ABL Facility.

On the Effective Date, the agreements with respect to the Exit ABL Facility shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable

in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit ABL Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. On the Effective Date, all of the Liens and security interests to be granted in connection with the Exit ABL Facility (a) shall be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the Exit ABL Facility, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under or in connection with the Exit ABL Facility, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.  The Reorganized Global Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

### D.    New Exit Facilities

Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the New Exit Facilities, the New Exit Facilities Documents, and all transactions contemplated thereby (including the New Capital Syndication and any supplementation thereof, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the New Exit Facilities and the New Exit Facilities Documents.  The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the New Exit Facilities Documents, necessary or appropriate to consummate the New Exit Facilities without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the New Capital Commitment Parties may mutually agree to be necessary to consummate the New Exit Facilities and the transactions contemplated by the New Exit Facilities Documents.

On the Effective Date, the New Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, and enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance,

91

recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law.

The Reorganized Global Debtors are authorized to conduct the New Capital Syndication on terms acceptable to the New Capital Commitment Parties, and to execute, deliver, and perform any New Capital Syndication Documents in connection therewith, in each case without further notice to or order of the Bankruptcy Court.

i.      <u>New Exit Debt Facilities</u>

Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the New Exit Debt Facilities and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the New Exit Debt Facilities, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the New Exit Debt Facilities.  The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the New Exit Debt Facilities Documents, necessary or appropriate to incur loans under the New Exit Debt Facilities without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the New Exit Term Loan Secured Parties may mutually agree to be necessary to consummate the New Exit Debt Facilities.

On the Effective Date, the agreements with respect to the New Exit Debt Facilities shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Exit Debt Facilities are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. On the Effective Date, all of the Liens and security interests to be granted in connection with the New Exit Debt Facilities (a) shall be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the New Exit Debt Facilities, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under or in connection with the New Exit Debt Facilities, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.  The Reorganized Global Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being

92

understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

ii.        Preferred Equity Facilities

Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Preferred Equity Facilities and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Preferred Equity Units, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the Preferred Equity Facilities.  The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the Preferred Equity Facilities Documents, necessary or appropriate to issue preferred equity under the Preferred Equity Facilities Documents without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the Preferred Equity Facilities Parties may mutually agree to be necessary to issue the Preferred Equity Units and consummate the transactions contemplated by the Preferred Equity Facilities Documents.

On the Effective Date, the agreements with respect to the Preferred Equity Facilities shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Preferred Equity Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law.  The Preferred Equity Units shall be issued and distributed in accordance with the terms of the Plan free and clear of all Liens, Claims, and other Interests.  All of the Preferred Equity Units issued pursuant to the Plan shall be duly authorized and validly issued.

**E.     New Capital Commitment Claims and DIP Term Loan Documents Indemnification Obligations**

Notwithstanding anything to the contrary in the Plan, (a) the New Capital Commitment Claims and (b) all indemnification, expense reimbursement, and contribution obligations of the Global Debtors or Reorganized Global Debtors, as applicable, arising under or in connection with the DIP Term Loan Documents (including indemnification obligations in favor of the DIP Term Loan Agent and the DIP Term Loan Lenders), shall, to the extent such obligations survive the termination of the DIP Term Loan Credit Agreement pursuant to its terms, survive, remain in full force and effect, and be binding on the applicable Reorganized Global Debtor from and after the Effective Date; provided, however, that any such indemnification obligations that relate to or arise from any claim or Cause of Action that is (i) released pursuant to Article XI of the Plan or

93

(ii) subject to the Exculpation provided under Section 11.4 of the Plan shall not be preserved under the Plan and shall be deemed released and discharged as of the Effective Date.  For the avoidance of doubt, nothing in the Section 6.18 of the Plan shall limit, modify, or impair any rights of the DIP Term Loan Agent, the DIP Term Loan Lenders, and the New Capital Commitment Parties, as applicable, to seek indemnification, expense reimbursement, or contribution from any entity that is not a Global Debtor or a Reorganized Global Debtor to the extent such rights exist under the DIP Term Loan Documents and the New Capital Commitment Letter, as applicable, and survive the termination thereof.

### F.    Litigation Trust[27]

On the Effective Date the Global Debtors shall, subject to all consents in favor of the Required Consenting DIP Term Loan Lenders in the Plan and the Restructuring Support Agreement, execute the Litigation Trust Agreement and take such steps as necessary to establish the Litigation Trust in accordance with the terms of the Plan.  The beneficial interests with respect to the Litigation Trust shall be for the benefit of the Holders of DIP Term Loan Claims, and the Global Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title and interest in the Litigation Trust Assets.  Pursuant to section 1141 of the Bankruptcy Code, such Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests, except as otherwise set forth in the Plan.  For the avoidance of doubt, if applicable, the Litigation Trust Assets shall include Litigation Trust Retained Causes of Action held by or assertable by any Global Debtor (including any TopCo Global Debtor), in each case to the extent set forth in the Schedule of Retained Causes of Action.

The (A) establishment, purpose, and administration of the Litigation Trust, (B) appointment, rights, and powers, of the Litigation Trustee, and (C) treatment of the Litigation Trust for federal income tax purposes, among other things, shall be governed by the Litigation Trust Agreement.  On and after the Effective Date, the Litigation Trustee shall be authorized, in accordance with the terms of the Plan and the Litigation Trust Agreement, to take such other actions as may be necessary or desirable to make any distributions on account of any Litigation Trust Assets.

As of the Effective Date, the Litigation Trustee shall be appointed as trustee of the Litigation Trust pursuant to the Litigation Trust Agreement and the Plan.  On or after the Effective Date, the Litigation Trustee will assume the Litigation Trustee Duties.

On the Effective Date and at the election of the Required Consenting DIP Term Loan Lenders, the Global Debtors shall fund the Litigation Trust Escrow Account in an amount equal to the Litigation Trust Escrow Amount.  If funded, the Litigation Trust Escrow Amount shall automatically and irrevocably vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests.  If funded, the Litigation Trust Escrow Amount shall be used for the administration of the Litigation Trust, to pay expenses of the Litigation Trust, and to pursue the Litigation Trust Retained Causes of Action, with any excess amount being used to distribute to Holders of DIP Term Loan Claims, as set forth in the Litigation Trust Agreement.  All proceeds

---

[27]    [**NTD**: All provisions related to Litigation Trust remain under review and subject to material revision.]

from the pursuit of the Litigation Trust Retained Causes of Action shall be used by the Litigation Trustee to pay for the costs and expenses of administration of the Litigation Trust, pursuit of the Litigation Trust Retained Causes of Action, and distribution to Holders of DIP Term Loan Claims, as set forth in the Litigation Trust Agreement.  The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement, respectively.

### G. Continued Corporate Existence and Corporate Action

Except as otherwise provided in the Plan or as otherwise may be agreed between the Global Debtors and the Required Consenting DIP Term Loan Lenders, each of the Global Debtors, as Reorganized Global Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable Laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Global Debtor, each of the Reorganized Global Debtors may take such action as permitted by applicable Law and such Reorganized Global Debtor's New Organizational Documents, as such Reorganized Global Debtor may determine is reasonable and appropriate, including, but not limited to, causing:  (a) a Reorganized Global Debtor to be merged with and into another Reorganized Global Debtor, or a subsidiary and/or Affiliate of a Reorganized Global Debtor; (b) a Reorganized Global Debtor to be dissolved; (c) the conversion of a Reorganized Global Debtor from one Entity type to another Entity type; (d) the legal name of a Reorganized Global Debtor to be changed; (e) the closure of a Reorganized Global Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Global Debtor under the Law of jurisdictions other than the Law under which the Global Debtor currently is incorporated.

### H. Corporate Action

On the Effective Date, the New Organizational Documents and any other applicable amended and restated corporate Organizational Documents of each of the Reorganized Global Debtors and New Saks, the New Exit Facilities Documents and the Exit ABL Facility Documents shall be deemed authorized in all respects.  On the Effective Date, all actions contemplated by the Plan and the Restructuring Transactions shall be deemed authorized and approved in all respects, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.

Any action under the Plan to be taken by or required of the Global Debtors or the Reorganized Global Debtors, including the adoption or amendment of certificates of formation, incorporation, and bylaws, the issuance of securities and instruments, or the selection of officers or directors shall be authorized and approved in all respects, without any requirement of further action by any of the Global Debtors' or Reorganized Global Debtors' or New Saks' equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

On or (as applicable) before the Effective Date, the appropriate officers of the Global Debtors, the Reorganized Global Debtors, or New Saks, as applicable, shall be authorized and, as applicable, directed to issue, execute, deliver, acknowledge, file, and/or record, as applicable, such securities, documents, contracts, instruments, releases and other agreements and take such other action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, in the name of and on behalf of the Global Debtors, the Reorganized Global Debtors, and New Saks, as applicable, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, or member approval or action.  In addition, the selection of the Persons who will serve as the New Board shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Global Debtor or New Saks, and each shall serve from and after the Effective Date pursuant to and in accordance with the terms of the applicable New Organizational Documents and other applicable documents until such director, officer, or manager resigns or is removed or terminated in accordance with the applicable New Organizational Documents and other applicable documents or Laws.

The authorizations, approvals, and directives contemplated by Section 6.19 of the Plan shall be effective, notwithstanding any requirements under non-bankruptcy Law.

## I.      Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth in the Plan, on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents directly or indirectly evidencing, related to or connected with any Claim, other than certain Intercompany Claims and Existing Intercompany Equity Interests, as expressly set forth in the Plan, and any rights of any Holder in respect thereof, shall be deemed canceled, discharged, and of no force or effect without further act or action under any applicable agreement, Law, regulation, order, or rule.  The holders of or parties to such canceled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation or the cancellation thereof, except the rights provided for in the Plan.  Notwithstanding anything to the contrary in the Plan and in the Restructuring Support Agreement, each of the DIP Credit Agreements, the Prepetition OpCo Notes Indenture, the Prepetition SGUS Notes Indenture, the Prepetition FILO Credit Agreement, the Prepetition NPC Credit Agreement, the Prepetition Initial Notes Indenture, and the HoldCo II SGUS Notes Guarantee shall continue in effect solely to the extent necessary to:  (a) permit Holders of the DIP Facility Claims, Prepetition SGUS Notes Claims, Prepetition FILO Claims, Prepetition NPC Claims, Prepetition OpCo Second Out Notes Claims, and HoldCo II SGUS Notes Guarantee Claims to receive distributions under the Plan on account of such respective Claims; and (b) preserve all rights of (i) the Prepetition SGUS Noteholders with respect to the Prepetition SGUS Notes Indenture and vice versa, (ii) the Prepetition FILO Lenders with respect to the Prepetition FILO Credit Agreement and vice versa, (iii) the Prepetition NPC Lenders with respect to the Prepetition NPC Credit Agreement and vice versa, (iv) the Prepetition OpCo Second Out Noteholders with respect to the Prepetition OpCo Notes Indenture and vice versa, (v) the Prepetition OpCo Third Out Noteholders with respect to the Prepetition OpCo Notes Indenture and vice versa, (vi) the Holders of Prepetition Initial Notes with respect to the Prepetition Initial Notes Indenture and vice versa, and (vii) the HoldCo II SGUS Notes Guarantee Claims with respect to the HoldCo II SGUS Notes Guarantee and vice versa, in each case with respect to any

rights or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement, in each case that they may have under such agreements that survive termination of such agreements against any entity that is not a Global Debtor or a Reorganized Global Debtor, and otherwise in accordance with the terms of the Plan.  Except as provided pursuant to the Plan, upon satisfaction of the DIP Facility Claims, Prepetition SGUS Notes Claims, Prepetition FILO Claims, Prepetition NPC Claims, Prepetition OpCo Second Out Notes Claims, Prepetition OpCo Third Out Notes Claims, Prepetition Initial Notes Claims, and HoldCo II SGUS Notes Guarantee Claims respectively (and as the case may be), each of the DIP Credit Agreements, the Prepetition OpCo Notes Indenture, the Prepetition SGUS Notes Indenture, the Prepetition FILO Credit Agreement, the Prepetition NPC Credit Agreement, the Prepetition Initial Notes Indenture, and the HoldCo II SGUS Notes Guarantee, respectively (and as the case may be), shall be discharged of all of their respective obligations associated with the DIP Credit Agreements, the Prepetition SGUS Notes Indenture, the Prepetition FILO Credit Agreement, the Prepetition NPC Credit Agreement, the Prepetition OpCo Notes Indenture, the Prepetition Initial Notes Indenture, and the HoldCo II SGUS Notes Guarantee, respectively and as the case may be.

On the Effective Date, except as otherwise specifically provided for in the Plan (including in the Restructuring Steps Plan):  (i) the obligations of the Global Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Global Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Global Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be cancelled, terminated and of no further force or effect solely as to the Global Debtors, without further act or action, and the Global Debtors and the Reorganized Global Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Global Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Global Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Global Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be automatically and fully released and discharged.

## J.      Release of Liens, Claims and Equity Interests

On the Effective Date, except as otherwise specifically provided for in the Plan (including in the Restructuring Steps Plan):  (i) the obligations of the Global Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Global Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Global Debtors that are

97

specifically Reinstated pursuant to the Plan, if any) shall be cancelled, terminated and of no further force or effect solely as to the Global Debtors, without further act or action, and the Global Debtors and the Reorganized Global Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Global Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Global Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Global Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be automatically and fully released and discharged.

### K.      Directors of the Reorganized Global Debtors

#### i.      Boards

Subject to the terms of the Restructuring Support Agreement, the Confirmation Order, and the applicable New Organizational Documents, on the Effective Date, the New Boards shall be established and new members of the New Boards appointed.  The initial members of the New Boards, who shall each be selected by the Required Consenting DIP Term Loan Lenders, in consultation with the Global Debtors, shall be identified in the Plan Supplement to be Filed with the Bankruptcy Court prior to the Effective Date.  Unless reappointed, the members of the Boards prior to the Effective Date shall have no continuing obligations to any of the Reorganized Global Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Global Debtor on the Effective Date. Commencing on the Effective Date, the members of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Global Debtor, as applicable, and may be replaced or removed in accordance therewith, as applicable.

### L.      Management Incentive Plans

The New Board shall be authorized to adopt and implement the Management Incentive Plan on the terms set forth in the Plan Supplement.  After the Effective Date, in accordance with the terms of the Post-Emergence Incentive Program, and in consultation with the New Board, the Reorganized Global Debtors may pay the Post-Emergence Bonuses to the Key Employees.

### M.      General Distribution Mechanics

- Distributions on Account of Allowed Claims Only.  Notwithstanding anything in the Plan and in the Restructuring Support Agreement to the contrary, no distribution under the Plan shall be made on account of a Claim until such Claim becomes an Allowed Claim.

- Disbursing Agent.  Except as otherwise provided in the Plan, all distributions under the Plan, including the distribution of the New Saks Common Stock, shall be made by the Disbursing Agent; provided that with respect to any distributions made from the

Litigation Trust in accordance with the Plan and the Litigation Trust Agreement, the "Disbursing Agent" shall be the Litigation Trustee.

- Distribution Record Date. Distributions under the Plan to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Any transfers of Claims after the Distribution Record Date shall not be recognized for purposes of the Plan unless otherwise provided therein.

- No Recourse. Except with respect to Claims which are reinstated, no claimant shall have recourse to the Reorganized Global Debtors (or any property thereof), other than with regard to the enforcement of rights or distributions under the Plan.

- Method of Cash Distributions. Any Cash payment to be made pursuant to the Plan will be made in U.S. dollars and may be made by draft, check, or wire transfer, in the sole discretion of the Global Debtors or the Reorganized Global Debtors, or as otherwise required or provided in any relevant agreement or applicable law.

- Distributions on Non-Business Days. Any payment or distribution under the Plan due on a day other than a Business Day may be made, without interest, on the next Business Day.

- No Distribution in Excess of Allowed Amount of Claim. No Holder of an Allowed Claim shall receive in respect of such Claim any distribution under the Plan in excess of the Allowed amount of such Claim.

- Fractional Shares. No fractional interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.

## N.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall for U.S. federal (and applicable state and local) income tax purposes be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (but solely to the extent that such other amount is an allowable portion of such Allowed Claim).

## O.    Withholding Taxes

In connection with the Plan and all distributions under the Plan, the Reorganized Global Debtors, the Disbursing Agent and any Claims Agent shall comply with all withholding and reporting requirements imposed by any U.S. federal, state, provincial, local or foreign taxing authority, and all distributions under the Plan hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Global Debtors, the Disbursing Agent and any Claims Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including requiring a Holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of the Plan:  (a) each Holder of an Allowed Claim that is to receive a distribution under the Plan under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and

99

other tax obligations on account of such distribution; and (b) no distributions under the Plan shall be required to be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Global Debtors, the Disbursing Agent or the Claims Agent, as applicable, for the payment and satisfaction of such tax obligations or has, to their satisfaction, established an exemption therefrom.

### P.  Exemption from Certain Transfer Taxes and Recording Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Global Debtor to a Reorganized Global Debtor or to any Entity pursuant to or in connection with the Plan, including:  (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Global Debtors or the Reorganized Global Debtors, including, without limitation, the New Saks Common Stock, the Preferred Equity Units, the Exit ABL Facility, and the New Exit Debt Facilities; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral under the Exit ABL Facility Documents and the New Exit Debt Facilities Documents, as applicable; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any U.S. federal, state or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate U.S. federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

### Q.  Exemption from Securities Laws

The offering, issuance, and distribution of any securities, including the New Saks Common Stock and Take Back Preferred Units in exchange for Claims pursuant to Article III or Article V of the Plan, shall be exempt from, among other things, the registration requirements of the Securities Act and any other applicable U.S. state or local Laws requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code (except with respect to an Entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) to the extent permitted and available.  Except as otherwise provided in the Plan or the governing certificates or instruments, any and all such New Saks Common Stock and Take Back Preferred Units so issued under the Plan (a) will not be "restricted securities" (as defined under the Securities Act), and (b) will be freely tradable and transferable under the Securities Act by the recipients thereof that are not, and have not been within ninety (90) days of such transfer, an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Global Debtors or the Reorganized Global Debtors, in each case, subject to (x) the provisions of section 1145(b)(1) of

the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (y) compliance with applicable securities Laws and any rules and regulations, including those of the United States Securities and Exchange Commission or U.S. state or local securities Laws, if any, applicable at the time of any future transfer of such securities or instruments, and (z) any restrictions in the New Organizational Documents.

The offering, issuance, and sale of the Incremental New Money Preferred Units shall be exempt from the registration requirements of the Securities Act pursuant to section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. Each recipient of Incremental New Money Preferred Units shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act, and the Incremental New Money Preferred Equity Facility Share Purchase Agreement shall contain such representations, warranties, and covenants as are customary for transactions exempt from registration under section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder. The Incremental New Money Preferred Units shall constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, and any resale of such securities shall be subject to applicable restrictions under the Securities Act, including the requirements of Rule 144 or another available exemption from the registration requirements of the Securities Act.

Notwithstanding anything to the contrary in any Plan Document or the Restructuring Support Agreement, no Entity (including DTC, ClearPar, or any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether issuance of the New Saks Common Stock and Preferred Equity Units is exempt from registration and/or eligible for book-entry delivery, settlement, and depository (to the extent applicable).

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, THE GLOBAL DEBTORS DO NOT MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE GLOBAL DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## R.    Setoffs and Recoupments

Except as otherwise provided in the Plan or in the Plan Supplement, each Reorganized Global Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that the applicable Global Debtors or Reorganized Global Debtors may hold against the

Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); provided that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Global Debtors, of any such claims, rights, and Causes of Action. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Global Debtors or the Reorganized Global Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Global Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or Proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

Notwithstanding anything to the contrary in the Plan, nothing in the Plan or the Confirmation Order shall modify the rights of the Global Debtors, the Reorganized Global Debtors, the Plan Administrator (if appointed), or any current or former counterparty to an Unexpired Lease or Executory Contract with the Global Debtors, as applicable, to assert any right of setoff or recoupment, if any, that such party may have under applicable bankruptcy Law or non-bankruptcy Law, including, but not limited to, the ability to (a) setoff or recoup a security deposit, if any, held pursuant to the terms of an Unexpired Lease or Executory Contract, as applicable, (b) assert rights of setoff or recoupment, if any, in connection with reconciliation of Claims, or (c) assert rights of setoff or recoupment, if any, as a defense to any claim (including any Claim) or Cause of Action held by or against the Global Debtors or the Reorganized Global Debtors, or any of its or their successors, as applicable.

