United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 05, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re:<br><br>SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90103 (ARP)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 2172, 2179 & 2651** |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER (I) APPROVING THE DISCLOSURE
STATEMENT, (II) CONFIRMING THE THIRD AMENDED
JOINT CHAPTER 11 PLAN OF SAKS GLOBAL ENTERPRISES LLC AND
ITS GLOBAL DEBTOR AFFILIATES, AND (III) GRANTING RELATED RELIEF**

The Global Debtors, having:

a.  commenced, on January 13, 2026 (the "Petition Date") and January 14, 2026, these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

b.  continued to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.  obtained, on February 20, 2026, entry of the *Final Order (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 917];

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is counsel for the following Debtors: Saks OFF 5TH Holdings, LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner, Inc., and Luxury Outlets USA, LLC (collectively the "SO5 Digital Debtors"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP are counsel for the remaining Debtors (collectively, the "Global Debtors").

d.    entered into (a) that certain *Restructuring Support Agreement*, dated as of April 1, 2026, between and among the Global Debtors and the Consenting DIP Term Loan Lenders thereto and any other Person that may become a party to such agreement pursuant to its terms (as may be amended from time to time in accordance with its terms, the "Restructuring Support Agreement"), and (b) that certain *$500,000,000 Incremental New Money Facilities Commitment Letter*, dated as of April 1, 2026, between and among the Global Debtors and the New Capital Commitment Parties thereto and any other Person that may become a party to such agreement pursuant to its terms (as amended and restated on April 8, 2026, and as may be amended from time to time in accordance with its terms, the "New Capital Commitment Letter");

e.    filed, on April 5, 2026, the (a) *Global Debtors' Emergency Motion for Entry of an Order (I) Authorizing Entry Into and Performance Under the New Capital Commitment Letter, (II) Approving Payment and Allowance of Related Premiums, Fees, and Expenses as Administrative Expense Claims, and (III) Granting Related Relief* (the "New Capital Commitment Letter Motion") [Docket No. 1861]; (b) *Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 1796], (c) *Disclosure Statement for Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 1797], and (d) *Global Debtors' Motion for an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Procedures and Solicitation Package; (III) Scheduling a Combined Hearing; (IV) Establishing Procedures for Objecting to the Plan and Final Approval of the Disclosure Statement; (V) Approving the Form, Manner, and Sufficiency of Notice of the Combined Hearing; and (VI) Granting Related Relief* [Docket No. 1798] (the "Conditional Disclosure Statement Approval Motion");

f.    obtained, on April 26, 2026, following a hearing on the New Capital Commitment Letter Motion, entry of the *Order (I) Authorizing Entry Into and Performance Under the New Capital Commitment Letter, (II) Approving Payment and Allowance of Related Premiums, Fees, and Expenses as Administrative Expense Claims, and (III) Granting Related Relief* [Docket No. 1997] which, among other things, approved (a) the Global Debtors' entry into and performance under the New Capital Commitment Letter, and (b) the payment and allowance of the New Capital Commitment Obligations (as defined in the New Capital Commitment Letter Motion) as administrative expenses senior in priority to all other administrative expense claims (other than the DIP Facility Claims) against the Global Debtors and their estates;

g.    obtained, on May 1, 2026, following a hearing on the Conditional Disclosure Statement Approval Motion (the "Conditional Disclosure Statement Hearing"), entry of the *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Procedures and Solicitation Package; (III) Scheduling a Combined Hearing; (IV) Establishing Procedures for Objecting to the Plan and Final Approval of the Disclosure Statement; (V) Approving the Form, Manner, and Sufficiency of Notice of the Combined Hearing; and (VI)*

*Granting Related Relief* [Docket No. 2172] (the "Conditional Disclosure Statement Order") which, among other things, approved the Disclosure Statement (as defined below) on a conditional basis as containing adequate information under section 1125 of the Bankruptcy Code and approved the Solicitation Procedures and the Solicitation Materials;

h.      filed, on May 1, 2026, the solicitation versions of the (a) *Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2178], and (b) *Disclosure Statement for the Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2179] (as amended, supplemented, or modified from time to time, the "Disclosure Statement");

i.      caused the Solicitation Materials, including the *Notice of Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving Solicitation Procedures and Solicitation Package; (III) Scheduling a Combined Hearing; (IV) Establishing Procedures for Objecting to the Plan and Final Approval of the Disclosure Statement; (V) Approving the Form, Manner, and Sufficiency of Notice of the Combined Hearing; and (VI) Granting Related Relief* [Docket No. 2172, Ex.1] (the "Combined Hearing Notice"), to be distributed on or before May 4, 2026, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules"), the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures"), and the Conditional Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket Nos. 2288 and 2529] (together, the "Solicitation Affidavit");

j.      caused, on May 6, 2026, the Combined Hearing Notice to be published in The New York Times as evidenced by the *Affidavit of Publication of The New York Times Regarding the Notice of Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Procedures and Solicitation Package; (III) Scheduling a Combined Hearing; (IV) Establishing Procedures For Objecting to the Plan and Final Approval of the Disclosure Statement; (V) Approving the Form, Manner, and Sufficiency of Notice of the Combined Hearing; and (VI) Granting Related Relief* [Docket No. 2212] (the "Publication Affidavit");

k.      filed, (i) on May 18, 2026, the *Notice of Filing of First Plan Supplement to the Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2316] (the "First Plan Supplement"), (ii) on May 26, 2026, the *Notice of Filing of Second Plan Supplement to the Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2355] (the "Second Plan Supplement"), (iii) on May 28, 2026, the *Notice of Filing of Third Plan Supplement to the Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2365] (the "Third Plan Supplement"), and (iv) on June 4, 2026, the *Notice of Filing of Fourth*

3

*Plan Supplement to the Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2607] (the "Fourth Plan Supplement" and, collectively with the First Plan Supplement, the Second Plan Supplement, and the Third Plan Supplement, as amended, modified, or supplemented from time to time, the "Plan Supplement");

l.  caused, on May 27, 2026, the *Notice of Filing of Schedule of Excluded Parties* to be served on certain Excluded Parties, as evidenced by the Certificate of Service filed on June 1, 2026 [Docket No. 2530];

m.  filed, (i) on June 4, 2026, the *Second Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2600], and (ii) on June 5, 2026, the *Third Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2651] (as amended, supplemented, or modified from time to time, the "Plan"); [2]

n.  filed, on June 4, 2026, the *Global Debtors' Memorandum of Law in Support of an Order (I) Approving the Global Debtors' Disclosure Statement on a Final Basis, and (II) Confirming the Second Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2603] (the "Confirmation Brief");

o.  filed, on June 4, 2026, the *Declaration of Leticia Sanchez on Behalf of Stretto, Inc. Regarding the Solicitation and Tabulation of Votes on the Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket Nos. 2604 and 2605] (as may be amended, modified, or supplemented from time to time, the "Voting Report"); and

p.  filed, on June 4, 2026, the (i) *Declaration of Jamie Baird in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2606] (the "Baird Declaration"), (ii) *Declaration of Mark Weinsten, Chief Restructuring Officer, in Support of (I) Approval of the Global Debtors' Amended Disclosure Statement on a Final Basis and (II) Confirmation of the Second Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2611] (the "Weinsten Declaration"), and (iii) *Declaration of Paul S. Aronzon in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2602] (the "Aronzon Declaration" and, collectively with the Baird Declaration and the Weinsten Declaration, the "Confirmation Declarations").

The Bankruptcy Court having:

a.  entered, on May 1, 2026, the Conditional Disclosure Statement Order;

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan. The rules of interpretation set forth in Article I of the Plan shall apply to this Order (as defined below).

b.     set June 1, 2026 at 4:00 p.m. (Prevailing Central Time) as the deadline to vote to accept or reject the Plan and opt out of, or opt in to, as applicable, the Third-Party Release contained in the Plan (the "Voting Deadline");

c.     set June 1, 2026 at 4:00 p.m. (Prevailing Central Time) as the deadline for filing objections to the final approval of the Disclosure Statement or Confirmation of the Plan (as may have been extended with respect to certain parties, the "Combined Objection Deadline");

d.     set June 5, 2026 at 9:00 a.m. (Prevailing Central Time) as the date and time for the combined hearing (as may be adjourned, the "Combined Hearing") to consider final approval of the Disclosure Statement and Confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, Local Rule 3016-2, Section P of the Complex Case Procedures, and sections 1125, 1126, 1128, and 1129 of the Bankruptcy Code;

e.     considered the Disclosure Statement, the Plan, including the discharge, compromises, settlements, releases, exculpations, and injunctions set forth therein, the Plan Supplement, the Confirmation Brief, the Confirmation Declarations, the Voting Report, the Combined Hearing Notice, the Publication Affidavit, the Solicitation Affidavit, and all other pleadings, exhibits, declarations, affidavits, statements, responses, and comments regarding final approval of the Disclosure Statement and Confirmation of the Plan, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

f.     held the Combined Hearing;

g.     heard the statements and arguments made by counsel and parties in interest in respect of final approval of the Disclosure Statement and Confirmation of the Plan;

h.     considered all oral representations, affidavits, testimony, documents, filings, and other evidence regarding final approval of the Disclosure Statement and Confirmation and having admitted the same into evidence at the Combined Hearing;

i.     overruled, including for any reasons stated on the record of the Combined Hearing, any and all objections to final approval of the Disclosure Statement and Confirmation of the Plan and all statements and reservations of rights not consensually resolved, waived, settled, or withdrawn; and

j.     made rulings on the record at the Combined Hearing.

**NOW, THEREFORE**, the Bankruptcy Court having found that the Combined Hearing Notice and the opportunity for any party in interest to object to final approval of the Disclosure Statement and Confirmation of the Plan have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions (including, without limitation, the

5

Restructuring Transactions) contemplated thereby; and the Bankruptcy Court having found that the record of the Chapter 11 Cases and the legal and factual bases set forth in the documents Filed in support of final approval of the Disclosure Statement and Confirmation of the Plan, and all evidence proffered or adduced by counsel at the Combined Hearing, establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of Law, and orders (collectively, the "Order"):

<b><u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u></b>

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT**:

**A.    Findings of Fact and Conclusions of Law**

1.    The findings of fact and the conclusions of Law set forth and incorporated in this Order and on the record of the Combined Hearing (which are incorporated into this Order by this reference) constitute the Bankruptcy Court's findings of fact and conclusions of Law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Each finding of fact set forth or incorporated in this Order, to the extent it is or may be deemed a conclusion of Law, shall also constitute a conclusion of Law. Each conclusion of Law set forth or incorporated in this Order, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

**B.    Jurisdiction and Venue**

2.    Venue in the Bankruptcy Court was proper as of the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409. Approval of the Disclosure Statement and Confirmation of the Plan are core proceedings under 28 U.S.C. § 157(b)(2). The Bankruptcy Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. The Bankruptcy

6

Court has exclusive jurisdiction to determine whether the Disclosure Statement and Plan comply with the applicable provisions of the Bankruptcy Code and should be approved on a final basis and confirmed, respectively, and to enter a Final Order with respect thereto.

**C.      Eligibility for Relief**

3.      The Global Debtors were at all times during these Chapter 11 Cases, and continue to be, Entities eligible for relief under section 109 of the Bankruptcy Code, and the Global Debtors are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

**D.      Commencement and Joint Administration of These Chapter 11 Cases**

4.      On the Petition Date and January 14, 2026, the Global Debtors commenced the Chapter 11 Cases by Filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On January 14, 2026, the Bankruptcy Court entered the *Order (I) Authorizing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 46], authorizing the joint administration of the Chapter 11 Cases for procedural purposes only in accordance with Bankruptcy Rule 1015(b). Since the Petition Date, the Global Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases. On January 27, 2026, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 480]. On January 29, 2026, the U.S. Trustee reconstituted the Creditors' Committee [Docket No. 522].

**E.      Judicial Notice**

5.      The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court including, without limitation, all pleadings and other documents filed, and orders entered thereon. The Bankruptcy Court also takes judicial notice of all hearing transcripts, evidence proffered or adduced, and all arguments made at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases.

**F.      Objections**

6.      All parties have had a fair opportunity to litigate all issues raised, or that might have been raised, in objections to final approval of the Disclosure Statement and Confirmation of the Plan and such objections, if any, have been fully and fairly litigated or resolved. Any resolution of objections to final approval of the Disclosure Statement or Confirmation of the Plan explained on the record at the Combined Hearing is hereby incorporated by reference. All unresolved objections, statements, informal objections, and reservations of rights (except with respect to any unresolved Cure Disputes and objections to the assumption or rejection of Executory Contracts and Unexpired Leases, which shall be addressed in accordance with Section 9.2 of the Plan), if any, related to final approval of the Disclosure Statement or Confirmation of the Plan are overruled on the merits with prejudice.

**G.      Plan Supplement**

7.      The documents identified in the Plan Supplement were Filed as required and notice of such documents was (a) appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and (b) in compliance with the provisions of the Plan, the Conditional Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules. All parties required to be given notice of the documents identified in the Plan Supplement have been provided due, proper, timely,

and adequate notice and have had an opportunity to appear and be heard with respect thereto. The transmittal and notice of the Plan Supplement (and all documents identified in the Plan Supplement) was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was conducted in good faith. No other or further notice with respect to the Plan Supplement (and all documents identified in the Plan Supplement) is necessary or shall be required. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. The Global Debtors are authorized to alter, amend, update, or modify the Plan Supplement before the Effective Date in accordance with the terms of the Plan (including the review and consent rights of certain parties as set forth therein), this Order, the Bankruptcy Code, and the Bankruptcy Rules. The terms of the Management Incentive Plan, as set forth in the Plan Supplement, have been negotiated in good faith and at arm's length, are fair and reasonable, and are approved.

**H.      Adequacy of Disclosure Statement**

8.      The Disclosure Statement contains extensive material information regarding the Global Debtors so that parties entitled to vote on the Plan could make informed decisions regarding the Plan. The Disclosure Statement contains "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Global Debtors, the Plan, and the transactions (including, without limitation, the Restructuring Transactions) contemplated therein, and complies with any additional applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and non-bankruptcy law, including the Securities Act. The Global Debtors' solicitation of votes on the Plan via transmittal of the Disclosure Statement and the other Solicitation Materials was authorized by and

complied with the Conditional Disclosure Statement Order and was appropriate under the circumstances.

**I.      Conditional Disclosure Statement Order and Notice**

9.      On May 1, 2026, the Bankruptcy Court entered the Conditional Disclosure Statement Order. As evidenced by the Solicitation Affidavit, the Publication Affidavit, and the record in the Chapter 11 Cases, the Global Debtors provided due, adequate, and sufficient notice of the Plan and Disclosure Statement, the Conditional Disclosure Statement Order, the Solicitation Materials, the Plan Supplement, the settlement, release, exculpation, and injunction provisions contained in the Plan, including the Third-Party Release, the Combined Hearing, the Voting Deadline, the Combined Objection Deadline, and any applicable bar dates described in the Conditional Disclosure Statement Order, in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3016, 3017, 3019, and 3020(b), the Local Rules, the Complex Case Procedures, the Solicitation Procedures, and the Conditional Disclosure Statement Order. No other or further notice is or shall be required.

**J.      Solicitation**

10.      The Global Debtors and their professionals solicited votes for acceptance and rejection of the Plan in good faith, and such solicitation complied with the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 3017, 3018, and 3019, the Conditional Disclosure Statement Order, the Solicitation Procedures, the Local Rules, the Complex Case Procedures, and all other applicable rules, laws, and regulations. Transmission and service of the Solicitation Materials was timely, adequate, and sufficient under the facts and circumstances of the Chapter 11 Cases. No other or further notice, transmission, or solicitation is or shall be required. The period during which the

Global Debtors solicited votes on the Plan is a reasonable and adequate period of time for Holders of Claims in the Voting Classes to have made an informed decision to accept or reject the Plan.

**K.      Service of Release Opt-In and Release Opt-Out Forms**

11.      The process described in the Voting Report that the Global Debtors and the Claims Agent followed to identify the relevant parties on which to serve the applicable Ballot or notice of non-voting status and Release Opt-In Form or Release Opt-Out Form, as applicable, and to distribute the notice of non-voting status and Release Opt-In Form or Release Opt-Out Form, as applicable, (a) is consistent with practices used in other complex chapter 11 cases in this District, (b) was reasonably calculated to ensure that each Holder of Claims and Equity Interests in each Class was informed of its ability to opt in to, or out of, as applicable, the Third-Party Release and the ramifications for electing not to timely do so, and (c) is consistent with the applicable provisions of the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Complex Case Procedures, and all other applicable rules, Laws, and regulations. Any party that elected in the Release Opt-In Form to opt in to the Third-Party Release and timely submitted such election to the Claims Agent in accordance with the Solicitation Procedures and the Release Opt-In Form prior to the applicable deadline to submit a Ballot, whether under any original or extended deadline, shall be a Releasing Party under the Plan, except as otherwise provided under the Plan or the Plan Supplement. Any party that elected to opt out of the Third-Party Release by checking the box on the applicable Ballot or Release Opt-Out Form indicating that they opt not to grant the Third-Party Release and timely submitted such election to the Claims Agent in accordance with the Solicitation Procedures and the Release Opt-Out Form prior to the applicable deadline to submit a Ballot, whether under any original or extended deadline, shall not be a Releasing Party under the Plan.

L.       **Voting Report**

12.       Prior to the Combined Hearing, the Global Debtors Filed the Voting Report. As set forth in the Voting Report, the procedures used to tabulate the Ballots were fair, in good faith, and conducted in accordance with the Conditional Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Complex Case Procedures, and all other applicable rules, Laws, and regulations.

13.       As set forth in the Plan, Holders of Claims in Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, 4-D, 4-E, 4-F, 4-G, 5-A, 5-B, 5-C, and 5-D (collectively, the "Voting Classes") for each of the Global Debtors were eligible to vote on the Plan pursuant to the Solicitation Procedures. Holders of Claims in Classes 1 and 2 are Unimpaired and conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote to accept or reject the Plan. Holders of Intercompany Claims and Existing Intercompany Interests in Classes 7 and 10 (the "Intercompany Classes"), respectively, are either Unimpaired and presumed to accept the Plan, or Impaired and deemed to reject the Plan because they are not entitled to a recovery under the Plan. Holders of Intercompany Claims and Existing Intercompany Interests are not entitled to vote to accept or reject the Plan. Pursuant to the Conditional Disclosure Statement Order, the Global Debtors were not required to solicit the votes of, or to send any Solicitation Materials to Holders of Claims and Equity Interests in the Intercompany Classes. Holders of Claims in Classes 6-A, 6-B, 8, and 9 are Impaired under the Plan and are conclusively deemed to have rejected the Plan (together with the Unimpaired Classes, the "Non-Voting Classes").

14.     As evidenced by the Voting Report, Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, 4-D, 4-E, 4-F, 5-A, 5-B, 5-C, and 5-D[3] voted to accept the Plan in sufficient number and in a sufficient amount to constitute accepting Classes.  Class 4-G voted to reject the Plan.

**M.     Bankruptcy Rule 3016**

15.     The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The Global Debtors appropriately Filed the Disclosure Statement and the Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Plan and Disclosure Statement describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, satisfying Bankruptcy Rule 3016(c).

**N.     Modifications to the Plan**

16.     Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan after solicitation of the Plan, as reflected in the Plan or in this Order (including any modifications announced on the record at the Combined Hearing) (collectively, the "Plan Modifications"), constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims or their authorized representatives, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim under the Plan. After giving effect to the Plan Modifications, the Plan continues to satisfy the requirements of sections 1122 and 1123 of the Bankruptcy Code, and notice of the Plan Modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, the Plan Modifications do not require additional

---

[3]     As set forth in the Voting Report, Class 5-D was occupied as of the commencement of the Combined Hearing by Claims eligible to vote.  However, no vote to accept or reject the Plan was cast in Class 5-D by any Holder of a Claim eligible to vote in such Class.  Thus, pursuant to Section 5F of the Plan, Class 5-D is presumed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims be afforded an opportunity to cast new votes on the Plan or change previously cast acceptances or rejections of the Plan. No Holder of a Claim who has voted to accept the Plan shall be permitted to change its vote as a consequence of the Plan Modifications. Accordingly, the Plan is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such Plan Modifications shall be binding and shall apply with respect to the Plan. All Holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified, revised, supplemented, or otherwise amended, and all Holders of Claims and Equity Interests who are conclusively deemed to have rejected the Plan are deemed to have rejected the Plan as modified, revised, supplemented, or otherwise amended.

17. The Global Debtors have complied with section 1127 of the Bankruptcy Code with respect to the Plan. The requirements of section 1127 of the Bankruptcy Code have been satisfied.

**O. Burden of Proof**

18. The Global Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation of the Plan. Further, to the extent applicable, the Global Debtors have proven the elements of sections 1129(a) and 1129(b) by clear and convincing evidence. Each witness who testified (by declaration, proffer, or otherwise) on behalf of the Global Debtors and/or in support of Confirmation of the Plan in connection with the Combined Hearing was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

14

**P.**      **Plan Compliance with Requirements of Section 1129 of Bankruptcy Code**

19.      Based on the following findings of fact and conclusions of law, the Plan, all pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with Confirmation of the Plan, and all evidence and arguments made, proffered, or adduced at the Combined Hearing, all requirements for plan Confirmation set forth in section 1129 of the Bankruptcy Code have been satisfied.

**I.**      **Compliance with Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

20.      The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code.

**a.**      **Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1)).**

21.      The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code, and the classification of Claims and Equity Interests under the Plan is proper under the Bankruptcy Code. Article IV of the Plan provides for the separate classification of Claims and Equity Interests into Classes based on differences in the legal nature or priority of such Claims and Equity Interests (other than Administrative Expense Claims, DIP ABL Facility Claims, DIP OpCo Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims, each of which are addressed in Article III of the Plan and are not required to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code). Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims and Equity Interests created under the Plan. The classifications were not promulgated for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Equity Interests. In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims and Equity

15

Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class. The Plan, therefore, satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

> **b.      Specified Unimpaired and Impaired Classes (11 U.S.C. §§ 1123(a)(2) and 1123(a)(3)).**

22.      The Plan satisfies sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code. Article IV of the Plan specifies that Claims in Classes 1 and 2 are Unimpaired and presumed to accept the Plan and that Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, 4-D, 4-E, 4-F, 4-G, 5-A, 5-B, 5-C, 5-D, 6-A, 6-B, 8, and 9 are Impaired. Holders of Claims and Equity Interests in Classes 6-A, 6-B, 8, and 9 are Impaired under and are conclusively deemed to have rejected the Plan. Article IV of the Plan also specifies that Holders of Claims and Equity Interests in Classes 7 and 10 are either Impaired and deemed to reject the Plan, or Unimpaired and presumed to accept the Plan.

> **c.      No Discrimination (11 U.S.C. § 1123(a)(4)).**

23.      The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. Article IV of the Plan provides the same treatment for each Claim or Equity Interest within a particular Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment with respect to such Claim or Equity Interest. Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

> **d.      Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**

24.      The provisions of the Plan, including Article VI thereof, together with the exhibits and attachments thereto (including the Plan Supplement), satisfy the requirements of section 1123(a)(5) of the Bankruptcy Code and provide in detail the adequate and proper means for the implementation of the Plan, including, among other things: (a) the good faith compromise and settlement of Claims and Equity Interests in connection with all settlements in the Plan,

including the Committee Settlement; (b) the authorization for the Global Debtors or the Reorganized Global Debtors, as applicable, to take all actions necessary to effectuate the Plan and the Restructuring Transactions; (c) the funding and sources for distributions under the Plan, including Cash; (d) the consummation of the Exit ABL Facility and related agreements; (e) the consummation of the New Exit Debt Facilities and related agreements in accordance with the requirements of the New Capital Commitment Letter; (f) the issuance and distribution of the New Saks Common Stock and Take Back Preferred Units; (g) the adoption of the New Organizational Documents; (h) the consummation of various corporate or other similar transaction steps necessary to implement the new corporate and organizational structure upon emergence; (i) the formation of the Litigation Trust, the execution of the Litigation Trust Agreement and the other Litigation Trust Documents, the appointment of the Litigation Trustee and the Litigation Trust Committee, and the transfer of the Litigation Trust Assets, including the Litigation Trust Initial Funding Amount (if applicable) and the Litigation Trust Retained Causes of Action, to the Litigation Trust; (j) the authorization, approval, and entry into corporate actions under the Plan; (k) the appointment of the New Boards; (l) the preservation and vesting of the Reorganized Global Debtors Retained Causes of Action in the Reorganized Global Debtors; (m) the preservation of the D&O Liability Insurance Policies in accordance with the terms set forth in the Plan; (n) except as otherwise set forth in the Plan or any Plan Supplement, the continued corporate existence of the Global Debtors; (o) the cancellation of existing agreements and Equity Interests as set forth in the Plan; (p) the assumption of certain employment obligations; (q) the adoption and implementation of the Management Incentive Plan and the Post-Emergence Incentive Plan; and (r) the effectuation and implementation of further transactions contemplated by the Plan, including, without limitation, the Restructuring Transactions. In addition to these core transactions, the Plan sets forth the other

17

critical mechanics of the Global Debtors' emergence, such as the vesting of Estate assets of the Global Debtors in the Reorganized Global Debtors, the assumption of Executory Contracts and Unexpired Leases, and the settlement of certain Claims and Equity Interests. The precise terms governing the execution of certain of these transactions are set forth in the applicable Definitive Documents, forms of agreements, or term sheets included in the Plan Supplement. Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

e.      **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).**

25.     The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code because Article VI of the Plan and the New Organizational Documents prohibit the issuance of new non-voting equity securities to the extent prohibited under section 1123(a)(6) of the Bankruptcy Code and provide for an appropriate distribution of voting power among the classes of securities possessing voting power; *provided*, *however*, that the foregoing restriction shall (a) have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code, (b) only have such force and effect for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Reorganized Global Debtors, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

26.     To the extent the beneficial interests in the Litigation Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities Laws, such beneficial interests shall not be non-voting equity securities. Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

18

**f.      Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)).**

27.      The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Article VI of the Plan provides that, as of the Effective Date, each member of each of the Global Debtors' existing boards shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Global Debtor on the Effective Date. Commencing on the Effective Date, the members of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Global Debtor, as applicable, and may be replaced or removed in accordance therewith, as applicable. Certain initial members of the New Boards were identified in Exhibit I of the Plan Supplement [Docket No. 2607].

28.      Moreover, the Plan provides that as of the Effective Date, the Litigation Trustee shall be appointed as trustee of the Litigation Trust in accordance with the Plan, this Order, and the Litigation Trust Documents. The Litigation Trustee was selected by the Creditors' Committee with the reasonable consent of the Required Consenting DIP Term Loan Lenders and in consultation with the Global Debtors. The identity of the Litigation Trustee was identified in Exhibit L of the Plan Supplement [Docket No. 2355].

29.      The foregoing manner of selection of the officers, directors, or trustees (or any successor of any officer, director, or trustee) of the Reorganized Global Debtors is consistent with the interests of all Holders of Claims and Equity Interests and with public policy. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

       **g.**      **Discretionary Contents of the Plan (11 U.S.C. § 1123(b)).**

30.      The Plan satisfies the requirements of section 1123(b) of the Bankruptcy Code. The other provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code.

      **i.**      **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

31.      Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the occurrence of the Effective Date, Article IX of the Plan provides, among other things, that any Executory Contracts and Unexpired Leases of the Global Debtors (a) not previously assumed, (b) not previously rejected pursuant to an order of the Bankruptcy Court, or (c) identified on the Assumed Contracts / Leases List will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and this Order, except any Executory Contract or Unexpired Lease (i) that is identified on the Rejected Contracts / Leases List, (ii) that is the subject of (A) a separate motion or notice to reject, assume, or assume and assign or a Cure Dispute that is pending as of the Confirmation Date, or (B) an order of the Bankruptcy Court that is not yet a Final Order, or (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).

32.      The Global Debtors or Reorganized Global Debtors, as applicable, subject to the Definitive Document Consent Rights, are authorized to amend or supplement the Rejected Contracts / Leases List or the Assumed Contracts / Leases List in their discretion: (a) with respect to any Executory Contract, at any time prior to the Effective Date; and (b) with respect to any Unexpired Lease, at any time prior to the Confirmation Date (or, in either case, such later date as may be agreed in writing (email being sufficient) with a counterparty). Notwithstanding the foregoing, if the Bankruptcy Court determines that the Allowed Cure Cost with respect

to any Executory Contract or Unexpired Lease is materially greater than the amount set forth in the Assumed Contracts / Leases List, then the Global Debtors or Reorganized Global Debtors, as applicable, shall have seven (7) days in which to confirm their renewed intent to assume the applicable Executory Contract or Unexpired Lease and pay such Allowed Cure Cost; otherwise, such Executory Contract or Unexpired Lease shall be deemed rejected as of the date, which may be after the Effective Date, that is the later of (i) the date an Order is entered resolving such Cure Dispute, and (ii) solely with respect to an Unexpired Lease, the date on which the Global Debtors or Reorganized Global Debtors, as applicable, relinquish control of the relevant premises and notify the affected landlord and such landlord's counsel (if any) in writing (e-mail being sufficient) of the surrender of the premises and, as applicable, (a) turn over keys, key codes, and/or security codes, if any, to the affected landlord or (b) if such keys, key codes and/or security codes, if any, are not available or providing same would be impractical, notify such affected landlord and such landlord's counsel, if any, in writing (e-mail being sufficient) that the keys, key codes, and security codes, if any, are not available or that providing same would be impractical, but that the landlord may rekey the leased premises.

33.     The Global Debtors' determinations regarding the assumption or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Global Debtors, are necessary to the implementation of the Plan, and are in the best interests of the Global Debtors, their Estates, Holders of Claims or Equity Interests, and other parties in interest in these Chapter 11 Cases.

> **ii.     Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action (11 U.S.C. § 1123(b)(3)).**

34.     **Approval of Compromises and Settlements**. Pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as applicable, and in consideration for the distributions

21

and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, Causes of Action, or controversies (a) belonging to the Global Debtors or the Global Debtors' Estates as set forth in the Plan and (b) by and among the Global Debtors, the Creditors' Committee, the DIP Lenders, the Consenting DIP Term Loan Lenders, and Axonic. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Equity Interests, Causes of Action, and controversies belonging to the Global Debtors or the Global Debtors' Estates pursuant to section 1123 of the Bankruptcy Code and, with respect to the compromise and settlement by and among the Global Debtors, the Creditors' Committee, the DIP Lenders, the Consenting DIP Term Loan Lenders, and Axonic, Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.

35.     Based upon the representations and arguments of counsel to the Global Debtors and all other testimony either actually given or proffered and other evidence introduced at the Combined Hearing and the full record of these Chapter 11 Cases, this Order constitutes the Bankruptcy Court's approval of all settlements embodied in the Plan or in the form included in the Plan Supplement, as applicable, and this Order (including, without limitation, the Committee Settlement and the Axonic Settlement), because, among other things: (a) such settlements reflect a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes, and allowing the Global Debtors to expeditiously exit chapter 11, on the other hand; (b) absent such settlements, there is a likelihood of complex and protracted litigation involving attendant expense, inconvenience, and delay that could derail the Global Debtors' chapter 11 objectives and efforts; (c) each of the parties supporting such settlements is represented by counsel that is recognized as being knowledgeable, competent, and experienced; (d) the settlements

embodied in the Plan and this Order, or in the form included in the Plan Supplement, as applicable, are, in each case, the product of arm's-length bargaining and good-faith negotiations between sophisticated parties; and (e) such settlements are fair, equitable, reasonable, and in the best interests of the Global Debtors, the Reorganized Global Debtors, their respective Estates and property, creditors, and other parties in interest, will maximize the value of the Estates, and are essential to the successful implementation of the Plan. Based on the foregoing, each of the settlements embodied in the Plan and this Order, or in the form included in the Plan Supplement, as applicable, satisfies the requirements of applicable Fifth Circuit law for approval of settlements and compromises pursuant to Bankruptcy Rule 9019.

36. **Global Debtor Release**. Consistent with sections 157 and 1334(a) and (b) of title 28 of the United States Code, and sections 105(a), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code, the Bankruptcy Court has jurisdiction and constitutional adjudicatory authority to approve the release set forth in Section 11.2 of the Plan (the "Global Debtor Release"). The Global Debtor Release represents a valid exercise of the Global Debtors' business judgment and is the result of a good-faith and arm's-length negotiation between sophisticated parties who had representation from able counsel and advisors following the Special Restructuring Committee Independent Investigation by the Global Debtors' Special Restructuring Committee. Such releases are a necessary and integral element of the Plan, and are fair, equitable, reasonable, and in the best interests of the Global Debtors, their Estates, and Holders of Claims and Equity Interests. Entry of this Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the Global Debtor Release, and shall further constitute the Bankruptcy Court's finding that the Global Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement

and compromise of the Claims released by the Global Debtor Release; (c) a valid exercise of the Global Debtors' business judgment in light of the circumstances of these Chapter 11 Cases and the recommendations of the Special Restructuring Committee following the Special Restructuring Committee Independent Investigation, and after due notice and a hearing; (d) appropriately tailored under the facts and circumstances of the Chapter 11 Cases; and (e) a bar to any of the Global Debtors and their Estates, the Reorganized Global Debtors, or the Litigation Trust asserting any Cause of Action released by the Global Debtor Release against the Released Parties or their property.

37.     The Global Debtors have satisfied their burden with respect to the propriety of the Global Debtor Release. The Global Debtor Release appropriately offers protection to parties who provided consideration to the Global Debtors and that participated in the Global Debtors' restructuring process. The Global Debtor Release is appropriate in light of the significant concessions and contributions made by the Released Parties to the Chapter 11 Cases, including by actively supporting the Chapter 11 Cases, the Plan, and the Restructuring Transactions, and the critical nature of the Global Debtor Release to the Plan and the settlements contained therein. The scope of the Global Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases, and the Global Debtor Release is given and made after due notice and a hearing.

38.     **Releases by Holders of Claims and Equity Interests**. Consistent with sections 157 and 1334(a) and (b) of title 28 of the United States Code, and sections 105(a), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code, the Bankruptcy Court has jurisdiction and constitutional adjudicatory authority to approve the release set forth in Section 11.3 of the Plan (the "Third-Party Release"). The Third-Party Release is given and made after due notice and a hearing. The

Third-Party Release is consensual with respect to the Releasing Parties. The Ballots sent to all Holders of Claims entitled to vote, the non-voting status notices sent to certain Holders of Claims and Equity Interests not entitled to vote, the Release Opt-In Form and Release Opt-Out Form sent to Holders of Claims and Equity Interests in the Non-Voting Classes, as applicable, and the Combined Hearing Notice sent to parties in interest unambiguously provided in bold letters that the Third-Party Release was contained in the Plan. Additionally, Holders of Claims or Equity Interests who elected to grant the Third-Party Release demonstrated their affirmative consent by returning or not returning, as applicable, a Release Opt-In Form, Release Opt-Out Form, or Ballot with the optional box checked to indicate that such Holder wishes to grant, or wishes not to grant, as applicable, the Third-Party Release. Such parties in interest were provided due and adequate notice of the Chapter 11 Cases, the Plan, the Third-Party Release, the opportunity to object to the Plan and the Third-Party Release contained therein, and the opportunity to opt in to, or opt out of, as applicable, the Third-Party Release, and were properly informed that Holders of Claims against or Equity Interests in the Global Debtors were being given the opportunity to opt in to, or opt out of, as applicable, the release of all Claims and Causes of Action against the Global Debtors and the Released Parties. Additionally, the Third-Party Release provisions of the Plan were conspicuous and emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, the non-voting status notices, the Release Opt-In Forms, and the Release Opt-Out Forms. Thus, the Third-Party Release is consensual under Fifth Circuit and Southern District of Texas precedent as to those Releasing Parties who opted in to, or did not opt out of, as applicable, the Third-Party Release.

39. **Exculpation**. Consistent with sections 157 and 1334(a) and (b) of title 28 of the United States Code, and sections 105(a), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code, the

Bankruptcy Court has jurisdiction and authority to approve the exculpation set forth in <u>Section 11.4</u> of the Plan (the "<u>Exculpation</u>"). The Exculpation is appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022) and *In re Highland Capital Mgmt., L.P.*, 132 F.4th 353 (5th Cir. 2025), because it is an integral part of the Plan, has been proposed in good faith, was formulated following good faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. The Exculpation is an integral part of the Global Debtors' overall restructuring efforts and is an essential element of the Plan. The evidence before the Bankruptcy Court demonstrates that the Exculpation was critical to the Exculpated Parties' willingness to support the Global Debtors' chapter 11 efforts, the Exculpated Parties would not have been so inclined to participate in the Plan process without the promise of exculpation, and such parties did so in reliance upon the protections afforded in the Exculpation. The Exculpation appropriately affords protection to the Exculpated Parties who constructively participated in and contributed to the Global Debtors' chapter 11 process consistent with their duties under the Bankruptcy Code, and it is appropriately tailored to protect the Exculpated Parties from unnecessary litigation. The Exculpation, including its carve-out for willful misconduct, actual fraud, and gross negligence, is consistent with established practice in this jurisdiction and others.

40.     **Discharge of Claims and Termination of Equity Interests**. Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise provided for in the Plan, effective as of the Effective Date, with respect to the Reorganized Global Debtors: (a) the rights afforded in the Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Global Debtors or any of their assets, property or Estates; (b) the Plan shall bind all Holders of Claims

and Equity Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and the Global Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Persons and Entities shall be precluded from asserting against the Global Debtors, the Global Debtors' Estates, the Reorganized Global Debtors, their successors and assigns and their assets and properties any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

41.     **Injunction**. Section 105(a) and sections 1123(b)(3) and (b)(6) of the Bankruptcy Code permit issuance of the injunction provisions set forth in <u>Section 11.6</u> of the Plan (collectively, the "<u>Injunction</u>"), which are within the jurisdiction of this Bankruptcy Court. The Injunction is essential to the Plan and is necessary to implement the Plan and to preserve and enforce the Global Debtor Release, the Third-Party Release (solely with respect to the Releasing Parties), and the Exculpation provisions in <u>Article XI</u> of the Plan. The Injunction is appropriately tailored to achieve those purposes and appropriate under applicable law, including *In re Highland Capital Management, L.P.*, 132 F.4th 353, 360–62 (5th Cir. 2025), and is, therefore, approved.

### iii.     Additional Plan Provisions (11 U.S.C. § 1123(b)(6)).

42.     The other discretionary provisions of the Plan, including the Plan Supplement, are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

h.      **Cure of Defaults (11 U.S.C. § 1123(d)).**

43.      <u>Article IX</u> of the Plan provides for the satisfaction of Cure Costs associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. Except to the extent that less favorable treatment has been agreed to by the non-Global Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, the Global Debtors shall pay any Cure Costs, if monetary, in full in Cash either (a) on the Effective Date or as soon as reasonably practicable thereafter, or (b) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (i) the Effective Date, or as soon as reasonably practicable thereafter, and (ii) seven (7) days after the date on which such Cure Dispute has been resolved (either consensually or by Final Order).

44.      Any Cure Disputes will be determined in accordance with the procedures set forth in <u>Article IX</u> of the Plan and applicable bankruptcy and non-bankruptcy Law. As such, the Plan provides that the Global Debtors will cure defaults with respect to assumed Executory Contracts and Unexpired Leases in accordance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

**II.      The Global Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**

45.      The Global Debtors, as Plan proponents, have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, and 1128 of the Bankruptcy Code, and Bankruptcy Rules 3017, 3018, and 3019. The Global Debtors and their agents solicited votes to accept or reject the Plan after the Bankruptcy Court entered the Conditional Disclosure Statement Order approving, among other things, the Solicitation Package and the Solicitation Procedures.

46. The Global Debtors and their agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly and in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Conditional Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Complex Case Procedures, and all other applicable rules, Laws, and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

**III.     Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).**

47. The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Global Debtors have proposed the Plan and the Restructuring Transactions (and all documents necessary to effectuate the Plan, including, without limitation, the Plan Supplement) in good faith and not by any means forbidden by Law. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the Filing of the Chapter 11 Cases, the Plan itself, the process leading to its formulation, and the transactions to be implemented pursuant thereto, including, without limitation, the Restructuring Transactions. Consistent with the overriding purpose of chapter 11, the Chapter 11 Cases were Filed, and the Plan was proposed, with the legitimate purpose of allowing the Global Debtors to maximize the value of their Estates. The Global Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, the record of the Conditional Disclosure Statement Hearing, the record of the Combined Hearing, and all the other proceedings held in the Chapter 11 Cases before the Bankruptcy Court.

48. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Global Debtors' Estates and to effectuate successful chapter 11 proceedings for the

Global Debtors. The Plan was the product of extensive negotiations conducted at arm's length among the Global Debtors and certain of their key stakeholders and parties in interest in the Chapter 11 Cases including, but not limited to, the Creditors' Committee and the Consenting DIP Term Loan Lenders.  The Global Debtors, the Creditors' Committee, and the Consenting DIP Term Loan Lenders have acted in good faith in the negotiation and prosecution of the Plan.  Further, the settlements embodied in the Plan and the Plan's exculpation, release, and injunction provisions have been negotiated in good faith and at arm's length and are consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1125(e), 1129, and 1142 of the Bankruptcy Code and applicable Fifth Circuit precedent. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

**IV.        Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

49.        Payments made or to be made by the Global Debtors for services or for costs and expenses incurred in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Bankruptcy Court as reasonable. The Plan, therefore, satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

**V.        Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**

50.        The Plan sets forth the process for appointment of the members of the New Boards, and the identities of certain members of the New Boards were disclosed in the Plan Supplement. The Plan sets forth the process for appointment of the Litigation Trustee, and the identity of the Litigation Trustee was disclosed in the Plan Supplement. The appointment to, or continuance in, office of the applicable Persons, including any officers and directors, is consistent with public

policy. Accordingly, the Global Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**VI.      No Rate Changes (11 U.S.C. § 1129(a)(6)).**

51.      The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and will not require governmental regulatory approval. Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

**VII.      Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**

52.      The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis (as defined in the Disclosure Statement and attached as Exhibit B thereto), and the other evidence related thereto, as supplemented by any evidence proffered or adduced at or prior to the Combined Hearing, (a) are reasonable, persuasive, and credible as of the dates such analysis or evidence was prepared, presented, or proffered, (b) utilize reasonable and appropriate methodologies and assumptions, (c) have not been controverted by other evidence, and (d) establish that, with respect to each Impaired Class of Claims or Equity Interests, each Holder of an Allowed Claim or Equity Interest will recover at least as much under the Plan on account of such Claim or Equity Interest, as of the Effective Date, as such Holder would receive if the Global Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

53.      Accordingly, the Global Debtors have demonstrated that the Plan is in the best interests of their creditors, and the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**VIII.    Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).**

54.    The Unimpaired Classes are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. The Voting Classes are Impaired under the Plan and, other than Class 4-G,  have each voted to accept the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has been satisfied with respect to the Unimpaired Classes and the Voting Classes, other than Class 4-G. Class 4-G is Impaired under the Plan and has voted to reject the Plan.

55.    Claims and Equity Interests in Classes 6-A, 6-B, 7 (to the extent such Class is Impaired), 8, 9, and 10 (to the extent such Class is Impaired) are Impaired under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code (the "Deemed Rejecting Classes" and, collectively with Class 4-G, the "Rejecting Classes").  Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to each of the Rejecting Classes and, thus, satisfies section 1129(b) of the Bankruptcy Code with respect to each of the Rejecting Classes, as set forth below.

**IX.    "Cram Down" Requirements (11 U.S.C. § 1129(b)).**

56.    Notwithstanding the fact that Class 4-G has voted to reject the Plan, and that the Deemed Rejecting Classes have been deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code with respect to the Global Debtors for the following reasons. *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) of the Bankruptcy Code have been satisfied. *Second*, the Plan is fair and equitable with respect to the Rejecting Classes. The Plan has been proposed in good faith, is reasonable, and meets the requirements that, with respect to each Rejecting Class, (a) no Holder of any Claim or Equity Interest that is junior to the Rejecting Class will receive or retain any

property under the Plan on account of such junior Claim or Equity Interest, and (b) no Holder of a Claim or Equity Interest in a Class senior to the Rejecting Class is receiving more than 100 percent on account of its Claim or Equity Interest. Accordingly, the Plan is fair and equitable to all Holders of Claims and Equity Interests in the Rejecting Classes. *Third*, the Plan does not discriminate unfairly with respect to the Rejecting Classes because similarly situated creditors and Equity Interest Holders will receive substantially similar treatment on account of their Claims and Equity Interests irrespective of Class. Holders of Claims in the Voting Classes voted to accept the Plan in sufficient number and in sufficient amount to constitute impaired accepting classes under the Bankruptcy Code. The Plan may therefore be confirmed with respect to the Global Debtors even though not all Impaired Classes have voted to accept the Plan.

**X.      Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code (11 U.S.C. § 1129(a)(9)).**

57.      The treatment of DIP ABL Facility Claims, DIP OpCo Claims, Administrative Expense Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims under Article III of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**XI.      Acceptance by at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10)).**

58.      The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code with respect to the Global Debtors. As set forth in the Voting Report, all Voting Classes are Impaired, and the requisite number and amount of Claims specified under the Bankruptcy Code voted to accept the Plan, as determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code).

**XII.      Feasibility of the Plan (11 U.S.C. § 1129(a)(11)).**

59.    The evidence supporting the Plan proffered or adduced at or prior to the Combined Hearing and in the applicable Confirmation Declarations and the Confirmation Brief: (a) is reasonable, persuasive, and credible as of the dates such evidence was prepared, presented, and/or proffered; (b) has not been controverted by other evidence; (c) establishes that the Plan is feasible and that Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Global Debtors; and (d) establishes that the Global Debtors or the Reorganized Global Debtors, as applicable, will have sufficient funds available to meet their obligations under the Plan. The Plan, therefore, satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**XIII.     Payment of Bankruptcy Fees (11 U.S.C. § 1129(a)(12)).**

60.    Article III of the Plan provides for the payment of all U.S. Trustee Fees due and payable by the Global Debtors pursuant to section 1930(a) of title 28 of the United States Code on the Effective Date. After the Effective Date, each of the Reorganized Global Debtors (or the Disbursing Agent acting on behalf of each of the Reorganized Global Debtors) shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable and shall File with the Bankruptcy Court (to the extent the Chapter 11 Cases have not yet been closed, dismissed, or converted) quarterly reports as required by the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

61.    The Global Debtors and the Reorganized Global Debtors shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under chapter 7 of the Bankruptcy Code of the case of that particular Global Debtor for whom the Global Debtors or the Reorganized Global Debtors, as applicable, is responsible. Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**XIV.**  **Retiree Benefits (11 U.S.C. § 1129(a)(13)).**

62.  Pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Global Debtors will continue to pay all obligations on account of "retiree benefits" (as such term is used in section 1114 of the Bankruptcy Code) on and after the Effective Date in accordance with applicable law. The Rejected SERPs and the Rejected Severance Arrangements do not constitute "retiree benefits" (as such term is used in section 1114 of the Bankruptcy Code). As a result, the requirements of section 1129(a)(13) of the Bankruptcy Code are satisfied.

**XV.**  **Non-Applicability of Certain Sections (11 U.S.C. §§ 1129(a)(14), (15), and (16)).**

63.  The Global Debtors do not owe any domestic support obligations, are not individuals, and are not nonprofit corporations. Therefore, sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.

**XVI.**  **Only One Plan (11 U.S.C. § 1129(c)).**

64.  Other than the Plan (including previous versions thereof), no other plan has been filed for the Global Debtors in the Chapter 11 Cases. The Plan, therefore, satisfies the requirements of section 1129(c) of the Bankruptcy Code.

**XVII.**  **Principal Purpose of the Plan (11 U.S.C. § 1129(d)).**

65.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**XVIII.**  **Not a Small Business Case (11 U.S.C. § 1129(e)).**

66.  The Chapter 11 Cases are not small business cases, and accordingly section 1129(e) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**Q.      Likelihood of Satisfaction of Conditions Precedent to the Effective Date**

67.      Each of the conditions precedent to the Effective Date, as set forth herein or in Section 10.2 of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Section 10.3 of the Plan.

**R.      Good-Faith Solicitation (11 U.S.C. § 1125(e))**

68.      The Global Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Global Debtors' Estates for the benefit of their stakeholders. The Plan accomplishes this goal. Accordingly, the Global Debtors, the Released Parties, and the Exculpated Parties have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation of acceptances of the Plan, their participation in the Chapter 11 Cases, and the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

**S.      Federal Rule of Evidence 502(d) Relief**

69.      Pursuant to the Plan and the Litigation Trust Agreement, on and/or after the Effective Date, the Litigation Trust will receive documents and information from the Global Debtors, the Special Restructuring Committee, the Creditors' Committee, and/or their respective counsel in connection with the Litigation Trustee's prosecution of the Litigation Trust Retained Causes of Action. Certain of these documents may be subject to attorney-client privilege, the attorney work product privilege or doctrine, and/or other privileges or immunities, and, with respect to any materials produced by the Special Restructuring Committee, the production thereof

36

shall not constitute a waiver of any such Privileges or work product protections that might exist, and the Litigation Trustee shall not argue that such a waiver has occurred based on such production, in accordance with ordered paragraph R below. Nothing in this Order shall affect the extent to which any materials were privileged, or whether such privilege was waived, prior to such production.

70.     Granting relief pursuant to Rule 502(d) of the Federal Rules of Evidence ("Federal Rule 502(d)") will aid in the expeditious and efficient production of documents and information related to the Litigation Trust Retained Causes of Action. As part of this Order, granting Federal Rule 502(d) relief will limit further expenditure of time and resources by the Bankruptcy Court, the Global Debtors, the Reorganized Global Debtors, the Litigation Trustee, and other interested parties.

## T.     Implementation

71.     The Plan and all documents contained in the Plan Supplement and all other relevant and necessary documents have been negotiated in good faith and at arm's length, are fair and reasonable, are supported by reasonably equivalent value and fair consideration, are in the best interests of the Global Debtors, their Estates, and the Reorganized Global Debtors, as applicable, and shall, upon completion of documentation and execution in accordance with the terms and conditions of the Plan, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local Law. The documents and agreements are essential elements of the Plan, and the Global Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements. The Global Debtors and the Reorganized Global Debtors, as applicable, are authorized, without any further notice to or action, order, or approval of the

37

Bankruptcy Court, to finalize, execute, and deliver all agreements, documents, instruments, and certificates relating thereto and perform their obligations thereunder in accordance with the Plan.

## ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

**A.     Findings of Fact and Conclusions of Law**

72.     The above-referenced findings of fact and conclusions of Law are hereby incorporated by reference as though fully set forth in this Order and constitute findings of fact and conclusions of Law pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014. To the extent that any finding of fact is determined to be a conclusion of Law, it is deemed so, and vice versa.

**B.     Approval of the Disclosure Statement**

73.     The Disclosure Statement is approved on a final basis as containing adequate information pursuant to section 1125 of the Bankruptcy Code and sufficient information of a kind necessary to satisfy the disclosure requirements of any applicable non-bankruptcy Laws, rules, and regulations.

**C.     Confirmation of the Plan**

74.     The Plan, attached hereto as Exhibit A, including all exhibits thereto, shall be, and hereby is, confirmed under section 1129 of the Bankruptcy Code. The Global Debtors are authorized to enter into and execute all documents and agreements related to the Plan (including all exhibits and attachments thereto and documents referred to therein, including the Plan Supplement), and the execution, delivery, and performance thereafter by the Reorganized Global Debtors and the Litigation Trustee, as applicable, are hereby approved and authorized. The Global Debtors, the Reorganized Global Debtors, and the Litigation Trustee, as applicable, are authorized

to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan, including, without limitation, entry into any agreements contained in the Plan Supplement, as applicable, as may be modified by the Global Debtors in their business judgment subject to the terms and conditions of the Plan (including the consent rights contained therein). The terms of the Plan (including the Plan Supplement) shall be effective and binding as of the Effective Date.

75.     The failure to include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document, agreement, or exhibit does not impair the effectiveness of that article, section, or provision; it being the intent of the Bankruptcy Court that the Plan, the Plan Supplement, and any related document, agreement, or exhibit are approved in their entirety.

**D.     Objections Overruled**

76.     To the extent that any objections (including any reservations of rights, joinders, or statements contained therein) to final approval of the Disclosure Statement or Confirmation have not been withdrawn, waived, or settled before entry of this Order, are not cured by the relief granted in this Order, or have not been otherwise resolved as stated on the record of the Combined Hearing, all such objections (including any reservation of rights, joinders, or statements contained therein), except with respect to unresolved Cure Disputes and objections to the assumption or rejection of Executory Contracts and Unexpired Leases, if any, are hereby overruled in their entirety and on the merits in all respects.

77.     All objections to final approval of the Disclosure Statement or Confirmation not Filed and served prior to the objection deadline set forth in the Combined Hearing Notice or other

notices Filed with the Bankruptcy Court (in each case, as may have been extended by the applicable Global Debtors), if any, are deemed waived and shall not be considered by the Bankruptcy Court.

### E.      Solicitation

78.      The solicitation of votes on the Plan complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures and was appropriate and satisfactory and is approved in all respects.

### F.      Means for Implementation of the Plan

79.      The provisions governing the means for implementation of the Plan set forth in Article VI of the Plan shall be, and hereby are, approved in their entirety. The Global Debtors are authorized to take all actions reasonably necessary to implement the Plan on the terms set forth in Article VI. Upon the Effective Date, the Global Debtors or the Reorganized Global Debtors, as applicable, are authorized to make the payments or other distributions set forth in Article III and Article V of the Plan.

### G.      Incorporation by Reference

80.      The terms of the Plan, the Plan Supplement, all exhibits thereto, this Order, the Definitive Documents, and all other relevant and necessary documents constitute essential elements of the Plan and shall, on and after the Effective Date, be binding in all respects upon, and shall inure to the benefit of, the Global Debtors, their Estates and their creditors and equity holders, and their respective successors and assigns, non-Global Debtor Affiliates, any affected third parties, all Holders of Equity Interests, all Holders of any Claims, whether known or unknown, including, but not limited to, all contract counterparties, leaseholders, Governmental Units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar Entities for the

Global Debtors, if any, subsequently appointed in any of the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Chapter 11 Cases, and each of their respective Affiliates, successors, and assigns.

**H.      The Releases, Injunction, Exculpation, and Related Provisions Under the Plan**

81.      The release, exculpation, injunction, and related provisions set forth in Article XI of the Plan are incorporated herein in their entirety, are hereby approved and authorized in their entirety, are so ordered, and shall be immediately effective and binding upon the Effective Date without further action or notice by this Bankruptcy Court, any of the parties subject to such provisions, or any other party, including, but not limited to:

a.      **Releases by the Global Debtors**. The Global Debtor Release provisions set forth in Section 11.2 of the Plan are hereby approved.

b.      **Third-Party Releases**. The Third-Party Release provisions set forth in Section 11.3 of the Plan are hereby approved.[4]

c.      **Exculpation**. The Exculpation provisions set forth in Section 11.4 of the Plan are hereby approved.

d.      **Discharge of Claims and Termination of Equity Interests**. The discharge and termination provisions set forth in Section 11.5 of the Plan are hereby approved.

e.      **Injunction**. The Injunction provisions set forth in Section 11.6 of the Plan are hereby approved.

f.      **Setoffs and Recoupment**. The setoff and recoupment provisions set forth in Section 11.7 of the Plan are hereby approved.

g.      **Release of Liens**. The provisions releasing Liens set forth in Section 11.10 of the Plan are hereby approved.

h.      **Avoidance Action Waiver**. The avoidance action release and waiver provisions set forth in Section 6.8(l) of the Plan are hereby approved.

---

[4]   Notwithstanding anything contrary herein, or in the Plan, any Related Parties of funds and accounts managed by BlackRock Financial Management, Inc. or its affiliates that are DIP Lenders (the "BlackRock Consenting Creditors") (including any separate branch, trading desk, fund and/or business group of a BlackRock Consenting Creditor) shall not be deemed to be Releasing Parties themselves, unless such Related Party is itself a DIP Lender.

82. Notwithstanding anything contained herein or the other Plan Documents and for the avoidance of doubt, Franz-Ferdinand Buerstedde, Steven Langman, and Dan Teper are Excluded Parties and are not Released Parties in any capacity.

**I.     Classifications of Claims and Equity Interests**

83. The terms of the Plan shall govern the classification of Claims and Equity Interests for purposes of the distributions to be made thereunder. The classifications set forth on the Ballots tendered to or returned by the Holders of Claims or Equity Interests in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Equity Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Equity Interest as representing the actual classification of such Claim or Equity Interest under the Plan for distribution purposes; and (d) shall not be binding on the Global Debtors except for voting purposes.

**J.     Plan Supplement**

84. The documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements introduced into evidence by the Global Debtors at the Combined Hearing (including all exhibits and attachments thereto and documents referred to in the Plan Supplement), and the execution, delivery, and performance thereof by the Global Debtors, the Reorganized Global Debtors, the Litigation Trustee, and their successors are authorized when they are finalized, executed, and delivered. Without further order or authorization of this Bankruptcy Court, the Global Debtors, the Reorganized Global Debtors, the Litigation Trustee, and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement

that are consistent with the Plan and this Order. Execution versions of the documents comprising or contemplated by the Plan Supplement shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create all mortgages, Liens, deeds of trust, pledges, and security interests purported to be created thereby to the extent set forth in this Order.

## K.      Restructuring Transactions

85.      Before, on, and after the Effective Date, the applicable Global Debtors or the Reorganized Global Debtors, as applicable, may, consistent with the terms of the Restructuring Support Agreement, enter into any transaction and take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including any transactions described in, approved by, contemplated by, or necessary to effectuate the Plan), that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable: (a) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, migration, consolidation, or other Organizational Documents with the appropriate governmental authorities pursuant to applicable Law; (d) the execution, delivery, and Filing, if applicable, of the New Organizational Documents, the New Exit Debt Facilities Documents, and the Exit ABL Facility Documents; (e) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations,

dissolutions, or liquidations; and (f) all other actions that the applicable Global Debtors or the Reorganized Global Debtors reasonably determine, in consultation with the Required Consenting DIP Term Loan Lenders, are necessary or appropriate, including making filings or recordings that may be required by applicable Law.

86.     Notwithstanding the DIP OpCo Claims Distribution or anything to the contrary in the Plan, the Take Back Term Loans (if any) and the Take Back Preferred Units shall be distributed directly to holders of First Out DIP Term Loan Facility Claims, Second Out DIP Term Loan Facility Claims, and Third Out DIP Term Loan Facility Claims in accordance with Section 5.3, Section 5.4, and Section 5.5 of the Plan, as applicable, and the Restructuring Steps Plan.

87.     The Global Debtors and the Reorganized Global Debtors, as applicable, are authorized to effectuate the DIP Conversion on the Effective Date in accordance with the Plan. The DIP Conversion shall occur upon the receipt of all necessary consents and votes in favor, including to the extent required under the Restructuring Support Agreement. Upon the DIP Conversion, the DIP Term Loan Claims shall convert into Take Back Term Loans (if any), Take Back Preferred Units, or New Saks Common Stock in accordance with the Plan.

**L.     Continued Corporate Existence of Certain Global Debtors; Vesting of Assets; Dissolution of Certain Global Debtors**

88.     Except as otherwise provided in the Plan or as otherwise may be agreed between the Global Debtors and the Required Consenting DIP Term Loan Lenders, each of the Global Debtors, as Reorganized Global Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable Laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or

terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.

89.     On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Global Debtor, each of the Reorganized Global Debtors may take such action as permitted by applicable Law and such Reorganized Global Debtor's New Organizational Documents, and may take all actions as may be necessary or appropriate to effectuate the Plan, as such Reorganized Global Debtor may determine is reasonable and appropriate, including, but not limited to, causing: (a) a Reorganized Global Debtor to be merged with and into another Reorganized Global Debtor, or a subsidiary and/or Affiliate of a Reorganized Global Debtor; (b) a Reorganized Global Debtor to be dissolved; (c) the conversion of a Reorganized Global Debtor from one Entity type to another Entity type; (d) the legal name of a Reorganized Global Debtor to be changed; (e) the closure of a Reorganized Global Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of a Reorganized Global Debtor under the Laws of jurisdictions other than the Law under which the Global Debtor currently is incorporated. In addition to the foregoing, on or after the Effective Date, the Reorganized Global Debtors shall: (w) maintain the books and records and accounts of the Global Debtors; (x) administer each Global Debtor's tax obligations (including (A) filing tax returns and paying tax obligations, (B) requesting, if necessary, an expedited determination of any unpaid tax liability of each Global Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of such Global Debtor ending after the Petition Date through the liquidation of such Global Debtor as determined under applicable tax Laws, and (C) representing the interest and account of each Global Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit); (y) prepare and file any and all

informational returns, reports, statements, returns or disclosures relating to the Global Debtors that are required hereunder, by any Governmental Unit or applicable law; and (z) pay statutory fees in accordance with the Plan.

90.     Notwithstanding anything in the Plan, this Order, or any organizational or governing document of HBS Global Properties LLC to the contrary, on the Effective Date or as soon as reasonably practicable thereafter at the Global Debtors' discretion, each of the Global Debtors that holds an equity or membership interest in HBS Global Properties LLC hereby forfeits, disclaims, and relinquishes any and all equity interests, membership interests, and associated rights in HBS Global Properties LLC (collectively, the "Disclaimed Interests"). The Disclaimed Interests shall not vest in the Reorganized Global Debtors and shall be deemed cancelled and of no further force or effect as of such date, without the need for any further action by the Global Debtors, the Reorganized Global Debtors, or HBS Global Properties LLC.  For the avoidance of doubt, from and after such date, the Reorganized Global Debtors shall have no further rights, interests, obligations, or liabilities arising from or related to the Disclaimed Interests or membership in HBS Global Properties LLC.  All parties' rights with respect to any timely filed claims by HBS Global Properties LLC against the Global Debtors are reserved.

91.     Except as otherwise provided in the Plan, this Order, or any agreement, instrument, or other document incorporated herein (including the Committee Settlement Term Sheet and the Litigation Trust Documents), on the Effective Date, all property of the Estates, wherever located, including any property, wherever located, acquired by the Global Debtors under or in connection with the Plan, except the Disclaimed Interests, shall vest in the applicable Reorganized Global Debtor, free and clear of all Claims, Liens, charges, other encumbrances and Equity Interests, other

46

than the Charging Liens and the Liens securing the obligations under the Exit ABL Facility and New Exit Debt Facilities, respectively.

92.     On and after the Effective Date, except as otherwise provided in the Plan or in this Order, each applicable Reorganized Global Debtor may operate its business(es) and may use, acquire and dispose of property, wherever located, and each Reorganized Global Debtor, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims, but excluding the Litigation Trust Retained Causes of Action and General Unsecured Claims) or Equity Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

**M.     Sources for Cash Distributions under the Plan**

93.     The Global Debtors shall fund Cash distributions under the Plan with Cash on hand, including Cash from operations and the proceeds of the DIP Facilities, the Exit ABL Facility, and the New Exit Debt Facilities. Cash payments to be made pursuant to the Plan will be made by the Reorganized Global Debtors or the Disbursing Agent in accordance with Article VII of the Plan.

94.     From and after the Effective Date, subject to any applicable limitations set forth in any agreement entered into on or after the Effective Date (including, without limitation, the New Organizational Documents, the New Exit Debt Facilities Documents, and the Exit ABL Facility Documents), the Reorganized Global Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of managers or directors (or other applicable governing bodies), as applicable, of the applicable Reorganized Global Debtors deem appropriate.

**N.      Exit ABL Facility**

95.      Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit ABL Facility and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit ABL Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the Exit ABL Facility. The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the Exit ABL Facility Documents, necessary or appropriate to incur loans under the Exit ABL Facility without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the Exit ABL Parties may mutually agree to be necessary to consummate the Exit ABL Facility.

96.      On the Effective Date, the agreements with respect to the Exit ABL Facility shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit ABL Facility are being extended, and shall be deemed to have been extended, in good faith, following arm's length negotiations, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law.

97.     On the Effective Date, all of the Liens and security interests to be granted in connection with the Exit ABL Facility (a) shall be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the Exit ABL Facility, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under or in connection with the Exit ABL Facility, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law. The Reorganized Global Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of the Plan and this Order (it being understood that perfection shall occur automatically by virtue of the entry of this Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

**O.     New Exit Debt Facilities**

98.     On the Effective Date, the New Exit Debt Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, and enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Exit Debt Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to

avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. The Reorganized Global Debtors are authorized to conduct the New Capital Syndication on terms acceptable to the New Capital Commitment Parties, and to execute, deliver, and perform any New Capital Syndication Documents in connection therewith, in each case without further notice to or order of the Bankruptcy Court.

99.     On the Effective Date, the agreements with respect to the New Exit Debt Facilities shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Exit Debt Facilities are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. On the Effective Date, all of the Liens and security interests to be granted in connection with the New Exit Debt Facilities (a) shall be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the New Exit Debt Facilities, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under or in connection with the New Exit Debt Facilities, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable

50

non-bankruptcy Law. The Reorganized Global Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of the Plan and this Order (it being understood that perfection shall occur automatically by virtue of the entry of this Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

100.    On the Effective Date, the agreements with respect to the Take Back Preferred Equity Facility (including the Take Back Preferred Equity Facilities Documents) shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Take Back Preferred Equity Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. The Take Back Preferred Units shall be issued and distributed in accordance with the terms of the Plan free and clear of all Liens, Claims, and other Interests. All of the Take Back Preferred Units issued pursuant to the Plan shall be duly authorized and validly issued.

## P.      Reorganized Global Debtors' Ownership

101.    On the Effective Date, in accordance with the terms of the Plan, New Saks shall issue and deliver all of the New Saks Common Stock and Take Back Preferred Units pursuant to the terms and conditions of the Plan, this Order, the Restructuring Steps Plan, and the New Organizational Documents. The issuance of New Saks Common Stock and Take Back Preferred Units pursuant to the Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Equity Interest, and all of the New Saks Common Stock and Take Back Preferred Units issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

102.    Any Holder of an Allowed Claim receiving New Saks Common Stock and Take Back Preferred Units pursuant to the terms and conditions of the Plan may designate that all or a portion of such Holder's *pro rata* share of the New Saks Common Stock and Take Back Preferred Units be registered in the name of, and delivered to, its designee by delivering notice thereof to the Global Debtors and/or by the designee delivering notice thereof to the Claims Agent in accordance with such other procedures for such designations and/or delivery that the Global Debtors or the Reorganized Global Debtors, as applicable, may establish in accordance with the Plan. Any such designee shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

## Q.      Litigation Trust

103.    The Litigation Trust Agreement and the provisions regarding the Litigation Trust, the Litigation Trustee, the Litigation Trust Committee, the Litigation Trust Allocation, the Litigation Trust Funding, and all other provisions related to the Litigation Trust set forth in the

Litigation Trust Agreement and the Plan, including in Section 6.8 of the Plan, are hereby approved in their entirety.

104. On the Effective Date, the Global Debtors shall execute the Litigation Trust Documents and take all steps reasonably necessary to establish the Litigation Trust in accordance with the terms of the Plan and the Committee Settlement Term Sheet and for the benefit of the Litigation Trust Beneficiaries. The Global Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title and interest in the Litigation Trust Assets, subject to Section 6.8(f) of the Plan. Pursuant to section 1141 of the Bankruptcy Code, such Litigation Trust Assets (including the Litigation Trust Initial Funding Amount, if any) shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests, and shall become assets of the Litigation Trust for all purposes. The act of transferring the Litigation Trust Assets to the Litigation Trust shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Litigation Trust as if the asset or right was still held by the Global Debtors. The Litigation Trust Assets shall include Litigation Trust Retained Causes of Action held by or assertable by any Global Debtor, in each case to the extent set forth in the Plan and the Schedule of Retained Causes of Action.

105. The Litigation Trust Initial Funding Amount (if any) and the Litigation Trust MOIC (if any) are approved, and the Reorganized Global Debtors are authorized to provide the Litigation Trust Initial Funding Amount in accordance with the Plan and this Order. At least two (2) Business Days prior to the Effective Date, the Litigation Trustee may make an election to not receive the Litigation Trust Initial Funding Amount (the "Litigation Trust Initial Funding Election"), after consulting with the Global Debtors and with the prior written consent of the Required Consenting

DIP Term Loan Lenders and the Creditors' Committee, by written notice to the Global Debtors. Absent such election, but subject to the terms of the Litigation Trust Documents, the Reorganized Global Debtors shall fund the Litigation Trust Initial Funding Amount to the Litigation Trust on the Effective Date, which shall automatically and irrevocably vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests. The Litigation Trust Initial Funding Amount shall be used for the administration of the Litigation Trust, to pay the Litigation Trust Fees and Expenses, and to pursue the Litigation Trust Retained Causes of Action, with any excess amount being used to make distributions to Litigation Trust Beneficiaries, as set forth in the Litigation Trust Documents. Neither the Global Debtors nor the Reorganized Global Debtors shall have any obligation to fund the Litigation Trust in excess of the Litigation Trust Initial Funding Amount, and neither the Ad Hoc Group, the DIP Secured Parties, the New Capital Commitment Parties, nor the Prepetition Secured Parties (as defined in the Final DIP Order) shall have any obligation to provide any funding to the Litigation Trust. Subject to the terms of the Litigation Trust Documents, the Plan, and the Committee Settlement Term Sheet, and with the unanimous consent of the Litigation Trust Committee, the Litigation Trustee shall be entitled to enter into Litigation Funding Agreements. Subject to the foregoing, the Litigation Trustee may enter into Litigation Funding Agreements without further notice to or action, order, or approval by the Bankruptcy Court.

106. The Litigation Trustee shall be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b), as well as the sole representative of the Estates appointed pursuant to section 1123(b)(3) of the Bankruptcy Code and shall have all powers, authority, and responsibilities specified in the Plan and Litigation Trust Documents, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code. The (a) establishment,

purpose, and administration of the Litigation Trust, and (b) appointment, rights, and powers, of the Litigation Trustee, shall be governed by the Litigation Trust Documents. On and after the Effective Date, the Litigation Trustee shall be authorized, in accordance with the terms of the Plan and the Litigation Trust Documents, to take such actions as may be necessary or desirable to make any distributions on account of any Litigation Trust Assets, in accordance with the Litigation Trust Documents and the Litigation Trust Allocation.

107.    To the extent necessary and in furtherance of the Litigation Trustee's duties, and solely with respect to the Litigation Trust Assets, following the Effective Date, the Litigation Trustee shall be deemed to be a judicial substitute for the Reorganized Global Debtors as the party in interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Global Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code. Subject to the terms of the Litigation Trust Documents and the Committee Settlement, the Litigation Trust shall have sole authority to investigate, prosecute, settle, or abandon the Litigation Trust Retained Causes of Action. In pursuing any claim, right, or Litigation Trust Retained Cause of Action, the Litigation Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code and shall succeed to the Global Debtors' rights with respect to the time periods in which a Cause of Action may be brought under the Bankruptcy Code.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Litigation Trust Retained Causes of Action.  Moreover, any Holder of a Claim that timely filed a Proof of Claim is not required, under section 108 of the Bankruptcy Code or applicable Law, to commence or continue any action in a non-bankruptcy forum in order to further toll or satisfy any limitations period with respect to any such Holder's Claim that had not expired prior to the Petition

55

Date.  With respect to any claim, right, or Litigation Trust Retained Cause of Action, the Litigation Trust shall also succeed to and be vested with all rights, powers, interests, standing, and authority of the Creditors' Committee relating to any discovery pending as of the Effective Date.

108.    All claims and Causes of Action identified on the Schedule of Retained Causes of Action are expressly preserved and shall not be released, discharged, exculpated, enjoined, or otherwise impaired by the Plan, this Order, or any other Plan Document.

109.    Subject to the HoldCo II Adjustment Factor (defined below), Litigation Trust Class B Interests shall be issued to eligible Litigation Trust Beneficiaries at a ratio of one (1) Litigation Trust Interest for each $1.00 of their Allowed Claims.   Notwithstanding the foregoing, Litigation Trust Class B Interests issued to Holders of Allowed Class 5-C HoldCo II Go-Forward Trade Claims and Allowed Class 5-D HoldCo II General Unsecured Claims (collectively, "Allowed HoldCo II Claims") shall be issued at a ratio of two (2) Litigation Trust Class B Interests for each $1.00 of such Allowed HoldCo II Claims (the "HoldCo II Adjustment Factor").  The amount of any Allowed General Unsecured Claim excluding the portion of Allowed HoldCo II Claims (such amount, the "Non-HoldCo II Portion") shall be issued at a ratio of one (1) Litigation Trust Class B Interest for each $1.00 of such Non-HoldCo II Portion.  For example, if a Class B Beneficiary holds a $100 Allowed General Unsecured Claim based on a $40 Allowed Class 5-D HoldCo II General Unsecured Claim and a $60 Allowed Class 4-D OpCo General Unsecured Claim, then the effective aggregate amount of such General Unsecured Claim for purposes of determining such Class B Beneficiary's entitlement to Litigation Trust Class B Interests shall be $140 ($40 times two per the HoldCo II Adjustment Factor, plus $60) and shall thus receive 140 Litigation Trust Class B Interests.

110.    Beneficial interests in the Litigation Trust, and any right to receive a distribution from the Litigation Trust, shall not be evidenced by any certificate, security, receipt, or any other form or manner whatsoever, except as maintained on the books and records of the Litigation Trust by the Litigation Trustee.  Litigation Trust Class A-1 Interests shall be transferable and assignable during the term of the Litigation Trust Agreement solely to the extent that such transfer or assignment would not require registration under the Securities Act; *provided* that any transfer by will, intestate succession, or operation of Law shall be permitted regardless of such restriction. Litigation Trust Class A-2 Interests, Litigation Trust Class A-3 Interests, Litigation Trust Class A-4 Interests, and Litigation Trust Class B Interests shall be non-transferable and non-assignable during the term of this Agreement except by will, intestate succession, or operation of Law.  In addition, the Litigation Trust Interests and the rights of the Beneficiaries arising under the Litigation Trust Agreement shall not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such interests constitute "securities," the Global Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code shall be deemed satisfied and the offer, issuance and distribution under the Plan of the beneficial interests in the Litigation Trust shall be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities Laws and regulations.

**R.    Federal Rule of Evidence 502(d) Relief**

111.    Pursuant to Federal Rule 502(d), the production or transfer of any document or information by any party (including, but not limited to, the Global Debtors, the Special Restructuring Committee, the Creditors' Committee, and their respective counsel) to the Litigation Trust shall not constitute or be deemed a waiver or forfeiture of any claim of attorney-client

57

privilege, work product protection, or any other applicable privilege or protection, either in these Chapter 11 Cases or any other proceeding.

112. Any documents and information produced to the Litigation Trust may be used in these Chapter 11 Cases or any other federal or state proceedings, subject to the holder of any privilege asserting such privilege and clawing the applicable documents back, pursuant to Federal Rule 502(d), and subject to the Plan and the Litigation Trust Agreement.

113. This Order shall be interpreted to provide the greatest protection allowed by Federal Rule 502, or otherwise permitted by law.

114. The provisions of this Order regarding relief pursuant to Federal Rule 502(d) shall survive the occurrence of the Effective Date and entry of a final decree by the Bankruptcy Court closing these Chapter 11 Cases pursuant to Bankruptcy Rule 3022 for any documentation or material produced to the Litigation Trust by any party. Neither the occurrence of the Effective Date nor entry of the final decree by the Bankruptcy Court closing the Chapter 11 Cases shall relieve counsel or other persons obligated hereunder from their responsibilities and obligations pursuant to this Order.

115. Nothing in this Order granting relief pursuant to Federal Rule 502(d) shall otherwise affect the Global Debtors', the Reorganized Global Debtors', or the Litigation Trust's rights or obligations under applicable Law.

**S.      Exemption from Registration Requirements**

116. To the fullest extent permitted by section 1145(a) of the Bankruptcy Code, the offering, issuance, and distribution of any securities, including the New Saks Common Stock and Take Back Preferred Units, in exchange for Claims pursuant to Article III or Article V of the Plan, shall be exempt from, among other things, the registration requirements of the Securities Act and

any other applicable U.S. state or local Laws requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code (except with respect to an Entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code). Except as otherwise provided in the Plan or the governing certificates or instruments, any and all such New Saks Common Stock and Take Back Preferred Units so issued under the Plan (a) will not be "restricted securities" (as defined under the Securities Act) and (b) will be freely tradable and transferable under the Securities Act by the recipients thereof that are not, and have not been within ninety (90) days of such transfer, an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Global Debtors or the Reorganized Global Debtors, in each case, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (ii) compliance with applicable securities Laws and any rules and regulations, including those of the SEC or U.S. state or local securities Laws, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) any restrictions in the New Organizational Documents.

117.    Notwithstanding anything to the contrary in any Plan Document or the Restructuring Support Agreement, no Entity (including DTC, ClearPar, or any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether issuance of the New Saks Common Stock and Take Back Preferred Units is exempt from registration and/or eligible for book-entry delivery, settlement, and depository (to the extent applicable). Any transfers of assets or Equity Interests effected (including with respect to the New Saks Common Stock and Take Back Preferred Units), or any obligations incurred through the Restructuring Transactions, are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

**T.     Organizational Documents**

118.     The Reorganized Global Debtors shall enter into such agreements and/or amend their Organizational Documents to the extent necessary to implement the terms and provisions of the Plan and the Bankruptcy Code, which shall: (a) contain terms consistent with the Plan Supplement; and (b) authorize the issuance, distribution, and reservation of the New Saks Common Stock and Take Back Preferred Units to the Entities entitled to receive such issuances, distributions, and reservations, as applicable under the Plan. The New Organizational Documents will be deemed to be modified to prohibit (to the extent they do not already include a provision prohibiting) the issuance of non-voting equity securities, pursuant to and solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Global Debtors shall be governed by the New Organizational Documents applicable to such Reorganized Global Debtor. On or immediately before the Effective Date, each Global Debtor and each Reorganized Global Debtor, as applicable, will file its respective New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable Laws of its state of incorporation or formation, to the extent required under the Plan or applicable non-bankruptcy Law for such New Organizational Documents to become effective. After the Effective Date, the Reorganized Global Debtors may amend and restate the formation, incorporation, organizational, and constituent documents (including, without limitation, any Organizational Documents), as applicable, as permitted by the Laws of their respective jurisdiction of formation or incorporation, as applicable, and the terms of such documents.

119.     Any Entity's or Person's receipt of New Saks Common Stock and Take Back Preferred Units under, or as contemplated by, the Plan shall be deemed as its agreement to the

applicable New Organizational Documents for New Saks, and such Entities and Persons shall be deemed signatories to the applicable New Organizational Documents for New Saks without further action required on their part (solely in their capacity as members of New Saks). The New Organizational Documents for New Saks will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with their terms, and each recipient of New Saks Common Stock and Take Back Preferred Units, as applicable, will be bound thereby in all respects even if such recipient has not actually executed and delivered a counterpart thereof.

**U.      Indemnification Provisions in Organizational Documents**

120.    On and as of the Effective Date, all indemnification obligations of the Global Debtors that were in place as of the Petition Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such persons than the indemnification provisions in place prior to the Restructuring Transactions; *provided* that, with respect to former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable, such indemnification provisions shall be reinstated solely to the extent necessary to access D&O Liability Insurance Policies, and the Reorganized Global Debtors shall have no out-of-pocket liability for any such indemnification obligations owed to former directors, officers, managers,

61

independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable; *provided further,* that, the Global Debtors shall have no liability for any indemnification obligations arising on or after the Petition Date that are or may be owed to any party that is an Excluded Party. On the Effective Date, each applicable Reorganized Global Debtor shall be deemed to have assumed all unexpired D&O Liability Insurance Policies.

## V. Exemption from Certain Transfer Taxes and Recording Fees

121. To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer (or deemed transfer) pursuant to or in connection with the Plan, including: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Global Debtors, the Reorganized Global Debtors, or any direct or indirect subsidiary of the foregoing (whether or not such subsidiary itself is a Global Debtor), including, without limitation, the New Saks Common Stock, the Take Back Preferred Units, the Exit ABL Facility, and the New Exit Debt Facilities; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral under the Exit ABL Facility Documents and the New Exit Debt Facilities Documents, as applicable; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall constitute a "transfer under the plan" and shall not be subject to any U.S. federal, state or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax (including as a

result of a transfer of an economic interest), mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and this Order shall direct the appropriate U.S. federal, state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

## W.      Cancellation of Securities and Agreements

122.    The provisions of the Plan regarding the cancellation of existing securities and agreements, including Section 6.14 of the Plan, are hereby approved in their entirety. For the avoidance of doubt, except as may otherwise be agreed to by the Global Debtors (or the Reorganized Global Debtors) and the Required Consenting DIP Term Loan Lenders, the following agreements are hereby cancelled and the Global Debtors' obligations thereunder are discharged in their entirety, in accordance with Section 6.14 of the Plan: (a) that certain Guaranty Agreement, dated as of December 3, 2014 by Global Debtor Saks & Company for the benefit of the Lender thereunder, and (b) that certain Guaranty Agreement, dated as of December 30, 2022 by SFA Holdings Inc., for the benefit of the Lender thereunder.

## X.      Boards; Management

123.    Subject to the terms of the Restructuring Support Agreement, this Order, and the applicable New Organizational Documents, on the Effective Date, the New Boards shall be established and new members of the New Boards appointed. The initial members of the New

Boards shall consist of those individuals identified in the Plan Supplement. Unless reappointed, the members of the Boards of the Global Debtors prior to the Effective Date shall have no continuing obligations to any of the Reorganized Global Debtors on and after the Effective Date, and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Global Debtor on the Effective Date. Commencing on the Effective Date, the members of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Global Debtor, as applicable, and may be replaced or removed in accordance therewith, as applicable.

**Y.      Change of Control Provisions**

124.     Any change of control provision in (a) any Executory Contract or Unexpired Lease shall be unenforceable in connection with (i) assumption of such Executory Contract or Unexpired Lease and (ii) the Restructuring Transactions, to the extent that any change of control provision would be triggered by the assumption of such Executory Contract or Unexpired Lease or the consummation of any Restructuring Transaction, and (b) any contract, agreement, or other document of the Global Debtors, including any Executory Contract or Unexpired Lease assumed by the Global Debtors shall be deemed modified in accordance with section 365 of the Bankruptcy Code such that assumption of such agreement and consummation of the transactions contemplated by the Plan, including, without limitation, the Restructuring Transactions, shall not (either alone or in combination with any other condition, event, circumstance or occurrence) (i) be prohibited, restricted, or conditioned on account of such provision or require any consent thereunder, (ii) breach or result in the modification or termination of such Executory Contract or Unexpired Lease, as applicable, (iii) result in any penalty or other fees or payments, accelerated or increased obligations, renewal or extension conditions, or any other entitlement in favor of such non-Global

Debtor party thereunder, including any penalty or other fees or payments, accelerated or increased obligations, renewal or extension conditions that are triggered upon or after the occurrence of (either alone or in combination with any other condition, event, circumstance or occurrence) a change of control (or term with similar effect), or (iv) entitle the non-Global Debtor party thereto to do or impose any of the foregoing or otherwise exercise any other default-related rights or remedies with respect thereto.

125.     Any Executory Contract or Unexpired Lease assumed pursuant to the Plan or otherwise may not be terminated on account of such assumption or on account of the Plan, the transactions (including, without limitation, the Restructuring Transactions) contemplated therein, or any change of control or ownership interest composition or entity conversion that may occur at any time before, on, or in connection with the Effective Date. The Reorganized Global Debtors may rely on the Plan and this Order as a complete defense to any action by a party to an assumed Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease on account of such assumption or on account of the Plan, the transactions (including, without limitation, the Restructuring Transactions) contemplated herein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date. Each Executory Contract or Unexpired Lease (including any amendments thereto entered into after the Petition Date and prior to the Effective Date) assumed pursuant to Article IX of the Plan shall revest in and be fully enforceable by the Reorganized Global Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

**Z.      D&O Liability Insurance Policies**

126.    On the Effective Date, the Global Debtors or Reorganized Global Debtors, as applicable, shall be deemed to have assumed all of the Global Debtors' D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, which "tail policy" shall not be otherwise terminated or reduced) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that any indemnity obligations that would otherwise be assumed by the foregoing assumption of the D&O Liability Insurance Policies shall be governed as provided elsewhere in the Plan and shall not be deemed to be assumed by the assumption of such D&O Liability Insurance Policies; *provided*, *further*, that all of the D&O Liability Insurance Policies (including any "tail policy") in effect as of the Confirmation Date shall remain in full force and effect for their entire term and shall not be cancelled (notwithstanding, for the avoidance of doubt, the dissolution of any Global Debtor or the Litigation Trust), subject to and in accordance with the Plan. The Global Debtors and the Reorganized Global Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the Global Debtors or Reorganized Global Debtors, as applicable, may deem necessary and with the consent of the Required Consenting DIP Term Loan Lenders.

127.    Solely as it relates to the Litigation Trust Retained Causes of Action, the Litigation Trust shall be responsible for monitoring and preserving the ability to maintain claims against the D&O Liability Insurance Policies in effect on or prior to the Effective Date. To the extent the Global Debtors are not the first named insured under any D&O Liability Insurance Policy and notwithstanding Confirmation of the Plan or the occurrence of the Effective Date (a) nothing

herein shall constitute a rejection of such D&O Liability Insurance Policy, (b) such D&O Liability Insurance Policy shall remain in full force and effect, and (c) any and all rights of the Global Debtors under such D&O Liability Insurance Policy shall remain in full force and effect. Solely as it relates to the Litigation Trust Retained Causes of Action, the Litigation Trust shall retain all rights of the applicable Global Debtors (or Reorganized Global Debtors, as applicable) to assert claims against the D&O Liability Insurance Policies and/or to recover the proceeds thereof, and the dissolution of the Global Debtors or Reorganized Global Debtors, if any, shall have no impact upon the rights of the Litigation Trust to assert claims against the D&O Liability Insurance Policies or to recover the proceeds thereof.

128.    Entry of this Order constitutes the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies (including any "tail policy") subject to and on the terms set forth in the Plan and this Order.

**AA.    Other Insurance Policies**

129.    Each of the Global Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (a) the Global Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Global Debtors.

**BB.    Corporate Action**

130.    On the Effective Date, the New Organizational Documents and any other applicable amended and restated corporate Organizational Documents of each of the Reorganized Global Debtors and New Saks, the New Exit Debt Facilities Documents and the Exit ABL Facility

Documents shall be deemed authorized in all respects. On the Effective Date, all actions contemplated by the Plan and the Restructuring Transactions shall be deemed authorized and approved in all respects, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.

131.   Any action under the Plan to be taken by or required of the Global Debtors, the Reorganized Global Debtors, or New Saks, as applicable, including the adoption or amendment of certificates of formation, incorporation, and bylaws, the issuance of securities and instruments, or the selection of officers or directors shall be authorized and approved in all respects, without any requirement of further action by any of the Global Debtors', the Reorganized Global Debtors', or New Saks' equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

132.   On or (as applicable) before the Effective Date, the appropriate officers of the Global Debtors, the Reorganized Global Debtors, or New Saks, as applicable, shall be authorized and, as applicable, directed to issue, execute, deliver, acknowledge, file, and/or record, as applicable, such securities, documents, contracts, instruments, releases and other agreements and take such other action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and this Order, in the name of and on behalf of the Global Debtors, the Reorganized Global Debtors, and New Saks, as applicable, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, or member approval or action.

133.   Notwithstanding anything to the contrary herein, on or after the Effective Date of the Plan, the Reorganized Global Debtors shall be authorized to take all actions necessary to effectuate the terms of the Committee Settlement, the Axonic Settlement, and all other settlements as contemplated in the Plan (including any transactions described in, or contemplated by, the

Committee Settlement Term Sheet), including, without limitation, the contribution to and vesting of the Litigation Trust Assets to the Litigation Trust, without any requirement or further action by the board of managers or equity holders of the Global Debtors or the Reorganized Global Debtors, as applicable, or approval of the Bankruptcy Court. Without limiting the generality of the foregoing, all actions contemplated by the Committee Settlement and other settlements as set forth in the Plan and this Order shall be deemed authorized and approved by the Bankruptcy Court in all respects, and all such actions taken or caused to be taken by the Global Debtors or the Reorganized Global Debtors, as applicable, shall be deemed to have been authorized and approved by the Bankruptcy Court.

## CC.   Additional Transactions Authorized Under the Plan

134.   On or prior to the Effective Date, the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders, shall be authorized to take any such actions as may be necessary or appropriate to Reinstate Claims or Equity Interests or render Claims or Equity Interests Unimpaired, as provided for under the Plan.

## DD.   Treatment of Executory Contracts and Unexpired Leases

135.   The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article IX of the Plan (including the procedures regarding any and all disputes concerning the assumption, assumption and assignment, or rejection, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.

136.   On the Effective Date, except as otherwise provided in the Plan, any Executory Contracts and Unexpired Leases (a) not previously assumed, (b) not previously rejected pursuant to an order of the Bankruptcy Court, or (c) identified on the Assumed Contracts / Leases List will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy

Code and this Order, except any Executory Contract or Unexpired Lease (i) that is identified on the Rejected Contracts / Leases List, (ii) that is the subject of (A) a separate motion or notice to reject, assume, or assume and assign or a Cure Dispute that is pending as of the Confirmation Date or (B) an order of the Bankruptcy Court that is not yet a Final Order, or (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).

137. Entry of this Order shall constitute an order approving the assumptions or rejections of the Global Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such other date as may be identified on the Rejected Contracts / Leases List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

138. The deadline under section 365(d)(4) of the Bankruptcy Code, by which each Global Debtor may assume or reject Unexpired Leases, may be extended after the Effective Date if mutually agreed to in writing (email being sufficient) between the Global Debtors and the applicable counterparty (which may be a Global Debtor) to the Unexpired Lease.

139. Parties to Executory Contracts that are assumed pursuant to the Plan shall be permitted to set off any existing deposits held on behalf of the Global Debtors in satisfaction or partial satisfaction of the Cure Amount listed in the Assumed Contracts / Leases List, as applicable; *provided* that, the foregoing shall not apply with respect to any party to an Unexpired Lease that is assumed pursuant to the Plan; *provided further* that, notwithstanding the foregoing, no party shall be entitled to apply such deposit to recover an amount greater than such Cure Amount.

140.     The rejection by the SO5 Digital Debtors of an Executory Contract or Unexpired Lease to which any Global Debtor is also a party shall be without prejudice to the rights of the Global Debtor under such Executory Contract or Unexpired Lease, including, without limitation, such Global Debtor's right to assume the Executory Contract or Unexpired Lease pursuant to the Plan and this Order. The Global Debtors, their Estates, and the Litigation Trust shall not be liable to any counterparty for any losses, damages, claims, or other amounts resulting from the SO5 Digital Debtors' rejection of any Executory Contract or Unexpired Lease that is not rejected by the Global Debtors.

## EE.     Abandoned Property

141.     The Global Debtors or the Reorganized Global Debtors, as applicable, are authorized to abandon, and are deemed to have abandoned, any remaining personal property (including, without limitation, any furniture, fixtures, and equipment) located on the Global Debtors' leased premises associated with a rejected Unexpired Lease on the effective date of the rejection of such Unexpired Lease (the "Rejection Date"), and such property shall be abandoned free and clear of any Liens, Claims, and encumbrances; *provided* that (a) the Global Debtors or the Reorganized Global Debtors, as applicable, are not authorized to abandon, and are directed to remove any hazardous materials as defined under applicable Law from any leased premises as and to the extent they are required to do so by applicable Law and (b) to the extent the Global Debtors or the Reorganized Global Debtors, as applicable, seek to abandon personal property that contains any "personally identifiable information," as that term is defined in section 101(41A) of the Bankruptcy Code, or other personal and/or confidential information about the Global Debtors' employees and/or customers, or any other individual, the Global Debtors or the Reorganized Global Debtors, as applicable, shall remove such information from such personal property prior to

71

its abandonment. Any personal property of the Global Debtors or the Reorganized Global Debtors, as applicable, remaining on any leased premises associated with a rejected Unexpired Lease after the Rejection Date shall be deemed abandoned by the Global Debtors or the Reorganized Global Debtors, as applicable, pursuant to section 554 of the Bankruptcy Code without any further notice to or action, order, or approval of the Bankruptcy Court, and the applicable counterparties to such Unexpired Leases shall be permitted, in their sole discretion, to sell, utilize, and/or dispose of any such abandoned property without notice or liability to the Global Debtors, the Reorganized Global Debtors, or any third parties and, to the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is modified to allow such disposition. The rights of the applicable counterparties to such Unexpired Leases to assert Claims for the disposition, removal, or storage of any abandoned property are reserved, as are all parties' rights to object to such Claims.

**FF.    Claims Based on Rejection of Rejected SERPs and Rejected Severance Arrangements**

142.    Any employees who were terminated after the Bar Date may file with the Claims Agent Proofs of Claim asserting Claims arising from the rejection of the Rejected SERPs and Rejected Severance Arrangements, as applicable, under Section 9.8 of the Plan within thirty (30) days after the Effective Date. **ANY PROOFS OF CLAIM ARISING FROM THE REJECTION OF THE REJECTED SERPS AND THE REJECTED SEVERANCE ARRANGEMENTS THAT ARE NOT TIMELY FILED SHALL BE AUTOMATICALLY DISALLOWED, FOREVER BARRED FROM ASSERTION, AND SHALL NOT BE ENFORCEABLE AGAINST THE GLOBAL DEBTORS, THE REORGANIZED GLOBAL DEBTORS, THE ESTATES, THE LITIGATION TRUST, OR THEIR RESPECTIVE PROPERTY WITHOUT THE NEED FOR ANY OBJECTION BY THE GLOBAL DEBTORS, THE REORGANIZED GLOBAL DEBTORS, OR THE LITIGATION TRUST,**

**AS APPLICABLE, OR FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND ANY CLAIM ARISING OUT OF THE REJECTION OF THE REJECTED SERPS AND THE REJECTED SEVERANCE ARRANGEMENTS SHALL BE DEEMED FULLY SATISFIED, RELEASED, AND DISCHARGED NOTWITHSTANDING ANYTHING IN A PROOF OF CLAIM TO THE CONTRARY, UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT.**

**GG.    Professional Fee Escrow Account**

143.    No later than the Effective Date, the Global Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professional Persons. No Liens, Claims, or Equity Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates of the Global Debtors or the Reorganized Global Debtors, as applicable, on the Effective Date. The amount of Professional Fee Claims owing to the Professional Persons shall be paid in Cash to such Professional Persons by the Reorganized Global Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professional Persons have been paid in full, any remaining amount in the Professional Fee Escrow Account reserved for such Professional Persons shall promptly be transferred to the Reorganized Global Debtors without any further notice to or action, approval, or order of the Bankruptcy Court.

**HH.     Post-Confirmation Date Fees and Expenses**

144.    Except as otherwise specifically provided for in the Plan, from and after the date of entry of this Order, the Global Debtors and/or the Reorganized Global Debtors, as applicable, shall, in the ordinary course of business, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to administration of the Chapter 11 Cases, prosecution of Causes of Action, and implementation and consummation of the Plan incurred by the Global Debtors (including, for the avoidance of doubt, the Special Restructuring Committee), the Reorganized Global Debtors, and/or the Creditors' Committee without any further notice to or action, order or approval of the Bankruptcy Court.

145.    Upon the Confirmation Date, any requirement that Professional Persons comply with sections 327-331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Global Debtors or the Reorganized Global Debtors, as applicable, may employ and pay any Professional Person in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

146.    On or prior to the Effective Date, the Global Debtors shall pay in full in Cash (or the Global Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Fees and Expenses incurred or estimated to be incurred, through the Confirmation Date in accordance with the DIP Orders.

**II.     U.S. Trustee Fees and Related Reporting Obligations**

147.    All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Global Debtors in full in Cash on the Effective Date. After the Effective Date, each of the Reorganized Global Debtors or the Disbursing Agent acting on behalf of each of the Reorganized

Global Debtors shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable. The Reorganized Global Debtors shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under chapter 7 of the Bankruptcy Code of the case of that particular Global Debtor for whom the Global Debtors or the Reorganized Global Debtors, as applicable, is responsible. The U.S. Trustee shall not be treated as providing any release under the Plan. U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to File any Proof of Claim or any request for administrative expense for U.S. Trustee Fees. Notwithstanding anything to the contrary herein, neither the Reorganized Global Debtors nor the Litigation Trust shall be obligated to pay fees to the U.S. Trustee on account of distributions to Litigation Trust Beneficiaries or Litigation Trust Fees and Expenses.

**JJ.     Provisions Governing Distributions**

148.    The procedures governing distributions contained in <u>Article VII</u> of the Plan shall be, and hereby are, approved in their entirety.

**KK.     Procedures for Resolving Claims**

149.    The procedures for resolving Disputed, contingent, and unliquidated Claims or Equity Interests of the Global Debtors contained in <u>Article VIII</u> of the Plan shall be, and hereby are, approved in their entirety. Notwithstanding anything to the contrary herein, the Litigation Trustee shall have the sole responsibility and authority with respect to reconciling and administering General Unsecured Claims.

**LL.     Dissolution of the Creditors' Committee**

150.    The Creditors' Committee shall be automatically dissolved on the later of (a) the Effective Date or (b) the effective date of any chapter 11 plan for the SO5 Digital Debtors, and all members, employees, Professional Persons retained by the Creditors' Committee, or agents thereof

75

shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases under the Bankruptcy Code; *provided* that if the Effective Date occurs prior to the effective date of the chapter 11 plan for the SO5 Digital Debtors, (i) the Creditors' Committee shall be automatically dissolved solely with respect to the Global Debtors and (ii) the Global Debtors shall have no obligation to pay the expenses of the Creditors' Committee (including for employees, Professional Persons, and agents thereof) incurred after the Effective Date and such expenses shall be paid by the SO5 Digital Debtors; *provided*, *further*, that the Creditors' Committee shall continue to exist, and its Professional Persons shall continue to be retained after the Effective Date and have standing and a right to be heard for the following limited purposes: (x) requests for payment of Professional Fee Claims, and (y) any appeals of this Order or other appeal or pending litigation to which the Creditors' Committee is a party. From and after the Effective Date, the Reorganized Global Debtors shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Creditors' Committee's professionals, solely to the extent arising out of or related to the foregoing, without further order of the Bankruptcy Court.

**MM.   Conditions Precedent to the Effective Date**

151.    The provisions governing the conditions precedent to Confirmation and the Effective Date set forth in Article X of the Plan shall be, and hereby are, approved in their entirety, subject to satisfaction or waiver of such provisions pursuant to their terms. The Global Debtors are authorized to consummate the Plan at any time after the entry of this Order, subject to satisfaction or waiver of such provisions pursuant to their terms.

**NN.   Payment of Prepetition Trustees and Agents Fees and Expenses**

152.    Notwithstanding anything in the Plan, Plan Supplement, or this Order to the contrary, on the Effective Date, the Global Debtors or the Reorganized Global Debtors, as

76

applicable, shall indefeasibly pay in full in Cash any outstanding Prepetition Trustees and Agents Fees and Expenses (including attorneys' fees and expenses) incurred, or reasonably estimated to be incurred, up to and including the Effective Date; provided, however, that the Prepetition Trustees and Agents Fees and Expenses to be paid as a condition to the Effective Date shall be estimated prior to the Effective Date, and such estimates shall be delivered (in the form of a summary invoice and without the need for itemized time detail) to the Global Debtors and the Ad Hoc Group Advisors at least three (3) Business Days before the anticipated Effective Date (or, if the Global Debtors have not provided Citibank and its counsel with at least three (3) Business Days' notice of the anticipated Effective Date, as soon as reasonably practicable after the Global Debtors provide such notice); provided, further, that the Global Debtors shall use reasonable efforts to provide Citibank and its counsel with at least five (5) Business Days' prior notice (or otherwise provide notice as soon as reasonably practicable) of the anticipated Effective Date.  For the avoidance of doubt, the Prepetition Trustees and Agents Fees and Expenses shall be paid by the Global Debtors or Reorganized Global Debtors, as applicable, without any requirement for the filing of retention applications, fee applications, proofs of claim, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court approval.  In addition, the Global Debtors or Reorganized Global Debtors, as applicable, shall continue to pay the Prepetition Trustees and Agents Fees and Expenses as soon as reasonably practicable (but in any case within ten (10) days following presentation of a summary invoice generally describing the services rendered without itemized time detail) to the Global Debtors or the Reorganized Global Debtors, as applicable, related to implementation, consummation, and defense of the Plan, the Plan Supplement, or this Order, or any agreement, instrument, or other document related thereto, including, without limitation, making, directing, or facilitating

distributions pursuant to and in accordance therewith, whether incurred before, on, or after the Effective Date. Citibank shall not be required to share any of the Prepetition Trustees and Agents Fees and Expenses.

153. Notwithstanding anything to the contrary, the Global Debtors or the Reorganized Global Debtors, as applicable, shall indefeasibly pay in full in Cash any outstanding fees and expenses (including attorneys' fees and expenses) of the Prepetition Trustees and Agents incurred, or reasonably estimated to be incurred, up to and including the Effective Date.

**OO.    Retention of Jurisdiction**

154. The provisions governing the retention of jurisdiction set forth in <u>Article XII</u> of the Plan shall be, and hereby are, approved in their entirety. This Bankruptcy Court may, and upon the Effective Date shall, retain exclusive jurisdiction over the matters arising in, and under, and related to, these Chapter 11 Cases, as set forth in <u>Article XII</u> of the Plan.

**PP.    Waiver or Estoppel**

155. Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount or in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Global Debtors and/or their counsel, or any other Entity if such agreement was not disclosed in the Plan, this Order, the Disclosure Statement, or papers filed with the Bankruptcy Court.

**QQ.    Term of Injunctions or Stays**

156. Unless otherwise provided in the Plan or in this Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect

until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### RR.    Binding Effect

157.    Subject to <u>Section 10.5</u> of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Equity Interest in, the Global Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

### SS.    Filing of Additional Documents

158.    Subject to the terms and conditions of the Restructuring Support Agreement and the Plan, on or before substantial consummation of the Plan, the Global Debtors shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Global Debtors, the Reorganized Global Debtors, the Litigation Trustee, and, as applicable, all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan. The Claims Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date.

### TT.    Reservation of Rights

159.    Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court enters this Order. None of the Filing of the Plan, any statement or

provision contained herein, or the taking of any action by the Global Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Global Debtors with respect to any Claims or Equity Interests prior to the Effective Date.

**UU.     Severability**

160.    If, prior to the entry of this Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Global Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

161.    Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. This Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Global Debtors and the Required Consenting DIP Term Loan Lenders; and (c) non-severable and mutually dependent.

**VV.     Governmental Approvals Not Required**

162.    This Order shall constitute all approvals and consents required, if any, by the Laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Plan and the Disclosure Statement, any documents,

80

instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

## WW.   Recording

163.   The Global Debtors and Reorganized Global Debtors, as applicable, hereby are authorized to deliver a notice or short form of this Order, with the Plan attached (in a form complying with any applicable non-bankruptcy rules or regulations), to any state or local recording officer, and such officer must accept for filing such documents or instruments without charging any stamp tax, recording tax, personal property transfer tax, mortgage, or other similar tax. Such notice shall constitute sufficient notice of the entry of this Order to such filing and recording officers.

## XX.   Inconsistency

164.   In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in this Order); provided that in the event of an inconsistency between the Committee Settlement Term Sheet and the other documents in the Plan Supplement, the terms of such other documents in the Plan Supplement shall control. In the event of an inconsistency between this Order and the Plan, the Disclosure Statement, or any prior order of the Bankruptcy Court, this Order shall control.

## YY.   Documents, Mortgages, and Instruments

165.   Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate

to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, and this Order.

## ZZ.   Substantial Consummation

166.   Substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## AAA.   Effect of Failure of Conditions

167.   If all of the conditions to effectiveness have not been satisfied (as provided in Section 10.1 and Section 10.2 of the Plan) or duly waived (as provided in Section 10.3 of the Plan) and the Effective Date has not occurred on or before the first Business Day that is more than thirty (30) days after the Confirmation Date, or by such later date as set forth by the Global Debtors in a notice Filed with the Bankruptcy Court prior to the expiration of such period, then the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders and, subject to the terms of the Plan, the Creditors' Committee, may File a motion to vacate this Order. Notwithstanding the Filing of such a motion, this Order shall not be vacated if all of the conditions to consummation set forth in Section 10.1 and Section 10.2 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If this Order is vacated pursuant to Section 10.4 of the Plan, the Plan shall be null and void in all respects, this Order shall be of no further force or effect, no distributions under the Plan shall be made, the Global Debtors and all Holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in the Global Debtors; (b) prejudice in any manner the rights of the Global Debtors, any Holders of Claims or

82

Equity Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by any Global Debtor or any other Person with respect to any matter set forth in the Plan.

**BBB.   Modifications or Amendments**

168.   The provisions governing the modification, revocation, or withdrawal of the Plan set forth in Article XIII of the Plan shall be, and hereby are, approved in their entirety. The Global Debtors, subject to the consent requirements set forth in the Plan and subject to section 1127 of the Bankruptcy Code, may modify or amend the Plan and the Plan Supplement until the occurrence of the Effective Date.

**CCC.   Global Debtors' Actions Post-Confirmation Through the Effective Date**

169.   During the period from entry of this Order through and until the Effective Date, each of the Global Debtors shall continue to operate its business as a debtor in possession, subject to the oversight of this Bankruptcy Court as provided under the Bankruptcy Code, the Bankruptcy Rules, and this Order and any order of this Bankruptcy Court that is in full force and effect. During such period, the Global Debtors and all other parties in interest under the Plan are authorized to execute such documents, agreements, or filings that are contemplated by the Plan, the Plan Supplement, or the Restructuring Transactions without any further order of this Bankruptcy Court or corporate action, and to take any actions necessary or advisable or appropriate to implement the documents, agreements, or filings that are contemplated by the Plan, the Plan Supplement, or the Restructuring Transactions, in each case subject to the terms and conditions of the Plan. Notwithstanding anything to the contrary herein or in the Plan, upon entry of this Order, the Global Debtors shall be released from any and all reporting obligations arising under any order of the

Bankruptcy Court entered in connection with any of the First Day Pleadings (as defined in the First Day Declaration).

**DDD.  Notice of Confirmation and Effective Date**

170.    In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven (7) Business Days after the Effective Date, the Reorganized Global Debtors shall cause a notice of Confirmation and occurrence of the Effective Date (the "Notice of Effective Date") to be served on all known Holders of Claims and Equity Interests and the Bankruptcy Rule 2002 service list. Notwithstanding the foregoing, no service of the Notice of Effective Date or of any kind shall be required to be mailed or made upon any Entity to whom the Global Debtors mailed the Combined Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Global Debtors or the Reorganized Global Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. Further, the Global Debtors and the Reorganized Global Debtors, as applicable, shall only be required to serve Holders who have not Filed a Proof of Claim in these Chapter 11 Cases with the Notice of Effective Date to the extent that such Holders have active electronic mail addresses for such Holders. The above-referenced notices are adequate under the circumstances of these Chapter 11 Cases, and no other or further notice is necessary.

171.    After the Effective Date, the Reorganized Global Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the entry of this Order to receive documents pursuant to Bankruptcy Rule 2002.

**EEE.   Administrative Claims**

172.    Each Holder of an Administrative Expense Claim, other than New Capital Commitment Claims, DIP Facility Claims, Intercompany Claims, Professional Fee Claims, or U.S. Trustee Fees, that accrued on or before the Effective Date and other than in the ordinary course of business, must File with the Bankruptcy Court or with the Claims Agent by mail, hand delivery, or through the Claims Agent's website and serve on the Reorganized Global Debtors and the Litigation Trustee a proof of such Administrative Expense Claim by no later than the Administrative Bar Date.  Such proof of Administrative Expense Claim must include at a minimum:  (a) the name of the applicable Global Debtor that is purported to be liable for the Administrative Expense Claim, and if the Administrative Expense Claim is asserted against more than one Global Debtor, the exact amount asserted to be owed by each such Global Debtor; (b) the name of the Holder of the Administrative Expense Claim; (c) the asserted amount of the Administrative Expense Claim; (d) the basis of the Administrative Expense Claim; and (e) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

**FFF.   Headings**

173.    Headings utilized in this Order are for convenience and reference only, and do not constitute a part of the Plan or this Order for any other purpose.

**GGG. Waiver of Stay**

174. For good cause shown, the requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen (14) days after entry of the order are hereby waived, and this Order shall be effective and enforceable immediately upon its entry by this Bankruptcy Court. Immediately upon the entry of this Order and subject to the conditions precedent to Confirmation of the Plan set forth in Article X of the Plan: (a) this Order and the provisions of the Plan shall be binding upon (i) the Global Debtors, (ii) the Reorganized Global Debtors, (iii) all Holders of Claims and Equity Interests in the Global Debtors, whether or not Impaired under the Plan and whether or not, if Impaired, such Holders accepted the Plan, (iv) each Person acquiring property under the Plan, (v) any other party-in-interest, (vi) any Person making an appearance in these Chapter 11 Cases, and (vii) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, or guardians; and (b) the Global Debtors are authorized to consummate the Plan immediately upon entry of this Order in accordance with the terms of the Plan, including the conditions precedent to consummation of the Plan set forth in Article X of the Plan.

175. This Order is a Final Order, and the period in which an appeal of the entry of this Order must be filed shall commence upon the entry hereof.

**HHH. Reversal/Stay/Modification/Vacatur of Order**

176. Except as otherwise provided in this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of the Bankruptcy Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority or Lien incurred or

undertaken by the Global Debtors, Reorganized Global Debtors, Litigation Trustee, or any other Person or Entity authorized or required to take action to implement the Plan, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Order, the Plan, the Plan Documents, or any amendments or modifications to the foregoing.

## III.     Resolved Matters

177.     **Aetna Life Insurance Company**.  The Master Services Agreement, MSA-657542, effective as of August 1, 2018, as amended, and related schedules, exhibits, appendices and documents ("Aetna MSA"), under which Aetna Life Insurance Company ("Aetna") provides claims administration and related services with respect to the Global Debtors' self-funded employee benefits plan ("Benefits Plan"), is hereby assumed.  Notwithstanding any other provision of the Plan or any other order entered in these Chapter 11 Cases, the Global Debtors and the Reorganized Global Debtors are authorized to pay to Aetna in the ordinary course of business all amounts that become due to Aetna under the Aetna MSA, including, without limitation, all service fees and all Benefits Plan benefits paid by Aetna for which Aetna has not otherwise been reimbursed, without regard to the dates of service for such benefits.

178.     **Texas Comptroller**. Notwithstanding anything to the contrary in the Plan or this Order, the following rights of the Texas Comptroller of Public Accounts (the "Texas Comptroller") are reserved with respect to any tax claims filed by the Texas Comptroller: (a) statutory or common law setoff rights in accordance with section 553 of the Bankruptcy Code; (b) rights to pursue claims against non-Global Debtor third parties; and (c) rights related to any Cause of Action in which the

87

Texas Comptroller is a party. The Texas Comptroller shall not be a Releasing Party. The Texas Comptroller shall not be required to file any proof of claim, motion, or request for payment in order to be paid any Administrative Expense Claims for taxes that arise in the ordinary course of the Global Debtors' business, including postpetition taxes incurred by the Global Debtors after the Petition Date (in accordance with section 503(b)(1)(B)-(D) of the Bankruptcy Code), which shall be paid in accordance with section 1129(a)(9)(A) of the Bankruptcy Code or, if not due on the Effective Date, in the ordinary course of business in accordance with applicable law. The Texas Comptroller's rights are reserved regarding the payment of interest on the Texas Comptroller's Administrative Expense Claims (if any).

179.     The Texas Comptroller's Allowed Priority Tax Claims (if any) will be paid in cash, in full, upon allowance, or alternatively, in deferred cash payments in accordance with section 1129(a)(9)(C) over a period ending not later than five (5) years after the Petition Date.  The Texas Comptroller may amend its Priority Tax Claims in accordance with applicable law to reflect the results of the actual assessment of tax liabilities without the consent of the Bankruptcy Court or the Reorganized Global Debtors. For the avoidance of doubt, the Texas Comptroller's rights are reserved regarding receiving interest on its Allowed Priority Tax Claims (if any) after the Effective Date pursuant to sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. Notwithstanding anything in this or the foregoing paragraph to the contrary, (a) the Global Debtors, the Reorganized Global Debtors, and any other party in interest reserve the right to object to any Claim of the Texas Comptroller, and (b) nothing in this or the foregoing paragraph shall be construed as an admission by any party of liability to the Texas Comptroller.

180.     **Lexon and Endurance Surety Obligations**.     Notwithstanding any other provisions of the Plan, this Order, the Restructuring Transactions, or any other order of this

Bankruptcy Court, on the Effective Date, all rights and obligations related to the (i) Global Debtors' current surety bonds issued by Lexon Insurance Company and Endurance Assurance Corp. (collectively, the "Sureties", and the surety bonds issued by the Sureties, collectively, the "Surety Bonds" and each a "Surety Bond") and maintained in the ordinary course of business; (ii) surety payment and indemnity agreements (the "Indemnity Agreements"), setting forth the Sureties' respective rights against the Global Debtors, and the Global Debtors' respective obligations thereunder, including, without limitation, the obligation to pay and indemnify the Sureties from any loss, cost, or expense that the Sureties may incur, in each case, on account of the issuance of any Surety Bonds on behalf of the Global Debtors; (iii) any documents and/or agreements governing the Sureties' rights in any collateral, including but not limited to letters of credit, control agreements and/or cash (the "Sureties' Collateral" and such documents and/or agreements, the "Sureties' Collateral Agreements") in connection with the Surety Bonds and the Indemnity Agreements; and/or (iv) ordinary course premium payments to Sureties for the Surety Bonds (items (i), (ii), (iii), and (iv), collectively, the "Surety Bond Program," and the Global Debtors' obligations arising therefrom, the "Surety Bond Obligations") shall be reaffirmed and ratified by the applicable Reorganized Global Debtors and continue in full force and effect and are not discharged, enjoined, or released by the Plan in any way.  For the avoidance of doubt, nothing in the Plan, this Order, the Restructuring Transactions or other agreements between the Global Debtors and third parties, including, without limitation, any exculpation, release, injunction, exclusions and discharge provision of the Plan, including, without limitation, any of those provisions contained in Article XI of the Plan, shall bar, alter, limit, impair, release, modify or enjoin any Surety Bond Obligations, in each case solely with respect to the Surety Bond Program and the Sureties' rights in any of the Sureties' Collateral.

181.     Without the requirement of any action by the Sureties, the Sureties are deemed to have opted out of any third-party release provisions of the Plan and the Sureties are not "Releasing Parties" under the Plan. Any discharge, exculpation, and injunction provisions of the Plan shall not impair the Sureties' rights or claims with respect to the Surety Bond Program, Indemnity Agreements and/or the Sureties' Collateral.  The Surety Bond Program, Indemnity Agreements and all Surety Bond Obligations related thereto shall be treated by the Reorganized Global Debtors and the Sureties in the ordinary course of business from and after the Effective Date; and in furtherance thereof, in the event that any of the Surety Bond Obligations cease to be in effect upon the Effective Date for reasons other than their expiration or termination in accordance with the terms of the applicable agreements, the Reorganized Global Debtors and the Sureties shall execute the documents that are necessary to reinstitute such Surety Bond Obligations, including, without limitation, the indemnity obligations thereunder, on terms substantially consistent with those in effect immediately prior to the Effective Date; *provided*, *however*, that nothing in the foregoing shall be deemed to alter, limit, modify, or expand any such Surety Bond Obligations, nor to require the provision of additional collateral beyond what is required under any such existing Surety Bond Obligations unless otherwise agreed to by the Global Debtors or the Reorganized Global Debtors, as applicable, and the Sureties.  For the avoidance of doubt, with a reservation of rights to all parties, and only to the extent applicable, any agreements related to the Surety Bond Program are assumed by the Global Debtors and the Reorganized Global Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date and with the consent of the Sureties.  Nothing in the Plan, the Restructuring Transactions, or this Order shall affect in any way the Sureties' rights against any non-Global Debtor, or any non-Global Debtor's rights against the Sureties, including under the Surety Bond Program or with regard to the Surety Bond Obligations.  Nothing in the

90

Plan, the Restructuring Transactions, this Order, or any other order of the Bankruptcy Court shall be deemed to provide the Sureties' consent to the involuntary substitution of any principal under the Surety Bonds.

182.    Notwithstanding any other provision of the Plan, the Restructuring Transactions, including any merger or divisive merger document or transaction, any Plan Supplement, this Order, or any other order of the Bankruptcy Court, during the pendency of the Surety Bond Program, the Sureties' Collateral shall remain in place to secure all the Surety Bond Obligations with respect to the Sureties.  Notwithstanding any other provisions of the Plan, this Order, or any other order of this Bankruptcy Court, the Sureties may exercise their rights to the Sureties' Collateral, as applicable, based upon the terms set forth in, and solely to the extent permitted under, the Sureties' Collateral Agreements, Indemnity Agreements and/or applicable common law, and to pay any loss adjustment expenses associated with the Surety Bonds. Solely as permitted under the Sureties' Collateral Agreements, Indemnity Agreements and/or applicable common law, at any time after the Effective Date, the Sureties may apply the Sureties' Collateral or the proceeds therefrom to payment or reimbursement of any and all premiums, losses, expenses, including, without limitation, attorneys' fees that are Surety Bond Obligations secured by the Sureties' Collateral.

183.    **Berkley Surety Obligations**. Surety bonds provided by Berkley Insurance Company ("BIC") in effect as of the date of entry of this Order (the "Existing BIC Bonds") will remain in effect until the expiration of the notice period set forth in the cancellation provisions of the applicable Existing BIC Bond or as required by applicable law.  Any executory Existing BIC Bond will be deemed rejected as of the Effective Date.  BIC's rights to assert Administrative Expense Claims arising from its obligations under the Existing BIC Bonds are reserved.  BIC is

deemed to have opted out of any third-party release provisions of the Plan, and BIC is not a "Releasing Party" under the Plan.

184.   **Provision Regarding Flagship Partners II LLC**.  On June 3, 2026, Global Debtor Saks & Company LLC and Flagship Partners II LLC ("BH Flagship") entered into that certain First Amendment to Lease regarding the premises at the first through fifth floors (as well as below grade and garage spaces) of the building located at 9570-9584 Wilshire Boulevard, Beverly Hills, California (such amendment, the "BH First Amendment" and such underlying lease, the "BH Lease"), pursuant to which the BH Lease shall be assumed by the Global Debtors subject to those modifications and amendments set forth in the BH First Amendment. Effectiveness of the BH First Amendment is subject to certain approvals by BH Flagship's lenders, which approvals may not be obtained until after the Effective Date. In the event BH Flagship lender approval is not obtained by the outside date set forth in the BH First Amendment, notwithstanding the occurrence of the Effective Date, the BH First Amendment shall be null and void and of no effect, and the Global Debtors shall be entitled (subject to the consent of the Ad Hoc Group of Secured Noteholders and DIP Lenders) to terminate the BH Lease upon thirty (30) days' notice to BH Flagship. In the event of such termination, BH Flagship shall be permitted to file a proof of claim within 30 days of the effective date of termination on account of rejection damages arising out of such termination as if the BH Lease had been rejected pursuant to section 365 of the Bankruptcy Code.  If the Global Debtors do not elect to terminate the BH Lease, then the BH Lease shall remain in full force and effect as unmodified by the BH First Amendment.

185.   **HBC US Holdings LLC**.  Notwithstanding anything to the contrary herein or in the Plan, nothing in the Plan or this Order shall impair the respective rights of parties with respect to the settlement proceeds in the "Designated Account" established by the Interchange Settlement

92

Order [Docket No. 1047]; *provided* that the Litigation Trust's and Reorganized Global Debtors' respective rights with respect to such proceeds shall be governed by the Schedule of Retained Causes of Action.  All parties' rights with respect to all other aspects of that certain August 5, 2024 participation agreement to which Saks Global Enterprises LLC (f/k/a HBC US Holdings LLC) is party (which agreement was subsequently assigned by the participant to a third party) (the "Participation Agreement") are reserved; *provided* that the Litigation Trust's and Reorganized Global Debtors' respective rights with respect to all such other aspects of the Participation Agreement shall be governed by the Schedule of Retained Causes of Action.  The Bankruptcy Court shall retain jurisdiction with respect to the foregoing. For the avoidance of doubt and notwithstanding anything herein to the contrary, solely to the extent that the Participation Agreement is an Executory Contract, it shall be deemed rejected as of the Effective Date.

186.   **Securities and Exchange Commission**. Notwithstanding any provision herein to the contrary, no provision of the Plan or this Order (i) releases any non-Global Debtor Person or non-Global Debtor Entity (including any Released Party) from any claim or cause of action of the United States Securities and Exchange Commission (the "SEC"); or, (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any claims, causes of action, proceedings, or investigations against any non-Global Debtor Person or non-Global Debtor Entity (including any Released Party) in any forum.

187.   **Brookfield BPY US Retail Holdings, LLC**.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Definitive Documents, or this Order, Related Parties of Brookfield Properties Retail Inc. are not Releasing Parties under the Plan.

188.   **Tennessee Department of Revenue**. Notwithstanding anything to the contrary in the Plan or this Order, the Tennessee Department of Revenue (the "Department") shall not be

required to File a request for the payment of an expense described in section 503(b)(1)(B) or (C) of the Bankruptcy Code as a condition of any such expense being an allowed administrative expense.  The State of Tennessee shall be deemed to have opted out of the Third-Party Release in Section 11.3 of the Plan.  For the avoidance of doubt, the Department may assert any Priority Tax Claim against the Global Debtors by Filing a Proof of Claim prior to the Priority Tax Claims Bar Date.  The Department's Priority Tax Claims (if any) will be paid in cash, in full, upon allowance, or alternatively, in regular installment payments in cash in accordance with section 1129(a)(9)(C) of the Bankruptcy Code over a period ending not later than five (5) years after the Petition Date.  The Department's rights are reserved regarding receiving interest on its Allowed Priority Tax Claims (if any) after the Effective Date pursuant to sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.  Notwithstanding anything in this or the foregoing paragraph to the contrary, (a) the Global Debtors, the Reorganized Global Debtors, and any other party in interest reserve the right to object to any Claim of the Department, and (b) nothing in this or the foregoing paragraph shall be construed as an admission by any party of liability to the Department.

189.    **Texas Taxing Authorities**.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Order, any 2026 ad valorem taxes due and owing to the Texas Taxing Authorities[5] (the "Tax Claims") shall be paid in the ordinary course of business and when due

---

[5]   The term "Texas Taxing Authorities" is defined as all ad valorem taxing jurisdictions represented by the firms of Linebarger Goggan Blair & Sampson, LLP; Perdue, Brandon, Fielder, Collins & Mott LLP; and McCreary Veselka Bragg and Allen, including but not limited to: Bexar County, Cypress-Fairbanks Independent School District, Dallas County, Fort Bend County, Harris County Emergency Service District #9, Harris County Improvement District #1, City of Houston (where represented by Linebarger), Houston City College, Houston Independent School District, Lone Star College System, San Marcos CISD, Tarrant County, City of Grapevine, Grapevine-Colleyville Independent School, City of Garland, Garland Independent School District, City of Katy, Katy Management District #1, Fort Bend Independent School District, Fort Bend County Levee Improvement District #2, Clear Creek Independent School District, Harris County Municipal Utility District #358, Harris County Water Control Improvement District #155, Spring Branch Independent School District, City of Houston (where represented by Perdue), and Hays County.

pursuant to applicable non-bankruptcy law (subject to any applicable extensions, grace periods, or similar rights under applicable law).  The Texas Taxing Authorities' rights are reserved regarding the payment of postpetition interest on any Tax Claims, as may be allowed by applicable state and bankruptcy law.  To the extent that any of the Texas Taxing Authorities have valid, senior, perfected, enforceable, and unavoidable tax liens on account of 2026 ad valorem tax liabilities, the Texas Taxing Authorities shall retain their liens (the "Tax Liens"), if any, on property or any proceeds from the sale of such property of the Global Debtors and/or the Reorganized Global Debtors, including the Texas Tax Reserve established pursuant to paragraph 51 of the Final DIP Order, until the Tax Claims are paid in full.  For the avoidance of doubt, the funds earmarked in the Texas Tax Reserve shall not be transferred to the Litigation Trust nor constitute Litigation Trust Assets.  The Texas Taxing Authorities' lien priority shall not be primed or subordinated by any exit financing approved by the Bankruptcy Court in conjunction with the Confirmation of the Plan or otherwise, solely to the extent that any Tax Liens are granted priority over any other liens pursuant to applicable law.  The Texas Taxing Authorities may amend their claims after the Effective Date to reflect the certified tax amounts for tax year 2026 without having to receive prior authorization to do so. All rights and defenses of the Global Debtors, the Reorganized Global Debtors, and any other party in interest under applicable law are reserved with respect to any ad valorem tax liabilities owing to the Texas Taxing Authorities.

190.    **Vorys, Sater, Seymour, and Pease LLP, and Gibbs & Bruns LLP.** Notwithstanding anything to the contrary herein or in the Plan, all rights of all parties and objections of the Global Debtors, Vorys, Sater, Seymour, and Pease LLP, and Gibbs & Bruns LLP regarding the inclusion on the Rejected Contracts / Leases List of any engagement letters or agreements between one or more of the Global Debtors and either of Vorys, Sater, Seymour, and

95

Pease LLP, or Gibbs & Bruns LLP, are reserved pending a further order of the Bankruptcy Court and whether such engagement letters or agreements constitute Executory Contracts and any assumption or rejection of such letters or agreements shall not be effective until the entry of a further order of the Bankruptcy Court.

191.    **Bal Harbour Shops, LLC**.  Notwithstanding anything contained in the Plan, any Plan Supplement, or this Order, the lease between Global Debtor Saks Fifth Avenue LLC, as tenant, and Bal Harbour Shops, LLC, as landlord, dated June 10, 1974, as amended, for the premises used as a Saks Fifth Avenue store in the Bal Harbour Shops in Miami, Florida ("BHS Lease") shall not be, and is not, assumed as of the Effective Date, and the BHS Lease shall not otherwise be assumed or rejected, to the extent that it is determined in the Florida State Court Eviction Action[6], including any appeals therein, that the BHS Lease was not terminated prepetition or if otherwise mutually agreed by the parties, until further order of this Court.  For the avoidance of doubt, the deadline for the Global Debtors to assume or reject the BHS Lease pursuant to section 365(d)(4) of the Bankruptcy Code shall be extended through the date of entry of any further order of this Court authorizing assumption or rejection of the BHS Lease, to the extent that it is determined in the Florida State Court Eviction Action, including any appeals therein, that the BHS Lease was not terminated prepetition or if otherwise mutually agreed by the parties.

192.    **Provisions Regarding the Chubb Companies**. Notwithstanding anything to the contrary in the Plan (including, without limitation, and for the avoidance of doubt, Sections 6.4, 6.17, 6.21, 7.16, 9.8 and 11.6 of the Plan, including any corresponding sections of this Order), the Plan Supplement, any other Plan Documents, the Disclosure Statement, this Order, any other

---

[6]    "Florida State Court Eviction Action" has the meaning given to it in *Bal Harbour Shop, LLC's Motion to Modify the Automatic Stay Pursuant to 11 U.S.C. § 362 to Permit Continuation of Pending Florida State Court Eviction Action* [Docket No. 1816].

Definitive Documents, the Bar Date Order, any bar date notice or claim objection, any other document related to the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision of the foregoing that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

    a.    on the Effective Date, all of the insurance policies that have been issued at any time by the Chubb Companies[7] to (or which provide coverage to) the Global Debtors or any of their predecessors, and all agreements, documents, or instruments related thereto (collectively, the "Chubb Insurance Policies") shall be assumed and unaltered, in their entirety, by the Reorganized Global Debtors, pursuant to sections 105 and 365 of the Bankruptcy Code, and upon such assumption, the Reorganized Global Debtors shall become and remain liable in full for all of their and the Global Debtors' obligations under the Chubb Insurance Policies regardless of whether such obligations arose prior to the Effective Date or arise on or after the Effective Date, without the need or requirement for the Chubb Companies to File or serve a Cure Dispute or a request, application, claim, Cure Cost, Proof of Claim, notices of setoff or recoupment, or motion for payment or allowance of any Administrative Expense Claim; *provided* that, the Global Debtors' or the Reorganized Global Debtors' (as applicable) shall maintain their right to dispute such obligations in accordance with the terms and conditions of the Chubb Insurance Policies and/or applicable non-bankruptcy law; *provided further* that, any indemnity obligations that would otherwise be assumed by the foregoing assumption of any Chubb Insurance Policy that is a D&O Liability Insurance Policy shall be governed as provided in the Plan and shall not be deemed to be assumed with the assumption of any such D&O Liability Insurance Policy; *provided, however*, that notwithstanding the immediately foregoing, coverage for defense and indemnity under any D&O Liability Insurance Policies issued by the Chubb Companies shall remain pursuant and subject to the terms and conditions of any applicable D&O Liability Insurance Policy and any claim that the Chubb Companies may have against the Global Debtors or the Reorganized Global Debtors, as applicable, on account of any such claim shall be treated as provided in this paragraph, and nothing in this paragraph shall prevent the Chubb Companies from administering, handling, settling, or paying such defense and indemnification claims in the ordinary course and in full

---

[7]    The term "Chubb Companies" shall mean ACE American Insurance Company, Indemnity Insurance Company of North America, Westchester Surplus Lines Insurance Company, Westchester Fire Insurance Company, Illinois Union Insurance Company, Executive Risk Indemnity Inc., Federal Insurance Company, Chubb National Insurance Company, Chubb Custom Insurance Company, ACE Property & Casualty Insurance Company, Great Northern Insurance Company, Vigilant Insurance Company, Chubb Atlantic Indemnity, Ltd., Executive Risk Specialty Insurance Company, ESIS, Inc., and each of their respective U.S.-based affiliates and each of their predecessors and successors, collectively, and solely in their capacities as insurers and/or third-party administrators of one or more of the Global Debtors.

dollars, subject to the terms and conditions of any applicable Chubb Insurance Policies.

b.  nothing shall permit or otherwise effectuate a sale, assignment, or other transfer of the Chubb Insurance Policies, any portion thereof, and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to the Chubb Insurance Policies without either the prior express written consent of the Chubb Companies or approval by an order of the Bankruptcy Court after notice and a hearing, provided further, the Chubb Companies' rights with regard to any such request are specifically preserved and reserved; *provided* that, notwithstanding anything to the contrary in this paragraph 192, and solely as it relates to the Litigation Trust Retained Causes of Action, the Litigation Trust shall (i) be responsible for monitoring and preserving the ability to maintain claims that the Global Debtors (or Reorganized Global Debtors, as applicable), as an insured, may have, against any Chubb Insurance Policy that is a D&O Liability Insurance Policy in effect on or prior to the Effective Date, and (ii) retain all rights of the applicable Global Debtors (or Reorganized Global Debtors, as applicable), as an insured, to assert claims, if any, against any Chubb Insurance Policy that is a D&O Liability Insurance Policy and/or to recover the proceeds thereof, in both cases subject to the terms and conditions of any applicable Chubb Insurance Policies; *provided*, *further*, that the dissolution of the Global Debtors or Reorganized Global Debtors, if any, shall not modify the terms and conditions of any applicable Chubb Insurance Policies; and, *provided*, *further*, that  neither the Litigation Trust, nor the Litigation Trustee, are, nor shall either be deemed to be, an insured under any of the Chubb Insurance Policies.

c.  nothing (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Chubb Insurance Policies, or (ii) alters or modifies the duty, if any, that the Chubb Companies have to pay claims covered by the Chubb Insurance Policies or the Chubb Companies' rights to seek payment or reimbursement from the Global Debtors (or, after the Effective Date, the Reorganized Global Debtors) with respect thereto or draw on any collateral or security therefor; *provided*, *that*, (i) notwithstanding anything to the contrary in this paragraph 192, if a Chubb Insurance Policy has a SIR, the Holder of a Claim arising from events prior to the Petition Date that is payable pursuant to such policy shall have a General Unsecured Claim against the applicable Global Debtor's Estate up to the amount of the SIR that may be established upon the liquidation of the Claim, and such Holder's recovery from the Global Debtors or the Reorganized Global Debtors, as applicable, shall be solely in the form of its distribution on account of such General Unsecured Claim under the Plan to the extent that the Claim is Allowed; for the avoidance of doubt, any such SIR shall be considered satisfied pursuant to the allowance of the General Unsecured Claim solely up to the amount of the applicable SIR; (ii) nothing shall require the Chubb Companies to pay any amounts within any SIR; and (iii) if the Chubb Companies pay any defense costs or any other amounts within any SIR, the Chubb Companies shall have a General Unsecured Claim for any such amounts.

98

d.  from and after the Effective Date, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article XI of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit, to the extent applicable:  (i) claimants with workers' compensation claims or direct action claims against the Chubb Companies under applicable non-bankruptcy law to proceed with their claims against the Chubb Companies and/or under the Chubb Insurance Policies; (ii) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against the Chubb Companies under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article XI of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; (iii) the Chubb Companies to draw against any or all of the collateral or security provided by or on behalf of the Global Debtors or the Reorganized Global Debtors at any time and to hold the proceeds thereof as security for the obligations of the Global Debtors or the Reorganized Global Debtors under the Chubb Insurance Policies or apply such proceeds to the obligations of the Global Debtors or the Reorganized Global Debtors under the Chubb Insurance Policies, in accordance with the terms and conditions thereof; and (iv) the Chubb Companies to cancel any Chubb Insurance Policy solely as permitted by the terms of the Chubb Insurance Policy, and take other actions relating to the Chubb Insurance Policies (including effectuating a setoff or recoupment); and

e.  nothing in the second paragraph of Section 11.6 of the Plan (and any corresponding language in this Order thereto) requires, precludes, and/or prohibits Chubb to or from administering, handling, defending, settling, and/or paying claims covered by the Chubb Insurance Policies in accordance with and subject to the terms and conditions of such Chubb Insurance Policies and/or applicable non-bankruptcy law.

For the avoidance of doubt, this paragraph 192 only applies to the Chubb Companies and the Chubb Insurance Policies, claims arising therefrom, and claims covered thereunder.

193.  **Provision Regarding TopCo Ad Hoc Group**. On the Effective Date, the Global Debtors shall pay to that certain ad hoc group of lenders under the Prepetition TopCo Facility (the "TopCo Ad Hoc Group") $200,000 in cash for legal costs as consideration for the TopCo Ad Hoc Group not directly or indirectly objecting, interfering, or otherwise obstructing Confirmation and/or consummation of the Plan.  For the avoidance of doubt, the TopCo Ad Hoc Group shall not be entitled to any other distribution under the Plan and any and all rights, claims, and causes of

99

action pursuant to or arising out of that certain Springing Guarantee Agreement, dated as of December 23, 2024, made by Lisa and Richard Baker Enterprises, LLC, as guarantor, in favor of GLAS USA LLC, as administrative agent, for the lenders under the Prepetition TopCo Facility, are preserved and are not addressed or impacted under the Plan.

194.    **Town of Westfield**. For the avoidance of doubt, any assumption of that certain Redevelopment Agreement, by and among  the Town of Westfield and SW Westfield LLC, dated as of March 21, 2023,  will include an assumption of each "Associated Agreement," including any amendments thereto, as that term is defined in the Redevelopment Agreement, unless otherwise agreed to by the parties.

195.    **Verve Culture Inc**. Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or this Order, Verve Culture Inc.'s ("Verve Culture") election to opt out of the Third-Party Release set forth in Section 11.3 of the Plan is acknowledged and preserved in all respects, and any claims, causes of action, rights, or remedies that Verve Culture may have against any person or entity that is not a Reorganized Global Debtor or against any insurer, insurance carrier, or surety, or under or in connection with any insurance policy, fidelity bond, indemnity agreement, or similar instrument are preserved. Nothing in the Plan, the Disclosure Statement, or this Order shall prohibit or restrict Verve Culture from conducting discovery in aid of the foregoing preserved claims pursuant to applicable rules of procedure.

196.    **Provision Related to the United States**.  Notwithstanding anything to the contrary contained in the Plan and this Order, nothing shall limit or be intended to or be construed as a release that would, in effect, act as a bar to the United States Government or any of its agencies, or any state and local authority, from pursuing any police or regulatory action or any criminal action.

197.     **Safety National Casualty**.  The rights of the Global Debtors and of Safety National Casualty Corporation ("Safety National") relating to or arising under any insurance policies that have been issued at any time by Safety National to the Global Debtors or any of their predecessors, and all agreements, documents, or instruments related thereto (the "Safety National Policies"), including but not limited to any defenses to coverage arising under the Safety National Policies, are expressly reserved and not modified or impaired by any of the terms of the Plan (including, without limitation, and for the avoidance of doubt, Section 7.16).  Notwithstanding anything in this Order or in the Plan, all of Safety National's rights under the Safety National Policies are reserved.

198.     **SF Wilshire BH, LLC**.  Unless otherwise agreed in writing between SF Wilshire BH, LLC and the Global Debtors on or prior to the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of Claim No. 4144, on the Effective Date, SF Wilshire BH, LLC, as the Holder of such Other Secured Claim, shall receive the Collateral securing its Other Secured Claim.

Signed: June 05, 2026

_____
Alfredo R Pérez
United States Bankruptcy Judge

**Exhibit A**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SAKS GLOBAL ENTERPRISES LLC, *et al.*,[1] | Case No. 26-90103 (ARP) |
| Debtors. | (Jointly Administered) |

**THIRD AMENDED JOINT CHAPTER 11 PLAN OF SAKS**
**GLOBAL ENTERPRISES LLC AND ITS GLOBAL DEBTOR AFFILIATES**

**HAYNES AND BOONE, LLP**
Kelli Stephenson Norfleet (TX Bar No. 24070678)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney P. Lyda (TX Bar No. 24013330)
David Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, TX 77010
Telephone:     (713) 547 2000
Facsimile:     (713) 547 2600
Email:     kelli.norfleet@haynesboone.com
         kenric.kattner@haynesboone.com
         arsalan.muhammad@haynesboone.com
         kourtney.lyda@haynesboone.com
         david.trausch@haynesboone.com

**WILLKIE FARR & GALLAGHER LLP**
Debra M. Sinclair (admitted *pro hac vice*)
Robin Spigel (admitted *pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
Betsy L. Feldman (admitted *pro hac vice*)
Jessica D. Graber (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:     (212) 728-8000
Facsimile:     (212) 728-8111
Email:     dsinclair@willkie.com
         rspigel@willkie.com
         absmith@willkie.com
         bfeldman@willkie.com
         jgraber@willkie.com

-and-

Jennifer J. Hardy (TX Bar No. 24096068)
600 Travis Street
Houston, TX 77002
Telephone:     (713) 510-1766
Facsimile:     (713) 510-1799
Email:     jhardy2@willkie.com

-and-

Ryan Blaine Bennett (admitted *pro hac vice*)
300 North LaSalle Drive
Chicago, IL 60654
Telephone:     (312) 728-9123
Facsimile:     (312) 728-9199
Email:     rbennett@willkie.com

*Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

*Co-Counsel to the Global Debtors*
*and Global Debtors in Possession*

Dated: June 5, 2026

---

[1]     A complete list of each of the debtors in these chapter 11 cases (collectively, the "Debtors") may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Saks. The location of Debtor Saks Global Enterprises LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 225 Liberty Street, 31st Floor, New York, NY 10281. Bradley Arant Boult Cummings LLP is counsel for the following Debtors: Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC (collectively the "SO5 Digital Debtors"). Haynes and Boone, LLP and Willkie Farr & Gallagher LLP, respectively, are co-counsel for the Global Debtors.

# TABLE OF CONTENTS

**ARTICLE I.**

DEFINITIONS AND INTERPRETATION ................................................ 2

**A.** Definitions. ................................................................................. 2
**B.** Interpretation; Application of Definitions and Rules of Construction. ........................... 39
**C.** Appendices and Plan Documents. .................................................................. 40
**D.** Definitive Document Consent Rights. .............................................................. 40
**E.** Nature of the Restructuring Transactions ......................................................... 41

**ARTICLE II.**

CERTAIN INTERCREDITOR AND INTER-DEBTOR ISSUES ........... 41

2.1. Settlement of Certain Intercreditor and Inter-Global Debtor Issues............................. 41
2.2. Formation of Global Debtor Groups for Convenience Purposes. ................................. 41

**ARTICLE III.**

DIP ABL FACILITY CLAIMS,
DIP OPCO CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,
PROFESSIONAL FEE CLAIMS, U.S. TRUSTEE FEES, AND
PRIORITY TAX CLAIMS ........................................................................ 41

3.1. DIP ABL Facility Claims. ........................................................................... 42
3.2. DIP OpCo Claims. ..................................................................................... 42
3.3. Administrative Expense Claims. ................................................................... 43
3.4. Professional Fee Claims. ............................................................................. 44
3.5. Priority Tax Claims. ................................................................................... 45
3.6. U.S. Trustee Fees and Related Reporting Obligations. ......................................... 46

**ARTICLE IV.**

CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS............. 47

4.1. Classification of Claims and Equity Interests.................................................... 47
4.2. Separate Classification of Other Secured Claims. ............................................... 48

**ARTICLE V.**

TREATMENT OF CLAIMS AND EQUITY INTERESTS ..................... 48

**A.** Treatment of Claims and Equity Interests.......................................................... 48
5.1. Class 1 – Priority Non-Tax Claims................................................................. 49
5.2. Class 2 – Other Secured Claims. ................................................................... 49
5.3. Class 3-A – First Out DIP Term Loan Facility Claims. ......................................... 50
5.4. Class 3-B – Second Out DIP Term Loan Facility Claims. ...................................... 50
5.5. Class 3-C – Third Out DIP Term Loan Facility Claims.......................................... 51
5.6. Class 4-A – Prepetition SGUS Notes Claims. .................................................... 51
5.7. Class 4-B – Prepetition FILO and NPC Claims................................................... 52
5.8. Class 4-C – Prepetition OpCo Second Out Notes Claims. ..................................... 53

i

5.9. Class 4-D – Go-Forward OpCo Trade Claims.................................................................53
5.10. Class 4-E – OpCo General Unsecured Claims. ..............................................................54
5.11. Class 4-F – Prepetition OpCo Third Out Notes Claims. ................................................54
5.12. Class 4-G – Prepetition Initial Notes Claims..................................................................54
5.13. Class 5-A – HoldCo II SGUS Notes Guarantee Claims..................................................55
5.14. Class 5-B – Axonic Guarantee Claims............................................................................55
5.15. Class 5-C – Go-Forward HoldCo II Trade Claims. ........................................................56
5.16. Class 5-D – HoldCo II General Unsecured Claims.........................................................56
5.17. Class 6-A – Prepetition TopCo Facility Claims..............................................................56
5.18. Class 6-B – TopCo General Unsecured Claims...............................................................57
5.19. Class 7 – Intercompany Claims.......................................................................................57
5.20. Class 8 – Subordinated Claims........................................................................................57
5.21. Class 9 – Existing TopCo Equity Interests.....................................................................57
5.22. Class 10 – Existing Intercompany Equity Interests........................................................58
B.     Class Acceptance Requirement. ......................................................................................58
C.     Tabulation of Votes on a Non-Consolidated Basis. ........................................................58
D.     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code..............................58
E.     Voting Classes; Deemed Acceptance or Rejection by Non-Voting Classes...................59
F.     Vacant and Abstaining Classes. ......................................................................................59
G.     Controversy Concerning Impairment..............................................................................59
H.     Special Provision Governing Unimpaired Claims. .........................................................59

**ARTICLE VI.**
                    **MEANS FOR IMPLEMENTATION OF THIS PLAN............................ 60**

6.1.   Non-Substantive Consolidation......................................................................................60
6.2.   Restructuring Transactions. ............................................................................................60
6.3.   Continued Corporate Existence in Certain Debtors; Vesting of Assets..........................61
6.4.   Indemnification Provisions in Organizational Documents. .............................................62
6.5.   Sources for Cash Distributions under this Plan. ..............................................................63
6.6.   Exit ABL Facility............................................................................................................63
6.7.   New Exit Facilities. .........................................................................................................64
6.8.   Committee Settlement. ....................................................................................................66
6.9.   Reorganized Global Debtors' Ownership. .....................................................................79
6.10.  Exemption from Registration Requirements. ..................................................................79
6.11.  Organizational Documents..............................................................................................80
6.12.  Exemption from Certain Transfer Taxes and Recording Fees. .......................................81
6.13.  Other Tax Matters...........................................................................................................81
6.14.  Cancellation of Existing Securities and Agreements. .....................................................81
6.15.  Boards .............................................................................................................................84
6.16.  Directors and Officers Insurance Policies. .....................................................................84
6.17.  New Capital Commitment Claims, DIP Term Loan Documents Indemnification
       Obligations, and DIP ABL Indemnification Obligations. ...............................................85
6.18.  Corporate Action.............................................................................................................86
6.19.  Comprehensive Settlement of Claims and Controversies; Termination of
       Subordination Rights.......................................................................................................87
6.20.  Additional Transactions Authorized Under this Plan......................................................87

6.21.    Insurance Policies...........................................................................................................88
6.22.    Disclaimed Interests......................................................................................................88

**ARTICLE VII.**
              **PROVISIONS GOVERNING DISTRIBUTIONS....................................89**

7.1.    Distributions. .................................................................................................................89
7.2.    No Postpetition Interest on Claims. ...............................................................................89
7.3.    Date of Distributions. .....................................................................................................89
7.4.    Distribution Record Date. ...............................................................................................89
7.5.    Disbursing Agent. ...........................................................................................................90
7.6.    Delivery of Distribution...................................................................................................91
7.7.    Unclaimed Property.........................................................................................................92
7.8.    Satisfaction of Claims......................................................................................................92
7.9.    Manner of Payment Under Plan. .....................................................................................92
7.10.    De Minimis Cash Distributions. .....................................................................................92
7.11.    Distributions on Account of Allowed Claims Only. ......................................................93
7.12.    Fractional Shares.............................................................................................................93
7.13.    No Distribution in Excess of Amount of Allowed Claims. .............................................93
7.14.    Foreign Currency Exchange Rate....................................................................................93
7.15.    Withholding and Reporting Requirements.......................................................................93
7.16.    Claims Payable by Third Parties. ....................................................................................94

**ARTICLE VIII.**
              **PROCEDURES FOR RESOLVING CLAIMS......................................94**

8.1.    Allowance of Claims........................................................................................................94
8.2.    Claims Administration Responsibilities..........................................................................95
8.3.    Estimation of Claims........................................................................................................95
8.4.    Disputed Claims Process. ................................................................................................96
8.5.    Adjustment to Claims or Equity Interests without Objection. ........................................96
8.6.    No Distributions Pending Allowance. .............................................................................97
8.7.    Distributions After Allowance. .......................................................................................97
8.8.    Claim for Reimbursement or Contribution......................................................................97

**ARTICLE IX.**
              **EXECUTORY CONTRACTS AND UNEXPIRED LEASES..................98**

9.1.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................98
9.2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.................100
9.3.    Claims Based on Rejection of Executory Contracts and Unexpired Leases. ................101
9.4.    Contracts and Leases Entered into After the Petition Date............................................102
9.5.    Modifications, Amendments, Supplements, or Other Agreements.................................102
9.6.    Non-Occurrence of Effective Date.................................................................................103
9.7.    Reservation of Rights.....................................................................................................103
9.8.    Employee Compensation and Benefits...........................................................................103

**ARTICLE X.**
     **CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN**........................................................................................... 105

10.1. Conditions Precedent to Confirmation........................................................... 105
10.2. Conditions Precedent to the Effective Date................................................... 106
10.3. Satisfaction and Waiver of Conditions Precedent.......................................... 108
10.4. Effect of Failure of Conditions..................................................................... 109
10.5. Binding Effect.............................................................................................. 109
10.6. Substantial Consummation. ........................................................................ 110

**ARTICLE XI.**
     **RELEASE, INJUNCTION, AND RELATED PROVISIONS................ 110**

11.1. Discharge of Claims and Termination of Certain Equity Interests; Compromise and Settlement of Claims, Certain Equity Interests, and Controversies............................. 110
11.2. Releases by the Global Debtors.................................................................... 111
11.3. Third-Party Release..................................................................................... 113
11.4. Exculpation................................................................................................. 115
11.5. Discharge of Claims and Termination of Equity Interests.............................. 116
11.6. Injunction.................................................................................................... 117
11.7. Setoffs and Recoupment. ........................................................................... 118
11.8. Waiver of Statutory Limitations on Releases. ............................................. 118
11.9. Protection Against Discriminatory Treatment............................................... 119
11.10. Release of Liens........................................................................................ 119

**ARTICLE XII.**
     **RETENTION OF JURISDICTION ...................................................... 120**

**ARTICLE XIII.**
     **MISCELLANEOUS PROVISIONS...................................................... 122**

13.1. Dissolution of Creditors' Committee............................................................. 122
13.2. Termination of Professional Persons. ......................................................... 123
13.3. Modifications and Amendments................................................................... 123
13.4. Payment of Prepetition Trustees and Agents Fees and Expenses ............... 124
13.5. Revocation or Withdrawal of this Plan. ....................................................... 125
13.6. Allocation of Distributions under this Plan Between Principal and Interest................. 125
13.7. Severability................................................................................................. 125
13.8. Governing Law. .......................................................................................... 126
13.9. Section 1125(e) of the Bankruptcy Code. ................................................... 126
13.10. Inconsistency. ........................................................................................... 126
13.11. Time........................................................................................................... 126
13.12. Reference to Monetary Figures. .................................................................. 127
13.13. Exhibits. ..................................................................................................... 127
13.14. Reservation of Rights.................................................................................. 127
13.15. Successors and Assigns. ............................................................................ 127

v

13.16. Notices. ............................................................................................................. 127
13.17. Filing of Additional Documents. ............................................................................ 128
13.18. Closing of Chapter 11 Cases. ................................................................................. 129
13.19. Tax Matters ........................................................................................................... 129

**THIRD AMENDED JOINT CHAPTER 11 PLAN OF**
**SAKS GLOBAL ENTERPRISES LLC AND ITS GLOBAL DEBTOR AFFILIATES**

Saks Global Enterprises LLC and its Global Debtor affiliates propose this joint chapter 11 plan of reorganization (as amended, supplemented, or otherwise modified from time to time, this "Plan") for the resolution of the outstanding Claims against, and Equity Interests in, the Global Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I of this Plan.

Although proposed jointly for administrative purposes, this Plan resolves the outstanding Claims against, and Equity Interests in, each Global Debtor pursuant to the Bankruptcy Code on an individual basis.  Each Global Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code on a joint basis.  The classification of Claims and Equity Interests set forth in Article IV of this Plan applies with respect to each Global Debtor on an individual basis as set forth herein.  This Plan does not contemplate the substantive consolidation of any of the Global Debtors.

Reference is made to the Disclosure Statement for discussion of the Global Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan.

**ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS PLAN (INCLUDING WITHOUT LIMITATION, UNDER ARTICLE VI HEREOF) IN FULL.**

**THE ISSUANCE OF ANY SECURITIES REFERRED TO IN THIS PLAN SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF ANY INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF APPLICABLE LAW IN ANY JURISDICTION.  NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY SECURITIES REFERRED TO IN THIS PLAN (OTHER THAN SECURITIES ISSUED PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE IN A DEEMED PUBLIC OFFERING) IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.**

# ARTICLE I.
## DEFINITIONS AND INTERPRETATION

**A.      Definitions.**

As used in this Plan, capitalized terms have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

1.1.      "*Ad Hoc Group*" means the ad hoc group of holders of DIP Facility Claims and Prepetition Secured Claims represented by the Ad Hoc Group Advisors.

1.2.      "*Ad Hoc Group Advisors*" means, collectively, the advisors retained by the Ad Hoc Group, including (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as co-counsel to the Ad Hoc Group, (b) Porter Hedges LLP, as co-counsel to the Ad Hoc Group, (c) FTI Consulting, as financial advisor to the Ad Hoc Group, (d) Lazard Frères & Co. LLC, as investment banker to the Ad Hoc Group, (e) Hilco Global, as valuation consultant to the Ad Hoc Group, (f) Kekst CNC, as public relations advisor to the Ad Hoc Group, (g) Morgan Lewis & Bockius LLP, as labor counsel to the Ad Hoc Group, and (h) such other professionals that may be retained by or on behalf of the Ad Hoc Group, solely in the case referred to in this clause (h), upon written notice to the Global Debtors.

1.3.      "*Additional SGUS Notes*" means those certain 11.000% senior secured asset based notes due 2029, issued in the aggregate principal amount of $462.5 million, the issuance of which was authorized by SGUS on August 8, 2025.

1.4.      "*Administrative Bar Date*" means the applicable deadline by which all requests for Administrative Expense Claims must be Filed and served on the Global Debtors, which shall be the first Business Day that is or follows the date that is thirty (30) days after the Effective Date; provided that Filing a request for payment of Administrative Expense Claims is not required where this Plan, the Bankruptcy Code, or a Final Order expressly excuses the obligation to make such Filing.

1.5.      "*Administrative Expense Claim*" means a Claim (other than any DIP Facility Claim) for costs and expenses of administration of the Chapter 11 Cases Allowed under sections 503(b), 507(a)(2), 507(b), or, if applicable, 1114(e)(2) of the Bankruptcy Code, including, but not limited to:  (a) any actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Global Debtors (including, but not limited to, wages, salaries, commissions for services, and payments for inventories, leased equipment, and premises); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, solely to the extent incurred on or before the Effective Date; (c) all U.S. Trustee Fees; (d) any Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code; and (e) any Claims that have been designated "Administrative Expense Claims" by Final Order of the Bankruptcy Court.

1.6.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

2

1.7.     "*Allowed*" means, with respect to a Claim or Equity Interest under this Plan, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim or Proof of Equity Interest Filed by the Bar Date or a request for payment of an Administrative Expense Claim Filed by the Administrative Bar Date, as applicable (or for which Claim or Equity Interest a Proof of Claim or Proof of Equity Interest is not required to be Filed under this Plan, the Bankruptcy Code, the Bar Date Order, or a Final Order, including the Final DIP Order); (b) a Claim that is scheduled by the Global Debtors as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim or Proof of Equity Interest, as applicable, has been timely Filed; (c) a Claim allowed in any stipulation that is approved by the Bankruptcy Court by a Final Order; or (d) a Claim allowed pursuant to this Plan or a Final Order, including the Final DIP Order; provided that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by this Plan, the Confirmation Order, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim or Proof of Equity Interest is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Global Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Unless expressly waived by this Plan, the Allowed amount of Claims or Equity Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Global Debtor or Reorganized Global Debtor, as applicable. For the avoidance of doubt, subject to the notice provisions in Articles VIII and IX of this Plan, a Proof of Claim or Proof of Equity Interest Filed after the Bar Date or a request for payment of an Administrative Expense Claim Filed after the Administrative Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

1.8.     "*Assumed Contracts / Leases*" means, collectively, those Executory Contracts and Unexpired Leases that shall be assumed by the Reorganized Global Debtors, as set forth in the Assumed Contracts / Leases List or otherwise assumed under this Plan.

1.9.     "*Assumed Contracts / Leases List*" means the list or lists of Assumed Contracts / Leases included in the Plan Supplement which provide for proposed Cure Costs, as applicable, as may be amended or supplemented in accordance with Article IX of this Plan.

1.10.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, Causes of Actions, or remedies that may be brought by or on behalf of the Global Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Actions, or remedies under chapter 5 and section 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common Law, including fraudulent transfer Laws.

3

1.11. "*Axonic*" means Axonic Coinvest II, LP, collectively with all of its affiliates party to the Axonic Transaction Documents.

1.12. "*Axonic Guarantee*" means that certain Amended and Restated Guaranty, dated as of March 18, 2021, by and among each guarantor signatory thereto and executed in favor of Axonic Credit Opportunities Master Fund, LP and Axonic Capital LLC, as amended, amended and restated, supplemented, or otherwise modified or replaced from time to time prior to the Petition Date.

1.13. "*Axonic Guarantee Claim*" means any Claim against HoldCo II or any other Global Debtor arising under, derived from, related to, or based on the Axonic Guarantee.

1.14. "*Axonic Settlement*" means any agreement (if any) by and among Axonic and any Global Debtor regarding the Axonic Guarantee Claim and any Other Axonic Claim, which settlement is subject to the consent rights of the Required Consenting DIP Term Loan Lenders set forth in the Restructuring Support Agreement and the DIP Documents, and the Creditors' Committee as set forth in the Committee Settlement Term Sheet.

1.15. "*Axonic Settlement Consideration*" means the consideration, if any, provided to Axonic in accordance with the Axonic Settlement, if any. As a component of the Axonic Settlement, no property (including Litigation Trust Interests) will be distributed to Axonic under the Plan.

1.16. "*Axonic Transaction Documents*" has the meaning set forth in the *Objection to the Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 120].

1.17. "*Ballot*" means the form distributed by the Global Debtors or the Claims Agent to Holders of Impaired Claims entitled to vote on this Plan on which the acceptance or rejection of this Plan is to be indicated, in accordance with the Solicitation Procedures.

1.18. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

1.19. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

1.20. "*Bankruptcy Rules*" means, collectively, (a) the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, (b) the Local Rules, and (c) any chambers rules of the Bankruptcy Court.

4

1.21. "*Bar Date*" means the applicable date established by the Bar Date Order by which respective Proofs of Claim and Proofs of Equity Interest must be Filed.

1.22. "*Bar Date Order*" means the *Order (A) Establishing Deadlines for the Filing of Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Approving the Form and Manner of Filing Proofs of Claim, (III) Approving the Form and Manner of Notice Thereof, Including Section 503(b)(9) Requests, and (IV) Granting Related Relief* [Docket No. 1158].

1.23. "*Boards*" means, collectively, the applicable boards of directors or other governing bodies of the Global Debtors or Reorganized Global Debtors, as applicable.

1.24. "*Business Day*" means any day other than a Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or a day on which commercial banks are authorized to close under the Laws of, or are in fact closed for general business in, the state of New York.

1.25. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and the equivalents thereof, in the legal tender of the United States of America.

1.26. "*Causes of Action*" means without limitation, any action, Claim, damage, remedy, judgment, cause of action, controversy, demand, right, action, suit, right of setoff, cross claim, counterclaim, recoupment, any Claim arising from any contract or for breach of duty imposed by law or in equity, contribution, reimbursement, suit, class action, third-party claim, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, direct or indirect, choate or inchoate, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, disputed or undisputed, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, the term "Causes of Action" includes: (a) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (b) any right to object to or otherwise contest Claims or Equity Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) claims pursuant to section 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state Law. For the avoidance of doubt, all "Causes of Action" that are Litigation Trust Retained Causes of Action shall be preserved for, and may be pursued by the Litigation Trust, and shall not be (x) Reorganized Global Debtor Retained Causes of Action, or (y) released by the Plan, the Confirmation Order, or otherwise.

1.27. "*Certain Former Directors & Officers*" means Richard Baker and Ian Putnam.

5

1.28.    "*Chapter 11 Cases*" means:  (a) when used with reference to a particular Global Debtor, the case pending for that Global Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all of the Global Debtors, the jointly administered chapter 11 cases pending for the Global Debtors in the Bankruptcy Court.

1.29.    "*Charging Liens*" means, collectively, the Prepetition Initial Notes Charging Lien, Prepetition NPC Loan Charging Lien, Prepetition OpCo Notes Charging Lien, and Prepetition SGUS Notes Charging Lien.

1.30.    "*Claim*" means any claim as defined in section 101(5) of the Bankruptcy Code against any Global Debtor or property of any Global Debtor, including any Claim arising after the Petition Date.

1.31.    "*Claims Agent*" means Stretto, Inc. in its capacity as noticing, claims, and solicitation agent for the Global Debtors.

1.32.    "*Claims Objection Deadline*" means the deadline for objecting to a Claim asserted against a Global Debtor, which shall be on the date that is the later of (a) 180 days after the Effective Date, or in the case of an Administrative Expense Claim, ninety (90) days after the Effective Date, and (b) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court for objecting to such Claims.

1.33.    "*Claims Register*" means the official register of Claims maintained by the Clerk or the Claims Agent.

1.34.    "*Class*" means a class of Claims or Equity Interests established under Article IV of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.35.    "*ClearPar*" means ClearPar by S&P Global.

1.36.    "*Clerk*" means the clerk of the Bankruptcy Court.

1.37.    "*Closing Date Commitment Premium*" has the meaning set forth in the New Capital Commitment Letter.

1.38.    "*Collateral*" means, at any time, any assets and any property of the Global Debtors or Reorganized Global Debtors, as applicable, wherever located, whether real, personal or mixed, or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim.

1.39.    "*Combined Hearing*" means a hearing to be held by the Bankruptcy Court regarding Confirmation of this Plan (as may be amended pursuant to Section 13.3 of this Plan) and final approval of the adequacy of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

1.40.    "*Committee Settlement*" means the comprehensive settlement between the Global Debtors, the Ad Hoc Group, and the Creditors' Committee set forth in Section 6.8 herein and the Committee Settlement Term Sheet.

1.41.    "*Committee Settlement Term Sheet*" means that certain UCC Settlement Term Sheet, dated as of May 1, 2026, by and among the Creditors' Committee, the Global Debtors, and the Ad Hoc Group.

1.42.    "*Commitment Cash Premium*" has the meaning set forth in the New Capital Commitment Letter.

1.43.    "*Commitment Increases*" has the meaning set forth in the New Capital Commitment Letter.

1.44.    "*Conditional Disclosure Statement Approval Hearing*" means a hearing held by the Bankruptcy Court on May 1, 2026 to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code.

1.45.    "*Conditional Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, the Solicitation Materials, and the Solicitation Procedures [Docket No. 2172].

1.46.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

1.47.    "*Confirmation Date*" means the date on which the Clerk enters the Confirmation Order on the docket of the Bankruptcy Court, within the meaning of Bankruptcy Rules 5003 and 9021.

1.48.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as may be amended, modified, or supplemented from time to time, in form and substance (a) acceptable to the Required Consenting DIP Term Loan Lenders in their sole discretion, (b) reasonably acceptable to the DIP ABL Agent, and (c) reasonably acceptable to the Creditors' Committee with respect to the implementation of the terms of the Committee Settlement Term Sheet.

1.49.    "*Consenting DIP Term Loan Lenders*" means, collectively, as of the relevant time, those DIP Term Loan Lenders that are party to the Restructuring Support Agreement.

1.50.    "*Continuing Personnel*" means Geoffroy van Raemdonck as Chief Executive Officer, Darcy Penick as President and Chief Commercial Officer, Lana Todorovich as Chief of Global Brand Partnerships, Brandy Richardson as Chief Financial Officer, Mark Weinsten as Chief Restructuring Officer, Andrew Woodworth as Chief Legal Officer, Jessica Morris as Chief Accounting Officer & Treasurer, and any other individual who may be identified on a schedule of Continuing Personnel, to be agreed among the Creditors' Committee and the Required Consenting DIP Term Loan Lenders.

7

1.51.     "*Cooperation Covenant*" has the meaning set forth in Section 6.8(h) of this Plan.

1.52.     "*Cooperation Reimbursement*" has the meaning set forth in Section 6.8(h) of this Plan.

1.53.     "*Creditors' Committee*" means the statutory committee of unsecured creditors, appointed in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, as identified in the *US Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 480], and the *US Trustee's Notice (Amended) of Appointment of Committee of Unsecured Creditors* [Docket No. 522], Filed by the U.S. Trustee on January 27, 2026 and January 29, 2026, respectively, as the same may be further reconstituted from time to time.

1.54.     "*Cure Cost*" means (a) all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties in writing (email being sufficient) under an Executory Contract or Unexpired Lease), and (b) to the extent required to be cured by the Bankruptcy Code, other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that, in each case, is to be assumed by the Global Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

1.55.     "*Cure Dispute*" has the meaning set forth in Section 9.2 of this Plan.

1.56.     "*D&O Liability Insurance Policies*" means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to or providing coverage to any of the Global Debtors for current or former directors', managers', employees', and/or officers' liability.

1.57.     "*Debtors*" means, collectively, the Global Debtors and the SO5 Digital Debtors.

1.58.     "*Definitive Document Consent Rights*" means the documentation principles set forth in Section I.D. hereof.

1.59.     "*Definitive Documents*" has the meaning set forth in the Restructuring Support Agreement.

1.60.     "*DIP ABL Advisors*" means, collectively, (a) Otterbourg P.C., as co-counsel to the DIP ABL Agent, (b) Morgan Lewis & Bockius LLP, as co-counsel to the DIP ABL Agent, and (c) M-III Partners, LP, as investment banker to the DIP ABL Agent.

1.61.     "*DIP ABL Agent*" means Bank of America, N.A., in its capacity as administrative agent and collateral agent for the lenders under the DIP ABL Credit Agreement, together with its successors and permitted assigns.

1.62.     "*DIP ABL Credit Agreement*" means that certain Senior Secured Super-Priority DIP ABL Credit Agreement, dated as of January 15, 2026 by and among Holdings,

8

Saks as borrower, the co-borrowers party thereto, the guarantors party thereto, the lenders party thereto, Bank of America, N.A., as administrative agent, collateral agent, and swingline lender, as amended, restated, amended or restated, supplemented, extended, renewed, or otherwise modified, refinanced, or replaced from time to time.

1.63.    "*DIP ABL Credit Facility*" means the debtor-in-possession asset-based financing facility on the terms and conditions set forth in the DIP ABL Credit Agreement.

1.64.    "*DIP ABL Documents*" means the DIP ABL Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

1.65.    "*DIP ABL Facility Claim(s)*" means any Claim arising on account of the DIP ABL Credit Facility.

1.66.    "*DIP ABL Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the DIP ABL Documents.

1.67.    "*DIP ABL Loans*" means, collectively, the extensions of credit made pursuant to the senior secured superpriority revolving credit facility arising under or pursuant to the DIP ABL Credit Agreement (including the ABL DIP Loans, as defined in the DIP Orders).

1.68.    "*DIP ABL Parties*" means the DIP ABL Lenders and the DIP ABL Agent.

1.69.    "*DIP Agents*" means, collectively, the administrative and collateral agents for the DIP Lenders with respect to the DIP Facilities, which shall be (a) the DIP ABL Agent, (b) the DIP OpCo Agent, (c) the DIP Term Loan Agent, and (d) in each case, their successors and permitted assigns.

1.70.    "*DIP Conversion*" means the conversion, on the Effective Date, of DIP Term Loan Claims into Take Back Term Loans (if any), Take Back Preferred Units, or New Saks Common Stock in accordance with (a) the terms of this Plan, (b) the Restructuring Support Agreement, (c) the New Capital Commitment Letter, (d) the DIP Documents, as applicable, and (e) any additional terms and conditions set forth in the applicable Definitive Documents as may be agreed among the Global Debtors and the Required Consenting DIP Term Loan Lenders.

1.71.    "*DIP Credit Agreements*" means, collectively, the DIP ABL Credit Agreement, the DIP OpCo Credit Agreement, and the DIP Term Loan Credit Agreement.

1.72.    "*DIP Credit Documents*" means, collectively, the DIP ABL Documents, the DIP OpCo Loan Documents, and the DIP Term Loan Documents.

1.73.     "*DIP Documents*" means, collectively, the DIP Motion, the DIP Orders, the DIP Credit Agreements, the DIP Credit Documents, and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

1.74.     "*DIP Facilities*" means, collectively, the DIP OpCo Credit Facility, the DIP Term Loan Credit Facility, and the DIP ABL Credit Facility.

1.75.     "*DIP Facility Claims*" means, collectively, all Claims of the DIP Agents and/or the DIP Lenders related to, arising under, or in connection with the Final DIP Order and the DIP Documents, including, without limitation, Claims for all principal amounts outstanding, interest, fees, reasonable and documented expenses (including the reasonable and documented expenses of counsel as set forth in the DIP Credit Documents), costs and other charges of the DIP Agent and the DIP Lenders in respect of the obligations of the Global Debtors arising under the DIP Documents, including, for the avoidance of doubt and as applicable, the DIP ABL Facility Claims, the DIP OpCo Claims, and the DIP Term Loan Claims.

1.76.     "*DIP Lenders*" means, collectively, and as of the relevant time, the DIP ABL Lenders, the DIP OpCo Lenders, and the DIP Term Loan Lenders.

1.77.     "*DIP Loans*" means, collectively, the DIP ABL Loans, the DIP OpCo Loans, and the DIP Term Loans.

1.78.     "*DIP Motion*" means the *Global Debtors Emergency Motion for Entry of Interim And Final Orders (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 49].

1.79.     "*DIP OpCo Agent*" means U.S. Bank Trust Company, National Association, together with its successors and permitted assigns.

1.80.     "*DIP OpCo Claims*" means, collectively, all Claims arising on account of the DIP OpCo Loans.

1.81.     "*DIP OpCo Claims Distribution*" has the meaning set forth in Section 3.2 of this Plan.

1.82.     "*DIP OpCo Credit Agreement*" means that certain Superpriority Senior Secured Term Loan Debtor-in-Possession OpCo Credit Agreement, dated as of January 15, 2026, by and among Holdings, Saks as borrower, the lenders party thereto, and U.S. Bank Trust Company, National Association, in its capacity as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, extended, renewed, or otherwise modified from time to time.

10

1.83.     "*DIP OpCo Credit Facility*" means the intercompany debtor-in-possession facility provided pursuant to the DIP OpCo Credit Agreement.

1.84.     "*DIP OpCo Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the DIP OpCo Loan Documents.

1.85.     "*DIP OpCo Loan Documents*" means, collectively, the DIP OpCo Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection with the DIP OpCo Credit Facility, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

1.86.     "*DIP OpCo Loans*" means, collectively, the superpriority senior secured, multi-draw, delayed draw term loans arising under or pursuant to the DIP OpCo Credit Agreement.

1.87.     "*DIP Orders*" means, as applicable, the Global Debtors' Interim DIP Order, the Final DIP Order, or any other Final Order approving, among other things, the terms of the DIP Facilities and the DIP Credit Documents.

1.88.     "*DIP Term Loan Agent*" means U.S. Bank Trust Company, National Association, together with its agents, successors and permitted assigns.

1.89.     "*DIP Term Loan Claims*" means, collectively, the First Out DIP Term Loan Facility Claims, the Second Out DIP Term Loan Facility Claims, and the Third Out DIP Term Loan Facility Claims.

1.90.     "*DIP Term Loan Credit Agreement*" means that certain Debtor-in-Possession Term Loan Credit Agreement, dated as of January 15, 2026, by and among SGUS as borrower, the Lenders party thereto from time-to time, and U.S. Bank Trust Company, National Association, in its capacity as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, extended, renewed, or otherwise modified from time to time.

1.91.     "*DIP Term Loan Credit Facility*" means the delayed draw term loan debtor-in-possession financing facility provided pursuant to the DIP Term Loan Credit Agreement.

1.92.     "*DIP Term Loan Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the DIP Term Loan Documents.

1.93.     "*DIP Term Loan Documents*" means, collectively, the DIP Term Loan Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection with the DIP Term Loan Credit Facility, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

1.94.     "*DIP Term Loans*" means, collectively, the First Out DIP Term Loans, the Second Out DIP Term Loans, and the Third Out DIP Term Loans.

11

1.95.      "*Disallowed*" means a finding or conclusion of Law of the Bankruptcy Court in a Final Order, or provision in the Confirmation Order, disallowing a Claim or Equity Interest.  Except as otherwise provided herein or as agreed to by the Global Debtors (with the consent of the Required Consenting DIP Term Loan Lenders), the Reorganized Global Debtors, or the Litigation Trustee, as applicable, a Proof of Claim or Equity Interest Filed after the Bar Date or a request for payment of an Administrative Expense Claim Filed after the Administrative Bar Date, as applicable, shall be automatically deemed Disallowed and expunged from the Claims Register as of the Effective Date without any further action, order, or approval of the Bankruptcy Court, unless a Final Order has deemed such late-Filed Claim timely.  "Disallow"  and  "Disallowing"  shall have correlative meanings.

1.96.      "*Disbursing Agent*" means the Litigation Trustee or the Reorganized Global Debtors, or another agent of the Reorganized Global Debtors; <u>provided</u> that (a) with respect to any distributions made from the Litigation Trust in accordance with this Plan and the Litigation Trust Documents, the "Disbursing Agent" shall be the Litigation Trustee; (b) with respect to any distributions made on account of the DIP Term Loan Claims, the "Disbursing Agent" may be the DIP Agent, at the election of the Required Consenting DIP Term Loan Lenders in their sole discretion; and (c) with respect to any distributions on account of the Prepetition SGUS Notes Claims, such distributions shall be made to, or in a manner reasonably acceptable to, the Prepetition SGUS Notes Trustee for distribution in accordance with this Plan.

1.97.      "*Disclaimed Interests*" has the meaning set forth in <u>Section 6.22</u> of this Plan.

1.98.      "*Disclosure Statement*" means the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and Its Global Debtor Affiliates* [Docket No. 2162], including all exhibits and schedules annexed thereto or referred to therein (in each case, as it or they may be amended, modified, or supplemented from time to time).

1.99.      "*Disputed*" means, as to a Claim or an Equity Interest, a Claim or an Equity Interest:  (a) that is not Allowed; and (b) that is not Disallowed under this Plan, the Bankruptcy Code, or a Final Order, as applicable.

1.100.      "*Distribution Record Date*" means the date for purposes of determining which Holders of Allowed Claims are eligible to receive distributions under this Plan, which date shall be the Confirmation Date, or such other date as shall be agreed by (a) the Global Debtors and the Required Consenting DIP Term Loan Lenders and (b) solely with respect to the Distribution Record Date for General Unsecured Claims, the Global Debtors, the Required Consenting DIP Term Loan Lenders, the Creditors' Committee, and the Litigation Trustee, as applicable; <u>provided</u>, that the Distribution Record Date shall not apply to any securities of the Global Debtors deposited with DTC or ClearPar, as applicable (including, without limitation, the Prepetition SGUS Notes), the Holders of which shall receive a distribution in accordance with the customary procedures of DTC or ClearPar, as applicable; <u>provided</u>, <u>further</u>, that the Distribution Record Date shall not apply to any of the DIP Facility Claims.

1.101.      "*DTC*" means The Depository Trust Company.

12

1.102.    "*Effective Date*" means the date specified by the Global Debtors in a notice Filed with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 10.2 of this Plan have been satisfied or waived in accordance with Section 10.3 of this Plan, and no stay of the Confirmation Order is in effect. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

1.103.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.104.    "*Equal Priority Intercreditor Agreement*" means that certain Equal Priority Intercreditor Agreement, dated as of August 8, 2025, by and among Saks, Holdings, SGUS, in its capacity as administrative agent for the Initial First Out Secured Parties (as defined therein), Citibank, N.A. in its capacity as collateral agent under the Prepetition NPC Credit Agreement, the Prepetition OpCo Notes Trustee, and the Prepetition Initial Notes Trustee, as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date.

1.105.    "*Equity Interest*" means, collectively, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, and any other equity, ownership, membership, profit interests, or phantom equity of or in any Global Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, or other equity, ownership, membership, or profits interests of any Global Debtor (in each case whether or not arising under or in connection with any employment agreement).

1.106.    "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

1.107.    "*Estate*" means, as to each Global Debtor, the estate created in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.108.    "*Excess Liquidity Reduction*" has the meaning set forth in the New Capital Commitment Letter.

1.109.    "*Excluded Parties*" means collectively, (a) all Entities and Persons other than a Released Party, and (b) the Entities and Persons identified in the Schedule of Excluded Parties, as set forth therein and subject to the terms thereof; provided, that the failure to identify any Person or Entity as an Excluded Party in the Schedule of Excluded Parties or otherwise shall not result in such Person or Entity being or being deemed to be a Released Party.

1.110.    "*Exculpated Parties*" means, collectively, (a) each of the Global Debtors, (b) each member of the Special Restructuring Committee, solely in their capacity as such, and (c) the Creditors' Committee and each of its members, solely in their capacities as such; provided that no party that is not a Released Party shall be an Exculpated Party.

13

1.111.     "*Exculpation*" means the exculpation provision set forth in <u>Section 11.4</u> of this Plan.

1.112.     "*Executory Contract*" means a contract to which one or more of the Global Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof.

1.113.     "*Existing Intercompany Equity Interests*" means, collectively, any Equity Interest in a Global Debtor or a subsidiary of a Global Debtor that is owned or held by another Global Debtor existing immediately prior to the Effective Date.

1.114.     "*Existing TopCo Equity Interests*" means, collectively, any Equity Interest of the TopCo Global Debtors existing immediately prior to the Effective Date.

1.115.     "*Exit ABL Credit Agreement*" means the loan agreement memorializing the Exit ABL Facility, the material terms of which shall be included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Global Debtors, the Exit ABL Credit Agreement Agent, and the Exit ABL Facility Lenders.

1.116.     "*Exit ABL Credit Agreement Agent*" means the administrative agent under the Exit ABL Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the Exit ABL Credit Agreement.

1.117.     "*Exit ABL Facility*" means an exit asset based loan facility in the principal amount of $1.5 billion.

1.118.     "*Exit ABL Facility Documents*" means, collectively, the Exit ABL Credit Agreement and any other agreements or documents related to or executed in connection with the Exit ABL Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

1.119.     "*Exit ABL Facility Lenders*" means the lenders party to the Exit ABL Facility Documents.

1.120.     "*Exit ABL Parties*" means the Exit ABL Facility Lenders and the Exit ABL Credit Agreement Agent.

1.121.     "*Expense Reimbursement*" has the meaning set forth in the New Capital Commitment Letter.

1.122.     "*File*," "*Filed*," or "*Filing*" means, as applicable, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or the Claims Agent (as applicable).

1.123.     "*Final DIP Order*" means the *Final Order (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting*

14

*Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 917], as may be amended from time to time.

1.124.   "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

1.125.   "*First Out DIP PIK Loans*" has the meaning set forth in the DIP Term Loan Credit Agreement.

1.126.   "*First Out DIP Term Loan Facility Claims*" means, collectively, any Claims against a Global Debtor arising under, derived from, based on, or related to the First Out DIP Term Loans.

1.127.   "*First Out DIP Term Loans*" means, collectively, the "First Out Term Loans" under and as defined in the DIP Term Loan Credit Agreement.

1.128.   "*First Out DIP Term Loan Lenders*" means, collectively, the "Lenders" under and as defined in the DIP Term Loan Credit Agreement that hold First Out DIP Term Loan Claims.

1.129.   "*Flagship CMBS Settlement*" has the meaning set forth in the Restructuring Support Agreement.

1.130.   "*General Unsecured Claim*" means any Unsecured Claim, including, without limitation, any Claim arising from the rejection of Executory Contracts and Unexpired Leases and any Claim arising from any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by, a Global Debtor in connection therewith other than (a) an Administrative Expense Claim, (b) a Priority Non-Tax Claim, (c) a Priority Tax Claim, (d) a Professional Fee Claim, (e) an Intercompany Claim, or (f) a Subordinated Claim.   For the avoidance of doubt, a "General Unsecured Claim" excludes any Equity Interests or Secured Claims.

1.131.   "*Global Debtor Release*" has the meaning set forth in Section 11.2 of this Plan.

15

1.132.    "*Global Debtors*" means, collectively, the Debtors that are not SO5 Digital Debtors.

1.133.    "*Go-Forward HoldCo II Trade Claims Cash Pool Distribution Amount*" means Cash in an amount equal to the lesser of (a) $500,000.00 and (b) 2.5% of all Allowed Go-Forward HoldCo II Trade Claims.

1.134.    "*Go-Forward HoldCo II Trade Claim*" means an Unsecured Claim for the provision of goods and/or services to HoldCo II held by a Go-Forward HoldCo II Trade Claimant or such Go-Forward HoldCo II Trade Claimant's Related Party and for which the applicable Go-Forward HoldCo II Trade Claimant will provide goods and/or services to HoldCo II from and after the Effective Date on terms reasonably satisfactory to the Reorganized Global Debtors and the Required Consenting DIP Term Loan Lenders.  Go-Forward HoldCo II Trade Claims shall not (a) include any Claim arising from or based upon rejection of any Executory Contract or Unexpired Lease or (b) constitute an OpCo General Unsecured Claim, a HoldCo II General Unsecured Claim, or a TopCo General Unsecured Claim.

1.135.    "*Go-Forward HoldCo II Trade Claimant*" means trade creditors, service providers and/or other vendors who provide goods and/or services to HoldCo II as a Reorganized Global Debtor on terms reasonably satisfactory to the Reorganized Global Debtors and the Required Consenting DIP Term Loan Lenders, including the applicable creditors described in (a) the *Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors and 503(b)(9) Claimants; (II) Confirming Administrative Expense Priority of Outstanding Orders; and (III) Granting Related Relief* [Docket No. 14] and (b) the *Debtors' Joint Emergency Motion for Entry of Order (I) Authorizing Debtors to Pay Prepetition Claims of Certain (A) Lien Claimants and (B) Customs and Regulatory Claimants; and (II) Granting Related Relief* [Docket No. 16].

1.136.    "*Go-Forward OpCo Trade Claim*" means an Unsecured Claim for the provision of goods and/or services to the Global Debtors (other than HoldCo II) held by a Go-Forward OpCo Trade Claimant or such Go-Forward OpCo Trade Claimant's Related Party and for which the applicable Go-Forward OpCo Trade Claimant will provide goods and/or services to the applicable Reorganized Global Debtors from and after the Effective Date on terms reasonably satisfactory to the Reorganized Global Debtors and the Required Consenting DIP Term Loan Lenders.  Go-Forward OpCo Trade Claims shall not (a) include any Claim arising from or based upon rejection of any Executory Contract or Unexpired Lease or (b) constitute an OpCo General Unsecured Claim, a HoldCo II General Unsecured Claim, or a TopCo General Unsecured Claim.

1.137.    "*Go-Forward OpCo Trade Claims Cash Pool Distribution Amount*" means Cash in an amount equal to the lesser of (a) $2,000,000.00 and (b) 2.5% of all Allowed Go-Forward OpCo Trade Claims.

1.138.    "*Go-Forward OpCo Trade Claimant*" means trade creditors, service providers and/or other vendors who provide goods and/or services to the applicable

16

Reorganized Global Debtors (other than HoldCo II) from and after the Effective Date on terms reasonably satisfactory to the Reorganized Global Debtors and the Required Consenting DIP Term Loan Lenders, including the applicable creditors described in (a) the *Global Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors and 503(b)(9) Claimants; (II) Confirming Administrative Expense Priority of Outstanding Orders; and (III) Granting Related Relief* [Docket No. 14] and (b) the *Debtors' Joint Emergency Motion for Entry of Order (I) Authorizing Debtors to Pay Prepetition Claims of Certain (A) Lien Claimants and (B) Customs and Regulatory Claimants; and (II) Granting Related Relief* [Docket No. 16].

1.139.     "*Go-Forward Trade Claims*" means, collectively, Go-Forward OpCo Trade Claims and Go-Forward HoldCo II Trade Claims.

1.140.     "*Go-Forward Trade Claimants*" means, collectively, Go-Forward OpCo Trade Claimants and Go-Forward HoldCo II Trade Claimants.

1.141.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.142.     "*HoldCo II*" means Saks Fifth Avenue HoldCo II LLC.

1.143.     "*HoldCo II General Unsecured Claim(s)*" means, collectively, any General Unsecured Claims against HoldCo II in Class 5-D.

1.144.     "*HoldCo II SGUS Notes Guarantee*" means that certain Guarantee of the obligations under the Prepetition SGUS Notes Indenture provided by HoldCo II pursuant to that certain Second Supplemental Indenture, by and among SGUS, as issuer, HoldCo II and Citibank, N.A., as trustee and collateral agent, dated as of August 8, 2025, as amended, restated, supplemented, waived, or otherwise modified as of the date hereof.

1.145.     "*HoldCo II SGUS Notes Guarantee Claims*" means, collectively, any Claims arising under or pursuant to the HoldCo II SGUS Notes Guarantee.

1.146.     "*HoldCo II SGUS Notes Guarantee Claims Cash Pool Distribution Amount*" means Cash in an amount of $100,000.00.

1.147.     "*Holder*" means any Entity or Person holding a Claim against or an Equity Interest in any Global Debtor, as applicable.

1.148.     "*Holdings*" means Saks Global Holdings LLC.

1.149.     "*Impaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests, as applicable, that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.150.     "*Incremental New Money Debt Facility*" means the senior secured first lien term loan facility consisting of term loans in an aggregate principal amount up to $500 million (subject to (a) any Commitment Increases or in-kind increases described in the New Capital

17

Commitment Letter, (b) any reductions on account of the Excess Liquidity Reduction on the terms set forth in the New Capital Commitment Letter, or (c) such other increases or reductions as may be agreed between the New Capital Commitment Parties and the Global Debtors in connection with any New Capital Syndication).

1.151. "*Incremental New Money Preferred Equity Facility*" means the facility pursuant to which the Incremental New Money Preferred Units are issued on the terms set forth in the New Capital Commitment Letter.

1.152. "*Incremental New Money Preferred Equity Facility Documents*" means collectively, the Incremental New Money Preferred Equity Facility Share Purchase Agreement and any other agreements or documents related to or executed in connection with the Incremental New Money Preferred Equity Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

1.153. "*Incremental New Money Preferred Equity Facility Parties*" means the Consenting DIP Term Loan Lenders that become party from time to time to the Incremental New Money Preferred Equity Facility Share Purchase Agreement, together with their successors and permitted assigns.

1.154. "*Incremental New Money Preferred Equity Facility Share Purchase Agreement*" means the share purchase agreement memorializing the Incremental New Money Preferred Equity Facility, the material terms of which shall be consistent with the New Capital Commitment Letter and included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Global Debtors and the Incremental New Money Preferred Equity Facility Parties.

1.155. "*Incremental New Money Preferred Units*" means the redeemable preferred units of Holdings, with an aggregate initial liquidation preference equal to $500 million, *minus* any reduction on account of the amount of any Excess Liquidity Reduction, subject to any in-kind increases as described in this Plan and the New Capital Commitment Letter. The Incremental New Money Preferred Units with respect to distribution, redemption and repurchase rights and rights upon the Reorganized Global Debtors or its subsidiaries' liquidation, winding up or dissolution, will rank senior to the common equity and all other equity interests of the Reorganized Global Debtors, including the Take Back Preferred Units.

1.156. "*Incremental New Money Term Loans*" means the senior secured first lien term loans issued under the Incremental New Money Debt Facility.

1.157. "*Independent Managers*" means, collectively, (a) the independent members of the board of managers of HBC GP LLC and (b) the independent members of the governing body of each subsidiary Global Debtor that is not member-managed.

1.158. "*Initial SGUS Notes*" means those certain 11.000% senior secured asset based notes due 2029, issued in the aggregate principal amount of $300 million, the issuance of which was authorized by SGUS on June 27, 2025.

1.159.     "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

1.160.     "*Intercompany Claim*" means any Claim, Cause of Action, or remedy held by or asserted against a Global Debtor by another Global Debtor, other than the Prepetition FILO and Prepetition NPC Claims.

1.161.     "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Global Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on January 15, 2026 [Docket No. 206].

1.162.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

1.163.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.164.     "*Litigation Funding*" means any litigation funding or financing to pursue Litigation Trust Retained Causes of Action in accordance with the Committee Settlement Term Sheet and the Litigation Trust Documents; <u>provided</u> that any contingency fee arrangements with professionals retained by the Litigation Trust shall not constitute Litigation Funding.

1.165.     "*Litigation Funding Agreement*" means any agreement into which the Litigation Trust enters in respect of Litigation Funding; <u>provided</u> that any such agreement proposed to be entered into with a third-party shall be subject to the Litigation Trust Class A-1 ROFR; <u>provided</u>, <u>further</u>, that any such Litigation Funding shall have recourse solely to the proceeds of the Litigation Trust Retained Causes of Action, excluding Litigation Trust Proceeds used to fund the Litigation Trust Reserve.

1.166.     "*Litigation Trust*" means the trust, of which the Litigation Trustee shall serve as trustee, to be established on the Effective Date pursuant to this Plan, the Litigation Trust Documents, and the Committee Settlement to administer the Litigation Trust Assets and reconcile, administer, process, settle, resolve, liquidate, satisfy, and make distributions on account of Allowed General Unsecured Claims.

1.167.     "*Litigation Trust Agreement*" means that certain agreement entered into no later than the Effective Date, which shall be in form and substance reasonably acceptable to the Creditors' Committee, the Global Debtors, and the Required Consenting DIP Term Loan Lenders setting forth, among other things, the terms and conditions for the establishment of the Litigation Trust and the appointment of the Litigation Trustee.

1.168.     "*Litigation Trust Allocation*" has the meaning set forth in <u>Section 6.8(e)</u> of this Plan.

19

1.169.    "*Litigation Trust Assets*" means, collectively, the Litigation Trust Initial Funding Amount (if any), the Litigation Trust Retained Causes of Action, any additional assets as may be mutually agreed among the Creditors' Committee, the Ad Hoc Group, and the Global Debtors prior to the Effective Date, and any additional assets that the Reorganized Global Debtors, in their reasonable discretion and with the consent of the Litigation Trustee, may transfer to the Litigation Trust from time to time after the Effective Date.  For the avoidance of doubt, Litigation Trust Assets shall not include the Professional Fee Escrow Account (and any amounts therein).

1.170.    "*Litigation Trust Beneficiaries*" means, collectively, Holders of Allowed Second Out DIP Term Loan Claims, Third Out DIP Term Loan Claims, Prepetition OpCo Second Out Notes Claims, Prepetition OpCo Third Out Notes Claims, Prepetition Initial Notes Claims, Go-Forward OpCo Trade Claims, OpCo General Unsecured Claims, Go-Forward HoldCo II Trade Claims, and HoldCo II General Unsecured Claims who receive Litigation Trust Interests under this Plan.

1.171.    "*Litigation Trust Class A Interests*" means, collectively, the Litigation Trust Class A-1 Interests, the Litigation Trust Class A-2 Interests, the Litigation Trust Class A-3 Interests, and the Litigation Trust Class A-4 Interests.

1.172.    "*Litigation Trust Class A-1 Interests*" means interests in the Litigation Trust provided to Holders of Second Out DIP Term Loan Claims and Third Out DIP Term Loan Claims representing a right to recovery from the Litigation Trust Proceeds in accordance with the Litigation Trust Allocation, which interests shall be allocated between Class 3-B Second Out DIP Term Loan Claims and Class 3-C Third Out DIP Term Loan Claims in a manner to be determined solely by the Required Consenting DIP Term Loan Lenders in accordance with the DIP Documents.

1.173.    "*Litigation Trust Class A-1 ROFR*" means the right of holders of Litigation Trust Class A-1 Interests to offer a Litigation Funding Agreement on terms that match or exceed the terms offered to the Litigation Trust by a third party, as determined by the Litigation Trustee and the members of the Litigation Trust Committee designated by the Creditors' Committee in their reasonable discretion.

1.174.    "*Litigation Trust Class A-2 Interests*" means interests in the Litigation Trust provided to Holders of Prepetition OpCo Second Out Notes Claims representing a right to recovery from the Litigation Trust Proceeds in accordance with the Litigation Trust Allocation.

1.175.    "*Litigation Trust Class A-3 Interests*" means interests in the Litigation Trust provided to Holders of Prepetition OpCo Third Out Notes Claims representing a right to recovery from the Litigation Trust Proceeds in accordance with the Litigation Trust Allocation.

1.176.    "*Litigation Trust Class A-4 Interests*" means interests in the Litigation Trust provided to Holders of Prepetition Initial Notes Claims representing a right to recovery from the Litigation Trust Proceeds in accordance with the Litigation Trust Allocation.

1.177.    "*Litigation Trust Class B Interests*" means, collectively, the interests in the Litigation Trust provided to Holders of Go-Forward OpCo Trade Claims, OpCo General

20

Unsecured Claims, Go-Forward HoldCo II Trade Claims, and HoldCo II General Unsecured Claims representing a right to recovery from the Litigation Trust Proceeds in accordance with the Litigation Trust Allocation, which interests shall be allocated among Holders of Go-Forward OpCo Trade Claims, OpCo General Unsecured Claims, Go-Forward HoldCo II Trade Claims, and HoldCo II General Unsecured Claims in a manner to be determined by the Creditors' Committee, in consultation with the Global Debtors.

1.178.   "*Litigation Trust Committee*" means the oversight committee, which shall oversee the Litigation Trust in accordance with the Plan and the Litigation Trust Documents, and which shall be composed of two (2) designees selected by the Creditors' Committee; and one (1) designee selected by the Required Consenting DIP Term Loan Lenders.

1.179.   "*Litigation Trust Documents*" means, collectively, the Litigation Trust Agreement and the other documents necessary to form the Litigation Trust, each of which shall be in form and substance acceptable to the Global Debtors, the Creditors' Committee, and the Required Consenting DIP Term Loan Lenders.

1.180.   "*Litigation Trust Fees and Expenses*" means (a) all reasonable and documented fees, expenses, and costs (including any taxes (if any) imposed on or payable by the Litigation Trust) incurred by the Litigation Trust, (b) any professionals retained by the Litigation Trust, and (c) any additional amount determined necessary by the Litigation Trustee to be included in the Litigation Trust Reserve; provided that the foregoing (a) through (c) shall in all respects be in accordance with and subject to the Litigation Trust Documents and the Committee Settlement Term Sheet.

1.181.   "*Litigation Trust Initial Distribution*" has the meaning set forth in Section 6.8(e)(ii) of this Plan.

1.182.   "*Litigation Trust Initial Funding Amount*" means $20,000,000.00 in Cash, which shall be provided by the Reorganized Global Debtors, subject to the Litigation Trust Initial Funding Election.

1.183.   "*Litigation Trust Initial Funding Election*" has the meaning set forth in Section 6.8(f) of this Plan.

1.184.   "*Litigation Trust Interests*" means, collectively, the Litigation Trust Class A Interests and the Litigation Trust Class B Interests.

1.185.   "*Litigation Trust MOIC*" means a 1.5x Multiple on Invested Capital applied to the Litigation Trust Initial Funding Amount, if any.

1.186.   "*Litigation Trust Proceeds*" means, if applicable, all dividends, rents, royalties, income, proceeds, and other receipts of, from, or attributable to the Litigation Trust Assets (if any) after payment of expenses of the Litigation Trust, which such Litigation Trust Proceeds shall be distributed in accordance with the Litigation Trust Allocation as set forth in Section 6.8 hereof and the Litigation Trust Documents.

1.187.    "*Litigation Trust Repayment Distribution*" has the meaning set forth in Section 6.8(e)(i) of this Plan.

1.188.    "*Litigation Trust Reserve*" means an amount that the Litigation Trustee determines, in accordance with the terms of the Litigation Trust Documents, is necessary to pay current and projected Litigation Trust Fees and Expenses.

1.189.    "*Litigation Trust Retained Causes of Action*" means all claims and Causes of Action of the Global Debtors arising prior to the Effective Date that are not (a) Reorganized Global Debtor Retained Causes of Action or (b) released under the Plan, including the claims and Causes of Action that shall vest in the Litigation Trust, as set forth in the Schedule of Retained Causes of Action.

1.190.    "*Litigation Trustee*" means the Person or Entity (or successor thereto) selected by the Creditors' Committee with the reasonable consent of the Required Consenting DIP Term Loan Lenders and in consultation with the Global Debtors, who or which, on and after the Effective Date, shall have the rights, powers and duties as set forth in this Plan, the Litigation Trust Documents, and the Committee Settlement to administer the Litigation Trust Assets and reconcile, administer, process, settle, resolve, liquidate, satisfy, and make distributions on account of Allowed General Unsecured Claims.

1.191.    "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas, including the Procedures for Complex Cases in the Southern District of Texas.

1.192.    "*Management Incentive Plan*" means a management incentive plan for the Reorganized Global Debtors on the terms set forth in the Plan Supplement.

1.193.    "*Majority Commitment Parties*" has the meaning set forth in the New Capital Commitment Letter.

1.194.    "*Neiman Acquisition Directors*" means, collectively, any directors of the Global Debtors or their predecessors serving in such capacity at the time of the approval and/or closing of the acquisition of the Neiman Marcus Group, other than any Persons that are Released Parties.

1.195.    "*New Board*" means the initial board of directors or similar governing body of each of the Reorganized Global Debtors.

1.196.    "*New Capital Commitment Claims*" means, collectively, any Claim by a New Capital Commitment Party pursuant to the New Capital Commitment Letter, including but not limited to the Closing Date Commitment Premium, the Commitment Cash Premium, the Expense Reimbursement, and the indemnity obligations contained in the New Capital Commitment Letter.  For the avoidance of doubt, the New Capital Commitment Claims shall constitute Allowed Administrative Expense Claims, which, for the avoidance of doubt, shall be senior in priority to all other Administrative Expense Claims (other than the DIP Facility Claims).

22

1.197.    "*New Capital Commitment Letter*" means that certain *$500,000,000.00 Incremental New Money Facilities Commitment Letter* entered into by and among Saks, the New Capital Commitment Parties, and the other parties thereto, dated April 1, 2026, as such agreement may be amended, supplemented, amended and restated, or otherwise modified from time to time.

1.198.    "*New Capital Commitment Parties*" means, collectively, the Consenting DIP Term Loan Lenders that become party from time to time to the New Capital Commitment Letter, together with their successors and permitted assigns.

1.199.    "*New Capital Syndication*" means the syndication process pursuant to which the Global Debtors will seek to obtain commitments from third-party capital providers to syndicate some or all of the New Exit Facilities, which process will be in a form reasonably acceptable to the New Capital Commitment Parties.

1.200.    "*New Capital Syndication Documents*" means, collectively, any and all agreements, documents, and instruments delivered or entered into in connection with the New Capital Syndication, subject to the consents and conditions precedent set forth in the Restructuring Support Agreement.

1.201.    "*New Exit Debt Facilities*" means, collectively, the Take Back Debt Facility and the Incremental New Money Debt Facility.

1.202.    "*New Exit Debt Facilities Credit Agreement*" means the loan agreement memorializing the New Exit Debt Facilities, the material terms of which shall be included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Global Debtors, the Exit Debt Term Loan Agent, and the New Exit Debt Term Lenders.

1.203.    "*New Exit Debt Facilities Documents*" means, collectively, the New Exit Debt Facilities Credit Agreement and any other agreements or documents related to or executed in connection with the New Exit Debt Facilities, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

1.204.    "*New Exit Debt Term Lenders*" means the lenders party to the New Exit Debt Facilities Documents.

1.205.    "*New Exit Debt Term Loan Agent*" means the administrative agent under the New Exit Debt Facilities Credit Agreement, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the New Exit Debt Facilities Credit Agreement.

1.206.    "*New Exit Facilities*" means, collectively, the New Exit Debt Facilities and the Preferred Equity Facilities.

1.207.    "*New Exit Facilities Documents*" means, collectively, the agreements, documents, and instruments delivered or entered into in connection with the New Exit Facilities, including, without limitation, the New Capital Commitment Letter, the New Capital Syndication Documents, the New Exit Debt Facilities Documents, and the Preferred Equity

23

Facilities Documents, and any credit agreement, term sheet, backstop agreement, guarantee agreement, pledge and collateral agreement, intercreditor agreement, and other ancillary and security documents provided therein or related thereto, subject in all respects to the consents and conditions precedent set forth in the Restructuring Support Agreement.

1.208.    "*New Exit Term Loans*" means the indebtedness issued pursuant to the New Exit Debt Facilities, and shall include, collectively, the Take Back Term Loans and the Incremental New Money Term Loans.

1.209.    "*New Exit Term Loan Secured Parties*" means, collectively, the New Exit Debt Term Lenders and the New Exit Debt Term Loan Agent.

1.210.    "*New Organizational Documents*" means, collectively, the new Organizational Documents of the Reorganized Global Debtors, to be entered into on the Effective Date, including certificates of incorporation, limited liability company agreements, stockholders or shareholders agreements, operating agreements, equity subscription or purchase agreements, charters or bylaws.

1.211.    "*New Saks*" means either (a) Holdings or (b) a new corporation or limited liability company that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Global Debtors in the Chapter 11 Cases or issue the New Saks Common Stock to be distributed pursuant to this Plan.

1.212.    "*New Saks Common Stock*" means the common Equity Interests of New Saks authorized under the New Organizational Documents of the Reorganized Global Debtors and issued and/or distributed on the Effective Date in accordance with this Plan, subject to dilution by the Management Incentive Plan and the New Exit Facilities.

1.213.    "*OpCo General Unsecured Claim(s)*" means, collectively, any General Unsecured Claims against the OpCo Global Debtors other than HoldCo II.

1.214.    "*OpCo Global Debtor(s)*" means any Global Debtor other than any TopCo Global Debtor and HoldCo II.

1.215.    "*Organizational Documents*" means, collectively, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization) or which relate to the internal governance of such Person (such as bylaws or a partnership agreement, or an operating, limited liability company, or members agreement).

1.216.    "*Other Axonic Claim*" means any Claim held by Axonic arising under, derived from, related to, or based on the Axonic Transaction Documents, other than an Axonic Guarantee Claim.

1.217.    "*Other Secured Claim*" means any Secured Claim against a Global Debtor other than a DIP Facility Claim, Prepetition SGUS Notes Claim, Prepetition OpCo Second Out Notes Claim, Prepetition OpCo Third Out Notes Claim, and Prepetition Initial Notes Claims.

24

1.218.    "*PAA*" means that certain Payment Administration Agreement, dated as of August 8, 2025 by and among Saks, Holdings, the Opco Subsidiary Guarantors (as defined therein), the Prepetition FILO Agent, the Prepetition NPC Agent, the Prepetition SGUS Notes Trustee, the Prepetition Initial Notes Collateral Agent, the Prepetition OpCo Notes Trustee, and the Old Agent (as defined therein), as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date.

1.219.    "*PBGC*" means the Pension Benefit Guaranty Corporation.

1.220.    "*PBGC-Insured Pension Plans*" means, together, the Saks Fifth Avenue Pension Plan, insured by the PBGC and covered by Title IV of the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301-1461 (2018 & Supp. V 2024) and The Neiman Marcus Group LLC Retirement Plan, insured by the PBGC and covered by Title IV of the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301-1461 (2018 & Supp. V 2024).

1.221.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

1.222.    "*Petition Date*" means, as applicable, January 13, 2026 or January 14, 2026, the date on which each Global Debtor commenced its Chapter 11 Case.

1.223.    "*Plan*" means this joint chapter 11 plan proposed by the Global Debtors, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Restructuring Support Agreement, and the terms hereof. If this Plan is withdrawn as the Plan for a particular Global Debtor, the defined term "Plan" shall not include the plan of reorganization or liquidation for such Global Debtor in its Chapter 11 Case where the context otherwise requires.

1.224.    "*Plan Documents*" means, collectively, those documents necessary to effectuate this Plan following entry of the Confirmation Order, which shall be contained in the Plan Supplement and shall be subject to revision and modification prior to the Effective Date.

1.225.    "*Plan Supplement*" means any compilation of documents and forms of documents (including term sheets), agreements, schedules, and exhibits to this Plan, which may be amended from time to time, including (a) the New Organizational Documents, (b) the Schedule of Retained Causes of Action, (c) the Schedule of Excluded Parties, (d) the Restructuring Steps Plan, (e) the Assumed Contracts / Leases List, (f) the Rejected Contracts / Leases List, (g) the Exit ABL Facility Documents, (h) the New Exit Facilities Documents, (i) to the extent known, the identity of the members of the New Board and the nature and compensation for any director who is an Insider, (j) the Management Incentive Plan, (k) the Litigation Trust Documents, (l) to the extent known, and if appointed, the identity(ies) of the Litigation Trustee; (m) to the extent known, the list of entities anticipated to be merged, dissolved, or liquidated pursuant to the Plan; (n) the Committee Settlement Term Sheet; and (o) any and all other documents necessary to effectuate the Restructuring Transactions or that are contemplated by this Plan, which shall be (1) Filed by the Global Debtors prior to the

25

Combined Hearing (as may be amended or supplemented from time to time in accordance with the Plan, the Restructuring Support Agreement and the Committee Settlement Term Sheet) and (2) be in all respects in form and substance acceptable to the Required Consenting DIP Term Loan Lenders and, subject to the terms of the Committee Settlement Term Sheet, the Creditors' Committee.

1.226.    "*Post-Emergence Bonuses*" means the bonuses that may be paid by the Reorganized Global Debtors to certain eligible employees related to performance during the second half of the 2026 fiscal year pursuant to the Post-Emergence Incentive Plan in an aggregate amount not to exceed $6.5 million, at the discretion of and on terms to be decided by the New Board.

1.227.    "*Post-Emergence Incentive Plan*" means the incentive bonus plan to be adopted by the Reorganized Global Debtors that provides for payment of the Post-Emergence Bonuses.

1.228.    "*Preferred Equity Facilities*" means, together, the Take Back Preferred Equity Facility and the Incremental New Money Preferred Equity Facility.

1.229.    "*Preferred Equity Facilities Documents*" means, collectively, the Incremental New Money Preferred Equity Facility Documents and the Take Back Preferred Equity Facility Documents.

1.230.    "*Preferred Equity Facilities Parties*" means, collectively, the Take Back Preferred Equity Facility Parties and the Incremental New Money Preferred Equity Facility Parties.

1.231.    "*Preferred Equity Units*" means, collectively, the Incremental New Money Preferred Units and the Take Back Preferred Units.

1.232.    "*Prepetition ABL Agent*" means Bank of America, N.A., solely in its capacity as administrative agent and collateral agent under the Prepetition ABL Credit Agreement, and any successor thereto.

1.233.    "*Prepetition ABL Credit Agreement*" means that certain Credit Agreement, dated as of December 23, 2024 by and among the Prepetition ABL Borrower, the Prepetition ABL Agent, and the Prepetition ABL Lenders (as amended by that certain Amendment No. 1, dated as of June 27, 2025, as further amended by that certain Consent and Amendment No. 2, dated as of July 23, 2025, as further amended by that certain Amendment No. 3 to ABL Credit Agreement, dated as of September 8, 2025, and as may be further amended, restated, amended and restated, supplemented, extended, renewed, refinanced or otherwise modified from time to time).

1.234.    "*Prepetition ABL Lenders*" means, the "Lenders" (as defined in the Prepetition ABL Credit Agreement).

26

1.235. "*Prepetition FILO Agent*" means, collectively, SGUS as administrative agent, and Bank of America, N.A., as collateral agent, under the Prepetition FILO Credit Agreement, together with their successors and permitted assigns in such capacity.

1.236. "*Prepetition FILO and NPC Claims*" means, collectively, the Prepetition FILO Claims and Prepetition NPC Claims.

1.237. "*Prepetition FILO and NPC Claims Cash Pool Distribution Amount*" means Cash in the amount of $100,000.00.

1.238. "*Prepetition FILO Claim(s)*" means any Claim against a Global Debtor arising under, derived from, related to, or based on the Prepetition FILO Credit Agreement.

1.239. "*Prepetition FILO Credit Agreement*" means that certain Term Loan Credit Agreement, dated as of June 27, 2025 by and among Saks as borrower, the Opco Subsidiary Guarantors (as defined therein), the lenders party thereto from time to time, and SGUS, as administrative agent, as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date.

1.240. "*Prepetition FILO Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the Prepetition FILO Credit Agreement.

1.241. "*Prepetition Initial Notes*" means, collectively, the secured notes issued under the Prepetition Initial Notes Indenture.

1.242. "*Prepetition Initial Notes Charging Lien*" means the Lien, indemnification, and priority of payment rights in favor of the Prepetition Initial Notes Collateral Agent and the Prepetition Initial Notes Trustee under the Prepetition Initial Notes Indenture, on or with respect to distributions made to the Prepetition Initial Notes Trustee on account of the Prepetition Initial Notes Claims; provided that notwithstanding anything to the contrary herein, the Prepetition Initial Notes Collateral Agent and the Prepetition Initial Notes Trustee shall not be entitled to withhold any distributions on account of such Prepetition Initial Notes Charging Lien if the Prepetition Initial Notes Trustee Fees and the Prepetition Initial Notes Collateral Agent Fees are paid in accordance with this Plan.

1.243. "*Prepetition Initial Notes Claim(s)*" means any and all Claims on account of, arising under or pursuant to the Prepetition Initial Notes and the Prepetition Initial Notes Documents. For the avoidance of doubt, such Claims shall not constitute OpCo General Unsecured Claims.

1.244. "*Prepetition Initial Notes Collateral Agent*" means Citibank, N.A. (and any successors thereto, as permitted by the terms of the Prepetition Initial Notes Documents) in its capacity as Collateral Agent under the Prepetition Initial Notes Documents.

1.245. "*Prepetition Initial Notes Collateral Agent Fees*" means the reasonable and documented compensation, fees, costs, expenses, disbursements, and claims for indemnity, subrogation, and contribution of the Prepetition Initial Notes Collateral Agent, in each case including any fees, expenses, and disbursements of attorneys, advisors, or agents retained or

27

utilized by the Prepetition Initial Notes Collateral Agent, incurred by or owed to the Prepetition Initial Notes Collateral Agent, whether incurred prior to or after the Petition Date (and including such amounts incurred prior to, on, or after the Effective Date) in each case in accordance with the Prepetition Initial Notes Documents.

1.246. "*Prepetition Initial Notes Documents*" means, collectively, the "Notes Documents," as defined under the Prepetition Initial Notes Indenture.

1.247. "*Prepetition Initial Notes Indenture*" means that certain Indenture, dated as of December 16, 2024 (as may be amended, restated, supplemented, or otherwise modified prior to the Petition Date), by and among Saks, as issuer (as successor in interest to SFA Issuer LLC), Holdings, the Opco Subsidiary Guarantors (as defined therein), the Prepetition Initial Notes Trustee, and the Prepetition Initial Notes Collateral Agent.

1.248. "*Prepetition Initial Notes Trustee*" means Citibank, N.A. (and any successors thereto, as permitted by the terms of the Prepetition Initial Notes Indenture), in its capacities as Trustee, Paying Agent, Registrar, and Notes Custodian (the foregoing terms as defined in the Prepetition Initial Notes Indenture) and in any other capacities (other than Collateral Agent) under or related to the Prepetition Initial Notes Indenture.

1.249. "*Prepetition Initial Notes Trustee Fees*" means the reasonable and documented compensation, fees, costs, expenses, disbursements, and claims for indemnity, subrogation, and contribution of the Prepetition Initial Notes Trustee, in each case including any fees, expenses, and disbursements of attorneys, advisors, or agents retained or utilized by the Prepetition Initial Notes Trustee, incurred by or owed to the Prepetition Initial Notes Trustee, whether incurred prior to or after the Petition Date (and including such amounts incurred prior to, on, or after the Effective Date) in each case in accordance with the Prepetition Initial Notes Documents.

1.250. "*Prepetition NPC Agent*" means, collectively, SGUS, as administrative agent, the Prepetition NPC Collateral Agent, and any successors thereto (as permitted by the terms of the Prepetition NPC Credit Agreement), in each case under the Prepetition NPC Credit Agreement.

1.251. "*Prepetition NPC Claim(s)*" means any and all Claims against a Global Debtor arising under, derived from, related to, or based on the Prepetition NPC Credit Agreement.

1.252. "*Prepetition NPC Collateral Agent*" means Citibank, N.A., as Collateral Agent (as defined in the Prepetition NPC Credit Agreement) and in any other capacities under or related to the Prepetition NPC Credit Agreement.

1.253. "*Prepetition NPC Collateral Agent Fees*" means the reasonable and documented compensation, fees, costs, expenses, disbursements, and claims for indemnity, subrogation, and contribution of the Prepetition NPC Collateral Agent, in each case including any fees, expenses, and disbursements of attorneys, advisors, or agents retained or utilized by the Prepetition NPC Collateral Agent, incurred by or owed to the Prepetition NPC Collateral Agent, whether incurred prior to or after the Petition Date (and including such amounts

28

incurred prior to, on, or after the Effective Date) in each case in accordance with the Prepetition NPC Credit Agreement.

1.254.    "*Prepetition NPC Credit Agreement*" means that certain Term Loan Credit Agreement, dated as of August 8, 2025 (as may be amended, amended and restated, supplemented, or otherwise modified, refinanced or replaced prior to the Petition Date), by and among Saks, as borrower, the Opco Subsidiary Guarantors (as defined therein), the Prepetition NPC Lenders, SGUS, as administrative agent, and the Prepetition NPC Collateral Agent.

1.255.    "*Prepetition NPC Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the Prepetition NPC Credit Agreement.

1.256.    "*Prepetition NPC Loan Charging Lien*" means the Lien, indemnification, and priority of payment rights in favor of the Prepetition NPC Collateral Agent under the Prepetition NPC Loan Documents, on or with respect to distributions made on account of the Prepetition NPC Claims; provided that notwithstanding anything to the contrary herein, the Prepetition NPC Collateral Agent shall not be entitled to withhold any distributions on account of such Prepetition NPC Loan Charging Lien if the Prepetition NPC Collateral Agent Fees are paid in accordance with this Plan.

1.257.    "*Prepetition NPC Loan Documents*" means, collectively, the "Loan Documents," as defined under the Prepetition NPC Credit Agreement.

1.258.    "*Prepetition OpCo Notes*" means, collectively, the Prepetition OpCo Second Out Notes and the Prepetition OpCo Third Out Notes.

1.259.    "*Prepetition OpCo Notes Charging Lien*" means the Lien, indemnification, and priority of payment rights in favor of the Prepetition OpCo Notes Trustee and Prepetition OpCo Notes Collateral Agent under the Prepetition OpCo Notes Indenture, on or with respect to distributions made to the Prepetition OpCo Notes Trustee on account of the Prepetition OpCo Notes Claims; provided that, notwithstanding anything to the contrary herein, the Prepetition OpCo Notes Trustee shall not be entitled to withhold any distributions on account of such Prepetition OpCo Notes Charging Lien if the Prepetition OpCo Notes Trustee Fees are paid in accordance with this Plan.

1.260.    "*Prepetition OpCo Notes Claim(s)*" means, to the extent not converted into a DIP Facility Claim, any and all Claims against a Global Debtor arising under or pursuant to the Prepetition OpCo Notes and the Prepetition OpCo Notes Documents.

1.261.    "*Prepetition OpCo Notes Collateral Agent*" means Citibank, N.A. (and any successors thereto, as permitted by the terms of the Prepetition OpCo Notes Documents) in its capacity as Collateral Agent under the Prepetition OpCo Notes Documents.

1.262.    "*Prepetition OpCo Notes Collateral Agent Fees*" means the reasonable and documented compensation, fees, costs, expenses, disbursements, and claims for indemnity, subrogation, and contribution of the Prepetition OpCo Notes Collateral Agent, in each case including any fees, expenses, and disbursements of attorneys, advisors, or agents retained or utilized by the Prepetition OpCo Notes Collateral Agent, incurred by or owed to the Prepetition

29

OpCo Notes Collateral Agent, whether incurred prior to or after the Petition Date (and including such amounts incurred prior to, on, or after the Effective Date) in each case in accordance with the Prepetition OpCo Notes Indenture.

1.263. "*Prepetition OpCo Notes Documents*" means, collectively, the "Notes Documents," as defined under the Prepetition OpCo Notes Indenture.

1.264. "*Prepetition OpCo Notes Indenture*" means that certain Indenture, dated as of August 8, 2025 (as amended, restated, supplemented, or otherwise modified prior to the Petition Date), by and among Saks, as issuer, Holdings, the Opco Subsidiary Guarantors (as defined therein), the Prepetition OpCo Notes Trustee, and the Prepetition OpCo Notes Collateral Agent.

1.265. "*Prepetition OpCo Notes Trustee*" means Citibank, N.A. (and any successors thereto, as permitted by the terms of the Prepetition OpCo Notes Indenture), in its capacities as Trustee, Paying Agent, Registrar, and Notes Custodian (the foregoing terms as defined in the Prepetition OpCo Notes Indenture) and in any other capacities (other than Collateral Agent) under or related to the Prepetition OpCo Notes Indenture.

1.266. "*Prepetition OpCo Notes Trustee Fees*" means the reasonable and documented compensation, fees, costs, expenses, disbursements, and claims for indemnity, subrogation, and contribution of the Prepetition OpCo Notes Trustee, in each case including any fees, expenses, and disbursements of attorneys, advisors, or agents retained or utilized by the Prepetition OpCo Notes Trustee, incurred by or owed to the Prepetition OpCo Notes Trustee, whether incurred prior to or after the Petition Date (and including such amounts incurred prior to, on, or after the Effective Date) in each case in accordance with the Prepetition OpCo Notes Indenture

1.267. "*Prepetition OpCo Second Out Notes*" means, collectively, those certain 11.000% senior secured second out notes due 2029 issued by Saks pursuant to the Prepetition OpCo Notes Indenture.

1.268. "*Prepetition OpCo Second Out Notes Claims*" means, collectively, any and all Claims on account of, arising under, or pursuant to the Prepetition OpCo Second Out Notes and the Prepetition OpCo Notes Documents.

1.269. "*Prepetition OpCo Third Out Notes*" means, collectively, those certain 11.000% senior secured third out notes due 2029 issued by Saks pursuant to the Prepetition OpCo Notes Indenture.

1.270. "*Prepetition OpCo Third Out Notes Claims*" means, collectively, any and all Claims on account of, arising under, or pursuant to the Prepetition OpCo Third Out Notes and the Prepetition OpCo Notes Documents. For the avoidance of doubt, such Claims shall not constitute OpCo General Unsecured Claims.

1.271. "*Prepetition Secured Claims*" means, collectively, the Prepetition OpCo Notes Claims, the Prepetition SGUS Notes Claims, the Prepetition FILO and NPC Claims, and the Prepetition Initial Notes Claims.

30

1.272.   "*Prepetition SGUS Notes*" means, collectively, the Initial SGUS Notes and the Additional SGUS Notes.

1.273.   "*Prepetition SGUS Notes Charging Lien*" means the Lien, indemnification, and priority of payment rights in favor of the Prepetition SGUS Notes Trustee under the Prepetition SGUS Notes Indenture, on or with respect to distributions made to the Prepetition SGUS Notes Trustee on account of the Prepetition SGUS Notes Claims; provided that, notwithstanding anything to the contrary herein, the Prepetition SGUS Notes Trustee shall not be entitled to withhold any distributions on account of such Prepetition SGUS Notes Charging Lien if the Prepetition SGUS Notes Trustee Fees are paid in accordance with this Plan.

1.274.   "*Prepetition SGUS Notes Claim(s)*" means, to the extent not converted into a DIP Term Loan Claim, any and all Claims against a Global Debtor arising under, derived from, related to, or based on the Prepetition SGUS Notes and the Prepetition SGUS Notes Documents.

1.275.   "*Prepetition SGUS Notes Claims Cash Pool Distribution Amount*" means Cash in the amount of $100,000.00.

1.276.   "*Prepetition SGUS Notes Documents*" means, collectively, the "Notes Documents," as defined under the Prepetition SGUS Notes Indenture.

1.277.   "*Prepetition SGUS Notes Indenture*" means that certain Asset Based Indenture, dated as of June 27, 2025 (as amended, restated, supplemented, or otherwise modified prior to the Petition Date), by and among SGUS, as issuer, the guarantors party thereto, and the Prepetition SGUS Notes Trustee.

1.278.   "*Prepetition SGUS Notes Trustee*" means Citibank, N.A. (and any successors thereto, as permitted by the terms of the Prepetition SGUS Notes Documents), in its capacities as Trustee, Collateral Agent, Authenticating Agent, Registrar, Paying Agent, and Notes Custodian under the Prepetition SGUS Notes Documents.

1.279.   "*Prepetition SGUS Notes Trustee Fees*" means the reasonable and documented compensation, fees, costs, expenses, disbursements, and claims for indemnity, subrogation, and contribution of the Prepetition SGUS Notes Trustee, in each case including any fees, expenses, and disbursements of attorneys, advisors, or agents retained or utilized by the Prepetition SGUS Notes Trustee, incurred by or owed to the Prepetition SGUS Notes Trustee, whether incurred prior to or after the Petition Date (and including such amounts incurred prior to, on, or after the Effective Date) in each case in accordance with the Prepetition SGUS Notes Documents.

1.280.   "*Prepetition TopCo Agent*" means GLAS USA LLC, in its capacity as administrative agent under the Prepetition TopCo Credit Agreement, together with its successors and permitted assigns.

1.281.   "*Prepetition TopCo Credit Agreement*" means that certain Credit Agreement, by and among TopCo, as borrower, Global Debtor Mercury Aggregator Holdco LLC, a Delaware limited liability company, as holdings, HBSFA Holdings Ltd., a Canadian

31

limited company, as Canadian holdings, the other guarantors party thereto, the Prepetition TopCo Lenders, and Prepetition TopCo Agent.

1.282.    "*Prepetition TopCo Facility*" means the credit facility provided for under the Prepetition TopCo Credit Agreement.

1.283.    "*Prepetition TopCo Facility Claims*" means, collectively, any Claims on account of the Prepetition TopCo Facility arising under or pursuant to the Prepetition TopCo Credit Agreement.

1.284.    "*Prepetition TopCo Lenders*" means, collectively, and as of the relevant time, those lenders that are party to the Prepetition TopCo Credit Agreement.

1.285.    "*Prepetition Trustees and Agents*" means, collectively, the Prepetition SGUS Notes Trustee, the Prepetition OpCo Notes Trustee, the Prepetition OpCo Notes Collateral Agent, the Prepetition Initial Notes Trustee, the Prepetition Initial Notes Collateral Agent, the Prepetition NPC Agent, the Prepetition FILO Agent, and the Prepetition ABL Agent.

1.286.    "*Prepetition Trustees and Agents Fees and Expenses*" means, collectively, the Prepetition SGUS Notes Trustee Fees, Prepetition NPC Collateral Agent Fees, Prepetition OpCo Notes Trustee Fees, Prepetition OpCo Notes Collateral Agent Fees, Prepetition Initial Notes Trustee Fees, and Prepetition Initial Notes Collateral Agent Fees.

1.287.    "*Priority Non-Tax Claim*" means any Claim, other than a DIP Facility Claim, an Administrative Expense Claim, a Professional Fee Claim, a Cure Cost, or a Priority Tax Claim, that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.288.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.289.    "*Priority Tax Claims Bar Date*" means the date that is 180 days after the Petition Date.

1.290.    "*Privileges*" has the meaning set forth in Section 6.8(i) of this Plan.

1.291.    "*Professional Fee Claim*" means any Claim by a Professional Person for compensation for services rendered or reimbursement of expenses incurred by such Professional Person on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court, including in connection with final fee applications of such Professional Persons.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional Person's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

1.292.    "*Professional Fee Escrow Account*" means an account funded by the Global Debtors with Cash no later than the Effective Date in the amount equal to the Professional Fee Escrow Amount.

1.293.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professional Persons have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Effective Date, which shall be estimated pursuant to the method set forth in Article III of this Plan.

1.294.    "*Professional Person(s)*" means any Persons (a) retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court, or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.295.    "*Proof of Claim*" means a proof of Claim Filed against any of the Global Debtors in the Chapter 11 Cases.

1.296.    "*Proof of Equity Interest*" means a proof of Equity Interest Filed against any of the Global Debtors in the Chapter 11 Cases.

1.297.    "*Reinstate*" means with respect to Claims or Equity Interests, that the Claim or Equity Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  "Reinstated" and "Reinstatement" shall have correlative meanings.

1.298.    "*Rejected Contracts / Leases List*" means the list (as determined by the Global Debtors) of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto), if any, that will be rejected pursuant to this Plan.

1.299.    "*Rejected SERPs*" means, collectively, (a) the Saks Global U.S. Supplemental Executive Retirement Plan, effective January 1, 2016, that is sponsored by Saks, and (b) the Saks Fifth Avenue Supplemental Pension Plan, effective July 2, 1990 (as amended and restated April 1, 1998), that is sponsored by Saks & Company LLC.

1.300.    "*Rejected Severance Arrangements*" means, collectively, (a) the Saks Global Severance Pay Plan, (b) the Neiman Marcus Group LLC Amended and Restated Employee Severance Plan for Vice Presidents and Senior Vice Presidents, (c) the Neiman Marcus Group LLC Amended and Restated Employee Severance Plan, and (d) any other plan, program or agreement providing for severance benefits, regardless of whether such benefits are subject to ERISA.

1.301.    "*Related Parties*" means, collectively with respect to any Person, in each case solely in its capacity as such with respect to such Person, such Person's predecessors, successors, assigns, and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, equityholders, members (including ex officio members and managing members), managers, managed accounts or funds, management companies, fund advisors,

33

advisory or subcommittee board members, general and limited partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time, and any Person claiming by or through any of them, including such Related Parties' respective heirs, executors, estates, servants, and nominees.

1.302. "*Release Opt-In Forms*" means the form to be provided to Holders of Claims or Interests in Classes 6-A, 6-B, 8, and 9 through which such Holders may elect to affirmatively opt into the Third-Party Release.

1.303. "*Release Opt-Out Forms*" means the form to be provided to Holders of Claims in Classes 1 and 2 through which such Holders may elect to affirmatively opt out of the Third-Party Release.

1.304. "*Released Parties*" means, collectively, and each solely in its capacity as such, and subject to paragraph 82 of the Confirmation Order: (a) the Global Debtors and their Estates; (b) the Reorganized Global Debtors and the Specified Related Parties; (c) the DIP Agents and the DIP Lenders; (d) the New Capital Commitment Parties; (e) the Creditors' Committee and each of its members solely in their capacities as members of the Creditors' Committee; (f) the Ad Hoc Group and each of its members; (g) each of the Prepetition Trustees and Agents; (h) each of the Prepetition ABL Lenders; (i) the Litigation Trustee; and (j) each Related Party of each Entity in clauses (c) through (i) above; provided that no Person or Entity shall be a Released Party unless they are also a Releasing Party; provided, further, that a member of the Creditors' Committee that affirmatively elects to "opt out" of the Third-Party Release as provided on its Ballot is a Releasing Party solely in its capacity as a member of the Creditors' Committee and shall be a Released Party solely in its capacity as a member of the Creditors' Committee; provided, further, that Ian Putnam is not a Released Party; provided, further, that, notwithstanding the foregoing or anything to the contrary herein, any releases provided by the Global Debtors and their Estates shall only apply to (b)–(j) hereof.

1.305. "*Releasing Parties*" means, collectively, and each solely in its capacity as such: (a) the Global Debtors and their Estates; (b) the Reorganized Global Debtors and the Specified Related Parties; (c) the DIP Agents and the DIP Lenders; (d) the New Capital Commitment Parties; (e) the Creditors' Committee and each of its members solely in their capacity as members of the Creditors' Committee; (f) the Ad Hoc Group and each of its members; (g) each of the Prepetition ABL Lenders; (h) all Holders of Claims in Voting Classes that do not affirmatively elect to "opt out" of the Third-Party Release or that affirmatively elect to opt-in, as applicable, as provided on their respective Ballots, Release Opt-In Forms, or Release Opt-Out Forms (as applicable); (i) each of the Prepetition Trustees and Agents, in their capacities as such; (j) all Holders of Claims in Classes 1 and 2 that do not affirmatively elect to "opt out" of the Third-Party Release as provided on their respective Release Opt-Out Forms; (k) all Holders of Claims or Interests in Classes 6-A, 6-B, 8, and 9 that affirmatively elect to "opt in" to the Third-Party Release as provided on their respective Release Opt-In Forms; and (*l*) each of such parties' Related Parties for which such Entity is legally entitled to bind such Related Party to the releases contained in this Plan under applicable non-bankruptcy law; provided, however, that, in each case, the following Persons or Entities shall not be a Releasing Party: (A) all Holders of Claims that are presumed to accept the Plan who affirmatively opt

34

out of the Third-Party Release by checking the box on the applicable notice of non-voting status indicating that they opt to not grant the Third-Party Release; (B) all Holders of Claims in Voting Classes who affirmatively opt out of the Third-Party Release by checking the box on the applicable ballot indicating that they opt not to grant the Third-Party Release; (C) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt into the Third-Party Release by checking the box on the applicable notice of non-voting status indicating that they opt to grant the Third-Party Release; or (D) any Holder of a Claim or Interest who timely objects to the Third-Party Release and whose objection is not resolved before the Confirmation Date.  None of the Excluded Parties shall be Releasing Parties.

1.306.    "*Reorganized Global Debtor(s)*" means, on or after the Effective Date, the Global Debtors or any successors thereto, by merger, consolidation, reorganization or otherwise, as the case may be.

1.307.    "*Reorganized Global Debtor Retained Causes of Action*" has the meaning set forth in the Committee Settlement Term Sheet.

1.308.    "*Required Consenting DIP Term Loan Lenders*" means, at any time, Consenting DIP Term Loan Lenders holding DIP Term Loan Claims that, taken together, represent more than 50.0% of the sum of all DIP Term Loan Claims outstanding at such time, voting as a single class, subject to the exclusions and modifications provided for in the DIP Term Loan Credit Agreement or, solely with respect to any treatment (including the DIP Conversion) which does not provide for the repayment in full in cash of the First Out DIP Term Loan Facility Claims, First Out DIP Term Loan Lenders holding at least 80% of the aggregate outstanding principal amount of First Out DIP Term Loan Facility Claims (exclusive of any fees, premiums, interest, or First Out DIP PIK Loans) that are held by all First Out DIP Term Loan Lenders under the DIP Term Loan Credit Agreement in accordance with the requirements of section 10.08(2)(i) of the DIP Term Loan Credit Agreement.

1.309.    "*Restructuring Fees and Expenses*" means all documented fees, costs, and expenses of each of the Ad Hoc Group Advisors and DIP ABL Advisors.

1.310.    "*Restructuring Steps Plan*" means a document to be included in the Plan Supplement that will set forth the material components of the applicable Restructuring Transactions, including a summary of any transaction steps necessary to complete this Plan, and shall otherwise be in form and substance acceptable to the Global Debtors and the Required Consenting DIP Term Loan Lenders, each in their sole discretion.

1.311.    "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of April 1, 2026, inclusive of all exhibits and schedules thereto, by and among the Global Debtors, the Consenting DIP Term Loan Lenders, and any other Person that may become a party to such agreement pursuant to its terms, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms.

1.312.     "*Restructuring Transactions*" means the transactions described in Article VI of this Plan and the Restructuring Steps Plan, including, for the avoidance of doubt, the DIP Conversion.

1.313.     "*Retained Causes of Action*" means, collectively, the Litigation Trust Retained Causes of Action and the Reorganized Global Debtor Retained Causes of Action; provided that, for the avoidance of doubt, Retained Causes of Action shall include, without limitation, claims and Causes of Action held by or assertable on behalf of any OpCo Global Debtor, any TopCo Global Debtor, or any other Global Debtor, in each case, as identified in the Schedule of Retained Causes of Action.

1.314.     "*Saks*" means Saks Global Enterprises LLC.

1.315.     "*Schedule of Excluded Parties*" means the schedule of Excluded Parties, which shall be contained in the Plan Supplement.  The Schedule of Excluded Parties shall be in form and substance reasonably acceptable to the Creditors' Committee and the Required Consenting DIP Term Loan Lenders.

1.316.     "*Schedule of Retained Causes of Action*" means the schedule identifying all claims and Causes of Action retained pursuant to the Plan and Confirmation Order, including the Litigation Trust Retained Causes of Action and the Reorganized Global Debtor Retained Causes of Action, which shall be (x) contained in the Plan Supplement, (y) consistent with the Committee Settlement Term Sheet and (z) otherwise in form and substance reasonably satisfactory to the Creditors' Committee and the Required Consenting DIP Term Loan Lenders.

1.317.     "*Schedules*" means, collectively, the schedules of assets and liabilities, the schedules of Executory Contracts and Unexpired Leases, and the statements of financial affairs Filed by the Global Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

1.318.     "*SEC*" means the United States Securities and Exchange Commission.

1.319.     "*Second A&R Intercreditor Agreement*" means that certain Second Amended and Restated Intercreditor Agreement, dated as of August 8, 2025, by and among Bank of America, N.A., as the Initial ABL Agent, Citibank, N.A., as the Initial Note / Term Agent, Holdings, Saks, and each subsidiary of Saks signatory thereto, as amended, restated, supplemented, waived, or otherwise modified as of the date hereof.

1.320.     "*Second Out DIP Term Loan Facility Claims*" means, collectively, any Claims against a Global Debtor arising under, derived from, based on, or related to the Second Out DIP Term Loans.

1.321.     "*Second Out DIP Term Loans*" means, collectively, the "Second Out Term Loans" under and as defined in the DIP Term Loan Credit Agreement.

1.322.     "*Second Out / Third Out DIP Distribution*" means all New Saks Common Stock (subject to dilution by the Management Incentive Plan) and any junior preferred equity

36

or similar instrument (if any), which may be debt for tax purposes, 70% of which shall be distributed to Holders of the Second Out DIP Term Loan Facility Claims and 30% of which shall be distributed to the Holders of any Third Out DIP Term Loan Facility Claims, which junior preferred equity or similar instrument (if any) shall be in an amount and on terms acceptable to the Global Debtors and the Required Consenting DIP Term Loan Lenders.

1.323. "*Second Out/Third Out DIP Litigation Trust Class A-1 Interest Allocation*" means the allocation of the Litigation Trust Class A-1 Interests between Holders of Second Out DIP Term Loan Claims and Third Out DIP Term Loan Claims, in a manner to be determined by the Required Consenting DIP Term Loan Lenders in their sole discretion on or before the Effective Date.

1.324. "*Secured Claim*" means a Claim: (a) that is secured by a valid, perfected and enforceable Lien on Collateral, to the extent of the value of the Claim Holder's interest in such Collateral as of the Confirmation Date; (b) to the extent that the Holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code; or (c) that is otherwise Allowed pursuant to this Plan or Final Order of the Bankruptcy Court as a secured Claim.

1.325. "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local Law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

1.326. "*SGUS*" means SGUS LLC, a Delaware limited liability company and wholly owned subsidiary of Saks.

1.327. "*SIR*" has the meaning set forth in Section 7.16 of this Plan.

1.328. "*SO5 Digital Debtors*" means, collectively, Saks OFF 5TH Holdings LLC, Saks OFF 5TH LLC, Saks OFF 5TH Midco Partner Inc., and Luxury Outlets USA, LLC, represented by Bradley Arant Boult Cummings LLP.

1.329. "*Solicitation Materials*" means, collectively, all solicitation materials with respect to this Plan, including the Disclosure Statement and related Ballots, which have been approved by the Bankruptcy Court pursuant to the Conditional Disclosure Statement Order.

1.330. "*Solicitation Procedures*" means, collectively, the procedures concerning the solicitation of votes on this Plan approved by the Bankruptcy Court pursuant to the Conditional Disclosure Statement Order.

1.331. "*Special Restructuring Committee*" means the special committee of the Board of Managers of HBC GP LLC and certain of its direct and indirect subsidiaries, comprised of William Tracy, Paul Aronzon, and Scott Vogel.

1.332. "*Special Restructuring Committee Independent Investigation*" means any investigation conducted by the Special Restructuring Committee.

1.333. "*Specified Related Parties*" means, collectively, (a) employees of the Global Debtors employed as of the Effective Date that are not former officers or directors;

37

(b) the Global Debtors' Professional Persons as of the Effective Date, in their capacity as professional persons, at any time; but excluding auditors that were retained by, and accounting firms that also were engaged as auditors to, the applicable Global Debtors in their capacities as acquirors of Neiman Marcus Group solely with respect to the Claims and Causes of Action set forth in paragraph 13 of the Schedule of Excluded Parties; (c) current officers or directors of the Global Debtors as of the Effective Date, including the Continuing Personnel, but excluding (i) current directors of HBC GP LLC who do not sit on the Special Restructuring Committee in any capacity, at any Entity, at any time and (ii) the Neiman Acquisition Directors; and (d) any other Person or Entity to be agreed among the Creditors' Committee and the Ad Hoc Group.

1.334. "*Subordinated Claim*" means any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise.

1.335. "*Take Back Debt Facility*" means the senior secured first lien term loan facility consisting of term loans in an (a) aggregate principal amount up to $750 million *minus* the principal amount of term loans issued under the Incremental New Money Debt Facility (including term loans issued through the payment in kind of any fees or premiums) or (b) such lower amount as may be agreed among the Global Debtors and the Required Consenting DIP Term Loan Lenders.

1.336. "*Take Back Preferred Equity Facility*" means the facility pursuant to which the Take Back Preferred Units are issued.

1.337. "*Take Back Preferred Equity Facility Documents*" means collectively, the Take Back Preferred Equity Facility Share Purchase Agreement and any other agreements or documents related to or executed in connection with the Take Back Preferred Equity Facility, including any amendments, modifications, supplements thereto in accordance with the terms thereof.

1.338. "*Take Back Preferred Equity Facility Parties*" means the Consenting DIP Term Loan Lenders that become party from time to time to the Take Back Preferred Equity Facility Share Purchase Agreement, together with their successors and permitted assigns.

1.339. "*Take Back Preferred Equity Facility Share Purchase Agreement*" means the share purchase agreement or other definitive documents memorializing the Take Back Preferred Equity Facility, the material terms of which shall be included in the Plan Supplement, and which shall be entered into by one or more of the Reorganized Global Debtors and the Take Back Preferred Equity Facility Parties.

1.340. "*Take Back Preferred Units*" means the single class of redeemable preferred units of the Holdings with an aggregate initial liquidation preference equal to (a) the outstanding amount of First Out DIP Term Loan Facility Claims on the Effective Date *minus* (b) the principal amount of Take Back Term Loans (if any) issued on the Effective Date.

1.341. "*Take Back Term Loans*" means the senior secured first lien term loans issued under the Take Back Debt Facility, if any.

1.342.    "*Third Out DIP Term Loan Facility Claims*" means, collectively, any Claims against a Global Debtor arising under, derived from, based on, or related to the Third Out DIP Term Loans.

1.343.    "*Third Out DIP Term Loans*" means, collectively, the "Third Out Term Loans" under and as defined in the DIP Term Loan Credit Agreement.

1.344.    "*Third-Party Release*" has the meaning set forth in Article XI of this Plan.

1.345.    "*TopCo*" means Global Debtor Mercury Aggregator L.P.

1.346.    "*TopCo General Unsecured Claim(s)*" means any General Unsecured Claim against the TopCo Global Debtors.

1.347.    "*TopCo Global Debtor(s)*" means, collectively, TopCo, HBSFA Holdings Ltd., Mercury Aggregator HoldCo LLC, HBC GP IV LLC, HBC GP LLC, HBC IV LP, HBC I L.P., and Saks Global Investor L.P.

1.348.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

1.349.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

1.350.    "*Unexpired Lease*" means a lease of non-residential real property to which one or more of the Global Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof.

1.351.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

1.352.    "*Unsecured Claim*" means any Claim that is not secured by a Lien on property in which one of the Global Debtors' Estates has an interest.

1.353.    "*Voting Classes*" means, collectively, Classes 3-A, 3-B, 3-C, 4-A, 4-B, 4-C, 4-D, 4-E, 4-F, 4-G, 5-A, 5-B, 5-C, and 5-D.

1.354.    "*Voting Deadline*" means June 1, 2026 at 4:00 p.m. prevailing Central Time.

**B.    Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein.  The use of "include" or "including" is without limitation, whether

39

stated or not. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan. Any reference in this Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. References to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Equity Interests," "Holders of Equity Interests," "Disputed Equity Interests," and the like, as applicable. Subject to the provisions of any contracts, certificates, or articles of incorporation, instruments, releases, or other agreements or documents entered into in connection with this Plan, including, without limitation, the Restructuring Support Agreement, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal Law, including the Bankruptcy Code and the Bankruptcy Rules. The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns. Any reference to directors or board of directors includes managers, managing members or any similar governing body, as the context requires, and references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws.

## C.      Appendices and Plan Documents.

All Plan Documents and appendices to this Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Holders of Claims and Equity Interests may inspect a copy of the Plan Documents, once Filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or, free of charge, via the Global Debtors' restructuring website maintained by the Claims Agent at https://cases.stretto.com/saks/, or obtain a copy of any of the Plan Documents, at the Global Debtors' expense, by a written request sent to the Claims Agent at the following mailing or email addresses or by calling the Claims Agent at the following telephone numbers:

Saks Global Enterprises LLC
c/o Stretto, Inc.
410 Exchange, Suite 100
Irvine, CA 92602
+1 (833) 232-5246 (U.S./Canada, Toll-Free); +1 (949) 373-7589 (International, Toll)
SaksInquiries@stretto.com

## D.      Definitive Document Consent Rights.

Notwithstanding anything to the contrary in this Plan, certain of the Definitive Documents remain subject to negotiation and completion, as applicable. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations,

warranties, and covenants consistent in all material respects with the terms of the Restructuring Support Agreement, the New Capital Commitment Letter, and the Committee Settlement Term Sheet, in each case, and shall otherwise be in form and substance acceptable to the Global Debtors and the Required Consenting DIP Term Loan Lenders and, subject to the terms of the Committee Settlement Term Sheet, the Creditors' Committee, except, in each case, as otherwise specified in this Plan, the applicable Definitive Document, or the Confirmation Order.  Failure to reference in this Plan the rights referred to in this paragraph shall not impair such rights and obligations.

**E.        Nature of the Restructuring Transactions.**

The Restructuring Transactions will be consummated (a) on the terms and conditions set forth in the Restructuring Support Agreement, the New Capital Commitment Letter, this Plan, and the Plan Documents, and (b) pursuant to the Confirmation Order.

# ARTICLE II.
## CERTAIN INTERCREDITOR AND INTER-DEBTOR ISSUES

### 2.1.    *Settlement of Certain Intercreditor and Inter-Global Debtor Issues.*

The treatment of Claims and Equity Interests under this Plan represents, among other things, the settlement and compromise of certain potential intercreditor and inter-Global Debtor disputes.

### 2.2.    *Formation of Global Debtor Groups for Convenience Purposes.*

This Plan groups the Global Debtors together solely for purposes of describing treatment under this Plan, Confirmation of this Plan and making distributions under this Plan in respect of Claims against and Equity Interests in the Global Debtors under this Plan.  Such groupings shall not affect any Global Debtor's status as a separate legal Entity, change the organizational structure of the Global Debtors' business enterprise, constitute a change of control of any Global Debtor for any purpose, cause a merger or consolidation of any legal Entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in this Plan, all Global Debtors shall continue to exist as separate legal Entities.

# ARTICLE III.
## DIP ABL FACILITY CLAIMS,
## DIP OPCO CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,
## PROFESSIONAL FEE CLAIMS, U.S. TRUSTEE FEES, AND PRIORITY TAX CLAIMS

This Plan constitutes a joint chapter 11 plan for all of the Global Debtors.  All Claims and Equity Interests, except DIP ABL Facility Claims, DIP OpCo Claims, Administrative Expense Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims, are placed in the Classes set forth in Article IV.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP ABL Facility Claims, DIP OpCo Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on this Plan, and thus are excluded from the Classes of Claims and Equity Interests set forth in Article IV.

41

A Claim or Equity Interest is placed in a particular Class only to the extent that any portion of such Claim or Equity Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim or Equity Interest is placed in a particular Class for all purposes, including voting, Confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Equity Interest is placed in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest and has not been paid, released, or otherwise settled prior to the date of such distribution.

### 3.1.  *DIP ABL Facility Claims.*

On the Effective Date, DIP ABL Facility Claims shall be Allowed in an amount not less than $713,965,800.86, *plus* any issued and outstanding or undrawn letters of credit, accrued and unpaid interest, fees, and expenses payable under the DIP ABL Documents and the DIP Orders through the Effective Date, and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of DIP ABL Facility Claims shall receive, in full satisfaction, settlement, release and discharge of the Allowed DIP ABL Facility Claims, (i) payment in Cash in full, and (ii) all issued and undrawn letters of credit shall be replaced or cash collateralized in the amounts specified under the DIP ABL Documents, from the proceeds, as applicable, of the Exit ABL Credit Facility or the New Exit Facilities; provided, that, (i) at the option of such holder, to the extent such holder has issued commitments under the Exit ABL Credit Facility, such holder's Allowed DIP ABL Facility Claims may be converted on a cashless basis to loans deemed outstanding under the Exit ABL Credit Facility as of the Effective Date, and (ii) at the option of the Exit ABL Parties and the DIP ABL Parties, all outstanding or undrawn letters of credit issued under the DIP ABL Credit Facility immediately prior to the Effective Date shall be converted on a cashless basis and deemed letters of credit issued under the Exit ABL Facility as of the Effective Date.

### 3.2.  *DIP OpCo Claims.*

On the Effective Date, DIP OpCo Claims shall be Allowed in an amount not less than $2,104,096,015.48, *plus* any accrued and unpaid interest, fees, and expenses (including any amounts paid-in-kind) payable under the DIP OpCo Loan Documents through the Effective Date, and, except as set forth in Section 6.8(n) hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. On the Effective Date, SGUS, as sole holder of the DIP OpCo Claims shall receive, in full satisfaction, settlement, release and discharge of the Allowed DIP OpCo Claims, and in accordance with the Restructuring Steps Plan, (a) 100% of the New Saks Common Stock, (b) 100% of the Take Back Term Loans (if any), and (c) 100% of the Take Back Preferred Units (the "DIP OpCo Claims Distribution"), provided that the DIP OpCo Claims Distribution shall be distributed directly to Holders of DIP Term Loan Facility Claims in accordance with Sections 5.3, 5.4, and 5.5 of this Plan, as applicable, and the

42

Restructuring Steps Plan, without first being distributed to SGUS, or in such other manner to be agreed among the Global Debtors and the Required Consenting DIP Term Loan Lenders.

Upon payment in full or satisfaction of all Allowed DIP Facility Claims in accordance with the terms of this Plan, all Liens and security interests granted to secure such obligations, whether in the Chapter 11 Cases or otherwise, shall be terminated and of no further force or effect.

### 3.3. *Administrative Expense Claims.*

(a)  <u>Time for Filing Administrative Expense Claims</u>.

The Holder of an Administrative Expense Claim, other than New Capital Commitment Claims, DIP Facility Claims, Intercompany Claims, or U.S. Trustee Fees that accrued on or before the Effective Date and other than in the ordinary course of business, must File with the Bankruptcy Court or with the Claims Agent by mail, hand delivery, or through the Claims Agent's website and serve on the Reorganized Global Debtors and the Litigation Trustee a proof of such Administrative Expense Claim by no later than the Administrative Bar Date.  Such proof of Administrative Expense Claim must include at a minimum:  (i) the name of the applicable Global Debtor that is purported to be liable for the Administrative Expense Claim, and if the Administrative Expense Claim is asserted against more than one Global Debtor, the exact amount asserted to be owed by each such Global Debtor; (ii) the name of the Holder of the Administrative Expense Claim; (iii) the asserted amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THIS PLAN.**

The Global Debtors, in consultation with the Required Consenting DIP Term Loan Lenders, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval.  The Global Debtors may also choose to object to any Administrative Expense Claim (other than a Cure Cost, which will be addressed pursuant to <u>Section 9.2</u> of this Plan) no later than the Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Global Debtors (or other party with standing) object to a timely Filed and properly served Administrative Expense Claim, such Administrative Expense Claim will be deemed Allowed in the amount requested after expiration of the Claims Objection Deadline, as such Claims Objection Deadline may be extended.  In the event that the Global Debtors object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

(b)      Treatment of Administrative Expense Claims.

Except with respect to Administrative Expense Claims that are Professional Fee Claims, and except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Global Debtor(s) agree in writing (email being sufficient) to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash: (i) if such Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Expense Claim is based on liabilities incurred by the Global Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense Claim without any further action by the Holder of such Allowed Administrative Expense Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Global Debtors; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### 3.4.    *Professional Fee Claims.*

(a)      Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and opportunity for a hearing in accordance with the procedures established by the Bankruptcy Court.  The Global Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account.  The Global Debtors shall establish the Professional Fee Escrow Account in trust for the Professional Persons and fund such account with Cash equal to the Professional Fee Escrow Amount on the Effective Date.

(b)      Professional Fee Escrow Account.

No later than the Effective Date, the Global Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professional Persons.  No Liens, Claims, or Equity Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Such funds shall not be considered property of the Estates of the Global Debtors or the Reorganized Global Debtors, as applicable, on the Effective Date.  The amount of Professional Fee Claims owing to the Professional Persons shall be paid in Cash to such Professional Persons by the Global Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professional Persons have been paid in full, any remaining amount in the Professional Fee Escrow Account

shall promptly be transferred to the Reorganized Global Debtors without any further notice to or action, approval, or order of the Bankruptcy Court.

(c)     Professional Fee Escrow Amount.

Professional Persons shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Global Debtors before and as of the Effective Date and shall deliver such estimates to the Global Debtors and the Ad Hoc Group Advisors no later than three (3) Business Days before the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are payable and the subject of the Professional Person's final request for payment of Filed Professional Fee Claims.  If a Professional Person does not provide an estimate, the Global Debtors with notice to and the consent of the Required Consenting DIP Term Loan Lenders, which is not to be unreasonably withheld may estimate the unpaid and unbilled fees and expenses of such Professional Person.

(d)     Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided for in the Plan, from and after the Confirmation Date, the Global Debtors and/or the Reorganized Global Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to administration of the Chapter 11 Cases, prosecution of Causes of Action, and implementation and consummation of the Plan incurred by the Global Debtors, the Reorganized Global Debtors, and/or the Creditors' Committee.  Upon the Confirmation Date, any requirement that Professional Persons comply with sections 327-331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Global Debtors or the Reorganized Global Debtors, as applicable, may employ and pay any Professional Person in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**3.5.     *Priority Tax Claims.***

(a)     Time for Filing Priority Tax Claims.

The Holder of a Priority Tax Claim must File with the Bankruptcy Court and serve on the Reorganized Global Debtors, the Claims Agent, and the U.S. Trustee, proof of such Priority Tax Claim by the Priority Tax Claims Bar Date.  Such proof of Priority Tax Claim must include at a minimum:  (i) the name of the applicable Global Debtor that is purported to be liable for the Priority Tax Claim and if the Priority Tax Claim is asserted against more than one Global Debtor, the exact amount asserted to be owed by each such Global Debtor; (ii) the name of the Holder of the Priority Tax Claim; (iii) the asserted amount of the Priority Tax Claim; (iv) the basis of the Priority Tax Claim; and (v) supporting documentation for the Priority Tax Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF PRIORITY TAX CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH PRIORITY TAX CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM**

45

**SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THIS PLAN.**

          (b)      <u>Treatment of Priority Tax Claims</u>.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in consultation with the Required Consenting DIP Term Loan Lenders, each Holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, either: (i) on the Effective Date or as soon thereafter as reasonably practicable if the Priority Tax Claims Bar Date has not yet occurred, Cash in an amount equal to such Claim; or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the Holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); <u>provided</u> that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due; <u>provided</u>, <u>further</u>, that notwithstanding any provision of this Plan or the Restructuring Support Agreement to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state Law shall be assumed by and Reinstated against the applicable Reorganized Global Debtor. On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable Law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.

### 3.6.    *U.S. Trustee Fees and Related Reporting Obligations.*

All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Global Debtors in full in Cash on the Effective Date. The Global Debtors shall File all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Global Debtors shall File with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. After the Effective Date, each of the Reorganized Global Debtors or the Disbursing Agent acting on behalf of each of the Reorganized Global Debtors shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable. The Reorganized Global Debtors shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under chapter 7 of the Bankruptcy Code of the Chapter 11 Case of that particular Global Debtor for whom the Global Debtors or the Reorganized Global Debtors, as applicable, is responsible. The U.S. Trustee shall not be treated as providing any release under this Plan. U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to File any Proof of Claim or any request for administrative expense for U.S. Trustee Fees. The provisions of this <u>Section 3.6</u> shall control notwithstanding any other provision(s) in this Plan to the contrary.

## ARTICLE IV.
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

### 4.1.   *Classification of Claims and Equity Interests.*

Except for the Claims addressed in Article III hereof or as otherwise set forth herein, all Claims and Equity Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Equity Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or an Equity Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan constitutes a separate Plan for each of the Global Debtors, and the classification of Claims and Equity Interests, as applicable, set forth herein shall apply separately to each of the Global Debtors.  All of the potential Classes for the Global Debtors are set forth herein. Such groupings shall not affect any Global Debtor's status as a separate legal Entity, change the organizational structure of the Global Debtors' business enterprise, constitute a change of control of any Global Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Global Debtors shall continue to exist as separate legal Entities.

The classification of Claims against and Equity Interests in the Global Debtors pursuant to this Plan is as follows:

| Class | Claims and Equity Interest | Status | Voting Rights |
|-------|----------------------------|--------|---------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3-A | First Out DIP Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 3-B | Second Out DIP Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 3-C | Third Out DIP Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 4-A | Prepetition SGUS Notes Claims | Impaired | Entitled to Vote |
| Class 4-B | Prepetition FILO and NPC Claims | Impaired | Entitled to Vote |
| Class 4-C | Prepetition OpCo Second Out Notes Claims | Impaired | Entitled to Vote |
| Class 4-D | Go-Forward OpCo Trade Claims | Impaired | Entitled to Vote |
| Class 4-E | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4-F | Prepetition OpCo Third Out Notes Claims | Impaired | Entitled to Vote |
| Class 4-G | Prepetition Initial Notes Claims | Impaired | Entitled to Vote |

47

| Class | Claims and Equity Interest | Status | Voting Rights |
|---|---|---|---|
| Class 5-A | HoldCo II SGUS Notes Guarantee Claims | Impaired | Entitled to Vote |
| Class 5-B | Axonic Guarantee Claims | Impaired | Entitled to Vote |
| Class 5-C | Go-Forward HoldCo II Trade Claims | Impaired | Entitled to Vote |
| Class 5-D | HoldCo II General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6-A | Prepetition TopCo Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6-B | TopCo General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing TopCo Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Existing Intercompany Equity Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |

This Plan consolidates certain Claims against all Global Debtors solely for purposes of voting and Confirmation. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Global Debtors have not classified Administrative Expense Claims, DIP ABL Facility Claims, DIP OpCo Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims as described in Article III.

If a controversy arises regarding whether any Claim is properly classified under this Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Combined Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on this Plan.

### 4.2.   *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under this Plan.

### ARTICLE V.
### TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.   **Treatment of Claims and Equity Interests.**

48

Each Holder of an Allowed Claim or Allowed Equity Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Equity Interest, except to the extent different treatment is agreed to by the Global Debtors or the Reorganized Global Debtors, as applicable, and such Holder.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Equity Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Claim or Equity Interest becomes an Allowed Claim or an Allowed Equity Interest, as applicable, or as soon as reasonably practicable thereafter.

### 5.1.    *Class 1 – Priority Non-Tax Claims.*

(a)    Classification:  Class 1 consists of all Priority Non-Tax Claims.

(b)    Treatment:  The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims are unaltered by this Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Non-Tax Claim, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a lesser treatment, on the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall receive, at the election of the Global Debtors and subject to the reasonable consent of the Required Consenting DIP Term Loan Lenders:  (i) Cash in an amount equal to such Allowed Claim or in the ordinary course of business as and when due; or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)    Voting:  Priority Non-Tax Claims are not Impaired Claims.  The Holders of Priority Non-Tax Claims are conclusively presumed to accept this Plan.  The Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 5.2.    *Class 2 – Other Secured Claims.*

(a)    Classification:  Class 2 consists of all Other Secured Claims.

(b)    Treatment:  The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by this Plan.  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date each Holder of an Allowed Other Secured Claim shall receive, at the election of the Global Debtors and subject to the reasonable consent of the Required Consenting DIP Term Loan Lenders:  (i) Cash in an amount equal to such Allowed Claim; (ii) the Collateral securing its Other Secured Claim; (iii) Reinstatement of such Allowed Claim; or (iv) such other treatment that will render such Other Secured Claim Unimpaired.

Upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date the Global Debtors or the Reorganized Global Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate,

satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

(c)    Voting:  The Other Secured Claims are not Impaired Claims.  The Holders of Other Secured Claims are conclusively presumed to accept this Plan.  The Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

### 5.3.    *Class 3-A – First Out DIP Term Loan Facility Claims.*

(a)    Classification:  Class 3-A consists of all First Out DIP Term Loan Facility Claims.

(b)    Treatment:  On the Effective Date, the First Out DIP Term Loan Facility Claims shall be Allowed in an amount not less than \$1,266,823,584.22, *plus* any accrued and unpaid interest, fees, and expenses (including any amounts paid-in-kind) payable under the DIP Term Loan Documents through the Effective Date, and, except as set forth in Section 6.8(n) hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of First Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed First Out DIP Term Loan Facility Claims, its *pro rata* share of (i) the aggregate amount of Take Back Term Loans (if any) and (ii) the aggregate amount of Take Back Preferred Units, which aggregate amounts shall be dependent upon the treatment elected by the Majority Commitment Parties under the terms of the New Capital Commitment Letter; provided that the treatment set forth in this Section 5.3(b) shall be subject to the satisfaction of Section 10.2(h) of this Plan.

(c)    Voting:  The First Out DIP Term Loan Facility Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such First Out DIP Term Loan Facility Claims; provided that for the avoidance of doubt, a vote in favor of this Plan by each Holder of the First Out DIP Term Loan Facility Claims shall not constitute a vote or consent in favor of the DIP Conversion, which must be obtained in accordance with the applicable terms of the DIP Documents.

### 5.4.    *Class 3-B – Second Out DIP Term Loan Facility Claims.*

(a)    Classification:  Class 3-B consists of all Second Out DIP Term Loan Facility Claims.

(b)    Treatment:  On the Effective Date, the Second Out DIP Term Loan Facility Claims shall be Allowed in an amount not less than \$763,258,789.84, *plus* any accrued and unpaid interest, fees, and expenses (including any amounts paid-in-kind) payable under the DIP Term Loan Documents through the Effective Date, and, except as set forth in Section 6.8(n) hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law

or regulation by any Person.  On the Effective Date, each Holder of Second Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Second Out DIP Term Loan Facility Claims, its *pro rata* share of: (i) 70% of the Second Out / Third Out DIP Distribution (subject to dilution by the Management Incentive Plan); and (ii) the Litigation Trust Class A-1 Interests, in accordance with the Second Out / Third Out DIP Litigation Trust Class A-1 Interest Allocation.

(c)     Voting:     The Second Out DIP Term Loan Facility Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Second Out DIP Term Loan Facility Claims; provided that for the avoidance of doubt, a vote in favor of this Plan by each Holder of the Second Out DIP Term Loan Facility Claims shall not constitute a vote or consent in favor of the DIP Conversion, which must be obtained in accordance with the applicable terms of the DIP Documents.

### 5.5.     *Class 3-C – Third Out DIP Term Loan Facility Claims.*

(a)     Classification:  Class 3-C consists of all Third Out DIP Term Loan Facility Claims.

(b)     Treatment:  On the Effective Date, the Third Out DIP Term Loan Facility Claims shall be Allowed in an amount not less than $729,523,083.98, *plus* any accrued and unpaid interest, fees, and expenses (including any amounts paid-in-kind) payable under the DIP Term Loan Documents through the Effective Date, and, except as set forth in Section 6.8(n) hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  On the Effective Date, each Holder of Third Out DIP Term Loan Facility Claims shall receive, in full satisfaction, settlement, release, and discharge of its respective Allowed Third Out DIP Term Loan Facility Claims, its *pro rata* share of: (i) 30% of the Second Out / Third Out DIP Distribution (subject to dilution by the Management Incentive Plan); and (ii) the Litigation Trust Class A-1 Interests, in accordance with the Second Out / Third Out DIP Litigation Trust Class A-1 Interest Allocation.

(c)     Voting:     The Third Out DIP Term Loan Facility Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Third Out DIP Term Loan Facility Claims; provided that for the avoidance of doubt, a vote in favor of this Plan by each Holder of the Third Out DIP Term Loan Facility Claims shall not constitute a vote or consent in favor of the DIP Conversion, which must be obtained in accordance with the applicable terms of the DIP Documents.

### 5.6.     *Class 4-A – Prepetition SGUS Notes Claims.*

(a)     Classification:  Class 4-A consists of all Prepetition SGUS Notes Claims.

(b)     Treatment:  On the Effective Date, the Prepetition SGUS Notes Claims shall be Allowed under this Plan in an amount of up to $91,201,626.49, *plus* any additional accrued and

51

unpaid interest, fees and expenses payable on account of the Prepetition SGUS Notes Claims through the Effective Date, and, except as set forth in Section 6.8(n) hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition SGUS Notes Claim, except to the extent that the Prepetition SGUS Notes Trustee or a Holder of a Prepetition SGUS Notes Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of a Prepetition SGUS Notes Claim shall receive, subject to the terms of this Plan, its *pro rata* share of the Prepetition SGUS Notes Claims Cash Pool Distribution Amount.

(c)     Voting:  The Prepetition SGUS Notes Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Prepetition SGUS Notes Claims.

### 5.7.   *Class 4-B – Prepetition FILO and NPC Claims.*

(a)     Classification:  Class 4-B consists of all Prepetition FILO and Prepetition NPC Claims.

(b)     Treatment:  On the Effective Date, the Prepetition FILO and Prepetition NPC Claims shall be Allowed under this Plan in an aggregate amount no less than $10,536,250.00, consisting of $5,299,444.44 of Allowed Prepetition FILO Claims and $5,236,805.56 of Allowed Prepetition NPC Claims, *plus* any additional accrued and unpaid fees, interest and expenses payable on account of the Prepetition FILO and Prepetition NPC Claims through the Effective Date, and, except as set forth in Section 6.8(n) hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition FILO Claim and Prepetition NPC Claim, as applicable, except to the extent that the Prepetition FILO Agent or Prepetition NPC Agent, as applicable, or a Holder of a Prepetition FILO Claim or Prepetition NPC Claim, as applicable, agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of an Allowed Prepetition FILO Claim and an Allowed Prepetition NPC Claim shall receive, subject to the terms of this Plan, its *pro rata* share of the Prepetition FILO and NPC Claims Cash Pool Distribution Amount. The Holders of Allowed Prepetition FILO and NPC Claims shall be entitled to receive, retain, and not turn over the distributions described herein notwithstanding anything in the Equal Priority Intercreditor Agreement, Second A&R Intercreditor Agreement, or PAA to the contrary.

(c)     Voting:  The Prepetition FILO and NPC Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Prepetition FILO and NPC Claims.

### 5.8.   *Class 4-C – Prepetition OpCo Second Out Notes Claims.*

(a)   <u>Classification</u>:  Class 4-C consists of all Prepetition OpCo Second Out Notes Claims.

(b)   <u>Treatment</u>:  On the Effective Date, the Prepetition OpCo Second Out Notes Claims shall be Allowed under this Plan in an amount no less than $1,507,417,231.63, *plus* any additional accrued and unpaid interest, fees and expenses payable on account of the Prepetition OpCo Second Out Notes Claims through the Effective Date, and, except as set forth in <u>Section 6.8(n)</u> hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition OpCo Second Out Notes Claim, except to the extent that a Holder of a Prepetition OpCo Second Out Notes Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of a Prepetition OpCo Second Out Notes Claim shall receive its *pro rata* share of the Litigation Trust Class A-2 Interests, as set forth in <u>Section 6.8</u> hereof and the Litigation Trust Documents; <u>provided</u> that, for the avoidance of doubt, SGUS waives any distributions to which it is entitled to on account of Prepetition OpCo Second Out Notes Claims (if any) and such waived distribution shall be distributed *pro rata* to the remaining Holders of Allowed Prepetition Second Out Notes Claims.  The Holders of Allowed Prepetition OpCo Second Out Notes Claims shall be entitled to receive, retain, and not turn over the distributions described herein notwithstanding anything in the Equal Priority Intercreditor Agreement, Second A&R Intercreditor Agreement, or PAA to the contrary.

(c)   <u>Voting</u>:  The Prepetition OpCo Second Out Notes Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Prepetition OpCo Second Out Notes Claims.

### 5.9.   *Class 4-D – Go-Forward OpCo Trade Claims.*

(a)   <u>Classification</u>:  Class 4-D consists of all Go-Forward OpCo Trade Claims.

(b)   <u>Treatment</u>:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Go-Forward OpCo Trade Claim, except to the extent that a Holder of a Go-Forward OpCo Trade Claim agrees to less favorable treatment with respect to such Holder's Claim on the Effective Date, each Holder of an Allowed Go-Forward OpCo Trade Claim shall receive, subject to the terms of this Plan: (i) its *pro rata* share of the Litigation Trust Class B Interests, as set forth in <u>Section 6.8</u> hereof and the Litigation Trust Documents; and (ii) if Holders of Go-Forward OpCo Trade Claims in Class 4-D vote to accept this Plan as a Class, their *pro rata* share of the Go-Forward OpCo Trade Claims Cash Pool Distribution Amount.

(c)   <u>Voting</u>:  The Go-Forward OpCo Trade Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Go-Forward OpCo Trade Claims.

**5.10.**   ***Class 4-E – OpCo General Unsecured Claims.***

(a)   Classification:  Class 4-E consists of all OpCo General Unsecured Claims.

(b)   Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed OpCo General Unsecured Claim, except to the extent that a Holder of an Allowed OpCo General Unsecured Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of an Allowed OpCo General Unsecured Claim shall receive, subject to the terms of this Plan, its *pro rata* share of the Litigation Trust Class B Interests, as set forth in Section 6.8 hereof and the Litigation Trust Documents.

(c)   Voting:  The OpCo General Unsecured Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such OpCo General Unsecured Claims.

**5.11.**   ***Class 4-F – Prepetition OpCo Third Out Notes Claims.***

(a)   Classification:  Class 4-F consists of all Prepetition OpCo Third Out Notes Claims.

(b)   Treatment:  On the Effective Date, the Prepetition OpCo Third Out Notes Claims shall be Allowed under this Plan in an amount no less than $461,638,172.05, *plus* any additional accrued and unpaid interest, fees and expenses payable on account of the Prepetition OpCo Third Out Notes Claims through the Effective Date, and, except as set forth in Section 6.8(n) hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person.  In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition OpCo Third Out Notes Claim, except to the extent that a Holder of a Prepetition OpCo Third Out Notes Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of a Prepetition OpCo Third Out Notes Claim shall receive its *pro rata* share of Litigation Trust Class A-3 Interests, as set forth in Section 6.8 hereof and the Litigation Trust Documents.  The Holders of Allowed Prepetition OpCo Third Out Notes Claims shall be entitled to receive, retain, and not turn over the distributions described herein notwithstanding anything in the Equal Priority Intercreditor Agreement, Second A&R Intercreditor Agreement, or PAA to the contrary.

(c)   Voting:  The Prepetition OpCo Third Out Notes Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Prepetition OpCo Third Out Notes Claims.

**5.12.**   ***Class 4-G – Prepetition Initial Notes Claims.***

(a)   Classification:  Class 4-G consists of all Prepetition Initial Notes Claims.

(b)   Treatment:  On the Effective Date, the Prepetition Initial Notes Claims shall be Allowed under this Plan in an amount no less than $54,183,372.72, *plus* any additional accrued and unpaid interest, fees and expenses payable on account of the Prepetition Initial Notes Claims

54

through the Effective Date, and, except as set forth in Section 6.8(n) hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. In full and final satisfaction, compromise, settlement, release, and discharge of each Prepetition Initial Notes Claim, except to the extent that a Holder of a Prepetition Initial Notes Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of a Prepetition Initial Notes Claim shall receive its *pro rata* share of Litigation Trust Class A-4 Interests, as set forth in Section 6.8 hereof and the Litigation Trust Documents. The Holders of Allowed Prepetition Initial Notes Claims shall be entitled to receive, retain, and not turn over the distributions described herein notwithstanding anything in the Equal Priority Intercreditor Agreement, Second A&R Intercreditor Agreement, or PAA to the contrary.

(c)     Voting: The Prepetition Initial Notes Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Prepetition Initial Notes Claims.

### 5.13.   *Class 5-A – HoldCo II SGUS Notes Guarantee Claims.*

(a)     Classification:   Class 5-A consists of all HoldCo II SGUS Notes Guarantee Claims.

(b)     Treatment:  On the Effective Date, the HoldCo II SGUS Notes Guarantee Claims shall be Allowed under this Plan in an amount of up to $91,201,626.49, *plus* any additional accrued and unpaid interest, fees and expenses payable on account of the HoldCo II SGUS Notes Guarantee Claims through the Effective Date, and, except as set forth in Section 6.8(n) hereof, shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable Law or regulation by any Person. In full and final satisfaction, compromise, settlement, release, and discharge of each HoldCo II SGUS Notes Guarantee Claim, except to the extent that a Holder of a HoldCo II SGUS Notes Guarantee Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of a HoldCo II SGUS Notes Guarantee Claim shall receive, subject to the terms of this Plan, its *pro rata* share of the HoldCo II SGUS Notes Guarantee Claims Cash Pool Distribution Amount.

(c)     Voting:   The HoldCo II SGUS Notes Guarantee Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such HoldCo II SGUS Notes Guarantee Claims.

### 5.14.   *Class 5-B – Axonic Guarantee Claims.*

(a)     Classification:  Class 5-B consists of the Axonic Guarantee Claims.

(b)     Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of the Axonic Guarantee Claims, each Holder of an Axonic Guarantee Claim shall receive the Axonic Settlement Consideration. Notwithstanding anything to the contrary herein, no property (including Litigation Trust Interests) will be distributed to Axonic under the Plan.

(c)      Voting:  The Axonic Guarantee Claims are Impaired Claims.  Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Axonic Guarantee Claims.

### 5.15.    *Class 5-C – Go-Forward HoldCo II Trade Claims.*

(a)      Classification:    Class 5-C consists of all Go-Forward HoldCo II Trade Claims.

(b)      Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Go-Forward HoldCo II Trade Claim, except to the extent that a Holder of a Go-Forward HoldCo II Trade Claim agrees to less favorable treatment with respect to such Holder's Claim on the Effective Date, each Holder of an Allowed Go-Forward HoldCo II Trade Claim shall receive, subject to the terms of this Plan: (i) its *pro rata* share of the Litigation Trust Class B Interests, as set forth in Section 6.8 hereof and the Litigation Trust Documents; and (ii) if Holders of Go-Forward HoldCo II Trade Claims in Class 5-C vote to accept this Plan as a Class, their *pro rata* share of the Go-Forward HoldCo II Trade Claims Cash Pool Distribution Amount.

(c)      Voting:  The Go-Forward HoldCo II Trade Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such Go-Forward HoldCo II Trade Claims.

### 5.16.    *Class 5-D – HoldCo II General Unsecured Claims.*

(a)      Classification:    Class 5-D consists of all HoldCo II General Unsecured Claims.

(b)      Treatment:  In full and final satisfaction, compromise, settlement, release, and discharge of each HoldCo II General Unsecured Claim, except to the extent that a Holder of an Allowed HoldCo II General Unsecured Claim agrees to less favorable treatment with respect to such Holder's Claim, on the Effective Date, each Holder of an Allowed HoldCo II General Unsecured Claim shall receive, subject to the terms of this Plan, its *pro rata* share of the Litigation Trust Class B Interests, as set forth in Section 6.8 hereof and the Litigation Trust Documents.

(c)      Voting:  The HoldCo II General Unsecured Claims are Impaired Claims. Holders of such Claims are entitled to vote to accept or reject this Plan, and the votes of such Holders will be solicited with respect to such HoldCo II General Unsecured Claims.

### 5.17.    *Class 6-A – Prepetition TopCo Facility Claims.*

(a)      Classification:  Class 6-A consists of all Prepetition TopCo Facility Claims.

(b)      Treatment:  On the Effective Date, the Prepetition TopCo Facility Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.

(c)      Voting:  The Prepetition TopCo Facility Claims are Impaired Claims. Holders of such Claims are conclusively deemed to have rejected this Plan pursuant to

56

section 1126(g) of the Bankruptcy Code.  Holders of Prepetition TopCo Facility Claims are therefore not entitled to vote to accept or reject this Plan.

### 5.18.    *Class 6-B – TopCo General Unsecured Claims.*

(a)    Classification:  Class 6-B consists of all TopCo General Unsecured Claims.

(b)    Treatment:  On the Effective Date, the TopCo General Unsecured Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.

(c)    Voting:  The TopCo General Unsecured Claims are Impaired Claims. Holders of such Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of TopCo General Unsecured Claims are therefore not entitled to vote to accept or reject this Plan.

### 5.19.    *Class 7 – Intercompany Claims.*

(a)    Classification:  Class 7 consists of all Intercompany Claims.

(b)    Treatment:  On or after the Effective Date, or as soon as practicable thereafter, any and all Intercompany Claims shall, at the option of the Global Debtors and upon the consent of the Required Consenting DIP Term Loan Lenders, be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Global Debtors; provided that no distributions shall be made on account of any Intercompany Claims.

(c)    Voting:  The Intercompany Claims are Unimpaired if Reinstated or Impaired if the Allowed Intercompany Claims are cancelled.  Holders of Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan.

### 5.20.    *Class 8 – Subordinated Claims.*

(a)    Classification:  Class 8 consists of all Subordinated Claims.

(b)    Treatment:  On the Effective Date, all Subordinated Claims will be cancelled, released, and extinguished without any distribution on account of such Claims.

(c)    Voting: The Subordinated Claims are Impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Subordinated Claims are conclusively deemed to reject this Plan.  Therefore, Holders of Allowed Subordinated Claims are not entitled to vote to accept or reject this Plan.

### 5.21.    *Class 9 – Existing TopCo Equity Interests.*

(a)    Classification:  Class 9 consists of all Existing TopCo Equity Interests.

(b)    Treatment:  On the Effective Date, all Existing TopCo Equity Interests shall be cancelled, released, and extinguished, and each Holder of an Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under this Plan on account of such Allowed Existing TopCo Equity Interests.

(c)    Voting:  The Existing TopCo Equity Interests are Impaired.  Holders of Existing TopCo Equity Interests are conclusively deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing TopCo Equity Interests are not entitled to vote to accept or reject this Plan.

### 5.22.   *Class 10 – Existing Intercompany Equity Interests.*

(a)    Classification:  Class 10 consists of all Existing Intercompany Equity Interests.

(b)    Treatment:  Subject to the Restructuring Steps Plan, each Allowed Existing Intercompany Equity Interest shall be Reinstated, distributed, contributed, set off, settled, cancelled, and released, or otherwise addressed at the option of the Global Debtors and upon the consent of the Required Consenting DIP Term Loan Lenders.

(c)    Voting:  The Existing Intercompany Equity Interests are Unimpaired if Reinstated or Impaired if the Allowed Existing Intercompany Equity Interests are canceled. Holders of Allowed Existing Intercompany Equity Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Intercompany Equity Interests are not entitled to vote to accept or reject this Plan.

## B.    Class Acceptance Requirement.

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Holders of the Allowed Claims in such Class that have voted on this Plan.  A Class of Equity Interests that is entitled to vote on this Plan has accepted this Plan if it is accepted by at least two-thirds (2/3) in amount of Allowed Equity Interests of such Class that have voted on this Plan.

## C.    Tabulation of Votes on a Non-Consolidated Basis.

All votes on this Plan shall be tabulated on a non-consolidated basis by Class and by Global Debtor for the purpose of determining whether this Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.

## D.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by at least one Impaired Class of Claims.  Because certain Classes are deemed to have rejected this Plan or may vote to reject this Plan, the Global Debtors will request Confirmation of this Plan, as it may be modified and amended from time to time, under

58

section 1129(b) of the Bankruptcy Code with respect to such Classes. Subject to Section 13.3 and Section 13.4 of this Plan, the Global Debtors reserve the right at any time to alter, amend, modify, revoke, or withdraw this Plan or any Plan Document as to any particular Global Debtor, in consultation with the Creditors' Committee, in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. Subject to Section 13.3 and Section 13.4 of this Plan, the Global Debtors also reserve the right at any time to request Confirmation of this Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject this Plan.

**E.      Voting Classes; Deemed Acceptance or Rejection by Non-Voting Classes.**

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims or Equity Interests in such Class shall be deemed to have accepted this Plan. To the extent that Claims or Equity Interests of any Class are Unimpaired, each Holder of a Claim or Equity Interest in such Class is presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject this Plan.

**F.      Vacant and Abstaining Classes.**

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code; provided that a Claim shall be deemed temporarily Allowed if (a) such Claim would be Allowed but for the fact that the applicable period of time for objecting to such Claim has not yet expired, and (b) no objection to such Claim has been interposed as of the Voting Deadline. Moreover, any Class of Claims or Equity Interests that is occupied as of the commencement of the Combined Hearing by a Claim or Equity Interest eligible to vote, but as to which no vote is cast, shall be presumed to accept this Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

**G.      Controversy Concerning Impairment.**

If a controversy arises as to whether any Claim or Equity Interest (or any Class of Claims or Equity Interests) is Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date, absent consensual resolution of such controversy among the Global Debtors and the complaining Entity or Entities.

**H.      Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in this Plan, nothing under this Plan or the Plan Supplement shall affect the rights of the Global Debtors or the Reorganized Global Debtors, as applicable, regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

59

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

### 6.1.   *Non-Substantive Consolidation.*

This Plan is a joint plan that does not provide for substantive consolidation of the Global Debtors' Estates, and on the Effective Date, the Global Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Nothing in this Plan shall constitute or be deemed to constitute an admission that any one of the Global Debtors is subject to or liable for any Claim against any other Global Debtor.  Additionally, Holders of Claims and Equity Interests against multiple Global Debtors, to the extent Allowed in each Global Debtor's Chapter 11 Case, will be treated as holding a separate Claim or separate Equity Interest, as applicable, against each Global Debtor's Estate; provided, however, that no Holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.  Notwithstanding the foregoing, solely for distribution purposes, (a) Holders of Allowed Claims other than Allowed DIP Claims entitled to a distribution under the Plan shall be entitled to a single Claim with respect to any particular debt owed; (b) any and all Claims based on joint and several liability or a guaranty by the Global Debtors shall be deemed eliminated and extinguished; and (c) Litigation Trust Beneficiaries shall be entitled to only one recovery under the Plan from the Litigation Trust on account of such Claims without regard to which Global Debtor was originally liable for such Claim; provided, however, that the foregoing shall not apply to the Landlords (as such term is defined in the *Supplemental Objection of Brixmor Property Group, WFP Tower B Co. L.P., WFP Tower D Co. L.P., GGP Services, Inc., Regency Centers, L.P., and Aventura Fashion Island, L.P. to the Amended Joint Chapter 11 Plan of Saks Global Enterprises LLC and its Global Debtor Affiliates* [Docket No. 2550]) represented by Kelley Drye & Warren LLP.

### 6.2.   *Restructuring Transactions.*

Before, on, and after the Effective Date, the applicable Global Debtors or the Reorganized Global Debtors, as applicable, may, consistent with the terms of the Restructuring Support Agreement, enter into any transaction and take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan), that are consistent with and pursuant to the terms and conditions of this Plan, including, as applicable:  (a) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, migration, consolidation, or other Organizational Documents with the appropriate governmental authorities pursuant to applicable Law; (d) the execution, delivery, and filing, if applicable, of the New Organizational Documents, the New Exit Facilities Documents, the Exit ABL Facility Documents; (e) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations,

60

dissolutions, or liquidations; and (f) all other actions that the applicable Global Debtors or Reorganized Global Debtors reasonably determine, in consultation with the Required Consenting DIP Term Loan Lenders, are necessary or appropriate, including making filings or recordings that may be required by applicable Law.  For the purposes of effectuating this Plan, none of the Restructuring Transactions contemplated herein shall constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction or matter that would result in a violation, breach, or default under, or increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Global Debtors or the Reorganized Global Debtors under, or result in the creation or imposition of a Lien upon any property or asset of the Global Debtors or the Reorganized Global Debtors pursuant to any agreement, contract, or document of the Global Debtors, and any consent or advance notice required under any agreement, contract, or document of the Global Debtors shall be deemed satisfied by Confirmation.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.  The Confirmation Order shall authorize the Global Debtors and the Reorganized Global Debtors, as applicable, to undertake the DIP Conversion contemplated by this Plan and enter into other Definitive Documents.

### 6.3.    *Continued Corporate Existence in Certain Debtors; Vesting of Assets.*

(a)      General.  Except as otherwise provided in this Plan or as otherwise may be agreed between the Global Debtors and the Required Consenting DIP Term Loan Lenders, each of the Global Debtors, as Reorganized Global Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under and in accordance with the applicable Laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Global Debtor, each of the Reorganized Global Debtors may take such action as permitted by applicable Law and such Reorganized Global Debtor's New Organizational Documents, and may take all actions as may be necessary or appropriate to effectuate the Plan, as such Reorganized Global Debtor may determine is reasonable and appropriate, including, but not limited to, causing:  (i) a Reorganized Global Debtor to be merged with and into another Reorganized Global Debtor, or a subsidiary and/or Affiliate of a Reorganized Global Debtor; (ii) a Reorganized Global Debtor to be dissolved; (iii) the conversion of a Reorganized Global Debtor from one Entity type to another Entity type; (iv) the legal name of a Reorganized Global Debtor to be changed; (v) the closure of a Reorganized Global Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (vi) the reincorporation of a Reorganized Global Debtor under the Law of jurisdictions other than the Law under which the Global Debtor currently is incorporated.  In addition to the foregoing, on or after the Effective Date, the Reorganized Global Debtors shall:  (w) maintain the books and records and accounts of the Global Debtors; (x) administer each Global Debtor's tax obligations (including, for the avoidance of doubt (A) filing tax returns and paying tax obligations, (B) requesting, if necessary, an expedited determination of any unpaid tax liability of each Global Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Global Debtor ending after

61

the Petition Date through the liquidation of such Global Debtor as determined under applicable tax laws, and (C) representing the interest and account of each Global Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit; (y) prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Global Debtors that are required hereunder, by any Governmental Unit or applicable law; and (z) pay statutory fees in accordance with this Plan.

(b)      Vesting of Assets.      Except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, (including, for the avoidance of doubt, the Committee Settlement Term Sheet and the Litigation Trust Documents), on the Effective Date, all property of the Estates, wherever located, including any property, wherever located, acquired by the Global Debtors under or in connection with this Plan, shall vest in the applicable Reorganized Global Debtor, free and clear of all Claims, Liens, charges, other encumbrances and Equity Interests, other than the Charging Liens and the Liens securing the obligations under the Exit ABL Facility and New Exit Debt Facilities, respectively. On and after the Effective Date, except as otherwise provided in this Plan or in the Confirmation Order, each applicable Reorganized Global Debtor may operate its business(es) and may use, acquire and dispose of property, wherever located, and each Reorganized Global Debtor, as applicable, may prosecute, compromise or settle any Claims (including any Administrative Expense Claims), Equity Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Without limiting the foregoing, the Reorganized Global Debtors may pay the charges that they incur on or after the Confirmation Date, if any, for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court. Anything in this Plan to the contrary notwithstanding, any Unimpaired Claims against a Global Debtor shall remain the obligations solely of such Global Debtor or such Reorganized Global Debtor, as applicable, and shall not become obligations of any other Global Debtor or Reorganized Global Debtor, as applicable, by virtue of this Plan, the Chapter 11 Cases, or otherwise. For the avoidance of doubt, the Litigation Trust Assets, including but not limited to the Litigation Trust Retained Causes of Action, shall vest solely in the Litigation Trust, and shall not vest in each of the respective Reorganized Global Debtors.

### 6.4.   *Indemnification Provisions in Organizational Documents.*

On and as of the Effective Date, all indemnification obligations of the Global Debtors that were in place as of the Petition Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such persons than the indemnification provisions in place prior to the Restructuring Transactions; provided that, with respect to former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable, such indemnification provisions shall be reinstated solely to the extent necessary to access D&O Liability Insurance Policies, and the Reorganized Global Debtors shall have no out-of-pocket liability for any such

indemnification obligations owed to former directors, officers, managers, independent contractors, employees, attorneys, accountants, investment bankers, and other professionals of the Global Debtors, as applicable.  On the Effective Date, each applicable Reorganized Global Debtor shall be deemed to have assumed all unexpired D&O Liability Insurance Policies.

### 6.5.    *Sources for Cash Distributions under this Plan.*

The Global Debtors shall fund Cash distributions under this Plan with Cash on hand, including Cash from operations and the proceeds of the DIP Facilities, the Exit ABL Facility, and the New Exit Facilities.  Cash payments to be made pursuant to this Plan will be made by the Reorganized Global Debtors or the Disbursing Agent in accordance with Article VII.

From and after the Effective Date, subject to any applicable limitations set forth in any agreement entered into on or after the Effective Date (including, without limitation, the New Organizational Documents, the New Exit Facilities Documents, and the Exit ABL Facility Documents), the Reorganized Global Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of managers or directors, as applicable (or other applicable governing bodies), of the applicable Reorganized Global Debtors deem appropriate.

### 6.6.    *Exit ABL Facility.*

Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit ABL Facility and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit ABL Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the Exit ABL Facility.  The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the Exit ABL Facility Documents, necessary or appropriate to incur loans under the Exit ABL Facility without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the Exit ABL Parties may mutually agree to be necessary to consummate the Exit ABL Facility.

On the Effective Date, the agreements with respect to the Exit ABL Facility shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit ABL Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. On the Effective Date, all of the Liens and security interests to be granted in connection with the Exit ABL Facility (a) shall be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the Exit ABL Facility, (c) shall be

deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under or in connection with the Exit ABL Facility, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.  The Reorganized Global Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

### 6.7.    *New Exit Facilities.*

Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the New Exit Facilities, the New Exit Facilities Documents, and all transactions contemplated thereby (including the New Capital Syndication and any supplementation thereof, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the New Exit Facilities and the New Exit Facilities Documents.  The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the New Exit Facilities Documents, necessary or appropriate to consummate the New Exit Facilities without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the New Capital Commitment Parties may mutually agree to be necessary to consummate the New Exit Facilities and the transactions contemplated by the New Exit Facilities Documents.

On the Effective Date, the New Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, and enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law.

The Reorganized Global Debtors are authorized to conduct the New Capital Syndication on terms acceptable to the New Capital Commitment Parties, and to execute, deliver, and perform any New Capital Syndication Documents in connection therewith, in each case without further notice to or order of the Bankruptcy Court.

(a)     New Exit Debt Facilities.

Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the New Exit Debt Facilities and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the New Exit Debt Facilities, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the New Exit Debt Facilities.  The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the New Exit Debt Facilities Documents, necessary or appropriate to incur loans under the New Exit Debt Facilities without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the New Exit Term Loan Secured Parties may mutually agree to be necessary to consummate the New Exit Debt Facilities.

On the Effective Date, the agreements with respect to the New Exit Debt Facilities shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Exit Debt Facilities are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law.  On the Effective Date, all of the Liens and security interests to be granted in connection with the New Exit Debt Facilities (a) shall be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the Collateral granted in accordance with the New Exit Debt Facilities, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under or in connection with the New Exit Debt Facilities, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.  The Reorganized Global Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

(b)     Preferred Equity Facilities.

Confirmation of this Plan shall be deemed to constitute approval by the Bankruptcy Court of the Preferred Equity Facilities and related agreements (including all transactions contemplated

65

thereby, such as any supplementation or additional syndication of the Preferred Equity Units, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Global Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Global Debtors to enter into and perform their obligations in connection with the Preferred Equity Facilities. The Reorganized Global Debtors shall be authorized to execute and deliver all documents, including the Preferred Equity Facilities Documents, necessary or appropriate to issue preferred equity under the Preferred Equity Facilities Documents without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Global Debtors and the Preferred Equity Facilities Parties may mutually agree to be necessary to issue the Preferred Equity Units and consummate the transactions contemplated by the Preferred Equity Facilities Documents.

On the Effective Date, the agreements with respect to the Preferred Equity Facilities shall constitute legal, valid, binding, and authorized obligations of the Reorganized Global Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Preferred Equity Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law. The Preferred Equity Units shall be issued and distributed in accordance with the terms of this Plan free and clear of all Liens, Claims, and other Interests. All of the Preferred Equity Units issued pursuant to this Plan shall be duly authorized and validly issued.

### 6.8. *Committee Settlement.*

(a)     General. On May 1, 2026 the Global Debtors, the Ad Hoc Group, and the Creditors' Committee reached agreement on the Committee Settlement Term Sheet and agreed to the terms of the Committee Settlement to be implemented through the Plan and to be approved by the Bankruptcy Court in connection with Confirmation thereof. The principal terms of the Committee Settlement are reflected below. For the avoidance of doubt, Section 6.8(b)-(k) hereof shall be subject to terms of the Litigation Trust Documents, which shall be reasonably acceptable to the Creditors' Committee and subject in all respects to the consent rights set forth in the DIP Documents and the Restructuring Support Agreement.

(b)     Litigation Trust.

On the Effective Date the Global Debtors shall execute the Litigation Trust Documents and take all steps reasonably necessary to establish the Litigation Trust in accordance with the terms of this Plan and the Committee Settlement Term Sheet and for the benefit of the Litigation Trust Beneficiaries. The Global Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title and interest in the Litigation Trust Assets. Pursuant to section 1141 of the Bankruptcy Code, such Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests, and shall become assets of the Litigation Trust for all purposes. The act of transferring

66

the Litigation Trust Assets to the Litigation Trust shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Litigation Trust as if the asset or right was still held by the Global Debtors.  For the avoidance of doubt, if applicable, the Litigation Trust Assets shall include Litigation Trust Retained Causes of Action held by or assertable by any Global Debtor (including any TopCo Global Debtor), in each case to the extent set forth in the Schedule of Retained Causes of Action.

The Litigation Trustee shall be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b), as well as the sole representative of the Estates appointed pursuant to section 1123(b)(3) of the Bankruptcy Code and shall have all powers, authority, and responsibilities specified in the Plan and Litigation Trust Documents, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code.  The (i) establishment, purpose, and administration of the Litigation Trust, and (ii) appointment, rights, and powers, of the Litigation Trustee, shall be governed by the Litigation Trust Documents.  On and after the Effective Date, the Litigation Trustee shall be authorized, in accordance with the terms of this Plan and the Litigation Trust Documents, to take such actions as may be necessary or desirable to make any distributions on account of any Litigation Trust Assets, in accordance with the Litigation Trust Documents and the Litigation Trust Allocation.

In furtherance of this section of this Plan:  (1) it is intended that the Litigation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Litigation Trust Beneficiaries, consistent with the terms of this Plan, and accordingly, all assets held by the Litigation Trust are intended to be deemed for United States federal income tax purposes to have been distributed by the Global Debtors or the Reorganized Global Debtors, as applicable, to the Litigation Trust Beneficiaries and then contributed by the Litigation Trust Beneficiaries to the Litigation Trust in exchange for their interests in the Litigation Trust; (2) the sole purpose of the Litigation Trust shall be the liquidation and distribution of the net assets of the Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (3) all parties (including, without limitation, the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust Beneficiaries receiving interests in the Litigation Trust, and the Litigation Trustee) shall report consistently with such treatment described in provisos (1) and (2) of this paragraph; (4) all parties (including, without limitation, the Global Debtors, the Reorganized Global Debtors, and the Litigation Trust Beneficiaries receiving interests in the Litigation Trust, and the Litigation Trustee) shall report consistently with the valuation of the assets transferred to the Litigation Trust as determined by the Litigation Trustee (or its designee); (5) the Litigation Trustee shall be responsible for filing all applicable tax returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (6) the Litigation Trustee shall annually send to each Holder of an interest in the Litigation Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction, or credit (including receipts and expenditures) of the trust as relevant for United States federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private

letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee may timely elect to (x) treat any portion of the Litigation Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (y) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes.  If a "disputed ownership fund" election is made, (I) the portion of the Litigation Trust assets allocated to the disputed ownership fund will be subject to entity-level taxation, and (II) all parties (including, without limitation, the Global Debtors or Reorganized Global Debtors, as applicable, and the Litigation Trust Beneficiaries, and the Litigation Trustee) shall report for United States federal (and applicable state and local) income tax purposes consistently with the foregoing.  Any taxes (including with respect to earned interest, if any) imposed on the Litigation Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid out of the assets of the Litigation Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

Notwithstanding the foregoing or anything to the contrary in this Plan, Confirmation Order, or Plan Supplement, beneficial interests in the Litigation Trust may not be transferred, sold, pledged, or otherwise disposed of, or offered for sale, in each case, except in accordance with applicable non-bankruptcy law.  The Litigation Trust will operate in compliance with applicable federal and state securities laws and SEC staff guidance, including those regarding liquidating trusts, if applicable.

The Litigation Trust's primary purpose is to investigate, prosecute, settle, or abandon the Litigation Trust Retained Causes of Action, and to review, reconcile, object to and resolve General Unsecured Claims, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Retained Causes of Action and provide for the orderly liquidation thereof.

Subject to the terms of the Litigation Trust Documents and the Committee Settlement, the Litigation Trust shall have sole authority to investigate, prosecute, settle, or abandon the Litigation Trust Retained Causes of Action.  In pursuing any claim, right, or Litigation Trust Retained Cause of Action, the Litigation Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code and shall succeed to the Global Debtors' rights with respect to the time periods in which a Cause of Action may be brought under the Bankruptcy Code.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Litigation Trust Retained Causes of Action.  Moreover, any Holder of a Claim that timely filed a Proof of Claim is not required, under section 108 of the Bankruptcy Code or applicable law, to commence or continue any action in a non-bankruptcy forum in order to further toll or satisfy any limitations period with respect to any such Holder's Claim that had not expired prior to the Petition Date.

(c)    Litigation Trustee.

(i)    *Appointment*.  As of the Effective Date, the Litigation Trustee shall be appointed as trustee of the Litigation Trust in accordance with the Plan, Confirmation Order, and the Litigation Trust Documents.  The Litigation Trustee shall have all of the rights and responsibilities set forth in this Plan, the Committee Settlement, and the Litigation Trust Documents.  Without limiting the generality of the foregoing, the Litigation Trustee shall administer distributions to Litigation Trust Beneficiaries to the extent provided under the Plan, the Committee Settlement, and the Litigation Trust Documents, and shall serve as the representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of pursuing Litigation Trust Retained Causes of Action.  The structure of powers between the Litigation Trustee and the Litigation Trust Committee shall be set forth in the Litigation Trust Documents.

(ii)    *Responsibilities of the Litigation Trustee*.  The responsibilities of the Litigation Trustee shall be identified in the Litigation Trust Agreement, subject to any consultation and consent rights of the Litigation Trust Committee as may be set forth in the Litigation Trust Documents and the Committee Settlement Term Sheet, and shall include, without limitation:  (a) making distributions to Litigation Trust Beneficiaries as contemplated by the Plan, Confirmation Order, Litigation Trust Documents, and Committee Settlement; (b) investigating reviewing, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue any Litigation Trust Retained Causes of Action, as provided for in the Litigation Trust Documents; (c) protecting and enforcing the rights to the Litigation Trust Retained Causes of Action by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise, subject to the terms of the Litigation Trust Documents; (d) reviewing, reconciling, and where appropriate, allowing or objecting to General Unsecured Claims (which shall include Class 4-D Go-Forward OpCo Trade Claims, Class 4-E OpCo General Unsecured Claims, Class 5-C HoldCo II Go-Forward Trade Claims, and Class 5-D HoldCo II General Unsecured Claims), and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, litigation to judgment, or resolution of all objections to Disputed General Unsecured Claims; provided that the compromise, settlement or resolution of Disputed General Unsecured Claims whose sole source of recovery is against the Litigation Trust may be achieved without any further notice to or action, order, or approval by the Bankruptcy Court; (e) administering and adjusting the Claims Register to reflect any such settlements or compromises without any further notice to or action,

69

order, or approval by the Bankruptcy Court; (f) determining and maintaining the Litigation Trust Reserve, in consultation with the Litigation Trust Committee; (g) making repayment to the Reorganized Global Debtors of the Litigation Trust Initial Funding Amount, if any, in the timing and manner prescribed by the Plan, to the extent of available funds to do so; (h) entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Litigation Trust Documents, and performing all obligations thereunder; (i) administering or managing any assets vested in the Litigation Trust by the Reorganized Global Debtors; (j) seeking the examination of any Person or Entity pursuant to Bankruptcy Rule 2004; (k) retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Litigation Trust Documents and paying the reasonable compensation thereof as Litigation Trust Fees and Expenses, solely out of the assets of the Litigation Trust; (l) withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Litigation Trustee has reasonably determined, based upon the advice of his agents or professionals, is required to be withheld from such distribution under any U.S. federal income tax or other laws; (m) exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Litigation Trust Documents; (n) subject to the terms of the Litigation Trust Documents and the Committee Settlement Term Sheet, entering Litigation Funding Agreements; provided that any Litigation Funding set forth in such Litigation Funding Agreements shall have recourse solely to the Litigation Trust Proceeds; and (o) taking all other actions consistent with the provisions of this Plan, Confirmation Order, the Committee Settlement, and the Litigation Trust Documents that the Litigation Trustee deems reasonably necessary or desirable to administer the Litigation Trust.

(iii)     *Litigation Trustee as Fiduciary*. The Litigation Trustee shall be a fiduciary of the Litigation Trust Beneficiaries and shall have such rights, powers, and duties necessary to enable the Litigation Trustee to perform its obligations under this Plan, Confirmation Order, the Committee Settlement, and the Litigation Trust Documents, as applicable, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Litigation Trust Documents. To the extent necessary and in furtherance of the Litigation Trustee duties, following the Effective Date, the Litigation Trustee shall be deemed to be a judicial substitute for the Reorganized Global Debtors as the party in interest in the Chapter 11 Cases, under this Plan or in any judicial proceeding or

70

appeal to which the Global Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.  The Litigation Trustee shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers, including upon advice of counsel, unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence, or willful misconduct.

(i)  *Compensation*.  The Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings, in accordance with the Litigation Trust Documents, and as disclosed in the Plan Supplement.

(d)  <u>Litigation Trust Committee</u>.

(i)  The Litigation Trust Committee shall have the responsibility to oversee the administration of the Litigation Trust and the activities of the Litigation Trustee, as set forth in the Litigation Trust Documents.  The Litigation Trust Committee shall act in accordance with the Litigation Trust Documents as fiduciaries of the Litigation Trust Beneficiaries.

(ii)  The Litigation Trust Documents shall provide that the members of the Litigation Trust Committee shall be entitled to reasonable compensation as determined from time-to-time by the Litigation Trust Committee in consultation with the Litigation Trustee and reimbursement of all reasonable and documented out-of-pocket expenses incurred by the members in connection with the performance of their duties with respect to the Litigation Trust Committee.   Such reasonable compensation and expense reimbursements shall constitute an appropriate expense of the Litigation Trust and be paid from the Litigation Trust Assets.

(iii)  The Litigation Trustee shall require the majority vote of the Litigation Trust Committee in order to: (a) enforce, settle, release, or otherwise resolve any Litigation Trust Retained Causes of Action where the amount in dispute exceeds $500,000; (b) employ any professionals or contractors; (c) abandon cash or non-cash Litigation Trust Assets with a value in excess of $250,000; (d) make any lump-sum disbursements of Litigation Trust Assets or Litigation Trust Proceeds exceeding $100,000, other than the payment of professionals, disbursements to Litigation Trust Beneficiaries in accordance with the Litigation Trust Documents, or other disbursements as provided under the Plan; (e) determine the amount necessary for the Litigation Trust Reserve to pay current and

71

projected Litigation Trust Fees and Expenses; and (f) take any other actions to be mutually agreed among the parties and set forth in the Litigation Trust Documents.

(iv) The Litigation Trustee shall require the unanimous vote of the Litigation Trust Committee in order to: (a) amend, restate, amend and restate, or modify the Litigation Trust Documents; (b) waive any breach of, or any modification of, any right or obligation under the Litigation Trust Documents; (c) enter into any Litigation Funding Agreement; (d) establish or fund any Litigation Trust Reserve in excess of $20,000,000 or incur in excess of an aggregate $30,000,000 in Litigation Trust Fees and Expenses; and (e) wind-down or terminate the Litigation Trust.

(e) Litigation Trust Allocation. The Litigation Trustee shall be authorized to make distributions of Litigation Trust Proceeds solely in the following waterfall, in all cases, net of the Litigation Trust Fees and Expenses and the Litigation Trust Reserve (the "Litigation Trust Allocation"):

(i) *First*, if the Reorganized Global Debtors fund the Litigation Trust Initial Funding Amount, the Reorganized Global Debtors shall receive 100% of any Litigation Trust Proceeds until an amount equal to the Litigation Trust MOIC (inclusive, for the avoidance of doubt, of the Litigation Trust Initial Funding Amount) has been paid in Cash to the Reorganized Global Debtors (the "Litigation Trust Repayment Distribution");

(ii) *Second*, after the Litigation Trust Repayment Distribution occurs, if applicable, the Litigation Trust will distribute 50% of all Litigation Trust Proceeds to holders of Litigation Trust Class A Interests and 50% of all Litigation Trust Proceeds to holders of Litigation Trust Class B Interests on a dollar-for-dollar basis until an aggregate amount of $80 million has been distributed to Litigation Trust Beneficiaries (the "Litigation Trust Initial Distribution"); and

(iii) *Third*, after the Litigation Trust Initial Distribution occurs, the Litigation Trust will distribute 80% of all Litigation Trust Proceeds to holders of Litigation Trust Class A Interests and 20% of all Litigation Trust Proceeds to holders of Litigation Trust Class B Interests.

(iv) With respect to any distribution of Litigation Trust Proceeds to Litigation Trust Class A Interests, such distributions shall be made: (A) *first*, to holders of Litigation Trust Class A-1 Interests, until the Second Out DIP Term Loan Claims and Third Out DIP Term Loan Claims have been paid in full; (B) *second*, to holders of Litigation Trust Class A-2 Interests, until the Prepetition OpCo Second Out

72

Notes Claims have been paid in full; (C) *third*, to holders of Litigation Trust Class A-3 Interests, until the Prepetition OpCo Third Out Notes Claims have been paid in full; and (D) *fourth*, to holders of Litigation Trust Class A-4 Interests, until the Prepetition Initial Notes Claims have been paid in full. For purposes of calculating the outstanding amount of Second Out DIP Term Loan Claims, Third Out DIP Term Loan Claims, Prepetition OpCo Second Out Notes Claims, Prepetition OpCo Third Out Notes Claims and Prepetition Initial Notes Claims entitled to distribution under the Litigation Trust, such Claims shall be calculated after giving effect to any distributions under this Plan, with any distribution of New Saks Common Stock valued using the mid-point Equity Value set forth in the Valuation Analysis (as each is defined in the Disclosure Statement). Each holder of a junior Litigation Trust Class A Interest shall acknowledge and agree to turn over to the Litigation Trustee for application to any outstanding senior Litigation Trust Class A Interests Litigation Trust Proceeds received or receivable by such holder of a junior Litigation Trust Class A Interest until all senior Litigation Trust Class A Interests have received payment in full in accordance with the above priorities.

(v) The parties will mutually agree on the classification of Holders of General Unsecured Claims of the Global Debtors, including which class or classes of such Holders will be entitled to receive distributions of Litigation Trust Class B Interests; provided that for the avoidance of doubt, Holders of deficiency Claims on account of the DIP Facilities or the Prepetition Secured Obligations (as defined in the Final DIP Order) shall not be entitled to receive distributions of Litigation Trust Class B Interests; provided, further, that the Creditors' Committee may increase the allocation of Litigation Trust Class B Interests to certain holders of Litigation Trust Class B Interests, as the Creditors' Committee determines appropriate, to reflect differences in structural priority and relative asset value among the Global Debtors.

(f) Litigation Trust Funding. At least two (2) Business Days prior to the Effective Date, the Litigation Trustee may make an election to not receive the Litigation Trust Initial Funding Amount (the "Litigation Trust Initial Funding Election"), after consulting with the Global Debtors and with the prior written consent of the Required Consenting DIP Term Loan Lenders and the Creditors' Committee, by written notice to the Global Debtors. Absent such election, the Reorganized Global Debtors shall fund the Litigation Trust Initial Funding Amount to the Litigation Trust on the Effective Date, which shall automatically and irrevocably vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, or interests. The Litigation Trust Initial Funding Amount shall be used for the administration of the Litigation Trust, to pay the Litigation Trust Fees and Expenses, and to pursue the Litigation Trust Retained Causes of Action, with any excess amount being used to distribute to Litigation Trust Beneficiaries, as set forth in the Litigation Trust Documents. All proceeds from the pursuit of the Litigation Trust

73

Retained Causes of Action shall be used by the Litigation Trustee to pay for the Litigation Trust Fees and Expenses, pursuit of the Litigation Trust Retained Causes of Action, and distribution to Litigation Trust Beneficiaries, in accordance with the Committee Settlement Term Sheet and as set forth in the Litigation Trust Documents.  Neither the Global Debtors nor the Reorganized Global Debtors shall have any obligation to fund the Litigation Trust in excess of the Litigation Trust Initial Funding Amount.  Neither the Ad Hoc Group, the DIP Secured Parties, nor the Prepetition Secured Parties (as defined in the Final DIP Order) shall have any obligation to provide any funding to the Litigation Trust.  Subject to the Litigation Trust Documents and the Committee Settlement Term Sheet and with the unanimous consent of the Litigation Trust Committee, the Litigation Trustee shall be entitled to enter into Litigation Funding Agreements.  Subject to the foregoing, the Litigation Trustee may enter into Litigation Funding Agreements without further notice to or action, order, or approval by the Bankruptcy Court.  Neither the Ad Hoc Group, the DIP Secured Parties, nor the Prepetition Secured Parties (as defined in the Final DIP Order) shall be obligated to provide any funding to the Litigation Trust.

(g)      Retention of Professionals by the Litigation Trustee.

Subject to the terms of the Litigation Trust Documents and the consent of the Litigation Trust Committee, the Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with this Plan and the Litigation Trust Agreement, respectively.  The Litigation Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

(h)      Cooperation of the Reorganized Global Debtors.

The Reorganized Global Debtors shall use commercially reasonable efforts to cause the following officers and employees of the Reorganized Global Debtors, the Chief Legal Officer, the Chief Financial Officer, and the Chief Accounting Officer & Treasurer, at reasonable times and on reasonable advance notice to the Reorganized Global Debtors, to cooperate with, support, and not obstruct the activities of the Litigation Trust, including the investigation or pursuit of the Litigation Trust Retained Causes of Action (the "Cooperation Covenant"); provided, however, that if the information or cooperation reasonably requested by the Litigation Trust is not within the knowledge or possession of such identified individuals, the Reorganized Global Debtors shall use commercially reasonable efforts to identify and make available such other officers, employees, or personnel of the Reorganized Global Debtors who may have knowledge of, or access to, the requested information, subject to the same conditions of reasonable times and reasonable advance notice; further provided that the Litigation Trust shall promptly reimburse the Reorganized Global Debtors for all reasonable and documented costs and expenses in excess of (a) the first $100,000 in the aggregate incurred in connection with providing factual information reasonably requested by the Litigation Trust regarding the reconciliation and administration of General Unsecured Claims by the Litigation Trust, and (b) an additional $50,000 in the aggregate otherwise incurred in connection with compliance with the Cooperation Covenant (the "Cooperation Reimbursement"), including reasonable costs associated with allocating time of employees and professionals (without mark-up), which shall constitute Litigation Trust Fees and Expenses.  In accordance with the Cooperation Covenant, on the Effective Date or as soon as reasonably

74

practicable thereafter, the Reorganized Global Debtors shall use commercially reasonable efforts to (i) deliver or cause to be delivered to the Litigation Trust any and all books and records and all other documents and communications, or copies of the same, that in the good faith judgment of the Reorganized Global Debtors are related to the Litigation Trust Retained Causes of Action, and (ii) provide the Litigation Trust and its representatives with reasonable access to the Global Debtors' books and records, personnel, and other information as the Litigation Trust may reasonably request in connection with the activities of the Litigation Trust; provided, that the Litigation Trust or the Litigation Trustee shall deliver to the Global Debtors a written request list (email being sufficient), which may be amended and supplemented from time to time, identifying with reasonable specificity the books, records, documents, and communications (or categories thereof) that the Litigation Trust is requesting pursuant to the Litigation Trust Documents.  In addition, effective as of the Effective Date, the Global Debtors and the Reorganized Global Debtors shall be deemed to have transferred to the Litigation Trust, and the Litigation Trust shall succeed to, the Global Debtors' attorney-client privilege and the work-product protection solely with respect to the Litigation Trust Retained Causes of Action.

(i)     Privileges.

Except as expressly stated otherwise below, in connection with the Litigation Trust Assets, the Litigation Trust shall stand in the same position as the Global Debtors and their Estates, and shall also stand in the same position as the Creditors' Committee, as to all evidentiary privileges of any type or nature whatsoever, including the attorney-client privilege, the work product privilege or doctrine, any other privilege or immunity attaching to any documents or communications in any form, including electronic data hosted on remote servers, and any other applicable evidentiary privileges of each of the foregoing (collectively, the "Privileges"), and shall have all of the rights of the Global Debtors and their Estates, and the Creditors' Committee, to preserve and assert any such Privileges, and shall be deemed to be an assignee by each Global Debtor and its respective Estate, and the Creditors' Committee, of each such Privilege as of the formation of the Litigation Trust.  The Litigation Trust's receipt of such Privileges associated with the Litigation Trust Assets shall not operate as a waiver of any Privileges, or any other evidentiary privilege of any type or nature whatsoever (including privileges of the type described above), possessed or retained by the Reorganized Global Debtors.  The Global Debtors or the Reorganized Global Debtors, as applicable, on the one hand, and the Litigation Trust, on the other hand, shall protect the Privileges and reasonably consult with one another in advance of taking any action that may result in or with respect to the potential waiver of any privilege.  Nothing in this provision (or anything else in the Plan) requires the Global Debtors, their Estates, or the Creditors' Committee to share or assign, or entitles the Litigation Trust to receive, any information protected by any evidentiary privilege of any type of nature (including privileges of the type described above) that do not concern the Litigation Trust Assets, although the sharing of any such information with the Litigation Trust shall not constitute a waiver of any applicable privilege.  Consistent with the foregoing, the Confirmation Order shall provide that pursuant to Rule 502(d) of the Federal Rules of Evidence, the Global Debtors and the Reorganized Global Debtors (including, for the avoidance of doubt, the Special Restructuring Committee) shall not be deemed to have waived any evidentiary privilege of any type or nature whatsoever (including privileges of the type described above) through, or as result of, directly or indirectly, sharing any documents, information, or work product with the Litigation Trust.

Without limiting the foregoing, the Special Restructuring Committee shall produce to the Litigation Trust, within seven (7) Business Days after the Effective Date: (i) all interview memoranda regarding the interviews conducted in the Special Restructuring Committee Independent Investigation (other than counsel's mental impressions, legal theories, and opinion work product); (ii) a list of all interviews requested in the Special Restructuring Committee Independent Investigation; (iii) all documents produced to the Special Restructuring Committee by the Global Debtors and/or any third parties; and (iv) any additional factual documentation or information related to the Special Restructuring Committee Independent Investigation. The Special Restructuring Committee's production of these materials does not constitute a waiver of any Privileges or work product protections that might exist, and will not be used by the Litigation Trustee to argue that such a waiver has occurred. All rights of the Global Debtors, the Reorganized Global Debtors, the Ad Hoc Group, and the Litigation Trustee, as applicable, are reserved, including to seek the production of any other documents, communications, materials, or other information from the Special Restructuring Committee.

(j)   Tax Matters.

It is intended that the Litigation Trust be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code with the Litigation Trust Beneficiaries treated as grantors and owners of the Litigation Trust, and the Litigation Trustee shall take a position on the Litigation Trust's tax return accordingly. The Litigation Trust shall be established for the primary purpose of liquidating the Litigation Trust Assets, reconciling claims asserted against the Global Debtors and the Reorganized Global Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust, and is otherwise intended to comply with the ruling guidelines set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. For all U.S. federal income tax purposes, all parties (including the Global Debtors, Reorganized Global Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat the transfer of the Litigation Trust Assets by the Global Debtors or Reorganized Global Debtors, as applicable, to the Litigation Trust in accordance with the Plan, the Committee Settlement, and the Litigation Trust Documents as (a) a transfer directly to each of the Litigation Trust Beneficiaries of an undivided interest in the Litigation Trust Assets, followed by (b) the transfer by the Litigation Trust Beneficiaries to the Litigation Trust of such Litigation Trust Assets in exchange for the Litigation Trust Interests. Accordingly, the Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

The Litigation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the proceeds of the Litigation Trust Assets (e.g., income, gain, loss, deduction and credit). Each Litigation Trust Beneficiary holding a beneficial interest in the Litigation Trust will receive a copy of the information returns and must report on its U.S. federal income tax return its share of all such items. The information provided by the Litigation Trust will pertain to the Litigation Trust Beneficiaries who receive their interests in the Litigation Trust in connection with the Plan.

76

The Litigation Trust shall in no event be dissolved later than five (5) years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Litigation Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

With respect to any of the assets of the Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Litigation Trust, such assets may be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment may also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate U.S. federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

(k)     Indemnification.

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the Litigation Trustee, in the performance of his or her duties hereunder, shall be defended, held harmless and indemnified from time to time by the Litigation Trust (and not any other person) against any and all losses, claims, costs, expenses and liabilities to which the Litigation Trustee may be subject by reason of his or her execution of duties pursuant to the discretion, power and authority conferred on the Litigation Trustee by the Plan or the Confirmation Order; provided that the indemnification obligations arising pursuant to this Section shall not indemnify the Litigation Trustee for any actions taken by such members which constitute fraud, gross negligence, willful misconduct, criminal conduct or intentional breach of the Plan or the Confirmation Order. Satisfaction of any obligation of the Litigation Trust arising pursuant to the terms of this Section shall be payable only from the assets of the Litigation Trust, including, if available, any insurance maintained by the Litigation Trust. The indemnification provisions contained in this Section shall remain available to and be binding upon any future Litigation Trustee or the estate of any decedent. The Litigation Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Litigation Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Litigation Trustee, which insurance coverage may, at the sole option of the Litigation Trustee, be extended for a reasonable period after the termination of the Litigation Trust Documents.

(l)     Avoidance Action Waiver.

On the Effective Date, the Global Debtors shall be deemed to waive and release any and all Avoidance Actions held by the Global Debtors against (i) the Released Parties and (ii) any trade creditor, service provider, vendor, or lessor of non-residential real property of the Global Debtors, other than as may be preserved with the consent of the Creditors' Committee; provided that such

77

release shall not apply to any claims or Causes of Action against any Person or Entity referenced in this clause (ii) to the extent arising from or relating to conduct outside such Person's or Entity's capacity as a trade counterparty or lessor of non-residential real property.

Notwithstanding the foregoing, on the Effective Date, the Global Debtors shall be deemed to waive and release any and all Avoidance Actions held by the Global Debtors against Axonic, solely to the extent that (x) an Axonic Settlement is reached in advance of the Voting Deadline and (y) in connection with such Axonic Settlement, Axonic waives any entitlement to Litigation Trust Class B Interests. The terms of the Axonic Settlement shall be reasonably acceptable to the Creditors' Committee and subject to the consent rights set forth in the DIP Documents and the Restructuring Support Agreement.

(m)    Non-Transferability of Litigation Trust Interests. Beneficial interests in the Litigation Trust, and any right to receive a distribution from the Litigation Trust, shall not be evidenced by any certificate, security, receipt, or any other form or manner whatsoever, except as maintained on the books and records of the Litigation Trust by the Litigation Trustee; and any and all beneficial interests in the Litigation Trust shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law; provided that the foregoing restrictions shall apply to Litigation Trust Class A Interests solely to the extent that the Litigation Trust Class A Interests would otherwise require registration under the Securities Act. In addition, the Litigation Trust Interests shall not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such interests constitute "securities," the Global Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance and distribution under the Plan of the beneficial interests in the Litigation Trust will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

(n)    Challenge Period. Notwithstanding anything to the contrary herein (including Articles III and V hereof), the deadline for the Creditors' Committee to commence a Challenge, as defined in the DIP Orders, shall be tolled until the earlier of (i) the occurrence of the Effective Date, and (ii) fourteen (14) calendar days following the provision of notice by a Party to the other Parties, of alleged non-compliance by the applicable Party or Parties with the terms of the Committee Settlement; provided that the Creditors' Committee, the Ad Hoc Group, and the Global Debtors shall work in good faith during such 14-day period to resolve alleged non-compliance consensually without commencement of a Challenge. Upon the Effective Date, and only to the extent not already settled and released pursuant to the Final DIP Order, all such Challenge rights and claims shall be deemed settled and released by the Global Debtors, the Reorganized Global Debtors, the Creditors' Committee, and the Litigation Trust, and shall not constitute Litigation Trust Assets. Notwithstanding the foregoing, the deadline for the Creditors' Committee to bring a Challenge against the Prepetition ABL Secured Parties (as defined in the DIP Orders), except with respect to the Asserted Unencumbered Assets (as defined in the email agreement, dated May 8, 2026 at 1:31pm, by and between the Committee and the Prepetition ABL Secured Parties), whose Challenge Period will end on the earliest of (i) an agreement amongst the Creditors' Committee and the Prepetition ABL Secured Parties, (ii) confirmation of a chapter 11 plan, and (iii) June 30, 2026 (subject to further extensions as may be agreed by the Creditors' Committee and the Prepetition ABL Secured Parties), any and all Challenges against the

78

Prepetition ABL Secured Parties have been forever waived, released, and barred, and the Challenge Period therefor expired as of 11:59 p.m. (ET) on May 1, 2026.

### 6.9. *Reorganized Global Debtors' Ownership.*

On the Effective Date, in accordance with the terms of this Plan, New Saks shall issue and deliver all of the New Saks Common Stock and Preferred Equity Units pursuant to the terms and conditions of this Plan, the Confirmation Order, the Restructuring Steps Plan, and the New Organizational Documents. The issuance of New Saks Common Stock and Preferred Equity Units pursuant to this Plan is authorized without the need for further limited liability company or corporate action and without any further action by any Holder of a Claim or Equity Interest, and all of the New Saks Common Stock and Preferred Equity Units issued or issuable pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Any Holder of an Allowed Claim receiving New Saks Common Stock and Preferred Equity Units pursuant to the terms and conditions of this Plan may designate that all or a portion of such Holder's *pro rata* share of the New Saks Common Stock and Preferred Equity Units be registered in the name of, and delivered to, its designee by delivering notice thereof to the Global Debtors and/or by the designee delivering notice thereof to the Claims Agent in accordance with such other procedures for such designations and/or delivery that the Global Debtors or the Reorganized Global Debtors, as applicable, may establish in accordance with this Plan. Any such designee shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

### 6.10. *Exemption from Registration Requirements.*

The offering, issuance, and distribution of any securities, including the New Saks Common Stock (including the New Saks Common Stock that may be paid as part of the Closing Date Commitment Premium) and Take Back Preferred Units in exchange for Claims pursuant to Article III or Article V of this Plan, shall be exempt from, among other things, the registration requirements of the Securities Act and any other applicable U.S. state or local Laws requiring registration prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code (except with respect to an Entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code) to the extent permitted and available. Except as otherwise provided in this Plan or the governing certificates or instruments, any and all such New Saks Common Stock and Take Back Preferred Units so issued under this Plan (a) will not be "restricted securities" (as defined under the Securities Act), and (b) will be freely tradable and transferable under the Securities Act by the recipients thereof that are not, and have not been within ninety (90) days of such transfer, an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Global Debtors or the Reorganized Global Debtors, in each case, subject to (x) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (y) compliance with applicable securities Laws and any rules and regulations, including those of the SEC or U.S. state or local securities Laws, if any, applicable at the time of any future transfer of such securities or instruments, and (z) any restrictions in the New Organizational Documents.

The offering, issuance, and sale of the Incremental New Money Preferred Units shall be exempt from the registration requirements of the Securities Act pursuant to section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.  Each recipient of Incremental New Money Preferred Units shall be an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act, and the Incremental New Money Preferred Equity Facility Share Purchase Agreement shall contain such representations, warranties, and covenants as are customary for transactions exempt from registration under section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.  The Incremental New Money Preferred Units shall constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, and any resale of such securities shall be subject to applicable restrictions under the Securities Act, including the requirements of Rule 144 or another available exemption from the registration requirements of the Securities Act.

Notwithstanding anything to the contrary in any Plan Document or the Restructuring Support Agreement, no Entity (including DTC, ClearPar, or any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether issuance of the New Saks Common Stock and Preferred Equity Units is exempt from registration and/or eligible for book-entry delivery, settlement, and depository (to the extent applicable).

### 6.11.   *Organizational Documents.*

The Reorganized Global Debtors shall enter into such agreements and/or amend their Organizational Documents to the extent necessary to implement the terms and provisions of this Plan and the Bankruptcy Code, which shall:  (a) contain terms consistent with the Plan Supplement; and (b) authorize the issuance, distribution, and reservation of the New Saks Common Stock and Preferred Equity Units to the Entities entitled to receive such issuances, distributions and reservations, as applicable under this Plan.  The New Organizational Documents will be deemed to be modified to prohibit (and will include a provision prohibiting) the issuance of non-voting equity securities, pursuant to and solely to the extent required under section 1123(a)(6) of the Bankruptcy Code.  Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Global Debtors shall be governed by the New Organizational Documents applicable to such Reorganized Global Debtor.  On or immediately before the Effective Date, each Global Debtor and each Reorganized Global Debtor, as applicable, will file its respective New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable Laws of its state of incorporation or formation, to the extent required under this Plan or applicable non-bankruptcy Law for such New Organizational Documents to become effective.  After the Effective Date, the Reorganized Global Debtors may amend and restate the formation, incorporation, organizational, and constituent documents (including, without limitation, any Organizational Documents), as applicable, as permitted by the Laws of their respective jurisdiction of formation or incorporation, as applicable, and the terms of such documents.

Any Entity's or Person's receipt of New Saks Common Stock and Preferred Equity Units, under, or as contemplated by, this Plan shall be deemed as its agreement to the applicable New Organizational Documents for New Saks, and such Entities and Persons shall be deemed signatories to the applicable New Organizational Documents for New Saks without further action

80

required on their part (solely in their capacity as members of New Saks).  The New Organizational Documents for New Saks will be effective as of the Effective Date and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each recipient of New Saks Common Stock and Preferred Equity Units, as applicable, will be bound thereby in all respects even if such recipient has not actually executed and delivered a counterpart thereof.

### 6.12. *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer (or deemed transfer) pursuant to or in connection with this Plan, including:  (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Global Debtors, the Reorganized Global Debtors, or any direct or indirect subsidiary of the foregoing (whether or not such subsidiary itself is a Global Debtor), including, without limitation, the New Saks Common Stock, the Preferred Equity Units, the Exit ABL Facility, and the New Exit Debt Facilities; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; (d) the grant of collateral under the Exit ABL Facility Documents and the New Exit Debt Facilities Documents, as applicable; (e) the forfeiture, disclamation, or relinquishment of the Disclaimed Interests; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall constitute a "transfer under the plan" and shall not be subject to any U.S. federal, state or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax (including as a result of a transfer of an economic interest), mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate U.S. federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Plan.

### 6.13. *Other Tax Matters.*

From and after the Effective Date, the Reorganized Global Debtors shall be authorized to make and to instruct any of their wholly owned subsidiaries to make any elections available to them under applicable Law with respect to the tax treatment of the Restructuring Transactions as specified in the Restructuring Steps Plan.

### 6.14. *Cancellation of Existing Securities and Agreements.*

Except as otherwise set forth in this Plan and the Confirmation Order, on the Effective Date, all agreements, including all intercreditor agreements, instruments, and other documents directly or indirectly evidencing, related to or connected with any Claim, other than certain

Intercompany Claims and Existing Intercompany Equity Interests, as expressly set forth in this Plan, and any rights of any Holder in respect thereof, shall be deemed canceled, discharged, and of no force or effect without further act or action under any applicable agreement, Law, regulation, order, or rule. The holders of or parties to such canceled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation or the cancellation thereof, except the rights provided for in this Plan.

Notwithstanding anything to the contrary herein and in the Restructuring Support Agreement, each of the DIP Documents, the Prepetition OpCo Notes Documents, the Prepetition SGUS Notes Documents, the Prepetition FILO Loan Documents, the Prepetition NPC Loan Documents, the Prepetition Initial Notes Documents, and the HoldCo II SGUS Notes Guarantee shall continue in effect solely to the extent necessary to: (a) permit Holders of the DIP Facility Claims, Prepetition SGUS Notes Claims, Prepetition FILO Claims, Prepetition NPC Claims, Prepetition OpCo Second Out Notes Claims, and HoldCo II SGUS Notes Guarantee Claims to receive distributions under this Plan on account of such respective Claims; (b) preserve all rights of (i) the Prepetition SGUS Notes Trustee with respect to the Prepetition SGUS Notes Documents, (ii) the Prepetition FILO Lenders with respect to the Prepetition FILO Credit Agreement and vice versa, (iii) the Prepetition NPC Collateral Agent with respect to the Prepetition NPC Loan Documents, (iv) the Prepetition OpCo Notes Trustee and Prepetition OpCo Notes Collateral Agent with respect to the Prepetition OpCo Notes Documents, (v) the Prepetition Initial Notes Trustee and Prepetition Initial Notes Collateral Agent with respect to the Prepetition Initial Notes Documents, (vi) the DIP OpCo Agent with respect to the DIP OpCo Loan Documents, (vii) the DIP ABL Agent with respect to the DIP ABL Documents, and (viii) the DIP Term Loan Agent with respect to the DIP Term Loan Documents, in each case with respect to any rights or obligation to compensation (including with respect to the applicable Charging Liens), indemnification, expense reimbursement, or contribution, or any other claim or entitlement, in each case that they may have under such agreements; (c) permit the Prepetition Initial Notes Trustee, Prepetition Initial Notes Collateral Agent, Prepetition NPC Collateral Agent, Prepetition OpCo Notes Trustee, Prepetition OpCo Notes Collateral Agent, Prepetition SGUS Notes Trustee, DIP OpCo Agent, DIP ABL Agent, and DIP Term Loan Agent, as applicable, to perform any functions that are necessary to effectuate the immediately foregoing, including appearing and being heard in the Chapter 11 Cases or in any other court or proceeding in the Bankruptcy Court related to the Prepetition Initial Notes Documents, Prepetition NPC Loan Documents, Prepetition OpCo Notes Documents, Prepetition SGUS Notes Documents, DIP OpCo Loan Documents, or DIP Term Loan Documents, as applicable, and in furtherance of the foregoing; (d) permit the Prepetition Initial Notes Trustee, Prepetition Initial Notes Collateral Agent, Prepetition NPC Collateral Agent, Prepetition OpCo Notes Trustee, Prepetition OpCo Notes Collateral Agent, Prepetition SGUS Notes Trustee, DIP OpCo Agent, DIP ABL Agent, and DIP Term Loan Agent to enforce any right or obligation owed to them or to the holders of the Prepetition Initial Notes Claims, Prepetition NPC Claims, Prepetition OpCo Notes Claims, Prepetition SGUS Notes Claims, DIP OpCo Claims, DIP ABL Facility Claims, and DIP Term Loan Claims, as applicable, under this Plan, Plan Supplement, Confirmation Order, or other documents incorporated therein; and (e) permit the Prepetition Initial Notes Collateral Agent, Prepetition NPC Collateral Agent, Prepetition OpCo Notes Collateral Agent, Prepetition SGUS Notes Trustee, DIP OpCo Agent, DIP ABL Agent, and DIP Term Loan Agent (in each case, at the Global Debtors' direction and expense) to take any action and execute any documents necessary to terminate, cancel, extinguish, and/or evidence the release of any and all Liens and other security interests with respect to the Prepetition Initial Notes Claims,

82

Prepetition NPC Claims, Prepetition OpCo Notes Claims, Prepetition SGUS Notes Claims, DIP OpCo Claims, DIP ABL Facility Claims, and DIP Term Loan Claims, including, without limitation, the preparation and filing, in form, substance, and content reasonably acceptable to the Prepetition Initial Notes Collateral Agent, Prepetition NPC Collateral Agent, Prepetition OpCo Notes Collateral Agent, Prepetition SGUS Notes Trustee, DIP OpCo Agent, DIP ABL Agent, and DIP Term Loan Agent, in each case, in accordance with this Plan, as applicable, of any and all documents necessary to terminate, satisfy, or release any Liens and other security interests held by the Prepetition Initial Notes Collateral Agent, Prepetition NPC Collateral Agent, Prepetition OpCo Notes Collateral Agent, Prepetition SGUS Notes Trustee, DIP OpCo Agent, DIP ABL Agent, and DIP Term Loan Agent, as applicable.

Except as provided pursuant to this Plan, upon satisfaction of the DIP Facility Claims, Prepetition SGUS Notes Claims, Prepetition FILO Claims, Prepetition NPC Claims, Prepetition OpCo Second Out Notes Claims, Prepetition OpCo Third Out Notes Claims, Prepetition Initial Notes Claims, and HoldCo II SGUS Notes Guarantee Claims respectively (and as the case may be), each of the DIP Credit Agreements, the Prepetition OpCo Notes Documents, the Prepetition SGUS Notes Documents, the Prepetition FILO Loan Documents, the Prepetition NPC Loan Documents, the Prepetition Initial Notes Documents, and the HoldCo II SGUS Notes Guarantee, respectively (and as the case may be), shall be discharged of all of their respective obligations associated with the DIP Credit Agreements, the Prepetition SGUS Notes Documents, the Prepetition FILO Loan Documents, the Prepetition NPC Loan Documents, the Prepetition OpCo Notes Documents, the Prepetition Initial Notes Documents, and the HoldCo II SGUS Notes Guarantee, respectively and as the case may be.

On the Effective Date, except as otherwise specifically provided for in this Plan (including in the Restructuring Steps Plan): (i) the obligations of the Global Debtors under any certificate, share, note (including, without limitation, the Prepetition Initial Notes, Prepetition OpCo Notes, and the Prepetition SGUS Notes), bond, agreement (including, without limitation, the Prepetition NPC Loan Documents), indenture (including, without limitation, the Prepetition Initial Notes Documents, Prepetition OpCo Notes Documents, and Prepetition SGUS Notes Documents), purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Global Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Global Debtors that are specifically Reinstated pursuant to this Plan, if any) shall be cancelled, terminated, null and void, and of no further force or effect solely as to the Global Debtors or, with respect to the Prepetition Initial Notes Documents, Prepetition NPC Loan Documents, Prepetition OpCo Notes Documents and Prepetition SGUS Notes Documents, as applicable, the Prepetition Initial Notes Trustee, Prepetition Initial Notes Collateral Agent, Prepetition NPC Collateral Agent, Prepetition OpCo Notes Trustee, Prepetition OpCo Notes Collateral Agent, or Prepetition SGUS Notes Trustee, as applicable, without further act or action, and the Global Debtors and the Reorganized Global Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Global Debtors or, with respect to the Prepetition Initial Notes Documents, Prepetition NPC Loan Documents, Prepetition OpCo Notes Documents, and Prepetition SGUS Notes Documents, as applicable, the Prepetition Initial Notes Trustee, Prepetition Initial Notes Collateral Agent, Prepetition NPC Collateral Agent, Prepetition

83

OpCo Notes Trustee, Prepetition OpCo Notes Collateral Agent, or Prepetition SGUS Notes Trustee, as applicable, pursuant, relating, or pertaining to any agreements (including, without limitation, the Prepetition NPC Loan Documents), indentures (including, without limitation, the Prepetition Initial Notes Documents, Prepetition OpCo Notes Documents, and Prepetition SGUS Notes Documents), certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes (including, without limitation, the Prepetition Initial Notes, Prepetition OpCo Notes, and the Prepetition SGUS Notes), bonds, purchase rights, options, warrants, calls, puts, awards, commitments, registration rights, preemptive rights, rights of first refusal, rights of first offer, co-sale rights, investor rights, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Global Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Global Debtors that are specifically Reinstated pursuant to this Plan, if any) shall be automatically and fully released and discharged.

On and after the final distribution on account of the Prepetition SGUS Notes Claims and HoldCo II SGUS Notes Guarantee Claims, the Prepetition SGUS Notes shall be deemed to be null, void, and worthless, and DTC shall take down the relevant positions at the request of the Prepetition SGUS Notes Trustee without any requirement of indemnification or security on the part of the Prepetition SGUS Notes Trustee, the Global Debtors, or the Reorganized Global Debtors (as applicable).

### 6.15.   *Boards*

Subject to the terms of the Restructuring Support Agreement, the Confirmation Order, and the applicable New Organizational Documents, on the Effective Date, the New Boards shall be established and new members of the New Boards appointed.  The initial members of the New Boards, who shall each be selected by the Required Consenting DIP Term Loan Lenders, in consultation with the Global Debtors, shall be identified in the Plan Supplement to be Filed with the Bankruptcy Court prior to the Effective Date.  Unless reappointed, the members of the Boards prior to the Effective Date shall have no continuing obligations to any of the Reorganized Global Debtors on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Global Debtor on the Effective Date. Commencing on the Effective Date, the members of the New Boards shall serve pursuant to the terms of the applicable New Organizational Documents or the applicable Organizational Documents of such Reorganized Global Debtor, as applicable, and may be replaced or removed in accordance therewith, as applicable.

### 6.16.   *Directors and Officers Insurance Policies.*

In accordance with this Plan:  (a) on the Effective Date, the Global Debtors or Reorganized Global Debtors, as applicable, shall be deemed to have assumed all of the Global Debtors' D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto, which "tail policy" shall not be otherwise terminated or reduced) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; provided that any indemnity obligations that would otherwise be assumed by

84

the foregoing assumption of the D&O Liability Insurance Policies shall be governed as provided elsewhere in this Plan and shall not be deemed to be assumed with assumption of such D&O Liability Insurance Policies; provided, further, that all of the D&O Liability Insurance Policies shall remain in full force and effect subject to this Section 6.16 and this Plan; (b) the Global Debtors and the Reorganized Global Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the Global Debtors or Reorganized Global Debtors, as applicable, may deem necessary and upon consent from the Required Consenting DIP Term Loan Lenders; and (c) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies, and confirmation of the Plan shall not impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation will be deemed and treated as an Executory Contract that has been assumed by the Global Debtors under the Plan as to which no Proof of Claim need be filed. The D&O Liability Insurance Policies (including any "tail policy") in effect as of the Confirmation Date shall remain in full force and effect for their entire term and shall not be cancelled (notwithstanding, for the avoidance of doubt, the dissolution of any Global Debtor or the Litigation Trust).

Solely as it relates to the Litigation Trust Retained Causes of Action, the Litigation Trust shall be responsible for monitoring and preserving the ability to maintain claims against the D&O Liability Insurance Policies in effect in or prior to the Effective Date. To the extent the Global Debtors are not the first named insured under any D&O Liability Insurance Policy and notwithstanding Confirmation of the Plan or the occurrence of the Effective Date (i) nothing herein shall constitute a rejection of such D&O Liability Insurance Policy, (ii) such D&O Liability Insurance Policy shall remain in full force and effect, and (iii) any and all rights of the Global Debtors under such D&O Liability Insurance Policy shall remain in full force and effect. For the avoidance of doubt and solely as it relates to the Litigation Trust Retained Causes of Action, the Litigation Trust shall retain all rights of the applicable Global Debtors (or Reorganized Global Debtors, as applicable) to assert claims against the D&O Liability Insurance Policies and/or to recover the proceeds thereof, and the dissolution of the Global Debtors or Reorganized Global Debtors, if any, shall have no impact upon the rights of the Litigation Trust to assert claims against the D&O Liability Insurance Policies or to recover the proceeds thereof.

For the avoidance of doubt, on and after the Effective Date, each of the Reorganized Global Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

**6.17.** ***New Capital Commitment Claims, DIP Term Loan Documents Indemnification Obligations, and DIP ABL Indemnification Obligations.***

(a) Notwithstanding anything to the contrary herein, (a) the New Capital Commitment Claims, (b) all indemnification, expense reimbursement, and contribution obligations of the Global Debtors or Reorganized Global Debtors, as applicable, arising under or in connection with the DIP Term Loan Documents (including indemnification obligations in favor of the DIP Term Loan Agent and the DIP Term Loan Lenders), and (c) all indemnification, expense reimbursement, and contribution obligations of the Global Debtors or Reorganized Global Debtors, as applicable, arising under or in connection with the DIP ABL Documents (including

85

indemnification obligations in favor of the DIP ABL Agent and the DIP ABL Lenders) shall, to the extent such obligations survive the termination of the DIP Term Loan Credit Agreement or DIP ABL Credit Agreement, as applicable, pursuant to its terms, survive, remain in full force and effect, and be binding on the applicable Reorganized Global Debtor from and after the Effective Date; provided, however, that any such indemnification obligations that relate to or arise from any claim or Cause of Action that is (i) released pursuant to Article XI of this Plan or (ii) subject to the Exculpation provided under Section 11.4 of this Plan shall not be preserved hereunder and shall be deemed released and discharged as of the Effective Date. For the avoidance of doubt, nothing in this Section 6.17 shall limit, modify, or impair any rights of the DIP Term Loan Agent, the DIP Term Loan Lenders, DIP ABL Agent, the DIP ABL Lenders, and the New Capital Commitment Parties, as applicable, to seek indemnification, expense reimbursement, or contribution from any entity that is not a Global Debtor or a Reorganized Global Debtor to the extent such rights exist under the DIP Term Loan Documents, DIP ABL Documents, or the New Capital Commitment Letter, as applicable, and survive the termination thereof.

### 6.18. *Corporate Action.*

(a)    On the Effective Date, the New Organizational Documents and any other applicable amended and restated corporate Organizational Documents of each of the Reorganized Global Debtors and New Saks, the New Exit Facilities Documents and the Exit ABL Facility Documents shall be deemed authorized in all respects. On the Effective Date, all actions contemplated by this Plan and the Restructuring Transactions shall be deemed authorized and approved in all respects, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.

(b)    Any action under this Plan or the Restructuring Steps Plan (as may be amended on or prior to the Effective Date to incorporate additional tax optimization steps into this Plan, subject to all applicable consent rights) to be taken by or required of the Global Debtors or the Reorganized Global Debtors, including the adoption or amendment of certificates of formation, incorporation, and bylaws, the issuance of securities and instruments, the formation of any holding companies in accordance with the Restructuring Steps Plan (as may be amended on or prior to the Effective Date to incorporate additional tax optimization steps into this Plan, subject to all applicable consent rights), or the selection of officers or directors shall be authorized and approved in all respects, without any requirement of further action by any of the Global Debtors' or Reorganized Global Debtors' or New Saks' equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

(c)    On or (as applicable) before the Effective Date, the appropriate officers of the Global Debtors, the Reorganized Global Debtors, or New Saks, as applicable, shall be authorized and, as applicable, directed to issue, execute, deliver, acknowledge, file, and/or record, as applicable, such securities, documents, contracts, instruments, releases and other agreements and take such other action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, in the name of and on behalf of the Global Debtors, the Reorganized Global Debtors, and New Saks, as applicable, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, or member approval or action. In addition, the selection of the Persons who will serve as the New Board shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action

86

by the board of directors, board of managers, or equity holders of the applicable Reorganized Global Debtor or New Saks, and each shall serve from and after the Effective Date pursuant to and in accordance with the terms of the applicable New Organizational Documents and other applicable documents until such director, officer, or manager resigns or is removed or terminated in accordance with the applicable New Organizational Documents and other applicable documents or Laws.

(d)     The authorizations, approvals, and directives contemplated by this Section 6.18 shall be effective, notwithstanding any requirements under non-bankruptcy Law.

**6.19.     *Comprehensive Settlement of Claims and Controversies; Termination of Subordination Rights.***

(a)     Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims, Equity Interests, Causes of Action, or controversies (i) belonging to the Global Debtors or the Global Debtors' Estates as set forth in this Plan and (ii) by and among the Global Debtors, the Creditors' Committee, the DIP Lenders, and the Consenting DIP Term Loan Lenders.  This Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Equity Interests, Causes of Action, and controversies belonging to the Global Debtors or the Global Debtors' Estates pursuant to section 1123 of the Bankruptcy Code and, with respect to the compromise and settlement by and among the Global Debtors, the Creditors' Committee, the DIP Lenders, and the Consenting DIP Term Loan Lenders, Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, or controversies and the Bankruptcy Court's finding that all such compromises or settlements are:  (i) in the best interest of the Global Debtors, the Reorganized Global Debtors, and their respective Estates and property, and of Holders of Claims or Equity Interests; and (ii) fair, equitable, and reasonable.

(b)     Except as provided herein, the classification and manner of satisfying all Claims and Equity Interests and the respective distributions and treatments under this Plan take into account or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b), or 510(c) of the Bankruptcy Code or otherwise, and any and all such rights against the Global Debtors and/or their Estates are terminated pursuant to this Plan.  Pursuant to section 510 of the Bankruptcy Code, the Global Debtors, the Reorganized Global Debtors, or the Litigation Trustee, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Equity Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

**6.20.     *Additional Transactions Authorized Under this Plan.***

On or prior to the Effective Date, the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders, shall be authorized to take any such actions, as may be

87

necessary or appropriate to Reinstate Claims or Equity Interests or render Claims or Equity Interests Unimpaired, as provided for under this Plan.

### 6.21.  *Insurance Policies.*

Each of the Global Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder.  Unless otherwise provided in this Plan, on the Effective Date, (a) the Global Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Global Debtors.

Nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (x) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies, or (y) alters or modifies the duty, if any, that the insurers or third-party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Global Debtors or draw on any Collateral or security therefor.  For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to File or serve a Cure Dispute or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any Claims Bar Date or similar deadline governing Cure Costs or Claims.

For the avoidance of doubt, all of the Global Debtors' D&O Liability Insurance Policies shall be governed by Section 6.4 and Section 6.16 of this Plan and not this Section 6.21.

### 6.22.  *Disclaimed Interests.*

Notwithstanding anything in this Plan, the Confirmation Order, or any organizational or governing document of HBS Global Properties LLC to the contrary, on the Effective Date or as soon as reasonably practicable thereafter in the Global Debtors' discretion, each of the Global Debtors that holds an equity or membership interest in HBS Global Properties LLC hereby forfeits, disclaims, and relinquishes any and all equity interests, membership interests, and associated rights in HBS Global Properties LLC (collectively, the "Disclaimed Interests").  The Disclaimed Interests shall not vest in the Reorganized Global Debtors on or after the Effective Date and shall be deemed cancelled and of no further force or effect as of such date, without the need for any further action by the Global Debtors, the Reorganized Global Debtors, or HBS Global Properties LLC.  For the avoidance of doubt, from and after such date, the Reorganized Global Debtors shall have no further rights, interests, obligations, or liabilities arising from or related to the Disclaimed Interests or membership in HBS Global Properties LLC.  All parties' rights with respect to any timely filed claims by HBS Global Properties LLC against the Global Debtors are reserved.

88

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1. *Distributions.*

Except as otherwise provided herein, the Disbursing Agent shall make all distributions under this Plan to the applicable Holders of Allowed Claims in accordance with the terms of this Plan; provided, however, that, notwithstanding the foregoing, all distributions on account of the Prepetition SGUS Notes Claims shall be made to, or in a manner reasonably acceptable to, the Prepetition SGUS Notes Trustee for distribution in accordance with this Plan and the procedures specified in the Prepetition SGUS Notes Indenture.

### 7.2. *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Final DIP Order or the Confirmation Order or otherwise permitted or required by applicable bankruptcy Law, including, but not limited to, section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date. For the avoidance of doubt, this Section 7.2 shall not apply to any DIP Facility Claims for which the Final DIP Order contemplates the payment of postpetition interest.

### 7.3. *Date of Distributions.*

Unless otherwise provided in this Plan, on the Effective Date (or, if a Claim or Equity Interest is not an Allowed Claim or Allowed Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest), or as soon as reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Equity Interest shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests (as applicable) in the applicable Class. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Equity Interests, distributions on account of any such Disputed Claims or Disputed Equity Interests shall be made pursuant to the provisions set forth in Article VIII hereof or the Litigation Trust Documents, as applicable.

### 7.4. *Distribution Record Date.*

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable). Neither the Global Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Costs or any Cure Disputes in connection with the assumption and/or assignment of the Global Debtors' Executory Contracts and Unexpired Leases, neither the Global Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the

89

non-Global Debtor party to the applicable Executory Contract or Unexpired Lease, even if such non-Global Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Cost.  For the avoidance of doubt, the Distribution Record Date shall not apply to any securities of the Global Debtors deposited with DTC or ClearPar, the Holders of which shall receive any distribution (if any) in accordance with the customary procedures of DTC or ClearPar, as applicable.

   **7.5.** ***Disbursing Agent.***

   (a)   <u>Powers of Disbursing Agent</u>.  The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions under this Plan or payments contemplated hereby, subject to the rights of the Prepetition SGUS Notes Trustee under <u>Section 7.1</u> hereof, in respect of the Reorganized Global Debtors; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

   (b)   <u>Expenses Incurred by the Disbursing Agent On or After the Effective Date</u>. Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Global Debtors (solely if the Disbursing Agent is not a Reorganized Global Debtor), the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash and will not be deducted from distributions under this Plan made to Holders of Allowed Claims by the Disbursing Agent.  The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Reorganized Global Debtors or the Litigation Trust, as applicable, and without the need for approval by the Bankruptcy Court.  In the event that the Disbursing Agent and the Reorganized Global Debtors are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs, and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

   (c)   <u>Bond</u>.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Global Debtors. Furthermore, any such Entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

   (d)   <u>Cooperation with Disbursing Agent</u>.  The Reorganized Global Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of Holders of Claims, in each case, that are entitled to receive distributions under this Plan, as set forth in the Global Debtors' or the applicable Reorganized Global Debtors' books and records. The Reorganized Global Debtors will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in <u>Section 7.15</u> of this Plan.

90

### 7.6.   *Delivery of Distribution.*

Subject to the provisions contained in this Article VII or the Litigation Trust Documents, as applicable, with respect to distributions required to be made to Holders of Allowed Claims by the Reorganized Global Debtors or Disbursing Agent under this Plan or the Litigation Trust Documents, the Disbursing Agent will, subject to Bankruptcy Rule 9010, make all distributions under this Plan or payments to any Holder of an Allowed Claim as and when required by this Plan at: (a) the address of such Holder on the books and records of the Global Debtors or their agents; or (b) the address in any written notice of address change delivered to the Global Debtors or the Disbursing Agent, including any addresses included on any Filed Proofs of Claim or transfers of Claim Filed with the Bankruptcy Court; provided, however, that notwithstanding the foregoing, all distributions on account of the Prepetition SGUS Notes Claims shall be made to, or in a manner reasonably acceptable to, the Prepetition SGUS Notes Trustee, as applicable, for distribution in accordance with this Plan. In the event that any distribution under this Plan to any such Holder is returned as undeliverable, no distribution or payment to such Holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter such distribution under this Plan shall be made to such Holder without interest; provided, however, that such distributions under this Plan or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from: (y) the Effective Date and (z) the date that such Holder's Claim is first Allowed. Notwithstanding the foregoing, any distributions to be made on account of (i) the DIP ABL Facility Claims shall be delivered to the DIP ABL Agent for the benefit of itself and the DIP ABL Lenders in accordance with the terms of the DIP ABL Credit Agreement, (ii) the Prepetition FILO Claims shall be delivered to the Prepetition FILO Agent for the benefit of itself and the Prepetition FILO Lenders in accordance with the terms of the Prepetition FILO Credit Agreement, (iii) the Prepetition NPC Claims shall be delivered to the Prepetition NPC Agent for the benefit of itself and the Prepetition NPC Lenders in accordance with the terms of the Prepetition NPC Credit Agreement, (iv) the DIP OpCo Claims shall be delivered to the DIP OpCo Agent for the benefit of itself and the DIP OpCo Lenders in accordance with the terms of the DIP OpCo Credit Agreement, and (v) the DIP Term Loan Claims in the form of Cash shall be delivered to the DIP Term Loan Agent for the benefit of itself and the DIP Term Loan Lenders in accordance with the terms of the DIP Term Loan Credit Agreement.

Notwithstanding anything to the contrary in this Plan, the Plan Supplement, or the Confirmation Order, all distributions to Holders of Prepetition NPC Claims and Prepetition SGUS Notes Claims shall be deemed completed when made to (or in a manner reasonably acceptable to) the Prepetition SGUS Notes Trustee, as applicable. The Prepetition SGUS Notes Trustee shall be deemed to be the single Holder of the Prepetition SGUS Notes Claims for purposes of distributions under this Plan. Subject to the Prepetition SGUS Notes Charging Lien, the Prepetition SGUS Notes Trustee may (at its election) transfer, direct, or facilitate the transfer of such distributions (and may rely upon information received from the Disbursing Agent for purposes of such transfer) through the facilities of DTC in accordance with DTC's customary practices; provided, however, that such distributions under this Plan will only be issued in accordance with DTC book-entry procedures. For the avoidance of doubt, DTC shall be considered a single Holder with respect to distributions made on account of the Prepetition SGUS Notes. The Prepetition SGUS Notes Trustee shall not incur any liability whatsoever on account of any distributions made under this Plan. If the Prepetition SGUS Notes Trustee is unable to make, or consents to the Disbursing Agent making,

such distributions through the facilities of DTC, the Disbursing Agent shall make such distributions (subject to the Prepetition SGUS Notes Charging Lien). Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, the Prepetition SGUS Notes Trustee shall not have any duties, obligations, responsibilities, or liability whatsoever with respect to making any distributions on account of the Prepetition SGUS Notes Claims of any property that is not DTC eligible, and such other Disbursing Agent shall make such distributions (subject to the Prepetition SGUS Notes Charging Lien).

### 7.7. *Unclaimed Property.*

Either (a) ninety (90) days from the later of (i) the Effective Date and (ii) the date that such Holder's Claim is first Allowed, or (b) as set forth in the Litigation Trust Documents with respect to distributions made by the Litigation Trust, as applicable, all unclaimed property, wherever located, or interests in property distributable hereunder on account of such Claim or otherwise in possession of a Global Debtor on the Effective Date shall revert to the applicable Reorganized Global Debtor or its successor or assign or the Litigation Trust, as applicable, and automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary), and any Claim or right of the Holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred. The Reorganized Global Debtors and the Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Global Debtors' books and records, and the Proofs of Claim Filed against the Global Debtors, as reflected on the Claims Register maintained by the Claims Agent. Further, for administrative convenience, any Holder of an Allowed Claim may affirmatively reject the receipt of any distribution, including the distribution of any New Saks Common Stock, after the Distribution Record Date and prior to the Effective Date.

### 7.8. *Satisfaction of Claims.*

Unless otherwise specifically provided herein, any distributions under this Plan and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

### 7.9. *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Reorganized Global Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Global Debtors or the applicable Reorganized Global Debtor, as the case may be.

### 7.10. *De Minimis Cash Distributions.*

None of the Reorganized Global Debtors or the Disbursing Agent shall have any obligation to make a distribution that is less than $500.00 in Cash.

92

**7.11.**   *Distributions on Account of Allowed Claims Only.*

Notwithstanding anything herein and in the Restructuring Support Agreement to the contrary, no distribution under this Plan shall be made on account of a Claim until such Claim becomes an Allowed Claim.

**7.12.**   *Fractional Shares.*

No fractional interests in New Saks Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution would otherwise result in the issuance of a number of interests that is not a whole number, the actual distribution of interests shall be rounded as follows:  (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number; and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized interests to be distributed shall be adjusted as necessary to account for the foregoing rounding. For distribution purposes (including rounding), DTC or ClearPar, as applicable, will be treated as a single Holder, if applicable.

**7.13.**   *No Distribution in Excess of Amount of Allowed Claims.*

Notwithstanding anything herein and in the Restructuring Support Agreement to the contrary, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution under this Plan of a value in excess of the Allowed amount of such Claim.

**7.14.**   *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)* on the Effective Date.

**7.15.**   *Withholding and Reporting Requirements.*

In connection with this Plan and all distributions under this Plan hereunder, the Reorganized Global Debtors, the Disbursing Agent, and any Claims Agent shall comply with all withholding and reporting requirements imposed by any U.S. federal, state, provincial, local, or foreign taxing authority, and all distributions under this Plan hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Global Debtors, the Disbursing Agent, and any Claims Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including requiring a Holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of this Plan:  (a) each Holder of an Allowed Claim that is to receive a distribution under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations on account of such distribution; and (b) no distributions under this Plan shall be required to be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Global Debtors, the Disbursing

93

Agent, or the Claims Agent, as applicable, for the payment and satisfaction of such tax obligations or has, to their satisfaction, established an exemption therefrom.

### 7.16.   *Claims Payable by Third Parties.*

To the extent that one or more of the Global Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  If an applicable insurance policy has a self-insured retention ("SIR") or a deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy, upon the Allowance of such Claim, shall have an Allowed General Unsecured Claim against the applicable Global Debtor's Estate up to the amount of the SIR or deductible amount that may be established upon the liquidation of the Claim, and such Holder's recovery from the Global Debtors or the Reorganized Global Debtors, as applicable, shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under this Plan.  Such SIR shall be considered satisfied pursuant to this Plan through allowance of the General Unsecured Claim solely up to the amount of the applicable SIR or deductible, if any; provided, however, that nothing herein obligates the Global Debtors, the Reorganized Global Debtors, or any of their successors or assigns to satisfy any SIR under any insurance policy, including any D&O Liability Insurance Policies.  For the avoidance of doubt, any SIR provisions shall remain in full force and effect.  Any recovery on account of the Claim in excess of the SIR or the deductible established upon the liquidation of the Claim shall be recovered solely from the Global Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof.  For the avoidance of doubt, nothing herein or in the Confirmation Order shall modify or impair any of the Global Debtors' insurers' rights to be reimbursed or paid in the ordinary course according to the terms of the applicable insurance policy, including, without limitation, with respect to any amounts owed to the Global Debtors' insurers under an applicable SIR.  Nothing in this Plan shall be construed to limit, extinguish, expand, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.  Nothing herein relieves any Entity from the requirement to timely File a Proof of Claim or Proof of Equity Interest by the applicable Bar Date.

### ARTICLE VIII.
### PROCEDURES FOR RESOLVING CLAIMS

### 8.1.   *Allowance of Claims*

On and after the Effective Date and subject to the terms of this Plan, each of the Reorganized Global Debtors and the Litigation Trustee, as applicable, shall have and retain any and all rights and defenses the applicable Global Debtor had with respect to any Claim or Equity Interest immediately prior to the Effective Date.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Equity Interest shall become an Allowed Claim or Allowed Equity Interest unless and until such Claim or Equity Interest (a) is deemed Allowed under this Plan or pursuant to the Bankruptcy Code or (b) the Bankruptcy Court has entered a Final Order, including the

Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases Allowing such Claim or Equity Interest.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim or Proof of Equity Interest is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Global Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

## 8.2.    *Claims Administration Responsibilities*

Except as otherwise specifically provided by this Plan or the Confirmation Order, as applicable, and other than with respect to Professional Fee Claims, after the Effective Date, the Reorganized Global Debtors and the Litigation Trustee, as applicable, shall have the authority to: (a) File and prosecute objections to Claims or Equity Interests; (b) settle, compromise, withdraw, litigate to judgment, or otherwise resolve any and all obligations to Claims or Equity Interests without any further notice to or action, order, or approval by the Bankruptcy Court; (c) settle or compromise any Disputed Claim or Equity Interest; and (d) direct the Claims Agent to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, after the Effective Date, the Reorganized Global Debtors and the Litigation Trustee, as applicable, shall have the right to object to Claims and Equity Interests and shall retain any and all rights and defenses that the Global Debtors had with respect to any Claim or Equity Interest immediately before the Effective Date.  A motion to extend the applicable Claims Objection Deadline shall automatically extend the deadline until the Bankruptcy Court enters an order on such motion.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the sole responsibility and authority with respect to reconciling and administering General Unsecured Claims.

## 8.3.    *Estimation of Claims*

Before the Effective Date the Global Debtors, and on or after the Effective Date the Reorganized Global Debtors or the Litigation Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Equity Interest, including during the litigation of any objection to any Claim or Equity Interest or during the appeal, if applicable, relating to such objection. Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Equity Interest, that estimated amount shall constitute a maximum limitation on such Claim or Equity Interest for all purposes under this Plan (including for purposes of distributions), and the relevant Global Debtor or Reorganized Global Debtor, or the Litigation Trust, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Equity Interest.

95

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen (14) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 8.4. *Disputed Claims Process.*

Until the Effective Date, the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders, shall have the authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed, and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. On and after the Effective Date, the Reorganized Global Debtors or the Litigation Trust, as applicable, shall have the authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed, and (ii) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.

**Except as otherwise provided herein, all Proofs of Claim that are not timely Filed by the applicable Bar Date or that have not otherwise been Allowed pursuant to this Plan or a Final Order shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Global Debtor, any Reorganized Global Debtor, or the Litigation Trust, as applicable, without the need for any objection by the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court; <u>provided</u> that the Litigation Trust shall provide Holders of any Claims for non-residential real property Unexpired Leases with twenty-one (21) days' prior written notice of the Holder's Claim being Disallowed pursuant to this <u>Section</u> <u>8.4</u> by Filing such notice and serving it on the applicable Holder at the address listed in the Holder's Proof of Claim and their counsel, if known. The Holder shall have twenty-one (21) days to object to such notice in writing by Filing such objection with the Court. In the event that the Holder Files an objection to the Disallowance of its Claim, the Holder and the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust, as applicable, shall work consensually to resolve the dispute. If such dispute cannot be resolved consensually, then either party may submit the dispute to the Bankruptcy Court for adjudication. If a Holder does not File an objection within twenty-one (21) days of receiving such notice, the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust, as applicable, shall be authorized to adjust, modify or expunge, as applicable, any such Claim pursuant to this <u>Section 8.4</u>.**

### 8.5. *Adjustment to Claims or Equity Interests without Objection.*

Any duplicate Claim or Equity Interest or any Claim or Equity Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to this Plan) on the Claims Register by the Reorganized Global Debtors, or the Litigation Trust, as applicable,

without such party having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Equity Interest and without any further notice to or action, order, or approval of the Bankruptcy Court; provided that the Litigation Trust shall provide Holders of any Claims for non-residential real property Unexpired Leases with twenty-one (21) days' prior written notice of the Holder's Claim being adjusted or expunged pursuant to this Section 8.5 by Filing such notice and serving on the applicable Holder at the address listed in the Holder's Proof of Claim and their counsel, if known.  The Holder shall have twenty-one (21) days to object to such notice in writing by Filing such objection with the Court.   In the event that the Holder Filed an objection to the adjustment or expungement of its Claim, the Holder and the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust, as applicable, shall work consensually to resolve the dispute.  If such dispute cannot be resolved consensually, then either party may submit the dispute to the Bankruptcy Court for adjudication.  If a Holder does not File an objection within twenty-one (21) days of receiving such notice, the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust, as applicable, shall be authorized to adjust, modify or expunge, as applicable, any such Claim pursuant to this Section 8.5.

### 8.6.   *No Distributions Pending Allowance.*

If an objection to a Claim is Filed as set forth in Section 8.4 of this Plan, or if any portion of a Claim other than a Professional Fee Claim is a Disputed Claim, then except as otherwise agreed by the Global Debtors, Reorganized Global Debtors, or Litigation Trust, as applicable (in consultation with the Required Consenting DIP Term Loan Lenders), no payment or distribution (partial or otherwise) provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 8.7.   *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Equity Interest ultimately becomes an Allowed Claim or Allowed Equity Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Equity Interest in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Disputed Equity Interest becomes a Final Order, the Reorganized Global Debtors or the Litigation Trust, as applicable, shall provide to the Holder of such Claim or Equity Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim or Equity Interest.

### 8.8.   *Claim for Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim, and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 9.1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

Except as otherwise provided herein, any Executory Contracts and Unexpired Leases (a) not previously assumed, (b) not previously rejected pursuant to a Final Order of the Bankruptcy Court, or (c) identified on the Assumed Contracts / Leases List will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order, except any Executory Contract or Unexpired Lease (i) that is identified on the Rejected Contracts / Leases List, (ii) that is the subject of (A) a separate motion or notice to reject, assume, or assume and assign or a Cure Dispute that is pending as of the Confirmation Date or (B) an order of the Bankruptcy Court that is not yet a Final Order, or (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions or rejections of the Global Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such other date as may be identified on the Rejected Contracts / Leases List or other motion or notice to reject by prior written agreement (email being sufficient) of the affected counterparty to such Executory Contract or Unexpired Lease.

Each Executory Contract and Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Global Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by a Final Order of the Bankruptcy Court. To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, increases, accelerates or otherwise alters any obligations, rights or liabilities of the Global Debtors or the Reorganized Global Debtors thereunder as a result of, gives rise to any rights or benefits to any non-Global Debtor party to any such Executory Contract or Unexpired Lease, or creates any Lien on any asset or property, as applicable, of the Global Debtors or the Reorganized Global Debtors as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of this Plan or any other Restructuring Transaction (including any change of control, sale of business, assignment, vesting, termination, acceleration, or similar provisions therein), then such provision shall be deemed unenforceable and modified (solely for purposes of the transactions contemplated under this Plan) such that the transactions contemplated by this Plan or any other Restructuring Transaction shall not entitle the non-Global Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Global Debtors or the Reorganized Global Debtors thereunder, to be entitled to any rights or benefits thereunder, or create or impose a Lien on any asset or property of the Global Debtors or the Reorganized Global Debtors.

98

Notwithstanding anything to the contrary herein, nothing shall impair or prejudice the rights of any counterparty to an Unexpired Lease assumed or assumed and assigned pursuant to this Plan with respect to any Global Debtor's (solely with respect to Unexpired Leases assumed by a Global Debtor) or assignee's obligation (as applicable) to (A) indemnify and hold harmless such counterparty with respect to events that occurred prior to the date such Unexpired Lease was assumed or assumed and assigned, solely to the extent required under the terms of the applicable Unexpired Lease, or (B) pay accrued-but-unbilled amounts or year-end reconciliations and adjustments under the terms of such Unexpired Lease, including, but not limited to, common area maintenance charges, taxes, year-end adjustments, indemnity obligations, and repair and maintenance obligations, regardless of whether such obligations arose before or after the Effective Date, on the date upon which such obligations become due and in accordance with the terms of the applicable Unexpired Lease.  Further, notwithstanding anything to the contrary herein, nothing shall impair or prejudice the rights of any counterparty to an Unexpired Lease with respect to any available insurance coverage for third-party claims asserted in connection with the use by the Global Debtors of any leased premises, including with respect to events that occurred prior to the date of any assumption, assumption and assignment, or rejection.

Notwithstanding anything to the contrary herein (other than Section 9.8 of this Plan) and in the Restructuring Support Agreement, except as otherwise agreed to by the Global Debtors and any applicable counterparty to an Unexpired Lease (with consent from the Required Consenting DIP Term Loan Lenders), the Global Debtors or Reorganized Global Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts / Leases List or the Assumed Contracts / Leases List in their discretion: (a) with respect to any Executory Contract, at any time prior to the Effective Date; and (b) with respect to any Unexpired Lease, at any time prior to the Confirmation Date (or, in either case, such later date as may be agreed in writing (email being sufficient) with a counterparty).  Notwithstanding the foregoing, if the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is materially greater than the amount set forth in the Assumed Contracts / Leases List, then the Global Debtors or Reorganized Global Debtors, as applicable, shall have seven (7) days in which to confirm their renewed intent to assume the applicable Executory Contract or Unexpired Lease and pay such Allowed Cure Cost; otherwise, such Executory Contract or Unexpired Lease shall be deemed rejected as of the date, which may be after the Effective Date, that is the later of (i) the date an Order is entered resolving such Cure Dispute, and (ii) solely with respect to an Unexpired Lease, the date on which the Global Debtors or Reorganized Global Debtors, as applicable, relinquish control of the relevant premises and notify the affected landlord and such landlord's counsel (if any) in writing (e-mail being sufficient) of the surrender of the premises and, as applicable, (a) turn over keys, key codes, and/or security codes, if any, to the affected landlord or (b) if such keys, key codes and/or security codes, if any, are not available or providing same would be impractical, notify such affected landlord and such landlord's counsel, if any, in writing (e-mail being sufficient) that the keys, key codes, and security codes, if any, are not available or that providing same would be impractical, but that the landlord may rekey the leased premises.

For the avoidance of doubt, the inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Global Debtor that such contract or lease is an Executory Contract or Unexpired Lease, or that any Global Debtor has liability thereunder.

### 9.2. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Costs that differ from the amounts paid or proposed to be paid by the Global Debtors or the Reorganized Global Debtors on the Assumed Contracts / Leases List to a counterparty must be Filed, served, and actually received by the Global Debtors on or before fourteen (14) days after such notice (such deadline, the "Assumption Objection Deadline" and, together with any outstanding objections to the amount proposed on the Assumed Contracts / Leases List, a "Cure Dispute").  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Global Debtor, or Reorganized Global Debtor without the need for any objection by the Global Debtors or the Reorganized Global Debtors or any other party in interest, or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure Costs shall be deemed fully satisfied, released, and discharged upon payment by the Global Debtors or the Reorganized Global Debtors of the applicable Cure Costs; provided, however, that nothing herein shall prevent (if applicable) the Reorganized Global Debtors from paying any Cure Costs despite the failure of the relevant counterparty to File such request for payment of such Cure Costs. The Reorganized Global Debtors also may settle any Cure Costs without any further notice to or action, order, or approval of the Bankruptcy Court.  In the event that a non-Global Debtor contract counterparty Files a timely Cure Dispute and the Global Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard on at least seven (7) days' notice to the applicable non-Global Debtor contract counterparty, or such date as the parties agree, subject to the Bankruptcy Court's calendar.  Any objection by a counterparty to an Executory Contract or Unexpired Lease, as applicable, to (a) the ability of the applicable Global Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned, or (b) any other matter pertaining to the proposed assumption or proposed assumption and assignment must be Filed, served, and actually received by the Global Debtors by the later of (i) the date on which objections to Confirmation of this Plan are due, and (ii) the Assumption Objection Deadline.  The Reorganized Global Debtors may settle any Cure Dispute without any further notice to or action, order, or approval of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment, as applicable.

Except to the extent that less favorable treatment has been agreed to by the non-Global Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to this Plan, the Global Debtors shall pay any Cure Costs, if monetary, in full in Cash either (i) on the Effective Date or as soon as reasonably practicable thereafter, or (ii) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (x) the Effective Date, or as soon as reasonably practicable thereafter, and (y) seven (7) days after the date on which such Cure Dispute has been resolved.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to this Plan and payment or performance of the applicable Cure Costs shall result in the full release and satisfaction of any Claims and defaults, whether monetary or non-monetary,

100

including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid pursuant to this Section 9.2, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court; provided that the Litigation Trust shall provide Holders of any Claims for non-residential real property Unexpired Leases with twenty-one (21) days' prior written notice of the Holder's Claim being Disallowed or expunged pursuant to this Section 9.2 by Filing such notice and serving it on the applicable Holder at the address listed in the Holder's Proof of Claim and their counsel, if known; provided, however, that nothing herein shall affect the allowance of any Claims or any Cure Costs agreed to by the Global Debtors in any written agreement amending or modifying any Executory Contract or Unexpired Lease prior to the assumption of such Executory Contract or Unexpired Lease pursuant to this Plan or otherwise. The Holder shall have twenty-one (21) days to object to such notice in writing by Filing an objection with the Bankruptcy Court. If the Holder Files an objection, within twenty-one (21) days of receiving such notice, then the Holder and the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust, as applicable, shall work consensually to resolve the dispute. If such dispute cannot be resolved consensually, then either party may submit the dispute to the Bankruptcy Court for adjudication. If the Holder does not File an objection within twenty-one (21) days of receiving such notice, then the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust, as applicable, shall be authorized to disallow or expunge, as applicable, any such Claim pursuant to this Section 9.2. Notwithstanding anything to the contrary herein, the rights of any party to an assumed Executory Contract or Unexpired Lease to seek payment of any Cure Costs for a default under such Executory Contract or Unexpired Lease arising after the Assumption Objection Deadline and before the effective date of assumption may be pursued at any time within fourteen (14) calendar days after the effective date of assumption.**

To the extent applicable, rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Global Debtors or the Reorganized Global Debtors, as applicable, under such Executory Contracts or Unexpired Leases and the Global Debtors are entitled to all the rights provided under section 365 of the Bankruptcy Code.

### 9.3.    *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases under this Plan must be Filed with the Claims Agent within thirty (30) days after the later of (a) the effectiveness of the rejection of the applicable Executory Contract or Unexpired Lease, or (b) entry of an order approving the rejection of the applicable Executory Contract or Unexpired Lease. **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely Filed shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Global Debtors, the Reorganized Global Debtors, the Estates, or their respective property without the need for any objection by the Global Debtors or the**

**Reorganized Global Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court; provided that the Litigation Trust shall provide Holders of any Claims for non-residential real property Unexpired Leases with twenty-one (21) days' prior written notice of the Holder's Claim being Disallowed or expunged pursuant to this Section 9.3 by Filing such notice and serving it on the applicable Holder at the address listed in the Holder's Proof of Claim and their counsel, if known.** The Holder shall have twenty-one (21) days to object to such notice in writing by Filing an objection with the Bankruptcy Court. If the Holder Files an objection, within twenty-one (21) days of receiving such notice, then the Holder and the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust, as applicable, shall work consensually to resolve the dispute. If such dispute cannot be resolved consensually, then either party may submit the dispute to the Bankruptcy Court for adjudication. If the Holder does not File an objection within twenty-one (21) days of receiving such notice, then the Global Debtors, the Reorganized Global Debtors, or the Litigation Trust, as applicable, shall be authorized to disallow, as applicable, any such Claim pursuant to this Section 9.3. All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article V of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, respectively.

### 9.4.    *Contracts and Leases Entered into After the Petition Date.*

The Global Debtors or Reorganized Global Debtors will perform under any contracts and leases entered into after the Petition Date by any Global Debtor, including any Executory Contracts and Unexpired Leases assumed by any Global Debtor, and will be liable thereunder in the ordinary course of business.

### 9.5.    *Modifications, Amendments, Supplements, or Other Agreements.*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Global Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 9.6.   *Non-Occurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 9.7.   *Reservation of Rights.*

Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts / Leases List or the Assumed Contracts / Leases List, as applicable, nor anything contained in this Plan, nor the Global Debtors' delivery of a notice of the proposed assumption and proposed Cure Cost to any contract and lease counterparties set forth in the Assumed Contracts / Leases List shall constitute an admission by the Global Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Global Debtor has any liability thereunder.  Unless otherwise agreed between the Global Debtors (with the consent of the Required Consenting DIP Term Loan Lenders) or Reorganized Global Debtors, as applicable, and the contract or lease counterparty, if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Global Debtors or Reorganized Global Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Global Debtor's or Reorganized Global Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Global Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article XII.  If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts / Leases List, the Global Debtors shall have the right to reject such Executory Contract or Unexpired Lease, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

### 9.8.   *Employee Compensation and Benefits.*

The Global Debtors or Reorganized Global Debtors, as applicable, shall, subject to the provisions of this Section 9.8 and pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, include all qualified pension plans and collective bargaining agreements on the Assumed Contracts / Leases List.  Subject to the provisions of the Plan, all compensation and benefits agreements, plans, programs, and arrangements shall be treated as Executory Contracts. Except to the extent provided by Article XI of this Plan, nothing in this Plan shall limit, diminish, or otherwise alter the Global Debtors' or the Reorganized Global Debtors' defenses, claims, Causes of Action, or other rights, including the right to amend, modify or terminate, with respect to any such employment agreement, benefits agreement, plan, program or arrangement included on the Assumed Contracts / Leases List.  Except for the employment agreements assumed by the Global Debtors pursuant to an order entered by the Court on April 10, 2026 [Docket No. 1870], all employment agreements, offer letters and other individual agreements memorializing any terms and/or conditions of an employee's employment between or among any of the Global Debtors and any and all employees are deemed rejected as of the Effective Date.  The Rejected SERPs, the Rejected Severance Arrangements, all equity or equity-based (including phantom equity or any partnership interests issued subject to service based vesting requirements) compensation or

103

benefits agreements, plans, programs, and arrangements, any cash-based long-term or short-term incentive awards, cash retention awards, commission arrangements, other bonus arrangements, and any individual or broad-based severance benefit plan or program not otherwise captured in the Rejected Severance Arrangements shall be deemed rejected on the Effective Date. Notwithstanding anything contained in this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, the employment agreements and/or separation agreements between the Global Debtors and any Person that is not a Released Party (including, but not limited to, the Certain Former Directors & Officers), shall be deemed rejected, and not be in effect on the Effective Date, regardless of whether such employment agreement and/or separation agreement is listed on the Assumed Contracts / Leases List.

On the Effective Date, the Reorganized Global Debtors shall assume and continue to maintain the PBGC-Insured Pension Plans as and to the extent required by their terms (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Global Debtors reserve all of their rights thereunder).

As of the Effective Date, the obligations under the PBGC-Insured Pension Plans will continue in accordance with, and subject to, their terms and applicable non-bankruptcy law (and the Reorganized Global Debtors reserve all of their rights thereunder), and as a consequence, the Reorganized Global Debtors shall (i) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 for the PBGC-Insured Pension Plans, (ii) pay any required PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307 for the PBGC-Insured Pension Plans, and (iii) administer the PBGC-Insured Pension Plans in accordance with the applicable provisions of ERISA and the Internal Revenue Code, and the Reorganized Global Debtors reserve all of their rights thereunder.

Since the Plan provides that the Reorganized Global Debtors will continue the PBGC-Insured Pension Plans, the PBGC and the Reorganized Global Debtors agree that all proofs of claim filed by PBGC shall be deemed to be withdrawn as of the Effective Date, without the need for any objection by the Reorganized Global Debtors or the Litigation Trustee or any further notice to or action, order, or approval of the Bankruptcy Court and shall be expunged from the Claims Register.

With respect to the PBGC-Insured Pension Plans, nothing in the chapter 11 case, the Disclosure Statement, the Plan, the Confirmation Order, or any other document filed in the Chapter 11 case shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the PBGC-Insured Pension Plans for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the PBGC-Insured Pension Plans, subject to any and all applicable rights and defenses of such parties, which are expressly preserved. PBGC and the PBGC-Insured Pension Plans shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document filed in the Chapter 11 case. For the avoidance of doubt, the Global Debtors shall not be released from any liability or obligation under ERISA, the Internal Revenue Code, or any other applicable law relating to or arising from the PBGC-Insured Pension Plans. The terms of the Plan with respect to the PBGC-Insured Pension Plans shall be reasonably acceptable to the PBGC and the Required Consenting DIP Term Loan Lenders.

104

Confirmation of this Plan, the consummation of any of the Restructuring Transactions, or any assumption or assumption and assignment of compensation and benefits agreements, plans, programs, or other arrangements pursuant to the terms herein shall not be deemed to trigger any applicable change of control, sale of business, assignment, vesting, termination, acceleration, or similar provisions in any compensation and benefits agreements, plans, programs, or arrangements. No counterparty shall have rights under any compensation or benefits agreement, plan, program, or arrangement assumed or assumed and assigned pursuant to this Plan other than those applicable immediately prior to such assumption or assumption and assignment.

The New Board shall be authorized to adopt and implement the Management Incentive Plan on the terms set forth in the Plan Supplement.

After the Effective Date, in accordance with the terms of the Post-Emergence Incentive Plan and in consultation with the New Board, the Reorganized Global Debtors may pay the Post-Emergence Bonuses.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

**10.1.** *Conditions Precedent to Confirmation.*

Confirmation of this Plan is subject to the satisfaction or waiver of the following conditions:

(a)     the DIP Orders shall be in full force and effect;

(b)     the Global Debtors shall have paid in full in Cash (or the Global Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Fees and Expenses incurred or estimated to be incurred, through the proposed Confirmation Date in accordance with the DIP Orders;

(c)     the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with this Plan;

(d)     entry of the Confirmation Order; and

(e)     each of the Restructuring Support Agreement, the DIP Facilities, and the DIP Orders, shall not have been terminated in accordance with their respective terms, and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting DIP Term Loan Lenders or the DIP ABL Agent (as applicable) to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facilities), or the DIP Facilities in accordance with their respective terms upon the expiration of such time.

105

**10.2.** *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date is subject to the satisfaction or waiver of the following conditions:

(a)     the Confirmation Order (which shall include final approval of the Disclosure Statement) having become a Final Order in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, unless otherwise agreed by the Global Debtors, the Required Consenting DIP Term Loan Lenders, and the DIP ABL Agent;

(b)     the DIP Orders having become Final Orders in the Chapter 11 Cases, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, unless otherwise agreed by the Global Debtors, the Required Consenting DIP Term Loan Lenders, and the DIP ABL Agent;

(c)     no court of competent jurisdiction or other competent governmental or regulatory authority having issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the consummation of this Plan;

(d)     each of the applicable Plan Documents having been executed, delivered, acknowledged, and/or Filed, as applicable, by the Entities and Persons intended to be parties thereto and effectuated and remain in full force and effect, and any conditions precedent and consent rights held by the Creditors' Committee, the Required Consenting DIP Term Loan Lenders, and the DIP ABL Agent related thereto or contained therein having been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Plan Documents;

(e)     any non-technical and/or material amendments, modifications or supplements to this Plan having been acceptable to the Global Debtors, the Creditors' Committee (solely to the extent that any such alteration, amendment, or modification impacts the terms, provisions, consent and/or approval rights of the Creditors' Committee and other matters related thereto set forth in the Committee Settlement Term Sheet), and the Required Consenting DIP Term Loan Lenders except as otherwise provided in Section 13.3 of this Plan;

(f)     each of the offers, issuances, sales, and/or deliveries of New Saks Common Stock, Preferred Equity Facilities, and Preferred Equity Units, in connection with the Restructuring Transactions shall be exempt from the registration and prospectus delivery requirements of the Securities Act, no proceeding by any Governmental Unit or other Entity or Person that alleges that any such offer, issuance, sale, and/or delivery is not exempt from the registration and prospectus delivery requirements of the Securities Act shall be pending on the Effective Date, and no such proceeding shall be threatened in writing or instituted by any Governmental Unit on or prior to the Effective Date;

(g)     each of the Restructuring Support Agreement, the DIP Facilities, and the DIP Orders, having not been terminated in accordance with their respective terms, and there having not occurred and been continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting DIP Term Loan Lenders or the DIP ABL Agent (as

106

applicable) to terminate the Restructuring Support Agreement, the DIP Orders (including, for the avoidance of doubt, the occurrence of any "Event of Default" under the DIP Facilities), or the DIP Facilities in accordance with their respective terms upon the expiration of such time;

(h)      the Required Consenting DIP Term Loan Lenders have provided written consent to effectuate the DIP Conversion in accordance with the terms of the DIP Documents; provided that for the avoidance of doubt, a vote in favor of this Plan by each Holder of DIP Term Loan Claims shall not constitute a vote or consent in favor of the DIP Conversion, which must be obtained in accordance with the terms of the applicable DIP Documents;

(i)      all of the actions set forth in the Restructuring Steps Plan, as applicable, having been completed and implemented;

(j)      there not having been instituted or threatened to be instituted any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) by any Governmental Unit (i) making illegal, enjoining, or otherwise prohibiting the consummation of the Restructuring Transactions contemplated herein, in the Restructuring Support Agreement, and in the Plan Documents or (ii) imposing a material award, claim, injunction, fine, or penalty that, in each case, both (x) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (y) has a material adverse effect on the financial condition or operations of the Reorganized Global Debtors, taken as whole;

(k)      the Global Debtors having obtained all authorizations, consents, and regulatory approvals, if any, required to be obtained, and having filed all notices and reports, if any, required to be filed, including with any Governmental Unit, by the Global Debtors in connection with this Plan's effectiveness, in each case, as may be required by a Governmental Unit;

(l)      the New Saks Common Stock and Preferred Equity Units, to be issued and/or delivered on the Effective Date having been validly issued by New Saks, having been fully paid and non-assessable, and being free and clear of all taxes, Liens, and other encumbrances, pre-emptive rights, rights of first refusal, subscription rights, and similar rights, except for any restrictions on transfer as may be imposed by (i) applicable securities Laws and (ii) the New Organizational Documents;

(m)      all conditions precedent to the effectiveness of the Exit ABL Facility having been satisfied or duly waived by the party whose consent is required thereunder, and the Exit ABL Facility shall be in full force and effect;

(n)      all conditions precedent to the effectiveness of the New Exit Facilities, as memorialized in the New Exit Facilities Documents, have been satisfied or duly waived by the party whose consent is required thereunder, and the New Exit Facilities Documents shall be in full force and effect;

(o)      all requisite filings with any Governmental Unit and third parties having become effective, and all such Governmental Unit and third parties having approved or consented to the Restructuring Transactions, to the extent required;

(p)　　any and all requisite regulatory approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions having been obtained;

(q)　　the Flagship CMBS Settlement shall have been consummated;

(r)　　all accrued and unpaid Restructuring Fees and Expenses, the reasonable and documented fees, expenses, and disbursements of the DIP Agents, the Prepetition ABL Agent, the Prepetition Trustees and Agents Fees and Expenses, and the reasonable and documented fees and expenses of the Prepetition Initial Notes Trustee (including any predecessors thereto) having been paid in full in Cash by the Global Debtors, consistent with the terms of this Plan and the Restructuring Support Agreement;

(s)　　any and all outstanding Prepetition ABL Secured Obligations (as defined in the Final DIP Order) shall have been Paid in Full (as defined in the DIP Orders);

(t)　　the following documents being in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions, and not having been, as applicable, stayed, modified, reversed, vacated, subject to any pending appeal, and/or terminated prior to the Effective Date: (i) the New Organizational Documents; (ii) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (iii) all other documents necessary to consummate a transaction of the type contemplated by this Plan to the extent not otherwise listed above; and

(u)　　the Litigation Trust shall have been formed, and the Litigation Trust Assets shall have been transferred to and vested in the Litigation Trust.

For the avoidance of doubt, the conditions precedent to the Effective Date enumerated above shall apply to each Global Debtor on an individual basis (and may be satisfied and/or waived on an individual basis), and the Effective Date for any individual Global Debtor may occur prior to the Effective Date of any other individual Global Debtor.

### 10.3.　*Satisfaction and Waiver of Conditions Precedent.*

Except as otherwise provided herein, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Any of the conditions set forth in Section 10.1 and Section 10.2 of this Plan may be waived in whole or part by the Global Debtors with consent from the Required Consenting DIP Term Loan Lenders, and as the case may be, without notice, leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan; provided that any waiver with respect to the condition set forth in Section 10.2(r) or 10.2(t) of this Plan shall require the consent of the Creditors' Committee; provided, further, that any waiver with respect to the condition set forth in Section 10.2(e) shall require the consent of the Creditors' Committee, solely to the extent such waiver impacts the terms, provisions, consent and/or approval rights of the Creditors' Committee and other matters related thereto as set forth in the Committee Settlement Term Sheet; provided, further, that any condition to effectiveness with respect to the DIP Conversion with respect to (a) the First Out DIP Term Loan Facility Claims shall require the consent of First Out DIP Term Loan Lenders holding at

least 80% of the aggregate outstanding principal amount of First Out DIP Term Loan Facility Claims (exclusive of any fees, premiums, interest, or First Out DIP PIK Loans) that are held by all First Out DIP Term Loan Lenders, and (b) the Second Out DIP Term Loan Facility Claims and Third Out DIP Term Loan Facility Claims shall require the consent of DIP Term Loan Lenders holding at least two-thirds in aggregate outstanding principal amount of DIP Term Loan Claims that are held by all DIP Term Loan Lenders, in each case, in accordance with section 10.08(2)(i) of the DIP Term Loan Credit Agreement; provided further, that no waiver of any condition set forth in Section 10.1 or Section 10.2 of this Plan that relates to or would affect the rights, obligations, or treatment of the DIP ABL Agent or the DIP ABL Lenders (including, without limitation, with respect to the DIP ABL Facility Claims, the DIP ABL Documents, the DIP Orders, the Exit ABL Facility, and the Restructuring Fees and Expenses) shall be effective without the prior written consent of the DIP ABL Agent. The failure to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time. Notwithstanding any other provision of this Plan, the Global Debtors shall consult with the Creditors' Committee regarding any modification of the Plan or Plan Supplement that materially affects the treatment of General Unsecured Claims or any other rights of Holders of General Unsecured Claims.

### 10.4.  *Effect of Failure of Conditions.*

If all of the conditions to effectiveness have not been satisfied (as provided in Section 10.1 and Section 10.2 hereof) or duly waived (as provided in Section 10.3 hereof) and the Effective Date has not occurred on or before the first Business Day that is more than thirty (30) days after the Confirmation Date, or by such later date as set forth by the Global Debtors in a notice Filed with the Bankruptcy Court prior to the expiration of such period, then the Global Debtors, with the consent of the Required Consenting DIP Term Loan Lenders and, subject to the terms of the Committee Settlement Term Sheet, the Creditors' Committee, may File a motion to vacate the Confirmation Order. Notwithstanding the Filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 10.1 and Section 10.2 hereof are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to this Section 10.4, this Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under this Plan shall be made, the Global Debtors and all Holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in the Global Debtors; (b) prejudice in any manner the rights of the Global Debtors, any Holders of Claims or Equity Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by any Global Debtor or any other Person with respect to any matter set forth in this Plan.

### 10.5.  *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Equity Interest in, the Global Debtors and inure

to the benefit of and be binding on such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan.

### 10.6.  *Substantial Consummation.*

Substantial consummation of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### ARTICLE XI.
### RELEASE, INJUNCTION, AND RELATED PROVISIONS

### 11.1.  *Discharge of Claims and Termination of Certain Equity Interests; Compromise and Settlement of Claims, Certain Equity Interests, and Controversies.*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan or in any contract, instrument, or other agreement or document created pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims (other than any Existing Intercompany Equity Interests that are Reinstated hereunder) of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Global Debtors, the Reorganized Global Debtors, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim or Proof of Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim is Allowed; or (c) the Holder of such Claim or Equity Interest has accepted this Plan.  Except as otherwise provided herein (and unless a Court of competent jurisdiction otherwise determines that a default is incurable), any default by the Global Debtors with respect to any Claim that existed immediately prior to or on account of the Filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests (other than any Existing Intercompany Equity Interests that are Reinstated hereunder) subject to the Effective Date occurring, except as otherwise expressly provided in this Plan.  For the avoidance of doubt, nothing in this Section 11.1 shall affect the rights of Holders of Claims to seek to enforce this Plan, including the distributions to which Holders of Allowed Claims are entitled under this Plan.

In consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest, or any distribution to be made on account of such Allowed Claim or Allowed Equity Interest, as applicable.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's

approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Global Debtors, their Estates, and Holders of Claims and Equity Interests, and is fair, equitable, and reasonable.  In accordance with the provisions of this Plan (and subject to Section 6.8(b) of this Plan), pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Global Debtors may compromise and settle any Claims that are not Litigation Trust Retained Causes of Action against the Global Debtors and their Estates, as well as claims and Causes of Action that are not Litigation Trust Retained Causes of Action against other Entities.

### 11.2.    *Releases by the Global Debtors.*

**Notwithstanding anything else contained herein to the contrary, but subject to the second paragraph of this Section 11.2, to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally, and forever released and discharged by each and all of the Global Debtors and their Estates, including any successors to the Global Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of the Global Debtors and their Estates and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons or Entities (the "Global Debtor Release"), from any and all Claims and Causes of Action, including any derivative Claims asserted or assertable on behalf of the Global Debtors, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, other than the Retained Causes of Action, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Global Debtors, including, without limitation:  (a) the Chapter 11 Cases, the Special Restructuring Committee Independent Investigation, the Disclosure Statement, this Plan, or the Definitive Documents; (b) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (c) the business or contractual arrangements between any Global Debtor and any Released Parties; (d) the negotiation, formulation, or preparation of this Plan, the Disclosure Statement, the Plan Supplement, any materials prepared in connection with the Special Restructuring Committee Independent Investigation, the Definitive Documents, the DIP Documents (including with respect to the DIP Loans), the Exit ABL Facility Documents, the New Exit Facilities Documents, the Committee Settlement, or any agreements, instruments or other documents related to any of the foregoing or the Chapter 11 Cases; (e) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (f) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Global Debtors or the Reorganized Global Debtors; and/or (g) the Confirmation or**

111

consummation of this Plan or the solicitation of votes on this Plan, in each case, that such Global Debtor would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Person or Entity would have been legally entitled to assert for, or on behalf or in the name of, any Global Debtor, its respective Estate or any Reorganized Global Debtor (whether directly or derivatively) against any of the Released Parties.

Notwithstanding anything contained herein to the contrary, including any other provision of this Plan that purports to release any Person or Entity, the Plan (and the Global Debtor Release contained therein) shall not operate to waive or release: (a) any post-Effective Date obligations of any Person or Entity under this Plan, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Effective Date (including, for the avoidance of doubt, those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement this Plan as set forth herein, including the Exit ABL Facility Documents, the New Exit Facilities Documents, (b) the rights of Holders of Allowed Claims or Interests to receive distributions under this Plan, (c) any Claims or Causes of Action against any Party that is not a Released Party, including Causes of Action included on the Schedule of Retained Causes of Action, (d) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party, as determined by a Final Order of a court of competent jurisdiction; (e) the rights of any Global Debtor to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; and/or (f) any Litigation Trust Retained Cause of Action that could be asserted against any Global Debtor or its Estate; provided that notwithstanding anything to the contrary herein, the Litigation Trust shall not seek any affirmative recovery from any Reorganized Global Debtor. For the avoidance of doubt and notwithstanding anything to the contrary herein, including any other provision of this Plan that purports to release any Person or Entity, any Claims or Causes of Action (i) against the Excluded Parties, or (ii) relating to willful misconduct, actual fraud, or gross negligence, in each case, shall not be released and such claims shall be deemed Litigation Trust Retained Causes of Action that shall vest in, are preserved for, and may be pursued by the Litigation Trust.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Global Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Global Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (b) a good faith settlement and compromise of the Claims released by the Global Debtor Release; (c) in the best interests of the Global Debtors and all Holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Global Debtors, the Reorganized Global Debtors, or the Global Debtors' Estates asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Global Debtor Release. Entry of the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims,

obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Global Debtor Release.

Without limiting the generality of the foregoing, but subject to the second paragraph of this Section 11.2, each Global Debtor expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE GLOBAL DEBTOR OR RELEASED PARTY.

Each of the Releasing Parties expressly acknowledges that the releases and covenants not to sue contained in this Plan are effective regardless of whether those released matters or released claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.

## 11.3.   *Third-Party Release.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, pursuant to Bankruptcy Rule 9019 and to the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Global Debtor Release provided by the Global Debtors above, each Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Releasing Party, including any Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Releasing Parties) and their respective assets and properties (the "Third-Party Release") from any and all claims, interests, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in Law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common Laws, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction,

113

or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Global Debtors, including, without limitation:  (a) the Global Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Special Restructuring Committee Independent Investigation, the Disclosure Statement, this Plan, or the Definitive Documents; (b) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan; (c) the business or contractual arrangements between any Global Debtor and any Released Parties; (d) the negotiation, formulation, or preparation of this Plan, the Disclosure Statement, the Plan Supplement, any materials prepared in connection with the Special Restructuring Committee Independent Investigation, the Definitive Documents, the DIP Documents (including with respect to the DIP Loans), the Exit ABL Facility Documents, the New Exit Facilities Documents, the Committee Settlement, or any agreements, instruments or other documents related to any of the foregoing; (e) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (f) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Global Debtors or the Reorganized Global Debtors, as applicable; and/or (g) the Confirmation or consummation of this Plan or the solicitation of votes on this Plan that such Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties.

Notwithstanding anything contained herein to the contrary, including any other provision of this Plan that purports to release any Person or Entity, the foregoing provisions of this Third-Party Release shall not operate to waive or release:  (a) any post-Effective Date obligations of any Party or Entity under this Plan, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Effective Date (including, for the avoidance of doubt, those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement this Plan as set forth herein, including the Exit ABL Facility Documents, the New Exit Facilities Documents; (b) the rights of Holders of Allowed Claims or Interests to receive distributions under this Plan; (c) any Claims or Causes of Action against any Party that is not a Released Party, including Causes of Action included on the Schedule of Retained Causes of Action; (d) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party, as determined by a Final Order of a court of competent jurisdiction; (e) the rights of such Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; and/or (f) any Litigation Trust Retained Cause of Action that could be asserted against any Global Debtor or its Estate; provided that notwithstanding anything to the contrary herein, the Litigation Trust shall not seek any affirmative recovery from any Reorganized Global Debtor.  For the avoidance of doubt and notwithstanding anything to the contrary herein, including any other provision of this Plan that purports to release any Person or Entity, any Claims or Causes of Action (i) against the Excluded Parties, and (ii) relating to willful misconduct, actual fraud, or gross negligence, in each case, shall not be released and such claims shall be deemed Litigation Trust Retained Causes of Action that shall vest in, are preserved for, and may be pursued by the Litigation Trust.

114

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of this Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Global Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.  Entry of the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release**.

**Without limiting the generality of the foregoing, but subject to the second paragraph of this Section 11.3, each Releasing Party expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides**:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE GLOBAL DEBTOR OR RELEASED PARTY**.

**Each of the Releasing Parties expressly acknowledges that the releases and covenants not to sue contained in this Plan are effective regardless of whether those released matters or released claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.**

**11.4.   *Exculpation.***

**Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Global Debtor Release or the Third-Party Release, and except as otherwise specifically provided in this Plan, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to:   the administration of the**

115

Chapter 11 Cases, commencement of the Chapter 11 Cases, the Special Restructuring Committee Independent Investigation, pursuit of confirmation and consummation of this Plan, making distributions under this Plan, the Disclosure Statement, or the solicitation of votes for, or Confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Global Debtors; or the transactions or documentation in furtherance of any of the foregoing; the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, this Plan, the Plan Supplement, any materials prepared in connection with the Special Restructuring Committee Independent Investigation, the DIP Documents (including with respect to the DIP Loans), the Exit ABL Facility Documents, the New Exit Facilities Documents, the Committee Settlement, or any agreements, instruments or other documents related to any of the foregoing; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Global Debtors, the approval of the Disclosure Statement or Confirmation or consummation of this Plan; **provided, however**, that the foregoing provisions of this Exculpation shall not operate to waive or release:  (a) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party, as determined by a Final Order of a court of competent jurisdiction; and/or (b) the rights of any Person or Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; **provided, further**, that each Exculpated Party shall be entitled to rely upon the advice of counsel, to the extent otherwise permitted under applicable non-bankruptcy Law, concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions, or inactions.  The foregoing Exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this **Article XI** shall or shall be deemed to prohibit the Global Debtors or the Reorganized Global Debtors, as applicable, from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Global Debtors or the Reorganized Global Debtors, in each case unless otherwise expressly provided for in this Plan.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

### 11.5.   *Discharge of Claims and Termination of Equity Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise provided for herein, effective as of the Effective Date, with respect to the Reorganized Global Debtors:  (a) the rights afforded in this Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Global Debtors or any of their assets, property or Estates; (b) this Plan shall bind all Holders of Claims and Equity

Interests, notwithstanding whether any such Holders failed to vote to accept or reject this Plan or voted to reject this Plan; (c) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and the Global Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Persons and Entities shall be precluded from asserting against the Global Debtors, the Global Debtors' Estates, the Reorganized Global Debtors, their successors and assigns and their assets and properties any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

**11.6.** *Injunction.*

Except as otherwise provided herein or for obligations issued pursuant hereto, all Persons or Entities that have held, hold, or may hold, as applicable, Causes of Action, Claims, or Equity Interests that have been released, discharged, or are subject to Exculpation pursuant to Article XI, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties or the property or Estates of the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of the Global Debtors, the Reorganized Global Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Causes of Action, Claims, or Equity Interests, as applicable, unless such Holder has provided notice thereof in writing by the Effective Date to the Global Debtors or the Reorganized Global Debtors, as applicable; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Cause of Action, Claim, or Equity Interest released, exculpated, or settled pursuant to this Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Exculpated Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to the release and exculpation provisions of Article XI of this Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim or Cause of Action of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Global Debtor, Reorganized

117

**Global Debtor, or Exculpated Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable, and, only to the extent legally permissible and as provided for in <u>Article XII</u> of this Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.**

### 11.7.   *Setoffs and Recoupment.*

Except as otherwise provided herein or in the Plan Supplement, each Reorganized Global Debtor and the Litigation Trust, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that the applicable Global Debtors, Reorganized Global Debtors, or Litigation Trust, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); provided that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Global Debtors, of any such claims, rights, and Causes of Action. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Global Debtors or the Reorganized Global Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Global Debtors or the Reorganized Global Debtors, as applicable, notwithstanding any indication in any Proof of Claim or Proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment. Nothing in the Plan, the Confirmation Order, or the Plan Supplement, shall be deemed to affect, diminish, or impair any party's legal and equitable defenses and rights to setoffs and/or recoupment, and all such rights are expressly preserved.

Notwithstanding anything to the contrary herein, nothing in this Plan or the Confirmation Order shall modify the rights of the Global Debtors, the Reorganized Global Debtors, the Litigation Trustee, or any current or former counterparty to an Unexpired Lease or Executory Contract with the Global Debtors, as applicable, to assert any right of setoff or recoupment, if any, that such party may have under applicable bankruptcy Law or non-bankruptcy Law, including, but not limited to, the ability to (a) setoff or recoup a security deposit, if any, held pursuant to the terms of an Unexpired Lease or Executory Contract, as applicable, (b) assert rights of setoff or recoupment, if any, in connection with reconciliation of Claims, or (c) assert rights of setoff or recoupment, if any, as a defense to any claim (including any Claim) or Cause of Action held by or against the Global Debtors or the Reorganized Global Debtors, or any of its or their successors, as applicable.

### 11.8.   *Waiver of Statutory Limitations on Releases.*

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in

determining to enter into the releases contained in this Plan the possible existence of such unknown losses or Claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known may have materially affected its settlement with the Released Party. The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

### 11.9.   *Protection Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the Constitution of the United States, all Entities, including Governmental Units, shall not discriminate against the Reorganized Global Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against the Reorganized Global Debtors, or another Entity with whom the Reorganized Global Debtors have been associated, solely because each Global Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases, but before the Global Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 11.10.  *Release of Liens.*

Except as otherwise provided in the Confirmation Order, herein or in any contract, instrument, release, or other agreement or document amended or created pursuant to this Plan, including the Exit ABL Facility Documents, the New Exit Facilities Documents, and except for Other Secured Claims that the Global Debtors elect to Reinstate in accordance with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Global Debtors and its successors and assigns. Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the applicable Reorganized Global Debtor, to release any Collateral or other property of any Global Debtors (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Global Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or

after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Global Debtors, the Reorganized Global Debtors, or any administrative agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Reorganized Global Debtors shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

All documents necessary to terminate, satisfy, or release any Liens and/or security interests securing the obligations of the Global Debtors or Reorganized Global Debtors, as applicable, under the Prepetition SGUS Notes, Prepetition NPC Loan Documents, Prepetition OpCo Notes, or Prepetition Initial Notes, as applicable, shall be in form, substance, and content reasonably acceptable to the Prepetition Trustees and Agents, as applicable (and without representation, warranty or recourse against the applicable Prepetition Trustees and Agents).

## ARTICLE XII.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     To hear and determine any matters related to:  (i) applications for the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which a Global Debtor is party or with respect to which a Global Debtor may be liable and any Claims and Cure Disputes resulting therefrom; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Global Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article IX hereof, the Assumed Contracts / Leases List or the Rejected Contracts / Leases List; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(b)     To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending or commenced on the Effective Date;

(c)     To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     To ensure that distributions under this Plan to Holders of Allowed Claims are accomplished as provided herein, including resolving any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions;

(e)     To adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

(f)      To consider Claims or the Allowance, Disallowance, Classification, priority, compromise, estimation, secured or unsecured status, or payment of any Claim, including any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Equity Interests, as applicable;

(g)      To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(h)      To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(i)      To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(j)      To hear and determine all Professional Fee Claims;

(k)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing; provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(l)      To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of this Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan or Confirmation Order or to maintain the integrity of this Plan following consummation;

(m)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      To hear and determine all disputes involving the existence, nature, scope, or enforcement of the discharge, exculpations, releases, and injunction provisions contained in Article XI of this Plan;

(o)      To enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(p)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

121

(q)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(r)    To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Conditional Disclosure Statement Approval Hearing, the Combined Hearing, the Administrative Bar Date, or the deadline for responding or objecting to a Cure Cost, for the purpose of determining whether a Claim or Equity Interest is discharged hereunder, or for any other purpose;

(s)    To enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed reversed, revoked, or vacated;

(t)    To adjudicate any and all disputes arising from or relating to distributions under or pursuant to this Plan;

(u)    To recover all assets of the Global Debtors and property of the Estates, wherever located; and

(v)    To enter a final decree closing each of the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of this Article XII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### 13.1.   *Dissolution of Creditors' Committee.*

The Creditors' Committee shall be automatically dissolved on the later of (i) the Effective Date or (ii) the effective date of any chapter 11 plan for the SO5 Digital Debtors, and all members, employees, Professional Persons retained by the Creditors' Committee, or agents thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases under the Bankruptcy Code; provided that if the Effective Date occurs prior to the effective date of the chapter 11 plan for the SO5 Digital Debtors, the Global Debtors shall have no obligation to pay the expenses of the Creditors' Committee (including for employees, Professional Persons, and agents thereof) incurred after the Effective Date and such expenses shall be paid by the SO5 Digital Debtors; provided, further, that the Creditors' Committee shall continue to exist, and its Professional Persons shall continue to be retained after the Effective Date and have standing and a right to be heard for the following limited purposes: (a) requests for payment of Professional Fee Claims, and (b) any appeals of the Confirmation Order or other appeal or pending litigation to which the Creditors' Committee is a party. From and after the Effective Date, the Reorganized Global Debtors shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Creditors' Committee's professionals, solely to the extent arising out of or related to the foregoing, without further order of the Bankruptcy Court.

122

**13.2.** *Termination of Professional Persons.*

On the Effective Date, the engagement of each Professional Person retained by the Global Debtors and the Creditors' Committee (subject to Section 13.1) shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Professional Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Professional Fee Claims, and the Reorganized Global Debtors shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Professional Fee Claims. Nothing herein shall preclude any Reorganized Global Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

**13.3.** *Modifications and Amendments.*

This Plan may be amended, modified, or supplemented by the Global Debtors, with the express written consent of the Required Consenting DIP Term Loan Lenders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by Law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; provided that in addition to the foregoing, the express written consent of the Creditors' Committee shall be required for any amendment or modification of terms expressly included in the Committee Settlement Term Sheet; provided further, that the express written consent of the DIP ABL Agent shall be required for any amendment or modification of this Plan that relates to or would affect the rights, obligations, or treatment of the DIP ABL Agent or the DIP ABL Lenders (including, without limitation, with respect to the DIP ABL Facility Claims, the DIP ABL Documents, the DIP Orders, the Exit ABL Facility, and the Restructuring Fees and Expenses). In addition, after the Confirmation Date, so long as such action does not adversely affect the treatment of Holders of Allowed Claims and Allowed Equity Interests pursuant to this Plan, the Global Debtors, with the express written consent of the Required Consenting DIP Term Loan Lenders, may make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents, and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented. The Global Debtors, with the express written consent of the Required Consenting DIP Term Loan Lenders, may make technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications are immaterial or do not adversely affect the treatment of Holders of Claims or Equity Interests under this Plan. Subject to the restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Global Debtors expressly reserves its respective rights to alter, amend, or modify this Plan with respect to such Global Debtor one or more times, in each instance with the express written consent of the Required Consenting DIP Term Loan Lenders, and, solely to the extent that any such alteration, amendment, or modification impacts the rights of Holders of Unsecured Claims under the Plan, the Creditors' Committee, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or to remedy any defect or omission, or

123

reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan. Notwithstanding the foregoing, none of the provisions herein regarding payment of the Prepetition Trustees and Agents Fees and Expenses shall be modified or amended without Citibank's prior written consent. Notwithstanding anything to the contrary herein, no amendment, modification, supplement, or waiver of Section 10.2(h) of this Plan or its incorporation into Section 5.3(b) of this Plan shall be effective without the prior written consent of the Required Consenting DIP Term Loan Lenders, which for the avoidance of doubt, shall require (a) with respect to the First Out DIP Term Loan Facility Claims, consent of the First Out DIP Term Loan Lenders holding at least 80% of the aggregate outstanding principal amount of First Out DIP Term Loan Facility Claims (exclusive of any fees, premiums, interest, or First Out DIP PIK Loans) that are held by all First Out DIP Term Loan Lenders, and (b) with respect to the Second Out DIP Term Loan Facility Claims and Third Out DIP Term Loan Facility Claims, consent of the DIP Term Loan Lenders holding at least two-thirds in aggregate outstanding principal amount of DIP Term Loan Claims that are held by all DIP Term Loan Lenders, in each case, in accordance with section 10.08(2)(i) of the DIP Term Loan Credit Agreement.

### 13.4.   *Payment of Prepetition Trustees and Agents Fees and Expenses*

Notwithstanding anything in this Plan, Plan Supplement, or Confirmation Order to the contrary, on the Effective Date, the Global Debtors or the Reorganized Global Debtors, as applicable, shall indefeasibly pay in full in Cash any outstanding Prepetition Trustees and Agents Fees and Expenses (including attorneys' fees and expenses) incurred, or reasonably estimated to be incurred, up to and including the Effective Date; provided, however, that the Prepetition Trustees and Agents Fees and Expenses to be paid as a condition to the Effective Date shall be estimated prior to the Effective Date, and such estimates shall be delivered (in the form of a summary invoice and without the need for itemized time detail) to the Global Debtors and the Ad Hoc Group Advisors at least three (3) Business Days before the anticipated Effective Date (or, if the Global Debtors have not provided Citibank and its counsel with at least three (3) Business Days' notice of the anticipated Effective Date, as soon as reasonably practicable after the Global Debtors provide such notice); provided, further, that the Global Debtors shall use reasonable efforts to provide Citibank and its counsel with at least five (5) Business Days' prior notice (or otherwise provide notice as soon as reasonably practicable) of the anticipated Effective Date. For the avoidance of doubt, the Prepetition Trustees and Agents Fees and Expenses shall be paid by the Global Debtors or Reorganized Global Debtors, as applicable, without any requirement for the filing of retention applications, fee applications, proofs of claim, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court approval. In addition, the Global Debtors or Reorganized Global Debtors, as applicable, shall continue to pay the Prepetition Trustees and Agents Fees and Expenses as soon as reasonably practicable (but in any case within ten (10) days following presentation of a summary invoice generally describing the services rendered without itemized time detail) to the Global Debtors or the Reorganized Global Debtors, as applicable, related to implementation, consummation, and defense of this Plan, the Plan Supplement, or the Confirmation Order, or any agreement, instrument, or other document related thereto, including, without limitation, making, directing, or facilitating distributions pursuant to and in accordance therewith, whether incurred before, on, or after the Effective Date. Citibank shall not be required to share any of the Prepetition Trustees and Agents Fees and Expenses.

124

Notwithstanding anything to the contrary, the Global Debtors or the Reorganized Global Debtors, as applicable, shall indefeasibly pay in full in Cash any outstanding fees and expenses (including attorneys' fees and expenses) of the Prepetition Trustees and Agents incurred, or reasonably estimated to be incurred, up to and including the Effective Date.

### 13.5.   *Revocation or Withdrawal of this Plan.*

Each of the Global Debtors expressly reserves its respective rights to revoke or withdraw this Plan as to any particular Global Debtors, one or more times, prior to the Effective Date and to File subsequent chapter 11 plans.   If the Global Debtors revoke or withdraw this Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Global Debtors, or if Confirmation or consummation as to any or all of the Global Debtors does not occur, then, with respect to such Global Debtors:  (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Global Debtors or any other Person, (ii) prejudice in any manner the rights of such Global Debtors or any other Person, or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Global Debtors or any other Person; and (d) all procedural and substantive rights of any of the Global Debtors or any other Person shall be preserved, including with respect to (i) all litigation rights, (ii) any plan-related issues (including with respect to an appropriate schedule for any alternative plan confirmation), and (iii) any of the factual, valuation, or other assertions set forth in the Disclosure Statement.

### 13.6.   *Allocation of Distributions under this Plan Between Principal and Interest.*

Except as otherwise provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under this Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), the aggregate consideration paid to Holders with respect to their Allowed Claims shall be allocated first to the principal amount of such Allowed Claims (as determined for federal and applicable state and local income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

### 13.7.   *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Global Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration,

or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing is:  (a) valid and enforceable pursuant to its terms; (b) integral to this Plan and may not be deleted or modified without the consent of the Global Debtors, the Required Consenting DIP Term Loan Lenders, and the DIP ABL Agent; and (c) non-severable and mutually dependent.

### 13.8.   *Governing Law.*

Except to the extent that the Bankruptcy Code or other U.S. federal Law is applicable, or to the extent a Plan Document or exhibit or schedule to this Plan provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the Laws of the State of New York, without giving effect to the principles of conflict of Laws thereof to the extent such principles would result in the application of the Laws of any other jurisdiction.

### 13.9.   *Section 1125(e) of the Bankruptcy Code.*

The Global Debtors have, and upon Confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the Bankruptcy Code, and the Global Debtors, and the Consenting DIP Term Loan Lenders (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, solicitation, and/or purchase of the securities offered and sold under this Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

### 13.10.  *Inconsistency.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order); provided that in the event of an inconsistency between the Committee Settlement Term Sheet and the other documents in the Plan Supplement, the terms of such other documents in the Plan Supplement shall control.  In the event of an inconsistency between the Confirmation Order and this Plan or the Disclosure Statement, the Confirmation Order shall control.

### 13.11.  *Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Subject to the requirements of the Restructuring Steps Plan, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

**13.12.  *Reference to Monetary Figures.***

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

**13.13.  *Exhibits.***

All exhibits to this Plan (including, without limitation, all documents Filed with the Plan Supplement and all exhibits and ancillary agreements thereto) are incorporated and are a part of this Plan as if set forth in full herein.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

**13.14.  *Reservation of Rights.***

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of this Plan, any statement or provision contained herein, or the taking of any action by the Global Debtors with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Global Debtors with respect to any Claims or Equity Interests prior to the Effective Date.

**13.15.  *Successors and Assigns.***

The rights, benefits, and obligations of any Entity or Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity or Person, as applicable.

**13.16.  *Notices.***

All notices, demands, or requests in connection with this Plan shall be in writing (including by facsimile or electronic mail transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or electronic mail transmission, when received and telephonically confirmed, addressed as follows:

      (a)     if to the Global Debtors:

Saks Global Enterprises LLC
225 Liberty Street, 31st Floor
New York, New York 10281
Attention:  Andrew Woodworth, Chief Legal Officer; Mark Weinsten, Chief Restructuring Officer

with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue

New York, New York 10019
Attention: Debra M. Sinclair; Robin Spigel; Allyson B. Smith; Betsy L. Feldman;
Jessica D. Graber
Email address: dsinclair@willkie.com; rspigel@willkie.com;
absmith@willkie.com; bfeldman@willkie.com; jgraber@willkie.com

(b)      if to a Consenting DIP Term Loan Lender:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Andrew N. Rosenberg; Robert A. Britton; Christopher Hopkins;
Jessica Choi; Martin J. Salvucci
Email address: arosenberg@paulweiss.com; rbritton@paulweiss.com;
chopkins@paulweiss.com; jchoi@paulweiss.com; msalvucci@paulweiss.com

(c)      if to the Creditors' Committee:

Morrison Foerster LLP
250 West 55th Street
New York, NY 10019
Attention: Lorenzo Marinuzzi; Doug Mannal; Benjamin Butterfield; Raff
Ferraioli
Email address: lmarinuzzi@mofo.com; dmannal@mofo.com;
bbutterfield@mofo.com; rferraioli@mofo.com

After the Effective Date, the Reorganized Global Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Global Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

### 13.17. *Filing of Additional Documents.*

Subject to the terms and conditions of the Restructuring Support Agreement and this Plan, on or before substantial consummation of this Plan, the Global Debtors shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Global Debtors, the Reorganized Global Debtors, the Litigation Trustee, and, as applicable, all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

The Claims Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

128

**13.18.** *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Global Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases, as determined by the Reorganized Global Debtor with consent from the Required Consenting DIP Term Loan Lenders and the Creditors' Committee or the Litigation Trustee, as applicable, and all contested matters relating to each of the Global Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case; provided that in the event the Required Consenting DIP Term Loan Lenders consent to such closing of the Chapter 11 Cases and the Creditors' Committee or the Litigation Trust do not, all U.S. Trustee Fees in the Chapter 11 Cases accruing thereafter shall be paid by the Litigation Trust and constitute Litigation Trust Fees and Expenses.

**13.19.** *Tax Matters.*

The Global Debtors will cooperate with any advisors selected by the Required Consenting DIP Term Loan Lenders in respect of all tax structuring matters. The Reorganized Global Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Global Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

[*Remainder of Page Intentionally Left Blank*]

129

Dated:   June 5, 2026
         Houston, Texas

Respectfully submitted,

**SAKS GLOBAL ENTERPRISES LLC** on behalf
of itself and its affiliated Global Debtors


By:      */s/ Mark Weinsten*
Name:    Mark Weinsten
Title:   Chief Restructuring Officer