## S.    Modifications and Amendments

The Plan may be amended, modified, or supplemented by the Global Debtors, with the express written consent of the Required Consenting DIP Term Loan Lenders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by Law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of Holders of Allowed Claims and Allowed Equity Interests pursuant to the Plan, the Global Debtors, with the express written consent of the Required Consenting DIP Term Loan Lenders, may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Documents, and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. The Global Debtors, with the express written consent of the Required Consenting DIP Term Loan Lenders, may make technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications are immaterial or do not adversely affect the treatment of Holders of Claims or Equity Interests under the Plan. Subject to the restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Global Debtors expressly reserves its respective rights to alter, amend, or modify the Plan with respect to such Global Debtor one or more times, in each instance with the express written consent of the Required

Consenting DIP Term Loan Lenders, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or to remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### T.   Inconsistency

In the event of an inconsistency between the Plan and this Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan or the Disclosure Statement, the Confirmation Order shall control.

### U.   Reservation of Rights

All exhibits to the Plan (including, without limitation, all documents Filed with the Plan Supplement and all exhibits and ancillary agreements thereto) are incorporated and are a part of the Plan as if set forth in full therein.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

### V.   Closing of Chapter 11 Cases

Upon the occurrence of the Effective Date, the Reorganized Global Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases, as determined by the Reorganized Global Debtor with consent from the Required Consenting DIP Term Loan Lenders, and all contested matters relating to each of the Global Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

## XIII.   EFFECT OF CONFIRMATION OF THE PLAN ON CLAIMS AND EQUITY INTERESTS

### A.   Discharge of Claims and Termination of Certain Equity Interests

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are Reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Global Debtors, the Reorganized Global Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or

103

before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim is Allowed; or (3) the Holder of such Claim or Equity Interest has accepted the Plan. Except as otherwise provided in the Plan (and unless a court of competent jurisdiction otherwise determines that a default is incurable), any default by the Global Debtors with respect to any Claim that existed immediately prior to or on account of the Filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests (other than any Existing Intercompany Equity Interests that are Reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in the Plan. For the avoidance of doubt, nothing in Section 11.1 of the Plan shall affect the rights of Holders of Claims to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims are entitled under the Plan.

In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest, or any distribution to be made on account of such Allowed Claim or Allowed Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Global Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Global Debtors may compromise and settle any Claims against the Global Debtors and their Estates, as well as claims and Causes of Action against other Entities.

i.      [Releases by the Global Debtors][28]

**[Notwithstanding anything else contained in the Plan to the contrary, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally, and forever released and discharged by each and all of the Global Debtor Releasing Parties, including any successors to the Global Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities (the "Global Debtor Release"), from any and all Claims and Causes of Action, including any derivative Claims asserted or assertable on behalf of the Global Debtors, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the**

---

[28]  [**NTD**: The Global Debtor Release, Third Party Release, and Exculpation provisions are subject to the outcome of the Special Restructuring Committee Independent Investigation.]

104

**Effective Date or thereafter arising, in law, at equity or otherwise, other than Retained Causes of Action, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Global Debtors, including, without limitation:  (a) the Chapter 11 Cases, the Special Restructuring Committee Independent Investigation, the Disclosure Statement, the Plan, or the Definitive Documents; (b) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (c) the business or contractual arrangements between any Global Debtor and any Released Parties; (d) the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, any materials prepared in connection with the Special Restructuring Committee Independent Investigation, the Definitive Documents, the DIP Documents (including with respect to the DIP Loans), the Exit ABL Facility Documents, the New Exit Facilities Documents, or any agreements, instruments or other documents related to any of the foregoing or the Chapter 11 Cases; (e) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (f) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Global Debtors or the Reorganized Global Debtors; and/or (g) the Confirmation or consummation of the Plan or the solicitation of votes on the Plan, in each case, that such Global Debtor Releasing Party would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Global Debtor, its respective Estate or any Reorganized Global Debtor (whether directly or derivatively) against any of the Released Parties.**

**Notwithstanding anything contained in the Plan to the contrary, the foregoing provisions of this Global Debtor Release shall not operate to waive or release:  (a) any post-Effective Date obligations of any party or Entity under the Plan, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Effective Date (including, for the avoidance of doubt, those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan as set forth in the Plan, including the Exit ABL Facility Documents, the New Exit Facilities Documents, (b) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan, (c) any Retained Causes of Action, including Causes of Action included on the Schedule of Retained Causes of Action, (d) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party, as determined by a Final Order of a court of competent jurisdiction; and/or (e) the rights of such Global Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Global Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Global Debtor Release is:**

**(a) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Global Debtor Release; (c) in the best interests of the Global Debtors and all Holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Global Debtors, the Reorganized Global Debtors, or the Global Debtors' Estates asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Global Debtor Release. Entry of the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Global Debtor Release.**

**Without limiting the generality of the foregoing, each Global Debtor Releasing Party expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides:**

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

**Each of the Global Debtor Releasing Parties expressly acknowledges that the releases and covenants not to sue contained in the Plan are effective regardless of whether those released matters or released claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.]**

ii.     [Third-Party Release][29]

**[Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, pursuant to Bankruptcy Rule 9019 and to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Global Debtor Release provided by the Global Debtor Releasing Parties above, each Non-Global Debtor Releasing Party, on behalf of itself and any other Persons that might**

---

[29]   [**NTD**: The Global Debtor Release, Third Party Release, and Exculpation provisions are subject to the Special Committee Report.]

seek to claim under or through such Non-Global Debtor Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Global Debtor Releasing Parties) and their respective assets and properties (the "Third-Party Release") from any and all claims, interests, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in Law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common Laws, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Global Debtors, including, without limitation:  (a) the Global Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Special Restructuring Committee Independent Investigation, the Disclosure Statement, the Plan, or the Definitive Documents; (b) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (c) the business or contractual arrangements between any Global Debtor and any Released Parties; (d) the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, any materials prepared in connection with the Special Restructuring Committee Independent Investigation, the Definitive Documents, the DIP Documents (including with respect to the DIP Loans), the Exit ABL Facility Documents, the New Exit Facilities Documents, or any agreements, instruments or other documents related to any of the foregoing; (e) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (f) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Global Debtors or the Reorganized Global Debtors, as applicable; and/or (g) the Confirmation or consummation of the Plan or the solicitation of votes on the Plan that such Non-Global Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties.

Notwithstanding anything contained in the Plan to the contrary, the foregoing provisions of this Third-Party Release shall not operate to waive or release:  (a) any post-Effective Date obligations of any party or Entity under the Plan, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Effective Date (including, for the avoidance of doubt, those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan as set forth in the Plan, including the Exit ABL Facility Documents, the New Exit Facilities Documents, (b) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan, (c) any Retained Causes of Action, including Causes of Action included on the Schedule of Retained Causes of Action, (d) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party, as determined by a Final Order of a court of competent jurisdiction; and/or (e) the rights of such Non-Global Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other

107

agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Global Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.  Entry of the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release.

Without limiting the generality of the foregoing, each Non-Global Debtor Releasing Party expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Non-Global Debtor Releasing Parties expressly acknowledges that the releases and covenants not to sue contained in the Plan are effective regardless of whether those released matters or released claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.]

      iii.     [Exculpation][30]

---

[30]   [**NTD**: The Global Debtor Release, Third Party Release, and Exculpation provisions are subject to the outcome of the Special Restructuring Committee Independent Investigation.]

108

[Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Global Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, the Special Restructuring Committee Independent Investigation, pursuit of confirmation and consummation of the Plan, making distributions under the Plan, the Disclosure Statement, or the solicitation of votes for, or Confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Global Debtors; or the transactions or documentation in furtherance of any of the foregoing; the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Plan, the Plan Supplement, any materials prepared in connection with the Special Restructuring Committee Independent Investigation, the DIP Documents (including with respect to the DIP Loans), the Exit ABL Facility Documents, the New Exit Facilities Documents, or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Global Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; provided, however, that the foregoing provisions of this Exculpation shall not operate to waive or release: (a) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party, as determined by a Final Order of a court of competent jurisdiction; and/or (b) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy Law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions, or inactions. The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in **Article XI** of the Plan shall or shall be deemed to prohibit the Global Debtors or the Reorganized Global Debtors, as applicable, from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Global Debtors or the Reorganized Global Debtors, in each case unless otherwise expressly provided for in the Plan. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.]

iv.     Discharge of Claims and Termination of Equity Interests

Except as otherwise provided for in the Plan, effective as of the Effective Date, with respect to the Reorganized Global Debtors:  (a) the rights afforded in the Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Global Debtors or any of their assets, property or Estates; (b) the Plan shall bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and the Global Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Persons and Entities shall be precluded from asserting against the Global Debtors, the Global Debtors' Estates, the Reorganized Global Debtors, their successors and assigns and their assets and properties any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

v.      Injunction

Except as otherwise provided in the Plan or for obligations issued pursuant hereto, all Persons or Entities that have held, hold, or may hold, as applicable, Causes of Action, Claims, or Equity Interests that have been released, discharged, or are subject to Exculpation pursuant to Article XI of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties or the property or Estates of the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable, unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Cause of Action, Claim, or Equity Interest released, exculpated, or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Exculpated Parties that relates to or is reasonably likely to relate to any act

110

or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to the release and exculpation provisions of Article XI of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim or Cause of Action of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Global Debtor, Reorganized Global Debtor, or Exculpated Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable, and, only to the extent legally permissible and as provided for in Article XII of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.

### B.      Claims Administration Responsibilities

Except as otherwise specifically provided by the Plan or the Confirmation Order, as applicable, and other than with respect to Professional Fee Claims, after the Effective Date, the Reorganized Global Debtors shall have the sole authority to:  (a) File and prosecute objections to Claims or Equity Interests; (b) settle, compromise, withdraw, litigate to judgment, or otherwise resolve any and all obligations to Claims or Equity Interests without any further notice to or action, order, or approval by the Bankruptcy Court; (c) settle or compromise any Disputed Claim or Equity Interest; and (d) direct the Claims Agent to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, after the Effective Date, the Reorganized Global Debtors shall have the right to object to Claims and Equity Interests and shall retain any and all rights and defenses that the Global Debtors had with respect to any Claim or Equity Interest immediately before the Effective Date.  A motion to extend the applicable Claims Objection Deadline shall automatically extend the deadline until the Bankruptcy Court enters an order on such motion.

### C.      Estimation of Claims

Before the Effective Date the Global Debtors, and on or after the Effective Date the Reorganized Global Debtors, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Equity Interest, including during the litigation of any objection to any Claim or Equity Interest or during the appeal, if applicable, relating to such objection.

Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Equity Interest, that estimated amount shall constitute a maximum limitation on such Claim or Equity Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Global Debtor or Reorganized Global Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Equity Interest.

111

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Claim is estimated.

All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### D.    Disputed Claims Process

Until the Effective Date, the Global Debtors shall have the authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed, and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  On and after the Effective Date, the Reorganized Global Debtors shall have the sole authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed, and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.

Except as otherwise provided herein, all Proofs of Claim that are not timely Filed by the applicable Bar Date or that have not otherwise been Allowed pursuant to the Plan or a Final Order shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Global Debtor or any Reorganized Global Debtor, as applicable, without the need for any objection by the Global Debtors or the Reorganized Global Debtors, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.

## XIV.   EXECUTORY CONTRACTS UNDER THE PLAN

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, any Executory Contracts and Unexpired Leases (a) not previously assumed, (b) not previously rejected pursuant to an order of the Bankruptcy Court, and (c) identified on the Assumed Contracts / Leases List will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order, except any Executory Contract or Unexpired Lease (i) identified on the Rejected Contracts / Leases List, (ii) that is the subject of (A) a separate motion or notice to reject, assume, or assume and assign or a Cure Dispute that is pending as of the Confirmation Date or (B) an order of the Bankruptcy Court that is not yet a Final Order, or (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Global Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases,

on such other date as may be identified on the Rejected Contracts / Leases List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Global Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by an order of the Bankruptcy Court.  To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, increases, accelerates or otherwise alters any obligations, rights or liabilities of the Global Debtors or the Reorganized Global Debtors thereunder as a result of, gives rise to any rights or benefits to any non-Global Debtor party to any such Executory Contract or Unexpired Lease, or creates any Lien on any asset or property, as applicable, of the Global Debtors or the Reorganized Global Debtors as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of the Plan or any other Restructuring Transaction (including any change of control, sale of business, assignment, vesting, termination, acceleration, or similar provisions therein), then such provision shall be deemed unenforceable and modified (solely for purposes of the transactions contemplated under the Plan) such that the transactions contemplated by the Plan or any other Restructuring Transaction shall not entitle the non-Global Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Global Debtors or the Reorganized Global Debtors thereunder, to be entitled to any rights or benefits thereunder, or create or impose a Lien on any asset or property of the Global Debtors or the Reorganized Global Debtors.

Notwithstanding anything to the contrary in the Plan (other than Section 9.8 of the Plan) and in the Restructuring Support Agreement, except as otherwise agreed to by the Global Debtors and any applicable counterparty to an Unexpired Lease (with consent from the Required Consenting DIP Term Loan Lenders), the Global Debtors or Reorganized Global Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts / Leases List in their discretion prior to the Effective Date and the Assumed Contracts / Leases List in their discretion, prior to the later of (1) Effective Date and (2) seven (7) days after the date on which the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts / Leases List (or, in either case, such later date as may be agreed with a counterparty); provided that the Global Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.  For the avoidance of doubt, the inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Global Debtor that such contract or lease is an Executory Contract or Unexpired Lease, or that any Global Debtor has liability thereunder.

113

### B.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Costs that differ from the amounts paid or proposed to be paid by the Global Debtors or the Reorganized Global Debtors on the Assumed Contracts / Leases List to a counterparty must be Filed, served, and actually received by the Global Debtors on or before fourteen (14) days after such notice (together with any outstanding objections to the amount proposed on the Assumed Contracts / Leases List, a "Cure Dispute").  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Global Debtor, or Reorganized Global Debtor without the need for any objection by the Global Debtors or the Reorganized Global Debtors or any other party in interest, or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure Costs shall be deemed fully satisfied, released, and discharged upon payment by the Global Debtors or the Reorganized Global Debtors of the applicable Cure Costs; provided, however, that nothing herein shall prevent (if applicable) the Reorganized Global Debtors from paying any Cure Costs despite the failure of the relevant counterparty to File such request for payment of such Cure Costs.  The Reorganized Global Debtors also may settle any Cure Costs without any further notice to or action, order, or approval of the Bankruptcy Court.  In the event that a non- Global Debtor contract counterparty Files a timely Cure Dispute and the Global Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard on at least seven (7) days' notice to the applicable non-Global Debtor contract counterparty, or such date as the parties agree, subject to the Bankruptcy Court's calendar.  Any objection by a counterparty to an Executory Contract or Unexpired Lease, as applicable, to (a) the ability of the applicable Global Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned, or (b) any other matter pertaining to the proposed assumption or proposed assumption and assignment must be Filed, served, and actually received by the Global Debtors by the date on which objections to Confirmation of the Plan are due.  The Reorganized Global Debtors may settle any Cure Dispute without any further notice to or action, order, or approval of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment, as applicable.

Except to the extent that less favorable treatment has been agreed to by the non- Global Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, the Global Debtors shall pay any Cure Costs, if monetary, in full in Cash either (i) on the Effective Date or as soon as reasonably practicable thereafter, or (ii) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (x) the Effective Date, or as soon as reasonably practicable thereafter, and (y) seven (7) days after the date on which such Cure Dispute has been resolved.  The Global Debtors and the Reorganized Global Debtors, as applicable, reserve the right at any time (including, with respect to the Reorganized Global Debtors, after the Effective Date) to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved Cure Dispute.  If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease, as applicable, is greater than the amount set forth in the Assumed Contracts / Leases List,

114

the Global Debtors or the Reorganized Global Debtors, as applicable, shall have the right to reject such Executory Contract or Unexpired Lease by amending the Rejected Contracts / Leases List to include such Executory Contract or Unexpired Lease and providing prompt notice of any such amendment to any applicable counterparty, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan and payment or performance of the applicable Cure Costs shall result in the full release and satisfaction of any Claims and defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid pursuant to Section 9.2 of the Plan, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing herein shall affect the allowance of any Claims or any Cure Costs agreed to by the Global Debtors in any written agreement amending or modifying any Executory Contract or Unexpired Lease prior to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan or otherwise.**

To the extent applicable, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Global Debtors or the Reorganized Global Debtors, as applicable, under such Executory Contracts or Unexpired Leases and the Global Debtors are entitled to all the rights provided under section 365 of the Bankruptcy Code.

### C.      Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases under the Plan must be Filed with the Claims Agent within thirty (30) days after the date of the effectiveness of the rejection of the applicable Executory Contract or Unexpired Lease.  **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely Filed shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Global Debtors, the Reorganized Global Debtors, the Estates, or their respective property without the need for any objection by the Global Debtors or the Reorganized Global Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court.**  All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article V of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, respectively.

115

### D.       Ipso Facto and Similar Provisions Ineffective

Any term of any policy, contract, or other obligation applicable to a Global Debtor shall be unenforceable with respect to any Global Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of the Global Debtor as a result of, or gives rise to a right of any Person or entity based on any of the following: (i) the insolvency or financial condition of a Global Debtor; (ii) the commencement of any of these Chapter 11 Cases; (iii) confirmation or consummation of the Plan, including any change of control that will occur as a result of such consummation; or (iv) the Restructuring Transactions.

### E.       Insurance Policies

Each of the Global Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder.   Unless otherwise provided in the Plan, on the Effective Date, (a) the Global Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Global Debtors.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (x) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies, or (y) alters or modifies the duty, if any, that the insurers or third-party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Global Debtors (or the purchaser, solely to the extent assumed and assigned to the purchaser under an asset purchase agreement) or draw on any Collateral or security therefor.   For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to File or serve a Cure Dispute or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any Claims Bar Date or similar deadline governing Cure Costs or Claims.

For the avoidance of doubt, all of the Global Debtors' D&O Liability Insurance Policies shall be governed by Section 6.5 and Section 6.17 of the Plan.

### F.       Directors and Officers Insurance Policies

In accordance with the Plan:  (a) on the Effective Date, the Global Debtors or Reorganized Global Debtors, as applicable, shall be deemed to have assumed all of the Global Debtors' D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, which "tail policy" shall not be otherwise terminated or reduced) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; provided that any indemnity obligations that would otherwise be assumed by the foregoing assumption of the D&O Liability Insurance Policies shall be governed as provided elsewhere in the Plan and shall not be deemed to be assumed with assumption of such D&O Liability Insurance Policies; (b) the Global Debtors and the Reorganized Global Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the

116

Global Debtors or Reorganized Global Debtors, as applicable, may deem necessary and upon consent from the Required Consenting DIP Term Loan Lenders; and (c) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies.

For the avoidance of doubt, on and after the Effective Date, each of the Reorganized Global Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

### G.   Indemnification Provisions in Organizational Documents

On and as of the Effective Date, all indemnification obligations of the Global Debtors that were in place as of the Petition Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such persons than the indemnification provisions in place prior to the Restructuring Transactions; provided that, with respect to former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable, such indemnification provisions shall be reinstated solely to the extent necessary to access D&O Liability Insurance Policies, and the Reorganized Global Debtors shall have no out-of-pocket liability for any such indemnification obligations owed to former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable.  On the Effective Date, each applicable Reorganized Global Debtor shall be deemed to have assumed all unexpired D&O Liability Insurance Policies.

### XV.   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.   Conditions Precedent to Confirmation

It shall be a condition to the confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X of the Plan:

- the DIP Orders shall be in full force and effect;

- the Global Debtors shall have paid in full in Cash (or the Global Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Fees and Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Orders;

- the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan;

- the Confirmation Order shall have been entered; and

- each of the Restructuring Support Agreement, the DIP Facilities, and the DIP Orders, shall not have been terminated in accordance with their respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting DIP Term Loan Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facilities), or the DIP Facilities in accordance with their respective terms upon the expiration of such time.

## B.    Conditions to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X of the Plan:

- the Confirmation Order (which shall include final approval of the Disclosure Statement) shall have become a Final Order in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, unless otherwise agreed by the Global Debtors and the Required Consenting DIP Term Loan Lenders;

- the DIP Orders shall have become Final Orders in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, unless otherwise agreed by the Global Debtors and the Required Consenting DIP Term Loan Lenders;

- no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

- each of the applicable Plan Documents shall have been executed, delivered, acknowledged, and/or Filed, as applicable, by the Entities and Persons intended to be parties thereto and effectuated and remain in full force and effect, and any conditions precedent and consent rights held by the Required Consenting DIP Term Loan Lenders related thereto or contained therein shall have been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Plan Documents;

- any non-technical and/or material amendments, modifications or supplements to the Plan shall have been acceptable to the Global Debtors and the Required Consenting DIP Term Loan Lenders except as otherwise provided in Section 13.3 of the Plan;

- each of the offers, issuances, sales, and/or deliveries of New Saks Common Stock, Preferred Equity Facilities, and Preferred Equity Units, in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no proceeding by any Governmental Unit or other Entity or Person that alleges that any such offer, issuance, sale, and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such proceeding shall be

118

threatened in writing or instituted by any Governmental Unit on or prior to the Effective Date;

- each of the Restructuring Support Agreement, the DIP Facilities, and the DIP Orders, having not been terminated in accordance with their respective terms, and there having not occurred and been continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting DIP Term Loan Lenders to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facilities), or the DIP Facilities in accordance with their respective terms upon the expiration of such time;

- all of the actions set forth in the Restructuring Steps Plan, as applicable, shall have been completed and implemented;

- there shall not have been instituted or threatened to be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Unit (i) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transactions contemplated herein, in the Restructuring Support Agreement, and in the Plan Documents or (ii) imposing a material award, claim, injunction, fine, or penalty that, in each case, both (x) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (y) has a material adverse effect on the financial condition or operations of the Reorganized Global Debtors, taken as whole;

- the Global Debtors shall have obtained all authorizations, consents and regulatory approvals, if any, required to be obtained, and shall have filed all notices and reports, if any, required to be filed, including with any Governmental Unit, by the Global Debtors in connection with the Plan's effectiveness, in each case, as may be required by a Governmental Unit;

- the New Saks Common Stock and Preferred Equity Units, to be issued and/or delivered on the Effective Date shall have been validly issued by New Saks, shall have been fully paid and non-assessable, and being free and clear of all taxes, Liens, and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights, and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents;

- all conditions precedent to the effectiveness of the Exit ABL Facility shall have been satisfied or duly waived by the party whose consent is required thereunder, and the Exit ABL Facility shall be in full force and effect;

- all conditions precedent to the effectiveness of the New Exit Facilities, as memorialized in the New Exit Facilities Documents, have been satisfied or duly waived by the party whose consent is required thereunder, and the New Exit Facilities Documents shall be in full force and effect;

- all requisite filings with any Governmental Unit and third parties shall have become effective, and all such Governmental Unit and third parties having approved or consented to the Restructuring Transactions, to the extent required;

119

- any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions shall have been obtained;

- the Flagship CMBS Settlement shall have been consummated;

- all accrued and unpaid Restructuring Fees and Expenses shall have been paid in full in Cash by the Global Debtors, consistent with the terms of the Plan and the Restructuring Support Agreement; and

- the following documents being in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions, and shall not have been, as applicable, stayed, modified, reversed, vacated, subject to any pending appeal, and/or terminated prior to the Effective Date:  (i) the New Organizational Documents; (ii) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (iii) all other documents necessary to consummate a transaction of the type contemplated by the Plan to the extent not otherwise listed above.

For the avoidance of doubt, the conditions precedent to the Effective Date enumerated above shall apply to each Global Debtor on an individual basis (and may be satisfied and/or waived on an individual basis), and the Effective Date for any individual Global Debtor may occur prior to the Effective Date of any other individual Global Debtor.

### C.      Satisfaction and Waiver of Conditions Precedent

Except as otherwise provided in the Plan, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Section 10.1 and Section 10.2 of the Plan may be waived in whole or part by the Global Debtors with consent from the Required Consenting DIP Term Loan Lenders, and as the case may be, without notice, leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; provided that any condition to effectiveness with respect to the DIP Conversion with respect to (a) the First Out DIP Term Loan Claims shall require the consent of DIP Term Loan Lenders holding at least 80% of the aggregate outstanding principal amount of First Out DIP Term Loan Claims (exclusive of any fees, premiums, interest, or First Out DIP PIK Loans) that are held by all DIP Term Loan Lenders, and (b) the Second Out DIP Term Loan Facility Claims and Third Out DIP Term Loan Facility Claims shall require the consent of DIP Term Loan Lenders holding at least two-thirds in aggregate outstanding principal amount of DIP Term Loan Claims that are held by all DIP Term Loan Lenders, in each case, in accordance with section 10.08(2)(i) of the DIP Term Loan Credit Agreement.  The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

### D.      Effect of Failure of Conditions

If all of the conditions to effectiveness have not been satisfied (as provided in Section 10.1 and Section 10.2 of the Plan) or duly waived (as provided in Section 10.3 of the Plan) and the

Effective Date has not occurred on or before the first Business Day that is more than thirty (30) days after the Confirmation Date, or by such later date as set forth by the Global Debtors in a notice Filed with the Bankruptcy Court prior to the expiration of such period, then the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders, may File a motion to vacate the Confirmation Order.  Notwithstanding the Filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in <u>Section 10.1</u> and <u>Section 10.2</u> of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to <u>Section 10.4</u>, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under the Plan shall be made, the Global Debtors and all Holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims against or Equity Interests in the Global Debtors; (b) prejudice in any manner the rights of the Global Debtors, any Holders of Claims or Equity Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by any Global Debtor or any other Person with respect to any matter set forth in the Plan.

### E.   Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Equity Interest in, the Global Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

### F.   Revocation or Withdrawal of the Plan

Subject to the terms and conditions of the Restructuring Support Agreement, each of the Global Debtors expressly reserves its respective rights to revoke or withdraw the Plan as to any particular Global Debtors, one or more times, prior to the Effective Date and to File subsequent chapter 11 plans.  If the Global Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Global Debtors, or if Confirmation or consummation as to any or all of the Global Debtors does not occur, then, with respect to such Global Debtors:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Global Debtors or any other Person, (ii) prejudice in any manner the rights of such Global Debtors or any other Person, or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Global Debtors or any other Person; and (d) all procedural and substantive rights of any of the Global Debtors or any other Person shall be preserved, including with respect to (i) all litigation rights, (ii) any plan-related issues (including with respect to an

121

appropriate schedule for any alternative plan confirmation), and (iii) any of the factual, valuation, or other assertions set forth in the Disclosure Statement.

## XVI.   CONFIRMATION OF THE PLAN

### A.      Confirmation Generally

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code.  It requires further that a debtor's disclosures concerning its plan of reorganization are adequate.

To confirm the Plan, the Bankruptcy Court must find that all of the requirements of section 1129 of the Bankruptcy Code have been met.  Thus, even if the statutorily required majority vote in number and dollar amount is achieved for Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, [4-D], 5-A, and [5-B], (the only Classes entitled to vote under the Plan), the Bankruptcy Court must make independent findings respecting the Plan's satisfaction of the requirements of the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are discussed below.

### B.      Voting Procedures and Standards

Holders of Claims in Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, [4-D], 5-A, and [5-B], (the only Classes entitled to vote under the Plan) as of the Distribution Record Date will receive this Disclosure Statement, the Plan, and a Ballot for accepting or rejecting the Plan.  Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, [4-D], 5-A, and [5-B], are entitled to vote because they are Classes that are impaired and entitled to receive a distribution under the Plan.

A class is "impaired" under a plan unless, with respect to each Claim or Equity Interest of such class, the Plan:

(i)  leaves unaltered the legal, equitable and contractual rights to which the Claim or Equity Interest entitles the Holder of such claim or interest; or

(ii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates such Holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such Holder based on such claim or interest.

A class that is not impaired under a plan of reorganization is deemed to have accepted the Plan, or is impaired and deemed to have rejected the Plan and, therefore, solicitation of acceptances with respect to such class is not required and will not occur.

Among other things, the following are the Voting Procedures in connection with voting on the Plan and Plan:

(a) For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Equity Interests held by a single creditor against the Global Debtors in each Voting Class will be aggregated as if such creditor held a single Claim or Equity

Interest against the Global Debtors in the Voting Class, and the votes related to those Claims or Equity Interests shall be treated as a single vote on the Plan; provided, however, that separate Claims or Equity Interests held as of the Petition Date by different entities (even if related, affiliated, or properly and timely assigned or transferred prior to the Voting Record Date) shall not be deemed to be held by a single creditor pursuant to this provision, and the votes with respect to any such Claims or Equity Interests shall be treated as separate votes on the Plan.

(b) Holders with multiple Claims or Equity Interests within each Voting Class must vote all such Claims or Equity Interests to either accept or reject the Plan, and may not split their vote(s) within the Voting Class. Accordingly, an individual Ballot that partially rejects and partially accepts the Plan on account of multiple Claims or Equity Interests within the Voting Class will not be counted.

(c) Each Holder will be provided a single individual Ballot for all Claims or Equity Interests held by such Holder in each Voting Class against the Global Debtors.

(d) If a Claim or Equity Interest is transferred after the date established as the voting record date pursuant to the Disclosure Statement Order (the "Voting Record Date"), only the Holder of such Claim or Equity Interest as of the Voting Record Date may execute and submit a Ballot to the Solicitation Agent, the transferee of such Claim or Equity Interest shall be bound by any such vote (and the consequences thereof) made by the Holder of such transferred Claim or Equity Interest as of the Voting Record Date, and no "cause" will exist to permit any vote change under Bankruptcy Rule 3018(a).

(e) The delivery of a Ballot will be deemed made only when the Solicitation Agent actually receives the executed Ballot through the E-Ballot Portal or a Ballot is received via first-class mail postage prepaid, personal delivery, or overnight courier.

(f) Any party who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent properly completed Ballot. If multiple Ballots are received from the same Holder with respect to the same Claim or Equity Interest prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that Holder's intent and will supersede and revoke any Ballot previously received. After the Voting Deadline, no Ballot may be withdrawn or amended without the written consent of the Global Debtors, with the grant of such consent, absent a contrary order of this Court, being a matter of the Global Debtors' sole discretion.

(g) If a Holder of a Claim or Equity Interest casts multiple Ballots on account of the same Claim or Equity Interest, which are received by the Solicitation Agent on the same day and at the same time, but which are voted inconsistently, such Ballots shall not be counted.

(h) Except as otherwise provided in subsection (f) hereof, any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Solicitation Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal

123

amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Solicitation Agent prior to the Voting Deadline. The Global Debtors expressly reserve the right to contest the validity of any such withdrawals of Ballots.

(i) Notwithstanding anything in the Conditional Approval Order or the Bankruptcy Rules to the contrary, upon the occurrence of a Termination Date (as defined in the Restructuring Support Agreement), (i) any Consenting DIP Term Loan Lender's prior vote to accept the Plan shall automatically and without further action by such Consenting DIP Term Loan Lender be deemed to have been withdrawn and substituted with a vote to reject the Plan, and (ii) any Consenting DIP Term Loan Lender shall automatically and without further action by such Consenting DIP Term Loan Lender be deemed to have opted out of the releases set forth in the Plan.

The following types of Ballots will not be counted in determining whether the Plan has been accepted or rejected.

(a) Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;

(b) Any Ballot received after the Voting Deadline, except by order of the Bankruptcy Court or if the Global Debtors have granted an extension of the Voting Deadline, in writing, with respect to such Ballot;

(c) Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

(d) Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim or Equity Interest Holder;

(e) Any Ballot cast by an Entity that does not hold a Claim or Equity Interest in the Voting Classes;

(f) Any unsigned Ballot; and

(g) Any Ballot submitted by any means other than as set forth herein and in the Ballots, unless approved by the Global Debtors in writing or otherwise ordered by the Bankruptcy Court.

In connection with these Chapter 11 Cases, the Global Debtors will ask the Bankruptcy Court to approve the process by which Holders of Claims submit their votes (the "Voting Procedures"). In the event these Chapter 11 Cases are commenced, to the extent that the Bankruptcy Court does not or is unable to approve any portion of these Voting Procedures, the Global Debtors reserve the right to modify the Voting Procedures and recalculate the balloting in accordance with such modified procedures.

**If a Ballot is damaged or lost or if you have any questions concerning Voting Procedures, you may contact the Solicitation Agent at**

124

**Saks Global Enterprises LLC**
**c/o Stretto, Inc.**
**410 Exchange, Suite 100**
**Irvine, CA 92602**

**+1 (833) 232-5246  (U.S./Canada, Toll-Free); +1 (949) 373-7589  (International, Toll)**
**SaksInquiries@stretto.com**

A vote may be designated (*i.e.*, disregarded) if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not made or solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Under the Bankruptcy Code, the Plan will be "accepted" by a Voting Class if (excluding insiders) at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims in such Voting Class that cast Ballots to accept or reject the Plan vote in favor of the Plan.

### C.  Acceptance

The Bankruptcy Code provides that a class of claims will have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims in such class that have voted on the Plan.  There must be one impaired accepting class excluding insiders.  Here, acceptance of the Plan need only be solicited from Holders of Claims in Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, [4-D], 5-A, and [5-B], as those are the only Classes which are impaired and entitled to vote under the Plan.  Except in the context of a "cram down" (described below), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each impaired Class accepts the Plan.  If these Chapter 11 Cases are filed, the Global Debtors intend to request confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any Voting Classes that vote to reject or are deemed to reject the Plan.  This procedure is commonly referred to as a "cram down."  For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation of the Plan notwithstanding rejection by certain impaired Classes, see Article XVI.D.iv below.

### D.  Confirmation and Consummation

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all impaired Classes of Claims or Equity Interests, or if rejected by an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Equity Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Global Debtors believe: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Global Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed

125

in good faith.  Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code;

- the Plan has been proposed in good faith and not by any means forbidden by law;

- any payment made or to be made by the proponent, by the debtor or by a person issuing securities under the Plan, for services or for costs and expenses in, or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the bankruptcy court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the Plan with the debtor, or a successor to the debtor under the Plan.  The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such claim or interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the Plan or is not impaired under the Plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that allowed administrative expenses and priority claims (other than priority tax claims) will be paid in full on the Effective Date (except that if a class of priority claims has voted to accept the Plan, holders of such claims may receive deferred cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amounts of such claims) and that holders of priority tax claims may receive on account of such claims regular installment payments in cash of a total value, as of the Effective Date, equal to the allowed amount of such claims over a period that ends no later than 5 years from the petition date and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan;

- if a class of claims is impaired, at least one impaired class of claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class; and

126

- confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Global Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Global Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a more detailed summary of certain statutory confirmation requirements.

### i.  Best Interests of Holders of Claims and Equity Interests

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Equity Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.  Thus, with respect to each impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each holder of a Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Global Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In determining whether this test is satisfied, the first step is to determine the dollar amount that would be generated from the liquidation of each of the Global Debtors' assets and properties in a chapter 7 liquidation case.  The gross amount of cash available in such a liquidation would be the sum of the proceeds from the disposition of each such Debtor's assets and the cash held by each such Debtor at the time of the commencement of the chapter 7 case.  This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the applicable Debtor's business and the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders of the applicable Debtor in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

See the Liquidation Analysis attached as **Exhibit B** to this Disclosure Statement and Article XVI.D.i herein for a further discussion of how the Plan satisfies the "best interests" test. The Liquidation Analysis is incorporated herein by reference and was prepared by the Global Debtors with the assistance of the Global Debtors' advisors and reliance upon the valuation methodologies utilized by the Global Debtors' advisors.

THE GLOBAL DEBTORS HAVE DETERMINED, AS DISCUSSED IN THE LIQUIDATION ANALYSIS ATTACHED AS **EXHIBIT B** TO THIS DISCLOSURE STATEMENT, THAT CONFIRMATION OF THE PLAN WILL PROVIDE EACH CREDITOR

AND EQUITY INTEREST HOLDER OF EACH DEBTOR WITH A RECOVERY THAT IS NOT LESS THAN IT WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE APPLICABLE DEBTOR UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.  FURTHER, AS REFLECTED IN THE LIQUIDATION ANALYSIS, THE GLOBAL DEBTORS BELIEVE THAT LIQUIDATION OF THE GLOBAL DEBTORS' BUSINESSES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE WOULD RESULT IN SUBSTANTIAL DIMINUTION IN THE VALUE TO BE REALIZED BY HOLDERS OF CLAIMS AS COMPARED TO DISTRIBUTIONS CONTEMPLATED UNDER THE PLAN.   CONSEQUENTLY, THE GLOBAL DEBTORS AND THEIR MANAGEMENT BELIEVE THAT CONFIRMATION OF THE PLAN WILL PROVIDE A GREATER RETURN TO HOLDERS OF CLAIMS THAN WOULD A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

ii.      <u>Financial Feasibility</u>

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Global Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Global Debtors have prepared projections of the financial performance of the Reorganized Global Debtors for the fiscal years 2026 through 2030 (the "<u>Financial Projections</u>").  The Financial Projections, and certain of the assumptions on which they are based, are set forth in the projected financial information contained in **<u>Exhibit C</u>** to this Disclosure Statement.

THE PROJECTIONS SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED.  THE GLOBAL DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.  THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED ABOVE IN <u>ARTICLE X</u>.  IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE PROJECTIONS.

The Global Debtors prepared these Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances.  The Financial Projections have not been examined or compiled by independent accountants.  The Global Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Global Debtors and their management.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the period of the Financial Projections may vary from the projected results and the variations may be material.  All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

128

The Financial Projections indicate, on a pro forma basis, that the projected level of cash flow is sufficient to satisfy the Global Debtors' future capital expenditures and other obligations during the applicable period.  Accordingly, the Global Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Global Debtors.

### iii. Valuation Analysis

The Plan provides for the distribution of the New Saks Common Stock to Holders of DIP Term Loan Facility Claims on the Effective Date.  Accordingly, PJT, the Global Debtors' investment banker, performed an analysis of the estimated implied equity value of the Global Debtors as of an assumed Effective Date (the "Valuation Analysis") at the Global Debtors' request. Based on the Valuation Analysis, which is attached to this Disclosure Statement as **Exhibit D**, the enterprise value of the Reorganized Global Debtors will be approximately $[●] to approximately $[●], with an estimated midpoint of approximately $[●].

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with Article X of this Disclosure Statement entitled "Risk Factors."  PJT makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

### iv. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cram down" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

The Global Debtors reserve the right to seek to confirm the Plan utilizing the "cram down" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Global Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Global Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, as to any particular Debtor, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### v. Cram Down

The Bankruptcy Code contains provisions for confirmation of a plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the Plan does not discriminate unfairly with respect to each non accepting impaired class;

- the Plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the Plan.

### vi.    No Unfair Discrimination; Fair and Equitable Test

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims, or equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive any value under the Plan on account of such junior claims or interests.

The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

Specifically, with respect to equity interests, a plan is "fair and equitable" if either (i) each holder of an equity interest will receive or retain under the Plan a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the Plan on account of such interest.

The Global Debtors submit that if the Global Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially

130

equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, (a) no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Equity Interests in that Class, and (b) no holder of any Claim or Equity Interest that is junior to any claim or interest that is not satisfied in full will receive any distribution or retain any interest in any property on account of such junior Claim or Equity Interest.  The Global Debtors believe that the Plan and the treatment of all Classes of Claims or Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### vii. Classification of Claims and Equity Interests

The Global Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a plan of reorganization place each claim or interest into a class with other claims or interests that are "substantially similar."

## XVII.  ADDITIONAL INFORMATION

All of the exhibits to the Plan, the Plan Supplement and to this Disclosure Statement will be available for inspection by contacting the Solicitation Agent.

## XVIII. CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Global Debtors believe that the Plan is preferable to all other alternatives.  Consequently, the Global Debtors urge all Holders of Claims in the Voting Classes to **ACCEPT** the Plan, and to duly complete and return their Ballots so that they will be **ACTUALLY RECEIVED** on or before **4:00 p.m. (Prevailing Central Time) on [●], 2026**.

[*Remainder of Page Intentionally Left Blank*]

Dated: April 5, 2026
      Houston, Texas

                    Respectfully submitted,

                    **SAKS GLOBAL ENTERPRISES LLC** on behalf of itself and **its affiliated Global Debtors**

                    By: /s/                            
                    Name: [●]
                    Title: [●]

## EXHIBIT A

**Plan of Reorganization**

[Filed at Docket No. [●]]

## EXHIBIT B

**Liquidation Analysis**

[To come]

# EXHIBIT C

## Financial Projections

[To come]

## EXHIBIT D

**Valuation Analysis**

[To come]

## EXHIBIT E

**Restructuring Support Agreement**

*Strictly Confidential*

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED TO BE, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OR 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02 hereof, in each case, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**") is made and entered into as of April 1, 2026 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (ii) of this preamble, collectively, the "**Parties**"):[1]

i.     Saks Global Enterprises LLC, a company incorporated under the Laws of Delaware ("**Saks**"), and each of its Affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Ad Hoc Group (the Entities in this clause (i), together collectively with any Affiliate of Saks that commences a case under the Bankruptcy Code, collectively, the "**Company Parties**"); and

ii.     the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold or beneficially own, Company Claims (including DIP Term Loan Claims and Prepetition Secured Claims) that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and counsel to the Ad Hoc Group (the Entities in this clause (ii), collectively, the "**Consenting DIP Term Loan Lenders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting DIP Term Loan Lenders have in good faith and at arm's length negotiated certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the Plan Term Sheet attached hereto as **Exhibit B** (such transactions as described in this Agreement and the Plan Term Sheet, together with the Parties' entry into this Agreement, the "**Restructuring Transactions**");

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement shall have the meanings ascribed to them in Section 1.

**WHEREAS**, on January 13 (the "**Petition Date**") and 14, 2026, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**"), jointly administered under the case styled *In re Saks Global Enterprises LLC*, *et al.*, Case No. 26-90103 (ARP); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan Term Sheet.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

*Section 1.        Definitions and Interpretation*.

1.01.    Definitions.  The following terms shall have the following definitions:

"**Acceptable Post-Petition Trade Agreement**" has the meaning set forth in the Critical Vendor Process Agreement.

"**Ad Hoc Group**" means the ad hoc group of holders of DIP Facility Claims and Prepetition Secured Claims represented by Paul, Weiss, Lazard, and FTI.

"**Ad Hoc Group Advisors**" means advisors retained by the Ad Hoc Group, including (a) Paul, Weiss, (b) Lazard, (c) FTI, (d) Hilco, (e) Kekst, (f) Porter Hedges, (g) Morgan Lewis, and (h) upon prior written notice to the Debtors, any other local or special counsel or other professional retained by the Ad Hoc Group.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

"**Agents**" means, collectively, the DIP Agents, the Prepetition ABL Agent, the Prepetition Initial Notes Trustee, the Prepetition OpCo Notes Trustee, the Prepetition SGUS Notes Trustee, the Prepetition FILO Agent, the Prepetition NPC Agent, and the Prepetition TopCo Agent including, in each case, any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the Plan Term Sheet).

"**Agreement Effective Date**" means the date on which each of the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any written inquiry, proposal, offer, bid, term sheet, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, tender offer, equitization, recapitalization, plan of reorganization, share exchange, merger, joint venture, business combination, or similar transaction involving any one or more Company Parties or a material portion of any of their assets, in each case, in whole or in part, or the debt, equity, or other interests in any one or more Company Parties other than in accordance with or in furtherance of one or more of the Restructuring Transactions and as contemplated in the Plan Term Sheet; *provided* that for the avoidance of doubt, any negotiations or proposals entered into in accordance with Section 7.01(s) of this Agreement shall not constitute an Alternative Restructuring Proposal.

"**Authentic Settlement**" means any agreement (if any) by and among Authentic Brands Group and any non-Debtor Affiliate of the Debtors, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Axonic**" means Axonic Coinvest II, LP, together collectively with any of its Affiliates party to the Axonic Transaction Documents.

"**Axonic Settlement**" means any agreement (if any) by and among Axonic and any Debtor, which, notwithstanding anything to the contrary herein, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Axonic Transaction Documents**" has the meaning set forth in the *Objection to the Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 120].

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Bar Date Motion**" means any motion of the Debtors seeking entry of an order establishing the dates by which Proofs of Claim must be filed with respect to Claims against the Debtors.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Business Plan**" has the meaning set forth in the DIP OpCo Credit Agreement.

"**Call Option**" means that certain call option issued by the SGUS DIP Borrower to the DIP Term Loan Lenders with respect to outstanding Prepetition FILO Claims and Prepetition NPC Claims pursuant to the DIP Orders.

"**Call Option Documents**" means collectively, any and all documentation related to the Call Option, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Cash Collateral**" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"**Causes of Action**" means without limitation, any action, Claim, damage, remedy, judgment, cause of action, controversy, demand, right, action, suit, right of setoff, cross claim, counterclaim, recoupment, any Claim arising from any contract or for breach of duty imposed by law or in equity, contribution, reimbursement, suit, class action, third-party claim, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, direct or indirect, choate or inchoate, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, disputed or undisputed, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, the term "Causes of Action" includes:  (a) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (b) any right to object to or otherwise contest Claims or Equity Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) claims pursuant to section 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state Law.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Committee**" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on January 27, 2026, as such committee may be reconstituted, supplemented, or otherwise modified from time to time, including pursuant to the U.S. Trustee's *Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 522].

"**Company Claims**" means any Claim against a Company Party, including, without limitation, the Prepetition Secured Claims and the Prepetition TopCo Facility Claims.

4

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Party Termination Events**" has the meaning set forth in Section 12.02 of this Agreement.

"**Concession and Consignment Vendor Process Agreement**" means that certain Concession and Consignment Vendor Process Agreement, dated as of January 30, 2026 (as amended, restated, amended and restated, supplemented, extended, renewed, or otherwise modified from time to time), entered into by and among SGUS LLC, Saks Global Holdings, LLC, Saks Global Enterprises, and certain DIP Term Loan Lenders.

"**Concession Agreement**" means, with respect to any Concessionaire, any agreement entered into after the Petition Date with such Concessionaire that provides for payment in respect of any prepetition or postpetition obligation to such Concessionaire, as more fully described in the Concession and Consignment Vendor Process Agreement.

"**Concessionaires**" has the meaning set forth in the Concession and Consignment Vendor Process Agreement.

"**Conditional Disclosure Statement Motion**" means the motion of the Debtors seeking entry of the Conditional Disclosure Statement Order.

"**Conditional Disclosure Statement Order**" means any order entered by the Bankruptcy Court conditionally approving the Disclosure Statement and the Solicitation Materials.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan.

"**Consenting DIP Term Loan Lender Termination Events**" has the meaning set forth in Section 12.01 of this Agreement.

"**Consenting DIP Term Loan Lenders**" has the meaning set forth in the preamble of this Agreement.

"**Consignment Agreement**" means, with respect to any Consignor, any agreement entered into after the Petition Date with such Consignor that provides for payment in respect of any prepetition or postpetition obligation to such Consignor, as more fully described in the Concession and Consignment Vendor Process Agreement.

"**Consignors**" has the meaning set forth in the Concession and Consignment Vendor Process Agreement.

"**Critical Vendor Process Agreement**" means that certain Critical Vendor Process Agreement, dated as of January 27, 2026 (as amended, restated, amended and restated,

5

supplemented, extended, renewed, or otherwise modified from time to time and together with the schedules thereto), entered into by and among SGUS LLC, Saks Global Holdings LLC, and Saks Global Enterprises LLC, and the DIP Term Loan Lenders.

"**Customary Securities Lending Arrangement**" has the meaning set forth in Section 9.06.

"**Debtors**" means the Company Parties that have or will commence Chapter 11 Cases.

"**Definitive Documents**" has the meaning set forth in Section 3.01 of this Agreement, including all exhibits, annexes, schedules, amendments, and supplements relating to such documents.

"**DIP ABL Agent**" means Bank of America, N.A., in its capacity as administrative agent and collateral agent for the lenders under the DIP ABL Credit Agreement, together with its successors and permitted assigns.

"**DIP ABL Claims**" means, collectively, all Claims arising on account of the DIP ABL Credit Facility.

"**DIP ABL Credit Agreement**" means that certain Senior Secured Super-Priority DIP ABL Credit Agreement, dated as of January 15, 2026 by and among Saks, the co-borrowers party thereto, the guarantors party thereto, the lenders party thereto, Bank of America, N.A., as administrative agent, collateral agent, and swingline lender, and the other parties thereto, as amended, restated, amended or restated, supplemented, extended, renewed, or otherwise modified, refinanced, or replaced from time to time.

"**DIP ABL Credit Facility**" means the debtor-in-possession asset-based financing facility on the terms and conditions set forth in the DIP ABL Credit Agreement.

"**DIP ABL Documents**" means the DIP ABL Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

"**DIP ABL Lenders**" means, collectively, and as of the relevant time, those lenders that are party to the DIP ABL Documents.

"**DIP Agents**" means, collectively, the DIP ABL Agent, the DIP OpCo Agent, and the DIP Term Loan Agent.

"**DIP Conversion**" means the conversion, on the Plan Effective Date, of DIP Term Loan Claims into indebtedness, preferred equity, or New Saks Common Stock in accordance with (a) the terms of this Agreement, including the Plan Term Sheet, (b) the New Capital Commitment Letter, (c) the DIP Documents, as applicable, and (d) any additional terms and conditions set forth in the applicable Definitive Documents as may be agreed among the Debtors and the Required Consenting DIP Term Loan Lenders.

6

"**DIP Credit Documents**" means, collectively, the DIP ABL Documents, the DIP OpCo Documents, and the DIP Term Loan Documents.

"**DIP Documents**" means, collectively, the DIP Motion, the DIP Orders, the DIP Credit Documents, and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms thereof.

"**DIP Facilities**" means, collectively, the DIP OpCo Credit Facility, the DIP Term Loan Credit Facility, and the DIP ABL Credit Facility.

"**DIP Facility Claims**" means, collectively, all Claims of the DIP Agents and/or the DIP Lenders related to, arising under, or in connection with the Final DIP Order and the DIP Credit Documents, including, without limitation, Claims for all principal amounts outstanding, interest, fees, reasonable and documented expenses (including the reasonable and documented expenses of counsel as set forth in the DIP Documents), costs and other charges of the DIP Agent and the DIP Lenders in respect of the obligations of the Debtors arising under the DIP Documents, including, for the avoidance of doubt and as applicable, the DIP ABL Claims, the DIP OpCo Claims, and the DIP Term Loan Claims.

"**DIP Lenders**" means, collectively, and as of the relevant time, the DIP ABL Lenders, the DIP OpCo Lenders, and the DIP Term Loan Lenders.

"**DIP OpCo Agent**" means U.S. Bank Trust Company, National Association, together with its successors and permitted assigns.

"**DIP OpCo Claims**" means, collectively, all Claims arising on account of the DIP OpCo Credit Facility.

"**DIP OpCo Credit Agreement**" means that certain *Superpriority Senior Secured Term Loan Debtor-in-Possession OpCo Credit Agreement*, dated as of January 15, 2026, by and among Holdings, Saks as borrower, the lenders party thereto, U.S. Bank Trust Company, National Association, in its capacity as administrative agent and collateral agent, and the other parties thereto, as amended, restated, amended and restated, supplemented, extended, renewed, or otherwise modified from time to time.

"**DIP OpCo Credit Facility**" means the intercompany debtor-in-possession facility provided pursuant to the DIP OpCo Credit Agreement.

"**DIP OpCo Documents**" means, collectively, the DIP OpCo Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection with the DIP OpCo Credit Facility, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**DIP OpCo Lenders**" means, collectively, and as of the relevant time, those lenders that are party to the DIP OpCo Documents.

7

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**DIP Term Loan Agent**" means U.S. Bank Trust Company, National Association, together with its successors and permitted assigns.

"**DIP Term Loan Claims**" means, collectively, the First Out DIP Term Loan Claims, the Second Out DIP Term Loan Claims, and the Third Out DIP Term Loan Claims.

"**DIP Term Loan Credit Agreement**" means that certain *Debtor-in-Possession Term Loan Credit Agreement*, dated as of January 15, 2026, by and among SGUS LLC as borrower, the lenders party thereto from time-to time, U.S. Bank Trust Company, National Association, in its capacity as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, extended, renewed, or otherwise modified from time to time.

"**DIP Term Loan Credit Facility**" means the delayed draw term loan debtor-in-possession financing facility provided pursuant to the DIP Term Loan Credit Agreement.

"**DIP Term Loan Documents**" means, collectively, the DIP Term Loan Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection with the DIP Term Loan Credit Facility, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**DIP Term Loan Lender Cash Collateral Termination Event**" means the failure by the Debtors to comply with any Milestone or any other Event of Default under the DIP Orders or the DIP Term Loan Credit Agreement, as applicable.

"**DIP Term Loan Lenders**" means, collectively, and as of the relevant time, those lenders that are party to the DIP Term Loan Documents.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan, including all exhibits and schedules thereto and references therein, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, which shall be prepared and distributed in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any other applicable Law.

"**Employment Agreements**" means any postpetition employment agreements proposed to be entered into with an insider of the Debtors, as defined in section 101(31) of the Bankruptcy Code, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership,

8

or profits interests of any Company Party, in each case whether or not arising under or in connection with any Employment Agreement.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Executory Contracts and Leases Treatment**" has the meaning set forth in Section 7.01(g) of this Agreement.

"**Exit ABL Credit Facility**" means the credit facility incurred by the Debtors to replace or refinance the DIP ABL Credit Facility upon the Plan Effective Date, consistent with and subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Exit ABL Credit Facility Documents**" means collectively, the credit agreement and any other agreements, documents, and instruments delivered or entered into in connection with the Exit ABL Credit Facility, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Final DIP Order**" means the *Final Order (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* entered by the Bankruptcy Court on February 20, 2026 [Docket No. 917], including any subsequent amendment, restatement, modification, or supplement thereto, and any other order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Credit Documents and the use of Cash Collateral, which shall include the DIP Term Loan Lender Cash Collateral Termination Events, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**First Day Declaration**" means the *Declaration of Mark Weinsten in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 17].

"**First Day Pleadings**" means the first-day pleadings that the Company Parties filed on or after the Petition Date, including, for the avoidance of doubt, any amendments or modifications to the orders entered in respect of such pleadings.

"**First Out DIP PIK Loans**" has the meaning set forth in the DIP Term Loan Credit Agreement.

"**First Out DIP Term Loan Claims**" means, collectively, any Claims against a Debtor arising under, derived from, based on, or related to the First Out DIP Term Loans.

"**First Out DIP Term Loans**" means, collectively, the "First Out Term Loans" under and as defined in the DIP Term Loan Credit Agreement.

"**Flagship CMBS Settlement**" means the resolution with the CMBS Lenders (as defined in the DIP Term Loan Credit Facility), subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

9

"**FTI**" means FTI Consulting, Inc., as financial advisor to the Ad Hoc Group.

"**Hilco**" means Hilco Global, as valuation advisor to the Ad Hoc Group.

"**Holdings**" means Saks Global Holdings LLC.

"**Interchange Purchase Settlement**" means those certain settlements approved in, and the approved procedures for the disposition of Claims provided in, the *Order (I) Approving and Authorizing Debtors' Entry into Settlement Agreements with the Interchange Defendants and (II) Granting Related Relief* entered by the Bankruptcy Court on February 27, 2026 [Docket No. 1047], including (a) any subsequent amendment, restatement, modification, or supplement thereto, (b) the disposition of any funds escrowed in connection therewith, and (c) any future revenues contemplated thereby, in each case, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Interim DIP Order**" means the *Interim Order (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on January 15, 2026 [Docket No. 206].

"**Joinder**" means an executed form of joinder substantially in the form attached hereto as **Exhibit D**.

"**Kekst**" means Kekst CNC, as communications advisors to the Ad Hoc Group.

"**Key Employee Incentive Plan**" has the meaning set forth in the *Global Debtors' Motion for Entry of an Order (I) Authorizing and Approving Global Debtors' (A) Key Employee Incentive Plan and (B) Non-Insider Compensation Program and (II) Granting Related Relief* filed on or around the Agreement Effective Date.

"**Labor and Pension Matters**" means any and all issues concerning collective bargaining and/or employee defined benefit plans or defined contribution plans of the Debtors, and any amendments or modifications thereto, including, without limitation, the treatment of such issues under the Plan, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Landlord Settlements**" means any material agreement (if any) among a landlord of Real Property and the Debtors, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lazard**" means Lazard Frères & Co. LLC, as investment banker to the Ad Hoc Group.

10

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Litigation Trust**" means the trust, which shall be established on the Plan Effective Date and shall provide for the administration and prosecution of the Litigation Trust Causes of Action and any proceeds thereof.

"**Litigation Trust Causes of Action**" means those Causes of Action of any Debtor that shall vest in the Litigation Trust on the Plan Effective Date, which shall be set forth in the Plan.

"**Management Incentive Plan**" means a management incentive plan for the Debtors to be established on the Plan Effective Date on the terms set forth in the Plan Supplement.

"**Milestones**" means, collectively, the "Milestones" as defined in Section 5.12 of the DIP OpCo Credit Agreement that are incorporated by reference in Section 4 hereof.

"**Morgan Lewis**" means Morgan Lewis & Bockius LLP, as labor counsel to the Ad Hoc Group.

"**New Capital Commitment Letter**" has the meaning set forth in the Plan Term Sheet.

"**New Capital Commitment Party**" means any Consenting DIP Term Loan Lender that (a) is or becomes party to the New Capital Commitment Letter or (b) otherwise agrees to provide Incremental New Money Term Loans, as such term is defined in the New Exit Facilities Term Sheet.

"**New Capital Syndication**" means a syndication process pursuant to which the Company will seek to obtain commitments from third-party capital providers to syndicate some or all of the New Exit Facilities, which process will be in a form reasonably acceptable to the New Capital Commitment Parties.

"**New Capital Syndication Documents**" means, collectively, any and all agreements, documents, and instruments delivered or entered into in connection with the New Capital Syndication, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**New Exit Facilities**" has the meaning set forth in the Plan Term Sheet.

"**New Exit Facilities Documents**" means collectively, the agreements, documents, and instruments delivered or entered into in connection with the New Exit Facilities, including, without limitation, the New Capital Commitment Letter, the New Capital Syndication Documents, the New Exit Facilities Term Sheet, and any credit agreement, term sheets, backstop agreements, guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other ancillary and security documents provided therein or related thereto, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**New Exit Facilities Term Sheet**" is the annex detailing the terms of the New Exit Facilities attached to the Plan Term Sheet.

"**New Organizational Documents**" means, collectively, the new organizational and governance documents of the Debtors and any subsidiaries thereof, to be entered into on the Plan Effective Date, including, as applicable, the certificates or articles of incorporation, certificates of formation, certificates of organization, certificates of limited partnership, or certificates of conversion, limited liability company agreements, stockholders or shareholders agreements, operating agreements, limited partnership agreements, stockholder or shareholder agreements, bylaws, indemnification agreements, registration rights agreements, equity subscription or purchase agreements, charters, and bylaws (or equivalent governing documents of any of the foregoing), which shall be, in each case, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**New Saks**" means either (a) Holdings or (b) a new corporation or limited liability company that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors in the Chapter 11 Cases or issue the New Saks Common Stock to be distributed pursuant to the Plan.

"**New Saks Common Stock**" means the common Equity Interests of New Saks authorized under the New Organizational Documents of the Debtors and issued and/or distributed on the Plan Effective Date, subject to dilution by the Management Incentive Plan and the New Exit Facilities.

"**Outside Date**" shall mean 160 days after the Petition Date, as such date may be extended in accordance with any extension of the "Plan Effective Date" milestone provided for in the DIP Credit Documents.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Paul, Weiss**" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Ad Hoc Group.

"**Permitted Transfer**" has the meaning set forth in Section 9.01.

"**Permitted Transferee**" means each transferee of any Company Claims who meets the requirements of Section 9.01.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Plan**" means any joint plan that may be filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, as may be amended, supplemented, or otherwise modified from time to time pursuant to this Agreement, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, in each case, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

12

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that may be filed by the Debtors with the Bankruptcy Court, including all documents, forms of documents, schedules, and exhibits included therein, which may be amended from time to time, in each case, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Plan Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Porter Hedges**" means Porter Hedges LLP, Texas counsel to the Ad Hoc Group.

"**Portfolio CMBS Lenders**" means the lenders under the HBS CMBS loan (as defined in the First Day Declaration).

"**Portfolio CMBS Settlement**" means any agreement (if any) by and among the Portfolio CMBS Lenders and any non-Debtor Affiliate of the Debtors, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Post-Emergence Incentive Program**" means the incentive program that provides for payment of certain bonuses to certain identified key employees upon or after the Plan Effective Date, which will be filed as part of the Plan Supplement, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Prepetition ABL Agent**" means, Bank of America, N.A. as administrative agent and collateral agent, under the Prepetition ABL Credit Agreement, together with its successors and permitted assigns in such capacity.

"**Prepetition ABL Credit Agreement**" means that certain *ABL Credit Agreement*, dated as of December 23, 2024 by and among Saks as borrower, the lenders party thereto from time to time, the Prepetition ABL Agent and the other parties thereto, as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date.

"**Prepetition ABL Facility**" means the credit facility provided for under the Prepetition ABL Credit Agreement.

"**Prepetition FILO Agent**" means, collectively, SGUS LLC as administrative agent, and Bank of America, N.A., as collateral agent, under the Prepetition FILO Credit Agreement, together with their successors and permitted assigns in such capacity.

"**Prepetition FILO Claims**" means any Claim against a Debtor arising under, derived from, related to, or based on the Prepetition FILO Credit Agreement.

"**Prepetition FILO Credit Agreement**" means that certain *Term Loan Credit Agreement*, dated as of June 27, 2025 by and among Saks as borrower, the lenders party thereto from time to time, SGUS LLC, as administrative agent, and the other parties thereto, as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date.

"**Prepetition FILO Credit Facility**" means the credit facility provided for under the Prepetition FILO Credit Agreement.

"**Prepetition Initial Notes**" means, collectively, the secured notes issued under the Prepetition Initial Notes Indenture.

"**Prepetition Initial Notes Trustee**" means Citibank, N.A., in its capacity as trustee under the Prepetition Initial Notes Indenture, together with its successors and permitted assigns.

"**Prepetition Initial Notes Claims**" means any Claim on account of the Prepetition Initial Notes arising under or pursuant to the Prepetition Initial Notes Indenture.

"**Prepetition Initial Notes Indenture**" means that certain *Indenture*, dated as of December 16, 2024, by and among Saks, as issuer (as successor in interest to SFA Issuer LLC), the guarantors and other parties thereto, and Citibank, N.A. as trustee and as collateral agent, as amended, restated, supplemented, waived, or otherwise modified prior to the Petition Date.

"**Prepetition NPC Agent**" means, collectively, SGUS LLC, as administrative agent, and Citibank, N.A. as collateral agent, under the Prepetition NPC Credit Agreement, together with their successors and permitted assigns in such capacity.

"**Prepetition NPC Claims**" means any Claim against a Debtor arising under, derived from, related to, or based on the Prepetition NPC Credit Agreement.

"**Prepetition NPC Credit Agreement**" means that certain *Term Loan Credit Agreement*, dated as of August 8, 2025 by and among Saks, as borrower, the lenders party thereto from time to time, the guarantors and other parties thereto, SGUS LLC, as administrative agent, and Citibank, N.A., as collateral agent, as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date.

"**Prepetition NPC Credit Facility**" means the credit facility provided for under the Prepetition NPC Credit Agreement.

"**Prepetition OpCo Notes**" means, collectively, the Prepetition OpCo Second Out Notes and the Prepetition OpCo Third Out Notes.

"**Prepetition OpCo Notes Trustee**" means Citibank, N.A., in its capacity as trustee under the Prepetition OpCo Notes Indenture, together with its successors and permitted assigns.

"**Prepetition OpCo Notes Claims**" means, to the extent not converted into a DIP Facility Claim, any Claim against a Debtor arising under, derived from, related to, or based on the Prepetition OpCo Notes.

"**Prepetition OpCo Notes Indenture**" means that certain *Indenture*, dated as of August 8, 2025, by and among Saks, as issuer, the guarantors and other parties thereto, and Citibank, N.A. as trustee and collateral agent, as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date.

14

"**Prepetition OpCo Second Out Notes**" means, collectively, those certain second out notes issued under the Prepetition OpCo Notes Indenture.

"**Prepetition OpCo Second Out Notes Claims**" means, collectively, any Claims on account of the Prepetition OpCo Second Out Notes arising under or pursuant to the Prepetition OpCo Notes Indenture.

"**Prepetition OpCo Third Out Notes**" means, collectively, those certain third out notes issued under the Prepetition OpCo Notes Indenture.

"**Prepetition OpCo Third Out Notes Claims**" means, collectively, any Claims on account of the Prepetition OpCo Third Out Notes arising under or pursuant to the Prepetition OpCo Notes Indenture.

"**Prepetition Secured Claims**" means, collectively, the Prepetition OpCo Notes Claims, the Prepetition SGUS Notes Claims, the Prepetition FILO and NPC Claims, and the Prepetition Initial Notes Claims.

"**Prepetition SGUS Notes**" means, collectively, the secured notes issued under the Prepetition SGUS Notes Indenture.

"**Prepetition SGUS Notes Trustee**" means Citibank, N.A., in its capacity as trustee and collateral agent under the Prepetition SGUS Notes Indenture, together with its successors and permitted assigns.

"**Prepetition SGUS Notes Claims**" means, to the extent not converted into a DIP Term Loan Claim, any Claim against a Debtor arising under, derived from, related to, or based on the Prepetition SGUS Notes.

"**Prepetition SGUS Notes Indenture**" means that certain *Asset Based Indenture*, by and among SGUS LLC, as issuer, Citibank, N.A., as trustee and collateral agent, dated as of June 27, 2025, as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date.

"**Prepetition TopCo Agent**" means GLAS USA LLC, in its capacity as administrative agent under the Prepetition TopCo Credit Agreement, together with its successors and permitted assigns.

"**Prepetition TopCo Credit Agreement**" means that certain *Credit Agreement*, by and among Mercury Aggregator L.P., as borrower, Mercury Aggregator Holdco LLC, HBSFA Holdings Ltd., the guarantors party thereto, the lenders party thereto, and GLAS USA LLC, as administrative agent, dated as of December 23, 2024, as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date.

"**Prepetition TopCo Credit Facility**" means the credit facility provided for under the Prepetition TopCo Credit Agreement.

15

"**Prepetition TopCo Facility Claims**" means, collectively, any Claims on account of the Prepetition TopCo Facility arising under or pursuant to the Prepetition TopCo Credit Agreement.

"**Proof of Claim**" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

"**Public Disclosure**" has the meaning set forth in Section 14.24 of this Agreement.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims or enter with customers into long and short positions in Company Claims, in its capacity as a dealer or market maker in Company Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities, other debt, or interests).

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any of the Debtors, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Released Claim**" means any Company Claim released under the Plan.

"**Required Consenting DIP Term Loan Lenders**" means, at any time, Consenting DIP Term Loan Lenders holding DIP Term Loan Claims that, taken together, represent more than 50.0% of the sum of all DIP Term Loan Claims outstanding at such time, voting as a single class, subject to the exclusions and modifications provided for in the DIP Term Loan Credit Agreement or, solely with respect to any treatment (including the DIP Conversion) which does not provide for the repayment in cash in full of the First Out DIP Term Loan Claims on or before the Plan Effective Date, DIP Term Loan Lenders holding at least 80% of the aggregate outstanding principal amount of First Out DIP Term Loan Claims (exclusive of any fees, premiums, interest, or First Out DIP PIK Loans) that are held by all DIP Term Loan Lenders under the DIP Term Loan Credit Agreement.

"**Restructuring Fees and Expenses**" means all documented prepetition and postpetition fees and expenses of the Ad Hoc Group Advisors (including applicable transaction fees, financing fees, completion fees, and attorneys' fees), related to the Debtors, the Restructuring Transactions, or the Chapter 11 Cases.

"**Restructuring Steps Plan**" means a document to be included in the Plan Supplement that will set forth the material components of the applicable Restructuring Transactions, including a summary of any transaction steps necessary to complete the Plan, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Restructuring Transactions**" has the meaning set forth in recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

16

"**Saks**" has the meaning set forth in the recitals to this Agreement.

"**Second Day Pleadings**" means the second-day pleadings that the Company Parties filed following the Petition Date, including, for the avoidance of doubt, any amendments or modifications to the orders entered in respect of such pleadings.

"**Second Out DIP Term Loan Claims**" means, collectively, any Claims against a Debtor arising under, derived from, based on, or related to the Second Out DIP Term Loans.

"**Second Out DIP Term Loans**" means, collectively, the "Second Out Term Loans" under and as defined in the DIP Term Loan Credit Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Simon**" means Simon Property Group, Inc. and its Affiliates.

"**Simon Settlement**" means any agreement (if any) by and among Simon, the Debtors, and/or any non-Debtor Affiliate of the Debtors, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Solicitation Materials**" means all documents, forms, and other materials distributed in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including, without limitation, the Disclosure Statement, forms of ballots with respect to votes on the Plan, forms with respect to the releases contained in the Plan, as applicable.

"**SO5 Digital Settlement**" means the settlement, if any, of intercompany claims and procedures for payment in respect thereof as set forth in paragraph 4 of the *Final Order (I) Authorizing SO5 Digital Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on February 20, 2026 [Docket No. 919], including any subsequent amendment, restatement, modification, or supplement thereto, subject to the consents and conditions precedent set forth in Section 3.02 of this Agreement.

"**Termination Date**" means, with respect to a Party, the date on which termination of this Agreement as to such Party is effective in accordance with Sections **Error! Reference source not found.**, 12.02, 12.03, 12.04, 12.05, or 12.06, as applicable.

"**Termination Events**" has the meaning set forth in Section 12.02 of this Agreement.

"**Third Out DIP Term Loan Claims**" means, collectively, any Claims against a Debtor arising under, derived from, based on, or related to the Third Out DIP Term Loans.

"**Third Out DIP Term Loans**" means, collectively, the "Third Out Term Loans" under and as defined in the DIP Term Loan Credit Agreement.

17

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**U.S. Trustee**" means the United States Trustee for the Southern District of Texas.

"**Voting Deadline**" means the deadline for holders of Prepetition SGUS Notes Claims to vote to accept or reject the Plan.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)   unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein; *provided* that Bankruptcy Rule 9006(a) shall not apply to any period of time prescribed by any provisions of this Agreement relating to Milestones.  If any payment, distribution, act, or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety, including all exhibits, annexes, and schedules attached hereto in accordance with Section 14.02, rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the phrase "counsel to the Ad Hoc Group" refers in this Agreement to each counsel specified in Section 14.10 other than counsel to the Company Parties.

**Section 2.      *Effectiveness of this Agreement*.**  This Agreement shall become effective and binding upon each of the Parties at 11:59 p.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to Paul, Weiss as counsel to the Ad Hoc Group;

(b)      no default or Event of Default under and as defined in the DIP Term Loan Credit Agreement, the DIP OpCo Credit Agreement, the DIP Orders, or any applicable DIP Credit Documents has occurred and is continuing;

(c)      holders (or investment advisors, sub-advisors, or managers or discretionary accounts of holders) of at least 66.67% of the aggregate outstanding principal amount of DIP Term Loan Claims shall have executed and delivered counterpart signature pages to this Agreement to counsel to each of the Parties in accordance with Section 14.07;

(d)      New Capital Commitment Parties committing the Aggregate Funding Amount of the Incremental New Money Facilities (as such terms are defined in the New Capital Commitment Letter) shall have executed, delivered, and released counterpart signature pages to the New Capital Commitment Letter to counsel to the Company Parties; and

(e)      counsel to the Company Parties shall have given notice to counsel to the Ad Hoc Group in the manner set forth in Section 14.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.      *Definitive Documents*.**

3.01.   The Definitive Documents governing the Restructuring Transactions (collectively, the "**Definitive Documents**"), which shall, in each case, be in form and substance consistent with this Agreement (including with respect to any subsequent amendments, restatements, supplementations, or other modifications), including Section 3.02, shall include the following:

(a)      this Agreement;

(b)      the Plan Term Sheet;

(c)      the Plan (including, for the avoidance of doubt, all exhibits, annexes, schedules, supplements, and declarations related thereto, including the Plan Supplement);

(d)      the DIP Documents (including the DIP Orders), and any amendments or modifications thereto;

(e)      the Confirmation Order and any motion or other pleadings related to the Plan or confirmation of the Plan, which, for the avoidance of doubt, shall include declarations, affidavits, or similar pleadings;

(f)      the Disclosure Statement, the Conditional Disclosure Statement Motion, the Conditional Disclosure Statement Order, and the Solicitation Materials, which, for the avoidance of doubt, shall include declarations, affidavits, or similar pleadings;

(g)      the New Exit Facilities Documents and all related documents and materials;

(h)      the Restructuring Steps Plan;

(i)      the New Organizational Documents;

(j)      the Exit ABL Credit Facility Documents;

(k)      the Call Option Documents;

(l)      the First Day Pleadings, and in each case, all orders sought and granted pursuant thereto to the extent such pleadings seek relief in connection with the transactions contemplated herein, which, for the avoidance of doubt, shall include declarations, affidavits, or similar pleadings;

(m)      the Second Day Pleadings, and in each case, all orders sought and granted pursuant thereto to the extent such pleadings seek relief in connection with the transactions contemplated herein, which, for the avoidance of doubt, shall include declarations, affidavits, or similar pleadings;

(n)      the Bar Date Motion, and in each case, all orders sought and granted pursuant thereto which, for the avoidance of doubt, shall include declarations, affidavits, or similar pleadings;

(o)      the Business Plan, including any amendments or modifications thereto;

(p)      as applicable, all documents required to give effect to the Axonic Settlement, the Authentic Settlement, the Flagship CMBS Settlement, the Interchange Purchase Settlement, the Landlord Settlements, the Portfolio CMBS Settlement, the SO5 Digital Settlement, the Simon Settlement, and any other settlements to be embodied in the Plan or referenced in this Agreement, including any motions or pleadings filed (including declarations or affidavits) or orders (including any amendments or modifications thereto) sought in connection with same, which shall be in accordance with this Agreement and the Plan Term Sheet, including the consent rights set forth herein;

20

(q)      any and all motions, plan supplements, schedules, or other pleadings (including, for the avoidance of doubt, declarations, affidavits, or similar pleadings) filed on or after the Agreement Effective Date to assume, assume and assign or reject an executory contract or unexpired lease and the order or orders of the Bankruptcy Court approving such motions;

(r)      any and all documents relating to the Litigation Trust;

(s)      the Employment Agreements, any management incentive plan of New Saks (including, without limitation, the Management Incentive Plan), any key employee incentive plan (including, without limitation, the Key Employee Incentive Plan and the Post-Emergence Incentive Program), any key employee retention plan of the Company Parties or other executive compensation agreement (including amendments to any prepetition agreements), any severance agreement, and any collective bargaining and/or employee defined benefit plans or defined contribution plans (including those identified as Labor and Pension Matters) continued by the Debtors after the Plan Effective Date or established in connection with confirmation of the Plan;

(t)      the documentation setting the distribution record date and means of distribution under the Plan and the procedures for designating the recipients of distributions under the Plan;

(u)      any document subject to the consent of the Required Consenting DIP Term Loan Lenders under any other documents previously agreed-to among the parties (including in the Required Consenting DIP Term Loan Lenders' capacity as the "Required Lenders" under the DIP Term Loan Credit Agreement and the DIP OpCo Credit Agreement);

(v)      any materials relating to (a) through (t) above and (v) through (w) below, that are filed in any foreign proceeding (if any) commenced by any Debtor in connection with the Restructuring Transactions;

(w)      all other documents, motions, pleadings, briefs, applications, orders, agreements, supplements, and other filings, including any summaries or term sheets in respect thereof, that are directly related to any of the foregoing or as may be reasonably necessary or advisable to implement the Restructuring Transactions; and

(x)      in the case of each of the foregoing clauses (a) through (v), all exhibits, appendices, supplements, and attachments thereto.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents, including all amendments and modifications thereto and including all forms thereof filed with the Bankruptcy Court, shall, at all times and in all respects be in form and substance reasonably acceptable to the Company Parties and reasonably acceptable to the Required Consenting DIP Term Loan Lenders, and contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13; *provided* that the Definitive Documents set forth in Section 3.01(b)-(i) and the releases to be provided by the Consenting DIP Term Loan Lenders under the Plan and in accordance with Section 5.02(b)-(d) shall be acceptable to the Required Consenting DIP Term Loan Lenders in their sole discretion.

21

**Section 4.**      **Milestones.**The Milestones set forth in Section 5.12 of the DIP OpCo Credit Agreement are incorporated herein by reference and shall apply to the Restructuring Transactions, unless extended or waived in writing (email being sufficient); *provided* that, for the avoidance of doubt, any extension or waiver of any Milestone provided by the "Required SGUS Lenders" pursuant to Section 5.12 of the DIP OpCo Credit Agreement shall also be deemed to constitute a consent by the Required Consenting DIP Term Loan Lenders to the same extension or waiver of the corresponding Milestones.

**Section 5.**      **Commitments of the Consenting DIP Term Loan Lenders**.

5.01.   <u>Affirmative Commitments of the Consenting DIP Term Loan Lenders</u>.  During the Agreement Effective Period, each Consenting DIP Term Loan Lender, as applicable, agrees, in respect of all of its Company Claims presently owned and hereafter acquired (for so long as it remains the beneficial or record owner thereof, or the nominee, investment manager, or advisor for beneficial holders thereof), to:

(a)      support and cooperate with the Company Parties to take commercially reasonable steps necessary to consummate the Restructuring Transactions in accordance with the Plan Term Sheet, subject to the rights of the Consenting DIP Term Loan Lenders under this Agreement, and as applicable, the DIP OpCo Credit Agreement and DIP Term Loan Credit Agreement; *provided* that such actions shall be undertaken at the Company Parties' sole cost and expense and the Consenting DIP Term Loan Lenders shall not be required to make any expenditures or incur any direct costs in connection with such support and cooperation;

(b)      vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate), in each case, in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(c)      give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions, including to consent to the DIP Facilities, the DIP Credit Documents, and the DIP Orders to the extent consistent with this Agreement, including, but not limited to, the grant of Liens securing the DIP Facilities, the provision of adequate protection, and the use of Cash Collateral;

(d)      to the extent the Company Parties seek additional support for the Restructuring Transactions from the Company Parties' other stakeholders, use reasonable efforts to cooperate with the Company Parties' efforts in doing so; *provided*, that such cooperation (i) shall be undertaken at the Company Parties' sole cost and expense and the Consenting DIP Term Loan Lenders shall not be required to make any expenditures or incur any direct costs in connection with such support and cooperation, (ii) shall be subject to any consent rights provided for in this Agreement and the Definitive Documents, and (iii) shall not require the Consenting DIP Term Loan Lenders to make any economic concessions to any party except as agreed to by the Required Consenting DIP Term Loan Lenders in their sole discretion;

22

(e)      negotiate and consult in good faith with the Company Parties, and use commercially reasonable efforts to execute and implement, the Definitive Documents to which it is a party in a manner that is consistent with this Agreement;

(f)      at any time prior to entry of the Conditional Disclosure Statement Order, exercise (or cause to be exercised) the Call Option with respect to the amount of outstanding Prepetition FILO Claims and Prepetition NPC Claims that such Consenting DIP Term Loan Lender is eligible to purchase, in accordance with the Call Option Documents; *provided* that no Consenting DIP Term Loan Lender shall be required to exercise the Call Option unless the Call Option Documents are reasonably acceptable to such Consenting DIP Term Loan Lender following good faith negotiation of the Call Option Documents; and

(g)      provide the New Exit Facilities in accordance with the New Exit Facilities Documents; *provided* that, notwithstanding anything to the contrary in this Agreement, a Consenting DIP Term Loan Lender that is not a New Capital Commitment Party shall not have any obligation to provide financing under the Incremental New Money Debt Facility, as such term is defined in the New Exit Facilities Term Sheet that is attached to the Plan Term Sheet.

5.02.    <u>Affirmative Commitments of the Consenting DIP Term Loan Lenders Entitled to Vote on the Plan</u>.  During the Agreement Effective Period, each Consenting DIP Term Loan Lender that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, as applicable and subject to receipt by such Consenting DIP Term Loan Lender of the Solicitation Materials:

(a)      vote each of its Company Claims, as applicable, to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot; *provided* that each Consenting DIP Term Loan Lender may withhold, revoke, change, or withdraw (including automatically without further action) its vote (and upon such revocation, change or withdrawal, such vote shall be deemed void *ab initio*) in accordance with <u>Section 12.07</u> if this Agreement has been terminated in accordance with its terms;

(b)      elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; *provided* that the Plan shall provide for the Litigation Trust in accordance with the consent rights in <u>Section 3.02</u> of this Agreement; *provided further* that, to the extent the Plan is modified or amended at any time to allow holders of claims to opt into the releases set forth in the Plan, each Consenting DIP Term Loan Lender that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, as applicable and subject to receipt by such Consenting DIP Term Loan Lender of the Solicitation Materials, elect to opt into the releases set forth in the Plan; *provided further*, that each Consenting DIP Term Loan Lender may withhold, revoke, change, or withdraw (including automatically without further action) its election (and upon such revocation, change or withdrawal, such vote shall be deemed void *ab initio*) in accordance with <u>Section 12.07</u> if this Agreement has been terminated in accordance with its terms;

(c)      support, and not object to, the mutual release, exculpation, and injunction provisions or the mechanics to elect to opt out (or opt in, as applicable) of the releases to be

23

provided in the Plan; *provided* that the Plan shall provide for the Litigation Trust as set forth in the Plan, unless otherwise agreed to by each Consenting DIP Term Loan Lender; *provided further*, that the mutual release, exculpation, and injunction provisions shall be subject to the consents set forth in <u>Section 3.02</u> of this Agreement; and

(d)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a) through (c) above, in a manner inconsistent with clauses (a) through (c) above.

5.03.    <u>Negative Commitments of the Consenting DIP Term Loan Lenders</u>.  During the Agreement Effective Period, each Consenting DIP Term Loan Lender, as applicable, agrees, in respect of all of its Company Claims presently owned and hereafter acquired (for so long as it remains the beneficial or record owner thereof, or the nominee, investment manager, or advisor for beneficial holders thereof), that it shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action or inaction with the intention of interfering with, delaying, or impeding the acceptance, implementation, or consummation of the Plan or the Restructuring Transactions;

(b)      take any action or inaction that is inconsistent in any material respect with, or is intended to frustrate the Restructuring Transactions, this Agreement, the Plan Term Sheet, the Plan, the DIP Credit Documents, or any other Definitive Documents;

(c)      propose, file, support, or vote for any Alternative Restructuring Proposal that is inconsistent in any material respect with the Restructuring Transactions;

(d)      execute or file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement, the DIP Credit Documents, the Plan, or the Restructuring Transactions;

(e)      take any other action or inaction in contravention of this Agreement or any Definitive Document (including any of the DIP Documents);

(f)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document (including any of the DIP Documents) or as otherwise permitted under this Agreement;

(g)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Equity Interests in the Company Parties other than to enforce this Agreement or any Definitive Document (including any of the DIP Documents);

(h)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the

automatic stay arising under section 362 of the Bankruptcy Code other than to enforce this Agreement or any Definitive Document (including any of the DIP Documents); or

(i)      encourage or facilitate any person or entity to do any of the foregoing.

**Section 6.**      ***Additional Provisions Regarding the Consenting DIP Term Loan Lenders' Commitments***.

6.01.   <u>Generally</u>.  Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)      be construed to prohibit any Consenting DIP Term Loan Lender from appearing as a party in interest in any matter to be adjudicated in a Chapter 11 Case, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, or impeding, directly or indirectly, the Restructuring Transactions;

(b)      affect the ability of any Consenting DIP Term Loan Lender to consult with any other Consenting DIP Term Loan Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including the Committee and the U.S. Trustee);

(c)      impair or waive the rights of any Consenting DIP Term Loan Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(d)      prevent any Consenting DIP Term Loan Lender from enforcing this Agreement or any Definitive Document (including any of the DIP Documents), including any right, remedy, condition, consent, or approval requirement, or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document (including any of the DIP Documents);

(e)      be construed to prohibit any Consenting DIP Term Loan Lender from either itself or through any representatives or agents, soliciting, initiating, negotiating, facilitating, proposing, continuing, or responding to any proposal to purchase or sell Company Claims, so long as such Consenting DIP Term Loan Lender complies with <u>Section 9</u> of this Agreement;

(f)      prohibit any Consenting DIP Term Loan Lender from withdrawing its vote to support the Plan from and after a Termination Event as to such Consenting DIP Term Loan Lender;

(g)      prevent any Consenting DIP Term Loan Lender from taking any customary perfection step or other action as is necessary to preserve or defend the validity or existence of its Claims against the Company Parties (including the filing of Proofs of Claim);

(h)      prohibit any Consenting DIP Term Loan Lender from taking any other action that is not inconsistent with this Agreement, the Restructuring Transactions, or any Definitive Document;

25

(i)　　prohibit any Consenting DIP Term Loan Lender from objecting to, challenging, encouraging, or supporting any challenge to any fee applications of professionals employed or retained by the Company Parties, subject to any objection deadlines imposed by the Bankruptcy Court; or

(j)　　be construed to require that any Consenting DIP Term Loan Lender indemnify any party, incur any out-of-pocket costs or expenses which are not fully and promptly reimbursed by the Company Parties, or file any pleadings, in respect of this Agreement, the Definitive Documents, or any provision thereof.

### Section 7.　　*Commitments of the Company Parties*.

7.01.　　<u>Affirmative Commitments</u>.  Except as expressly permitted in <u>Section 8</u>, during the Agreement Effective Period, each of the Company Parties agrees to, and agrees to cause each of its direct and indirect subsidiaries to:

(a)　　support and take all steps reasonably necessary and desirable to implement and consummate the Restructuring Transactions in accordance with this Agreement and the Plan Term Sheet and the Milestones and take all reasonable and appropriate actions in furtherance of the Plan Term Sheet and the Restructuring Transactions as contemplated by this Agreement;

(b)　　to the extent any legal, financial, or structural impediment arises that would prevent, hinder, impede, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment, and negotiate in good faith any appropriate additional or alternative provisions or agreements with the Consenting DIP Term Loan Lenders to address any such impediment, or that are necessary to effectuate the consummation of the Restructuring Transactions or that would improve the tax efficiency of the Restructuring Transactions;

(c)　　use reasonable efforts to obtain, and reasonably consult with counsel to the Ad Hoc Group regarding, any and all required governmental, regulatory, and/or third-party approvals for the Restructuring Transactions;

(d)　　negotiate in good faith with the Consenting DIP Term Loan Lenders and use reasonable efforts to prepare, execute, and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions in accordance with this Agreement and the Milestones;

(e)　　take such action as may be reasonably necessary or reasonably requested by the Consenting DIP Term Loan Lenders to carry out the purposes and intent of this Agreement, including refraining from taking any action that would frustrate the purposes and intent of this Agreement;

(f)　　use reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)　　(i) consult in good faith with the applicable Ad Hoc Group Advisors on the Debtors' lease assumption and rejection strategy, including with respect to negotiations on the

26

rejection, modification, or assumption of leases, which strategy shall be in all respects acceptable to the Required Consenting DIP Term Loan Lenders; (ii) consult in good faith with the applicable Ad Hoc Group Advisors on the Debtors' store closing strategy, including with respect to any decision and documentation regarding any such store closing, which strategy shall be in all respects acceptable to the Required Consenting DIP Term Loan Lenders; (iii) consult in good faith with the applicable Ad Hoc Group Advisors on the Debtors' real estate sale strategy, including with respect to negotiations on the sale or any similar transaction regarding owned or ground leased real estate (including, without limitation, any Real Property), which strategy shall be in all respects acceptable to the Required Consenting DIP Term Loan Lenders; (iv) consult in good faith with the Ad Hoc Group Advisors prior to the Debtors' entry into or termination or modification of any material operational contracts or other arrangements (including, without limitation, collective bargaining agreements and material supplier agreements), which entry into, termination, or modification shall be in all respects acceptable to the Required Consenting DIP Term Loan Lenders; (v) identify in writing to the Ad Hoc Group Advisors the contracts and leases proposed to be assumed, assumed and assigned, or rejected by motion to the Bankruptcy Court or pursuant to the Plan at least five (5) Business Days prior to filing such motion or the Plan Supplement, as the case may be (the foregoing (i) through (v) collectively, the "**Executory Contracts and Leases Treatment**"), which Executory Contracts and Leases Treatment shall be consistent with this Agreement and the Plan Term Sheet and otherwise acceptable to the Required Consenting DIP Term Loan Lenders; and (vi) make relevant advisors available during business hours to provide assistance to the Ad Hoc Group's review of any such executory contracts and leases identified as part of the Executory Contracts and Leases Treatment;

(h)     operate the Company Parties in the ordinary course of business and in accordance with the terms of the Business Plan;

(i)     consult in good faith with the Ad Hoc Group Advisors with respect to the Axonic Settlement, the Authentic Settlement, the Flagship CMBS Settlement, the Interchange Purchase Settlement, the Landlord Settlements, Labor and Pension Matters, the Portfolio CMBS Settlement, the SO5 Digital Settlement, the Simon Settlement, and any other settlements to be embodied in the Plan, including any motions or pleadings filed (including declarations or affidavits) or orders (including any amendments or modifications thereto) sought in connection with same or otherwise, in each case, subject to any consent rights set forth herein;

(j)     timely file an objection to:

(i)     any motion filed with the Bankruptcy Court seeking the entry of an order for relief that: (x) materially is inconsistent with this Agreement or any Definitive Document; or (y) would, or would be reasonably expected to, frustrate the purposes of this Agreement or any Definitive Document, including by preventing the consummation of the Restructuring Transactions;

(ii)     any motion, application, adversary proceeding, or Cause of Action filed with the Bankruptcy Court by any party seeking the entry of an order (w) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (x) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (y) dismissing the Chapter 11 Cases; or (z) modifying or

27

terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; or

(iii)   any objections filed with the Bankruptcy Court to the Plan, any other Definitive Document, or the Restructuring Transactions;

(k)   inform counsel to the Ad Hoc Group as soon as reasonably practicable (and in any event, within one (1) Business Day) after becoming aware of: (i) any matter or circumstance, that they know, or believe is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) a material breach of this Agreement (including a material breach by any Debtor); (iii) the occurrence, or failure to occur, of any event of which the Company Parties have actual knowledge which occurrence or failure would be likely to cause any condition precedent contained in this Agreement, the Plan Term Sheet, the Plan, or any other Definitive Document not to occur or become impossible to satisfy; (iv) receipt of any written notice of any proceeding commenced or, to the actual knowledge of the Company Parties, threatened against the Company Parties relating to or involving or otherwise affecting in any material respect the transactions contemplated by this Agreement or the Restructuring Transactions; (v) any material governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened); and (vi) any representation or statement made or deemed to be made by any Debtor under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made;

(l)   upon reasonable request of any Consenting DIP Term Loan Lender or Ad Hoc Group Advisor, reasonably and promptly inform counsel to the Ad Hoc Group of, and promptly provide relevant documentation related to:  (i) the material business and financial (including liquidity) performance of the Debtors, which information shall include all liquidity forecasts and debtor-in-possession thirteen-week budgets prepared by the Debtors (including in accordance with the DIP Orders); (ii) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; (iii) the status and progress of the Company Parties' efforts to monetize their assets, which information may include, in the Company Parties' reasonable discretion, process letters, bidder lists and contacted parties, indications of interest, potential or submitted bids, drafts of any purchase agreements, and other related documentation; *provided* that the Debtors' obligation to provide indications of interest, potential or submitted bids, drafts of any purchase agreements, and other related documentation will cease with respect to any such information related to bids or potential bids applicable to assets on the date on which the Required Consenting DIP Term Loan Lenders have submitted a competing or stalking horse bid for such assets (including, but not limited to, any credit bid for such assets) in connection with a sale process; (iv) the status and progress of the Company Parties' efforts to effectuate footprint rationalization and other cost-saving measures consistent with the Plan and the Plan Term Sheet; and (v) the status of obtaining any necessary authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, regulatory body, or any stock exchange;

(m)   conduct at least weekly calls with the Ad Hoc Group Advisors, as applicable, regarding the information requests described in (l) above;

28

(n)     from the Agreement Effective Date through and including the Plan Effective Date, as applicable, promptly pay in full and in cash all Restructuring Fees and Expenses when properly incurred and invoiced in accordance with the relevant engagement letters and/or fee arrangements, and continue to pay such amounts as they come due as permitted by, and pursuant to the terms of, the DIP Orders; *provided* that: (i) all accrued and unpaid Restructuring Fees and Expenses as of the Plan Effective Date, as applicable, including any reasonable estimate of such Restructuring Fees and Expenses to be provided to the Company Parties two (2) Business Days prior to the Plan Effective Date, shall be paid by the Company Parties on the Plan Effective Date, as applicable; and (ii) in the event a Termination Date (as defined herein) occurs with respect to the Company Parties, the Company Parties shall remain obligated to pay all Restructuring Fees and Expenses accrued and unpaid as of and up to such Termination Date; *provided further*, that for the avoidance of doubt, the Company Parties' obligations to pay such Restructuring Fees and Expenses shall not be limited to the amount provided in any such estimate or conditioned upon the provision of such estimate;

(o)     use reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(p)     provide draft copies of all material pleadings and documents that any Company Party intends to file with or submit to the Bankruptcy Court or any governmental authority (including any regulatory authority), as applicable, to Paul, Weiss as counsel for the Ad Hoc Group at least three (3) Business Days prior to the date when such Debtor intends to file, submit, or issue such document, or as soon as reasonably practicable, subject to Section 5.18 of the DIP Term Loan Credit Agreement;

(q)     cooperate with the Consenting DIP Term Loan Lenders in connection with the replacement of any Agent;

(r)     provide the Ad Hoc Group Advisors with (i) reasonable access during normal business hours to the Debtors' books and records, (ii) reasonable access to the management and advisors of the Debtors for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, and (iii) timely and reasonable responses to all reasonable diligence requests, including with respect to any and all Claims or Causes of Action of the Debtors;

(s)     to the extent any Affiliate of Saks commences a case under the Bankruptcy Code after the Agreement Effective Date, cause such Affiliate to become Party to this Agreement as a Company Party;

(t)     upon the request of the Required Consenting DIP Term Loan Lenders, enter into customary Confidentiality Agreements and facilitate negotiations with potential third-party financing sources or strategic partners  as may be identified by or approved with the consent of the Required Consenting DIP Term Loan Lenders, in connection with one or more potential investments or other strategic transactions involving the Company Parties; and

(u)     upon the request of the New Capital Commitment Parties, conduct the New Capital Syndication in accordance with the New Capital Syndication Documents.

29

7.02.   <u>Negative Commitments</u>.  Except as expressly permitted in <u>Section 8</u>, during the Agreement Effective Period, each of the Company Parties shall not, and shall cause each of its direct and indirect subsidiaries to not, directly or indirectly, without the express written consent of the Required Consenting DIP Term Loan Lenders:

(a)   object to, delay, impede, or take any other action or inaction that could interfere with, delay, or impede the acceptance, implementation, or consummation of the Plan or the Restructuring Transactions;

(b)   take any action or inaction that is inconsistent in any material respect with, or is intended, or could be reasonably expected, to frustrate the Restructuring Transactions, this Agreement, Plan Term Sheet, the Plan, the DIP Documents, or any other Definitive Documents;

(c)   execute or file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement, Plan Term Sheet, the Plan, the DIP Credit Documents, or any other Definitive Documents;

(d)   file any DIP Order that does not include the DIP Term Loan Lender Cash Collateral Termination Events or is otherwise inconsistent, in whole or in part, with this Agreement, the Plan Term Sheet, the Plan, or any other Definitive Documents;

(e)   take any other action or inaction in contravention of this Agreement, Plan Term Sheet, the Plan, the DIP Credit Documents, or any other Definitive Documents, or to the material detriment of the Restructuring Transactions;

(f)   transfer any asset or right of any Debtor or any asset or right used in the business of the Debtors to any Entity outside the ordinary course of business, other than as expressly contemplated in, and in all respects consistent with, this Agreement, the Plan Term Sheet, the Plan, and the DIP Credit Documents;

(g)   settle any material litigation claims, governmental claims, or other claims that are currently pending or may be brought in the future against the Company Parties without the consent of the Required Consenting DIP Term Loan Lenders;

(h)   effectuate any intercompany transfers among the Debtors and any non-Debtor subsidiaries of Saks outside of the ordinary course of business, other than as expressly contemplated in, and in all respects consistent with this Agreement, the Plan Term Sheet, the Plan, and the DIP Credit Documents;

(i)   enter into any material agreement or material amendment, modification, or termination of an existing agreement, other than as expressly contemplated in, and in all respects consistent with this Agreement, the Plan Term Sheet, the Plan, and the DIP Credit Documents;

(j)   other than with respect to the Management Incentive Plan, any key employee incentive plan (including, without limitation, the Key Employee Incentive Plan and the Post-Emergence Incentive Program,), any key employee retention plan of the Company Parties or

30

other executive compensation agreement (including any Employment Agreements and amendments to any prepetition agreements), and except as otherwise specifically contemplated by this Agreement, the Plan Term Sheet, or the Plan, adopt, or seek approval or other treatment (including assumption or rejection) by the Bankruptcy Court with respect to, any executive compensation or retention plans, severance plans, or any other material agreement regarding executive compensation (in each case, whether entered into before or after the Petition Date), approve or pay any executive bonuses, executive incentive payments, executive retention payments, or severance payments, regardless of whether such executive bonuses, executive incentive payments, executive retention payments, or severance payments have been approved by the Bankruptcy Court, or terminate any employees that would give rise to material severance obligations, under contract or otherwise, including under the Worker Adjustment and Retraining Notification Act;

(k)       make any payment, or series of payments, in excess of $7,500,000 to an individual party (or a group of affiliated parties) pursuant to any order approving a First Day Pleading, a Second Day Pleading, or otherwise on account of a Company Claim that arose prepetition, including prepetition claims with administrative expense status but excluding any amounts necessary under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate counterparties to executory contracts or unexpired leases for any pecuniary losses in connection with the assumption or assumption and assignment of such contract or lease, except as otherwise permitted by the DIP Orders, the Critical Vendor Process Agreement, or the Concession and Consignment Vendor Process Agreement, as applicable;

(l)       enter into any settlement, compromise, or agreement with any authorized representative of retirees, employees, pension plans, or unions or any official or unofficial committee representing the foregoing, unless, for the avoidance of doubt, such settlement, compromise, or agreement is in all respects in form and substance reasonably acceptable to the Required Consenting DIP Term Loan Lenders;

(m)       take any action or inaction that would cause a change to the tax status or tax classification, for United States federal income tax purposes, of any Debtor to the extent such change in entity classification, in the reasonable judgment of the Required Consenting DIP Term Loan Lenders, would have an adverse effect on the Consenting DIP Term Loan Lenders;

(n)       modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(o)       engage in any merger, consolidation, material disposition, material acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction outside of the ordinary course of business, other than the Restructuring Transactions.

**Section 8.       Additional Provisions Regarding Company Parties' Commitments.**

8.01.   Alternative Restructuring Proposals.

(a)       Subject to this Section 8.01(a), the Company Parties shall not, directly or indirectly, solicit, initiate, enter into, or engage in discussions regarding any Alternative Restructuring Proposals, or otherwise facilitate any effort or attempt to make any Alternative

31

Restructuring Proposals, without the prior written consent of the Required Consenting DIP Term Loan Lenders, acting in their sole discretion.  If any Company Party receives an Alternative Restructuring Proposal or any update to an Alternative Restructuring Proposal, the Company Party shall be permitted to (i) consider, respond to, and facilitate, third-party Alternative Restructuring Proposals, (ii) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or non-disclosure agreements with any Entity for the purpose of facilitating such Entity's participation in the Restructuring Transactions or such Entity's Alternative Restructuring Proposal, and (iii) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting DIP Term Loan Lender), any other party in interest in the Chapter 11 Cases (including the Committee and the U.S. Trustee), or any other Entity regarding the Restructuring Transactions; *provided* that the Company Parties shall, before taking any action in the foregoing clauses (ii) and (iii), first provide notice to Paul, Weiss, as counsel to the Ad Hoc Group, of such Alternative Restructuring Proposal, together with copies of any such written proposals or other materials related to such Alternative Restructuring Proposal (or, if such Alternative Restructuring Proposal is not documented in written form, a reasonable description of such Alternative Restructuring Proposal) (with the Debtors' obligation to provide copies of any such written proposals, other materials, or reasonable descriptions regarding any asset(s) ceasing as of the date the Ad Hoc Group submits a competing or stalking horse credit bid or other bid with respect to such asset(s), as set forth in Section 7.01(l) hereof); *provided further* that the Company Parties shall provide the Ad Hoc Group and the Ad Hoc Group Advisors with the same information at the same time as furnished in accordance with the foregoing clause (ii).

(b)      With respect to any asset(s), as set forth in Section 7.01(l) hereof, until the date on which the Ad Hoc Group submits a competing or stalking horse credit bid or other bid for such asset(s), the Company Parties shall, as applicable:  (i) notify in writing (with email being sufficient) the Ad Hoc Group Advisors within one (1) Business Day of any Alternative Restructuring Proposal, with such notice to include the identity of the Entity or group of Entities involved, as well as the key terms of such Alternative Restructuring Proposal, and a copy of such proposal; (ii) provide the Ad Hoc Group Advisors with regular updates regarding such Alternative Restructuring Proposal, which updates shall be no less frequent than every one (1) Business Day; (iii) provide the Ad Hoc Group Advisors with all other material documentation received in connection with such Alternative Restructuring Proposal; and (iv) respond promptly to information requests and questions from the Ad Hoc Group Advisors relating to such Alternative Restructuring Proposal or any of the actions contemplated by this Section 8.01.

8.02.   Applicable Law and Fiduciary Obligations.

(a)      Nothing in this Agreement shall require the Company Parties or their governing bodies to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking such action would be inconsistent with applicable law or their fiduciary obligations under applicable law, and any such action or inaction shall not be deemed to constitute a breach of this Agreement.

(b)      Notwithstanding anything to the contrary set forth in Section 8.02 or otherwise in this Agreement, the Company Parties shall be permitted to enter into an Alternative Restructuring Proposal if and only if (A) the Company Parties receive an unsolicited, *bona fide*,

32

written Alternative Restructuring Proposal in accordance with Section 8.01(a) of this Agreement, (B) such Company Parties or their governing bodies determine in good faith and after consultation with their legal counsel that failure to negotiate or pursue such Alternative Restructuring Proposal would be inconsistent with their fiduciary duties in accordance with Section 8.02(a), (C) the Company Parties have provided to the Ad Hoc Group Advisors the notice and documentation required under Section 8.01(b) of this Agreement, and (D) the Alternative Restructuring Proposal provides for the repayment of all DIP Term Loan Claims in full and in cash unless otherwise agreed to by the Required Consenting DIP Term Loan Lenders.

(c)      Each Consenting DIP Term Loan Lender reserves all rights, Claims, and Causes of Action, if any, arising from or related to any purported exercise of fiduciary duties by any Company Party pursuant to this Section 8.02.

**Section 9.** *Transfer of Equity Interests and Securities*.

9.01.    During the Agreement Effective Period, no Consenting DIP Term Loan Lender may Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims to any affiliated or unaffiliated party (including any party in which it may hold a direct or indirect beneficial interest, any Affiliate, any affiliated fund, or any affiliated entity with a common investment advisor of such Consenting DIP Term Loan Lender) unless (a) such transferee executes and delivers to counsel to the Company Parties and counsel to the Ad Hoc Group in accordance with Section 14.07, at or before the time of the proposed Transfer, a fully executed Transfer Agreement, or (b) the transferee is a Consenting DIP Term Loan Lender or an Affiliate thereof, and the transferee provides notice of such Transfer (including the amount and type of Company Claim transferred and the identity of the transferor) to counsel to the Company Parties and counsel to the Ad Hoc Group in accordance with Section 14.07 at or before the time of the proposed Transfer (such Transfer in accordance with the foregoing (a) or (b), a "**Permitted Transfer**"). For the avoidance of doubt, this Section 9 does not permit any Transfer that would violate the terms of any order entered by the Bankruptcy Court with respect to the preservation of tax attributes. Notwithstanding anything to the contrary in this Section 9, any Transfer of DIP Term Loan Claims must comply with the requirements set forth in Section 10.04 of the DIP Term Loan Credit Agreement, and any putative Transfer of DIP Term Loan Claims that does not comply with the requirements set forth in Section 10.04 of the DIP Term Loan Credit Agreement shall not constitute a Permitted Transfer.

9.02.    Upon compliance with the requirements of Section 9.01, solely to the extent of and with respect to such transferred Company Claims, the transferor shall have no continuing rights or obligations hereunder and the transferee shall be the Consenting DIP Term Loan Lender hereunder. Any Transfer in violation of Section 9.01 shall be void *ab initio*. Any Consenting DIP Term Loan Lender that effectuates a Transfer of Company Claims in accordance with this Section 9 shall have no liability under this Agreement arising from or related to the failure of the transferee to comply with the terms of this Agreement with respect to such transferred Company Claims.

9.03.    This Agreement shall in no way be construed to preclude the Consenting DIP Term Loan Lenders from acquiring or receiving a Transfer of additional Company Claims;

*provided, however*, that (a) such additional Company Claims shall automatically and immediately upon such acquisition by or Transfer to a Consenting DIP Term Loan Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition or Transfer is given to counsel to the Company Parties or counsel to the Ad Hoc Group) and (b) such Consenting DIP Term Loan Lender shall provide notice of such acquisition (including the amount and type of Company Claim acquired or Transferred and the identity of the transferor) to counsel to the Company Parties and counsel to the Ad Hoc Group in accordance with Section 14.07 within five (5) Business Days of such acquisition or Transfer.

9.04.    This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting DIP Term Loan Lender to Transfer any of its Company Claims.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding anything to the contrary in this Agreement, a Qualified Marketmaker that acquires any Company Claims from a Consenting DIP Term Loan Lender with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims shall not be required to be or become a Consenting DIP Term Loan Lender to effect any Transfer of any Company Claims by a Consenting DIP Term Loan Lender to such Qualified Marketmaker, and shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims if: (a) such Qualified Marketmaker acquired such Company Claims with the purpose and intent of acting as a Qualified Marketmaker; (b) such Qualified Marketmaker subsequently Transfers such Company Claims (by purchase, sale assignment, participation, or otherwise) to a transferee that an Entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor (i) within ten (10) Business Days or (ii) if shorter, two (2) Business Days prior to the Voting Deadline; (c) such subsequent transferee otherwise is (or becomes, at the time of such transfer) a Permitted Transferee under Section 9.01; and (d) such subsequent Transfer otherwise is a Permitted Transfer under Section 9.01.  For the avoidance of doubt, to the extent that a Consenting DIP Term Loan Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims that the Qualified Marketmaker acquires from a holder of the Company Claims who is not a Consenting DIP Term Loan Lender without the requirement that the transferee be or become a Permitted Transferee.

9.06.    Notwithstanding anything to the contrary in this Section 9, to the extent that a Consenting DIP Term Loan Lender's Claims or other securities issued by the Company Parties may be loaned by such Consenting DIP Term Loan Lender (and consequently pledged, hypothecated, encumbered, or rehypothecated) as part of customary securities lending arrangements (each such arrangement, a "**Customary Securities Lending Arrangement**"), and such Customary Securities Lending Arrangement does not adversely affect such Consenting DIP Term Loan Lender's ability to timely satisfy any of its obligations under this Agreement, such Customary Securities Lending Arrangement shall not be deemed a Transfer hereunder.

34

9.07.   Notwithstanding anything to the contrary in this <u>Section 9</u>, the restrictions on Transfer set forth in this <u>Section 9</u> shall not apply to the grant of any Liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which Lien or encumbrance is released upon the Transfer of such claims and interests.

### Section 10.    *Representations and Warranties of Consenting DIP Term Loan Lenders*.

Each Consenting DIP Term Loan Lender severally, and not jointly, represents and warrants that, as of the date such Consenting DIP Term Loan Lender executes and delivers this Agreement:

(a)    it is the beneficial or record owner of the face amount of the Company Claims or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims other than those reflected in, such Consenting DIP Term Loan Lender's signature page to this Agreement, a Transfer Agreement, or a Joinder, as applicable (as may be updated pursuant to <u>Section 9</u>);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims;

(c)    the Company Claims held by it are free and clear of any pledge, Lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting DIP Term Loan Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has the full power to vote, approve changes to, and transfer all of its Company Claims as contemplated by this Agreement subject to applicable Law; and

(e)    solely with respect to holders of Company Claims, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. Person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting DIP Term Loan Lender in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

### Section 11.    *Mutual Representations, Warranties, and Covenants*.

11.01.  <u>Mutual Representations, Warranties and Covenants</u>.  Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Plan Effective Date:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)  except as expressly provided in this Agreement, the Plan Term Sheet, and the Bankruptcy Code, no consent or approval is required by any other Person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)  the entry into and performance by such Party of, and the transactions contemplated by, this Agreement does not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents;

(d)  except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)  except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(f)  it has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereby.

11.02.  <u>No Additional Representations and Warranties</u>.  Each of the Parties agrees and acknowledges that, except as expressly provided in this Agreement and the Definitive Documents, no other Party, in any capacity, has warranted or otherwise made any representations concerning any Released Claim (including any representation or warranty concerning the existence, nonexistence, validity, or invalidity of any Released Claim).  Notwithstanding the foregoing, nothing contained in this Agreement is intended to impair or otherwise derogate from any of the representations, warranties, or covenants expressly set forth in this Agreement or any of the Definitive Documents.

### *Section 12.  Termination Events*.

12.01.  <u>Consenting DIP Term Loan Lender Termination Events</u>.  The Required Consenting DIP Term Loan Lenders may terminate this Agreement as to all Parties by delivering prior written notice to counsel to the Company Parties in accordance with <u>Section 14.10</u> hereof upon the occurrence of any of the following events (the "**Consenting DIP Term Loan Lender Termination Events**"):

(a)  immediately upon the material breach by any Company Party of any of the provisions of this Agreement, or solely to the extent such breach is capable of cure, that remains uncured for a period of five (5) Business Days after the receipt by counsel to the Company Parties of written notice and a description of such breach;

(b)      the issuance by any governmental authority, regulatory authority, or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions or (ii) (A) would prevent consummation of a material portion of the Restructuring Transactions and (B) remains in effect for ten (10) calendar days after such terminating Required Consenting DIP Term Loan Lenders transmit a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)      any Company Party files, amends, modifies, executes, enters into, or files a pleading seeking authority to execute, enter into, amend, or modify, any Definitive Document that is not in all respects in form and substance consistent with this Agreement or the Plan Term Sheet, and in accordance with the rights set forth in this Agreement (including the consent rights of the Required Consenting DIP Term Loan Lenders contained in Section 3.02 of this Agreement), or publicly announces its intention to take any such action;

(d)      any Company Party files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting DIP Term Loan Lenders in any manner inconsistent with this Agreement or the Plan Term Sheet;

(e)      the entry of an order by the Bankruptcy Court or other court of competent jurisdiction, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting DIP Term Loan Lenders):

(i)      (A) directing the appointment of a trustee in any of the Chapter 11 Cases; (B) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code; (C) dismissing any of the Chapter 11 Cases; (D) directing the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code; or (E) modifying or terminating any of the Debtors' exclusive right to file and/or solicit acceptances of a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

(ii)      approving the rejection of this Agreement or declaring this Agreement to be unenforceable;

(iii)      (A) denying confirmation of the Plan, or confirming the Plan pursuant to an order that is not in all respects in form and substance acceptable to the Required Consenting DIP Term Loan Lenders, and such order remains in effect for five (5) calendar days after entry thereof; (B) reversing or vacating the Conditional Disclosure Statement Order, the Confirmation Order or any of the DIP Orders; or (C) approving any plan, disclosure statement, or Definitive Document, in any such case, that is not in accordance with the consent rights of the Required Consenting DIP Term Loan Lenders set forth in Section 3.02 of this Agreement or otherwise consistent with this Agreement;

(iv)      granting relief from the automatic stay (as set forth in Section 362 of the Bankruptcy Code) authorizing any party or Entity to proceed against any asset of a Company

37

Party in excess of $2,500,000 (except with respect to any motion filed before the Agreement Effective Date)without the prior written consent of the Required Consenting DIP Term Loan Lenders; or

(v)      that is inconsistent in any material respect with this Agreement, the DIP Orders, the DIP OpCo Credit Agreement, or the DIP Term Loan Credit Agreement, or otherwise not consented to by the Required Consenting DIP Term Loan Lenders;

(f)      the Debtors lose the exclusive right to file and/or solicit acceptances of a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

(g)      the Company Parties take any action or inaction to receive, obtain, or amend debtor-in-possession financing, cash collateral usage, exit financing, and/or financing arrangements, other than as expressly contemplated in this Agreement or the DIP Orders without the prior written consent of the Required Consenting DIP Term Loan Lenders;

(h)      the occurrence and continuation of an event of default under, or the termination of, any of the DIP Credit Documents or the DIP Orders, or the acceleration of the obligations under any of the DIP Facilities;

(i)      any of the Company Parties, without the prior written consent of the Required Consenting DIP Term Loan Lenders, enters into (i) a material settlement of litigation claims, governmental claims, or other claims that results in a cash payment or provides administrative or priority status to such claim, or (ii) makes an intercompany transfer among the Debtors and any non-Debtor subsidiaries of Saks that is not in the ordinary course of business;

(j)      the Company Parties lose access to the use of the DIP Facilities in accordance with the DIP Orders;

(k)      the occurrence of a DIP Term Loan Lender Cash Collateral Termination Event pursuant to the DIP Orders that remains uncured in accordance with the terms of the DIP Documents, if subject to cure;

(l)      any modification or amendment of any DIP Term Loan Lender Cash Collateral Termination Event, unless agreed to by the Required Consenting DIP Term Loan Lenders;

(m)      the failure of the Company Parties to promptly pay the fees and expenses of the Ad Hoc Group Advisors in accordance with the DIP Orders;

(n)      any Company Party makes any payment, or series of payments, in excess of $7,500,000 to an individual party (or a group of affiliated parties) pursuant to any order approving a First Day Pleading, a Second Day Pleading or otherwise on account of a prepetition Company Claim, including prepetition claims with administrative expense status but excluding any amounts necessary under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate counterparties to executory contracts or unexpired leases for any pecuniary losses in connection with the assumption or assumption and assignment of such contract or lease, without the prior written consent of the Required Consenting DIP Term Loan Lenders, subject in all respects to any Acceptable Post-Petition Trade Agreement, or any

38

Concession Agreement or Consignment Agreement validly made pursuant to the Critical Vendor Process Agreement or the Concession and Consignment Vendor Process Agreement, as applicable;

(o)      any Company Party (i) files a motion, application, adversary proceeding, or Cause of Action challenging any of the Liens or security interests securing the Prepetition Secured Claims or the validity or enforceability of the Prepetition Secured Claims or otherwise seeking to impose liability upon or enjoin any holder of the Prepetition Secured Claims, or (ii) any Company Party shall have supported any such motion, application, adversary proceeding, or Cause of Action filed by a third party or affirmatively consented to the standing of any such third party to bring such motion, application, adversary proceeding, or Cause of Action;

(p)      except as expressly permitted under this Agreement and the Plan Term Sheet, any Company Party enters into, seeks to assume, or makes any payment under any key employee incentive plan (including the Key Employee Incentive Plan and the Post-Emergence Incentive Program), key employee retention plan, or any other material agreement regarding executive compensation (whether entered into before or after the Petition Date) without the Required Consenting DIP Term Loan Lenders' prior written consent;

(q)      any of the Milestones set forth in Section 4 (as may be extended or waived in accordance with the terms of this Agreement) has not been achieved by the date specified for such Milestone as set forth in the DIP OpCo Credit Agreement; *provided* that for the avoidance of doubt, the Required Consenting DIP Term Loan Lenders shall be permitted to exercise their termination rights under this Section 12.01(q) independent of any rights or remedies that may exist under the DIP Term Loan Credit Agreement or the DIP OpCo Credit Agreement (whether exercised or waived), as applicable, with respect to any such Milestones; or

(r)      any of the Company Parties terminates this Agreement pursuant to a Company Party Termination Event.

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties by delivering written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events (the "**Company Party Termination Events**", and together with the Consenting DIP Term Loan Lender Termination Events, the "**Termination Events**"):

(a)      immediately upon the material breach by one or more of the Consenting DIP Term Loan Lenders that collectively constitute the Required Consenting DIP Term Loan Lenders of any of the provisions of this Agreement, or solely to the extent such breach is capable of cure, that remains uncured for a period of five (5) Business Days after the receipt by counsel to the Ad Hoc Group of written notice and a description of such breach;

(b)      the breach in any material respect by any of the Consenting DIP Term Loan Lenders of any of the provisions of this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with the terms hereof), such that the non-breaching Consenting DIP Term Loan Lenders hold less

39

than 66.67% of the principal amount of outstanding DIP Term Loan Claims, or, solely to the extent the Call Option has been exercised in accordance with the requirements of this Agreement, Prepetition FILO Claims, and Prepetition NPC Claims;

(c)     the issuance by any governmental authority, regulatory authority, or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions or (ii) (A) would prevent consummation of a material portion of the Restructuring Transactions and (B) remains in effect for ten (10) Business Days after such terminating Company Parties transmit a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d)     any Consenting DIP Term Loan Lender files, amends, modifies, executes, enters into, or files a pleading seeking authority to execute, enter into, amend, or modify, any Definitive Document that is not in all respects in form and substance consistent with this Agreement or the Plan Term Sheet, and in accordance with the rights set forth in this Agreement, or publicly announces its intention to take any such action;

(e)     the entry of an order by the Bankruptcy Court or other court of competent jurisdiction (other than in response to a motion or other request for relief made by a Company Party and subject to the Company Parties' obligations to oppose any such motion or request for relief by a third party), or the filing of a motion or application by any Consenting DIP Term Loan Lenders seeking an order (without the prior written consent of the Company Parties):

(i)     (A) directing the appointment of a trustee in any of the Chapter 11 Cases; (B) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code; (C) dismissing any of the Chapter 11 Cases; (D) directing the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code; or (E) modifying or terminating any of the Debtors' exclusive right to file and/or solicit acceptances of a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

(ii)     approving the rejection of this Agreement or declaring this Agreement to be unenforceable;

(iii)     (A) denying confirmation of the Plan, or confirming the Plan pursuant to an order that is not in all respects in form and substance acceptable to the Required Consenting DIP Term Loan Lenders, and such order remains in effect for five (5) calendar days after entry thereof; (B) reversing or vacating the Conditional Disclosure Statement Order, the Confirmation Order or any of the DIP Orders; or (C) approving any plan, disclosure statement, or Definitive Document, in any such case, that is not in all respects in form or substance reasonably acceptable to the Company Parties or otherwise consistent with this Agreement;

(iv)     granting relief from the automatic stay (as set forth in Section 362 of the Bankruptcy Code) authorizing any party or Entity to proceed against any asset of a Company Party in excess of $2,500,000 (except with respect to any motion filed before the Agreement

40

Effective Date) without the prior written consent of the Required Consenting DIP Term Loan Lenders; or

(v)      that is inconsistent in any material respect with this Agreement, the DIP Orders, the DIP OpCo Credit Agreement, or the DIP Term Loan Credit Agreement, or otherwise not consented to by the Company Parties.

(f)      the board of directors, board of managers, or such similar governing body of any Company Party determines in accordance with Section 8.02 hereof and subject to the terms therein, after consulting with counsel that (i) proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(g)      the satisfaction of the DIP Term Loan Claims in full in cash; or

(h)      any of the Consenting DIP Term Loan Lenders terminate this Agreement pursuant to a Company Party Termination Event such that the non-terminating Consenting DIP Term Loan Lenders hold less than 66.67% of the principal amount of outstanding DIP Term Loan Claims, Prepetition FILO Claims, and Prepetition NPC Claims.

12.03.  Outside Date Termination.   This Agreement may be terminated by any Consenting DIP Term Loan Lender with regard to itself only by delivering prior written notice to all Parties in accordance with Section 14.10 hereof if the Plan Effective Date does not occur by the Outside Date.

12.04.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting DIP Term Loan Lenders; and (b) each Company Party.

12.05.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

12.06.  Termination by Consenting DIP Term Loan Lender.  Any Consenting DIP Term Loan Lender may terminate this Agreement as to itself only, upon written notice to the other Parties in accordance with Section 14.10 hereof, if the Plan, or any other applicable Definitive Document, does not provide for the repayment in cash in full of the First Out DIP Term Loan Claims on or before the Plan Effective Date, without the consent of the DIP Term Loan Lenders holding at least 80% of the aggregate outstanding principal amount of First Out DIP Term Loan Claims (exclusive of any fees, premiums, interest, or First Out DIP PIK Loans) that are held by all DIP Term Loan Lenders, in accordance with section 10.08(2)(i) of the DIP Term Loan Credit Agreement.

12.07.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not

41

entered into this Agreement, including with respect to any and all Claims or Causes of Action. Upon the occurrence of a Termination Date (other than pursuant to Section 12.04(a)), (a) any and all consents, directions, elections or ballots provided or tendered prior to such Termination Date by the Parties subject to such termination shall be automatically deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, the Restructuring Transactions and this Agreement or otherwise; (b) such ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company Parties allowing such change or resubmission); and (c) absent the prior written direction of each such Consenting DIP Term Loan Lender, (i) each Consenting DIP Term Loan Lender's prior vote to accept the Plan shall automatically and without further action by such Consenting DIP Term Loan Lender be deemed to have been withdrawn and substituted with a vote to reject the Plan and (ii) each Consenting DIP Term Loan Lender's prior election to not opt out of (or if applicable, its prior election to opt into) the releases set forth in the Plan shall automatically and without further action by such Consenting DIP Term Loan Lender be deemed to have been withdrawn and substituted with an election to opt out of (or if applicable, not opt into) the releases set forth in the Plan.  The Conditional Disclosure Statement Order, the Disclosure Statement, and the Solicitation Materials shall provide for such withdrawal or change without Bankruptcy Court approval notwithstanding any requirement in the Bankruptcy Rules requiring permission of the Bankruptcy Court for a Consenting DIP Term Loan Lender to change or withdraw (including automatically without further action) its vote to accept the Plan, the Parties shall consent to any attempt by such Consenting DIP Term Loan Lender to change or withdraw (including automatically without further action) such vote at such time.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting DIP Term Loan Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting DIP Term Loan Lender, and (b) any right of any Consenting DIP Term Loan Lender, or the ability of any Consenting DIP Term Loan Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting DIP Term Loan Lender.  No purported termination of this Agreement shall be effective under this Section 12.07 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, with such material breach causing, or resulting in, the occurrence of one or more Termination Events.  Following the occurrence of a Termination Date, the following shall survive any such termination: (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) the Debtors' obligations in Section 14.22 of this Agreement up to and including such Termination Date; and (c) Sections 1.02, 12.07, and 14 hereof.  The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action or delivering any notice necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

**Section 13.** *Amendments and Waivers*.

(a) This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b) This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (i) each Company Party and (ii) the Required Consenting DIP Term Loan Lenders (which writing may be an email through counsel to the Ad Hoc Group); *provided, however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims held by a Consenting DIP Term Loan Lender, then the consent of each such affected Consenting DIP Term Loan Lender shall also be required to effectuate such modification, amendment, waiver, or supplement; *provided*, *further*, that any amendments to (i) the definition of "Consenting DIP Term Loan Lenders," "DIP Conversion," or "Required Consenting DIP Term Loan Lenders," (ii) Section 12.03, (iii) Section 12.06, or (iv) this Section 13 shall in each case require the written consent of each Company Party and each Consenting DIP Term Loan Lender.

(c) Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.** *Miscellaneous*

14.01. Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02. Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06.  TRIAL BY JURY WAIVER.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.  No Party or its advisors shall disclose to any Person or entity (including, for the avoidance of doubt, any other Party) the holdings information of any Consenting DIP Term Loan Lender without such Consenting DIP Term Loan Lender's prior written consent; *provided* that signature pages executed by Consenting DIP Term Loan Lenders shall be delivered to (a) all Consenting DIP Term Loan Lenders in redacted form that removes the details of such Consenting DIP Term Loan Lenders' holdings of the Company Claims listed thereon and (b) counsel to the Company Parties in unredacted form (to be held by counsel to the Company Parties on a professionals' eyes-only basis).  Any public filing of this Agreement, with the Bankruptcy Court, the SEC, or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting DIP Term Loan Lender.

14.08.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting DIP Term Loan Lenders, and in the enforcement or

44

interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting DIP Term Loan Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and, except as set forth in <u>Section 9</u>, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person or entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Saks Global Enterprises LLC
225 Liberty Street, Floor 31
New York, NY 10281
Attn: Andrew Woodworth

with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn:  Debra M. Sinclair; Robin Spigel; Betsy L. Feldman
Email address:  dsinclair@willkie.com; rspigel@willkie.com; bfeldman@willkie.com

(b)     if to a Consenting DIP Term Loan Lender, to:

The address set forth on its signature page hereto or such Consenting DIP Term Loan Lender's Transfer Agreement or Joinder, as applicable.

with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn: Andrew N. Rosenberg; Robert A. Britton; Christopher Hopkins
Email address:  arosenberg@paulweiss.com; rbritton@paulweiss.com; chopkins@paulweiss.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.   <u>Independent Due Diligence and Decision Making</u>.   Each Consenting DIP Term Loan Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial, and other conditions, and prospects of the Company Parties.

14.12.   <u>Enforceability of Agreement</u>.   Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.   <u>Reservation of Rights; Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason pursuant to <u>Section 12</u> (other than pursuant to <u>Section 12.05</u>), the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests, subject to <u>Section 13</u> in the case of any claim for breach of this Agreement.   Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.   Further, nothing herein shall be construed to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Agreement Effective Period, such appearance and the positions advocated in connection therewith are consistent with this Agreement and any Definitive Document and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying, or preventing the consummation of the Restructuring Transactions.

14.14.   <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.   <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Consenting DIP Term Loan Lenders under this Agreement are, in all respects, several and not joint.

14.16.   <u>Severability and Construction</u>.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.   <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not

preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.  Capacities of Consenting DIP Term Loan Lenders.  Each Consenting DIP Term Loan Lender has entered into this Agreement on account of all Company Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims.

14.19.  Survival.   Notwithstanding (a) any Transfer of any Company Claims in accordance with this Agreement or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in this Section 14 (including, for the avoidance of doubt, the obligation of the Company Parties to promptly pay or reimburse as and when due all documented fees and expenses of the Ad Hoc Group Advisors) and, where applicable, the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, Section 14 shall survive such termination.

14.20.  Email Consents.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13, or otherwise, including a written approval by the Company Parties, a Consenting DIP Term Loan Lender, or the Required Consenting DIP Term Loan Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.21.  Relationship Among Consenting DIP Term Loan Lenders.   None of the Consenting DIP Term Loan Lenders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, any Company Party, or any of the Company Parties' respective creditors or other stakeholders. The Company Parties acknowledge that the Consenting DIP Term Loan Lenders are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Consenting DIP Term Loan Lenders and the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting DIP Term Loan Lenders that principally manage and/or supervise such Consenting DIP Term Loan Lender's investment in the Company Parties, and shall not apply to any other trading desk or business group of such Consenting DIP Term Loan Lender so long as they are not acting at the direction or for the benefit of such Consenting DIP Term Loan Lender.

14.22.  Fees and Expenses.  During the Agreement Effective Period, the Company Parties shall promptly pay or reimburse when due all documented fees and expenses of the Ad Hoc Group Advisors; *provided* that nothing herein shall alter or modify the Debtors' payment obligations under the DIP Orders.

47

14.23. <u>Signatory Entities</u>.   Except where otherwise provided herein, this Agreement binds only the Consenting DIP Term Loan Lenders (and not any of their Affiliates) that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement in accordance with the terms hereof, and to the Company Claims beneficially held by such Parties in the aggregate principal amount(s) set forth on its signature page held on behalf of, and with respect to, such Party.

14.24. <u>Public Disclosure</u>.   The Company Parties shall deliver drafts to the Ad Hoc Group Advisors of any press releases and public documents in accordance with Section 5.22 of the DIP Term Loan Credit Agreement. Under no circumstances may any Company Party make any public disclosure of any kind that would disclose either: (a) the holdings of any Consenting DIP Term Loan Lender (including on the signature pages of the Consenting DIP Term Loan Lender, which shall not be publicly disclosed or filed); or (b) the identity of any Consenting DIP Term Loan Lender without the prior written consent of such Consenting DIP Term Loan Lender or the order of a Bankruptcy Court or other court with competent jurisdiction; *provided*, *however*, notwithstanding the foregoing, the Company Parties shall not be required to keep confidential the aggregate Claims and Equity Interests held by all Consenting DIP Term Loan Lenders, and each Consenting DIP Term Loan Lender hereby consents to the disclosure of the execution of this Agreement by the Company Parties, and the terms hereof, in the Plan, the Disclosure Statement filed therewith, and any filings by the Company Parties with the Bankruptcy Court, or as otherwise required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body.

14.25. <u>DIP Orders</u>.   For the avoidance of doubt, nothing in this Agreement modifies, amends, waives, supersedes, or otherwise affects the rights of any Agent or Consenting DIP Term Loan Lender under, as applicable, the DIP Documents, all of which remain expressly reserved.

*    *    *

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

48

*[Signatures on file]*

**Exhibit A**

**Company Parties**

| | |
|---|---|
| 1. | 12 EAST 49TH STREET LLC |
| 2. | BERGDORF GOODMAN LLC |
| 3. | BERGDORF GRAPHICS, INC. |
| 4. | BLACK CAVIAR LLC |
| 5. | CAFE BEVERLY HILLS SFA LLC |
| 6. | CAFE BEVERLY SFA TRUST |
| 7. | CAFÉ SFA-MINNEAPOLIS, LLC |
| 8. | CLUB LIBBY LU, INC. |
| 9. | CREATIVE DESIGN STUDIOS, LLC |
| 10. | FIFTH FLOOR RESTAURANT AT SFA LLC |
| 11. | GGI REALTY SERVICES, INC. |
| 12. | GHBC CITY, INC. |
| 13. | GHBC GROUPE HOLDINGS, INC. |
| 14. | GHBC GROUPE, INC. |
| 15. | GHBC SHARED SERVICES, INC. |
| 16. | HBC DIGITAL HOLDINGS INC. |
| 17. | HBC DIGITAL LLC |
| 18. | HBC GAITHERSBURG LLC |
| 19. | HBC GARDEN CITY LEASEHOLD LLC |
| 20. | HBC GP IV LLC |
| 21. | HBC GP LLC |
| 22. | HBC I L.P. |
| 23. | HBC IV L.P. |
| 24. | HBC STEELE LLC |
| 25. | HBC STERLING HEIGHTS LLC |
| 26. | HBC STERLING LLC |
| 27. | HBC US PROPCO HOLDINGS LLC |
| 28. | HBC VICTOR LLC |
| 29. | HBC WILKES-BARRE LLC |
| 30. | HBC WOODBRIDGE LLC |
| 31. | HBS LEASEHOLD LLC |
| 32. | HBSFA HOLDINGS LTD. |
| 33. | HG PROPERTY HOLDINGS LLC |
| 34. | LT 424 LLC |
| 35. | LT PARENT PROPCO LLC |
| 36. | LT PROPCO LLC |
| 37. | MERCHANDISE CREDIT, LLC |
| 38. | MERCURY AGGREGATOR HOLDCO LLC |
| 39. | MERCURY AGGREGATOR LP |
| 40. | NEIMAN MARCUS BERMUDA L.P. |
| 41. | NEIMAN MARCUS GLOBAL TECHNOLOGY SERVICES PRIVATE LIMITED |

| 42. | NEMA BEVERAGE CORPORATION |
|---|---|
| 43. | NEMA BEVERAGE HOLDING CORPORATION |
| 44. | NEMA BEVERAGE PARENT CORPORATION |
| 45. | NM BERMUDA, LLC |
| 46. | NM FINANCIAL SERVICES, INC. |
| 47. | NMG CALIFORNIA SALON LLC |
| 48. | NMG FLORIDA SALON LLC |
| 49. | NMG GLOBAL MOBILITY, INC. |
| 50. | NMG HOLDING COMPANY, INC. |
| 51. | NMG INTERCO LLC |
| 52. | NMG INTERMEDIATE LLC |
| 53. | NMG NOTES PROPCO LLC |
| 54. | NMG PARENT LLC |
| 55. | NMG SALON HOLDINGS LLC |
| 56. | NMG SALONS LLC |
| 57. | NMG TERM LOAN PROPCO LLC |
| 58. | NMG TEXAS SALON LLC |
| 59. | NMGP, LLC |
| 60. | NONSUCH LLC |
| 61. | SAKS & COMPANY LLC |
| 62. | SAKS & COMPANY REAL PROPERTY LLC |
| 63. | SAKS (CAYMAN) MANHATTAN BLOCKER INC. |
| 64. | SAKS (EU) MANHATTAN BLOCKER INC. |
| 65. | SAKS CLOUD SERVICES LLC |
| 66. | SAKS COLUMBUS REAL PROPERTY LLC |
| 67. | SAKS DIRECT LLC |
| 68. | SAKS FIFTH AVENUE HOLDCO II LLC |
| 69. | SAKS FIFTH AVENUE HOLDCO LLC |
| 70. | SAKS FIFTH AVENUE HOLDINGS INC. |
| 71. | SAKS FIFTH AVENUE LLC |
| 72. | SAKS FIFTH AVENUE PUERTO RICO, INC. |
| 73. | SAKS FIFTH AVENUE REAL PROPERTY LLC |
| 74. | SAKS GLOBAL ENTERPRISES LLC |
| 75. | SAKS GLOBAL HOLDINGS LLC |
| 76. | SAKS GLOBAL INVESTMENTS INC. |
| 77. | SAKS GLOBAL INVESTOR L.P. |
| 78. | SAKS MANHATTAN (BLOCKER) HOLDINGS L.P. |
| 79. | SAKS PARTNER INC. |
| 80. | SAKS RICHMOND REAL PROPERTY LLC |
| 81. | SAKS.COM HOLDINGS LLC |
| 82. | SAKS.COM INTERNATIONAL HOLDINGS LLC |
| 83. | SAKS.COM LLC |
| 84. | SAKS.COM MIDCO PARTNER INC. |
| 85. | SAKSWORKS BELLEVUE LLC |
| 86. | SCCA LEASEHOLD LLC |

| | |
|---|---|
| 87. | SCCA STORE HOLDINGS REAL PROPERTY LLC |
| 88. | SFA HOLDINGS INC. |
| 89. | SGUS LLC |
| 90. | SIXTH FLOOR RESTAURANT AT SFA LLC |
| 91. | STREET-WORKS DEVELOPMENT LLC |
| 92. | SW BEVERLY HILLS LLC |
| 93. | SW INTERNATIONAL HOLDINGS LLC |
| 94. | SW WESTFIELD LLC |
| 95. | SWD WESTFIELD I URBAN RENEWAL LLC |
| 96. | SWD WESTFIELD II URBAN RENEWAL LLC |
| 97. | SWD WESTFIELD III URBAN RENEWAL LLC |
| 98. | SWD WESTFIELD IV URBAN RENEWAL LLC |
| 99. | SWD WESTFIELD V URBAN RENEWAL LLC |
| 100. | SWD WESTFIELD VI URBAN RENEWAL LLC |
| 101. | SWD WESTFIELD VII URBAN RENEWAL LLC |
| 102. | SWD WESTFIELD VIII URBAN RENEWAL LLC |
| 103. | THE NEIMAN MARCUS GROUP LLC |
| 104. | THE RESTAURANT AT SAKS FIFTH AVENUE CORPORATION |
| 105. | THE WELLERY HOLDINGS LLC |
| 106. | THE WELLERY LLC |
| 107. | THE WELLERY MSO LLC |
| 108. | YF GREENWICH LLC |
| 109. | YORK FACTORY LLC |

**EXHIBIT F**

**List of Global Debtors**

12 East 49th Street LLC
Bergdorf Goodman LLC
Bergdorf Graphics, Inc.
Black Caviar LLC
Cafe Beverly Hills SFA LLC
Cafe Beverly SFA Trust
Café SFA-Minneapolis, LLC
Club Libby Lu, Inc.
Creative Design Studios, LLC
Fifth Floor Restaurant at SFA LLC
GGI Realty Services, Inc.
GHBC City, Inc.
GHBC Groupe Holdings, Inc.
GHBC Groupe, Inc.
GHBC Shared Services, Inc.
HBC Digital Holdings Inc.
HBC Digital LLC
HBC Gaithersburg LLC
HBC Garden City Leasehold LLC
HBC GP IV LLC
HBC GP LLC
HBC I L.P.
HBC IV L.P.
HBC Steele LLC
HBC Sterling Heights LLC
HBC Sterling LLC
HBC US Propco Holdings LLC
HBC Victor LLC
HBC Wilkes-Barre LLC
HBC Woodbridge LLC
HBS Leasehold LLC
HBSFA Holdings Ltd.
HG Property Holdings LLC
LT 424 LLC
LT Parent Propco LLC
LT Propco LLC
Merchandise Credit, LLC
Mercury Aggregator Holdco LLC
Mercury Aggregator LP
Neiman Marcus Bermuda L.P.
Neiman Marcus Global Technology
Services Private Limited
NEMA Beverage Corporation
NEMA Beverage Holding Corporation
NEMA Beverage Parent Corporation
NM Bermuda, LLC

NM Financial Services, Inc.
NMG California Salon LLC
NMG Florida Salon LLC
NMG Global Mobility, Inc.
NMG Holding Company, Inc.
NMG Interco LLC
NMG Intermediate LLC
NMG Notes PropCo LLC
NMG Parent LLC
NMG Salon Holdings LLC
NMG Salons LLC
NMG Term Loan PropCo LLC
NMG Texas Salon LLC
NMGP, LLC
Nonsuch LLC
Saks & Company LLC
Saks & Company Real Property LLC
Saks (Cayman) Manhattan Blocker Inc.
Saks (EU) Manhattan Blocker Inc.
Saks Cloud Services LLC
Saks Columbus Real Property LLC
Saks Direct, LLC
Saks Fifth Avenue HoldCo II LLC
Saks Fifth Avenue HoldCo LLC
Saks Fifth Avenue Holdings Inc.
Saks Fifth Avenue LLC
Saks Fifth Avenue Puerto Rico, Inc.
Saks Fifth Avenue Real Property LLC
Saks Global Enterprises LLC
Saks Global Holdings LLC
Saks Global Investments Inc.
Saks Global Investor L.P.
Saks Manhattan (Blocker) Holdings L.P.
Saks Partner Inc.
Saks Richmond Real Property LLC
Saks.com Holdings LLC
Saks.com International Holdings LLC
Saks.com LLC
Saks.com Midco Partner Inc.
SaksWorks Bellevue LLC
SCCA Leasehold LLC
SCCA Store Holdings Real Property LLC
SFA Holdings Inc.
SGUS LLC
Sixth Floor Restaurant at SFA LLC
Street-Works Development LLC

SW Beverly Hills LLC
SW International Holdings LLC
SW Westfield LLC
SWD Westfield I Urban Renewal LLC
SWD Westfield II Urban Renewal LLC
SWD Westfield III Urban Renewal LLC
SWD Westfield IV Urban Renewal LLC
SWD Westfield V Urban Renewal LLC
SWD Westfield VI Urban Renewal LLC
SWD Westfield VII Urban Renewal LLC
SWD Westfield VIII Urban Renewal LLC
The Neiman Marcus Group LLC
The Restaurant at Saks Fifth Avenue
Corporation
The Wellery Holdings LLC
The Wellery LLC
The Wellery MSO LLC
YF Greenwich LLC
York Factory LLC

**<u>EXHIBIT G</u>**

**Corporate Organization Chart**



# Saks TopCo
## Corporate Structure Chart
As of December 1, 2025

